UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JAMES OWENS, *et al.,* | ( | |
| | ( | |
| Plaintiffs, | ( | |
| | ( | |
| vs. | ( | Civil Action No. 01-2244 (JDB) |
| | ( | |
| REPUBLIC OF THE SUDAN, | ( | |
| c/o Ministry of Foreign Affairs | ( | |
| Nile Avenue | ( | |
| Khartoum, Sudan | ( | |
| MINISTRY OF INTERIOR | ( | |
| OF THE REPUBLIC OF SUDAN | ( | |
| University Avenue | ( | |
| Khartoum, Sudan | ( | |
| *et al.,* | ( | |
| | ( | |
| Defendants. | ( | |

## MOTION TO DISMISS

Pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*, the Republic of the Sudan and the Interior Ministry of the Republic of the Sudan (collectively "Sudan") file this Motion to Dismiss plaintiffs' Second Amended Complaint with prejudice.

Sudan respectfully submits that it is immune from these proceedings under the FSIA, and on that basis Sudan moves for dismissal with prejudice pursuant to Fed. R. Civ. P. 12(b)(1).

Subject to and without waiving the foregoing, Sudan further submits that the Second Amended Complaint fails to state a claim upon which relief can be granted, and on that basis Sudan moves for dismissal with prejudice pursuant to Fed. R. Civ. P. 12(b)(6).

Subject to and without waiving the foregoing, Sudan further submits that this Court may not render judgment on the matters here at issue under the Act of State doctrine, and on that basis

1

Sudan moves for dismissal of these proceedings with prejudice pursuant to Fed. R. Civ. P. 12(b)(6).

Subject to and without waiving the foregoing, Sudan further submits that this Court may not render judgment on the matters here at issue under the Political Question doctrine, and on that basis Sudan moves for dismissal with prejudice pursuant to Fed. R. Civ. P. 12(b)(6).

Finally, subject to and without waiving the foregoing, Sudan further submits that the Second Amended Complaint should be dismissed for failure to join a party under Fed. R. Civ. P. 19, and on that basis Sudan moves for dismissal with prejudice pursuant to Fed. R. Civ. P. 12(b)(7).

The bases for this Motion are set forth in the brief in support filed herewith and attached evidentiary materials, all of which are incorporated as if fully stated herein.

Accordingly, the Republic of the Sudan and the Interior Ministry of the Republic of the Sudan move for an Order dismissing these proceedings with prejudice as to them and vacating any and all previously entered orders of default against them.[1]

---

[1] Sudan is mindful of Local Rule 7(g), which provides that a request to vacate entry of default shall be accompanied by a verified answer. But Local Rule 1.1(a) provides that the local rules shall be construed in harmony with the Federal Rules of Civil Procedure, and Fed. R. Civ. P. 12(b) allows a defendant to file a Rule 12 motion in lieu of an answer. Indeed, Rule 12(b) provides that certain Rule 12 motions, including those made here, must be made before pleading. Moreover, the sovereign immunity principles here at issue are aimed not merely at protecting a foreign sovereign from liability but rather from having to participate in the litigation process at all, including *inter alia* preparation and filing of a response on the merits to plaintiffs' claims. *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990). For these reasons, Sudan respectfully submits that a verified answer is not required under the present circumstances. Sudan would also point out that the record does not reflect entry of a default order by the Clerk against the Ministry of Interior.

Respectfully submitted,

John F. Dienelt /on our

John F. Dienelt
D.C. Bar No. 110742
Don C. Lewis
Bar No. 403434
Martin T. Lutz
Bar No. 427634
PIPER RUDNICK LLP
1200 Nineteenth Street NW
Washington, DC  20036-2412
(202) 861-3900

March 10, 2004

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JAMES OWENS, *et al.*, | ( | |
| | ( | |
| Plaintiffs, | ( | |
| | ( | |
| vs. | ( | Civil Action No. 01-2244 (JDB) |
| | ( | |
| REPUBLIC OF THE SUDAN | ( | |
| c/o Ministry of Foreign Affairs | ( | |
| Nile Avenue | ( | |
| Khartoum, Sudan | ( | |
| MINISTRY OF INTERIOR | ( | |
| OF THE REPUBLIC OF THE SUDAN | ( | |
| University Avenue | ( | |
| Khartoum, Sudan | ( | |
| *et al.*, | ( | |
| | ( | |
| Defendants. | ( | |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SUDAN
DEFENDANTS' MOTION TO DISMISS

Attorneys for Defendants

John F. Dienelt
Bar No. 110742

Don C. Lewis
Bar No. 403434

Martin T. Lutz
Bar No. 427634

PIPER RUDNICK LLP
1200 Nineteenth Street NW
Washington, DC  20036-2412
(202) 861-3900

March 10, 2004

## TABLE OF CONTENTS

I.    THE EFFECT OF CICIPPIO-PULEO ON THIS COURT'S JURISDICTION................. 1

II.   SUDAN IS IMMUNE UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT. .... 2

    A.    As a factual matter, Sudan may not be deprived of immunity under 28 U.S.C.
       1605(a)(7) because the evidence shows that it did not engage in any of the
       acts listed therein. ................................................................................................ 3

    B.    As a matter of law, the 28 U.S.C. 1605(a)(7) exception may not be applied to
       deprive Sudan of its sovereign immunity in this case. ........................................... 3

    1.    The Complaint does not contain allegations sufficient to bring this case
       within the § 1605(a)(7) exception. .......................................................................... 4

          a.    The § 1605(a)(7) exception does not apply here because the act of
              which Sudan is accused allegedly occurred within Sudan's borders
              and plaintiffs have not given Sudan an opportunity to arbitrate. ................ 4

          b.    Sudan may not be deprived of immunity under 28 U.S.C. 1605(a)(7)
              because plaintiffs do not allege that the alleged "provision of material
              support or resources" was done by a Sudanese official, employee, or
              agent acting within the scope of his office, employment, or agency. ......... 5

          c.    Sudan may not be deprived of immunity under 28 U.S.C. 1605(a)(7)
              because plaintiffs do not allege facts indicating that Sudan knew or
              intended that its alleged provision of support would assist the
              embassy bombings. ................................................................................. 6

    2.    Even if plaintiffs had pled allegations sufficient to invoke the § 1605(a)(7)
       exception, Sudan still would retain its immunity because that exception is
       unconstitutional as applied to the facts of this case. ............................................. 7

          a.    28 U.S.C. 1605(a)(7) represents an unconstitutional delegation of
              power to the Executive because it purports to allow the Executive to
              determine the jurisdiction of U.S. courts. ...................................................... 7

          b.    28 U.S.C. 1605(a)(7) is unconstitutional because it violates the equal
              protection clause. ................................................................................... 9

          c.    28 U.S.C. 1605(a)(7) is unconstitutional because it incorporates a
              definition of "material support or resources" that is impermissibly
              vague. ...................................................................................................... 10

    3.    Sudan may not be deprived of immunity under 28 U.S.C. 1605(a)(7) because
       Sudan was not properly designated as a state sponsor of terrorism under the
       requisite statutes when the acts here at issue occurred. .......................................... 11

4.      Section 1605(a)(7) does not create an exception to foreign sovereign immunity for actions based on common law. ...................................... 13

III.    THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED. ............................. 17

A.      All of the claims in the Complaint that are expressly based on the Flatow Amendment should be dismissed. ......................................................... 17

B.      The claims that are not expressly based on the Flatow Amendment should also be dismissed. ............................................................................... 17

1.      Common law does not provide a basis for plaintiffs' claims. .............................. 18

2.      State common law is preempted in this area. ....................................................... 22

3.      Domestic common law does not govern the conduct of foreign persons on foreign soil............................................................................................................ 25

C.      Plaintiffs have not properly pled any cause of action. ......................................... 26

1.      The Complaint should be dismissed because it only pleads conclusions. ............ 27

2.      The Complaint should be dismissed for failure to plead causation...................... 30

3.      Plaintiffs have not sufficiently pled a common law claim for assault and battery in any event. ............................................................................................ 31

D.      Plaintiffs' claim for punitive damages should be dismissed. ................................ 31

IV.     THIS CASE SHOULD BE DISMISSED PURSUANT TO THE ACT OF STATE DOCTRINE.................................................................................................... 31

A.      Rendering a judgment here would require the court to rule on the validity of official acts of Sudan performed within its territory. ........................................... 32

B.      There are no well developed international legal standards for the court to apply in this case. ................................................................................................ 34

C.      This case involves sensitive issues that the Act of State doctrine requires to be left to the political branches of the U.S. government. ....................................... 36

V.      THIS CASE SHOULD BE DISMISSED PURSUANT TO THE POLITICAL QUESTION DOCTRINE.................................................................................... 39

VI.     THE COMPLAINT SHOULD BE DISMISSED UNDER RULE 19. ............................ 41

VII.    CONCLUSION. ............................................................................................................ 44

Pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C 1602 *et seq.* ("FSIA"), defendants The Republic of the Sudan and Interior Ministry of the Republic of the Sudan (collectively "Sudan") submit this brief in support of their Motion to Dismiss. Defendants here assert their immunity under the FSIA,[1] as well as their entitlement to dismissal on various other grounds as explained herein.   Sudan also responds here to the inquiry posed by the court's Order dated February 5, 2004.

I.   THE EFFECT OF CICIPPIO-PULEO ON THIS COURT'S JURISDICTION.

The court has requested briefing on the jurisdictional effect of *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 2004 U.S. App. Lexis 644 (D.C. Cir. 2004), wherein the appellate court held that neither 28 U.S.C. 1605(a)(7) nor the Flatow Amendment, 28 U.S.C. 1605 note, provides a cause of action for use against a foreign state.   In summary, Sudan submits that the effect of *Cicippio-Puleo* on this court's jurisdiction is two-fold.   First, the decision eliminates subject-matter jurisdiction because the immunity exception invoked by plaintiffs, 28 U.S.C. 1605(a)(7), applies only to causes of action specifically authorized by Congress, *i.e.* statutory claims.   The only statutory claims asserted by plaintiffs were based on the Flatow Amendment, and the appellate court has clarified that such claims may only be asserted against individual government officials. Plaintiffs' remaining claims are purportedly based on common law, and as such these are claims to which the § 1605(a)(7) exception does not apply.   Therefore, this court lacks subject-matter jurisdiction. *See* Section II.B.4 *infra*.

Second, *Cicippio-Puleo* leaves plaintiffs with no cause of action.   There is no claim under common law for the acts alleged here.   In this regard, the effect of *Cicippio-Puleo* is to render

---

[1]   Both the Republic of the Sudan and its Interior Ministry are treated as a "foreign state" for purposes of entitlement to FSIA immunity.   See 28 U.S.C. 1603(a); *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234-35 (D.C. Cir. 2003).

meaningless any subject-matter jurisdiction that the court may be thought to possess, for without a viable claim there is no case. *See* Section III.B *infra*.

In Section II *infra*, Sudan argues that this court lacks jurisdiction because Sudan is entitled to immunity, as no exception is available to plaintiffs under the FSIA. In Section III, Sudan argues that, even if this court does have jurisdiction in this case, plaintiffs have no cause of action against Sudan, and have not properly pled a claim even if one were to exist. In Sections IV, V and VI, Sudan argues that the Act of State Doctrine, the Political Question Doctrine, and Rule 19 each provides an additional ground for dismissal.

## II.   SUDAN IS IMMUNE UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT.

Sudan is immune from these proceedings under the FSIA. *See* 28 U.S.C. 1604. The doctrine of foreign sovereign immunity, as embodied in the FSIA, is not merely a matter of defense to the imposition of liability. It is more fundamental: it is the embodiment of the traditional principle that no sovereign need answer to another, and thus, by denying the court subject matter jurisdiction, it protects the sovereign against having to participate in U.S. legal proceedings at all.[2]   Foreign nations are presumed to be immune from U.S. court proceedings, and any exception to this immunity must be clearly established.[3]

As discussed below, Sudan retains its FSIA immunity in this case both as a matter of fact and as a matter of law.

---

[2]   *Kelly v. Syria Shell Petroleum Development B.V.*, 213 F.3d 841, 847 (5th Cir. 2000); *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000); *In re Papandreou*, 139 F.3d 247, 251 (D.C. Cir. 1998).

[3]   28 U.S.C. 1604; *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 87 (D.C. Cir. 2002). Exceptions to sovereign immunity are narrowly construed and granted only when it is clear that an exception is warranted. *Haven v. Polska*, 215 F.3d 727, 731 (7th Cir. 2000); *Gibbons v. Republic of Ireland*, 532 F. Supp. 668, 671 (D.D.C. 1982). "The FSIA seeks to avoid affronting other governments by making it hard for private litigants to haul them into court.... Wrongs committed by foreign nations are presumed to raise questions of foreign policy rather than law ...." *Patrickson v. Dole Food Co.*, 251 F.3d 795, 806 (9th Cir. 2001), *aff'd in part, cert. dismissed in part*, 123 S. Ct. 1655 (2003).

A.  As a factual matter, Sudan may not be deprived of immunity under 28 U.S.C. 1605(a)(7) because the evidence shows that it did not engage in any of the acts listed therein.

