UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMES OWENS, et al., | ( |
| Plaintiffs, | ( |
| vs. | ( Civil Action No. 01-2244 (JDB) |
| REPUBLIC OF SUDAN, et al., | ( |
| Defendants. | ( |

DECLARATION OF JOHN E. CLOONAN

I, John E. Cloonan, do depose and state as follows:

1. My name is John E. Cloonan. I am over 21 years of age. I reside at 78 Elmwood Terrace, West Caldwell, New Jersey. I have never been convicted of a crime. I am of sound mind. I am fully capable and competent to make this declaration. Unless otherwise noted, I have personal knowledge of the facts stated in this declaration. All of the facts stated in this declaration are true and correct.

2. From 1972 until 1979, and from 1981 until October 2002, I was employed as a Special Agent with the Federal Bureau of Investigation, working out of the New York City office. From 1979 until 1981, I was in the corporate security department of Exxon Corporation. Based on my service with the FBI, I have extensive experience in criminal investigation including the

gathering and assessment of factual evidence related to criminal conduct.

3. In the Spring of 1996, I began working on the Osama bin Laden case. I became part of a joint FBI/CIA operation that was legally authorized and responsible for neutralizing Osama bin Laden as a threat to United States national security. One of the legally authorized parts of this effort was to build a prosecutable case against bin Laden, and I worked on this effort with the United States Attorney's office in the Southern District of New York. I conducted extensive factual investigations in connection with my work on that effort. My particular role was to build a conspiracy case against bin Laden. I worked under the theory that the bombings of the United States embassies in Kenya and Tanzania in 1998 were two overt acts within the conspiracy case that I was working on, and for that reason I was privy to all aspects of the factual information developed in the embassy bombing investigations that were conducted by United States law enforcement and intelligence agencies. Based on my knowledge of the investigation results, and based on my investigations and my participation in formulation of the case and in the prosecution of the case against those who were indicted in and convicted of those bombings, I have a very thorough understanding, and very thorough knowledge, of who committed those bombings and the details regarding the planning and execution of the bombings.

4. In the course of my investigations concerning bin Laden, I interviewed four cooperating witnesses regarding the embassy bombings, who by their own admission were members of al Qaeda or the Egyptian Islamic Jihad and have intimate knowledge of the groups' operations. One of those cooperating witnesses was tasked by bin Laden and Mohammed Atef (a/k/a Abu Hafs) to conduct surveillances of the United States embassy in Nairobi and other United States targets in Nairobi. I also interviewed a number of other witnesses regarding the embassy bombings; I discussed the bombings with foreign law enforcement personnel and foreign intelligence services and was privy to and reviewed intelligence reports from those foreign countries; I was privy to all aspects of the United States investigations of those bombings; I received information regarding the embassy bombings generated by the CIA, FBI, National Security Agency, and the Treasury Department's Office of Foreign Assets Control and have discussed the matter with personnel from those agencies; I was privy to and reviewed the results of electronic surveillance and other communication intercepts regarding the bombings that were generated as part of the investigation of the bombings, including intercepts of communications of the person who headed the cell that attacked the embassy in Nairobi, who was a U.S. citizen; I was extensively involved in the preparation of the criminal prosecutions in the Southern District of New York that led to numerous convictions of those involved in the embassy bombings;

and I reviewed voluminous evidence and testimony submitted during those prosecutions.

5. Based on all of that investigative information, and my own personal involvement in the investigation of the embassy bombings, it is my belief and opinion (1) that the Government of Sudan, including its Ministry of Interior, had no involvement in the planning or execution of the attacks on the United States embassies in Kenya and Tanzania in August 1998, (2) that the Government of Sudan, including its Ministry of Interior, had no intent to do anything to assist with the planning or execution of the embassy bombings, and (3) that the Government of Sudan, including its Ministry of Interior, had no previous knowledge that those attacks were being planned or would be carried out.

6. In the course of my extensive investigation and review of investigation results referred to above, I saw no indication whatsoever that the Government of Sudan, or its Ministry of Interior, was involved or implicated in any way in the planning of, execution of, assistance with, training for, organization of, or support for those attacks on the United States embassies.

