UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JAMES OWENS, *et al.*, | ( | |
| | ( | |
| Plaintiffs, | ( | |
| | ( | |
| vs. | ( | Civil Action No. 01-2244 (JDB) |
| | ( | |
| REPUBLIC OF THE SUDAN, *et al.*, | ( | |
| | ( | |
| Defendants. | ( | |

SUDAN'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFFS' MOTION TO DISQUALIFY
COUNSEL FOR THE REPUBLIC OF SUDAN

Plaintiffs have alleged that a positional conflict has arisen in the course of the simultaneous representation by Piper Rudnick ("Piper") of the government of the Republic of the Sudan ("Sudan") and the plaintiffs in *Heiser et al. v. Islamic Republic of Iran, et al.* (the "*Heiser* Plaintiffs"),[1] as a result of which plaintiffs ask this court to disqualify Piper from its continued representation of Sudan in this case. As discussed more fully below, Piper has handled its concurrent representation of the *Heiser* Plaintiffs and Sudan in full compliance with the relevant ethical rules—indeed, in the only manner that those rules would allow. Moreover, disqualification of Piper as counsel for Sudan in this case would be inappropriate.

I.      FACTUAL BACKGROUND.

Current U.S. law places a heavy regulatory burden upon Sudan because it has been placed on the list of state sponsors of terrorism. As explained in the affidavit of Ambassador Timothy Carney previously submitted to the court by Sudan with its Memorandum in Support of

---

[1] *See Heiser, et. al. v. Islamic Republic of Iran, et al.*, No. 00-CV-2329 (D.D.C. filed Sept. 29, 2000) (The *Heiser* Complaint names as defendants Iran, several Iranian government entities and officials, Hizbollah and Osama bin Laden, and pertains to the 1996 bombing of the Khobar Towers in Saudi Arabia.)

1

Motion to Dismiss, the designation of Sudan as a sponsor of terrorism is based in large part on a series of intelligence reports that have long since been withdrawn as inaccurate.[2]  Moreover, the State Department has acknowledged that current sanctions against Sudan are maintained largely to press Sudan to continue pursuit of peace negotiations related to settlement of a long existing separatist conflict—a purpose wholly unrelated to terrorism.[3]

Piper was first contacted by the Embassy of Sudan in the spring of 2003 about whether Piper would be available to assist Sudan on several litigation matters with respect to which the Government of the Sudan had been encouraged to participate by the U.S. government.  This case was one of those matters.  The current U.S. regulatory regime adopted under the authority of the International Emergency Economic Powers Act[4] requires that any fee-based legal services provided to Sudan in connection with U.S. litigation must be licensed by the Treasury Department's Office of Foreign Assets Control ("OFAC").[5]  After appropriate reviews, and having concluded that there were no client conflicts or other reasons to decline the Embassy's request, Piper then prepared a license application for submission to OFAC, and we finally received an OFAC license in late July 2003.

The *Cicippio-Puleo* decision was issued on January 16, 2004 by the Court of Appeals.  Prior to that date Piper took no position in this case with respect to any legal issue resolved or raised by *Cicippio-Puleo*.  The *Cicippio-Puleo* ruling overturned numerous district court cases

––––––––––––––––––––

[2] *See* Declaration of Ambassador Timothy Michael Carney ¶ 10, Exhibit 1 to Sudan's Memorandum in Support of Motion to Dismiss, filed with the court on March 10, 2004.

[3] *See, e.g.*, Charles Snyder, Acting Assistant Secretary of State for African Affairs, Testimony before the Subcommittee on African Affairs of the House International Relations Committee (March 11, 2004) *available at* http://www.state.gov/p/af/rls/rm/30356.htm. ("We have used every opportunity to make known that any future relationship with the Sudanese government will depend on achieving a just and comprehensive peace with the south . . . . The pace of our normalization and review of sanctions on trade and assistance following a peace agreement will be determined by Khartoum's level of effort to reform and correct human rights policies and practices.").

