**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JAMES OWENS, et al.,

    Plaintiffs,

      v.

REPUBLIC OF SUDAN, et al.,

    Defendants.

Civil Action No.  01-2244 (JDB)

## MEMORANDUM OPINION

On August 7, 1998, nearly simultaneous truck bombs were exploded at the United States

embassies in Dar es Salaam, Tanzania, and Nairobi, Kenya.  Hundreds were killed and thousands

were injured in the explosions.  Several of the injured victims and their family members brought

this suit under section 1605(a)(7) of the Foreign Sovereign Immunities Act against the Republic

of Iran, the Republic of Sudan, and two of their respective ministries, for allegedly providing

material support to the terrorist organizations that carried out the attacks.  Defendants were

served through diplomatic channels, and when they initially failed to appear, the clerk entered

default against them.

Several months later, although well before any trial was scheduled to occur in the case,

counsel entered an appearance for the Republic of Sudan and its Ministry of the Interior ("the

Sudan defendants").  Soon thereafter, the Sudan defendants filed a motion to dismiss arguing that

they are immune from suit under the Foreign Sovereign Immunities Act, that plaintiffs' complaint

fails to state a claim upon which relief can be granted, and that the default should be vacated and

judgment entered in their favor instead.  Attached to the motion are declarations from Timothy

Michael Carney, a former United States Ambassador to Sudan, and John E. Cloonan, a former

Special Agent of the Federal Bureau of Investigation, stating their views that the Sudan

defendant did not have any involvement in the embassy bombings.  Plaintiffs responded with a

succession of filings, including a motion to strike the motion to dismiss, an opposition to the

motion to dismiss, a motion to take the depositions of former Ambassador Carney and former

Special Agent Cloonan, a motion in the alternative to strike the declarations of former

Ambassador Carney and former Special Agent Cloonan, and two separate motions requesting

forms of jurisdictional discovery.  Finally, after briefing of these motions was complete, Hunton

& Williams LLP -- the Sudan defendants' second counsel to file an appearance in this case --

filed a motion seeking leave to withdraw as counsel.

     The Court now denies plaintiffs' motion to strike the motion to dismiss, but also denies

the motion to dismiss itself, allowing plaintiffs to amend the complaint in accordance with the

holdings in this opinion.  The Court also denies plaintiffs' motions to take the depositions or

strike the declarations of former Ambassador Carney and former Special Agent Cloonan until

such time as plaintiffs comply with the relevant Touhy regulations.  The Court further denies

plaintiffs' motions seeking jurisdictional discovery until plaintiffs have cured the deficiencies in

their complaint, at which time the Court will further consider the opening of jurisdictional

discovery in this case.  Finally, the Court will hold a status conference on April 20, 2005, to

address the pending motion of Hunton & Williams LLP to withdraw as counsel, and the status of

this action moving forward.

## **BACKGROUND**

Plaintiffs in this case are United States nationals injured in the terrorist attacks on the United States embassies in Dar es Salaam, Tanzania and Nairobi, Kenya on August 7, 1998, and certain of their family members.  The attacks were carried out through the nearly simultaneous detonations of explosive materials in trucks at the respective embassies.  The explosions led to the death of hundreds of employees, visitors, and bystanders, and the injury of thousands more.  Plaintiff James Owens commenced this civil action on October 26, 2001, seeking damages from the Republic of Sudan, the Islamic Republic of Iran and the Iranian Ministry of Information and Security for their role in the alleged bombings.  The complaint has since been amended twice to add the Ministry of the Interior of the Republic of Sudan as a defendant and more than forty individuals as plaintiffs, but the claims and basic structure of the complaint have remained unchanged.

Plaintiffs bring this action pursuant to the state-sponsored terrorism exception to the immunity of a foreign state in section 1605(a)(7) of the Foreign Sovereign Immunities Act ("FSIA").  The complaint alleges broadly that defendants provided "material support" to Hizbollah and al Qaeda, the two terrorist organizations alleged to be responsible for the embassy bombings, in the form of "cover, sanctuary, technical assistance, explosive devices and training." Second Am. Compl. ¶¶ 2, 13.  As to the Sudan defendants in particular, the complaint alleges that they gave "cover" and "support" to the terrorist groups, id. ¶ 7; that they "provided cover and protection for the organization and training of the persons carrying out the attack as well as venues for these activities," id. ¶ 9; that they "entered into an agreement with al Qaeda and Hizbollah under which those organizations received shelter and protection from interference while carrying out planning and training of various persons for the attacks of August 7, 1998," id.

¶ 8; and that an "organizational and planning meeting" for the embassy attacks occurred "within the Republic of the Sudan" between "Usama Bin Laden, chief of al Qaeda, and Imad Mughaniyah, chief of Hezbollah," id.  Plaintiffs purport to state claims against the defendants for "intentional infliction of emotional distress/solatium" under the Flatow Amendment to the FSIA,[1] and for "personal injury" and "loss of consortium" without identifying a specific cause of action under federal or state law for those claims.  E.g., id. ¶¶ 12-16, 25-26.

Plaintiffs served the complaint on the defendants through diplomatic channels.  When none of the defendants appeared, the Clerk of the Court entered default against them on May 9, 2003.  As is customary in these cases, the Court scheduled an ex parte trial on liability and damages.  See 28 U.S.C. § 1608(e) ("No judgment by default shall be entered by a court of the United States or of a State against a foreign state . . . unless the claimant establishes his claim or right to relief by evidence satisfactory to the court.").  Plaintiffs then filed several motions in anticipation of trial, including a motion asking the Court to compel the Federal Bureau of Investigation to produce documents relating to the attacks, and a motion for issuance of letters rogatory asking the government of Israel to allow plaintiffs to depose several individuals in its custody.

On February 6, 2004, several months after the entry of default but well before any trial was set to begin, counsel from Piper Rudnick LLP filed an appearance on behalf of the Sudan defendants.  At about the same time, the D.C. Circuit issued a decision in Cicippio-Puleo v. Islamic Republic of Iran, 353 F.3d 1024 (D.C. Cir. 2004), holding that "neither 28 U.S.C. § 1605(a)(7) nor the Flatow Amendment, nor the two considered in tandem, creates a private right

---

[1] Pub. L. 104-208, Div. A, Title I, § 101(c) (codified at 28 U.S.C. § 1605 note).

of action against a foreign government."  Id. at 1033.  The Court issued an order asking plaintiffs

and the Sudan defendants to submit briefs addressing the viability of plaintiffs' complaint in light

of Cicippio-Puleo.  A month later, plaintiffs submitted their brief on Cicippio-Puleo issues.  Only

a few days later, the Sudan defendants filed a motion to dismiss.

The motion to dismiss advances a litany of arguments, all of which fall into one of three

categories:  (i) the Court lacks jurisdiction over the claims against the Sudan defendants because

they are immune from suit under the FSIA and plaintiffs have failed to demonstrate that the case

comes within the exception to immunity in section 1605(a)(7); (ii) plaintiffs have failed to state a

claim upon which relief can be granted under Cicippio-Puleo and other recent authority

interpreting the causes of action that may be brought against a foreign state; and (iii) plaintiffs'

claims are foreclosed by the act of state and political question doctrines.  The Sudan defendants

include in the motion to dismiss a request to vacate the entry of default against them.

The Sudan defendants also attach to their motion declarations from two former United

States officials.  The first declaration is from Timothy Michael Carney, the United States

Ambassador to Sudan from August 1995 until November 1997.  Former Ambassador Carney

explains that he is unaware of any credible intelligence or evidence that the Sudan defendants

were involved in, aware of, or provided material support to the groups that carried out the

Tanzania and Kenya embassy attacks.  Decl. of Timothy Michael Carney ("Carney Decl.") ¶ 6.

He explains that the government of Sudan even expelled al Qaeda from Sudan in May 1996 at

the request of the United States, and he notes that there was a great deal of intelligence before

this date attributing misconduct to Sudan that was later discredited or withdrawn by the CIA.

Carney Decl. ¶¶ 7, 10.

The second declaration is from  John E. Cloonan, a former Special Agent with the Federal Bureau of Investigations ("FBI"), who explains that while at the FBI he worked on a joint FBI/CIA operation tasked in part with building a prosecutable case against Osama bin Laden. Decl. of John E. Cloonan ("Cloonan Decl.") ¶ 2.  He attests that he participated in the investigation of the embassy bombings and has a thorough understanding of the information developed in that investigation, and states his belief that the Sudan defendants did not have any involvement in the embassy bombings and that the Sudan defendants did not provide any support to al Qaeda or Hizbollah.  Id. ¶¶ 3, 5-9.  Both former Ambassador Carney and former Special Agent Cloonan emphasize that they believe they would have been aware of any credible evidence linking the Sudan government to the embassy bombings if such evidence existed.  Cloonan Decl. ¶ 7; Carney Decl. ¶ 9.

Plaintiffs responded to the motion to dismiss with several filings of their own.  First, they moved to strike the motion to dismiss, arguing that the entry of default in the case foreclosed the Sudan defendants from seeking relief in this Court.  Along with the motion to strike, plaintiffs filed a motion for jurisdictional discovery, and a separate motion to disqualify Piper Rudnick LLP as counsel for the Republic of Sudan, citing an alleged conflict between the law firm's work in this case and its representation of plaintiffs in another pending section 1605(a)(7) case in this Court.  In response to plaintiffs' motion to qualify, Piper Rudnick LLP filed a motion to withdraw as counsel, which the Court granted.

On March 31, 2004, plaintiffs filed motions seeking leave to depose former Ambassador Carney and former Special Agent Cloonan.  The Federal Bureau of Investigation and the Department of State submitted papers opposing these motions on the ground that plaintiffs had

failed to comply with the Touhy regulations governing requests for documents or testimony from former government officials on issues relating to their employment. The government also observed that neither defendants nor the two former officials had contacted the agencies for permission to submit the declarations consistent with the requirements of the Touhy regulations. Plaintiffs responded to the government's opposition with a separate motion to strike the declarations, maintaining that the government admitted that the declarations disclose classified information, and arguing that it is unfair to allow defendants to use the declarations in support of their motion to dismiss when plaintiffs are prevented by the Touhy regulations from testing those declarations through deposition.

