# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JAMES OWENS, et al.,**<br><br>    **Plaintiffs,**<br><br>        v.<br><br>**REPUBLIC OF SUDAN, et al.,**<br><br>    **Defendants.** | **Civil Action No.  01-2244 (JDB)** |

## MEMORANDUM OPINION

This civil action arises out of the August 7, 1998, terrorist attacks on the United States

embassies in Dar es Salaam, Tanzania, and Nairobi, Kenya.  The nearly simultaneous bombings

killed at least 224 individuals and wounded more than 4,000 others, among them the ten

principal plaintiffs in this action.[1]  Pursuant to a 1996 amendment to the Foreign Sovereign

Immunities Act ("FSIA") that revoked jurisdictional protection for terrorist-sponsoring

governments, plaintiffs filed this suit against the Republic of Iran, the Republic of Sudan, and

two of their respective ministries on the theory that they provided material support to al Qaeda

and Hizbollah[2] -- the organizations believed to be responsible for the bombings -- and thus are

---

[1] By "principal plaintiffs," the Court refers to those plaintiffs who suffered physical injuries in the bombings.  Eight of the ten principal plaintiffs were civilian employees of the United States government.  See Third Am. Compl. ¶ 2.  Also named as plaintiffs are thirty-seven individuals who are relatives of the ten principal plaintiffs; their claims are based solely on nonphysical harms, such as intentional infliction of emotional distress or loss of consortium.

[2] Transliteration of these organizations' names has produced various spellings.  For ease of reference, "al Qaeda" and "Hizbollah" are used herein, except where an alternate spelling is reflected in a quoted document or case.

subject to civil liability in the United States for the harms caused by their actions.  Plaintiffs

allege that the injuries they sustained as a result of the embassy bombings were a "direct and

proximate consequence of the intentional acts of the agents of the Defendants," who aided,

abetted, or conspired with the attackers.  See, e.g., Third Am. Compl. ¶¶ 4, 14.  As compensation

for those injuries, plaintiffs seek money damages from defendants, jointly and severally, in the

amount of $258 million.[3]

Consistent with the requirements of the FSIA, plaintiffs served each defendant with a

copy of the complaint and summons via diplomatic channels.  When defendants failed to appear,

the Clerk of this Court recorded an entry of default on May 9, 2003.  As is customary in these

cases, the Court scheduled an *ex parte* trial on liability and damages.[4]  Several months later,

while plaintiffs were in the process of collecting evidence to support their claims, the Republic of

Sudan and its Ministry of the Interior ("the Sudan defendants") entered an appearance in this case

_____

[3] Plaintiffs also request an award of $1 billion in punitive damages.  The Court, however, previously dismissed the punitive-damages claim because the FSIA's revocation of sovereign immunity is narrowly drawn to authorize claims for punitive damages only against an "agency or instrumentality" of a terrorist-sponsoring state -- not against the foreign state itself -- and plaintiffs failed to allege facts that would allow the Court to conclude that any of the defendants in this case fall within the statutory definition of an "agency or instrumentality."  See Owens v. Republic of Sudan, 374 F.Supp. 2d 1, 25-26 (2005) ("Owens I") (plaintiffs must show that the Ministry of the Interior of the Republic of Sudan "engages in predominantly commercial activities" to support a claim for punitive damages).  See also Dammarell v. Islamic Republic of Iran, 281 F.Supp. 2d 105, 200-02 (D.D.C. 2003) (Iran's Ministry of Intelligence and Security is not an "agency or instrumentality" of the government); Roeder v. Islamic Republic of Iran, 333 F.3d 228, 234 (D.C. Cir. 2003) (Iran's Ministry of Foreign Affairs "must be treated as the state of Iran itself rather than as its agent").

[4] Under 28 U.S.C. § 1608(e), "[n]o judgment by default shall be entered by a court of the United States ... against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."

through counsel.  Soon thereafter, on March 10, 2004, the Sudan defendants filed a motion to dismiss, which contended that, *inter alia*, (1) the Court lacked jurisdiction over the claims against them because the FSIA gave them immunity and plaintiffs failed to demonstrate that the case met the requirements of 28 U.S.C. § 1605(a)(7), the terrorism exception to foreign sovereign immunity; (2) plaintiffs failed to state a claim upon which relief could be granted because the complaint did not assert proper causes of action; and (3) plaintiffs' claims were foreclosed by the act-of-state and political-question doctrines.

On March 29, 2005, the Court granted in part and denied in part the Sudan defendants' motion to dismiss.  To the extent that it granted the motion, however, the Court permitted plaintiffs to amend the complaint to cure the deficiencies observed.  The Sudan defendants timely filed a notice of appeal,[5] but asked the Court of Appeals to hold their appeal in abeyance to permit them to challenge the sufficiency of the amended complaint before this Court.  The Court of Appeals granted that request.  Plaintiffs filed their Third Amended Complaint on May 3, 2005,[6] and the Sudan defendants moved to dismiss that complaint on June 24, 2005.  Having received extensive briefing from the parties on the pertinent legal questions, and having carefully considered those arguments and the entire record of this case, the Court will deny the motion to dismiss the Third Amended Complaint for the reasons that follow.

---

[5] Although an order denying a motion to dismiss ordinarily is not appealable, when such an order rejects a claim of sovereign immunity it is subject to interlocutory review based on the "collateral order doctrine."  See Kilburn v. Socialist People's Libyan Arab Jamahiriya, 376 F.3d 1123, 1126 (D.C. Cir. 2004).

[6] The present complaint is styled as the Third Amended Complaint, reflecting the multiple revisions that have occurred since the inception of this case -- a four-year period during which FSIA jurisprudence evolved substantially.

## BACKGROUND

On August 7, 1998, terrorists detonated massive vehicle bombs outside two U.S. diplomatic outposts in East Africa within a span of just a few minutes.  At approximately 10:30 a.m., a truck that contained a large bomb exploded in the rear parking area of the U.S. Embassy in Nairobi, Kenya.  The explosion killed 213 people, including forty-four Embassy employees (twelve of whom were American citizens), and injured an estimated 4,000 people -- mostly Kenyan civilians -- who were either at the Embassy or in the vicinity.  Moments later, at approximately 10:39 a.m., a suicide bomber drove a truck laden with explosives up to a vehicular gate at the U.S. Embassy in Dar es Salaam, Tanzania, and ignited a blast that killed eleven people and injured another eighty-five.  See generally Department of State, Report of the Accountability Review Boards on the Embassy Bombings in Nairobi and Dar es Salaam on August 7, 1998, at http://www.state.gov/www/regions/africa/accountability_report.html.