Plaintiffs seek to deprive Sudan of its immunity by invoking 28 U.S.C. 1605(a)(7), which creates an exception to foreign sovereign immunity in cases involving, *inter alia*, provision of material support or resources for "extrajudicial killing." Sudan is submitting proof that the § 1605(a)(7) exception does not apply here for the fundamental reason that Sudan did not engage in any of the acts listed in § 1605(a)(7). Sudan's evidence shows (1) that the allegations contained in the Complaint are false, and (2) that Sudan repeatedly attempted to engage the United States in order to *assist* it in counter-terrorism activities.[4]

This evidence establishes a *prima facie* case of entitlement to immunity under § 1605(a)(7). Plaintiffs must come forward with proof sufficient to rebut Sudan's *prima facie* showing of absence of jurisdiction.[5] Presumably, plaintiffs are already in possession of what they deem to be such proof, given their pre-filing Rule 11 obligations. If the proof in plaintiffs' hands is not sufficient to overcome Sudan's establishment of entitlement to immunity, then this case should be dismissed.[6]

B.  As a matter of law, the 28 U.S.C. 1605(a)(7) exception may not be applied to deprive Sudan of its sovereign immunity in this case.

Separate and apart from the jurisdictional fact dispute addressed above, Sudan retains its FSIA immunity as a matter of law. This is so for the following reasons: (1) even assuming that the

---

[4]  *See generally* Declaration of Ambassador Timothy Michael Carney ("Carney Dec."); Declaration of John E. Cloonan ("Cloonan Dec."). The Complaint itself suggests Sudan's lack of involvement in the bombings. At ¶ 9 it is alleged that Iran, "[a]cting upon its knowledge of the attacks about to be carried out by those with whom it had conspired ... withdrew its diplomatic personnel from both Dar Es Salaam and Nairobi on August 6, 1998." No such allegation is made against Sudan, and in fact Sudan did not do so because, as the evidence submitted herewith shows, Sudan had no involvement with or foreknowledge of the attacks.

[5]  *Phoenix Consulting*, 216 F.3d at 40; *see also Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 708 n.9 (9th Cir. 1992); *Forsythe v. Saudi Arabian Airlines Corp.*, 885 F.2d 285, 289 n.6 (5th Cir. 1989).

[6]  A recent decision appeared to suggest that a jurisdictional fact dispute must await trial on the merits. *Kilburn v. Republic of Iran*, 277 F. Supp. 2d 24, 28 n.2 (D.D.C. 2003). Sudan submits that such a course would be contrary to the admonitions of the Supreme Court and the D.C. Circuit in cases such as *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493-94 (1983) and *Foremost-McKesson v. Islamic Republic of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990),

allegations in plaintiffs' Second Amended Complaint ("Complaint") were true, which they are not, they still would not be sufficient to bring this case within the § 1605(a)(7) exception; (2) the § 1605(a)(7) exception is unconstitutional as applied to this case;   (3) Sudan was not properly designated as a state sponsor of terrorism under the requisite specific statutes when the acts here at issue occurred, and (4) the § 1605(a)(7) exception does not apply to claims based on common law.

> 1.   **The Complaint does not contain allegations sufficient to bring this case within the § 1605(a)(7) exception.**
>
> > a.   The § 1605(a)(7) exception does not apply here because the act of which Sudan is accused allegedly occurred within Sudan's borders and plaintiffs have not given Sudan an opportunity to arbitrate.

The § 1605(a)(7) exception does not apply if (1) "the act occurred in the foreign state against which the claim has been brought" and (2) "the claimant has not afforded the foreign state a reasonable opportunity to arbitrate the claim...." 28 U.S.C. 1605(a)(7)(B)(i).  Plaintiffs have not alleged that they gave Sudan a chance to arbitrate these claims.  Thus the only question is whether the act of which Sudan is charged occurred in Sudan.  The Complaint makes clear that this issue must be resolved in the affirmative. To be sure, plaintiffs allege that individual agents of al Qaeda and Hezbollah committed acts of extrajudicial killing in Tanzania and Kenya.  But the act of which *Sudan* is accused is the act of provision of aid and comfort—*within Sudan*—to operatives while they happened to live within its borders.[7]  Because (1) the act alleged against Sudan occurred in Sudan, and (2) plaintiffs have not offered Sudan a chance to arbitrate these claims, the § 1605(a)(7) exception does not apply, and Sudan's immunity remains intact.[8]

---

which stress that a foreign sovereign's claim to immunity and any fact issues related thereto must be decided at the threshold of the case, before the sovereign is put through the litigation process, rather than at trial.

[7]   *Cf. Sami v. United States*, 617 F.2d 755, 761-62 (D.C. Cir. 1979) (in Federal Tort Claims Act case for false arrest, where officials in the United States had requested police in Germany to arrest plaintiff, the actionable conduct was deemed to have occurred in the United States, not Germany).

[8]   The FSIA's special immunity protections for sovereign acts committed wholly with the foreign sovereign's jurisdiction are consistent with the principles underlying the FSIA and the case law.  The most fundamental principle that applies here is the extreme reluctance on the part of Congress and the courts to interfere with, let alone sit in

> b.  Sudan may not be deprived of immunity under 28 U.S.C. 1605(a)(7) because plaintiffs do not allege that the alleged "provision of material support or resources" was done by a Sudanese official, employee, or agent acting within the scope of his office, employment, or agency.

For an exception to sovereign immunity to arise under § 1605(a)(7), the alleged conduct at issue—here, the provision of support or resources for extrajudicial killing—must have been "engaged in by an official, employee, or agent of such foreign state while *acting within the scope of his or her office, employment, or agency....*" 28 U.S.C. 1605(a)(7) (emphasis added); *see Flatow v. Islamic Republic of Islam*, 999 F. Supp. 1, 16 (D.D.C. 1998) (such a showing is an element of successful invocation of the § 1605(a)(7) exception); H.R. Rep. No. 104-383, at 105 (suit under § 1605(a)(7) "must allege" that terrorist act was undertaken by official, employee or agent of foreign country "while acting within the scope of his office, employment, or agency").

Plaintiffs plead no facts alleging that any (unidentified) Sudanese individual or individuals who supposedly provided aid to those who committed the embassy bombings were acting within the scope of his, her, or their office, employment, or agency. Thus plaintiffs have failed to make an allegation that is required in order to invoke the 28 U.S.C. 1605(a)(7) exception.[9]

---

judgment of, acts taken by a foreign country within its own borders. *See, e.g., Riggs National Corp. v. IRS*, 163 F.3d 1363, 1367 (D.C. Cir. 1999) (U.S. courts reluctant to decide cases involving "official action by a foreign sovereign performed within its own territory").

[9] In the last Count of the Complaint, plaintiffs attempt to support a claim for punitive damages by making the conclusory allegation that those who actually carried out the embassy bombings "were within the scope of their agency on behalf of the Defendants." Complaint ¶70 (Count 25). But elsewhere in the Complaint it is evident that Sudan is being accused only of providing material support and resources in Sudan to al Qaeda or Hezbollah, whose members allegedly proceeded to commit the embassy bombings. *Id.* ¶¶7-9. Plaintiffs do not allege that the Sudanese who allegedly provided this material support were acting within the scope of their office, employment, or agency. Moreover, if plaintiffs had intended to allege that any malfeasance in this case was committed by persons acting within the scope of their office, employment, or agency with Sudan, such a claim would require more than the mere pleading of a legal conclusion disguised as a fact allegation such as is contained in ¶70. *See Price*, 294 F.3d at 85, 93-94 (rejecting use of conclusory allegations in FSIA context). *See also infra* at Section III.C.1.

  c. Sudan may not be deprived of immunity under 28 U.S.C. 1605(a)(7) because plaintiffs do not allege facts indicating that Sudan knew or intended that its alleged provision of support would assist the <u>embassy bombings.</u>

Section 1605(a)(7) incorporates the definition of "provision of material support or resources" that is contained in 18 U.S.C. 2339A. Section 2339A, in turn, makes "provision of material support or resources" an offense if the actor "provides material support or resources ... *knowing or intending* that they are to be used in preparation for, or in carrying out" a given terrorist act. (Emphasis added.) Plaintiffs do not make any fact allegation that Sudan "knew or intended" that its alleged support of operatives in Sudan would assist those operatives in carrying out the specific operatives' acts here at issue, the bombings of the U.S. embassies in Kenya and Tanzania. The Complaint contains no fact allegation that Sudan committed any act having in mind the specific goal of furthering plans by others to destroy the embassies, no fact allegation that Sudan knew that any al Qaeda or Hezbollah agents allegedly living within Sudan's borders were plotting such acts, and no fact allegation of Sudan's direct and specific involvement with either the planning or the commission the acts of terror here at issue. Rather, the tenor of the pleading is that Sudan provided general aid and comfort to persons who—more than two years after Sudan expelled them from the country[10] in full cooperation with a request from the United States—went on to commit the acts of terrorism here at issue.

To invoke the § 1605(a)(7) exception, plaintiffs must allege that Sudan "knew or intended" that its alleged support of terrorists in Sudan would assist them in carrying out the specific terrorist acts here at issue, the embassy bombings. Plaintiffs do not make that allegation. Therefore, Sudan

---

[10] Sudan expelled Osama Bin Laden and other al Qaeda members from Sudan in May 1996, at the request of the United States. Carney Dec. ¶7. Only al Qaeda members have been implicated in the embassy bombings. Cloonan Dec. ¶12. It is not surprising, then, that the Complaint does not allege any contact between Sudan and those who committed the bombings in the 26 months before the acts were committed.

cannot be deprived of immunity under § 1605(a)(7), as plaintiffs have not properly pled its application in this case.

2.   Even if plaintiffs had pled allegations sufficient to invoke the § 1605(a)(7) exception, Sudan still would retain its immunity because that exception is <u>unconstitutional as applied to the facts of this case.</u>

a.   28 U.S.C. 1605(a)(7) represents an unconstitutional delegation of power to the Executive because it purports to allow the Executive to <u>determine the jurisdiction of U.S. courts.</u>

If the § 1605(a)(7) exception applies, then the federal courts have subject matter jurisdiction over the claims against the foreign nation. The § 1605(a)(7) exception cannot apply, however, unless the Secretary of State has designated the defendant nation as a state sponsor of terrorism. If the State Department decides to put a country on its "terrorist list", or to keep it there, then federal court jurisdiction exists. If the State Department decides not to put a country on the list, or decides to take it off, then there is no federal court jurisdiction. Section 1605(a)(7) thus makes the existence of subject matter jurisdiction entirely dependent upon a decision by the Executive. This is an improper delegation under Article III.

Congress has the sole power to make decisions establishing the jurisdiction of the federal district courts.[11] The Executive "can neither grant nor curtail federal court jurisdiction...."[12] In passing § 1605(a)(7), Congress did not merely take cognizance of an existing fact as found by the Executive, a practice that presents no constitutional issue. Rather, Congress delegated to the Executive the ability to make *future decisions* as to whether the federal courts will or will not have subject matter jurisdiction as to a given country. The Executive's decisions in this regard may well be the product *not* of a dispassionate factual analysis as to the activities of a given country at any

---

[11] *Palmore v. United States*, 411 U.S. 389, 400-01 (1973).

[12] *Carlyle Towers Condo. Ass'n v. FDIC*, 170 F.3d 301, 310 (2d Cir. 1999). Some district courts have upheld the validity of 28 U.S.C. 1605(a)(7) against this sort of argument. *See, e.g., Simpson v. Socialist People's Libyan Arab Jamahiriya*, 180 F. Supp. 2d 78, 86 (D.D.C. 2001)*; Price v. Socialist People's Libyan Arab Jamahiriya*, 110 F. Supp.

given time, but of the Executive's determination that a country's addition to, or continued inclusion

on, the terrorist list would increase leverage over that country with respect to unrelated conduct that

the United States finds objectionable, or even as a result of the Executive's appeal to a certain

domestic constituency.[13]

The "terrorist list" is a political tool as much as anything else. The State Department does

not pretend otherwise; a State Department spokesman recently acknowledged that it is "[c]ertainly"

the case that "the reason we designate state sponsors is to put them on notice that we want them to

change their behavior."[14]   Delegation to the Executive in this context (1) politicizes the question of

whether federal court jurisdiction exists and (2) injects into the jurisdictional question issues that

potentially have less to do with a state's conduct than with the Executive's view as to how U.S.

political interests might best be furthered.[15]

This is assuredly not the basis upon which the subject matter jurisdiction of the federal

courts is to be determined under the Constitution, and it is precisely to prevent such a politicization

of the judicial process that the courts forbid such an improper delegation by Congress to begin with.

See Braniff Airways v. Civil Aeronautics Board, 581 F.2d 846, 851 (D.C. Cir. 1978).

In a similar context the Second Circuit has indicated that a serious constitutional issue would

arise if subject matter jurisdiction resulted from a post-1996 decision by the State Department

---

2d 10, 13-14 (D.D.C. 2000);  *Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38, 51 (D.D.C. 2000).  Sudan is not aware of a definitive ruling on this issue from the D.C. Circuit.

[13] *See* Lori Fisler Damrosch, *Sanctions Against Perpetrators of Terrorism*, 22 Hous. J. Int'l L. 63, 65-66 (1999) (terrorism list "is probably both underinclusive and overinclusive and has probably also been shaped at least as much by U.S. foreign policy interests unconnected with terrorism as by the fight against terrorism itself"); Neil C. Livingstone, *Terrorism: Conspiracy, Myth and Reality*, 22 Fletcher Forum of World Aff. 1, 8-9 (1998) (Cuba's continued inclusion on terrorism is list the result of continued drug trafficking activity, not terrorist activity).