7. Had there been any indication or evidence of Sudan's involvement in or support for the embassy bombings, I am very confident that I would have developed it, or at the least would have seen it or been made aware of it. I certainly was actively looking for such evidence in my investigation, since as noted above I was trying to build a conspiracy case against bin Laden

and bin Laden had lived in Sudan for a number of years during the 1990s. In addition, we knew that Mohammed Atef, who was al Qaeda's chief military commander, had made calls to a telephone number in Khartoum after the bombings had occurred, and so Sudan was certainly one of the focal points of our investigation.

8. I am aware that the plaintiffs in this case have alleged that Sudan and/or its Ministry of Interior acted to assist in the embassy bombings by providing "cover, sanctuary, technical assistance, explosive devices, and training" to al Qaeda and Hezbollah. Based on my investigation and review of the investigation results concerning bin Laden and the embassy bombings, I believe that this allegation is false. I have seen no indication that Sudan provided that support to either group. As stated above, I believe that I would have seen such evidence had it existed.

9. I am aware that the plaintiffs in this case have alleged that Sudan and/or its Ministry of Interior provided material support or resources for the embassy bombings. Based on my investigation and review of the investigation results concerning bin Laden and the embassy bombings, I believe that this allegation is false. I have seen no indication that Sudan provided that support to either group. As stated above, I believe that I would have seen such evidence had it existed.

10. As stated above, in the course of my investigation of the embassy bombings, and in the course of my participation in

building cases for the prosecution of those indicted in the embassy bombings, which prosecution occurred in the Southern District of New York, I interviewed four cooperating witnesses. To a man, these witnesses told me that Sudan had no involvement in the bombings. I developed no information that Sudan, or agents acting on its behalf, had anything to do with the surveillance, planning, or execution of those attacks.

11. Of course, it is common knowledge that members of al Qaeda lived in Sudan during the 1990s. But this does not mean that Sudan was somehow complicit in any misconduct that al Qaeda subsequently may have engaged in or that al Qaeda was in any sense acting as Sudan's proxy or doing Sudan's bidding when al Qaeda attacked the embassies. It is also a fallacy to assume that, because al Qaeda members were present in Sudan, Sudan (1) implicitly supported their conduct or (2) at least knew what they were planning. In my experience, I would doubt very seriously that any country, including Sudan, would have the intelligence capacity that would have enabled it to be privy to each and every plot or activity being carried out or contemplated by al Qaeda -- any more than the United States was able to detect and prevent terrorist acts that have occurred here. Moreover, my investigation, including discussions with one person who admitted his involvement in the embassy bombings (who also was a U.S. citizen), confirmed that the embassy bombing planning and

preparation was a matter of the utmost secrecy within the two al Qaeda cells involved.

12. I am aware that the plaintiffs in this case have suggested that Hezbollah and/or Imad Mughaniyah were involved with the planning or execution of the embassy bombings. Based on my investigation and review of the investigation results concerning bin Laden and the embassy bombings, I believe that such a suggestion is false. Based on all of the information and investigation to which I have referred above, I have seen no indication of any involvement or implication of Hezbollah or Imad Mughaniyah in these attacks. I believe that I would have seen such evidence had it existed. All of the investigation results that I have seen indicate that the bombings were carried out solely by al Qaeda, and that the planning and execution of these bombings was a self-contained al Qaeda operation. There were two al Qaeda cells involved, one in Mombasa and one in Nairobi. The investigation results that I have seen indicate that the explosives used in the bombings were brought to Kenya by boat from either Somalia or Yemen, put into crates in a truck, and taken by land to Nairobi and to Dar es Salaam. The Nairobi bomb was put together in a house in Nairobi; the Dar es Salaam bomb was put together in a house in Dar es Salaam. Initial surveillance of the embassy in Kenya was carried out by a man associated with al Qaeda and this occurred in 1993.

13. I am aware that the plaintiffs in this case have suggested that Hezbollah was under the operational control of Sudan and/or its Interior Ministry. Based on my investigation and review of the investigation results concerning bin Laden and the embassy bombings, I believe that such a suggestion is false. The investigative information that I have seen indicates no connection between Hezbollah and Sudan. As stated above, I believe that I would have seen such evidence had it existed.