[4] 50 U.S.C. § 1701 *et seq.*

in this circuit that had ruled that the Flatow Amendment provided a cause of action against a foreign government.[6]  *Cicippio-Puleo* left unresolved the question of whether common law causes of action may be available in cases brought under 28 U.S.C 1605(a)(7), even though this issue too has been addressed by numerous trial courts in this circuit.[7]  In *Heiser*, Piper was requested, on January 20, 2004, to submit by January 23, 2004 a brief on this issue.  Prior to the *Cicippio-Puleo* ruling, such a question was not relevant in the case now before this court, as Plaintiffs had not expressly made any common law claims.  Indeed, for this very reason, after the *Cicippio-Puleo* ruling Plaintiffs filed an Amended Complaint on February 2, 2004 in order to assert claims based on common law.  In this court, the issue was raised as to the effect of *Cicippio-Puleo* on the court's jurisdiction in this case in the first hearing in which Sudan made an appearance, a February 3, 2004 hearing that had been scheduled to consider a discovery question.  Pursuant to that hearing, an Order was issued by this court on February 5, 2004 that the parties provide briefing on the effect of the *Cicippio-Puleo* decision on the court's jurisdiction by March 10, 2004.

---

[5] *See* Executive Order 13067 of November 3, 1997, 62 Fed. Reg. 59989 (Nov. 5, 1997); Sudanese Sanctions Regulations, 31 C.F.R. Part 538.

[6] *See, e.g., Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F. Supp. 2d 54 (D.D.C. 2003); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258 (D.D.C. 2003); *Dammarell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105 (D.D.C. 2003); *Regier v. Islamic Republic of Iran*, 281 F. Supp. 2d 87 (D.D.C. 2003); *Kilburn v. Islamic Republic of Iran*, 277 F. Supp. 2d 24 (D.D.C. 2003); *Price v. Socialist People's Libyan Arab Jamahiriya*, 274 F. Supp. 2d 20 (D.D.C. 2003); *Kerr v. Islamic Republic of Iran*, 245 F. Supp. 2d 59 (D.D.C. 2003); *Cronin v. Islamic Republic of Iran*, 238 F. Supp. 2d 222 (D.D.C. 2002), *Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38 (D.D.C. 2000).

[7] *See, e.g., Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258 (D.D.C. 2003); *Dammarell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105 (D.D.C. 2003); *Regier v. Islamic Republic of Iran*, 281 F. Supp. 2d 87 (D.D.C. 2003); *Kilburn v. Islamic Republic of Iran*, 277 F. Supp. 2d 24 (D.D.C. 2003); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286 (D.D.C. 2003); *Acree v. Republic of Iraq*, 271 F. Supp. 2d 179 (D.D.C. 2002), *Turner v. Islamic Republic of Iran*, 2002 U.S. Dist. LEXIS 26730 (D.D.C. 2002); *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78 (D.D.C. 2002); *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128 (D.D.C. 2001); *Polhill v. Islamic Republic of Iran*, 2001 U.S. Dist. LEXIS 15322 (D.D.C. 2001); *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27 (D.D.C. 2001); *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27 (D.D.C. 2001), *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107 (D.D.C. 2000).  Thus plaintiffs are simply mistaken that the briefs filed by Piper in *Heiser* and in this case come at a time when case law on the issue "is non-existent."  Plaintiffs'

II.   DISQUALIFICATION IS NOT APPROPRIATE UNDER THE RELEVANT ETHICS RULES.

A.   Disqualification is not warranted under D.C. Rule of Professional Conduct 1.7.

The relevant provision of the D.C. Rules of Professional Conduct, Rule 1.7(d), provides that a firm must withdraw from, or obtain waivers to continue, simultaneous representations raising a positional conflict, only when such continued representation would likely adversely affect the quality of the representation of either or both of the two firm clients. As discussed more fully below, Piper's simultaneous representation of the *Heiser* Plaintiffs and Sudan raises no such likelihood. Piper's lawyers representing the *Heiser* Plaintiffs are different from the lawyers representing Sudan; both teams are serving their clients with zeal and undivided loyalty. The cases will be decided by two different judges. Moreover, there are no facts in common between the two representations.

Further, Piper had long since obtained consent from Sudan to proceed with our representation notwithstanding our work for the *Heiser* Plaintiffs. Piper did not seek or obtain a waiver from the *Heiser* Plaintiffs before complying with this Court's request for briefing, as it would have been inappropriate to do so. First, briefing on the cause of action issue in *Heiser* had already substantially concluded with the filing of a legal brief on the cause of action issue on January 23, 2004; it was only after this date, in an Order dated February 5, 2004, that this court then requested briefing on the same question. Second, in light of Piper's obligations under Rule 1.16, discussed below, we could not withdraw from representing Sudan without seriously disadvantaging Sudan's interests in this case. Therefore, it would have been inappropriate to provide one of our other clients a veto over our continuing to represent Sudan when we were

---

Memorandum in Support of Motion to Disqualify Counsel, Summary. (Plaintiffs did not number their pages, so

under an ethical obligation to continue such representation.