On May 4, 2004, the Court issued an order denying without prejudice plaintiffs' various motions for discovery, and staying the case until such time as successor counsel for the Sudan defendants joined the case. The Court also denied plaintiffs' motion to compel the production of documents by the Federal Bureau of Investigation due to plaintiffs' failure to comply with the relevant Touhy regulations. On July 29, 2004, counsel from Hunton & Williams LLP filed an appearance on behalf of Sudan, and briefing continued anew on the remaining motions in the case. Two weeks later, plaintiffs submitted an opposition to the motion to dismiss. They attached to the opposition transcripts of the testimony of two al Qaeda officers -- one had testified in the criminal action against Osama Bin Laden arising out of the embassy bombings, the other had testified in a deposition in this action -- who claimed that the Sudan and al Qaeda had formed a partnership during the first half of the 1990s in which Sudan provided al Qaeda with military protection, safe passage, transportation, and other forms of support in exchange for weapons, communications equipment, and intelligence.

A hearing was held on October 27, 2004, to address the pending motions in the case.  The day before the hearing, plaintiffs filed additional renewed motions for jurisdictional discovery and issuance of letters rogatory for judicial assistance from the State of Israel.  More recently, Hunton & Williams LLP filed a motion to withdraw as counsel for the Sudan defendants, claiming that their clients were overdue on several legal bills and had not responded to requests for guidance on several matters.  Plaintiffs responded to the motion to withdraw with their own motion seeking an order setting a date for trial.  The Court issued an order denying both motions at that time.  The motion to dismiss and the many other pending motions are now fully briefed and argued, and ready for decision by the Court.[2]

## ANALYSIS

The Court addresses several of the outstanding motions in this opinion, including the Sudan defendants' motion to dismiss, plaintiffs' motion to strike the motion to dismiss, plaintiffs' motions for leave to depose former Ambassador Carney and former Special Agent Cloonan, plaintiffs' motion to strike the declarations of these former officials, and plaintiffs' motions seeking jurisdictional discovery.

**I.      Plaintiffs' Motion to Strike the Motion to Dismiss**

Plaintiffs contend that the Sudan defendants' motion to dismiss must be stricken, because the Sudan defendants never moved the Court to vacate the entry of default and because such a motion would be futile.  They also argue that any motion to vacate should be denied because the

---

[2]   Together with this decision, the Court is issuing decisions this date in Dammarell v. Islamic Republic of Iran, Civil Action No. 01-2224, and Salazar v. Islamic Republic of Iran, Civil Action No. 02-0558, that address some of the same legal issues as this case and will be referenced herein as appropriate.

Sudan defendants have not filed the verified answer arguably required by Local Civil Rule 7(g) when a party is the subject of an entry of default.  Plaintiffs finally cite evidence that the Sudan defendants spent several months actively collecting evidence to use in their defense before they appeared in the case, and contend that this intentional delay is an abuse of the court's procedures that warrants denying the motion to dismiss.[3]

Although the Court is concerned about the timing of the Sudan defendants' appearance in this action, it concludes that striking the motion to dismiss would be inappropriate for several reasons.  First, plaintiffs' suggestion that the Sudan defendants have not requested a vacation of the entry of default against them is clearly incorrect.  See Mot. to Dismiss at 2 ("Accordingly, the Republic of the Sudan and the Interior Ministry of the Republic of the Sudan move for an Order dismissing these proceedings with prejudice as to them and vacating any and all previously entered orders of default against them.").  Second, the D.C. Circuit has stressed that an entry of default should not be applied inflexibly to deny a willing foreign state the opportunity to offer a full defense to an FSIA action:

> Foreign sovereigns unfamiliar with the United States judicial system may fail to comprehend accurately what the FSIA means and how it operates.  Intolerant adherence to default judgments against foreign states could adversely affect this nation's relations with other nations and undermine the State Department's continuing efforts to encourage . . . foreign sovereigns generally to resolve disputes within the United States' legal framework. . . .  When a defendant foreign

---

[3]  Service was effectuated on the defendants through diplomatic channels on February 25, 2003.  Counsel for plaintiffs attests that on March 8, 2003, he received a phone call from a Sudanese official stationed at the Sudanese Embassy in Washington D.C. stating that the Sudan defendants had been served with process, had retained counsel, and wished to reply to the Summons and Complaint.  Aff. of Thomas Fortune Fay, dated March 15, 2004, ¶ 2.  Plaintiffs note that the declaration of former Ambassador Carney was signed on July 19, 2003, the declaration of former Special Agent Cloonan was signed on October 16, 2003, and counsel for the Sudan defendants did not appear in the case until February 2004.

state has appeared and asserts legal defenses, albeit after a default judgment has
been entered, it is important that those defenses be considered carefully and, if
possible, that the dispute be resolved on the basis of all relevant legal arguments.

Practical Concepts, Inc. v. Republic of Bolivia, 811 F.2d 1543, 1552 & n.19 (D.C. Cir. 1987)

(quotation omitted).

Third, section 1608(e) of the FSIA provides that a court cannot enter judgment by default

against a foreign state "unless the claimant establishes his claim or right to relief by evidence

satisfactory to the court." 28 U.S.C. § 1608(e). This provision requires the Court to satisfy itself

that there exists an adequate legal and factual basis for plaintiffs' claims. See, e.g., Roeder v.

Islamic Republic of Iran, 333 F.3d 228, 232 (D.C. Cir. 2003); Regier v. Islamic Republic of Iran,

281 F. Supp. 2d 87, 88-89 (D.D.C. 2003). Even if it were true that the Sudan defendants

committed procedural error in some respect upon appearing in the case, the Court is not inclined

to prevent the Sudan defendants from making arguments in their own defense that the Court

would have a statutory obligation to fully consider even in their absence. See Int'l Road Fed'n v.

Embassy of the Dem. Republic of the Congo, 131 F. Supp. 2d 248, 250 (D.D.C. 2001)

("Congress intended § 1608(e) to provide foreign states protection from unfounded default

judgments rendered solely upon a procedural default.").

Finally, it is not evident to the Court that there is any procedural error here. Plaintiffs

seize on the fact that Local Civil Rule 7(g) states that a "motion to vacate an entry of default . . .

shall be accompanied by a verified answer presenting a defense sufficient to bar the claim in

whole or in part." However, the Federal Rules of Civil Procedure permit a party to file a motion

to dismiss for lack of subject matter jurisdiction or failure to state a claim instead of an answer.

See Fed. R. Civ. P. 12(b). Courts routinely allow defendants to file a motion to dismiss in place

10

of an answer despite a prior entry of default, and this Court is unaware of any decision in which a court has struck a motion to dismiss following an entry of default because the motion to vacate the default was filed without an answer.  See, e.g., Simpson v. Socialist People's Libyan Arab Jamahiriya, 326 F.3d 230, 232 (D.C. Cir. 2003) (remanding for dismissal of torture claim against foreign state that had moved to vacate the entry of default and dismiss the complaint but had filed no answer); Harris v. District of Columbia, 159 F.R.D. 315, 317 (D.D.C. 1995) (motion to vacate without either motion to dismiss or answer is consistent with the local rules provided that a motion to dismiss is filed later and the balance of the relevant factors favors vacating the entry of default).

The strong presumption against the entry of default judgment against a foreign state that has appeared in the case and expressed a desire to contest the claims, along with the uniquely sensitive nature of a suit in which a foreign state wishes to challenge the allegation that it has harbored terrorists, convinces the Court that it is appropriate to allow the Sudan defendants to participate in their defense.  Plaintiffs are not prejudiced in any significant way by this result, because the Sudan defendants appeared well before any trial or final judgment, and the Court holds below that the declarations the defendants obtained before entering an appearance do not provide a basis for dismissing the complaint.[4]  Finally, it cannot be ignored that striking the motion to dismiss on procedural grounds would only delay this action unnecessarily, because the

---

[4] Plaintiffs claim to have taken the depositions of sixteen individuals prior to the appearance of the Sudan defendants, and argue that they will be forced to reschedule these depositions at the request of the defendants.  Mot. to Strike the Mot. to Dismiss at 7-8.  Should vacating the entry of default lead to additional costs of this kind, plaintiffs may at that time seek reimbursement for reasonable fees and expenses.  See Harris, 159 F.R.D. at 316; Bluegrass Marine Inc. v. Galena Road Gravel, Inc., 211 F.R.D. 356, 359 (S.D. Ill. 2002).

Sudan defendants could easily file a verified answer and then simply resubmit their motion to dismiss at that time. For these reasons, the Court will deny plaintiffs' motion to strike the motion to dismiss, and grant the Sudan defendants' request to vacate the entry of default.[5]

## II.   Motion to Dismiss

### A.   Standard of Review

The FSIA renders a foreign state immune from suit unless the case falls within one of the statutory exceptions to immunity. See 28 U.S.C. §§ 1604-1607. Consistent with the "restrictive view of sovereign immunity reflected in FSIA, the defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity." Phoenix Consulting, Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000) (quotation omitted). A court may dismiss a complaint brought pursuant to the FSIA only if it appears beyond doubt that plaintiffs can prove no set of facts that would establish the jurisdiction of the court and a viable claim for relief. Cicippio-Puleo, 353 F.3d at 1031-32; Daliberti v. Republic of Iraq, 97 F. Supp. 2d 38, 42-43 (D.D.C. 2000).

If a defendant "challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the district court should take the plaintiff's factual allegations as true and

---

[5]   A court considering a motion to vacate an entry of default should assess (i) whether the default was willful, (ii) whether vacating the default would prejudice the plaintiff, and (iii) whether a meritorious defense is alleged. Keegel v. Key West & Caribbean Trading Co., Inc., 627 F.2d 372, 373 (D.C. Cir. 1980). A defense is meritorious if it "contain[s] even a hint of a suggestion which, proven at trial, would constitute a complete defense." Id. at 317 (quotation omitted). The statements in the declarations filed by the Sudan defendants would certainly supply a hint of a meritorious defense if proven at trial. Although the Sudan defendants' delay appears to have been at least somewhat willful, that concern is overridden in this case by the absence of significant prejudice, the potential of a meritorious defense, and the strong presumption against an entry of default judgment against a foreign state.

determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff." Phoenix Consulting, 216 F.3d at 39 (quotation omitted). However, if the defendant also challenges "the factual basis of the court's jurisdiction, the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant." Id. at 40. Instead, the "court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." Id. at 40. A district court "retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction," and "must give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction." Kilburn v. Socialist People's Libyan Arab Jamahiriya, 376 F. 3d 1123, 1130 (D.C. Cir. 2004); Phoenix Consulting, 216 F.3d at 40.

> **B.     The Statutory Scheme**

The Foreign Sovereign Immunities Act ("FSIA") provides the sole basis for the exercise of jurisdiction over a foreign state in a United States court. Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989). Section 1604 of the statute establishes the general rule that a foreign state is immune from suit, stating that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in section 1605 to 1607 of this chapter." 28 U.S.C. § 1604. Section 1605 then identifies particular categories of cases in which sovereign immunity is not available, including those "in which the action is based upon a commercial activity" with a nexus to the United States, id. § 1605(a)(2), and "in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or

omission of that foreign state," id. § 1605(a)(5).  This action concerns the most recent exception

to sovereign immunity to be added to the statute:  the state-sponsored terrorism exception in

section 1605(a)(7).