Plaintiffs, all United States citizens claiming personal injuries resulting from the bombings, brought this action pursuant to the state-sponsored terrorism exception to foreign sovereign immunity.  Their complaint contends that defendants furnished material support, in the form of "cover, sanctuary, technical assistance, explosive devices and training," to al Qaeda and Hizbollah, the two terrorist organizations alleged to have carried out the embassy bombings.  Third Am. Compl. ¶ 2.  As to the Sudan defendants in particular, the complaint alleges that they "entered into an agreement with al Qaeda and Hezbollah under which those organizations received shelter and protection from interference while carrying out planning and training of various persons for terrorist attacks, including the attacks of August 7, 1998."  Id. at ¶ 8.  The complaint goes on to allege specifically (albeit in terms that are somewhat imprecise with respect

to timing) a series of actions taken by agents of the government of Sudan to furnish Osama bin

Laden,[7] the putative leader of al Qaeda, and his associates with shelter, security, financial and

logistical support, and business opportunities.  See id. at ¶¶ 8(a), 8(e), 8(h), 8(I), 8(k), 8(l), 8(m),

8(n), 8(o), 8(r), 8(t), 8(v), 8(w).  Those actions, plaintiffs contend, led directly to the 1998

embassy bombings in Nairobi and Dar es Salaam and, therefore, not only are sufficient to divest

the Republic of Sudan of sovereign immunity under 28 U.S.C. § 1605(a)(7), but also will support

substantive claims for assault and battery, intentional infliction of emotional distress, and loss of

consortium under the common law of the plaintiffs' respective home states.[8]

The Sudan defendants have moved to dismiss the Third Amended Complaint on two

grounds: (1) that the Sudan defendants are entitled to sovereign immunity and, therefore, the

court is deprived of subject-matter jurisdiction over claims against them, see Fed. R. Civ. P.

12(b)(1); and (2) that plaintiffs' pleading is legally insufficient and therefore fails to state a claim

upon which relief can be granted , see Fed. R. Civ. P. 12(b)(6).

## ANALYSIS

### I.      Subject-matter Jurisdiction

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, the Sudan defendants

have moved to dismiss the action against them for want of subject-matter jurisdiction based on

an assertion of sovereign immunity.  Ordinarily, when reviewing a motion to dismiss that

---

[7] Again, transliteration has resulted in various spellings of this name.  Plaintiffs use "Usama Bin Laden," see Third Am. Compl. ¶ 8, but the Court has chosen to employ "Osama bin Laden," or simply "bin Laden."

[8] Plaintiffs divide their claims into twenty-five counts, each of which represents a common cause of action by plaintiffs who were residents of the same state at the time of the bombings. The relevant states are Florida, Mississippi, North Carolina, Texas, and Virginia.

contests the court's subject-matter jurisdiction, the court must accept as true all the factual allegations contained in the complaint.  See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164, (1993).  Based on those allegations -- and any other materials that the court considers relevant to the jurisdictional inquiry -- the court must determine, as a matter of law, whether the plaintiff has met its burden of establishing a sufficient basis for the court's exercise of jurisdiction.  See Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  But where, as here, the jurisdictional challenge turns on a defendant's claim of entitlement to sovereign immunity -- a claim that may require the court to resolve not only questions of law but also questions of fact at the outset of the litigation -- the standard of review is altered slightly.

### A.    Standard of Review

Because sovereign immunity is in the nature of an affirmative defense, the plaintiff need not prove the absence of sovereign immunity in the first instance; rather, "the *defendant* bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity."  Phoenix Consulting, Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000) (emphasis added).  If the foreign-sovereign defendant proves that no exception applies, then "immunity under the FSIA is complete: The district court lacks subject matter jurisdiction over the plaintiff's case."  Id. at 39.  In attempting to prove the inapplicability of any of the statutory exceptions to immunity, the defendant "may challenge either the legal sufficiency *or the factual underpinning* of an exception."  Id. (emphasis added).  When a defendant challenges the factual basis of the court's jurisdiction, the court "must go beyond the pleadings and resolve any disputed issues of fact" that are relevant to the jurisdictional determination.  Id.  Here, however, the Sudan

defendants do not challenge the truth of the complaint's factual assertions for purposes of the motion to dismiss, see Sudan Defs.' Mem. in Supp. of Mot. to Dismiss at 2 n.2, so the Court will "take plaintiff[s'] factual allegations as true and determine whether they bring the case within any of the exceptions to immunity," see Phoenix Consulting, 216 F.3d at 40, keeping in mind that the ultimate burden rests on the *defendant* to persuade the Court that plaintiffs' claims are, as a matter of law, incapable of satisfying any of the FSIA exceptions.  Thus, when the facts are undisputed for purposes of a Rule 12(b)(1) challenge asserting sovereign immunity, as they are here, the plaintiff should receive the benefit of all favorable inferences that can be drawn from the alleged facts.  See Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 93 (D.C. Cir. 2002) ("[W]here the defendant contests only the legal sufficiency of plaintiff's jurisdictional claims, the standard is similar to that of Rule 12(b)(6), under which dismissal is warranted if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief.").

### B.      Foreign Sovereign Immunity and its Exceptions

The Foreign Sovereign Immunities Act ("FSIA") provides the sole basis for the exercise of jurisdiction over a foreign state in a United States court.  Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989).  Section 1604 of the FSIA establishes the general rule that a foreign state is immune from suit, declaring that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."  28 U.S.C. § 1604.  Section 1605 identifies particular categories of cases in which the defense of sovereign immunity is not available.  In this case, the only exception that is potentially applicable to the claims against the Sudan defendants is the state-

sponsored terrorism exception of section 1605(a)(7).

Enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996, section 1605(a)(7) lifts the immunity of foreign states (as well as their instrumentalities and agents) in any civil action

> in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency ....

28 U.S.C. § 1605(a)(7).[9]  The exception applies, however, only if (1) the foreign state was designated a state sponsor of terrorism at the time of the act or as a result of the act, (2) the foreign state has been given a reasonable opportunity to arbitrate the claim if the act at issue occurred within the foreign state's territory, and (3) either the claimant or the victim was a national of the United States at the time of the alleged act.  28 U.S.C. §§ 1605(a)(7)(A), (B)(i)-(ii).

---

[9]  The FSIA adopts the definition of "extrajudicial killing" in the Torture Victim Protections Act ("TVPA").  See 28 U.S.C. § 1605(e).  The TVPA defines "extrajudicial killing" as "a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all judicial guarantees ...."  28 U.S.C. § 1350 note.  Section 1605(a)(7) also incorporates the definition of "material support or resources" in 18 U.S.C. § 2339A, a statute that makes the provision of material support or resources -- knowing or intending that it will be used to commit one of several other crimes -- a federal offense.  At the time of the filing of this suit in 2001, the statute defined "material support or resources" as

> currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials

18 U.S.C. § 2339A(b)(1) (2001).

The allegations of the present complaint make clear that this Court's jurisdiction over the claims against the Sudan defendants, if it exists at all, must be based on "the provision of material support or resources" by Sudan's agents for an act of "extrajudicial killing" -- as opposed to the actual commission by its agents of an extrajudicial killing.[10]  To satisfy the "material support or resources" clause of the terrorism exception (and thus to establish this Court's subject-matter jurisdiction), the Court must find the following:

(1) that personal injury or death occurred (and that either the victim or the claimant was a United States national at the time);

(2) that an official, employee, or agent of a foreign state that the United States designated as a sponsor of terrorism -- while acting within the scope of his office, employment, or agency -- provided material support or resources for an act of extrajudicial killing;

(3) that the personal injury or death was caused by that provision of material support; and

(4) that the personal injury or death occurred outside the foreign state's territory or, if it occurred within the foreign state's territory, that the foreign state was given a reasonable opportunity to arbitrate the claim.