[14] Ambassador Francis X. Taylor, Coordinator for Counterterrorism, Dept. of State, Remarks at the On-the-Record Briefing on the release of the Annual Patterns of Global Terrorism 2001 Report (May 21, 2002) (http://www.state.gov/s/ct/rls/rm/10367.htm).

[15] Ironically, one of the four stated objectives of the FSIA was to take the immunity question out of the hands of the Executive altogether so as to insulate the question from political pressures. *See* H.R. Rep. No. 94-1487, at 7 (1976).

concerning the composition of the terrorist list.[16]   That is the situation here: Sudan's presence on the

list as of 1998 was the result of post-1996 decisions by the State Department to keep Sudan on the

list.   It is for Congress, not the Executive, to decide the jurisdiction of U.S. courts.   Subject matter

jurisdiction should not—and, under the Constitution, may not—be subject to political manipulation

by the Executive.   Because 28 U.S.C. 1605(a)(7) violates these principles on the facts of this case, it

is invalid as applied to these facts.

> b.   28 U.S.C. 1605(a)(7) is unconstitutional because it violates the equal
>       protection clause.

Under 28 U.S.C. 1605(a)(7), an act committed by officials of a state that is on the terrorist

list is actionable, while precisely the same act, committed by officials of a non-listed state, is not

actionable. This distinction is invalid under the equal protection clause.[17]   For such a distinction to

be consistent with equal protection principles, it must be "'rationally related to a legitimate

governmental purpose.'"   *Daliberti,* 97 F. Supp. 2d at 52 (citation omitted).

---

[16] When Libya made an improper-delegation argument to the Second Circuit, the court took comfort in the fact that the act in question had occurred in 1988 and that Libya was already on the terrorist list when Congress later enacted § 1605(a)(7) in 1996. *Rein v. Socialist People's Libyan Arab Jamahiriya,* 162 F.3d 748, 763-64 (2d Cir. 1998). *See also Daliberti,* 97 F. Supp. 2d 38, 51-52. Under those circumstances, the court reasoned, subject matter jurisdiction for claims against Libya *concerning its 1988 conduct* had been created automatically, *by Congress,* upon its passage of § 1605(a)(7) in 1996; no subsequent decision by the Secretary of State was involved. Congress' reference to the list in § 1605(a)(7), under those circumstances, was deemed to be akin to a simple recognition by Congress of an existing fact. In contrast, the act at issue here occurred in 1998. The § 1605(a)(7) exception applies if the defendant nation is on the list *at the time of the act at issue.* Thus it cannot be said that subject matter jurisdiction over the facts of this case was automatically created in 1996, as the act at issue had not even happened then. And it is no argument to say that that this court should take comfort in the fact that Sudan, like Libya, was on the list in 1996 and thus that the existence of subject matter jurisdiction here is the result of an act of Congress because Congress was on notice of Sudan's inclusion on the list when it passed § 1605(a)(7). The point is not that Sudan was on the list in 1996; rather, the point is that the Executive made the decision to maintain Sudan on the list through 1998 when the act at issue in this case took place. Congress could not have known that this would be the case because the list is not set in stone: the Secretary of State is always free to add countries to the list, take countries off of the list, or leave the list as it is. Sudan's *continued inclusion* on the list as of 1998 was the result solely of post-1996 decisions by the Executive not to exercise its power to take Sudan off of the list. Congress had no role whatsoever in this decision.

[17] As one commentary has observed: "It is instinctively repugnant to create a law in which one country is liable but another country is not, notwithstanding that the wrongful act in each case might be identical." V. Nanda & D. Pansius, Litigation of International Disputes in U.S. Courts § 8.04A[4] at 8-169 (2002).

Some courts have found that § 1605(a)(7) passes this test;[18] however, if the purpose of the legislation is to grant victims of terrorists acts the opportunity for relief, or to deter future acts of terrorism, then the distinction drawn by the provision is in fact not rational. One who is harmed by terrorists supported by a non-listed country suffers equally and is no less deserving of relief as compared with a victim harmed by terrorists supported by a listed country, so no rational distinction may be made on that basis. Nor is it rational to limit the statute's deterrent effect only to listed nations—especially given the vagaries of the list itself, discussed above. The only rational goal is to deter *all* state sponsored acts of terror, by *any* country. In the debates preceding passage of what is now § 1605(a)(7), Senator Brown noted that such an exception is appropriate because "the international community ... does not recognize the right of any state" to commit such acts.[19] This of course is true, and it highlights the irrationality inherent in § 1605(a)(7) in providing jurisdiction only as to certain states, even while others may be acknowledged to have engaged in the same conduct. Indeed, by exempting most of the countries of the world from U.S. court jurisdiction *even if* they support terrorist acts, the provision here at issue actually works at cross purposes with the goal of preventing terrorism.

        c.     28 U.S.C. 1605(a)(7) is unconstitutional because it incorporates a definition of "material support or resources" that is impermissibly vague.

Section 1605(a)(7) incorporates the definition of "material support or resources" that is contained in 18 U.S.C. 2339A. The "personnel" and "training" components of this definition are void for vagueness, *Humanitarian Law Project v. United States Dep't of Justice*, 352 F.3d 382 (9th Cir. 2003), as is the "expert advice or assistance" component. *Humanitarian Law Project v. Ashcroft*, 2004 U.S. Dist. Lexis 926 (C.D. Cal. 2004). Other components of that definition are

---

[18] *See, e.g., Daliberti*, 97 F. Supp. 2d at 52; *Simpson*, 180 F. Supp. 2d at 87.

[19] Terrorism Prevention Act—Conference Report, 142 CONG. REC. S3464 (Apr. 17, 1996) (remarks of Senator Brown).

equally vague and thus unconstitutional; terms such as "facilities," "lodging," "safehouses," and "physical assets" fail to provide adequate notice or clarity as to the type of activity that is prohibited, which notice and clarity is required by the Constitution.  *See Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997); *Kolender v. Lawson*, 461 U.S. 352 (1983). A claim based upon the alleged provision of "material support or resources" may not be based on a definition whose terms are unconstitutionally vague.[20]

3.   Sudan may not be deprived of immunity under 28 U.S.C. 1605(a)(7) because Sudan was not properly designated as a state sponsor of terrorism under the requisite statutes when the acts here at issue occurred.

Sudan also retains its immunity as a matter of law because, in order for § 1605(a)(7) to apply, Sudan must have been designated as a state sponsor of terrorism under the Export Administration Act or the Foreign Assistance Act when the acts in question occurred.  28 U.S.C. 1605(a)(7)(A).  Because Sudan was not so designated during the period here at issue, Sudan is entitled to immunity.

Sudan has never been designated as a state sponsor of terrorism under the FAA.  The Secretary of State designated Sudan a state sponsor of terrorism under the EAA in August 1993,[21] but the EAA lapsed in August 1994.[22]  The EAA was reauthorized in November 2000, but it lapsed

---

[20] Further, the definition of "material support or resources" that is contained in 18 U.S.C. 2339A and incorporated into 28 U.S.C. 1605(a)(7) reads as follows:

[C]urrency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, *and* other physical assets, except medicine or religious materials. (Emphasis added.)

The conjunctive "and" must be given its meaning.  *Ortiz v. Secretary of Defense*, 41 F.3d 738, 742 (D.C. Cir. 1994).  Accordingly, for a defendant to come within the definition of providing "material support or resources" under 18 U.S.C. 2339A, and thus within the immunity exception provided by 28 U.S.C. 1605(a)(7), the defendant must have provided all of the items listed in that definition.  Plaintiffs, however, do not allege that Sudan provided all of the items of support listed in the definition section of 18 U.S.C. 2339A.  Once again, then, plaintiffs have failed to make the allegations necessary to invoke the immunity exception contained in 28 U.S.C. 1605(a)(7).  Further, if some of these listed items are unconstitutionally vague, the use of the conjunctive renders the entire list invalid.

[21] Department of State, Office of the Secretary, *Determination Sudan*, 58 Fed. Reg. 52,523 (Oct. 8, 1993).

[22] Export Administration Act of 1979, Pub. L. No. 96-72, 93 Stat. 503, § 20 (Sept. 29, 1979), *as amended by* An Act To extend the Export Administration Act of 1979, Pub. L. No. 103-277, 108 Stat. 1407 (July 5, 1994).

again in August 2001.[23]   During these lapses, the President, relying upon other statutory and

constitutional authority, ordered that the EAA's provisions be carried out so as to continue in full

force and effect, but the *EAA itself* had expired.[24]

Because the EAA had expired from August 1994 until November 2000, Sudan cannot have

been designated during that period as a state sponsor of terrorism *"under the [EAA]."*  That is what

§ 1605(a)(7)(A) explicitly requires, but common sense suggests that a state cannot be designated as

*anything* "under" a statute if the statute itself does not even exist during the period in question.

Some cases applying the terrorism exception have found the designation here at issue to

have continuous effect.[25]   In none of these cases, however, was the issue significantly contested by

the defendant.[26]

As stated above, a foreign state may be deprived of immunity only when such a result is

clearly warranted.  In this case, the law requires that the designation had to exist at the time of the

act *under a specific statute,* which statute was not then in existence.  Therefore, it cannot be said

that an exception to Sudan's immunity protection is clearly warranted.

---

[23]  To provide for increased penalties for violations of the Export Administration Act of 1979, and for other purposes, Pub. L. No. 106-508, 114 Stat. 2360 (Nov. 13, 2000).

[24]  Exec. Order 12,924, 59 Fed. Reg. 43,437 (Aug. 23, 1994); Exec. Order 13,222, 66 Fed. Reg. 44,025 (Aug. 22, 2001).

[25]  *See, e.g., Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 59-60 (D.D.C. 2003); *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 20 (D.D.C. 2002); *Mousa v. Islamic Republic of Iran*, 238 F. Supp. 2d 1, 4 (D.D.C. 2001); *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 108 (D.D.C. 2000); *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 6 (D.D.C. 2000); *Flatow*, 999 F. Supp. at 9, 14.

[26]  It is also true that some courts have found that the President continued the effect of the regulations under the EAA during its various lapses. *See, e.g., Wis. Project on Nuclear Arms Control v. U.S. Dept. of Commerce*, 317 F.3d 275, 278-79 (D.C. Cir. 2003).  But this case does not involve a mere regulation that could have been authorized under any one of several statutory schemes; rather, it involves the Executive's designation of a foreign state as a sponsor of terrorism under the precise terms of a single carefully crafted statute, a matter of a different quality altogether.  In addition, Executive Order 12924, which despite the EAA's lapse purported to continue the effect of the EAA's provisions, by its very terms only applied to "rules and regulations issued or continued in effect by the Secretary of Commerce under the authority of the Export Administration Act...." Exec. Order 12,924, 59 Fed. Reg. 43,437 (Aug. 23, 1994).  The Secretary of State's designation of state sponsors of terrorism, of course, does not fall within this description.  Moreover, an act of the Executive, such as issuance of Executive Orders such as those being discussed, cannot have the effect of creating federal court jurisdiction.  That is for the Congress alone.  *See supra* at Section II.B.2.a; *see also Electronic Data Sys. Corp. v. Social Security Organization*, 508 F. Supp. 1350, 1363 (N.D. Tex. 1981) (Executive Order could not affect the jurisdiction of the federal court because "only Congress can confer and redefine the jurisdiction of United States Courts"; Executive Order that purported to do so represented an "intrusion by the

4.    Section 1605(a)(7) does not create an exception to foreign sovereign
immunity for actions based on common law.

Plaintiffs base some claims on the Flatow Amendment and some on common law.  Because

the Flatow Amendment claims are barred by *Cicippio-Puleo*, the only claims that are conceivably

viable any longer are plaintiffs' common law claims.  The court has no jurisdiction over such

claims, however, because Sudan retains its immunity against them.  Plaintiffs invoke the §

1605(a)(7) exception, but it does not apply where the claim against the foreign state is based only

on judge-made law.

Two longstanding principles supply the background against which this issue should be

viewed.  The first is that courts should exercise extreme caution when addressing issues affecting

foreign relations in general and in subjecting foreign sovereigns to the jurisdiction of U.S. courts in

particular.  The second is the principle that exceptions to immunity are narrowly construed and

applied only if clearly warranted.  Such principles reflect the extreme sensitivities involved in this

context, as has been emphasized most recently by the briefs filed by the United States arguing

against the attempts by various plaintiffs to expand the scope of jurisdiction over foreign sovereigns

and the scope of the causes of action that might be brought against them.[27]

In enacting § 1605(a)(7), Congress gave no indication that it intended the exception to open

the courthouse doors to causes of action based on common law.  The potential for disruption of

foreign relations and for embarrassment of the Executive in the conduct of such foreign relations

has traditionally been a chief concern of the political branches in this context.  Had Congress

intended that § 1605(a)(7) have the effect of subjecting foreign states to any and all common law-

---

Executive Branch into the carefully designed contours of Federal Court jurisdiction" that was "untenable under the
Constitution").