14. I am aware that the plaintiffs in this case have alleged that Sudan, acting through its Interior Ministry, entered into an arrangement with al Qaeda and Hezbollah whereby those groups received shelter and protection while planning and carrying out the embassy bombings. Based on my investigation and review of the investigation results concerning bin Laden and the embassy bombings, I believe that this allegation is false. I have seen no indication that Sudan entered into such an arrangement. As stated above, I believe that I would have seen such evidence had it existed.

15. I am aware that the plaintiffs in this case have alleged that Sudan was involved in an organizational and planning meeting between Osama bin Laden and Imad Mughaniyah with the purpose of carrying out the embassy bombings. Based on my investigation and review of the investigation results concerning bin Laden and the embassy bombings, I believe that this allegation is false. I have seen no indication that Sudan was

involved in or assisted with any such meeting. As stated above, I believe that I would have seen such evidence had it existed. The investigation results that I have seen showed that this meeting occurred in the early 1990s, that Sudan was not present, and that the purpose of the meeting was not aimed at planning for, or organizing for the conduct of, the embassy bombings. The meeting was arranged by a person who was associated with but not a member of al Qaeda.

16. Far from committing or providing support or resources for terrorist acts against the United States embassies in Kenya and Tanzania, the Sudanese had been trying to engage the United States in mutual counter-terrorism initiatives for years, beginning at least by early 1996. These efforts were largely rebuffed by the United States. I do not know but would assume that one of the reasons why the United States rejected Sudan's offers of assistance was that the CIA had received information regarding supposed misconduct, or planned misconduct, on Sudan's part. That information, it later turned out, was discredited, deemed to be false, and withdrawn by the CIA. My understanding is that over 100 reports of this kind were later determined to based on false information. I would assume that such false information, during the time when it was believed to be true, would have caused the United States to be hostile, or at least skeptical, toward Sudan and its offers of assistance.

17. One example of Sudan's willingness to cooperate concerned the phone calls by Mohammed Atef, referred to above. FBI investigators knew of a telephone number within Khartoum that Atef called soon after the embassy bombings. So we asked for and received permission to ask Sudan to help identify the subscriber to the number that Atef contacted and the person or persons who received the calls. We deemed this to be potentially very important information, and we had tried and failed to get it from other sources. I met with a Sudanese official and asked for the information, and he provided it to us. My understanding is that Sudan also conducted its own investigation into the matter and that in the course of that investigation Sudan identified and detained two men believed to be Pakistanis who had come into Sudan from Nairobi after the embassy bombings. Sudan detained these men as suspects in the Nairobi bombing. Among other things, these men had rented an apartment by the United States embassy in Khartoum; they had been observed in the vicinity of the embassy grounds in Khartoum; they had on their persons telephone numbers of a business associated with bin Laden, Khartoum Tannery; and they were in possession of documents indicating that they had recently raised funds. After detaining these men, Sudanese officials gave us pictures of them as well as a substantial amount of additional information, and Sudan also offered to turn these men over to United States officials in Nairobi. Shortly thereafter, the United States bombed the al-

Shifa plant in Khartoum. My understanding is that Sudan then turned the men over to Pakistani authorities.

18. As stated above, I am aware of numerous attempts by Sudan to engage the United States in joint counter-terrorism efforts, beginning in early 1996. In 1996, Sudan granted the United States' request to observe two facilities in Sudan. In 1996, Sudan also expelled bin Laden and about 100 persons associated with al Qaeda from Sudan, again at the request of the United States. Also, in the latter part of 1996, I was approached by a Sudanese official who again indicated Sudan's willingness to engage the United States and to participate in joint counter-terrorism activities with the United States. Over the next two years, the Sudanese continued to express their interest in such cooperative activities with the United States. The State Department largely rejected these approaches by Sudan. It did come to pass, however, that the United States sought information from Sudan in July 1999 concerning a subject who was believed to be in Khartoum and who was a person of considerable interest to United States authorities. A meeting occurred in New York between FBI personnel, including myself, and Sudanese personnel. At that time, Sudan provided a substantial amount of very important information about this subject to us. Several subsequent meetings occurred, during which Sudan continued to assist the United States in intelligence operations, and this

cooperative relationship continued during the remainder of my employment at the FBI.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 16, 2003 in Mountainside, New Jersey.

John E. Cloonan

JOHN E. CLOONAN