        B.      Withdrawal would be unethical under D.C. Rule of Professional Conduct 1.16.

Rule 1.16 of the D.C. Rules of Professional Conduct provides that a firm may only withdraw from a representation if "withdrawal can be accomplished without material adverse effect on the interests of the client."  As detailed above, in light of the OFAC licensing requirements, and the attendant concerns that any responsible law firm would naturally want to address before accepting an engagement in a case such as this involving allegations of complicity in acts of terrorism, no withdrawal from the representation of Sudan in favor of another law firm could be implemented promptly.[8]  Therefore, Piper's obligation under Rule 1.16 is to continue to represent Sudan.  Certainly there can be no question as to Piper's obligations, at a minimum, to comply with requests from the *Heiser* court and this court for briefing on the effect of the *Cicippio-Puleo* decision.

Contrary to Plaintiffs' assertion, the harm to Sudan if forced to find new counsel would be great.  Plaintiffs have asserted that "Sudan is an oil and gas rich sovereign nation" and that the "financial burden will be minimal" if Sudan is forced to find new counsel at this time.[9]  In fact, Sudan is one of the poorest nations in the world.[10]  Sudan has responsibilities to its citizens to begin to rebuild its country after enduring years of destructive civil war, and it is not a country with resources to spare defending lawsuits in U.S. courts.  Indeed, the financial burden of

---

Sudan is unable to provide a pinpoint cite.)

[8] The OFAC licensing process is not subject to any time limits, and thus an application may remain on file for several months before any response is made.  As an example, for reasons unrelated to this case, Piper filed with OFAC on January 15, 2004 a request for expedited approval of an amendment to Piper's existing license to represent Sudan.  This application was followed by telephone inquiries from Piper.  Even so, Piper's request was not finally approved by OFAC until March 12, 2004.

[9] Plaintiffs' Memorandum in Support of Motion to Disqualify Counsel, Section II.

participating in this and similar litigation was one of Sudan's main concerns when it was faced with the decision of whether to make an appearance here. Sudan has already invested significant financial resources in its current representation, and has invested time and energy in building its relationship with its current counsel. A change of counsel at this time would cause considerable harm to Sudan.

III.   NEITHER SUDAN NOR THE *HEISER* PLAINTIFFS HAVE BEEN OR WILL BE HARMED BY PIPER RUDNICK'S REPRESENTATION.

As stated by the D.C. Bar Legal Ethics Committee, in evaluating allegations of violations of Rule 1.7 "the focus of the analysis ought not to be on formalities but should be on the *actual harm* that may befall one or both clients." D.C. Bar Legal Ethics Comm., Opinion No. 265, at 4 (1996) (emphasis added). No harm to either party represented by Piper will result from Piper's continued representation of Sudan and the *Heiser* Plaintiffs.

Plaintiffs attempt three arguments as to why Piper's clients might be disadvantaged by our continued simultaneous representation, but none is valid. Plaintiffs first argue that success in one case could have a detrimental effect on the clients in the other. This contention overstates the importance of one district court decision on another district court—particularly where, as here, the cases are based on different facts, the same legal issues have already been addressed by district courts in this circuit, and the issues are under consideration now by numerous other courts in this circuit.

Central to Plaintiffs' argument is their assertion that the parties in these two cases are in a "race to a decision" because a decision in the first of these two cases to be decided has a "great

---

[10] Sudan's per capita GDP for 2002 (the most recent year for which the statistics were reported) was estimated at $1400. U.S. CENTRAL INTELLIGENCE AGENCY, THE WORLD FACTBOOK 2003, *available at* www.cia.gov/cia/publications/factbook/.

likelihood" of "creating adverse precedent" for the second of these two cases to be decided.[11]
This argument simply gives a false impression of the context in which the relevant issue has
arisen. First, although district court judges may review the decisions of their colleagues and use
them to inform their own, the decision of one district court judge does not create controlling
precedent for another. Second, numerous cases in this circuit have already addressed the issue of
whether a plaintiff may assert a common law cause of action in a case in which plaintiffs assert
jurisdiction under 1605(a)(7), albeit prior to the *Cicippio-Puleo* ruling.[12] Thus, there is no race
to obtain the first decision on this issue. Third, there are currently numerous pending cases in the
D.C. Circuit in which the issue of whether a plaintiff may assert common law causes of action in
a 1605(a)(7) case will be relevant.[13] Therefore, even if there had been no prior decisions in this
circuit relevant to this issue, and there have been many, the parties in this case and *Heiser* would
not be in a two-way race for a decision.