Section 1605(a)(7) was enacted as part of the Antiterrorism and Effective Death Penalty

Act ("AEDPA") in 1996.  The provision waives the immunity of foreign states and their

instrumentalities and agents in any case

> in which money damages are sought against a foreign state for personal injury or
> death that was caused by an act of torture, extrajudicial killing, aircraft sabotage,
> hostage taking, or the provision of material support or resources (as defined in
> section 2339A of title 18) for such an act if such act or provision of material
> support is engaged in by an official, employee, or agent of such foreign state while
> acting within the scope of his or her office, employment, or agency . . . .

28 U.S.C. § 1605(a)(7).[6]  It applies only if the foreign state was designated a state sponsor of

---

[6]  The FSIA adopts the definition of "extrajudicial killing" in the Torture Victim
Protections Act ("TVPA").  See 28 U.S.C. § 1605(e).  The TVPA defines "extrajudicial killing"
as "a deliberate killing not authorized by a previous judgment pronounced by a regularly
constituted court affording all judicial guarantees . . . ."  28 U.S.C. § 1350 note.

Section 1605(a)(7) also incorporates the definition of "material support or resources" in
18 U.S.C. § 2339A, a statute that makes the provision of material support or resources --
knowing or intending that it will be used to commit one of several other crimes -- a federal
offense.  At the time of the filing of this suit, the statute defined "material support or resources"
as

> currency or monetary instruments or financial securities, financial services,
> lodging, training, expert advice or assistance, safehouses, false documentation or
> identification, communications equipment, facilities, weapons, lethal substances,
> explosives, personnel, transportation, and other physical assets, except medicine
> or religious materials

and the definition has since been amended to read:

> any property, tangible or intangible, or service, including currency or monetary
> instruments or financial securities, financial services, lodging, training, expert
> advice or assistance, safehouses, false documentation or identification,

terrorism at the time of the act or as a result of the act, the foreign state has been given a

reasonable opportunity to arbitrate the claim if the act at issue occurred within the foreign state's

territory, and either the claimant or the victim was a national of the United States at the time of

the alleged act.  Id. §§ 1605(a)(7)(A), (B)(i)-(ii).[7]

The liability of a foreign state that has lost its immunity under section 1605 is determined

by section 1606, which provides in relevant part:

> As to any claim for relief with respect to which a foreign state is not entitled to
> immunity under section 1605 or 1607 of this chapter, the foreign state shall be
> liable in the same manner and to the same extent as a private individual under like
> circumstances; but a foreign state except for an agency or instrumentality thereof
> shall not be liable for punitive damages . . . .

Id. § 1606.  Five months after the addition of section 1605(a)(7), Congress enacted a provision

creating a private cause of action against officials, employees, and agents of foreign states for

cases falling within the waiver of sovereign immunity in section 1605(a)(7).  Known as the

Flatow Amendment, this provision states in relevant part:

> (a) An official, employee, or agent of a foreign state designated as a state sponsor
> of terrorism designated under section 6(j) of the Export Administration Act of
> 1979 while acting within the scope of his or her office, employment, or agency
> shall be liable to a United States national or the national's legal representative for
> personal injury or death caused by acts of that official, employee, or agent for

---

> communications equipment, facilities, weapons, lethal substances, explosives,
> personnel (1 or more individuals who may be or include oneself), and
> transportation, except medicine or religious materials.

Pub.L. 108-458, Title VI, § 6603(a)(2), (b), Dec. 17, 2004, 118 Stat. 3762 (codified at 18
U.S.C.A. § 2339A(b)(1) (West Supp. 2005).

[7]  Although section 1605(a)(7) was enacted in 1996, it applies retroactively, and thus
covers the events at issue in this case.  See Pub. L. 104-132, § 221(c) ("The amendments made
by this subtitle [amending this section and section 1610 of this title] shall apply to any cause of
action arising before, on, or after the date of the enactment of this Act [Apr. 24, 1996].").

which the courts of the United States may maintain jurisdiction under section
1605(a)(7) of title 28, United States Code for money damages which may include
economic damages, solatium, pain, and suffering, and punitive damages if the acts
were among those described in section 1605(a)(7)

See Pub.L. 104-208, § 101(c), 110 Stat. 3009-172 (codified at 28 U.S.C. § 1605 note) (citations

omitted).

### C.    The Sudan Defendants' Arguments

The Sudan defendants advance an assortment of arguments in their motion to dismiss.

The arguments can be grouped into claims that the Court lacks jurisdiction over the action

against the Sudan defendants because they are immune from suit, arguments that plaintiffs have

failed to state a claim against the Sudan defendants as a matter of law, and arguments that the

Court should abstain from considering the case on act of state and political question grounds.

For the sake of clarity, the Court will address each of these groups of arguments separately in the

sections below.

### 1.    Lack of Jurisdiction

The jurisdictional arguments in the Sudan defendants' motion to dismiss likewise can be

divided into three parts.  First, the Sudan defendants contend that plaintiffs have failed to allege

(or establish) the statutory prerequisites of section 1605(a)(7).  Second, they make out a series of

constitutional challenges to section 1605(a)(7).  Finally, they argue that Sudan was never

designated a state sponsor of terrorism under an operational statute.

### a.    Statutory Arguments

The Sudan defendants first claim that plaintiffs have failed to allege or prove that the

elements of 1605(a)(7) are satisfied in this case.  They contend that the action must be dismissed

because the alleged acts in this case occurred within Sudan's borders and plaintiffs fail to allege that they have given Sudan an opportunity to arbitrate, <u>see</u> Mem. in Supp. of Sudan Defs.' Mot. to Dismiss ("Def. Mem.") at 4; that plaintiffs do not allege that Sudan knew or intended that its material support of activities in Sudan would lead to the embassy bombings, <u>see</u> <u>id.</u> at 6-7; that plaintiffs do not allege that they provided "material support" with any specificity, <u>see</u> <u>id.</u> at 26-30; that the evidence in the record in fact proves conclusively that defendants did not provide any material support or resources for the bombings, <u>see</u> <u>id.</u> at 3; and that plaintiffs fail to allege that the provision of material support or resources was performed by a Sudanese official "acting within the scope of his office, employment, or agency," <u>id.</u> at 5-6.  The Court concludes that most of these arguments lack merit, and those with some merit are more properly addressed through amendment of the complaint rather than the outright dismissal proposed by the Sudan defendants.

### i.        Opportunity to arbitrate

First, the Sudan defendants insist that the act with which Sudan is charged occurred in Sudan, and therefore section 1605(a)(7) requires plaintiffs to allege that they gave the Sudan defendants an opportunity to arbitrate the claims, something they have not done (and, say the Sudan defendants, something they cannot do).  Def. Mem. at 4.  The Sudan defendants misread the statute.  Section 1605(a)(7)(B) requires a plaintiff to provide a foreign state an opportunity to arbitrate only if "the act occurred in the foreign state against which the claim has been brought."  28 U.S.C. § 1605(a)(7)(B).  It is plain from a reading of the state that the "act" referenced here is the same "act" described earlier in the provision -- namely, "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for

such an act." 28 U.S.C. § 1605(a)(7).  Although the Sudan defendants' alleged material support

for the act appears to have occurred in Sudan, the "act of . . . extrajudicial killing" in this case

occurred in Tanzania and Kenya.  As a result, plaintiffs were not required to offer the Sudan

defendants the opportunity to arbitrate or to allege that they did.

### ii.     Knowledge or intent of embassy bombings

The Sudan defendants argue next that the complaint fails to allege that the Sudan

defendants knew or intended that its material support would be used to support the embassy

bombings.  Def. Mem. at 6.  There is, however, no such requirement in section 1605(a)(7).  The

Sudan defendants purport to find this requirement in 18 U.S.C. § 2339A(a), which makes the

provision of material support or resources a criminal offense if the actor "know[s] or intend[s]

that they are to be used in preparation for, or in carrying out," certain acts of terrorism.  Id.

Section 1605(a)(7) adopts the definition of "material support or resources" in 18 U.S.C. §

2339A(b).  See supra at note 6.  However, the definition itself does not contain any knowledge or

intent requirement.  It merely lists different forms of assistance.  Although section 2339A(a)

makes it a federal offense only to knowingly or intentionally provide "material support or

resources" for a terrorist act, this hardly implies that section 1605(a)(7) meant to incorporate the

mens rea of the crime when it adopted the definition of "material support or resources" in section

2339A(b).

Were there any doubt on the issue, the D.C. Circuit recently held that a plaintiff need not

establish that material support or resources went directly to the specific act that gives rise to the

claim covered by section 1605(a)(7).  Kilburn, 376 F.3d at 1129.  It is enough, the D.C. Circuit

held, to show that the material support or resources went to the terrorist organization that

perpetrated the act, and that the support was a "proximate cause" of the terrorist act.  Id. at 1127-30.  Of course, if there is no statutory requirement that a plaintiff actually show that a foreign state's material support went directly to the embassy bombings, it would be strange for there to exist a requirement that a plaintiff show that a foreign state knew or intended that its support would go directly to the embassy bombings.

It is noteworthy that the court in Kilburn emphasized that section 1605(a)(7) is only a jurisdictional framework, and that any lingering concerns that foreign states would be exposed to damages for remote or attenuated acts of support could be addressed through the substantive law of liability.  Id. at 1127-29.  As an example of case law that might narrow a foreign state's liability, the D.C. Circuit cited a decision requiring evidence that a terrorist act was a "reasonably foreseeable result" of a foreign state's material support.  See id. at 1130 (citing Literacy Inst. & Holy Land Found. for Relief & Dev., 291 F.3d 1000, 1012 (7th Cir. 2002)).  There is, to be sure, an important conceptual difference between intent and causation, but it is just as certain that the D.C. Circuit in Kilburn did not understand there to be any requirement that a foreign state intend or know that their material support go to a terrorist act.