**C.     Sudan Defendants' Challenge to the Application of Section 1605(a)(7)**

In their Rule 12(b)(1) motion, the Sudan defendants dispute only the second and third of these jurisdictional elements.[11]  Specifically, they assert that plaintiffs' allegations that the Sudan

---

[10] There is no reference in the complaint to any act of torture, aircraft sabotage, or hostage taking (or the provision of material support for such an act) by defendants.

[11] With respect to the second element, the Sudan defendants do not dispute that the embassy bombings constitute an act of extrajudicial killing or that the United States has designated Sudan as a state sponsor of terrorism.

defendants provided "material support and resources" to al Qaeda and Hizbollah do not fit within the definition provided by 18 U.S.C. § 2339A.  They also challenge the adequacy of the pleadings with respect to agency, arguing that the complaint fails to make specific factual statements to back up the claim that officials, employees, or other agents of Sudan acted within the scope of their governmental duties.  Finally, the Sudan defendants contend that plaintiffs have not pleaded facts sufficient for the Court to find a legally cognizable causal link between the alleged material support and the injuries underlying the claims.

        1.       **Sufficiency of the allegations of "material support"**

In its March 29, 2005, decision denying the Sudan defendants' previous motion to dismiss, this Court held -- consistent with the D.C. Circuit's rulings in Price, 294 F.3d at 94, and Simpson v. Socialist People's Libyan Arab Jamahiriya, 326 F.3d 230 (D.C. Cir. 2003) -- that, in order for plaintiffs to survive a challenge to jurisdiction under section 1605(a)(7), their factual allegations must be specific enough to support a reasonable inference that defendants' conduct qualified as providing "material support or resources" for an extrajudicial killing, within the meaning of 18 U.S.C. § 2339A.  See Owens I, 374 F.Supp. 2d at 15.  The Court found that the vague and largely conclusory allegations in plaintiffs' Second Amended Complaint with regard to material support  -- which were limited to (1) a general charge that the Sudan defendants provided "cover," "support," and "sanctuary" to al Qaeda and Hizbollah, (2) assertions that the Sudan defendants entered into an unspecified agreement with al Qaeda and Hizbollah through which those organizations received "shelter and protection from interference," and (3) a claim that a meeting occurred in the Republic of Sudan between the leaders of al Qaeda and Hizbollah to plan the embassy attacks -- fell short of that standard.  See id.  Despite that failure, the Court --

again consistent with governing precedent -- permitted plaintiffs to amend the complaint to state

their allegations in greater detail.

They have done so.  The Third Amended Complaint now alleges, among other things,

that:

> "In the early 1990s, the government of Sudan sent overtures to Bin Laden and Al Qaeda, inviting the group to relocate en mass from Afghanistan to the Sudan."  Third Am. Compl. ¶ 8(a).

> "The representatives of the Sudanese government, promised the support of that government should Al Qaeda come to the Sudan.  Al Qaeda thereafter used Sudanese Airways planes to ferry anti-tank rockets and Stinger missiles from Afghanistan to the Sudan."  Id.

> Bin Laden lived in a large villa in Khartoum, protected by men who were dressed in Sudanese army fatigues and used jeeps with Sudanese army license plates.  Id. at ¶ 8(e).

> Police in Sudan arrested al Qaeda operatives who were engaged in explosives training, but quickly released them and did not file charges against them after the government's intelligence service intervened.  Id. at ¶ 8(h).

> "With the explicit approval of Bin Laden," Jamal Ahmed Al-Fadl, a top Al Qaeda lieutenant, "personally worked with the Sudanese intelligence officers."  Id. at ¶ 8(i).

> Sudanese intelligence officers were organized into a "delegation office" to meet the needs of al Qaeda, and those officers jailed foreigners whom al Qaeda suspected were agents from foreign governments.  Id. at ¶ 8(k).

> The intelligence service's delegation office "helped provide security for Al Qaeda and facilitated the movement of weapons in and out of the country," including one instance where "weapons were taken out of the country by delivering four crates of weapons to a hangar at a Sudanese military base, and then to a port facility owned by the Sudanese army."  Id. at ¶ 8(l).

> Sudan President Omar Hassan al-Bashir provided a letter that allowed al Qaeda members "to bypass tax and customs collection on international shipments and guaranteed their shipments, coming or going, would not be inspected."  Id. at ¶ 8(m).

> "Weapons and explosive shipments moved through a quay protected by the Sudanese military in Port Sudan into a barracks used by Sudanese armored and mechanized

infantry."  Id. at ¶ 8(n).

The intelligence service's delegation office "protected Al Qaeda members, such as Al-Fadl, from the interference of Sudanese immigrations office at the airport.  This was important because if Al Qaeda members were caught abroad and their passports were stamped with Sudanese immigration markings, it would be clear to foreign agents where the organization was located."  Id. at ¶ 8(o).

Al Qaeda purchased companies directly from the Sudanese government, and "[t]he funding that these companies provided to Al Qaeda was critical to its survival and continued existence."  Id. at ¶ 8(r).

"The Sudanese government employed Al Qaeda to manufacture chemical weapons in a section of Khartoum, called Hilat Koko ...."  Id. at ¶ 8(t).

"Dr. Abdullah Mohamed Yusef, a member of the Islamic National Front, through which President al-Bashir ran the Sudanese government, organized travel, documents and funneled economic aid to Al Qaeda while it was located in the Sudan."  Id. at ¶ 8(v).

"Al Qaeda entered into a transaction to purchase uranium through the former President of the Sudan, currently an officer in the Sudanese army."  Id. at ¶ 8(w).