[27]  *See, e.g.*, Brief for the United States Supporting Petitioner, *Sosa, v. Alvarez-Machain*, No. 03-339 (U.S. filed Jan. 23,
2004);  Brief for the United States as Amicus Curiae, *Cicippio-Puleo v. Islamic Republic of Iran*, No. 02-7085 (D.C.
Cir. filed Dec. 3, 2003).

based causes of action that could be divined by the judiciary, it presumably would have said so, but it did not. To the contrary, there is every indication that the claims that Congress intends to be available to § 1605(a)(7) plaintiffs are those created by Congress, not by judges. Numerous courts, for example, have stated that the Flatow Amendment was enacted by Congress to supply a cause of action for use by § 1605(a)(7) plaintiffs, thus filling the "void" and supplying a cause of action where none had previously existed.[28]

Limiting § 1605(a)(7)'s jurisdictional grant to statutory claims is in keeping with the rule that the conduct of foreign relations is the exclusive province of the political branches of government, not the judiciary.[29] That rule would have been severely undermined had Congress, in § 1605(a)(7), ceded control over the kinds of actions that could be brought against foreign states to the vagaries and shifting nature of common law-based claims as they might be divined from time to time by the courts. The decision as to when and under what circumstances a foreign state may be sued in this country has always rested with the political branches, not the courts.[30] The court of appeals in *Cicippio-Puleo* stressed that Congress has "proceeded with caution" when acting to create jurisdiction over, and supply causes of action against, foreign nations in this context. 2004 U.S. App. Lexis at *30. The court also stated that "it is for Congress, not the courts, to decide whether a cause of action should lie against foreign states." *Id.* at * 31. If these principles are to be cast aside, this should occur only under the specific and explicit instruction of Congress. Congress

---

[28] *See infra* Section III.B.

[29] *See, e.g., Baker v. Carr,* 369 U.S. 186, 211 (1962) ("Not only does resolution of [foreign relations] issues frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature; but many such questions uniquely demand single-voiced statement of the Government's views.").

[30] *See Oetjen v. Central Leather Co.,* 246 U.S. 297, 302 (1918) (the Constitution commits the conduct of foreign relations to the Executive and Legislative branches); *Fong Yue Ting v. United States,* 149 U.S. 698, 705 (the Constitution commits "the entire control of international relations" to the political branches) (citations omitted); *Al Odah v. United States,* 321 F.3d 1134, 1147 (D.C. Cir. 2003) (Randolph, J., concurring), *cert. granted, in part,* 124 S. Ct. 534 (Nov. 10, 2003) (it is "abundantly clear that Congress—not the Judiciary—is to determine, through legislation, what international law is and what violations of it ought to be cognizable in the courts").

gave no such instruction in § 1605(a)(7); there is no indication that Congress intended to cede any control over this aspect of the conduct of foreign relations to state or federal courts to decide what kinds of claims may be asserted against foreign sovereigns in the § 1605(a)(7) context.

Interpreting § 1605(a)(7) as creating jurisdiction for common law claims would not only run counter to Congress' stated intent that the FSIA exceptions are to be construed narrowly, it would also be directly contrary to Congress' intent and desire in enacting the FSIA to foster uniformity of decision, which according to Congress "is desirable since a disparate treatment of cases involving foreign governments may have adverse foreign relations consequences."[31] Creating jurisdiction for claims authorized by Congress does indeed foster uniformity in decisionmaking, but opening the courts to claims based entirely on judge-made law, as expressed and interpreted by the multitude of courts in the various jurisdictions across the country, would only undermine that goal.

It is neither accident nor anomaly that certain of the enumerated FSIA exceptions to sovereign immunity explicitly provide jurisdiction for actions arising out of common law claims, while § 1605(a)(7) does not.  Rather, this important difference serves to underscore the unique nature of the § 1605(a)(7) exception. Sections 1605(a)(2) and 1605(a)(5), for example, explicitly provide jurisdiction over common law claims in tort and contract, but they just as explicitly require a nexus to activity and effects within the United States.  Section 1605(a)(7) is different in that it applies to acts undertaken anywhere in the world without such a nexus requirement.  This broad applicability explains why § 1605(a)(7) makes no reference to common law actions.   The omission is significant.  Section 1605(a)(7) was designed to grant jurisdiction over foreign sovereigns where certain carefully defined acts were committed outside the territory of the United States, where U.S. common law does not apply. As the court of appeals has stated, § 1605(a)(7) was the result of a

---

[31] H.R. Rep. No. 94-1487, at 13 (1976).

"delicate legislative compromise."[32] The exception was highly controversial; indeed, "it had been consistently resisted by the executive branch."[33] The Executive Branch resisted the § 1605(a)(7) exception because its enactment would "potentially subject[] the American government to suits in foreign countries for action taken in the United States."[34]   In addition, in creating U.S. court jurisdiction even over claims based solely on acts that occurred entirely within the territory of the defendant sovereign (where an offer to arbitrate had been made), § 1605(a)(7) arguably represents a significant departure from customary international law. *McKeel v. Islamic Republic of Iran*, 722 F.2d 582, 588 (9th Cir. 1983) ("Nothing in the legislative history [of the 1976 Act] suggests that Congress intended to assert jurisdiction over foreign states for events occurring wholly within their own territory. Such an intent would not be consistent with the prevailing practice in international law."). Congress felt compelled to provide a forum for U.S. victims of international terrorism; however, Congress also recognized that in providing such a forum, it would have to balance the desire to help U.S. victims of foreign terrorism against the fear that asserting jurisdiction over foreign sovereigns for acts occurring abroad would run counter to fundamental principles of international law. International law is based on the principle of the sovereign equality of nations. It must be recalled that the United States has often hosted and aided opposition groups and rebel figures considered to be terrorists by other states—for example, Afghan Mujahideen, the Nicaraguan *Contras*, and the Angolan UNITA rebels. Nevertheless, the United States does not accept that its policies and actions in this context should be scrutinized in lawsuits in the courts of other countries.

---

[32] *Cicippio-Puleo*, 2004 U.S. App. Lexis at *29.
[33] *Price*, 294 F.3d at 89.
[34] *Id.*

In recognition of such concerns, Congress intended for this extraordinary grant of jurisdiction to be very narrow, and did not intend to invite federal or state judges to create the causes of action to be applied to sovereign governments through 1605(a)(7).[35]

### III.   THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

#### A.   All of the claims in the Complaint that are expressly based on the Flatow Amendment should be dismissed.

Counts 2, 5, 9, 12, 16, 20, 23, and 25 are expressly based on the Flatow Amendment. *Cicippio-Puleo* holds that the Flatow Amendment does not create a cause of action against a foreign state. Sudan is of course a foreign state, and Sudan's Interior Ministry is treated as the state itself for these purposes. *Roeder*, 333 F.3d at 234-35. Therefore, these Counts fail as a matter of law.[36]

#### B.   The claims that are not expressly based on the Flatow Amendment should also be dismissed.

Counts 1, 3, 4, 6, 7, 8, 10, 11, 13, 14, 15, 17, 18, 19, 21, 22, and 24 are not based on the Flatow Amendment; rather, plaintiffs appear to assert that these Counts, evidently for assault and battery, find a basis in common law of unidentified origin. Complaint ¶ 10.

No recovery is available to plaintiffs under common law in this case. Indeed, the absence of any alternative common-law basis for a cause of action in this context has been noted by the courts and has been identified as the very reason why Congress enacted the Flatow Amendment. *See, e.g.*,

---

[35] *See Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003) (stating that federal judges are "to find the relevant law, not to make it").

[36] If plaintiffs intend to assert that Counts 2, 5, 9, 12, 16, 20, and 23 are pled alternatively under a common law theory of intentional infliction of emotional distress or solatium, then Sudan would note (1) that the common law cannot provide the basis for any of plaintiffs' claims in this case, a point that Sudan discusses in more detail elsewhere; (2) there is no allegation of the standing of many of the plaintiffs to sue for intentional infliction of mental distress and/or solatium, nor is there any indication of their connection with the events here at issue or the manner in which they were harmed; and (3) "a 'bystander' plaintiff cannot recover damages for his or her purely emotional injury suffered as a result of consciousness of physical harm done to another person." *Cicippio-Puleo v. Islamic Republic of Iran*, 2002 U.S. Dist. Lexis 27050 at *6-7 (D.D.C. 2002), *aff'd*, No. 02-7085 (D.C. Cir. Jan. 16, 2004). That is, where a plaintiff sues for emotional distress caused by his or her knowledge that a third party has suffered injury, the plaintiff may not recover if he or she was not present at the time of the third party's injury. *See* Restatement (Second) Torts § 46(2), cmt. I. There is no indication that the plaintiffs who are asserting claims for intentional infliction of emotional distress/solatium in Counts 2, 5, 9, 12, 16, 20, and 23 were actually present when the bombings occurred.

*Daliberti*, 97 F. Supp. 2d at 43 n.1 (Flatow Amendment was enacted to provide a cause of action for

victims of state sponsored terrorism, thus "fill[ing] the void" that had existed regarding a cause of

action that could be asserted by victims of terrorism).[37]   Thus in a similar context the D.C. Circuit

has indicated that such claims must find their basis in statutory law—*i.e.*, if such a claim is not

based on the Flatow Amendment, it will have no basis at all:

> We recognize that some of the cases addressing these FSIA claims refer to "federal
> common law." ... The term "federal common law" seems to us to be a misnomer.
> Indeed, it is a mistake, we think, to label actions under the FSIA and Flatow
> Amendment for solatium damages as "federal common law" cases, for these actions
> are based on *statutory* rights.  Without the statute, the claims could not arise.

*Bettis,* 315 F.3d at 333 (emphasis in original). There are several reasons why claims in this context

must be based on statutory rights, *i.e.*, may not be based on common law, as stated below.

> 1.      Common law does not provides a basis for plaintiffs' claims.

When Congress enacted the Flatow Amendment, any possible common law claims in this

area were displaced and the Flatow Amendment became the sole basis upon which such claims may

rest.  The courts should not apply, nor seek to develop, common law upon which to base a cause of

action that Congress did not see fit to provide in statutes addressing closely related issues, *e.g.* the

Flatow Amendment, or the Torture Victims Protection Act, 28 U.S.C. 1350 note.  The Flatow

Amendment expresses the intent of Congress concerning the causes of action available to victims of

terrorist acts in this context.  Congress having addressed the issue, it is both unnecessary and

inappropriate to look to judge-made law for additional or alternative remedies.  "[O]nce Congress

---

[37]   *Accord, Campuzano v. Islamic Republic of Iran*, 2003 U.S. Dist. Lexis 15963 at *25 (D.D.C. 2003) ("Creating a
cause of cause of action for victims of terrorism, Congress... [enacted] the Flatow Amendment."); *Smith v. Islamic
Emirate of Afghanistan*, 262 F. Supp. 2d 217, 226 (S.D.N.Y. 2003) (28 U.S.C. 1605(a)(7) creates jurisdiction but the
Flatow Amendment creates the cause of action); *Cronin v. Islamic Republic of Iran*, 238 F. Supp. 2d 222, 230 (D.D.C.
2002) (after the 1996 addition of § 1605(a)(7), "serious issues remained, in particular, the causes of action available to
plaintiffs") (*quoting Flatow*, 999 F. Supp. at 12); *Roeder v. Islamic Republic of Iran*, 195 F. Supp. 2d 140, 172 (D.D.C.
2002) ("Congress recognized that although foreign sovereign immunity was waived by the 1996 Anti-terrorism Act,
victims of state-sponsored terrorism that occurs beyond the borders of the United States may lack the requisite private
cause of action to bring such a suit."); *Elahi*, 124 F. Supp. 2d at 106 (§ 1605(a)(7) merely waived sovereign immunity;
"[t]o create a cause of action or victims of terrorism, Congress enacted a separate piece of legislation [the Flatow
Amendment]").

has legislated on the subject, its decision prevails over the judicial lawmaking since it has primary responsibility for determining federal policy." 19 C. Wright, *et al.*, Federal Practice and Procedure § 4514 (2nd ed. 1996).

The courts have repeatedly enforced this rule.  In *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618 (1978), for example, the Court held that the measure of damages for death on the sea was governed by the Death on the High Seas Act, 46 U.S.C § 761 *et seq.*, and that because Congress had spoken to the issue by enacting applicable legislation, it was error for the court of appeals to look to general maritime law for additional or alternative measures of recovery.  The Court wrote: "In the area covered by the statute, it would be no more appropriate to prescribe a different measure of damages than to prescribe a different statute of limitations, or a different class of beneficiaries." 436 U.S. at 625.  Similar decisions include *O'Melveny & Myers v. Federal Deposit Ins. Corp.*, 512 U.S. 79, 86-87 (1994); *City of Milwaukee v. Illinois*, 451 U.S. 304, 312-17 (1981); *Conboy v. American Telephone & Telegraph Corp.*, 241 F.3d 242, 251-54 (2d Cir. 2001); and *Murphy v. Federal Deposit Ins. Corp.*, 61 F.3d 34, 38-40 (D.C. Cir. 1995).