In any event, the sort of harm alleged by Plaintiffs is not what Rule 1.7 is intended to
prevent. The Rule is intended to prevent a firm from representing a client with reduced vigor or
effectiveness.[14] Plaintiffs here are asserting, in effect, that one of Piper's clients might be
disadvantaged because Piper is doing high quality work for another client, but they have not, and
cannot, assert that Piper is providing a diminished quality of advocacy on behalf of either client.

_____

[11] Plaintiffs' Memorandum in Support of Motion to Disqualify Counsel, Section I.B.3.

[12] *See, e.g.*, cases cited at note 7 above.

[13] *See, e.g., Reed v. Islamic Republic of Iran*, No. 03-2657 (D.D.C. filed Dec. 30, 2003); *Valore v. Islamic Republic of Iran*, No. 03-1959 (D.D.C. filed Sept. 16, 2003); *Kirschenbaum v. Islamic Republic of Iran*, No. 03-1708 (D.D.C. filed Aug. 11, 2003); *Oveissi v. Islamic Republic of Iran*, No. 03-1197 (D.D.C. filed June 2, 2003); *Jacobsen v. Islamic Republic of Iran*, No. 02-1365 (D.D.C. filed July 8, 2002); *Salazar v. Islamic Republic of Iran*, No. 02-558 (D.D.C. filed March 22, 2002); *Lawton v. the Republic of Iraq*, No. 02-474 (D.D.C. filed March 14, 2002); *Kapar v. Islamic Republic of Iran*, No. 02-78 (D.D.C. filed Jan. 16, 2002); *Wyatt v. Syrian Arab Republic*, No. 01-1628 (D.D.C. filed July 27, 2001).

[14] D.C. Bar Legal Ethics Comm., Opinion No. 265, at 3 (1996) ("The mere possibility that a result in one representation will affect the outcome of another is not enough to trigger a conflict as to which waiver must be sought.")

The second alleged harm to a Firm client is claimed to arise from the fact that Plaintiffs are using an expert in this case that Piper used in the *Heiser* case. But no conceivable basis for disqualification has been shown to arise from this situation. Whatever risks are posed by Plaintiffs' using an expert that Piper has previously used arise regardless of any positional conflict. That is, if the *Cicippio-Puleo* ruling had come down the other way and the applicability of the Flatow Amendment to governments had been affirmed, or if the Court of Appeals had not left open the issue as to the availability of common law claims under Section 1605(a)(7), Plaintiffs presumably would not have amended their complaint and there would have been no positional conflict; nonetheless, all parties would still be in precisely the same situation with respect to Plaintiffs' expert. Further, the application of Rule 1.7 to cases of positional conflict is intended to protect the clients of the firm with the conflict, *not its opponents*. The Rule is not designed to give Plaintiffs an expectation that their experts will never work with law firms that may be adverse to them. Indeed, were the rule to apply as Plaintiffs have urged, plaintiffs' attorneys in any case could simply choose to employ an expert that was previously used by the opposing law firm and thereby establish a basis for a motion to disqualify the defendant's chosen counsel.

Finally, Plaintiffs assert that the continued representation by Piper of both the *Heiser* Plaintiffs and Sudan "taints the legal system" by creating an unfavorable appearance that could compromise the "public's belief in the fairness and justness of the courts and the legal process."[15] It is not clear how a law firm's diligent representation of clients with divergent interests would negatively affect perceptions of the fairness of the judicial system. Moreover, each of the three cases cited by Plaintiffs in support of this proposition is more than 20 years old,

---

[15] Plaintiffs' Memorandum in Support of Motion to Disqualify Counsel, Section I.B.3.

none pertains to a positional conflict, and none pertains to D.C. Rule 1.7 as currently in force.

More recent legal authority clearly reflects a different approach. As noted above, the D.C. Bar

Legal Ethics Committee recently stated that "we believe that the focus of the analysis ought not

to be on formalities but should be on the *actual harm* that may befall one or both clients." D.C.

Bar Legal Ethics Comm., Opinion No. 265, at 4 (1996) (emphasis added).