Finally, even if section 1605(a)(7) were read to require a plaintiff to allege and prove that a foreign state "intended" its material support or resources to assist in the commission of a terrorist act, plaintiffs make precisely that allegation in their complaint.  See Compl. ¶ 70 ("The injuries and loss of life, as above described, were intended as a result of each Defendant.").  For all of these reasons, the Sudan defendants' arguments relating to the absence of allegations of intent or knowledge must be rejected.

   iii.  **Specificity of allegations of "material support or**

**resources**"

The Sudan defendants also argue that plaintiffs have failed to allege that the defendants provided "material support" to al Qaeda and Hizbollah with the specificity required by the law. See Def. Mem. at 26-30.  In Price v. Socialist People's Libyan Arab Jamahiriya, the D.C. Circuit held that a plaintiff must plead an "act of torture" with sufficient detail to allow a court to determine whether it falls within the statutory definition.  See 294 F.3d at 87.  The complaint in that case had alleged only that the plaintiffs were "kicked, clubbed and beaten" by prison guards and "interrogated and subjected to physical, mental and verbal abuse." Id. at 86.  The court concluded that these allegations were too conclusory to state a claim for an "act of torture" under section 1605(a)(7):

> In light of the serious and far-reaching implications of the 1996 FSIA
> amendments, it is especially important for the courts to ensure that foreign states
> are not stripped of their sovereign immunity unless they have been charged with
> actual torture, and not mere police brutality.   In this case, plaintiffs' complaint
> offers no useful details about the nature of the kicking, clubbing, and beatings that
> plaintiffs allegedly suffered.

Id. at 87.  The court later extended the rule of Price to a case alleging an "act of . . . hostage-taking" by a foreign state.  See Simpson, 326 F.3d at 234  (finding allegations of hostage-taking insufficient under Price where plaintiff alleged she was held captive and incommunicado for several months but did not allege that defendant's purpose was to compel anyone to do or abstain from doing any act).  In both decisions, there was an indication that plaintiffs "might be able to state a proper claim for torture under the FSIA," and therefore the court remanded the case to the district court with instructions to allow the plaintiff to plead her allegations in greater detail. Price, 294 F.3d at 94; Simpson, 326 F.3d at 24-25.

Both of these cases involved an accusation that the foreign state was undertaking an act of terrorism itself.  See Price, 294 F.3d at 87 (alleging acts of torture by Libyan prison guards); Simpson, 326 F.3d at 231-32 (alleging act of hostage-taking by Libyan authorities).  The question remains open, however, whether Price requires a similar degree of detail in an allegation that a foreign state provided "material support" for an act of terrorism.  There are several reasons to believe that it should.  First, the allegation of "material support" is the analog of an allegation of "torture" and "hostage-taking" in cases where a foreign country is not directly involved in the act of terror but instead is assisting others in committing those acts.  In each case, the allegation defines the specific misconduct with which the foreign state is charged, and in each case, there is an imperative to ensure that a foreign state is not "stripped of their sovereign immunity unless they have been charged with actual" misconduct.  Price, 294 F.3d at 92.

Second, for each act -- material support, torture, and hostage-taking -- there is a statutory definition that circumscribes the exposure of the foreign state, and that the court can use as a yardstick at the pleading stage to measure the viability of the claims.  Plaintiffs should not be allowed to avoid this review by alleging their claim with such generality that the district court is unable to "make the 'critical preliminary determination' of its own jurisdiction as early in the litigation as possible."  Phoenix Consulting, 216 F.3d at 39 (quotation omitted).  Finally, a foreign state is exposed to a similar "condemnation" for allegations of material support for terrorist organizations as it is for allegations of torture or hostage-taking, and it is in large part this concern that a foreign state will be charged with the most serious of violations of international law norms in a United States court on the vaguest of allegations that drove Price's requirement of specificity.  See Price, 294 F.3d at 92-93.

For these reasons, the Court concludes that the meaning of "material support" must be alleged with a degree of specificity sufficient to determine that they "state a proper claim for [the provision of material support or resources] under the FSIA." Price, 294 F.3d at 94. The complaint in this case fall short of that standard. Plaintiffs make several conclusory allegations that the Sudan defendants provided "cover", "support", and "sanctuary" to al Qaeda and Hizbollah, Compl. ¶¶ 2, 7, a single allegation that the Sudan defendants entered into an unspecified agreement with al Qaeda and Hizbollah through which those organizations received "shelter and protection from interference," id. ¶ 8, and a single allegation that a meeting occurred in the Republic of Sudan between the leaders of al Qaeda and Hizbollah to plan the embassy attacks, id. These allegations do not provide enough information to determine the nature of any relationship between al Qaeda and Hizbollah, the form the alleged acts of "support" took, and whether those acts qualify as "material support or resources" within the meaning of the statute. The complaint "in its present form is simply too conclusory to satisfy § 1605(a)(7)." Price, 294 F.3d at 85.

On the other hand, it seems clear that plaintiffs can state their allegations in much greater detail. They have submitted to the Court hundreds of pages of transcripts containing far more detailed allegations of the ways in which the Sudan defendants harbored, transported, protected, and supported al Qaeda in exchange for weapons and intelligence. Pls.' Mem. in Opp'n to Mot. to Dismiss ("Pl. Opp."), Exs. A, B. The Court sees no reason why the plaintiffs cannot place these allegations in the complaint so that the defendants are given formal notice of the misconduct with which they are charged, and the Court is given the opportunity to determine whether the misconduct meets the statutory standard of material support before allowing the

22

litigation to proceed.  The proper course is therefore to give plaintiffs an opportunity to amend their complaint to provide a more particularized account of the material support they believe the Sudan defendants provided to the terrorist organizations that carried out the Kenya and Tanzania bombings.  See, e.g., Price, 294 F.3d at 87; Simpson, 326 F.3d at 234-35.

### iv.    Evidence of "material support or resources"

The Sudan defendants also argue that the complaint should be dismissed because the evidence in the record demonstrates conclusively that they did not provide any material support or resources to al Qaeda or Hizbollah.  They point to the declarations of Timothy Michael Carney (a former United States Ambassador to Sudan) and John E. Cloonan (a former Special Agent of the FBI, where he worked on a task force investigating al Qaeda and the embassy bombings) stating that those former officials are unaware of any evidence that the Sudan defendants played a role in the embassy bombings or actively sponsored al Qaeda or Hizbollah, and that the Sudan defendants in fact expelled al Qaeda from the country in 1996, two years prior to the embassy bombings.  Carney Decl. ¶¶ 6-7, 9-10; Cloonan Decl. ¶¶ 2-3, 5-10;.

Plaintiffs rebut these declarations with transcripts of the testimony of two al Qaeda lieutenants:  Jamal Al-Fadl, who testified in criminal proceedings against Osama Bin Laden, and Essam Al Riddi, who testified under oath before an individual appointed a Commissioner of the Court pursuant to the Federal Rules of Civil Procedure.  They describe a partnership between the Sudan defendants and al Qaeda in which the Sudan defendants pledged their support and sanctuary to al Qaeda, helped transport weapons and militants for al Qaeda, provided security and a safe haven for the training of al Qaeda militants, arranged for the release of al Qaeda officials who faced detention, and worked with al Qaeda to develop chemical weapons and

23

uranium, in return for which al Qaeda provided the Sudanese government with weapons,

communications equipment, and intelligence manpower.  See Pl. Opp., Ex. A at 216-43, 262-93,

341-79; Ex. B at 18-31.

This case therefore poses the question of how to resolve a clash of evidence relating to

jurisdiction in an FSIA case prior to any opportunity for discovery.  In Kilburn, the defendants

had argued that there were inherent contradictions in the plaintiff's complaint, and the plaintiff

replied with an expert affidavit stating that the defendants in fact provided the material support

for the act of kidnaping and murder alleged in the complaint.  The D.C. Circuit noted that the

defendant bore the ultimate burden of proving that it falls outside of the statutory exceptions to

immunity, but it had "never decided whether, in addition to the ultimate burden of persuasion, the

defendant also bears the initial burden of production."  Id. at 1130.  The court found it

unnecessary to reach the issue in that case, because "even if the plaintiff has the burden of

production, he has satisfied it."  Id.  Emphasizing that "the only discovery to date has been that

which the plaintiff has voluntarily accorded the defendants, and that the plaintiff has not yet had

an opportunity to conduct any," the court concluded that the plaintiff's affidavit was "more than

sufficient to satisfy any possible burden of production at this stage of the litigation."  Id.

Plaintiffs have made a similar showing here.  Without the benefit of any discovery of

defendants or their declarants, plaintiffs have come forward with evidence in the form of

testimony from purported al Qaeda lieutenants that satisfies any burden of production they may

bear at this early stage of the litigation.  These lieutenants describe how the Sudan defendants

nurtured al Qaeda through this partnership during the first half of the 1990s, enabling al Qaeda to

become an international terrorist organization with the ability to execute the synchronized

terrorist bombings at issue in this case.  Plaintiffs also suggest that Sudan provided a safe haven

through which al Qaeda and Hizbollah operatives began planning the specific attacks alleged in

this case.

The Court hastens to note that it is not expressing any view as to the credibility or

competence of the allegations of these lieutenants.[8]  Unlike in Kilburn, plaintiffs have not yet

come forward with an expert to substantiate their allegations, and the Sudan defendants have

made a substantial proffer of evidence in their defense.  Furthermore, this case is unusual in that

the parties seem to agree that the Sudan defendants severed ties to al Qaeda two years before the

relevant attacks.  Nonetheless, it cannot be said at this early stage of the proceedings that

plaintiffs will be unable to show that the Sudan defendants provided material support to al Qaeda

within the meaning of the statute and that this support was a proximate cause of the embassy

bombings.  See Kilburn, 376 F.3d at 1128.

As soon as plaintiffs address the deficiencies in their complaint identified in this opinion,

there may be a period of  circumscribed jurisdictional discovery that will allow the parties to

resolve the disputes of material fact reflected in their submissions.  See id. at 1131 (holding that

the "court retains considerable latitude in devising the procedures it will follow to ferret out the

facts pertinent to jurisdiction." (quotation omitted)); Phoenix Consulting, 216 F.3d at 40

(explaining that the court "must give the plaintiff ample opportunity to secure and present

evidence relevant to the existence of jurisdiction," but that such "jurisdictional discovery should

be carefully controlled and limited).  For the time being, however, the Court holds only that the

_____

[8]  There are open questions relating to the admissibility of both parties' evidence at this
point, and those issues will be resolved as necessary in due course.

Sudan defendants cannot obtain dismissal of plaintiffs' complaint on the basis of the Carney and Cloonan declarations.

### v.     "Within the scope of his office, employment, or agency."

Finally, the Sudan defendants contend that the complaint does not adequately plead that any Sudanese official provided material support or resources while "acting within the scope of his office, employment, or agency."  Def. Mem. at 5-6.  Although the complaint alleges that "those who carried out the attack described, were within the scope of their agency on behalf of the Defendants," Compl. ¶ 70, the Sudan defendants note that this statement appears to be a reference to those in Hizbollah and al Qaeda who allegedly carried out the attack, and not the Sudanese officials whose alleged material support to these organizations is the gravamen of the complaint.  They also argue that the existing allegation in paragraph 70 is conclusory and therefore insufficient under Price.  Def. Mem. at 5.