Under any imaginable standard of pleading specificity, these statements are sufficiently detailed to put the defendants on notice of the specific misconduct with which they are charged (and thereby to permit defendants to craft a reasonable response) and also to allow the Court to determine whether the alleged misconduct satisfies jurisdictional prerequisites.  The Sudan defendants now ask the Court to do just that -- i.e., to determine whether the acts alleged fall within the definition of "material support or resources" contained in 18 U.S.C. § 2339A(b)(1).[12]

_____

[12] Although section 1605(a)(7) requires that "the provision of material support or resources" be "*for*" an act of extrajudicial killing, this jurisdictional element does not require any specific knowledge or intent on the part of defendants that the support go toward a particular act of extrajudicial killing.  See Owens I, 374 F.Supp. 2d at 13-14.  Nor is there a requirement that the support have gone directly to the particular act that gave rise to the claims.  See Kilburn, 376 F.3d at 1130-31.  All that is necessary, then, is that defendants engaged in conduct within the statutory definition of "material support or resources" and that the recipient of that support subsequently committed an act of extrajudicial killing.  The causation element of the jurisdictional inquiry -- as well as any causal requirements of the substantive law underlying the

Certainly the Sudan defendants are correct that some of the alleged acts described in paragraph 8 of the complaint do not necessarily involve, in the definitional language of section 2339A, the provision of "currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets" by agents of the Sudan defendants to al Qaeda or Hizbollah.  See 18 U.S.C. § 2339A(b)(1) (2001). Nevertheless, the Court finds that many of the alleged acts do in fact fit within several of the section 2339A categories.  Indeed, the Court construes plaintiffs' complaint to assert that numerous locations within the Republic of Sudan served as "safehouses" for these terrorist organizations.  Nothing in the case to which the Sudan defendants refer the Court for a supposedly restrictive definition of "safehouse,"  United States v. Gerena, 662 F.Supp. 1218 (D.Conn. 1987), forecloses this view.  Indeed, the Gerena court determined that a particular location qualified as a safehouse because it "was used as a workshop for, among other things, the preparation of explosive/incendiary devices[, and it] served as a storage facility for weapons ... [and] as a hideout and ... a meeting place used to plan criminal activities."  See id. at 1227 n.4. Insofar as the government of the Republic of Sudan affirmatively allowed and/or encouraged al Qaeda and Hizbollah to operate their terrorist enterprises within its borders, and thus provided a base of operations for the planning and execution of terrorist attacks -- as the complaint unambiguously alleges -- Sudan provided a "safehouse" within the meaning of 18 U.S.C. § 2339A, as incorporated in 28 U.S.C. § 1605(a)(7).  Furthermore, the complaint contains specific

---

claims -- adequately protects foreign sovereigns from being held responsible for the attenuated effects of their material support.

allegations that the Sudan defendants provided financial services, see Third Am. Compl. ¶ 8(v);
lodging, see id. at ¶¶ 8(a), 8(e); false documentation or identification, see id. at ¶¶ 8(m), 8(o),
8(v); facilities, see id. at ¶¶ 8(e), 8(n); personnel, see id. at ¶¶ 8(e), 8(k), 8(l); transportation, see
id. at ¶¶ 8(a), 8(e), 8(l), 8(n); and other physical assets, see id. at ¶ 8(r).

The Court therefore concludes that there is no basis to dismiss the complaint on the
ground that plaintiffs' claims are incapable of satisfying the jurisdictional requirement of
"provision of material support or resources" by the Sudan defendants.  At this stage, plaintiffs'
allegations on this jurisdictional element are sufficient to satisfy section 1605(a)(7) and hence
survive the Sudan defendants' motion.

### 2.        Sufficiency of the allegations of scope of authority

The Sudan defendants further contend that they are entitled to dismissal of the case
against them because the Third Amended Complaint does not properly plead that any Sudanese
official, employee, or agent engaged in actions constituting "material support" while acting
within the scope of his or her government-conferred authority, as also required by section
1605(a)(7).  See Sudan Defs.' Mem. in Supp. of Mot. to Dismiss at 18-20.  In the March 29,
2005, opinion in this case, the Court found that the Second Amended Complaint was deficient in
this respect and permitted plaintiffs' to amend the complaint accordingly.  See Owens I, 374
F.Supp. 2d at 17.  In so doing, the Court expressly declined to interpret section 1605(a)(7) as
imposing a requirement of pleading specificity with respect to scope of authority.  Id. at 17-18.

As noted above, the Third Amended Complaint alleges specifically the acts of "material
support" that constitute the basis of the claims, as required by Price.  See generally Third Am.
Compl. ¶ 8.  It also now asserts in several paragraphs, including paragraph 8, that the material

support was provided, at least in part, by individuals who were acting within the scope of their authority as officials, employees, or agents of the Republic of Sudan.  See Third Am. Compl. ¶¶ 4, 8(j), 8(x).  Plaintiffs thus have addressed the deficiency identified in <u>Owens I</u> regarding allegations of state action, which was simply that nowhere in the Second Amended Complaint did plaintiffs directly assert that the acts of providing "material support" that form the basis for section 1605(a)(7) jurisdiction were committed by officials, agents, or employees of the Sudanese government acting within their scope of authority (all that was alleged was that the *embassy bombers* -- not those who provided material support to the bombers -- acted as agents for defendants).

The Sudan defendants, however, now argue that plaintiffs' statements in this regard in the Third Amended Complaint are legal conclusions that the Court need not accept as true for purposes of a Rule 12(b)(1) motion.  Although the Sudan defendants are correct that the Court is free to disregard conclusory statements of law for purposes of assessing jurisdiction (for example, a Court obviously need not accept as true an assertion in a complaint that the Court has jurisdiction to hear the claims), this principle does not require plaintiffs to spell out the elements underlying their jurisdictional claims in precise factual detail.[13]  To do so would ignore the liberal notice-pleading standard of Rule 8(a)(1) of the Federal Rules of Civil Procedure, which requires only a "short and plain statement of the grounds upon which the court's jurisdiction depends," except as otherwise provided by statute or the rules.  Plaintiffs have satisfied the requirements of Rule 8 with the allegations in paragraphs 4, 8(j), and 8(x), and the Court will not require any

---

[13] Similarly, the Federal Rules of Civil Procedure permit plaintiffs to plead negligence in a conclusory fashion.  <u>See</u> <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 513 n.4 (2002).

more specificity at this stage of the litigation.  Therefore, the Sudan defendants are not entitled to

dismissal of the claims against them in the Third Amended Complaint based on the complaint's

conclusory pleading of agency and scope of authority.

### 3.    Sufficiency of the allegations of jurisdictional causation

A closer question is whether there is a sufficient factual basis for the Court to find a

plausible causal link between the alleged material support and the injuries underlying the claims

-- a finding that the D.C. Circuit in <u>Kilburn</u> held is essential to the exercise of jurisdiction over

claims against a foreign sovereign pursuant to 28 U.S.C. § 1605(a)(7).  When a defendant

challenges the district court's jurisdiction under section 1605(a)(7), the court must make a

preliminary finding of "jurisdictional causation" before allowing the case to proceed.  <u>See</u>

<u>Kilburn</u>, 376 F.3d at 1129.  This jurisdictional requirement derives from language in section

1605(a)(7) that confines the court's authority to hear cases against foreign governments to those

claims in which "money damages are sought ... for personal injury or death that was *caused by*"

one of the specified acts (in this case, the provision of material support or resources for an

extrajudicial killing).  <u>See</u> 28 U.S.C. § 1605(a)(7) (emphasis added).