It would be especially inappropriate for the federal courts to stray from congressional directives in the delicate area of foreign relations.  As the State Department and Justice Department recently argued, the "provocative step" of creating a private right of action against a foreign government could have "serious adverse consequences for the conduct of foreign relations," and thus such a cause of action "should be recognized only if Congress has acted clearly in that direction.... [T]he courts should not lightly step in to create such an impact on the Nation's foreign policy, especially in light of the circumspection exercised by the political branches."[38]  *See Oetjen*, 246 U.S. at 302 (Constitution commits the conduct of foreign relations to the Executive and

---

[38] Brief for the United States as Amicus Curiae, at 5-6, *Cicippio-Puleo v. Islamic Republic of Iran*, No. 02-7085 (D.C. Cir. filed Dec. 3, 2003).

Legislative branches); *Fong Yue Ting*, 149 U.S. at 705 (the Constitution commits "the entire control of international relations" to the political branches); *Al Odah*, 321 F.3d at 1147 (Randolph, J., concurring), *cert. granted, in part*, 124 S. Ct. 534 (Nov. 10, 2003) (it is "abundantly clear that Congress -- not the Judiciary -- is to determine, through legislation, what international law is and what violations of it ought to be cognizable in the courts"). The court of appeals in *Cicippio-Puleo* stressed that Congress has "proceeded with caution" when acting to create jurisdiction over, and supply causes of action against, foreign nations in this context. 2004 U.S. App. Lexis at *30. The court also emphasized that the limited scope of the cause of action authorized by the Flatow Amendment was the result of Congress' careful balance of competing interests, all in the context of the very delicate area of foreign relations. Id. at *29-31. Similar care was used by Congress in the Torture Victims Protection Act, 28 U.S.C § 1350 note, wherein Congress defined the terms "torture" and "extrajudicial killing" in a way that was much more precise than definitions that may have been found elsewhere. There would be little point in the exercise of such care on the part of Congress if the courts had carte blanche to allow claims to proceed on whatever basis they deemed to be appropriate, congressional concerns notwithstanding. Surely it would be inappropriate to circumvent Congress, and the limited steps that Congress has carefully taken in this context, by allowing resort to judge-made law and judge-created causes of action. "[I]t is for Congress, not the courts, to decide whether a cause of action should lie against foreign states." *Id.* at *31.

Sudan is aware that this court has noted that some pre-*Cicippio-Puleo* district court decisions concluded that common law provides a cause of action separate and apart from the cause of action created by the Flatow Amendment.[39] The decisions cited by this court in this context were *Flatow*, 999 F. Supp. at 27-32; *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 32-33 (D.D.C.

---

[39] *See Regier v. Islamic Republic of Iran*, 281 F. Supp. 2d 87 (D.D.C. 2003); *Dammarell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105 (D.D.C. 2003).

2001); *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 47-50 (D.D.C. 2001); and *Elahi*, 124 F. Supp. 2d at 109-13. Each of these decisions was entered in the default judgment context, and none of them provides a basis upon which to depart from the principles addressed above.

Judge Lamberth's liability determination in *Flatow* was indeed informed by the common law; however, the court looked to common law only as a means of defining the scope of the causes of action created by the Flatow Amendment, not as a separate basis for an alternative cause of action. 999 F. Supp. at 29-32. This is similar to the approach taken in *Bettis*, where court of appeals looked to the common law only because it sought to interpret the scope and meaning of the cause of action *created by the Flatow Amendment*, not because it believed that common law supplied an additional or alternative basis for recovery. That is an important distinction—one that has not always been recognized in the district courts.

In *Jenco* and *Sutherland*, Judge Lamberth seems simply to have assumed that common law claims were available to a plaintiff in this context. The court did not address the question of why, if this is so, Congress and the courts deemed enactment of the Flatow Amendment necessary in order to fill the "void" regarding applicable causes of action that had existed prior to its enactment. Nor did the court address the issue of the statutory displacement of common law, as noted above. Finally, the court appears to have been of the view that 28 U.S.C. 1606 supported the application of common law causes of action in this context. It is well established, however, that § 1606 does not create or affect the substantive liability for a foreign state. *First National City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 620 (1983) (stating that "[t]he language and history of the FSIA clearly establish that the Act was not intended to affect the substantive law determining the liability of a foreign state or instrumentality, or the attribution of liability among

instrumentalities of a foreign state.").[40]   As is suggested by the heading of § 1606, "Extent of liability," § 1606 may affect the available *remedies* and *damages* available to a plaintiff, by providing that legal rules that might otherwise limit a government's liability would not be applicable except as set forth in § 1606; it cannot be said, however, that a given cause of action exists by virtue of the language of § 1606. *Roeder*, 195 F. Supp. 2d at 174 (stating that plaintiffs do not have a cause of action "by virtue of" § 1606 because "the Supreme Court has made clear that this provision does not impact the substantive liability of a foreign government.").

Finally, Judge Green in *Elahi* did not state that common law creates a claim in addition to that provided by the Flatow Amendment. Rather, the court noted that it was "[t]he statutory provision," *i.e.* the Flatow Amendment, that "create[d] the cause of action for state sponsored terrorism ...."[41]  It appears that the court looked to common law only for the guidance that it might provide in determining the damages to be awarded in connection with a cause of action based upon the Flatow Amendment.

None of these four decisions constitutes authority that should cause the court to deviate from the principles established by the court of appeals in *Bettis* and by the Supreme Court in cases such as *Mobil Oil, O'Melveny & Myers,* and *City of Milwaukee.*   Plaintiff's attempt in Counts 1, 3, 4, 6, 7, 8, 10, 11, 13, 14, 15, 17, 18, 19, 21, 22, and 24 to invoke common law tort principles fails, those Counts have no legal basis, and they should be dismissed.

2.   State common law is preempted in this area.

Any state common law causes of action have been preempted by enactment of the Flatow

---

[40] The Court's interpretation is confirmed by the FSIA's legislative history. *See* H.R. Rep. No. 94-1487 at 12 (1976) (FSIA "not intended to affect the substantive law of liability"); 108 CONG. REC. S 8878 (June 10, 1976) (Statement of Sen. Hruska) ("Of course this bill deals only with jurisdiction; the substantive law of liability would remain unchanged.").

[41] *Elahi*, 124 F. Supp. 2d at 109.

Amendment.  The Supremacy Clause gives Congress the power to preempt state law.[42]  State law is

preempted where, *inter alia*, Congress intends to "occupy the field" in a given area or where state

law conflicts with federal law.[43]  Both of these factors are present here:  The Flatow Amendment

demonstrates the intent of Congress to occupy the field in the area of actions by U.S. nationals

concerning certain kinds of terrorist acts, and any state common law claim that would exceed the

scope of the cause of action available under the Flatow Amendment would necessarily conflict with

the Flatow Amendment.  Therefore, no state common law cause of action is available to Plaintiffs,

as state common law is preempted.

As indicated above, Congress has occupied the field in the area of foreign relations generally

and claims by U.S. victims of foreign terrorist acts in particular.  Congressional intent to occupy the

field is found, *inter alia*, "where an Act of Congress 'touches a field in which the federal interest is

so dominant that the federal system will be assumed to preclude enforcement of state laws on the

same subject.'"[44]  Surely the federal interest could not be more dominant in any field than in that of

foreign relations.  As the Supreme Court has stated:

> The Federal Government representing as it does the collective interests of the ...
> states, is entrusted with full and exclusive responsibility for the conduct of affairs
> with foreign sovereignties....  Our system of government is such that the interest of
> the cities, counties and states, no less than the interest of the people of the whole
> nation, imperatively requires that federal power in the field affecting foreign
> relations be left entirely free from local interference.[45]

Moreover, the Court has found that the "field . . . [of] international relations [is] the one aspect of

our government that from the first has been most generally conceded imperatively to demand broad

national authority.  Any concurrent state power that may exist is restricted to the narrowest of

---

[42] *See* U.S. Const. Art. VI, cl. 2; *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000).

[43] *Crosby*, 530 U.S. at 372.

[44] *English v. General Electric Co.*, 496 U.S. 72, 79 (1990) (*citing Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

limits."[46]   Because Congress has occupied the field in the area of foreign relations, and particularly

with respect to foreign acts targeting U.S. interests and claims resulting therefrom, state law

infringing upon this area is deemed to be preempted by federal law absent clear congressional intent

to the contrary. Thus, to the extent that state common law would impose liability against foreign

sovereigns different from or in addition to that imposed by Acts of Congress, such common law is

preempted and any claims purportedly based on state common law necessarily fail.[47]

State common law is preempted for the additional reason that, as applied against foreign

sovereigns subject to jurisdiction under § 1605(a)(7), state common law tort causes of action

conflict with the Flatow Amendment.   As the Supreme Court has stated, state law conflicts with,

and is therefore preempted by, federal law where state law "stands as an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress."[48]   In a recent

unanimous decision, *Crosby*, 530 U.S. 363, the Court held that a Massachusetts law sanctioning the

conduct of business in Burma was in conflict with federal sanctions law, and therefore preempted,

because "the state Burma law [is] an obstacle to the accomplishment of Congress's full objectives

under the federal act."[49]   Although the federal and state laws had the same goal, their methods of

achieving that goal differed in certain respects.   Plaintiffs had argued that the state law was not

preempted because it did not directly conflict with the federal law, but simply furthered it. The

Court rejected this argument, concluding that "'[c]onflict is imminent' when 'two separate remedies

are brought to bear on the same activity'" and that "a common end hardly neutralizes conflicting

---

[45] *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941).

[46] *Hines*, 312 U.S. at 68.

[47] This is not to say that a state law cause of action may never apply against a foreign sovereign.  In cases in which the act occurred within the United States, the common law of the state in which the act took place might apply.

[48] *Hines*, 312 U.S. at 67; *accord, English*, 496 U.S. at 79; *California v. ARC America Corp.*, 490 U.S. 93, 101 (1989).

[49] *Crosby*, 530 U.S. at 373.

means."[50]  Finding that "Congress's calibrated Burma policy is a deliberate effort 'to steer a middle path'" and that "the limits were deliberate," the Court deemed the state law to be "at odds with achievement of the federal decision about the right degree of pressure to employ."[51]

In crafting the Flatow Amendment, Congress created a "delicate legislative compromise"[52] to provide a cause of action only against officials, employees or agents of foreign states.  To apply state common law causes of action against foreign states themselves in this context would be to allow states to completely frustrate the will of Congress on this point, in direct contravention of the preemption doctrine.

> 3.    Domestic common law does not govern the conduct of foreign persons on foreign soil.

There is a longstanding presumption that a federal statute regulates conduct only within the territory of the United States.  *See Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949) (stating that "legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States").  This presumption "serves to protect against unintentional clashes between our laws and those of other nations which could result in international discord."  *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991).  If acts of Congress are presumed not to apply to acts committed outside of U.S. jurisdiction, it must necessarily be the case that laws derived and applied by state (and federal) judges must be similarly

---

[50]  *Id.* at 379-80 (citation omitted).

[51]  *Id.* at 377-80 (citation omitted).  The Court's holding in *Crosby* is in keeping with longstanding Supreme Court jurisprudence.  Justice Holmes wrote that "[w]hen Congress has taken the particular subject matter in hand coincidence is as ineffective as opposition, and a state law is not to be declared a help because it attempts to go farther than Congress has seen fit to go."  *Charleston & Western Carolina R. Co. v. Varnville Furniture Co.*, 237 U.S. 597, 604 (1915); *accord, United States v. Locke*, 529 U.S. 115, 93 (2000)  ("It is not always a sufficient answer to a claim of pre-emption to say that state rules supplement, or even mirror, federal requirements. . . . The appropriate inquiry still remains whether the purposes and objectives of the federal statutes, including the intent to establish a workable, uniform system, are consistent with concurrent state regulation.").

[52]  *Ciccipio-Puleo*, 2004 U.S. App. Lexis at *29.

restricted. There appears to be no precedent for imposing a standard of conduct derived by judges in the United States upon the actions of foreign persons occurring on foreign soil.

C.    Plaintiffs have not properly pled any cause of action.

This is a case wherein plaintiffs seek something quite extraordinary: to bring a foreign nation before a U.S. court so that the propriety of the foreign sovereign's conduct may be judged. Particular focus must be placed upon the instrument that purports to subject the sovereign to U.S. court jurisdiction: the complaint. Of course, a complaint against any defendant must contain sufficient allegations if it is to survive dismissal; however, a complaint that would force a response from a foreign sovereign should be scrutinized with the utmost care and attention, in order to ensure that the face of the pleading at least contains sufficient factual allegations to state a viable cause of action such that the sovereign need be further burdened.

The D.C. Circuit recently enforced this principle in *Price*. There, plaintiffs invoked the § 1605(a)(7) immunity exception and attempted to plead *inter alia* a cause of action for torture against Libya. The trial court denied Libya's Rule 12(b)(6) motion, but the court of appeals reversed. In so doing, the court made clear that careful attention must be paid to the validity of a complaint in cases such as this, given the important principles involved. Referring to plaintiffs' failure to plead facts sufficient to state a claim for torture, the court wrote:

> A claimant need not set out all of the precise facts on which the claim is based in order to survive a motion to dismiss. However, in light of the serious and far-reaching implications of the 1996 FSIA amendments, it is especially important for the courts to ensure that foreign states are not stripped of their sovereign immunity unless they have been charged with actual torture, and not mere police brutality.

> In this case, plaintiffs' complaint offers *no useful details* about the nature of the kicking, clubbing, and beatings that plaintiffs allegedly suffered.... Thus, the facts pleaded do not reasonably support a finding that the physical abuse allegedly inflicted by Libya evinced the degree of cruelty necessary to reach a level of torture.