Under the law of the District of Columbia the mere appearance of a conflict is not

sufficient to disqualify counsel. Neither Rule 1.7 nor the commentary pertinent thereto reflects

such a concern; on the contrary, to the extent that Plaintiffs' argument pertains to the effect of the

Sudan representation upon the *Heiser* Plaintiffs, or the public at large, its concern is misplaced:

the District of Columbia has expressly considered and *rejected* such an ethical rule, and with

good reason. Legal Ethics Committee Opinion 265 notes that in interpreting the scope and

application of Rule 1.7, it must be recalled that a stricter version of the District's conflict rule

had originally been proposed but was later withdrawn after drawing protest. The rule finally

adopted by the D.C. Court of Appeals dispensed with the need for client consent to continue

representations raising positional conflicts out of concern from members of the bar that

> an extremely broad positional conflict rule . . . would have
> hampered lawyers and firms from undertaking varied
> representations and would have given existing clients broad veto
> powers over their lawyers' ability to accept new clients, thereby
> endangering the independence of lawyers and their willingness and
> ability to represent unpopular and *pro bono* clients.[16]

Of course, these same concerns are directly pertinent here, and the court should refrain from

adopting an interpretation of Rule 1.7 that would in effect mandate a rule on positional conflicts

that was explicitly rejected in the course of adopting the current version of Rule 1.7.

In some jurisdictions, positional conflicts are not prohibited at all. *See, e.g.*, State Bar of

Cal. Standing Comm. on Professional Responsibility and Conduct, Op. 1989-108 (undated) (lawyer may represent two different clients in separate cases even though lawyer will argue opposite sides of the same legal issue *before the same judge* in the two cases).   In other jurisdictions, including the District of Columbia, attention has been given to whether the representation occurs at the trial level, which is generally permissible, or the appellate level, raising greater concerns.[17]   The comments to the ABA Model Rule 1.7 expressly state that "it is ordinarily not improper to assert such [contrary] positions in cases pending in different trial courts."[18]   Although D.C.'s Rule 1.7 is not identical to the corresponding ABA Model Rule, the drafters of the D.C. Rule "were at some pains to point out that, although they took a different drafting approach than did the ABA, they did not believe that the different form of words they used would lead to significantly different results in actual cases."[19]

Thus, although the D.C. Rules themselves do not expressly refer to these various categories, it is appropriate to take them into account.   Consideration of such factors in this case demonstrates that the positional conflict does not raise the level of concern that would merit disqualification.   The relevant matters are before different judges, neither case is currently before an appellate court, and Piper has not filed any *amicus* brief or otherwise had any involvement with any matter in which the relevant issue has been raised on appeal.

---

[16] D.C. Bar Legal Ethics Comm., Opinion No. 265, at 6 (1996).

[17] See D.C. Bar Legal Ethics Comm., Opinion No. 265, at 2-3 (1996) (stating that the "paradigm example" of a positional conflict would arise where the same individual lawyer argued directly opposing positions before the same judge in immediately consecutive cases, noting that "[g]enerally, it is thought that the lawyer cannot" argue opposing positions "before two different appellate panels in the same court," but that a case where a "lawyer simultaneously takes inconsistent positions before two different judges of the same trial court" is a "more difficult situation" that "*may in some cases* be undesirable") (emphasis added).   *See also Philadelphia Bar Ass'n. Professional Guidance Comm.*, Op. 89-27 (1990).

[18] MODEL RULES OF PROF'L CONDUCT R. 1.7. cmt. ¶ 9 (emphasis added).

[19] D.C. Bar Legal Ethics Comm., Opinion No. 265, at 5 (1996).

IV.   DISQUALIFICATION IS NOT APPROPRIATE UNDER THE RELEVANT CASELAW.

A.   Courts have shown a reluctance to disqualify counsel.

There is no reported case in this circuit in which a court disqualified counsel on the basis of a positional conflict.  On the contrary, courts have shown a great reluctance to disqualify counsel, even in cases where direct conflicts have arisen.  For example, in *Barnes v. District of Columbia*,[20] a case cited by Plaintiffs, the court denied a Motion to Disqualify Counsel despite some question as to the timeliness of the law firm's notification of the arrival at the firm of a former government attorney who had worked extensively on behalf of the defense in the very case in which the law firm represented the plaintiffs.  In declining to disqualify the firm, the court noted its concerns for the "prejudice to the interests of [the firm's client] were he to lose counsel of choice."[21]  Similarly, in *Laker Airways Ltd. v. Pan American World Airways*, the court held that a highly specialized attorney with an extensive career in both government and private practice should not be disqualified despite "a roll of activities which allegedly bar him" provided by opposing counsel.[22]  In that case, the court began its analysis by stating that the first consideration to take into account in deciding whether disqualification is appropriate is that "[a] litigant has a right to freely chosen, competent counsel."[23]  The court also noted that motions to disqualify "have become increasingly popular 'tools of the litigation process,' being used . . . . for purely strategic purposes."[24]  The court denied the motion to disqualify, stating:

---

[20] *Barnes v. District of Columbia*, 266 F. Supp. 2d 138 (D.D.C. 2003).