The Sudan defendants are correct that the complaint cannot reasonably be read to allege that any Sudanese officials were providing support within the scope of their employment.  The information in the transcripts plaintiffs attached to their opposition papers indicates, however, that they will have no trouble making this allegation (on the basis of that information), and therefore the Court will allow plaintiffs to amend their complaint to correct this omission.  See Price, 294 F.3d at 92.  The Court disagrees, however, that when plaintiffs make this allegation as to the Sudanese officials, they need to do so in much greater detail than they now provide in paragraph 70.  The Sudan defendants do not explain how more detailed allegations in this instance would further the goals of the FSIA, or even what sort of detail they would anticipate or

need at this early stage of the proceedings.  Price cautions that a "claimant need not set out all of

the precise facts on which the claim is based in order to survive a motion to dismiss." Id.  The

Court declines to extend Price further.[9]

### b.    Constitutional arguments

The Sudan defendants raise a number of constitutional challenges to section 1605(a)(7) as

well.  They argue that section 1605(a)(7) represents an unconstitutional delegation to the

executive of the legislative power to create jurisdiction in the federal courts; that it violates the

equal protection clause by singling out certain foreign states that support acts of terrorism for suit

while allowing others to retain their sovereign immunity; and that the definition of "material

support or resources" incorporated from 18 U.S.C. § 2339A is unconstitutionally vague.  Each of

these arguments has been rejected in one form or another by prior decisions in this district court.

This Court rejects them again today as applied to the facts of this case.

### i.    Unconstitutional delegation of power

Section 1605(a)(7) only waives the sovereign immunity of a foreign state that was

"designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of

1979 (50 U.S.C. App. § 2405(j)) or section 620A of the Foreign Assistance Act of 1961 (22

U.S.C. § 2371) at the time the act occurred" or was "later so designated as a result of such act."

28 U.S.C. § 1605(a)(7)(A).  The decision to designate a foreign country a state sponsor of

terrorism under each of these statutes is made by the State Department.  See 50 U.S.C. App. §

2405(j); 22 U.S.C. § 2371(a).  The Sudan defendants contend that section 1605(a)(7) therefore

---

[9]  The legislative history of the FSIA states only that the "lawsuit must allege that the
terrorist act was undertaken by an 'official, employee, or agent' of a foreign country, 'while acting
within the scope of his office, employment, or agency.'"  H.R. Rep. No. 104-383, at 105 (1995).

allows the executive branch to determine the jurisdiction of a district court over suits against a foreign country in violation of the principle that the executive "can neither grant nor curtail federal court jurisdiction."  Carlyle Towers Condo. Ass'n v. FDIC, 170 F.3d 301, 310 (2d Cir. 1999).

This argument has been rejected by several courts in cases in which a foreign state was designated a state sponsor of terrorism before the enactment of section 1605(a)(7), on the theory that Congress itself made the decision to subject the foreign state to jurisdiction upon enacting the statute, and no further steps were necessary from the State Department.  See Rein v. Socialist People's Libyan Arab Jamahiriya, 162 F.3d 748, 764 (2d Cir. 1998); Simpson v. Socialist People's Libyan Arab Jamahiriya, 180 F. Supp. 2d 78, 86 (D.D.C. 2001), rev'd in part on other grounds, 326 F.3d 230 (D.C. Cir. 2003); Price v. Socialist People's Libyan  Arab Jamahiriya, 110 F. Supp. 2d 10, 13-14 (D.D.C. 2000), rev'd in part on other grounds, 294 F.3d 82 (D.C. Cir. 2002); Daliberti, 97 F. Supp. 2d at 51.  Sudan was designated a state sponsor of terrorism in 1993, three years before section 1605(a)(7) was enacted.  See 58 Fed. Reg. 52,523 (Oct. 8, 1993). In fact, Congress specifically identified Sudan in the legislative history of section 1605(a)(7) as one of the state-sponsors of terrorism that would be exposed to suit by the legislation.[10]  Clearly, then, this case falls squarely within the rule of these well-reasoned decisions.

The Sudan defendants insist that this case is different in that each of the earlier decisions involved an act of terrorism that had already occurred when section 1605(a)(7) was enacted,

---

[10]  H.R. Rep. No. 104-383, at 62 (1995) ("The existence of state-sponsored terrorism is well documented and state sponsors of terrorism include Libya, Iraq, Iran, Syria, North Korea, Cuba, and Sudan. . . .   Section 804 will give American citizens an important economic and financial weapon against these outlaw states.").

whereas the embassy bombings in this case took place two years after the addition of section 1605(a)(7).  Therefore, they argue, the Secretary of State had an opportunity to remove Sudan from the list of countries designated as state sponsors of terrorism before the embassy bombing, and failed to do so.  This fact, however, does not alter the central difficulty with the unconstitutional delegation theory in this context -- Sudan was "already on the list of state sponsors of terrorism," and therefore "[n]o decision whatsoever of the Secretary of State was needed to create jurisdiction over [Sudan] for its alleged role" in the destruction of the embassies.  Rein, 162 F.3d at 764.

To be sure, the State Department had the opportunity to restore the sovereign immunity of Sudan by removing it from the list.  See 50 U.S.C. App. § 2405(j)(4).  But *the Sudan defendants* cannot be heard to complain that the State Department can *remove* them from the list of designated terrorists, which is after all a power that can only work to the Sudan defendants' benefit.  See Rein, 162 F.3d at 763 (an unconstitutional delegation argument "might also arise if a state on the list when § 1605(a)(7) was enacted was later dropped from the list.  In that scenario, *a plaintiff* could put forth a claim of unduly delegated authority.") (emphasis added).[11] At any rate, the State Department did not add or remove the Sudan defendants from this list. Indeed, it took no action at all.  Congress exposed Sudan to the jurisdiction of this Court the moment it passed section 1605(a)(7) with Sudan already on the list of terrorist states.  Therefore, it cannot be said that Sudan is subject to the jurisdiction of this Court by virtue of any

---

[11]   The Sudan defendants argue that Rein indicated that a constitutional issue could arise in a situation where the removal of immunity resulted from a post-section 1605(a)(7) decision by the State Department, but the opinion said no such thing.  Rein stated only that a different situation might be presented if a foreign state was "not identified as a state sponsor of terrorism when § 1605(a)(7) was passed."  Rein, 162 F.3d at 763.  That is not the situation here.

unconstitutional delegation of power.[12]

### ii.    Equal Protection

Next, the Sudan defendants argue that section 1605(a)(7) offends the constitutional

guarantee of equal protection under the law, because "an act committed by officials of a state that

is on the terrorist list is actionable, while precisely the same act, committed by officials of a non-

listed state, is not actionable."  Def. Mem. at 9.  The Sudan defendants argue that there is no

rational basis for this distinction, and therefore that section 1605(a)(7) violates their

constitutional rights.

This argument overlooks the important ways in which section 1605(a)(7) is the result of a

"delicate legislative compromise."  Price, 294 F.3d at 86.  The legislative history reveals strong

opposition to section 1605(a)(7) by executive branch officials expressing concern that the statute

would disrupt the foreign policy of the United States and cause other nations to respond in kind.[13]

Although these concerns "did not prevent the amendment from passing, they nevertheless left

their mark in the final bill," including the provisions ensuring that "not all foreign states may be

sued."  Id.  The decision to expose to suit only those countries that "consistently operate outside

---

[12]  The Second Circuit indicated in Rein, and another judge of this Court held in Daliberti, that the State Department's decision to expose a foreign state to suit by designating it a state sponsor of terrorism might not present any constitutional concerns at all, because Congress may, consistent with the separation of powers, condition its legislative enactments on the making of an Executive finding, even when expanding the jurisdiction of the federal courts.  Rein, 162 F.3d at 762-64; Daliberti, 97 F. Supp. 2d at 49-50.  Having concluded that there was no exercise at all of the State Department's power to create jurisdiction in this case, the Court need not resolve whether that exercise might ever be unconstitutional.

[13]  See Price, 294 F.3d at 89; H.R. Rep. No. 103-702, at 12 (1994); H.R. Rep. 103-702, at 12 (1994); John F. Murphy, Civil Liability for the Commission of International Crimes as an Alternative to Criminal Prosecution, 12 Harv. Hum. Rts. J. 1, 35-37 (1999).

the bounds of the international community by sponsoring and encouraging acts generally

condemned by civilized nations" is an entirely reasonable accommodation of the competing

interests  considered in the crafting of the statute.  Daliberti, 97 F. Supp. 2d at 52.  This Court

therefore joins the others that have rejected this equal protection challenge to section 1605(a)(7).

See Simpson, 180 F. Supp. 2d at 87; Daliberti, 97 F. Supp. 2d at 52.[14]

### iii.    Void for vagueness

Finally, the Sudan defendants contend that the definition of "material support or

resources" in 18 U.S.C. § 2339A adopted by section 1605(a)(7) is unconstitutionally vague.[15]

The Sudan defendants rely on Humanitarian Law Project v. Reno, 205 F.3d 1130 (9th Cir. 2000),

where the Ninth Circuit found the terms "personnel" and "training" in the definition of "material

support or resources" in section 2339A unconstitutionally vague.  However, unlike in

Humanitarian Law Project (where certain human rights groups wished to provide aid to the

humanitarian and political activities of groups designated as foreign terrorist organizations),

plaintiffs in this case are not charging the Sudan defendants with conduct that "blurs the line

---

[14]    The D.C. Circuit recently held that "foreign states are not 'persons' protected by the Fifth Amendment," and therefore cannot avail themselves of the rights guaranteed by that provision, including the right to equal protection.  Price, 294 F. Supp. at 96-97.  The court expressed "no view as to whether other entities that fall within the FSIA's definition of 'foreign state' -- including corporations in which a foreign state owns a majority interest, see 28 U.S.C. § 1603(b) -- could yet be considered persons under the Due Process Clause."  Id. at 100.  Because the Sudan defendants' constitutional challenges are easily dismissed on the merits, the Court need not reach the issue whether the Ministry of the Interior of the Republic of Sudan might ever enjoy rights under the Constitution.