Interpreting the meaning of the words "caused by" in section 1605(a)(7), the D.C. Circuit

in <u>Kilburn</u> rejected a view of the jurisdictional statute that would have required plaintiffs to

satisfy a "particularly restrictive standard of causation" (which the defendants in that case had

termed "but for" causation).  <u>See</u> 376 F.3d at 1127-28.  Instead, <u>Kilburn</u> held, all that is needed to

establish this jurisdictional element is a court finding that the defendant's alleged conduct -- be it

the provision of material support or resources for an extrajudicial killing or one of the other acts

specified by section 1605(a)(7) -- if proven, more likely than not was a "proximate cause"

-16-

(perhaps one of several proximate causes) of the personal injury or death that is the subject of the claim.  See id. at 1128; see also id. at 1129 (concluding that "to accept [defendant's] contention that § 1605(a)(7) requires a single causation standard that is more restrictive that the base-line standard of proximate cause" would lead to a conflict with other provisions of the FSIA).

The Sudan defendants seize on Kilburn's use of the term "proximate cause" to argue that plaintiffs' claims against them must be dismissed unless the Court concludes that the acts of material support identified in the complaint were a "substantial factor" in bringing about plaintiffs' injuries.  See Sudan Defs.' Mem. in Supp. of Mot. to Dismiss at 8-10.  They derive this "substantial factor" requirement from various cases that interpret the meaning of "proximate cause" in the substantive law of tort, as well as from the definition of "legal cause" found in the Restatement (Second) of Torts § 431.  See id. at 9 n.8.  The Court, however, does not believe that the D.C. Circuit's interpretation in Kilburn of the "caused by" language of 28 U.S.C. § 1605(a)(7) introduces a substantiality prong into the jurisdictional-causation analysis.

First of all, the words "substantial factor" nowhere appear in the text of section 1605(a)(7) or the language of Kilburn.  Additionally, the conventional wisdom among modern tort scholars is that "[t]he substantial-factor test has not ... withstood the test of time, as it has proved confusing and been misused."  Restatement (Third) of Torts: Liability for Physical Harm § 26 cmt. j (Proposed Final Draft No. 1, 2005) (hereinafter "Restatement (3d)").  Furthermore, the considerations that the Sudan defendants contend are "relevant to determining whether a defendant's conduct is a substantial factor in bringing about a harm" -- namely, the number of other contributing factors, whether the defendant's conduct set into action a series of forces that remained in continuous and active operation at the time of the harm, and the lapse of time

-17-

between the conduct and the harm, see Sudan Defs.' Mem. in Supp. of Mot. to Dismiss at 9 --

would draw the Court into precisely the type of remoteness inquiry that Kilburn expressly

rejected.  See 376 F.3d at 1128 ("There is no need or justification ... for imposing an additional

nonremoteness hurdle in the name of jurisdiction.") (quoting Jerome B. Grubart, Inc. v. Great

Lakes Dredge & Dock Co., 513 U.S. 527, 538 (1995)).  And, finally, whatever value the

substantial-factor test retains, it is limited to determining liability for *negligent* conduct, see

Restatement (Second) of Torts § 433, whereas here the alleged conduct of the Sudan defendants

involves actions that are better characterized as intentional than as negligent.[14]

Rather than demand that courts decide, as a matter of jurisdiction, whether a defendant's

conduct was a "substantial factor" in bringing about the harm, Kilburn indicates that, in weighing

a defendant's jurisdictional challenge based on section 1605(a)(7), courts simply should consider

whether there is "some reasonable connection between the act or omission of the defendant and

the damage which the plaintiff has suffered."  See 376 F.3d at 1128 (quoting a definition of

"proximate cause" from Prosser & Keeton on the Law of Torts 263 (5th ed. 1984)).  Mindful of

Kilburn's instruction that "[a]ny concerns about reaching too far to charge foreign states with the

attenuated impact of their financial activities are better addressed as questions of substantive

law" rather than as part of a preliminary jurisdictional inquiry, the Court now must determine

what constitutes a "proximate cause" for jurisdictional purposes and whether the relationship

---

[14] See Assoc. Gen. Contractors of Calif. v. Calif. State Council of Carpenters, 459 U.S.
519, 547-48 (1983) (Marshall, J., dissenting) ("Although many legal battles have been fought
over the extent of tort liability for remote consequences of *negligent* conduct, it has always been
assumed that the victim of an *intentional* tort can recover from the tortfeasor if he proves that the
tortious conduct was a cause-in-fact of his injuries."); see also Derosier v. New England Tel. &
Tel. Co., 130 A. 145, 152 (N.H. 1925) ("For an intended injury the law is astute to discover even
very remote causation.").

between the Sudan defendants' alleged conduct and plaintiffs' injuries meets that standard.[15]   In

making this determination, the Court adopts the approach used by the drafters of the proposed

Restatement (Third) of Torts, which interprets the traditional concept of legal causation as

consisting of two distinct requirements: (1) that there be a factual causal relationship between the

actor's conduct and the ultimate injury at issue and (2) that the harm be "within the scope of the

risk" (that is, among the potential harms that made the conduct tortious in the first place).  See

Restatement (3d) §§ 26, 29.

### (i)    Cause-in-fact

With respect to factual cause, courts often inquire into whether the conduct was a

necessary condition for the harm to occur.  In other words, were the act removed from the

sequence of events leading up to the injury, would the injury have occurred as it did?[16]  This

counterfactual question becomes more difficult where -- as in this case -- substantial time passes

between the wrongful conduct and the injurious event.  Tort law, however, has recognized that

---

[15] It deserves mention that use of the term "proximate cause" has fallen out of favor in the contemporary tort lexicon because of its tendency to confuse jurors -- and even lawyers and judges.  As the draft Restatement (Third) of Torts observes, "the term 'proximate cause' is a poor one to describe limits on the scope of liability [and it is also] an unfortunate term to employ for factual cause or the combination of factual cause and scope of liability."  Restatement (3d) § 29 cmt. b.  Likewise, as the Kilburn opinion acknowledges, "but for" causation is a phrase that has the potential to mislead because it has multiple meanings.  See 376 F.3d at 1127 n.2 (observing that defendants use "but for" in a restrictive sense, but that "often ... it is viewed as an expansive theory" of causation).