294 F.3d at 93-94 (emphasis added) (citation omitted). Therefore, the court concluded that "[t]he complaint in its present form is simply too conclusory to satisfy § 1605(a)(7)."[53]

The same may be said here. Plaintiffs seek to force a sovereign nation to come into a courthouse located on another continent to defend itself against charges of the most serious nature. Surely plaintiffs must state their claims with a degree of specificity and detail so that this court may be assured that the extraordinary proceedings that plaintiffs wish to instigate are warranted. This court, as did the court in *Price*, should demand that a complaint in this context support both the imposition that would be placed upon the foreign sovereign *and* the grave charges that are being made.[54] The pleading at issue fails to do so.

  1.   <u>The Complaint should be dismissed because it only pleads conclusions.</u>

The Complaint pleads not facts, but legal conclusions. It repeats words in statutes and asserts, in effect, "that is what happened." If 28 U.S.C. 1605(a)(7) provides that an exception to immunity arises where a country provides material support or resources for a terrorist act, then the pleading simply states that this is what occurred. If such conduct is defined in 18 U.S.C. 2339A as provision of training, explosives, and assistance, then the pleading asserts that this is what was provided. There is nothing in the Complaint that provides any detail whatsoever as to any *facts* upon which the legal conclusions stated by plaintiff against Sudan might be based. The law is clear

---

[53] *Id.* at 85; *see also Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 234-35 (holding that complaint against foreign sovereign was insufficient and refusing to draw inferences to fill in gaps in pleading); *El-Hadad v. Embassy of the United Arab Emirates*, 69 F. Supp. 2d 69, 80 (D.D.C. 1999) (dismissing claims against sovereign where plaintiffs' jurisdictional allegations failed to establish "exactly how the individual defendants were involved in plaintiff's case" and deeming insufficient "conclusory allegations" where plaintiff "provide[d] no specific factual support for these allegations").

[54] *See Burnett v. Al Baraka Investment & Development Corp.*, 274 F. Supp. 2d 86, 103-04 (D.D.C. 2003) (engaging in "extra-careful scrutiny" of sufficiency of complaint alleging involvement in terrorist act).

that legal conclusions, cast in the form of factual allegations, are not sufficient to survive Rule 12(b)(6) dismissal.[55]

At ¶ 2, for example, the Complaint alleges that the perpetrators of the embassy bombings were given "cover, sanctuary, technical assistance, explosive devices and training" by Sudan. No details whatsoever are pled regarding any of this, such as who did what, when each form of assistance was given, where it was given, by which persons it was given, and to which persons it was given. Indeed, the laundry list quoted above is largely a recitation of some of the items contained in 18 U.S.C. 2339A, which 28 U.S.C. 1605(a)(7) incorporates by reference. This is nothing other than the pleading of legal conclusions, not facts, and as such it is not sufficient. *Donald v. Orfila*, 618 F. Supp. 645, 647 n.1 (D.D.C. 1985) (allegations that official acted in bad faith beyond the scope of this authority so as not to be entitled to immunity were legal conclusions not admitted for purposes of 12(b)(6) motion).

At ¶ 4, plaintiffs make a general allegation that the activities of Sudan's Ministry of Interior included "prosecution of terrorist acts" against U.S. nationals, through provision of material support to various terrorist organizations including al Qaeda and Hezbollah. No attempt is made to link this general allegation—itself pled in an entirely conclusory manner with no factual details at all—to the events alleged in this case. Such conclusory and generalized allegations are deficient. *See Steele v. Isikoff*, 130 F. Supp. 2d 23, 28, 34-35 (D.D.C. 2000) (court need not accept inferences not supported by "facts set out in the complaint," nor must the court "accept legal conclusions cast in the form of

---

[55] *See, e.g., Taylor v. FDIC*, 132 F.3d 753, 762 (D.C. Cir. 1997) (legal conclusions insufficient to state a claim); *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (court need not accept legal conclusions cast in the form of factual allegations); *M.K. v. Tenet*, 99 F. Supp. 2d 12, 17 (D.D.C. 2000) (rejecting as insufficient legal conclusions cast in the form of factual allegations); *see also Crest Auto Supplies, Inc. v. Ero Mfg. Co.*, 360 F.2d 896, 902 (7th Cir. 1966) (pleading should set forth sufficient facts to enable trial court to determine whether a claim has been stated; "[n]either a judge nor this court can test a pleading which merely copies some of the words of the statute, violation of which is the alleged basis of the complaint").

factual allegations;" tort claim dismissed under Rule 12(b)(6) where plaintiff failed to make fundamental allegation that defendant's conduct proximately caused plaintiff's injury).

A similar allegation is found at ¶ 7, in which plaintiffs make a general claim that Sudan's activities included support of terrorist activities operating with cover of the Sudanese government. Still no details at all are pled, and still no link is even attempted between the alleged support and the particular events at issue here. The allegation, once again, is deficient. *Price*, 294 F.3d at 93-94; *Steele*, 130 F. Supp. 2d at 28, 34-35.

At ¶ 8, Sudan is alleged to have entered into "an arrangement" with al Qaeda and Hezbollah whereby members of those organizations received protection while the organizations planned and trained for the embassy bombings. Plaintiffs also allege that a meeting between al Qaeda and Hezbollah took place within the borders of Sudan, which meeting was in furtherance of the bombing plot. Plaintiffs provide no details regarding any of this, nor do they even allege that Sudan knew that al Qaeda and Hezbollah were planning the embassy bombings. Most important, plaintiffs plead no facts or details regarding the nature of the "protection" allegedly provided, who provided it, when it was provided, under what terms it was provided, or why it was even needed—"protection" from what, and from whom? The allegation of "provision of protection," which is the basis upon which plaintiffs seek to deprive Sudan of its sovereign immunity, is as conclusory as the allegations dismissed by the court in *Price*, and is equally deficient. *See Haynesworth v. Miller*, 820 F.2d 1245, 1254 (D.C. Cir. 1987) (bare conclusions of law, or sweeping and unwarranted averments of fact, will not be deemed admitted for purposes of motion to dismiss).

A similar allegation is found at ¶ 9, where plaintiffs, in an equally conclusory manner and with an equal lack of any specific factual allegations, repeat the charge that Sudan's Ministry of Interior provided cover and protection for those who carried out the embassy bombings. Again, plaintiffs fail to plead a single fact regarding the provision of such alleged support, or a single fact

linking any conduct of Sudan to bombings, or a single fact suggesting that the "cover and protection" allegedly provided by Sudan was any different from the "cover and protection" that any country gives to those persons who happen to reside within its borders.[56]   Similar conclusory allegations regarding Sudan's "provision of material support" for and "concurrence" with the bombings—once again the pleading of conclusions as opposed to specific facts—are contained in the various personal injury counts. *See, e.g.*, Complaint ¶¶ 13, 18, 21, 30, 44, 47, 56, 63.

And that is it.  Upon those allegations, pled entirely in conclusory terms and lacking any of the "useful details" demanded by *Price*—indeed, lacking any factual details *whatsoever* supporting the legal conclusions pled—a sovereign nation would be brought into this court and made to defend itself.  The pleading here would not be sufficient in any case.  It certainly is not sufficient in this sensitive context, and it should be dismissed.[57]

    2.    <u>The Complaint should be dismissed for failure to plead causation.</u>

As the claims in this case allege what is essentially tortitous conduct, plaintiffs must make factual allegations that their injuries would not have occurred but for Sudan's conduct—*i.e.*, that a causal link exists between Sudan's alleged acts and plaintiffs' injuries.  *See Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 98-99 (refusing to enter default judgment against foreign

---

[56] It is wrong to assume that a country is guilty of facilitating terrorism simply because persons who reside—or, as in Sudan's case, formerly resided—in a given country (and who thus were given "protection" in some sense by the government and laws of that country) go on to commit a terrorist act. Persons who are or may turn out to be terrorists live in many countries. Indeed, the House Judiciary Committee noted that "[s]everal terrorist groups have established footholds ... in the United States" and such groups "operate largely without fear of recrimination"; the Committee also expressed its concern that the United States was being used "as a staging ground for those who seek to commit acts of terrorism against persons in other countries." H.R. Rep. No. 104-383 at 43 (1995). The Committee went on to acknowledge that "[t]he removal of alien terrorists from the United States, and the prevention of alien terrorists from entering the United States in the first place, present among the most intractable problems of immigration enforcement." *Id.* at 53. *See also* Conference Report on S. 735, Antiterrorism and Effective Death Penalty Act of 1996, 142 CONG. REC. H3616 (Apr. 18, 1996) (Remarks of Cong. Deutsch) (discussing the fact "that a terrorist organization like Hamas can establish a fundraising center just down the road from the United States Capitol"); Terrorism Prevention Act—Conference Report, 142 CONG. REC. S3464 (Apr. 17, 1996) (Remarks of Senator Brown) ("It is well known that many foreign terrorist groups depend on money raised in the United States to fund their activities abroad.); Terrorism Prevention Act—Conference Report, 142 CONG. REC. S3360 (Apr. 17, 1996) (Remarks of Senator Hatch) (stating that "we have ... at least 1,500 known terrorist groups and people in this country that we are watching and monitoring").

[57] *Id.* at 93-94; *cf. ACLU Foundation of Southern California v. Barr*, 952 F.2d 457, 468 (D.C. Cir. 1991) (courts require "allegations of the specific facts needed to overcome the defense" of official immunity); *Askir v. Boutros-Ghali*, 933 F.

sovereign where plaintiff failed to establish that defendants' acts of support caused plaintiff's injury). The Complaint does not contain any such factual allegations. Accordingly, the Complaint should be dismissed pursuant to Rule 12(b)(6) for failure to plead facts establishing causation.[58]

> 3.   Plaintiffs have not sufficiently pled a common law claim for assault and <u>battery in any event.</u>

Even if a common law assault and battery claim were conceivably available to plaintiffs, it would not apply here. Sudan is not alleged to have actually committed the acts at issue, so any claim against Sudan would have to be based on an aiding and abetting or conspiracy theory. Aiding and abetting require, *inter alia*, an allegation that the defendant knew of his role as part of an overall tortious activity at the time he provided assistance to those who later committed the wrongful act, as well as an allegation of the defendant's knowing and substantial assistance in the principal violation itself. *Ungar*, 211 F. Supp. 2d at 99. Conspiracy requires, *inter alia*, an allegation of agreement to commit the act in question between the supporting party and the party who actually committed it. *Id.* at 100. The Complaint contains no fact allegations supporting either theory.

> D.   <u>Plaintiffs' claim for punitive damages should be dismissed.</u>

The FSIA forbids the award of punitive damages against foreign states. 28 U.S.C. 1606. Count 25, which requests punitive damages, should be dismissed as to the Sudan defendants.

> IV.   THIS CASE SHOULD BE DISMISSED PURSUANT TO THE ACT OF STATE <u>DOCTRINE.</u>

The Act of State doctrine "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own

---

Supp. 368, 373 (S.D.N.Y. 1996) (dismissing claim on immunity grounds where "plaintiff has done nothing more than offer conclusory allegations").

[58]   Some cases from this District have suggested a lenient causation standard (albeit in the context of discussing establishment of jurisdiction under § 1605(a)(7)): that general sponsorship of a terrorist who then injures a U.S. national creates a sufficient link between defendant's conduct and the injury, and thus that no showing is necessary that the support given by the state contributed directly to the act in question. *See, e.g., Kilburn*, 277 F. Supp. 2d at 30-32

territory." *World Wide Minerals Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1164 (D.C. Cir. 2002) (citation omitted). The doctrine applies "when 'the relief sought or the defense interposed would [require] a court in the United States to declare invalid the official act of a foreign sovereign performed within' its boundaries." *Id.* at 1164-65 (brackets in original).

The Act of State doctrine "is not some vague doctrine of abstention but a '*principle of decision* binding on federal and state courts alike.'" *W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp*, 493 U.S. 400, 406 (1990) (citation omitted) (emphasis in original).

> A.   Rendering a judgment here would require the court to rule on the validity of
> official acts of Sudan performed within its territory.

The court could not render a judgment on plaintiffs' allegations against Sudan without also rendering judgment on the validity of a number of alleged acts of the Sudanese government, potentially involving, *inter alia,* security and intelligence operations of the most sensitive nature, all of which are alleged to have taken place only within Sudan. It is this very inquiry that the Act of State doctrine prohibits, regardless of whether the legality or illegality of the alleged acts is to be judged based upon reference to U.S., foreign, or international law. *Riggs,* 163 F.3d at 1367.

The circumstances of this case render application of the Act of State doctrine particularly appropriate. To decide this case, the court would need to hear and evaluate evidence as to whether the security and intelligence agencies within the Sudanese Government had obtained detailed knowledge of the future plans of a number of groups and individuals, many if not all of whom would not be known by the government to have conducted any previous terrorist activities at all. Further, the court would have to consider whether any such intelligence that may have been available to the government was sufficient to alert it as to the specific acts that the government is alleged to have aided. The court would also have to inquire into whether any such intelligence was

---

(citing cases). This would be a lesser standard from the one established in *Ungar,* and it is one that Sudan submits is an

shared by intelligence officers with senior policy-level officials of the Sudanese government, and whether senior Sudanese officials ought to have determined that such intelligence was credible.