[21] *Barnes v. District of Columbia*, 266 F. Supp. 2d 138, 141 (D.D.C. 2003).

[22] *Laker Airways Ltd. v. Pan American World Airways*, 103 F.R.D. 22, 41, 1984 U.S. Dist. LEXIS 15513, at **56 (D.D.C. 1984).

[23] *Laker Airways Ltd. v. Pan American World Airways*, 103 F.R.D. 22, 27, 1984 U.S. Dist. LEXIS 15513, at **5 (D.D.C. 1984).

[24] *Laker Airways Ltd. v. Pan American World Airways*, 103 F.R.D. 22, 27-28, 1984 U.S. Dist. LEXIS 15513, at **6-9 (D.D.C. 1984) (quotations omitted).

> The Court is both justified and required to regard defendants'
> arguments through a practical lens, and to assess them in light of
> those practicalities.   Its responsibility with respect to the
> supervision of its bar is not limited to the disqualification of
> attorneys for violations of the Code of Professional Responsibility;
> it also includes the rejection of efforts to abuse the Code through
> motions to disqualify which lack substantive merit and represent
> means to harass the opposing party.[25]

Opposing counsel's motion to disqualify was likewise denied in *Williamsburg Wax Museum Inc.
v. Historic Figures Inc.*, 501 F. Supp. 326 (D.D.C. 1980), a case in which a law firm represented
a party directly adverse to a former client.   In holding that the relationship between the matter
handled for the previous client was not sufficiently similar to the current matter to warrant
disqualification, the court noted:

> Because it has adverse consequences on the judicial process and,
> perhaps more importantly, because it has a substantial impact in
> time and money on a client who would have to hire new lawyers
> after others may already have done a significant amount of work,
> disqualification is not mandated when the grounds are vague or
> tenuous.[26]

In its decision, the court also noted that "courts must also not be oblivious to the fact that,
particularly in recent years, motions for disqualification have increasingly been used for strategic
litigation advantage."[27]

Courts in other circuits have shown a similar reluctance to disqualify counsel.   In *Woods
v. Covington County Bank*, 537 F.2d 804 (5th Cir. 1976), a case cited by Plaintiffs, the Fifth
Circuit overturned the district court's decision to disqualify counsel.   As quoted by Plaintiffs, the
court noted its responsibility "to preserve a reasonable balance between the need to ensure
ethical conduct on the part of lawyers appearing before it and other social interests, which

---

[25] *Laker Airways Ltd. v. Pan American World Airways*, 103 F.R.D. 22, 42, 1984 U.S. Dist. LEXIS 15513, at **58 (D.D.C. 1984).
[26] *Williamsburg Wax Museum Inc. v. Historic Figures Inc.*, 501 F. Supp. 326, 328 (D.D.C. 1980).

include the litigant's right to freely chosen counsel."[28]  According to the court, "an inflexible application" of the ethical rules "would frequently defeat important social interests including the client's right to counsel of his choice, the lawyer's right freely to practice his profession, and the government's need to attract skilled lawyers."[29]  The court noted the importance of keeping the legal profession "above suspicion," but stated that

> [i]t does not follow, however, that an attorney's conduct must be governed by standards which can be imputed only to the most cynical members of the public. Inasmuch as attorneys now commonly use disqualification motions for purely strategic purposes, such an extreme approach would often unfairly deny a litigant the counsel of his choosing.  Indeed, the more frequently a litigant is delayed or otherwise disadvantaged by the unnecessary disqualification of his lawyer . . . the greater the likelihood of public suspicion of both the bar and the judiciary.[30]
> \*       \*       \*
> We emphasize that an attorney need not be disqualified even where there is a reasonable possibility of improper professional conduct.  As we have seen, a court must also find that the likelihood of public suspicion or obloquy outweighs the social interests which will be served by a lawyer's continued participation in a particular case.[31]

The court concluded with "we cannot permit [the ethics rules] to be manipulated for strategic advantage on the account of an impropriety which exists only in the minds of imaginative lawyers."[32]

The Second Circuit has been similarly reluctant to disqualify counsel.  For example, in *Board of Education of the City of New York v. Nyquist*, the Second Circuit reversed the district court's decision disqualifying the General Counsel of New York State United Teachers ("NYSUT") from representing male teachers in a case against female teachers, most of whom

---

[27] *Williamsburg Wax Museum Inc. v. Historic Figures Inc.*, 501 F. Supp. 326, 331 (D.D.C. 1980).