[15]  The definition of "material support or resources" can be found at footnote 6, supra.

between protected expression and unprotected conduct." Id. at 1133.[16]

The allegations in the transcripts attached to plaintiffs' papers depict the Sudan defendants guarding al Qaeda officials with military personnel, transporting al Qaeda militants and weapons in and out of the country, protecting al Qaeda militants from the interference of police and other government officials, imprisoning informants who might identify al Qaeda officials, and supplying other forms of "lodging," "facilities," "personnel," and "transportation" that clearly lie within the compass of "material support or resources" in 18 U.S.C. § 2339A and do not raise any colorable First Amendment concerns.  The definition of "material support or resources" therefore is not unconstitutionally vague as applied to the circumstances of this case.  See United States v. Sattar, 314 F. Supp. 2d 279, 300-01 (S.D.N.Y. 2004) (holding that definition of "material support or resources" in section 2339A is not unconstitutionally vague as applied to case where individual was charged with making a terrorist leader "available as a co-conspirator in a conspiracy to kill and kidnap persons in a foreign country," because that is "conduct that plainly is prohibited" by section 2339A and does not "concern the scope of membership in an organization or the permissible extent of advocacy"); United States  v. Khan, 309 F. Supp. 2d 789, 822 (E.D. Va. 2004) (definition of "material support or resources" in section 2339A is not unconstitutionally vague where "[t]he conspiracy alleged in Count 5 was not to provide 'personnel' who would speak on behalf of LET, or provide moral support, or simply receive training, but to provide personnel who, after receiving training, would serve that organization as

---

[16]  The Ninth Circuit expressed concern that someone "who advocates the cause of the [group designated a terrorist organization] could be seen as supplying them with personnel," and "a plaintiff who wishes to instruct members of a designated group on how to petition the United Nations to give aid to their group" might be regarded as offering the group "training." Id. at 1137-38.

soldiers, recruiters, and procurers of supplies").[17]

### c.      Designation as a State Sponsor of Terrorism

The Sudan defendants also maintain that Sudan was never properly designated a state

sponsor of terrorism.  Sudan was added to the list of sponsors of terrorism under the Export

Administration Act ("EAA") in 1993.[18]  The EAA was enacted in 1969 as a temporary measure,

and Congress has occasionally re-enacted the statute, each time with a sunset provision

specifying a date on which the statute would expire.  The version of the EAA that was re-enacted

in 1979 was set to expire in August 1994, and when it did, the President declared a national

emergency and extended the statute by executive order.[19]  The President continued to extend the

statute by executive order through November 2000, when Congress reenacted the statute once

again on a temporary basis.[20]  See Wisconsin Project on Nuclear Arms Control v. United States

Dep't of Commerce, 317 F.3d 275, 283 (D.C. Cir. 2003).

The Sudan defendants do not seem to challenge the President's authority to revive the

---

[17]  Any vagueness concerns are further reduced here because, unlike the cases cited in the
text, this is a civil rather than criminal proceeding.  See Big Bear Super Market No. 3 v. I.N.S.,
913 F.2d 754, 757 (9th Cir. 1990) ("A greater degree of ambiguity will be tolerated in statutes
which--like the one challenged here--merely impose civil, as opposed to criminal penalties.");
Humanitarian Law Project v. Reno, 9 F. Supp. 2d 1176, 1202 (C.D. Cal. 1998) (because section
2339B of AEDPA provides for criminal sanctions for those who provide material support to
foreign terrorist organizations, "[t]he requirement of clarity is enhanced"), aff'd, 205 F.3d 1130
(9th Cir. 2000).

[18]  See 58 Fed. Reg. 52,523 (Oct. 8, 1993).

[19]  Exec. Order No. 12,924, 59 Fed. Reg. 43,437, available at 1994 WL 450440 (Aug. 19,
1994).

[20]  Pub. L. 106-508, 114 Stat. 2360 (2000) (codified at 50 App. U.S.C. § 2419).  The
EAA is codified at 50 App. U.S.C. § 2405.  The statute expired again in August 2001, and the
President extended the statute once more.  Exec. Order No. 13,222, 3 C.F.R. 783 (2002).

statute through executive order during periods of lapse.  They argue instead that Sudan was not

designated a state sponsor of terrorism "under the [EAA]" within the meaning of section

1605(a)(7) during the periods of lapse because the statute itself had expired.  No court has ever

accepted the Sudan defendants' interpretation of the EAA designation provision in section

1605(a)(7).[21]  The executive order continuing the statutory scheme in 1994 states that "the

provisions of the [EAA], as amended, . . . shall be carried out under this order so as to continue

in full force and effect."  Executive Order No. 12,924, 59 Fed. Reg. 43437 (August 19, 1994).

Courts uniformly have read this language to mean that the statute remained in full effect during

the periods of lapse.  See, e.g., Wisconsin Project, 317 F.3d at 283; Times Pub. Co. v. U.S. Dep't.

of Commerce, 236 F.3d 1286, 1291 (11th Cir. 2001).[22]  There is simply no indication that

Congress took a different view when it referenced the EAA in section 1605(a)(7).

In fact, Congress enacted section 1605 during one of the periods of lapse.  Had Congress

truly intended that every EAA-designated terrorist state would continue to enjoy sovereign

---

[21]  On the other hand, several courts have stated that foreign states were "continuously" designated as state sponsors of terrorism since the date of their designation (although none appear to have specifically considered the argument presented by the Sudan defendants here). See Peterson v. Islamic Republic of Iran, 264 F. Supp. 2d 46, 59-60 (D.D.C. 2003); Weinstein v. Islamic Republic of Iran, 184 F. Supp. 2d 13, 20 (D.D.C. 2002); Mousa v. Islamic Republic of Iran, 238 F. Supp. 2d 1, 4 (D.D.C. 2001); Elahi v. Islamic Republic of Iran, 124 F. Supp. 2d 97, 108 (D.D.C. 2000).

[22]  Contrary to the Sudan defendants' suggestion, these decisions held not only that the regulations issued under the EAA remained in effect during the periods of lapse, but also that the EAA itself continued to be good law.  See, e.g., Wisconsin Project, 317 F.3d at 278-79 (rejecting argument that "because the EAA was not in effect either when the exporters submitted their application data to the Department or when the Wisconsin Project requested that data from the Department under FOIA, no statute exists to justify the Department's withholding of the requested data"); Times Publishing Co., 236 F.3d at 1290 ("Courts addressing the continued vitality of the EAA pursuant to executive orders have found that the Act remains effective by virtue of a presidential order during periods of statutory lapse.").

immunity for acts of terrorism committed on the very date that Congress passed section 1605 (and for the foreseeable future until Congress re-enacted the statute), one would expect to see some indication of that fact in the text or the legislative history of the statute.  There is nothing at all to that effect.  What is more, the EAA states expressly that a determination by the Secretary of State that a foreign nation is a sponsor of terrorism "may not be rescinded" unless the President submits to the Speaker of the House of Representatives and several other officials reports explaining and certifying the decision to rescind.  See 50 App. U.S.C. § 2405(j)(4).  Congress enacted section 1605(a)(7) against the backdrop of this language, and there is again no reason to believe that Congress anticipated that the designation of a foreign state as a sponsor of terrorism would so easily vanish notwithstanding this provision.

Most important, the rule proposed by the Sudan defendants would have the effect of barring any cause of action against a foreign state designated under the EAA for practically every act of terror after August 1994.  This would include, among others, any act of material support for terrorism after that date by the Republic of Iran, a country whose "involvement in international terrorism has been unmatched by any other state."  Dammarell v. Islamic Republic of Iran, 281 F. Supp. 2d 105, 112 (D.D.C. 2003) (quotation omitted).  The Court declines to read such a sweeping result into section 1605(a)(7) in the absence of any evidence in the text or legislative history that this was Congress's design.

### 2.        Plaintiffs' Causes of Action

The Sudan defendants argue that the complaint fails to state a claim on which relief can be granted.  They contend that the claims that are based expressly on the Flatow Amendment must be dismissed in light of the D.C. Circuit's decision in Cicippio-Puleo holding that "neither

28 U.S.C. § 1605(a)(7) nor the Flatow Amendment, nor the two considered in tandem, creates a private right of action against a foreign government." 353 F.3d at 1032-33. The other claims must be dismissed as well, the Sudan defendants urge, because the common law cannot serve as the source of law for an action against a foreign state.

On this date, the Court is issuing an opinion in <u>Dammarell v. Islamic Republic of Iran</u>, Civil Action No. 01-2224, that addresses these and several other issues relating to the causes of action a plaintiff may bring against a foreign state in an action brought pursuant to section 1605(a)(7). <u>Dammarell</u> is an action against the Republic of Iran and its Ministry of Intelligence and Security filed by more than eighty victims and family members of victims of the 1983 Beirut embassy bombing. The opinion the Court has issued today in that case provides a detailed analysis of the viability of several proposed causes of action in a section 1605(a)(7) action, and requires plaintiffs there to amend the generalized causes of actions in their complaint in a manner consistent with that opinion.

In the <u>Dammarell</u> opinion, the Court concludes that a plaintiff may bring any action against a foreign state or instrumentality through section 1606 of the FSIA that the plaintiff could bring against a private individual in like circumstances, Mem. Op. at 20-31; that a plaintiff may therefore state a claim against a foreign state in a section 1605(a)(7) case under state common law or statutory law, Mem. Op. at 31-41; that the District of Columbia supplies the choice of law principles for a state law section 1605(a)(7) case, Mem. Op. at 32-34, and the application of those principles to an embassy bombing case will generally result in the state of domicile of the plaintiff providing the substantive rule of decision, Mem. Op. at 34-41; that a plaintiff cannot state a cause of action against a foreign state in a section 1605(a)(7) embassy bombing case

directly under the federal common law, Mem. Op. at 41-51; that a plaintiff may not bring a claim directly under the Flatow Amendment in light of Cippio-Puleo, or under the Flatow Amendment or the Torture Victims Protection Act through section 1606, because Congress has indicated its desire not to allow a cause of action against foreign states through those particular statutes, Mem. Op. at 51-57; and finally, that a plaintiff must identify in her pleadings "a particular cause of action arising out of a specific source of law," and will be given an opportunity to amend generalized claims when it appears that she is able to allege her causes of action with the necessary detail, see Acree v. Republic of Iraq, 370 F.3d 41, 59 (D.C. Cir. 2004), Mem. Op. at 57-59.  These conclusions apply in this case, and accordingly are adopted by reference.

Plaintiffs will need to make substantial changes to their complaint to conform to these holdings.  The causes of action in plaintiffs' complaint that arise explicitly under the Flatow Amendment are not viable, and must be withdrawn or amended to state a claim under state law. Moreover, plaintiffs will be required to provide greater detail concerning the claims alleged in the other counts in the complaint.  The complaint does not provide any explanation of the causes of action or sources of law raised in these counts, except for the label "loss of consortium" or "personal injury" above each count, and a general reference earlier in the complaint to "assault and battery at common law."  E.g., Compl. at 7-9.