[16] This is what many courts and scholars label as "but for" or "sine qua non" causation.  It is what Kilburn described as the "expansive" view of but-for causation -- the "potentially 'limitless' standard under which 'Eve's trespass caused all our woe.'"  376 F.3d at 1127 n.2 (quoting 2 Harper & James, The Law of Torts 1108 (1956)).  Kilburn, however, treated "but for" as a "particularly restrictive standard of causation," apparently because the defendants used it in this sense.  See id.

factual causation exists even in situations where "[a]n actor's tortious conduct ... occur[s] well before the other person suffers harm and require[s] a number of subsequent events to produce the harm."  Restatement (3d) § 26 cmt. c; see also Kilburn, 376 F.3d at 1128 (concluding that "caused by" requirement of section 1605(a)(7) does *not* limit jurisdiction only to situations where the defendant's conduct was either the nearest cause or a nonremote factual cause of the ultimate injury).  A common example of remote factual causation is a gas valve that was negligently constructed but that does not fail for many years.  Although the precise timing of the failure may be affected by other circumstances or conditions (for example, extreme temperatures might hasten the valve's inevitable failure), the faulty construction nevertheless is a factual cause because the failure would not have occurred without it.

Harder still is the causal conundrum that is presented where an intervening event (particularly an affirmative act by a third party) would itself have been sufficient to produce the harm.[17]  In that situation, it becomes impossible to say that the earlier conduct was a necessary condition for the harm to have occurred, because the injury would have happened anyway -- assuming, of course, that the later cause came about independently.[18]  Nevertheless, factual

---

[17] When there are multiple acts in simultaneous operation, each of which would be sufficient by itself to cause the harm, the harm is said to be "overdetermined."  The paradigmatic example of overdetermined harm is found in the "combined fires" cases, Anderson v. Minneapolis, St. Paul & Sault Ste. Marie Ry. Co., 179 N.W. 45 (Minn. 1920), and Kingston v. Chicago & N.W. Ry. Co., 211 N.W. 913 (Wisc. 1927).

[18] This is the situation (multiple sufficient causes) where "but for" -- defined as a necessary condition to the outcome -- can become restrictive.  And that is what the Kilburn court appeared to have in mind when it said the jurisdictional causation requirement of section 1605(a)(7) demanded only a showing of "proximate cause."  See 376 F.3d at 1129 (noting that, in circumstances where "application of a 'but for' standard to joint tortfeasors could absolve them all, ... courts generally regard 'but for' causation as inappropriate").

causation will not be defeated so long as the earlier conduct, more probably than not, would have

led to the same harm -- either on its own (because it was independently sufficient) or in

combination with other conduct or events that would foreseeably follow from the earlier conduct.

See Restatement (3d) § 27, cmt. f ("[T]he fact that [another] person's conduct is sufficient to

cause the harm does not prevent the actor's conduct from being a factual cause of harm ... if the

actor's conduct is necessary to at least one causal set."); see also Elliott v. Michael James, Inc.,

559 F.2d 759, 763-64 (D.C. Cir. 1977) ("[W]here there is a wrongdoer whose conduct caused

harm, he can not escape liability for the damage he has caused on the ground that the wrongful

act of a third party contributed to the injury.") (citing Miller v. Union Pacific R.R. Co., 290 U.S.

227, 236 (1933)).

      Here, the Sudan defendants do not attempt to identify any particular intervening causal

event that independently would have been sufficient to cause the embassy bombings.  Rather,

they simply attempt to negate the inference that their alleged provision of material support to al

Qaeda and Hizbollah was in any way essential to the bombings.  The Sudan defendants contend

that, at most, their alleged provision of material support to al Qaeda and Hizbollah was an

insubstantial factor in causing the embassy bombings in light of (1) the passage of time between

the acts of support and the 1998 attacks and (2) the likelihood that, during that time, other factors

(for which the Sudan defendants had no responsibility) contributed substantially to the planning

and execution of the bombings.  See Sudan Defs.' Mem. in Supp. of Mot. to Dismiss at 9-11.

From defendants' perspective, the provision of material support was, to use a common analogy,

akin to creating a small crack in a dam (which eventually may cause a flood) but then having a

massive storm overwhelm the dam for reasons unrelated to the crack -- or, perhaps more

appropriately, having the dam destroyed due to the more substantial fault of a third party, which

would have caused the flood even if there had been no pre-existing crack.  In this situation,

courts and scholars sometimes decline to treat a *de minimis* cause as a factual cause of the harm.

See Restatement (3d) § 27, cmt. i.  There is, however, a critical distinction between the cracked-

dam scenario and the factual allegations in the present case -- the Sudan defendants' actions very

well may have helped bring about whatever other factors contributed to the embassy bombings.[19]

At the least, it cannot be said at this point that the Sudan defendants have persuaded the Court to

reject that possibility.[20]

That is not to say that courts ought to be dismissive of assertions by a sovereign nation, in

a jurisdictional challenge to a claim based on 1605(a)(7), that its past wrongdoings are too far

---

[19] The Sudan defendants fare no better based on their own analogy to an arguably insubstantial cause of injury.  Relying on a 1980 Florida case, Pope v. Cruise Boat Co., Inc., 380 So.2d 1151 (Fla. Dist. Ct. App. 1980), they compare the present claim against them with one against a negligent driver who parked a vehicle in such a manner that a pedestrian had to walk out into the street to get around the vehicle and, in doing so, was hit by a truck.  See Sudan Defs.' Mem. in Supp. of Mot. to Dismiss at 10.  Whether or not the Florida court's rationale for dismissing the claims against the parked-car's operator (based on the remoteness of the causal connection) was sound, the analogy is inapposite because the sidewalk-obstruction situation, unlike the situation here, involved a causal contribution by the *plaintiff*.

[20] Recall that "the defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity."  Phoenix Consulting, 216 F.3d at 40. Placing the burden of persuasion on foreign-sovereign defendants who have been deemed to be sponsors of terrorism is not only "[i]n accordance with the restrictive view of sovereign immunity reflected in the FSIA," see id., it also is consistent with cases holding that causation may be *presumed* (subject to rebuttal proof by the defendant) for purposes of liability where the defendant violates a law that is designed to protect others from harm and such harm occurs.  See Elliott v. Michael James, Inc., 559 F.2d 759, 763-64 (D.C. Cir. 1977) ("[P]roof of a safety violation is itself evidence of proximate cause where the injury is generally of the kind intended to be avoided by the regulation involved.  If that evidence is not rebutted or offset, proximate cause is established as a matter of law.") (quoting Bowman v. Redding & Co., 449 F.2d 956, 963 (D.C. Cir. 1971)); see also id. at 764 (quoting Judge Learned Hand as stating: "He is a wrongdoer; let him unravel the casuistries resulting from his wrong.").

removed from the complained-of harms to qualify as a factual cause.  Indeed, the Court takes

heed of the Supreme Court's observation -- in a discussion of the "by reason of" requirement

contained in the civil-suit provision of the Racketeer Influenced and Corrupt Organizations Act

("RICO") -- that

> [i]n a philosophical sense, the consequences of an act go forward to eternity, and the
> causes of an event go back to the dawn of human events, and beyond.  But any attempt to
> impose responsibility upon such a basis would result in infinite liability for all wrongful
> acts, and would "set society on edge and fill the courts with endless litigation."  ...  As we
> put it in the antitrust context, "An antitrust violation may be expected to cause ripples of
> harm to flow through the nation's economy; but despite the broad wording of [the Clayton
> Act's private-enforcement provision,] there is a point beyond which the wrongdoer should
> not be held liable."