As to the alleged actions of the Sudanese government, the court's inquiry would have to focus on the particular acts of particular government officials that were allegedly intended to support known plans to commit the embassy bombings, and the court would then need to examine the extent to which any particular assistance allegedly provided by a Sudanese official was within the policy of the government and the scope of the official's authority such that the act could fairly be considered to have been within the scope of that individual's office.

Political and economic conditions in Sudan would complicate and exacerbate the challenge faced by the court in making such determinations. Sudan has been fighting a civil war against a number of different separatist groups, in a conflict that has been fought intermittently for decades. The civil war has enflamed tribal and religious tensions, strained the resources of the government, and tested the control mechanisms of the civilian central government, particularly in those areas where the rebels are strongest. The extraordinary political and economic factors operative in Sudan are such that plaintiffs' allegations against Sudan could not be evaluated by the court without a careful examination of the motives underlying each particular act that allegedly was taken by a given Sudanese official.

Further, the court would need to evaluate whether the government gathered and acted upon available intelligence in order to frustrate the activities of the groups and individuals in question. For example, any alleged overtures made by Sudanese officials to the groups in question, or meetings with relevant individuals, would not in themselves be evidence of an intention to support the acts in question, as such activities are typical of the type that security and intelligence agencies use to facilitate monitoring of the groups' activities. Indeed, Sudan has submitted evidence that

---

improper departure from traditional standards of causation as established in tort cases.

Sudan, far from assisting terrorist groups generally and far from providing assistance specifically tailored to facilitate the embassy bombings, was in fact engaged in counter-terrorism efforts domestically and was trying to engage the United States in joint counter-terrorism efforts and intelligence operations.[59]   To assess these issues, the court would need to subject to scrutiny the most sensitive communications from security, intelligence, and diplomatic officials of Sudan and their counterparts in the United States, and possibly Kenya and Tanzania.[60]

The inquiry that would be necessary here—scrutiny into the knowledge and motivations underlying the acts of officials at all levels within a foreign government—is precisely the sort of inquiry that the Act of State doctrine prohibits.   The case law recognizes that courts are poorly equipped to sit in judgment over the actions of foreign governments, *see generally Sabbatino*, 376 U.S. at 427-32, and this disability is particularly apparent in this case, where the challenges faced by the government in question are so complicated and so foreign to the experience of any U.S. court.

> B.    There are no well developed international legal standards for the court to apply in this case.

The difficulty of applying normal judicial analysis to plaintiffs' allegations is compounded by the fact that there are no well developed international legal standards available for the court's analysis and application.   A factor that weighs in favor of applying the Act of State doctrine is the extent to which there is a lack of international consensus regarding a particular activity or a lack of

---

[59] Carney Dec. ¶¶ 7-9; Cloonan Dec. ¶¶ 16-18.

[60] The State Department adverted to such a troublesome possibility in opposing enactment of § 1605(a)(7): "[T]he U.S. Government frequently coordinates closely with other nations ... on the imposition of sanctions and the development of joint positions vis-à-vis acts of terrorism.   The possibility of civil suits and potential judgments against state-sponsors of terrorism would inject a new unpredictable element in these very delicate relationships. Such proceedings could in some instances interfere with U.S. counter-terrorism objectives. They could also raise difficult issues involving sensitive intelligence and national security information."   Testimony of Jamison S. Borek, Deputy Legal Advisor, U.S. Department of State, at Hearings on S. 825, before the Senate Subcommittee on Courts and Administrative Practice (June 21, 1994).

"internationally-accepted legal principles which would render the issues appropriate for judicial disposition."[61]

Plaintiffs do not allege that the perpetrators of the embassy bombings were employees or agents of the Sudanese government. Rather, they claim that Sudan aided groups of which the perpetrators were members. Under international law, the acts of a political group, even an armed paramilitary group, are generally not imputable to a sponsoring government, even where the government provides support or encouragement to the group. This issue was addressed by the International Court of Justice in *Military and Paramilitary Activities* (Nicar. v. U.S.), 1986 I.C.J. 14 (June 27) (Merits, Judgment). There the International Court determined that the United States had supported the Nicaraguan *Contras* with financial aid, training, and political and strategic support, but nonetheless held that the illegal acts of the *Contras* were not imputable to the United States under international law. *Id.* at 62-65. Even though U.S. support may have been "preponderant or decisive in the financing, organizing, training, supplying and equipping of the *Contras*, the selection of its military or paramilitary targets, and the planning of the whole of its operation," this was insufficient for the purpose of attributing to the United States the illegal acts of the *Contras* committed in the course of their military operations in Nicaragua. *Id.* at 64. As stated by Judge Schwebel, "[c]ustomary international law does not know the delict of 'encouragement,'" such that even *inducing* a group to commit acts in violation of international law is itself not a violation of international law. *Id.* at 388 (dissenting opinion of Judge Schwebel at ¶ 259).

Therefore, the acts of the perpetrators of the embassy bombings would not be attributable to Sudan under international law. Further, even if the very general allegations in the Complaint were shown to be true—which they are not—they would not establish any violation of international

---

[61] *IAM v. OPEC*, 649 F.2d 1354, 1361 (9th Cir. 1981) (citing *Sabbatino*, 376 U.S. at 428); *see also Liu v. Republic of China*, 892 F.2d 1419, 1433 (9th Cir. 1989) (citing *Sabbatino*, 376 U.S. at 428).

standard by the Government of Sudan with respect to its acts or omissions in respect of the perpetrators of the embassy bombings.  For example, with respect to plaintiffs' allegation that Sudan provided "cover" to "terrorist groups," Complaint ¶ 2, there is no international standard by which the court could judge the alleged acts or omissions to have been illegal; indeed, there is no applicable international law that even sets out an accepted definition of what constitutes a "terrorist group" to begin with.[62]  Further, the only two treaties that might provide the court with some standards are the United Nations International Convention for the Suppression of Terrorist Bombings, *opened for signature* Jan. 12, 1998, 116 Stat. 721, 37 ILM 249, and the United Nations International Convention for the Suppression of the Financing of Terrorism, *opened for signature* Jan. 10, 2000, 116 Stat. 721, 39 ILM 270, which treaties prohibit certain forms of assistance to known terrorist plans. At the time the embassy bombings occurred, however, neither the United States nor any other country had ratified either treaty. The International Convention for the Suppression of Terrorist Bombings, the first of the two treaties to enter into force, did not enter into force until May 23, 2001.

C.   This case involves sensitive issues that the Act of State doctrine requires to be left to the political branches of the U.S. government.

One of the purposes of the Act of State doctrine is to avoid an intrusion by the judiciary into matters best left to the political branches of the U.S. government; the doctrine has particular applicability where the issues raised would require the court to scrutinize sensitive intelligence, security, and foreign policy operations of the Executive. *West v. Multibanco Comermex, S.A.*, 807 F.2d 820, 827-28 (9th Cir. 1987); *OPEC*, 649 F.2d at 1358-59. The doctrine "reflects fundamental notions of separation of powers in urging that our nation conduct its foreign relations with the

---

[62]  *See, e.g.*, Anne-Marie Slaughter and William Burke-White, *An International Constitutional Moment*, 43 HARV. INT'L L.J. 1, 9 (2002) (noting that, unlike the law of war and international criminal law, the international law of terrorism has progressed slowly, having "stumbled over the lack of a widely accepted working definition of the term.").

unified voice of the Executive Branch rather than through a multitude of judicial pronouncements." *Bandes v. Harlow & Jones, Inc.*, 852 F.2d 661, 666 (2d Cir. 1988).

Rendering a decision in this case would require the court to make determinations regarding the most sensitive aspects of relations between the United States and Sudan, the complexities of which are being carefully managed at senior levels within the Executive Branch. The State Department has indicated that cooperation on counter-terrorism efforts has been discussed in personal meetings between senior U.S and Sudanese officials.[63] The delicacy of these relations is further complicated by the current efforts that the United States is supporting through the work of the President's Special Envoy, former Senator John Danforth, aimed at bringing an end to civil war in Sudan.[64] Senator Danforth met with Vice President Taha and Chairman Garang most recently in January 2004, at which time both parties stressed the importance of the U.S.'s leadership role to the peace process.[65]

The Act of State doctrine is especially applicable in cases where the issues raised are of such

---

[63] *See, e.g.*, Transcript of State Department Daily Press Briefing, Ambassador Richard A. Boucher, Asst. Secretary of State for Public Affairs (May 21, 2003) (http://www.state.gov/r/pa/prs/dpb/2003/20842.htm). Indeed, the State Department is pleased with Sudan's counter-terrorism efforts. *See id.* ("[W]e have had very good, and I think increasingly good cooperation with Sudan on issues of counterterrorism, working together."). *See also* Ambassador Cofer Black, Coordinator for Counterterrorism, Dept. of State, Remarks at the On-the-Record Briefing on the Release of the Annual Patterns of Global Terrorism 2002 Report (April 30, 2003) (http://www.state.gov/s/ct/rls/rm/2003/20072.htm) (discussing U.S. pleasure with Sudanese cooperation in counter-terrorism efforts).

[64] *See* Assessment From the President's Special Envoy for Peace in Sudan, Report from John C. Danforth, April 21, 2003 (http://www.state/gov/p/af/rls/rpt/19796.htm). Indeed, both the President and the State Department have a keen interest in the outcome of Sudan's civil war. The President has "determined and certified that the Government of Sudan and the Sudan People's Liberation Movement are negotiating in good faith and that negotiations should continue." U.S. Dept. of State, Office of the Spokesman, *Sudan Peace Act Presidential Determination* (Oct. 22, 203) (http://www.state.gov/r/pa/prs/2003/25548.htm). The State Department has said that "[t]he United States will continue to work tirelessly" in support of the Peace Process, and has noted the United States' "senior-level involvement" in the peace process and its "provision of . . . resources and personnel." Adam Ereli, Deputy Spokesman, U.S. Dept. of State, *Sudan: Agreement on Security Arrangements* (Sept. 25, 2003) (http://state.gov/r/pa/prs/ps/2003.24545.htm); Philip T. Recker, Deputy Spokesman, U.S. Dept. of State, *Sudan: Talks Resume—Time for Agreement is Now* (Aug. 7, 2003) (http://www.state/gov/r/pa/prs/ps/2003/23123.htm).

[65] *See* U.S. Dept. of State, *Report on the Parties' Participation in and Commitment to the Sudan Peace Act* (2004 (http://www.state.gov/p/af/rls/rpt/30105.htm). In addition, the United States leads the Civilian Protection Monitoring Team in southern Sudan, and supports the cease-fire in Sudan's Nuba Mountains. *See id.*

a politically charged nature.[66] The allegations made by plaintiffs are of the most sensitive nature in Sudan, Kenya and Tanzania, and in the United States as well. Heated public debate has already emerged in the international media with respect to such issues as: (1) the level of counter-terrorism cooperation offered by Sudan to the United States throughout the second half of the 1990s, and whether Sudanese overtures were wrongly rejected as part of a political policy formulated by senior personnel within the Clinton administration, *see US missed three chances to seize Bin Laden*, SUNDAY TIMES (LONDON), Jan. 6, 2002; (2) the extent to which U.S. policy concerning Sudan was shaped by "questionable intelligence" reports, the deficiency of which has subsequently been acknowledged by U.S. officials, *see* Tim Weiner and James Risen, *Decision to Strike Factory in Sudan Based on Surmise Inferred from Evidence*, NEW YORK TIMES, Sept. 21, 1998, at A1; and (3) the extent to which these failures hindered intelligence and security operations that might have reduced the risks of terrorist acts by these same groups on U.S. soil, such that "[w]e probably never would have seen a September 11," *see* Barton Gellman, *U.S. Was Foiled Multiple Times in Efforts to Capture Bin Laden or Have Him Killed; Sudan's Offer to Arrest Militant Fell Through After Saudis Said No*, WASHINGTON POST, Oct. 3, 2001, at A1; David Rose, *The terrorism crisis: SPY BLUNDER: Resentful West spurned Sudan's key terror files*, THE OBSERVER, Sept. 30, 2001, at 4.

Indeed, Sudan is submitting evidence that it made numerous efforts to cooperate on counter-terrorism initiatives with the United States even during the period in which the embassy bombings took place.[67] The court could not render a fair judgment on the allegations made by plaintiffs without evaluating this issue, which evaluation would entail an inquiry into the knowledge and treatment of such overtures by U.S. security, diplomatic, and intelligence personnel. The Act of

---

[66] *See Sabbatino*, 376 U.S. at 428 ("It is ... evident that some aspects of international law touch much more sharply on national nerves than do others; the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches."); *OPEC*, 649 F.2d at 1361 (holding that "[t]he courts should not enter at the will of litigants into a delicate area of foreign policy which the executive and legislative branches have chosen to approach with restraint").