[28] *Woods v. Covington County Bank*, 537 F. 2d 804, 810 (5th Cir. 1976).

[29] *Woods v. Covington County Bank*, 537 F. 2d 804, 812 (5th Cir. 1976).

[30] *Woods v. Covington County Bank*, 537 F. 2d 804, 813 (5th Cir. 1976).

[31] *Woods v. Covington County Bank*, 537 F. 2d 804, 813 n.12 (5th Cir. 1976).

[32] *Woods v. Covington County Bank*, 537 F. 2d 804, 819 (5th Cir. 1976).

were also members of the NYSUT.  The court noted that in some cases,

> we have shown considerable reluctance to disqualify attorneys despite misgivings
> about the attorney's conduct.  This reluctance probably derives from the fact that
> disqualification has an immediate adverse effect on the client by separating him
> from counsel of his choice, and that disqualification motions are often interposed
> for tactical reasons.  And even in when made in the best of faith, such motions
> inevitably cause delay.[33]

The Second Circuit found that "with rare exceptions" disqualifications have been ordered in only

two types of cases:  where the court has reason to question the ability of an attorney to

vigorously represent his or her client, or where the attorney is in a position to use privileged

information concerning the opposing party through prior representation.[34]  With this standard in

mind, the court reversed the decision to disqualify counsel.

Likewise, in *W.T. Grant Co. v. Haines*, the Second Circuit declined to disqualify counsel.

In making its decision, the court noted that even if it had found a violation of professional ethics,

"this court has squarely held that a violation of professional ethics does not in any event

automatically result in disqualification of counsel."[35]  The court concluded that "we cannot

lightly separate [the client] from the counsel of its choice. . . . Disqualification of present counsel

and the substitution of a new attorney unfamiliar with the facts and the law will inevitably result

in further harmful delay and expense to [the client]."[36]

Given the reluctance of courts to disqualify counsel for alleged ethics violations brought

to the court's attention by opposing counsel, even in cases in which the allegation involves a

direct client conflict, a court should be particularly reluctant to order the disqualification of

counsel on the basis of an alleged positional conflict.

---

[33] *Board of Education of the City of New York v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979) (citations omitted).

[34] *Board of Education of the City of New York v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979).

[35] *W.T. Grant Co. v. Haines*, 531 F.2d 671, 677 (2d. Cir. 1976).

[36] *W.T. Grant Co. v. Haines*, 531 F.2d 671, 677 (2d. Cir. 1976).

B.     The ethics rules are not to be used as procedural weapons.

As is clear from cases discussed above, invocation of Rule 1.7 is inappropriate when used as a procedural weapon, as Plaintiffs attempt here.[37]  Plaintiffs have not offered any valid arguments as to how Piper's clients might suffer harm as a result of our continued representations in the two cases.  Thus, to prevent Sudan's lawyers from proceeding with this case at this stage would be to reward Plaintiffs for the misuse of the rules of ethics as a procedural tactic.

C.     None of the caselaw cited by Plaintiffs supports the contention that disqualification is appropriate here.

Plaintiffs have cited no case in which counsel was disqualified on the basis of a positional conflict.  For example, Plaintiffs rely on the case of *Hendry v. Pelland*, 73 F.3d 397 (D.C. Cir. 1996), which they misquote, in support of their contention that disqualification is the appropriate remedy in this case.[38]  The case does not involve a motion to disqualify counsel, but rather involved clients suing their former attorney for breach of fiduciary duties and a counterclaim for unpaid legal fees.  Likewise, the *BCCI Holdings* case cited by Plaintiffs also did not involve a motion to disqualify counsel, but rather a claim of breach of fiduciary duty brought by clients against their former attorneys.[39]  Moreover, both of these cases involved a law firm's representation of multiple clients with allegedly conflicting interests *in the same matter*, not unrelated parties in different cases, as is the situation in the case at bar.  *In re Austrian and German Bank Holocaust Litigation*, cited by Plaintiffs, also does not involve a Motion to

---

[37] *See, e.g., Woods v. Covington County Bank*, 537 F. 2d 804, 819 (5th Cir. 1976); *Laker Airways Ltd. v. Pan American World Airways*, 103 F.R.D. 22, 42, 1984 U.S. Dist. LEXIS 15513, at **58 (D.D.C. 1984); *Williamsburg Wax Museum Inc. v. Historic Figures Inc.*, 501 F. Supp. 326, 331 (D.D.C. 1980); *Dawson v. City of Bartlesville*, 901 F. Supp. 314 (N.D. Okla. 1995).