These conclusory allegations are akin to those found insufficient in Acree v. Republic of Iraq, where the D.C. Circuit ordered the plaintiffs to amend a complaint that "alluded to traditional torts of assault, battery and intentional infliction of emotional distress in their generic form" without "point[ing] to any other specific source in state, federal, or foreign law for their

37

cause of action." Acree, 370 F.3d at 59. As in Acree, this Court will require plaintiffs to amend their complaint to specify "a particular cause of action arising out of a specific source of law" for each of their claims. Id.; see also Simpson v. Socialist People's Libyan Arab Jamahiriya, No. 00-1722, 2005 WL 517850, at *1 (D.D.C.) ("In their amended complaint, the plaintiffs primarily reference general tort law. . . . Accordingly, the court grants the plaintiffs leave to amend their complaint with a statement of which law they seek this court to apply.") At a minimum, plaintiffs must identify a specific cause of action for each claim (i.e., a common law tort or a statutory cause of action), and a particular source of law for the cause of action (i.e., state common law, or a state or federal statute).

Although the Court will not repeat the lengthy analysis in the Dammarell decision, the Court will take a moment to provide its views on two arguments to which the Sudan defendants devote particular attention in their papers. First, the Sudan defendants argue that the text of section 1605(a)(7) indicates that Congress did not intend to provide jurisdiction over common law causes of action. This argument is premised on the Sudan defendants' understanding that "[s]ections 1605(a)(2) and 1605(a)(5), for example, explicitly provide jurisdiction over common law claims in tort and contract, but they just as explicitly require a nexus to activity and effects within the United States." Section 1605(a)(7), they argue, is different, because it has application anywhere in the world but also contains no reference to common law actions, suggesting that Congress wished to exclude them as part of the legislative compromise in the provision. Def. Mem. at 15-16.

This argument is without merit. First, the argument rests on a misreading of the statute. There is in fact a nexus to the United States in section 1605(a)(7) -- the claimant or the victim

38

must have been a national of the United States at the time of the act of terrorism, 28 U.S.C. §

1605(a)(7)(A) -- and there is no express reference to a common law tort in section 1605(a)(2).[23]

More to the point, although section 1605(a)(7) undoubtedly reflects an attempt by Congress to

strike a balance among several competing concerns, there is no indication at all that Congress

chose to resolve these concerns by maintaining the sovereign immunity of a foreign state from

common law causes of action.[24]   There was a "delicate legislative compromise" in section

1605(a)(7), but the D.C. Circuit has explained that it led to several concessions that appear on the

face of the statute, including the decision to allow only state sponsors of terrorism to be sued, §

1605(a)(7)(A), and the choice to give a foreign state a reasonable opportunity to arbitrate for acts

---

[23]   Section 1605(a)(2) revokes the sovereign immunity of a foreign state in cases "in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."  28 U.S.C. § 1605(a)(2).

[24]   The several concerns raised in the congressional hearings over section 1605(a)(7) have no bearing on the distinction between statutory and common -- or state and federal -- law.  The State Department was concerned that the statute "might cause other nations to respond in kind," would create "the prospect of nuisance or harassment suits brought by political opponents" and would erode the credibility of the entire FSIA through overextension. Price, 294 F.3d at 89; see also H.R. Rep. No. 103-702, at 12 (1994); Murphy, supra note 13, at 35-37.  None of these concerns perceptibly turn on the nature of the cause of action.

The Sudan defendants quote language from the legislative history of the *original FSIA* to the effect that uniformity of decision "is desirable since a disparate treatment of cases involving foreign governments may have adverse foreign relations consequences."  H.R. Rep. No. 94-1487, at 13 (1976).  There is no evidence that this concern led Congress twenty years later to distinguish silently between common law and statutory causes of action in section 1605(a)(7).  At any rate, the interest in uniformity is a reason to favor federal common law over state common law, not a reason to favor statutes over common law altogether, the argument for which the Sudan defendants cite this legislative history.  As this court explained in Dammarell, however, courts have consistently rejected the argument that a mere desire for uniformity can permit resort to the federal common law.  See Mem. Op. at 41-51.

that take place within its boundaries, § 1605(a)(7)(B).  See Cicippio-Puleo, 353 F.3d at 1035-36.

This Court would require far clearer evidence of the intent of Congress (than the mere

speculation of the Sudan defendants) before it would read an additional limitation found nowhere

in the text of the statute into section 1605(a)(7) for common law claims.

The Sudan defendants also argue that there is a presumption that federal statutes do not

govern the conduct of foreign persons on foreign soil, and therefore there must be a similar

presumption for federal and state common law.  Def. Mem. at 22-26.  The answer to this

argument is simple:  the FSIA itself provides for the application of existing causes of action

against foreign states.  Even supposing there is a presumption that domestic common law should

be inapplicable outside the United States, this presumption is overcome by the text of the FSIA,

which creates a scheme in which domestic common law has been applied to claims arising under

the other waivers of foreign sovereign immunity in section 1605 for almost thirty years.  First

National City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 621 (1983)

("Where state law provides a rule of liability governing private individuals, the FSIA requires the

application of that rule to foreign states in like circumstances.");  Pescatore v. Pan Am. World

Airways, Inc., 97 F.3d 1, 12 (2d Cir. 1996) ("[T]he FSIA . . . operates as a 'pass-through' to state

law principles.").[25]  The Sudan defendants do not convince the Court that the rule should be any

different for actions under section 1605(a)(7).

Finally, the Sudan defendants argue that plaintiffs' claim for punitive damages should be

---

[25]  So, for example, courts often conclude that jurisdiction exists under section 1605(a)(2) for acts "outside the territory of the United States" when those acts cause "a direct effect in the United States."  28 U.S.C. § 1605(a)(2); see Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 609-10 (1992); I.T. Consultants, Inc. v. Republic of Pakistan, 351 F.3d 1184, 1187-90 (D.C. Cir. 2003); McKesson Corp. v. Islamic Republic of Iran, 52 F.3d 346, 350 (D.C. Cir. 1995).

dismissed in accordance with section 1606 of the FSIA, which provides that "a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages."  28 U.S.C. § 1606.  This rule certainly bars a claim for punitive damages against the Republic of Sudan itself.  Whether the same is true of the Ministry of the Interior of the Republic of Sudan requires an analysis of whether the Ministry of the Interior is a "foreign state" within the meaning of section 1606, or an "agency or instrumentality thereof."  The D.C. Circuit held in Roeder v. Islamic Republic of Iran that Iran's Ministry of Foreign Affairs "must be treated as the state of Iran itself rather than its agent" for purposes of the Flatow Amendment, explaining that "if the core functions of the entity are governmental, it is considered the foreign state itself; if commercial, the entity is an agency or instrumentality of the foreign state."  333 F.3d at 233.

This Court, in an earlier decision in Dammarell, extended this reasoning to the punitive damages provision in section 1606, concluding that Iran's Ministry of Intelligence and Security must be treated as a foreign state rather than an agency or instrumentality because "[p]laintiffs have presented no evidence to suggest that the intelligence activities conducted by MOIS in the early 1980s or, for that matter, the activities conducted by MOIS today, had or have any commercial effect or purpose."  Dammarell, 281 F. Supp. 2d at 199.  The same holds for the Ministry of the Interior of the Republic of Sudan.  The only allegations that plaintiffs make with regard to the Ministry of the Interior is that it was involved in "the support of terrorist activities" and the "prosecution of terrorist acts."  Compl. ¶¶ 4, 7.  Until such time as plaintiffs can allege and prove that the Ministry of the Interior of the Republic of Sudan engages in predominantly commercial activities, the claim for punitive damages must be dismissed in its entirety.  Id. at

201.[26]

### 3.      Act of State and Political Question

Finally, the Sudan defendants maintain that the Court should dismiss the suit pursuant to the act of state and political question doctrines.  Both of these arguments are unavailing.

The act of state doctrine bars a court from deciding a case "when the outcome turns upon the legality or illegality . . . of official action by a foreign sovereign performed within its own territory."  Riggs Nat'l Corp. & Subsidiaries v. Comm'r of IRS, 163 F.3d 1363, 1367 (D.C. Cir. 1999); see W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., 493 U.S. 400, 406 (1990). The doctrine is founded on "'the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder' the conduct of foreign affairs." W.S. Kirkpatrick & Co., 493 U.S. at 404 (quoting Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 423 (1964)).  The FSIA does not remove the need to consider the act of state doctrine. See Republic of Austria v. Altmann, 124 S. Ct. 2240, 2254 (2004) ("[T]he FSIA in no way affects application of the act of state doctrine.").  Courts assessing whether the act of state doctrine forecloses a given case under the FSIA have looked to three factors:  (i) the degree of consensus concerning a particular area of international law, (ii) the implications of the issue for

---

[26] The Sudan defendants' remaining arguments relating to plaintiffs' alleged failure to state a cause of action can be dispensed with quickly.  They argue that plaintiffs have not pled their factual allegations with enough particularity under Federal Rule of Civil Procedure 8(b), Def. Rep. Mem. at 18-19, but that rule requires only a "short and plain statement of the claim." Fed. R. Civ. P. 8(b).  The Court doubts that this rule requires any greater particularity than Price itself requires with regard to allegations going to jurisdiction.  The Sudan defendants have not convinced the Court that any more is necessary, and the question at least should await the amended complaint.  Likewise, the Sudan defendants' argument that plaintiffs have failed to plead the elements of their tort claims cannot be addressed until plaintiffs identify the tort claims they plan to allege with the specificity required under this decision.  Def. Mem. at 31.

our foreign relations, and (iii) whether the government that perpetrated the challenged act is still

in existence.  See Doe v. Qi, 349 F. Supp. 2d 1258, 1295 (N.D. Cal. 2004) (citing Sabbatino, 376

U.S. at 427-28.

These factors weigh overwhelmingly in favor of rejecting the act of state doctrine here.