Holmes v. Sec. Investor Protection Corp., 503 U.S. 258, 266 n.10 (1992) (internal citations

omitted); see also Assoc. Gen. Contractors, 459 U.S. at 535-45 (comparing various tests for

identifying a cognizable injury in an antitrust suit with definitions of "proximate cause" and

indicating that relevant factors for consideration are the nature of the injury in light of the

purposes of the legislation and the "directness or indirectness of the asserted injury" vis-à-vis the

defendant's conduct).

     In this case, however, the Court does not believe that the 1998 embassy bombings

occurred at a point in time so far removed from the Sudan defendants' alleged material support of

al Qaeda and Hizbollah that it would be unjust to permit an FSIA-based action to proceed against

them for that conduct.  The Sudan defendants have not given the Court sufficient reason to

believe that the "ripples of harm" caused by their conduct had ceased to have significance in

1998.  This conclusion is consistent with the holding in another FSIA case brought against Sudan

for its alleged support of al Qaeda.  In Rux v. Republic of Sudan, 2005 WL 2086202 (E.D. Va.

Aug. 26, 2005), the surviving family members of sailors who were killed in the October 12, 2000, bombing of the U.S.S. Cole sued the government of Sudan, pursuant to 1605(a)(7), for damages that they assert were caused by Sudan's material support for al Qaeda.  Ruling on a motion to dismiss by Sudan, the court in Rux held that the jurisdictional-causation prerequisite had been satisfied.  Id. at *8.  Plaintiffs, the court said, "allege manifold facts ... [that], if true, would permit [a finding] that Sudan's conduct was the proximate cause of the Cole bombing and the deaths of seventeen American sailors aboard.  Such an inference is reasonable and anything but bizarre."  Id.  Of particular note, the court observed that "if Plaintiffs can prove at the liability phase that Sudan's financial dealings with Osama bin Ladin and Al-Qaeda provided the organization with the resources and opportunity to carry out the attack, legal causation could be established."  Id.  No less is true here.  If plaintiffs can produce evidence to support the various specific allegations in paragraph 8 of their complaint -- that Sudan furnished bin Laden and al Qaeda with, among other things, shelter, security, financial and logistical support (including the movement of weapons into and out of the country), and business opportunities -- it would not be unreasonable for a factfinder to conclude that such support was a necessary condition for the bombing, and therefore a factual cause of plaintiff's damages.

(ii)      <b>Harm within the risk</b>

Insofar as Kilburn and section 1605(a)(7) can be read to require for jurisdiction something more than mere factual causation (as it has just been defined), the Court concludes that any additional requirement is properly characterized as a limitation on the "scope" of what constitutes a jurisdictionally relevant cause-in-fact.  This is consistent with the view embraced by the drafters of the Restatement (Third) of Torts in explaining limitations on liability for actions

that are factual causes of harm.  <u>See</u> Restatement (3d) § 29 ("Scope of Liability (Proximate Cause)").  The inquiry focuses on whether there is an intuitive relationship between the act(s) alleged and the damages at issue (that is, whether the conduct was wrongful *because* that type of damage might result).  Properly understood, this harm-within-the-risk inquiry performs the liability-limiting function that courts often refer to as "proximate cause" -- that is, it determines, based on considerations of foreseeability and relative culpability, when liability should not attach to fault-based conduct that was, as a factual matter, a necessary condition for the harm to occur -- but it does so without utilizing terminology that more properly is associated with factual causation.

For present purposes, the analysis is straightforward: Does the "scope of the risk" associated with providing material support to terrorist groups include the risk that such support might facilitate a terrorist attack by members of those groups at some future point in time?  The obvious answer is yes; giving aid and comfort to those who engage in terrorist acts such as extrajudicial killing -- here, al Qaeda and Hizbollah -- is wrongful *precisely* because it makes it more likely that the beneficiaries of the aid will, years later, commit murders and cause injuries (such as those that occurred at the embassies in 1998).  <u>See</u> Restatement (3d) § 19, cmt. c ("If [a] third party's misconduct is among the risks making the defendant's conduct negligent, then ordinarily plaintiff's harm [caused by the third-party's misconduct] will be within the defendant's scope of liability.").  It makes no difference that the third-party's intervening conduct -- here, the conduct of the terrorist embassy bombers themselves -- was criminal or intentional, if the original conduct clearly contemplated that possibility.  <u>See</u> Restatement (3d) § 34, cmts. d & e.

In sum, because the Sudan defendants' conduct, if proven, could be considered a factual

cause of plaintiffs' injuries, and because the injuries were within the scope of harm that makes such conduct tortious, the Sudan defendants are not entitled to dismissal of the claims based on the absence of jurisdictional causation.  That being so, their challenge to the application of section 1605(a)(7) fails for all the reasons explained above.

## II.      Failure to State a Cognizable Claim

In their motion to dismiss, the Sudan defendants also argue, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, that plaintiffs have failed to state a claim for which relief can be granted in the following four ways: (1) the substantive causes of action alleged (assault and battery, intentional infliction of emotional distress, and loss of consortium) do not impose liability on a party who merely provides "material support" to a wrongdoer; (2) even if the substantive claims are properly pleaded on a theory of aiding and abetting or conspiracy, plaintiffs fail to plead sufficient facts to support such a theory; (3) all claims other than those brought under Florida law are time-barred under applicable state statutes of limitation; and (4) the omnibus claim for punitive damages is prohibited by 28 U.S.C. § 1606.

### A.      Standard of Review

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure will not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also Haynesworth v. Miller, 820 F.2d 1245, 1254 (D.C. Cir. 1987).  All that the Federal Rules require of a complaint is that it contain "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  Dura Pharmaceuticals, Inc. v. Broudo, 125 S. Ct. 1627, 1634 (2005) (quoting Conley,

355 U.S. at 47).  "Given the Federal Rules' simplified standard for pleading, '[a] court may

dismiss a complaint only if it is clear that no relief could be granted under any set of facts that

could be proved consistent with the allegations.'"  Swierkiewicz, 534 U.S. at 514 (quoting

Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)).

Under Rule 12(b)(6), the plaintiff's factual allegations must be presumed true and should

be liberally construed in his or her favor.  Leatherman, 507 U.S. at 164; Phillips v. Bureau of

Prisons, 591 F.2d 966, 968 (D.C. Cir. 1979).  The court must give the plaintiff every favorable

inference that may be drawn from the allegations of fact.  Scheuer v. Rhodes, 416 U.S. 232, 236

(1974); Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000).  Conclusory

legal and factual allegations, however, need not be considered by the court.  Domen v. Nat'l

Rehabilitation Hosp., 925 F. Supp. 830, 837 (D.D.C. 1996) (citing Papasan v. Allain, 478 U.S.