State doctrine requires that, in matters raising such politically sensitive questions, the courts must defer to those branches of the U.S. Government that are better equipped to resolve such matters. *Virtual Defense & Dev. Int'l, Inc. v. Republic of Moldova*, 133 F. Supp. 2d 1, 7 (D.D.C. 1999). The doctrine is "designed to prevent judicial pronouncements on the legality of the acts of foreign states which could embarrass the Executive Branch in the conduct of foreign affairs." *Liu*, 892 F.2d 1432 (citing *Sabbatino*, 376 U.S. at 428). Further, one of the purposes of the Act of State doctrine is to prevent U.S. district courts from becoming a forum for rendering judgments as to performance of the foreign affairs and intelligence functions by the Executive Branch and by other governments, particularly when such judgments could result in embarrassment of the Executive Branch in the conduct of foreign affairs. *See Honduras Aircraft Registry, Ltd. v. Gov't of Honduras*, 129 F.3d 543, 550 (11th Cir. 1997); *Liu*, 892 F.2d at 1432.

For all of the above reasons, the Act of State doctrine prohibits judicial consideration of the allegations made against Sudan in this case.

## V.    THIS CASE SHOULD BE DISMISSED PURSUANT TO THE POLITICAL QUESTION DOCTRINE.

The court should also decline to exercise jurisdiction on the additional basis that the issues raised are nonjusticiable political questions that are not properly the subject of judicial scrutiny.

There are three inquiries in identifying a political question:  (1) Does the issue involve resolution of issues committed by the text of the Constitution to a coordinate branch of government? (2) Would resolution of the question demand that a court move beyond areas of judicial expertise? (3) Do prudential considerations counsel against judicial intervention? *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1511 (D.C. Cir. 1984).  The instant case meets each of these criteria.

---

[67] Carney Dec. ¶¶ 7-9; Cloonan Dec. ¶¶ 16-18.

First, resolution of this case would require judicial intrusion into the conduct of bilateral relations between the United States and Sudan on counter-terrorism cooperation matters committed to the Executive Branch under Article II.  As noted above, the State Department has indicated that Sudan is engaged in close cooperation with U.S. counter-terrorism efforts and that this bilateral cooperation on counter-terrorism initiatives includes direct discussions among senior government officials.[68]  The court could not proceed in this case without passing judgment on, and possibly interfering with, this important cooperative relationship on counter-terrorism.

Second, as explained above, if the court proceeded with this case it would be called upon to render determinations with respect to sensitive factual matters concerning the conduct of security and intelligence operations by the Sudanese Government and the response to those activities by the United States and other governments.  In previous cases where courts have been invited to review sensitive information concerning alleged activities of foreign terrorist groups, the courts have found such review to lie beyond judicial expertise. *See People's Mojahedin Organization of Iran v. United States Dep't of State*, 182 F.3d 17, 23 (D.C. Cir. 1999) ("*PMOI I*"); *People's Mojahedin Organization of Iran v. Dep't of State*, 327 F.3d 1238, 1240-41 (D.C. Cir. 2003) ("*PMOI II*").  In *PMOI I* and *PMOI II*, the court declined to review the Secretary of State's determination that the plaintiff groups posed a security risk to the United States because the court recognized that it was poorly equipped to gather and analyze sensitive intelligence information calling for "decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibilities and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry."[69]

Third, prudential considerations counsel against the court's consideration of this case.  To evaluate plaintiffs' allegations against Sudan, the court would need to evaluate counter-evidence

---

[68] *See supra* at Section IV.C.

concerning Sudanese efforts to pursue cooperation with various U.S. agencies, requiring an inquiry into the Executive Branch's conduct of sensitive foreign affairs.  Although the allegations raised in the Complaint refer to matters occurring in 1998 and before, the court would not be able to evaluate the truth of those allegations without considering how the current cooperative relationship between the United States and Sudan came to be, whether and why U.S. agencies were less receptive to Sudan's offers of assistance on counter-terrorism initiatives from 1996 until 2000, and how the level of cooperation in recent years bears on the likely veracity of the plaintiffs' allegations.

In short, consideration by this court of plaintiffs' allegations would run the risk of aggravating the important cooperative and beneficial relationship between the United States and Sudan on the very issues raised in this case, it would require the court to indulge in an assessment of the quality of the intelligence and security operations of a foreign government, and it would engage the court in a review of the security and intelligence operations of the Executive Branch.  The political question doctrine forbids any such judicial inquiry.[70]

VI.    THE COMPLAINT SHOULD BE DISMISSED UNDER RULE 19.

To recover against Sudan in this case, it would not be enough for plaintiffs to prove that Sudan gave material support to certain persons or groups.  Plaintiffs must also prove that such persons or groups are the same persons or groups who actually went on to commit the embassy bombings, as there is no legal theory that holds a party liable for "supporting" another party who is not shown to have actually committed some wrongdoing.  But the persons who committed the embassy bombings have not been named as defendants and are not before the court—nor will they ever be.

---

[69] *PMOI I*, 182 F.3d at 23 (*quoting Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103, 111 (1948); *see also PMOI II*, 327 F.3d 1240-41.
[70] At the least, this court should not proceed without first asking the State Department for a statement of the Government's interests in this matter.

No party is in a position to assert a defense on behalf of these missing persons. Their testimony cannot be compelled, nor can any documentary evidence in their possession that may establish their innocence. The case against these missing persons would be made in an entirely one-sided presentation wherein the facts needed to establish what may be a valid defense would not be presented because they were in the hands of persons and groups who have no interest whatsoever in the outcome of these proceedings and who are far outside of the process of this court. Yet a finding of their involvement in the bombings, made in what would essentially be a default proceeding, could be the final step in establishing liability against Sudan in this case.[71]

That would be unfair to Sudan. And this is the sort of situation for which Rules 12(b)(7) and 19 provide a remedy. This case cannot proceed in the absence of the groups and individuals that are alleged to have carried out the attacks that give rise to plaintiffs' complaint. Those groups and persons are necessary parties to this action under Rule 19.

A party is deemed to be "necessary" under Rule 19(a) if failure to join that party would result in any one of three possible risks: (1) inability of the court to accord complete relief among the parties; (2) risk of harm to the absentee's ability to protect its interest; or (3) risk of harm to the defendant by subjecting it to double liability or inconsistent obligations.

Here, complete relief cannot be accorded in the absence of the missing parties, who are alleged to have perpetrated the acts at issue or to have been central to their planning. If the whole of this case is to be determined, those allegedly at the heart of the conduct at issue must be before the court and bound by its judgment. Indeed, "one focus of Rule 19 is the 'interest of the courts and the

---

[71] Sudan again emphasizes that it had no involvement in the embassy bombings or their planning. The instant discussion is premised on the theoretical possibility that an erroneous finding of Sudan's support for terrorists might be made.

public in complete, consistent, and efficient settlement of controversies.'"[72]   As settlement of this controversy cannot be "complete" without the joinder of those persons alleged to have committed acts central to the case, they are necessary parties under Rule 19.

Under Rule 19(a), persons deemed to be necessary must be joined if joinder is "feasible." Joinder is deemed not to be feasible if one of two circumstances exists:  the persons are not subject to service of process, or the persons' joinder will destroy diversity jurisdiction.  Here, joinder of the persons needed for a complete adjudication of the action is not feasible because those persons are not subject to service of process, given that the court has no personal jurisdiction over them. Moreover, even if the court did have personal jurisdiction over these necessary parties, it is inconceivable as a practical matter that they will ever appear before the court.

Under Rule 19(b), the court cannot proceed in the absence of these necessary parties.  Where the joinder of parties necessary to the complete adjudication of an action is not feasible, Rule 19(b) requires that the court determine whether "in equity and good conscience" the case may proceed. Proceeding in the absence of the necessary parties here would not meet this standard.

As noted above, Sudan would be unfairly prejudiced were it forced to proceed in defense without the presence of those who are missing.   Sudan would stand to benefit from the establishment by the missing persons of a defense to the charges that they committed the bombing, but that defense will not be made.   Moreover, Sudan is alleged to have participated with these persons and entities in connection with the events here at issue. If this case were to go forward, Sudan would be severely hindered in its ability to adduce evidence of its lack of participation with those who are missing, as well as other defensive evidence. Sudan would be in a difficult position:

---

[72] *Temple v. Synthes Corp.*, 498 U.S. 5, 6 (1990) (*quoting Provident Tradesmen's Bank & Trust Co. v. Patterson*, 390 U.S. 102, 111 (1968)).

on trial for participating with missing persons and entities with no ability to compel or otherwise adduce evidence, from those who are missing, that such participation did not occur.

In such circumstances, Rule 19(b) deems those who are missing to be indispensable. One of the enumerated factors for indispensability is the extent to which "judgment rendered in the person's absence might be prejudicial to ... those already parties...." The prejudice that would occur to Sudan if this case proceeded in the absence of those who are alleged to have been the central figures in the events at issue is manifest. The absence of these persons would deprive Sudan of its only opportunity to adduce evidence central to its defense.[73] It might also subject Sudan, as the only appearing defendant, to sole responsibility for damages even though such liability would properly be shared by other defendants if they were present.[74] In either of these events, Sudan would be unfairly prejudiced. Accordingly, the case should not proceed without proceed without the joinder of al Qaeda, Hezbollah, individual members thereof, and any other parties the court deems necessary to a complete and just adjudication of this action.

VII.   CONCLUSION.

The Republic of the Sudan has the greatest sympathy for those who suffered, and who still suffer, from the horrific events of August 7, 1998. Indeed, Sudan has attempted to assist in bringing to justice those responsible for these acts. Nevertheless sympathy for the victims does not relieve Sudan of the obligation to defend itself against proceedings that would wrongly accuse it of complicity in such horrors and require its citizens to compensate those to whom they did no wrong.

---

[73] *See Whyham v. Piper Aircraft Corp.*, 96 F.R.D. 557, 561-62 (M.D. Pa. 1982) (case against domestic aircraft manufacturer dismissed under Rule 19 where manufacturer could not properly establish defense without presence of foreign parties who owned and maintained allegedly defective aircraft and who could not be joined; evidence from foreign parties was crucial to manufacturer's defense and without their joinder, manufacturer could not present its defense adequately and thus case against manufacturer could not proceed in equity and good conscience).

[74] *See Provident Tradesmen's Bank*, 390 U.S. at 109-11 (defendant's interest in avoiding sole responsibility for shared liability one of the factors in Rule 19 analysis); *Estrella v. V&G Mgt. Corp.*, 158 F.R.D. 575, 580 (D.N.J. 1994) (dismissal recommended under Rule 19 where missing party's negligence was alleged to be the primary cause in fact of plaintiff's harm; present defendant would improperly be threatened with increased liability in absence of primary

For the foregoing reasons, the Republic of the Sudan and its Ministry of Interior respectfully ask this court to dismiss the claims that have been made against them, with prejudice.

Respectfully submitted,

John F. Dienelt
Bar No. 110742
Don C. Lewis
Bar No. 403434
Martin T. Lutz
Bar No. 427634
PIPER RUDNICK LLP
1200 Nineteenth Street NW
Washington, DC  20036-2412
(202) 861-3900

---

wrongdoer); *Potter v. Bennett*, 826 F. Supp. 62, 64-65 (D.R.I. 1993) (case dismissed under Rule 19 where judgment rendered in absence of missing parties would subject present defendant to sole responsibility for shared liability).

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

JAMES OWENS, *et al.*,                          (
                                                (
          Plaintiffs,                           (
                                                (
vs.                                             (          Civil Action No. 01-2244 (JDB)
                                                (
REPUBLIC OF THE SUDAN, *et al.*,                (
                                                (
          Defendants.                           (

## ORDER

On this day came on to be considered the Motion to Dismiss filed by Defendants Republic of the Sudan and Ministry of the Interior of the Republic of the Sudan. The court has considered the materials submitted by all parties and argument of counsel, and based upon that consideration the court deems the Motion to be meritorious.

Therefore, it is hereby ORDERED, ADJUDGED, and DECREED that the Motion to Dismiss is hereby GRANTED. Plaintiffs' allegations against defendants Republic of the Sudan and Ministry of the Interior of the Republic of Sudan are hereby DISMISSED WITH PREJUDICE.

_____
JUDGE PRESIDING

Copies to:


Thomas Fortune Fay
601 Pennsylvania Avenue, N.W.
No. 900—South Building
Washington, DC  20004
(202) 638-4534

Steven R. Perles
1615 New Hampshire Avenue, N.W.
Suite 200
Washington, DC  20009
(202) 745-1300

Rhonda C. Fields
United States Attorney's Office
555 Fourth Street, NW
10th Floor
Washington, DC  20530
(202) 514-6970
Fax: (202) 514-8780
rhonda.fields@usdoj.gov

John F. Dienelt
Piper Rudnick LLP
1200 Nineteenth Street, NW
Washington, DC  20036
(202) 861-3880
Fax: (202) 223-2085
john.dienelt@piperrudnick.com

Don C. Lewis
Piper Rudnick LLP
1200 Nineteenth Street, NW
Washington, DC  20036
(202) 861-6417
Fax: (202) 689-8569
don.lewis@piperrudnick.com

## CERTIFICATE OF SERVICE

I certify that the foregoing documents were served on March 10, 2004 on the following attorneys by hand delivery:

Thomas Fortune Fay, Esq.
601 Pennsylvania Avenue, NW
No. 900—South Building
Washington, DC  20004

Rhonda C. Fields, Esq.
Assistant U.S. Attorney
U.S. Department of Justice
555 Fourth Street, NW
10th Floor
Washington, DC  20530

Steven R. Perles, Esq.
1615 New Hampshire Avenue, NW
Suite 200
Washington, DC  20009

_____

Dated: March 10, 2004