[38] Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Disqualification of Counsel for the Republic of the Sudan, Section II.

[39] *See BCCI Holding (Luxembourg), S.A. v. Clifford*, 964 F. Supp. 468 (D.D.C. 1997).

Disqualify Counsel, but rather a petition for forfeiture of attorney's fees.[40]  As with the other cases cited by Plaintiffs, the case involved an alleged conflict between two different sets of clients with potentially different interests *in the same matter*, not unrelated parties in different cases.  Further, cases where courts are called upon to adjudicate claims raised by disgruntled clients against their own lawyers have little relevance to a case where opposing counsel is trying to separate a defendant from its chosen counsel.

## V.    CONCLUSION.

Disqualification of Piper as counsel for Sudan is not warranted under D.C. Rule of Professional Conduct 1.7 nor any other applicable ethics rule.  No harm has been or will be done to the Sudan or to the plaintiffs in the *Heiser* case as a result of Piper's representation of those clients.  Indeed, Sudan would suffer considerable harm were it precluded from continuing to work with its counsel of choice in this case.

Respectfully submitted,

John F. Dienelt
D.C. Bar No. 110742
Don C. Lewis
Bar No. 403434
Martin T. Lutz
Bar No. 427634
PIPER RUDNICK LLP
1200 Nineteenth Street NW
Washington, DC  20036-2412
(202) 861-3900

April 2, 2004

---

[40] *See In re: Austrian and German Bank Holocaust Litigation*, 317 F.3d 91 (2d Cir. 2003).

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JAMES OWENS, *et al.*, | ( | |
| | ( | |
| Plaintiffs, | ( | |
| | ( | |
| vs. | ( | Civil Action No. 01-2244 (JDB) |
| | ( | |
| REPUBLIC OF THE SUDAN, *et al.*, | ( | |
| | ( | |
| Defendants. | ( | |

## ORDER

On this day came on to be considered Plaintiffs' Motion to Disqualify Counsel for the Republic of Sudan.  The court has considered the materials submitted by all parties and argument of counsel, and based upon that consideration the court deems the Motion to be without merit.

Therefore, it is hereby ORDERED that the Motion to Disqualify Counsel for the Republic of Sudan be and hereby is DENIED.

_____
JUDGE PRESIDING

Copies to:


Thomas Fortune Fay
601 Pennsylvania Avenue, N.W.
No. 900—South Building
Washington, DC  20004
(202) 638-4534

Steven R. Perles
1615 New Hampshire Avenue, N.W.
Suite 200
Washington, DC  20009
(202) 745-1300

Rhonda C. Fields
United States Attorney's Office
555 Fourth Street, NW
10th Floor
Washington, DC  20530
(202) 514-6970
Fax: (202) 514-8780
rhonda.fields@usdoj.gov

John F. Dienelt
Piper Rudnick LLP
1200 Nineteenth Street, NW
Washington, DC  20036
(202) 861-3880
Fax: (202) 223-2085
john.dienelt@piperrudnick.com

Don C. Lewis
Piper Rudnick LLP
1200 Nineteenth Street, NW
Washington, DC  20036
(202) 861-6417
Fax: (202) 689-8569
don.lewis@piperrudnick.com

## CERTIFICATE OF SERVICE

I certify that the foregoing documents were served on April 2, 2004 on the following

attorneys by hand delivery:

> Thomas Fortune Fay, Esq.
> 601 Pennsylvania Avenue, NW
> No. 900—South Building
> Washington, DC  20004
>
> Rhonda C. Fields, Esq.
> Assistant U.S. Attorney
> U.S. Department of Justice
> 555 Fourth Street, NW
> 10th Floor
> Washington, DC  20530
>
> Steven R. Perles, Esq.
> 1615 New Hampshire Avenue, NW
> Suite 200
> Washington, DC  20009

_____

Dated: April 2, 2004