There are few acts that more clearly violate international law than a terrorist attack on innocent

civilians.  See Dammarell, 281 F. Supp. 2d at 192 (terrorist attacks on embassies are "clearly

contrary to the precepts of humanity as recognized in both national and international law").  This

case does not present a circumstance in which a change of government -- in Iran or Sudan --

warrants application of the act of state doctrine.  Finally, uniquely in a section 1605(a)(7) case,

the concern that the judiciary might be interfering with the executive's authority over foreign

relations is at its lowest point, because jurisdiction over the suit only exists if the executive has

first designated the nation as a state sponsor of terrorism.  See 28 U.S.C. § 1605(a)(7)(A).  For

these reasons, the only court to consider the application of the act of state doctrine to a section

1605(a)(7) case flatly rejected it:

> While the act of state doctrine seeks to prevent courts from interfering in the
> foreign affairs powers of the President and the Congress, it does not prohibit
> Congress and the Executive from using the threat of legal action in the courts as
> an instrument of foreign policy.  The designation of Iraq as a terrorist state was
> made by the Secretary of State on behalf of the Executive Branch under an
> express grant of authority by Congress.  For this Court to grant defendant's motion
> to dismiss on act of state grounds would constitute more of a judicial interference
> in the announced foreign policy of the political branches of government than to
> allow the suit to proceed under the explicit authorization of Congress.

Daliberti, 97 F. Supp. 2d at 54-55.

The Sudan defendants do not provide any reason to hold otherwise in this case.  They

maintain that the suit will require the scrutiny of sensitive communications among Sudanese

43

government officials and between Sudan and the United States, and that political conditions in

Sudan will complicate the litigation because the government is presently engaged in a conflict

with several separatist groups.  But none of these facts meaningfully distinguish this case from

any other section 1605(a)(7) action.  By their very nature, law suits against foreign nations

charged with supporting terrorists will often require the examination of government records, and

these countries will occasionally find themselves in periods of instability.

Congress was certainly aware of all of these issues, and yet concluded that suits are a

necessary response to the destructive consequences of state-sponsored terror.  It is not the

province of this Court to second-guess this choice through application of the act of state doctrine

or any other judicially-crafted principle of decision or abstention.[27]  The Court can -- and will --

remain sensitive to such concerns in the management of discovery, and more generally as it

charts the course of this litigation.  See Kilburn, 376 F.3d at 1131 (explaining in FSIA case that

the "court retains considerable latitude in devising the procedures it will follow to ferret out the

facts pertinent to jurisdiction." (quotation omitted)); Phoenix Consulting, 216 F.3d at 40 (holding

in FSIA case that "jurisdictional discovery should be carefully controlled and limited" in order

"to avoid burdening a sovereign that proves to be immune from suit").  However, it will not

dismiss an action that entails no greater consideration of the acts of a foreign state than any other

---

[27]  The Sudan defendants also insist that this case is unique because Sudan is now a
willing participant in the war on terror, and a decision in this case will complicate the delicate
relationship between the Sudan and the United States.  Def. Mem. at 38-39.  Notwithstanding
Sudan's involvement in counter-terrorism efforts, the executive branch has elected not to remove
Sudan from the list of state sponsors of terrorism, and Congress has chosen to condition an action
under section 1605(a)(7) on whether the foreign state was a designated country at the time of the
events at issue (and not at the time of suit).  The Court is not in a position to reverse either of
these decisions.

claim under section 1605(a)(7).

The political question doctrine is inapplicable for similar reasons. The Sudan defendants insist that this case requires the resolution of issues that are "committed by the text of the Constitution to a coordinate branch of government" and "beyond areas of judicial expertise," but nothing could be farther from the truth. Def. Mem. at 39 (citing Baker v. Carr, 369 U.S. 186, 217 (1962), and Ramirez de Arellano v. Weinberger, 745 F.2d 1500, 1511 (D.C. Cir. 1984), vacated on other grounds, 471 U.S. 1113 (1985)). The decision whether suit should be allowed against the Republic of Sudan is certainly one that touches on the relationship between the United States and other nations, a concern that is primarily committed to the discretion of Congress and the President. Through the waiver of sovereign immunity in section 1605(a)(7), however, and the designation of Sudan as a state sponsor of terror under the EAA, these coordinate branches have exercised this discretion to revoke the sovereign immunity of Sudan and expose it to suits such as this one. The Court will now apply law to facts and assess liability and damages under existing causes of action, using the "judicially discoverable and manageable standards" that normally guide the courts in the adjudication of law suits. Baker, 369 U.S. at 217. This case therefore does not raise any political question concerns.

## III.  Plaintiffs' Motions for Leave to Take Depositions and to Strike

Plaintiffs move for leave to take the depositions of former Ambassador Timothy Michael Carney and Special Agent John E. Cloonan or, in the alternative, to strike their declarations. The Federal Bureau of Investigation and the Department of State opposed these motions on the ground that plaintiffs had not followed the regulations -- known as the Touhy regulations -- that govern requests for information from existing or former public officials that they obtained in the

course of their employment.  See 22 C.F.R. §§ 172.1-172.9; 28 C.F.R. §§ 16.21-16.29.  To date,

plaintiffs have failed to come forward with any information suggesting that they have even

attempted to comply with the regulations, which in the first instance require nothing more than a

simple request to the relevant governing agency.  See 22 C.F.R. § 172.5; 28 C.F.R. § 16.24.

Plaintiffs made vague allusions at the most recent hearing in this case to a letter they sent one of

the agencies, but they have not submitted evidence of this letter to the Court.[28]

Plaintiffs move in the alternative to strike the declarations, noting that the agencies admit

that the Sudan defendants and the declarants themselves never contacted the agencies for

permission to submit to the Court the information contained in the declarations.  The Court is

very troubled by the prospect that the Sudan defendants will seek to rely on declarations that are

obtained without authorization from the government (and perhaps in violation of the Touhy

regulations), at the same time that plaintiffs might be foreclosed from contesting the declarations

through the operation of those very regulations.  The mere possibility that the case might

eventually find itself in that posture, however, does not excuse plaintiffs' failure to comply with

the regulations in the first instance.  See In re Boeh, 25 F.3d 761, 763-67 (9th Cir. 1994).[29]

---

[28]  Plaintiffs suggested at the hearing on this motion that they submitted a letter to the
government on these points, but they still have not presented the Court with any evidence of such
a letter.  Plaintiffs also mentioned a FOIA request they say they filed with the Department of
Justice.  The only such request of which the Court is aware is the one in Owens v. Dep't of
Justice, Civil Action No. 04-1701, in which this Court is the presiding judge.  That request does
not relate to a deposition of former Ambassador Carney or former Special Agent Cloonan, at
least not directly, but instead seeks information in the possession of the Federal Bureau of
Investigation regarding the investigation of the bombings.  At any rate, plaintiffs do not seem to
argue that the FOIA request is an acceptable substitute for compliance with the Touhy
regulations.

[29]  Plaintiffs also claim, as an alternate reason to strike the declarations, that the
government stated that they contain "classified information."  As far as the Court can tell from

The Court will therefore deny without prejudice plaintiffs' motions for leave to take depositions and to strike as premature in light of plaintiffs' failure to comply with the <u>Touhy</u> regulations.  Once plaintiffs comply with the <u>Touhy</u> regulations, the legal issues regarding the declarations more squarely can be presented if necessary.  The Court notes that plaintiffs sought the opportunity to depose these individuals prior to the start of discovery out of a concern that the Court would grant the Sudan defendants' motion to dismiss on the basis of the declarations.  The Court has now declined to dismiss the case on that ground, and so any immediate need the plaintiffs might have for this discovery has vanished.

## IV.    Plaintiffs' Motions Relating to Jurisdictional Discovery

Plaintiffs also have filed renewed motions for jurisdictional discovery and the issuance of a request to the State of Israel for international judicial assistance pursuant to the Hague Convention, seeking permission to depose individuals in Israeli custody.  These motions are also premature.  Plaintiffs must take significant steps to cure deficiencies in their pleadings in light of this opinion.  Moreover, issues regarding the representation of the Sudan defendants should be resolved before any further depositions are taken without their presence or other discovery is ordered.  The Court concludes that it would be inappropriate to proceed with piecemeal discovery before these issues are addressed.  Accordingly, the Court will deny the motions for discovery until such time as plaintiffs have taken steps to correct their pleadings, and other pending procedural issues are resolved.  At that point, the Court will consider whether a phase of carefully limited discovery will be appropriate to resolve issues of fact relating to the jurisdiction of this Court or other legal issues.  See <u>Kilburn</u>, 376 F.3d at 1131; <u>Phoenix Consulting</u>, 216 F.3d

the record, the agencies have said no such thing.

at 40.

**V.     Hunton & Williams LLP's Motion to Withdraw and Further Proceedings in this
        Case**

The Court will order that a status conference be held on April 20, 2005, to address some

of the open issues that remain in this case.  The Court will hear from the parties at that time

regarding the current status of Hunton & Williams LLP's motion to withdraw as counsel for the

Sudan defendants, and the implications of the motion for the proceedings in this case.[30]

Meanwhile, the Court expects that plaintiffs will be taking steps to amend the Complaint

consistent with this opinion.  An amended complaint shall be filed with the Court by not later

than May 9, 2005.  Service of the amended complaint shall be effectuated consistent with the

FSIA as promptly as possible.

**CONCLUSION**

The Sudan defendants' motion to dismiss is granted in part and denied in part, and

plaintiffs will be ordered to amend their complaint and complete service of the amended

complaint.  The other pending motions, with the exception of the motion of Hunton & Williams

LLP to withdraw as counsel, are denied.  A status conference is scheduled for April 20, 2005, to

---

[30] The Court rejects the Sudan defendants' contention that al Qaeda and other terrorist
organizations must be joined as indispensable parties before the suit can proceed.  Def. Mem. at
41-42.  The Sudan defendants do not cite any law for the proposition that the organization that
allegedly committed the terrorist act in a "material support" case must be joined in a lawsuit, and
the law is to the contrary.  See Temple v. Synthes Corp., Ltd., 498 U.S. 5, 7 (1990) ("It has long
been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single
lawsuit."); Costello Pub. Co. v. Rotelle, 670 F.2d 1035, 1043 n.11 (D.C. Cir. 1981).  This is not a
case where complete relief cannot be afforded among the parties if al Qaeda is not a party, or
where any of the other reasons for mandatory joinder is present.  Of course, joinder of entities
such as al Qaeda, which has no governmental or corporate presence, would likely be futile from a
practical as well as legal perspective.

discuss further proceedings in the case.  A separate order will issue herewith.


                                    _____/s/ John D. Bates_____
                                           JOHN D. BATES
                                    United States District Judge


          Dated:   ___March 29, 2005___

Copies to:

Thomas Fortune Fay
601 Pennsylvania Avenue, N.W.
No. 900 – South Building
Washington, DC 20004
(202) 638-4534

Steven R. Perles
1615 New Hampshire Avenue, N.W.
Suite 200
Washington, DC 20009
(202) 745-1300

Douglas K. Bemis, Jr.
John F. Dienelt
Hunton & Williams LLP
1900 K Street, NW
Washington, DC 20006
(202) 955-1886