265, 286 (1986)).

### B.   Joint-Tort Theories

The Sudan defendants assert that plaintiffs have failed to make out proper claims against

them under applicable state laws (those of Florida, Mississippi, North Carolina, Texas, and

Virginia) because the substantive counts of the complaint do not allege that the Sudan defendants

directly committed any of the specific torts and fail to advance a joint-tort theory of liability such

as  "aiding and abetting" or "conspiracy."  This argument can be dispensed with summarily, as

there are several references to aiding and abetting and conspiracy in the general allegations of

paragraphs 1 through 11 of the complaint (which are subsequently re-alleged and incorporated in

each of the twenty-five counts), see, e.g., Third Am. Compl. ¶¶ 4, 10, as well as in the

substantive counts, see, e.g., id. at ¶ 16, 24, 33.

A further objection is lodged by the Sudan defendants on the ground that, even if plaintiffs' complaint can be read to assert a joint-tort theory of liability, plaintiffs have nonetheless failed to plead sufficient facts to support such a theory.  As noted above, however, the Federal Rules of Civil Procedure demand only "a short and plain statement of the claim showing that the pleader is entitled to relief."  See Fed. R. Civ. P. 8(a)(2).  "Such a statement must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'"  Swierkiewicz, 534 U.S. at 512 (quoting Conley, 355 U.S. at 47).  Beyond that, federal civil practice "relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims."  Id.  The Third Amended Complaint provides the Sudan defendants with ample notice of the grounds upon which plaintiffs' claims rest.  Indeed, to the extent that the claims of aiding and abetting or conspiracy overlap with the allegations that the Sudan defendants provided "material support and resources" to al Qaeda and Hizbollah, the heightened jurisdictional-pleading requirements of the FSIA have afforded defendants significantly more detail about the joint-tort claims than a typical civil defendant would receive.

### C.    Statutes of Limitations

The Sudan defendants also assert that eleven of the twenty-five claims against them (all but those brought under Florida common law) should be dismissed as time-barred under the various statutes of limitations that apply to the causes of action under the laws of Mississippi, North Carolina, Texas, and Virginia.  It is true, of course, that state statutes of limitations usually apply when federal courts adjudicate state-law claims.  See Guaranty Trust Co. v. York, 326 U.S. 99, 108-10 (1945).  But it also is true that Congress may preempt state laws that conflict with

federal policies, including statutes of limitations.  See, e.g., 20 U.S.C. § 1091a (displacing state

statutes of limitations regarding debt enforcement with respect to federal student loans).

Congress did just that when it enacted the terrorism exception to the FSIA.  See 28 U.S.C. §

1605(f) ("No action shall be maintained under subsection (a)(7) unless the action is commenced

not later than 10 years after the date on which the cause of action arose.  All principles of

equitable tolling, including the period during which the foreign state was immune from suit, shall

apply in calculating this limitation period.").  Thus, any statutory time bars on state causes of

action are irrelevant to lawsuits brought against foreign states pursuant to the immunity exception

in the FSIA for sponsors of terrorism.  See Dammarell v. Islamic Republic of Iran, 2005 WL

3418304 (D.D.C. Dec. 14, 2005) (reaching the same conclusion).

### D.    Punitive Damages Claim

Finally, the Sudan defendants argue that the Court should dismiss plaintiffs' claim for

punitive damages with prejudice in light of the Court's ruling of March 29, 2005, which held that,

"until such time as plaintiffs can allege and prove that the Ministry of the Interior of the Republic

of Sudan engages in predominantly commercial activities, the claim for punitive damages must

be dismissed in its entirety."  See Owens I, 374 F.Supp. 2d at 26.  The Third Amended

Complaint makes no such allegations, but restates the claim for punitive damages against all

defendants.  Because plaintiffs do not address this aspect of the Sudan defendants' motion to

dismiss, the Court presumes that plaintiffs have retained the dismissed claim for punitive

damages only to preserve their ability to appeal the March 29, 2005, decision.  That course is

necessary in those jurisdictions that have strictly applied the rule that, because an amended

complaint supercedes the original complaint, "[a]ll causes of action alleged in an original

complaint which are not alleged in an amended complaint are waived."  See Marx v. Loral Corp.,

87 F.3d 1049, 1055 (9th Cir. 1996); see generally 6 Charles Alan Wright, Arthur R. Miller &

Mary K. Kane, Federal Practice and Procedure § 1476 (2d ed. 1990).  Although this approach has

been rejected by several circuits where the reason for repleading a claim is an adverse ruling by

the court, see In re Crysen/Montenay Energy Co., 226 F.3d 160, 162 (2d Cir. 2000) (declining to

require repleading of a claim or defense that has been explicitly denied, and noting agreement of

Tenth and Eleventh Circuits), the issue has not been resolved in this Circuit.[21]  The Court is

cognizant of the importance of preserving appeal rights, and thus will simply reaffirm its earlier

decision that punitive damages are not available to any of the plaintiffs in this case because the

FSIA's revocation of sovereign immunity is narrowly drawn to authorize claims for punitive

damages only against an "agency or instrumentality" of a terrorist-sponsoring state -- not against

the foreign state itself -- and plaintiffs have failed to allege facts that would allow the Court to

conclude that any of the defendants in this case fall within the statutory definition of an "agency

or instrumentality."

## CONCLUSION

For the foregoing reasons, the Sudan defendants' motion to dismiss the Third Amended

Complaint is denied.  A separate order has been issued on this date.

                                      /s/ John D. Bates

JOHN D. BATES
United States District Judge

---

[21] This issue of the preservation of appeal rights is not presently before this Court, and
indeed logically would arise only in the context of an appeal.

Dated:   January 26, 2006

Copies to:

Thomas Fortune Fay
601 Pennsylvania Avenue, NW, Suite 900 South
Washington, DC  20004
Email: thomasfay@aol.com

Steven R. Perles
Tuna Mecit
LAW OFFICES OF FAY & PERLES
700 Fifth Street, NW, Suite 200
Washington, DC  20001
Email: sperles@perleslaw.com
Email: t_mecit@yahoo.com

Ronald Alvin Karp
KARP, FROSH, LAPIDUS, WIGODSKY & NORWIND, P.A.
2273 Research Blvd.
Rockville, MD  20850-4304
Email: rkarp@karpfrosh.com

*Counsel for plaintiffs*

Douglas K. Bemis, Jr.
HUNTON & WILLIAMS LLP
1900 K Street, NW
Washington, DC  20006
Email: kbemis@hunton.com

*Counsel for the Sudan defendants*