UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


JAMES OWENS, et al.,                    .
                                        .
         Plaintiffs,          .   CA Nos.  01-2244, 04-1536,
                              .   08-1377, 08-1361, 08-1349
    v.                        .   08-1380
                              .
REPUBLIC OF SUDAN, et al.,    .   Washington, D.C.
                              .   Monday, October 25, 2010
         Defendants.          .   9:40 a.m.
                              .
. . . . . . . . . . . . . . . .   Pages 1 through 102

                    DAY 1
              EVIDENTIARY HEARING
       BEFORE THE HONORABLE JOHN D. BATES
          UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:
                              THOMAS FORTUNE FAY, ESQ.
01-2244                       RONALD KARP, ESQ.
                              JOSEPH FAY, ESQ.

04-1536                       JANE NORMAN, ESQ.

08-1361                       STEVEN PERLES, ESQ.
                              EDWARD MACALLISTER, ESQ.
                              ANDERS FERRINGTON, ESQ.
                              BILL WHEELER, ESQ.

08-1349, 08-1380              MICHAEL MILLER, ESQ.
                              GAVRIEL MAIRONE, ESQ.
                              DAVID DICKENS, ESQ.


Court Reporter:               BRYAN A. WAYNE, RPR, CRR
                              Official Court Reporter
                              U.S. Courthouse, Room 6714
                              333 Constitution Avenue, NW
                              Washington, D.C. 20001
                              202-354-3186


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

```
 1                      P R O C E E D I N G S

 2            THE DEPUTY CLERK:  Your Honor, we have civil action

 3     01-2244, civil action 04-1536, civil action 08-1377, civil

 4     action 08-1361, civil action 08-1349, and civil action 08-1380,

 5     James Owens et al. versus the Republic of Sudan.  I would ask

 6     that counsel please approach the lectern and identify yourselves

 7     for the record, starting with Mr. Thomas Fay.

 8            MR. FAY:  Good morning, Your Honor.  Thomas Fortune

 9     Fay representing the plaintiffs in the James Owens case.

10            THE COURT:  Good morning, Mr. Fay.

11            MR. FAY:  Good morning, Your Honor.

12            THE COURT:  So everybody is going to introduce

13     themselves.  That's good.  I need to attach names to faces.

14     Some of you aren't here very often.

15            MR. KARP:  I'm Ronald Karp, co-counsel with Mr. Fay

16     for the U.S. embassy employees.

17            MS. NORMAN:  Good morning, Your Honor.  Jane Norman.

18     I represent the Khaliq plaintiffs.

19            THE COURT:  Good morning.

20            MR. MACALLISTER:  Good morning, Your Honor.  Edward

21     MacAllister for the Amduso case, 08-1361.  I'm with co-counsel

22     Anders Ferrington, Bill Wheeler, Steve Perles, Jamie Franks, Leo

23     Jackson and John Eaves, Sr.  John Eaves, Jr. wanted to be here,

24     but he's having back surgery unexpectedly.

25            THE COURT:  Good morning to all of you.
```

1          MR. JOSEPH FAY:  Joseph Fay with Thomas Fay.

2          MR. MILLER:  Good morning, Your Honor.  I'm Michael

3    Miller and I'm here representing Winfred Wairimu, civil action

4    1349, and Mary Onsongo, which is action 1380.  I'm here with my

5    co-counsel from Tel Aviv, Mr. Gavi Mairone.  And also from my

6    law firm, Mr. David Dickens.  All right.  Thank you, Your Honor.

7          THE COURT:  All right.  Good morning to all of you.

8    In this collection of cases, we're going to proceed with what we

9    consider to be the trial.  It's a liability hearing necessitated

10   under the law, notwithstanding the entry of default judgments in

11   these cases.

12       I should clarify right at the outset that with respect to

13   the Khaliq cases, we're proceeding on 04-1536, but I have in

14   mind the brief on what we will eventually be doing with respect

15   to the second Khaliq case, which is 10-356.

16       I don't intend to make any observations at the outset with

17   respect to law.  We have some legal issues potentially in the

18   case that will need to be dealt with, but not this morning.

19   This is basically a proceeding to receive the facts to base the

20   determinations that I will make with your assistance in the

21   upcoming, I think it's safe to say months.  I doubt it will be

22   completed within weeks because in all likelihood we'll be

23   waiting for a transcript of these proceedings.

24       With that, I will ask you, however, if there's anything

25   preliminarily that we need to address, and then I'd like to just

1   receive a very thumbnail outline of what you anticipate for

2   today and over the course of the upcoming several days this week

3   as we receive this evidence.  Mr. Fay.

4           MR. FAY:  Just a couple of things, Your Honor.  First

5   of all, there are some clients here.  Fortunately, a limited

6   number.  If all the clients were here we'd have to have this

7   down at the stadium or something.

8           THE COURT:  We almost have to do that for the lawyers.

9           MR. FAY:  Almost.  And I'm glad Your Honor had the

10  lawyers introduce themselves.  Of course, all the lawyers here

11  are would-be competitors of mine.  But I feel better about the

12  clients, of course.  But let me introduce them, Your Honor.

13          THE COURT:  They're only would-be competitors, huh,

14  Mr. Fay?

15          MR. FAY:  Lydia Sparks Hickey and her husband.

16          THE COURT:  Good morning.

17          MR. FAY:  Ellen Bomer and her husband, Don.

18          THE COURT:  Good morning to both of you.

19          MR. FAY:  Yasemin Pressley and her son Berk.

20          THE COURT:  Good morning.

21          MR. FAY:  And James Ndeda.

22          THE COURT:  Good morning.

23          MR. FAY:  And Tobias Otieno.  I asked them not to be

24  offended if I mispronounced their name.

25          THE COURT:  You're asking me not to be offended, or

1    them?

2         MR. FAY:  I've offended a whole generation over the

3    years of Polish Americans and I'm still surviving.  So they'll

4    probably do okay, too.  And Mr. and Mrs. Rizwan Khaliq and their

5    daughter.

6         THE COURT:  Good morning.

7         MR. FAY:  Your Honor, the only one who hasn't been

8    introduced is Ken Piernick, who is also a lawyer, but he also

9    was an official in the FBI and he's going to be a witness in the

10   case as well.

11        THE COURT:  All right.

12        MR. FAY:  Your Honor, one other preliminary matter.

13   This court granted our request for international judicial

14   assistance, and that hasn't completely gone by the boards.  In

15   fact, there are a couple of people from Gavi Mairone's office

16   that are here that I've been working with on that.  It is

17   possible to take the deposition of Hassan Salameh sometime in

18   November, which I would imagine would -- the Court would not

19   conclude his consideration of all the evidence before then.

20   Again, of course, I don't know what Mr. Salameh is likely to

21   say, whether he's likely to say anything at all, but I am

22   willing to go on over there and give it a try.

23        THE COURT:  We'll see where we are at the end of this

24   week and then we'll talk about what lies beyond this week.

25        MR. FAY:  Very well, Your Honor.  And I think that

1    concludes all of the preliminary matters at this point.

2            THE COURT:  All right.  Other than giving me a

3    thumbnail outline of what to expect today, anything that any

4    other counsel wish to raise at this point?

5            MR. KARP:  Your Honor, I have a status conference in

6    front of Judge Friedman tomorrow at 9.  So if I could be excused

7    to attend that.

8            THE COURT:  Absolutely.  There are enough of you with

9    enough obligations that if I don't see someone here in court at

10   any particular time, I probably actually won't notice that

11   you're not here, with one or two possible exceptions.  But thank

12   you for raising that with me.

13     Anything else from any counsel before we get a little

14   outline of today?  Mr. Fay.  Today.

15           MR. FAY:  Thank you, Your Honor.  Your Honor, on

16   August 7 --

17           THE COURT:  Wait a minute.  Where are we going?  Are

18   you going into --

19           MR. FAY:  Just going to outline for a very few moments

20   the case --

21           THE COURT:  Before you do that, when I say thumbnail,

22   I want to know what witnesses I'm going to be hearing from today

23   and how the week plays out in terms of that subject.  Then we

24   can launch into the proceedings.

25           MR. FAY:  If I didn't send Your Honor a copy of the

1   trial schedule, I apologize.

2          THE COURT:  I don't know that I've received a copy of

3   the trial schedule.  I have the exhibit list.  Unless it's in

4   one of these volumes that I haven't yet completely reviewed.

5          MR. FAY:  Oh.

6          THE COURT:  Is it in one of them?

7          MR. FAY:  I know how much Your Honor may need reading

8   before falling asleep.  If nothing else works, this should work.

9   But let me read off, and then I'll give this to Your Honor's

10   clerk and perhaps he can run a copy.  I thought that I had

11   dropped off a copy, and I apologize.

12          THE COURT:  Why don't you just give that actually to

13   Ms. Waldref and she'll run off a copy.  That will make it easier

14   and you won't even have to read it off and I'll let you just

15   proceed.  If that's going to be the outline, then that'll be

16   good enough for me.

17          MR. FAY:  Your Honor, we have one other exhibit,

18   Your Honor, which is a photograph that we didn't have really

19   until yesterday.  But other than that, all of the exhibits are

20   listed on the exhibit sheet.

21          THE COURT:  All right.

22          MR. FAY:  Your Honor, on August 7, 1998, there were

23   simultaneous attacks carried out on the embassies of the

24   United States in Nairobi and Dar es Salaam.  In that attack, 12

25   Americans died, at least 246 nationals of Kenya and Tanzania

died, and it's been estimated that 5,000 were injured.  We know from the research and will be presented in testimony here, the timeline on that.

There was a meeting in Khartoum in the Sudan between Osama bin Laden of al-Qaeda and Imad Fayez Mughniyah, notwithstanding all the publicity for bin Laden, probably the most dangerous terrorist that has ever lived.  And at that meeting it was determined that the operation be carried out by al-Qaeda operatives; that the explosives and training would be done by the people from Hezbollah.  There will be extensive testimony on Hezbollah in the words of Reuven Paz, whose testimony will be presented by videotape.

Without Iran, there would be no Hezbollah.  Iran totally supports Hezbollah, provides it with training, provides it with weapons, provides it with intelligence as to targets.  And in this case they were certainly very close to the action.  The day before -- within days before the attacks taking place, all of the diplomatic personnel of Iran, both in Nairobi and in Dar es Salaam, left both countries and therefore were not present when the attacks took place.

The planning went from this meeting that was in 1994, and this event was really scheduled to happen in 1996.  There is a person of note who didn't make it the whole way, let us say, Mr. Banshiri.  Mr. Banshiri, who was really the head of al-Qaeda in Africa, he was to be the director on the scene, and he fell

overboard from a boat in the middle of Lake Victoria and drowned

in 1996, just to prove perhaps that not only good people die

young, some bad ones do, too.

But it went forward from there.  There will be testimony

that we have from the criminal trial in New York of al-Fadl,

testimony of Ali Mohammed, detailing the training, detailing the

extent of Sudanese protection for the people as this thing was

building up and training and so forth by Iran.

Now, this is a noteworthy case.

THE COURT:  Let me ask a question about that, just so

I have a little bit of an understanding, and you might be going

there now.  With respect to actions of al-Qaeda, whether it be

al-Qaeda general or al-Qaeda specific -- for instance, al-Qaeda

in Iraq or any other specific al-Qaeda entity, I'm aware of two

cases in which foreign governments have been held liable under

the Foreign Sovereign Immunities Act for conduct carried out by

al-Qaeda.  There's the case in front of Judge Collyer dealing

with al-Qaeda in Iraq, and the foreign government was Syria, for

beheadings of American contractors in Iraq.

And then there's the case that deals with the USS Cole,

which is actually to some extent a death on the high seas case

under the Foreign Sovereign Immunities Act, which deals with

Sudan and al-Qaeda for the bombing of the USS Cole.  Is there

any other case in which there has been a decision by the Court

that held a foreign government responsible under the FSIA for

1    conduct by al-Qaeda?

2            MR. FAY:  I believe that in <u>Kilburn</u> that Iran was held

3    responsible --

4            THE COURT:  For what acts?

5            MR. FAY:  Some group took control of somebody and

6    turned them over to the Libyans, who executed Mr. --

7            THE COURT:  Was that al-Qaeda?

8            MR. FAY:  Yeah.  I'm not sure, Your Honor, whoever it

9    was, what group that was --

10           THE COURT:  I don't think so.  I don't think so.  Just

11   in terms of the timing, I don't think it was, but in any event.

12   So there haven't been -- I'm just trying to make sure that I

13   have an understanding of the legal cases out there.  There

14   haven't been any cases to date that have run to conclusion and

15   found liability of a foreign government for actions by al-Qaeda,

16   for example, with respect to the 9/11 activities; is that

17   correct?

18           MR. FAY:  Well, the Cole of course did because --

19           THE COURT:  That's not 9/11.  9/11/2001 is what I'm

20   referring to when I say 9/11.

21           MR. FAY:  That case is pending up in New York, and

22   they've gotten by the preliminary motions.  But in terms of a

23   final decision after trial, no.

24           MR. MAIRONE:  Gavriel Mairone, Your Honor.  If I may,

25   in the 9/11 case there was a default judgment entered against

1    Iraq.

2              THE COURT:  Right.  But default judgment doesn't go

3    all the way, because even after a default judgment, which we

4    have here, you then need the judicial determinations under the

5    statute.

6              MR. MAIRONE:  Right.  And I would also point out to

7    the Court that the different al-Qaedas that you mentioned, since

8    al-Qaeda is very decentralized, they actually tend to work as

9    different independent entities.

10             THE COURT:  I'm aware of that.

11             MR. MAIRONE:  Okay.  Thanks.

12             THE COURT:  Thank you.  And there's been no prior

13   determinations in a case with respect to the east African

14   bombings?

15             MR. FAY:  Not that I'm aware of, Your Honor, and I

16   think I probably would have seen them.

17             THE COURT:  I think you would know, right.

18             MR. FAY:  I've searched every docket in the

19   United States.

20             THE COURT:  All right.  Go ahead.

21             MR. FAY:  This case is noteworthy for a couple of

22   reasons.  First of all --

23             THE COURT:  And I assume there's been no case that

24   you're aware of or any other counsel is aware of where a court

25   has concluded after presentation that some foreign government

1    was not liable with respect to conduct by al-Qaeda.  Correct?

2              MR. FAY:  Not that I know of, Your Honor, no.

3              THE COURT:  Those don't happen very often.

4              MR. FAY:  The only cases I know of where litigants

5    haven't been successful are cases where the litigants did not

6    fall within the one degree of kindred rule I call it that Judge

7    Lamberth set in the Father Jenco case.  I think Bettis was the

8    name of it, up on appeal.  I don't think there's any case where

9    a foreign government has not been found liable on any basis

10   other than that first degree of kindred.

11             THE COURT:  Well, that issue, which is a different

12   issue after the 2008 legislation, or potentially a different

13   issue, is not really what I'm looking at.  I'm looking at the

14   basic liability determinations.  Does Mr. Perles have anything

15   to add to this, any knowledge you have?  Or anyone?

16             MR. MACALLISTER:  Your Honor, there was a case against

17   Afghanistan for their support of al-Qaeda on 9/11, but it was

18   dismissed on subject matter jurisdiction because Afghanistan was

19   not listed as a state sponsor of terrorism, so they never got to

20   liability.  And I'll have more later.

21             THE COURT:  Go ahead, Mr. Fay.

22             MR. FAY:  Your Honor, first of all, since the last

23   case -- I think there was one decision came down last week, but

24   excepting that one, I haven't had time to read that,

25   unfortunately -- but this case comes down after the holding in

1    <u>Holder v. Humanitarian Law Project</u>, which I think details that

2    even training and assistance to the organization itself, even

3    that is enough to confer liability, that there's vicarious

4    liability on the part of the national state that's on the

5    terrorist list that's supporting that activity.

6         This case is noteworthy too because this, I believe, is the

7    first case that has come to trial since the passage of Section

8    1083 in January of 2008, extending the jurisdiction to nationals

9    other than American nationals who were employed directly or

10   indirectly by the U.S. government and suffered injury or death

11   as a result of a terrorist attack in the course of their

12   employment.

13        There are a number of Tanzanian nationals and a number of

14   Kenyan nationals in this case, and I of course represent, for

15   purposes of this, I'm representing all of them.  For purposes of

16   the damages I represented only the Tanzanian nationals.  It is

17   altogether appropriate with regard to the people represented in

18   both cases.  A number of the estates or people were members of

19   the security group from that country who were guarding the

20   American embassy.

21        The testimony in this case is going to show that both at

22   Dar es Salaam and at Nairobi the heroic actions of the people in

23   those security groups saved the lives certainly of dozens of

24   Americans and perhaps hundreds.

25             THE COURT:  That seems to me as if it's more relevant

1      for damages purposes than it is for liability purposes.  I'm not

2      minimizing it; it's very important and it's really noteworthy,

3      but it does seem to me to be more of a damages issue than a

4      liability issue.

5              MR. FAY:  Quite frankly, that legislation got in to a

6      large extent because of Mr. Owens, the lead plaintiff, who

7      continually sought to have the people in Tanzania who were in

8      the security group, who gave their lives in protection of

9      Americans.  At Dar es Salaam the truck carrying the bomb drew up

10     alongside a guard house, and when -- there was then what's known

11     as a Delta barrier, these things that pop up with a big sheet of

12     steel to stop the truck from going through.  Couldn't go through

13     and get up next to the embassy.

14         When the bomb went off, those guards all lost their lives.

15     Some of them, there were only pieces found.  And because the

16     bomb was so powerful that the reinforced concrete, a foot thick,

17     was turned into particles, and we have pictures that we will

18     show of the reinforcing rods hanging something like spaghetti.

19     And part of the embassy, even so, to -- part of the wall came

20     down, not the whole thing.  And there will be testimony that if

21     they had gotten up next to the embassy and set that off with

22     that force, that it would have brought the embassy down.

23         In Nairobi the obvious intent was to put that vehicle with

24     that truck on board in the underground garage.  Now, if that had

25     happened, so it was in a confined space, it certainly would have

1    brought the entire embassy down with an enormous loss of

2    American life, additional to the 12 Americans who died in

3    Nairobi.

4         This technique really was pioneered by the Iranians.  It

5    was the same thing that was used in the attack on the Marine

6    barracks.  The only difference was they used more explosive

7    there because that was an atrium lobby like a Hyatt.  But the

8    same type of thing, to knock down the entire building, this

9    causing enormous loss of life.  So it's altogether appropriate

10   that these nationals of Tanzania and Kenya be included here.

11        With that, Your Honor, Your Honor asked about the witness

12   list and so forth.

13        THE COURT:  And Ms. Waldref has the copies.  I don't

14   know where they are, but we'll hand them to you, and if you want

15   to hand one up to me, you may, or do whatever you wish with

16   them.

17        MR. FAY:  Thank you.  Your Honor, we're very pleased

18   to have an introduction to a fairly short piece detailing the

19   Nairobi attack, an introduction by Ambassador Prudence Bushnell,

20   who herself suffered serious injuries in the attack.  And then

21   we would put on the videotape which details what happened in

22   Nairobi.

23        She qualifies that videotape, and as well there's

24   additional testimony that will be given on that point by Worley

25   Reed, one of my clients who was the head of security at that

1   time, a man with years and years of experience in security.  He

2   was an officer in the U.S. Army before he went to the State

3   Department, and the State Department Diplomatic Security

4   Service, and he will detail that as well as qualify the Nairobi

5   film.

6       After that we have the video deposition of Essam al-Ridi.

7   Essam al-Ridi was Osama bin Laden's pilot.  It's noteworthy that

8   this deposition was taken after he had testified up in New York

9   about what he did as Osama bin Laden's pilot, and he details the

10  actions of the government of Sudan in support of al-Qaeda in the

11  Sudan as they were working up to this point.  It's noteworthy

12  because he has no ax to grind in this.  He's an independent

13  witness at this point.

14      Then in the afternoon we will put on Ken Piernick on the

15  bombing at Dar es Salaam.  Mr. Piernick is an attorney admitted

16  to the bar in North Carolina and I believe another state, which

17  escapes me at this point, but he spent a considerable amount of

18  time in the FBI after service in the Army.  He was an officer,

19  an airborne officer in aviation in the Army, and then went with

20  the FBI who was in charge of the operation at Dar es Salaam and

21  the crime scene.  He also was in charge after 9/11 for a period

22  of time of the crisis center over at the White House.  He has

23  broad knowledge of explosives and of terrorism.

24      And lastly, Your Honor, this afternoon we will have Ellen

25  Bomer testify.  One of the aspects -- we have two separate

1    events here.  They were joined by the planners, but they were in

2    different locations, and we wanted to make sure that we included

3    some testimony with regard to physical injury at each location.

4    That testimony with regard to Nairobi will be put on by Ellen

5    Bomer.  The testimony with regard to Dar es Salaam will be put

6    on by James Owens.  That will be on the third day as I have it

7    mapped out here.

8         As you can see, there are a number of things we have by

9    videotape, so I would think we wouldn't reach a point where

10   there's any dead time, so to speak.

11             THE COURT:  All right.  Well, let's proceed.

12             MR. FAY:  Okay, Your Honor.  With Your Honor's

13   permission I'll have Mr. Gunther step up and make the machine

14   work here.

15        I assure you if he can't I have no way of doing it.

16             THE COURT:  That's candid, Mr. Fay.  Mr. Perles.

17             MR. PERLES:  I'll stand over here while he's getting

18   the equipment set up.  Mr. MacAllister and I tried the Gates

19   case.  This is the action you referred to as being before Judge

20   Collyer.  That case is currently in the D.C. Circuit.  Syria has

21   now entered that case.  It is in the --

22             THE COURT:  They've entered for purposes of appeal?

23             MR. PERLES:  That is correct.  By design, I believe.

24   They waited to see what happened, entered their appearance

25   before the statutory period for the filing of an appeal, and

1    took an appeal.  The argument is heard I believe November 19,

2    and I think Mr. MacAllister and I are quite current on the state

3    of the law and of other cases like that.  We believe that your

4    understanding is correct that Gates and the Cole case are the

5    only two cases of its type.

6              THE COURT:  And as Mr. Fay pointed out, neither of

7    them is the same incident, obviously, but neither of them is the

8    same circumstance in that this case is under the 2008

9    legislation and involves an action by a different category of

10   plaintiff, if you will.

11             MR. PERLES:  I think that's correct.  Of course in the

12   Gates case one of the issues on appeal is whether we are

13   proceeding under -- whether we proceed under 1605(a)(7) or

14   whether we're proceeding under 1605 big A.  There's some

15   question that's been raised about whether the Court performed

16   the so-called conversion properly.  But as to material support

17   for al-Qaeda, the organization, I believe it's just those two

18   cases.

19             THE COURT:  Okay.

20             MR. PERLES:  Thank you.

21             THE COURT:  All right.

22        (Video deposition played of Ambassador Prudence Bushnell.)

23        (Video is played of "Seconds from Disaster".)

24             THE COURT:  All right.  Why don't we take a 10-minute

25   break and we'll resume with the next film.

```
 1            MR. FAY:  Well, we have next Mr. Reed, Worley Reed, to
 2    go over this.  He had access to all the investigative files and
 3    so forth.
 4            THE COURT:  All right.  Let's give everybody a
 5    10-minute break and we'll be back in action at 11:20.
 6        (Recess from 11:13 a.m. to 11:29 a.m.)
 7            MR. MACALLISTER:  Your Honor, I just wanted to say
 8    quickly that George Mimba is a plaintiff in the Amduso case.  We
 9    tried to have him here for direct examination, but he is unable
10    to make it.  We will be entering a video of his deposition and a
11    deposition transcript.  Also Mr. Jomo Boke, B-O-K-E, was one of
12    the security guards.  We will be entering his deposition and a
13    video of his deposition.  And Mr. Tobias Otieno is here.  He was
14    at the bomb site also.
15            THE COURT:  All right.  Thank you.  Let's continue
16    with Mr. Reed.
17            MR. FAY:  Thank you, Your Honor.  At this time we call
18    Worley Lee Reed.
19        WORLEY LEE REED, WITNESS FOR THE PLAINTIFFS, SWORN
20            THE COURT:  Good morning.
21            THE WITNESS:  Good morning, sir.
22            THE COURT:  Mr. Fay.
23                        DIRECT EXAMINATION
24    BY MR. FAY:
25    Q.  Could you please state your full name and address.
```

1    A.    Worley Lee Reed, at 4371 --

2              THE COURT:  Wait a minute.  You don't have to put your

3    home address into the record.

4              THE WITNESS:  Lake Wales, Florida.

5              THE COURT:  That's fine.

6              MR. FAY:  That's big enough.

7    BY MR. FAY:

8    Q.    Could you describe your education for me?

9    A.    Yes.  I have a bachelor's of science in physics and math

10   from the Ohio State University, a master's of sociology, social

11   psychology, from the Pacific Lutheran University, and I have a

12   master's of strategic studies from the U.S. Air Force Air War

13   College.

14   Q.    Could you tell us about your employment beginning in 1970.

15   A.    In 1970, when I graduated from Ohio State, I immediately

16   entered the U.S. Army as a second lieutenant.  I was in the

17   intelligence service and a regular officer, so I was also

18   detailed to infantry later in my career.  But I started in

19   intelligence, mainly counterintelligence.

20   Q.    Where did you go as an Army officer?  Where were you

21   deployed to?

22   A.    I initially went to Fort Benning for infantry training and

23   then to Fort Holabird for counterintelligence school.  And then

24   I was assigned to, of all places, Cleveland, Ohio, to the field

25   office up there, which was unusual.  But then I went to Korea,

1    to Daegu, Korea as a security intelligence officer for the

2    Korean support command.  And then from there I went to the --

3    back to Fort Lewis to the 9th infantry division, as a infantry

4    officer battalion S2, low-level type officer.

5         And then I went to the advanced course for intelligence at

6    Fort Huachuca, and then to the 25th infantry division at

7    Schofield Barracks, Hawaii, where I was a battalion and brigade

8    S2, S2 intelligence officer.  And then I was assigned to Site R,

9    which is a Joint Chiefs of Staff facility underground in

10   Maryland, under the national command authority, and then I left

11   the service at that time.

12   Q.   When did you go to work for the Department of State?

13   A.   I left the military and immediately I interviewed and

14   immediately went into the U.S. Department of State Diplomatic

15   Security Service as a special agent.  Those of you who are not

16   familiar with this service, it's similar to the Secret Service.

17   Their functions are similar, but for the Secretary of State and

18   for the State Department.

19   Q.   Can you tell us generally what the mission is of the

20   Diplomatic Security Service.

21   A.   The Diplomatic Security Service's mission is the protection

22   of life, information, and property, both domestically and

23   overseas.  We have a jurisdiction of worldwide.  And our main

24   mission is to protect the consulates and embassies overseas, our

25   consulates and embassies.

1  Q.   And that was 1980, did you say?

2  A.   Okay.  1981 I was a special agent in the States, and I was

3  assigned to the Washington field office in the first criminal

4  unit that the State Department ever had.  We did passport and

5  visa fraud investigations.  And then I was assigned to the

6  Secretary of State's detail as a protective agent, similar to

7  Secret Service, and with Secretary Haig and Secretary Shultz.

8      And then I went overseas as a security engineer because I

9  have a physics and mathematics background, to Athens, where I

10  spent half my tour in Athens and Beirut, and then other parts of

11  the Middle East and southern Europe.

12  Q.   What year was it when you went to Beirut?

13  A.   It was 1994 to 1996.  Prior to going -- while I was on the

14  secretary's detail I went to Beirut for the first embassy

15  bombing with Secretary Shultz in 1985, I believe it was.  And

16  then I later went back when I was in Athens as part of the

17  immediate recovery team for the second Beirut embassy bombing.

18  So that's generally what I did there.

19  Q.   And in between those I think was the Marine barracks

20  bombing?

21  A.   The Marine barracks bombing was before that with Secretary

22  of State Shultz.  We landed at the Beirut airport a week before

23  the bombing attack, and he wanted -- he was a former Marine and

24  wanted to see the, not only visit Beirut but also see the

25  barracks and so forth, see the situation himself.

1    Unfortunately, couldn't change it in time.

2    Q.   And then when did you end up going overseas to the embassy?

3          THE COURT:  Be more specific.  Overseas to the

4    embassy?

5          MR. FAY:  I'm sorry.

6    BY MR. FAY:

7    Q.   Let me withdraw that, go to a more artfully phrased

8    question.  After Beirut and being stationed out of Greece, where

9    did you go from there in your career?

10   A.   Okay.  I went to the U.S. Mission Geneva as a SEO again,

11   and then back as a deputy operation officer for DS, for security

12   engineering back in Washington, and then I was the officer in

13   charge of the Frankfurt engineering center that covers all of

14   Europe and the former Soviet Union.  And then I came back to the

15   States and then was assigned to Nairobi.

16   Q.   In Nairobi, what was your position?

17   A.   I was the officer in charge of the engineering service

18   center in Nairobi, and we covered 21 central and east --

19   southern and eastern African, sub-Saharan embassies and

20   consulates.

21   Q.   In that job and in your job in the Diplomatic Security

22   Service, on a day-to-day basis, I'm not talking about the attack

23   situation on August 7 of 1998, but on a day-to-day basis, to

24   what extent does the Diplomatic Security Service interface with

25   FBI, CIA, and other national security groups?

```
 1    A.    Almost on a daily basis because we communicate by
 2    telephone.   If there's a FBI legat, they call them, activity
 3    stationed at the embassy, we talk to them.   Part of my job was
 4    classified, so we had security -- involving security, so we had
 5    to interact, as the ambassador said, almost a daily basis,
 6    because what we did affected what they did, and we wanted to
 7    do -- we have a common goal and a common force in East Africa.
 8    So it was a close communication.
 9    Q.    Mr. Reed, did you participate in the investigative phase
10    after the August 7, 1998, attack on the Nairobi embassy?
11    A.    Yes.   Initially I was the search and rescue leader in the
12    building, and then the ambassador put me in charge of the site.
13    So I interfaced directly with Don Sachtleben as shown in the
14    movie.
15    Q.    Even you have trouble pronouncing Mr. Sachtleben's name.
16    A.    I called him Don all the time.   But basically I helped them
17    with the forensic investigation.   I obtained, like the CB,
18    30-man CB team that supported moving all the debris over to the
19    other site.   I was just a general manager for that site and
20    facility at that time.
21    Q.    Mr. Reed, in your position during this investigative phase,
22    as the person from the embassy really in charge from that
23    standpoint, did you have access to all of the investigative
24    documentation as well as participating in the investigation?
25    A.    The regional security officer, Paul Peterson, I, the FBI,
```

1    and the Nairobi police worked together on this directly as a

2    team.  So yes, the answer's yes.

3    Q.    Prior to testifying today, in fact, some time ago, months

4    or even a year ago, did you have an opportunity to review the

5    video we just saw intensely, let us say, watch it over and check

6    every nuance and so forth?  That's the video that was entitled

7    "Seconds From Disaster."

8    A.    Yes, I did.

9    Q.    Did you note some comments and so forth on the accuracy of

10   the video production?

11   A.    The production is 100 percent accurate.

12   Q.    Could I go through some of the things with you?  With

13   regard to the blast area, I don't think in there that it gave

14   some definition, but where the bomb actually went off, what do

15   you recall seeing there?

16   A.    I knew it intimately because I had completed a security

17   survey in February of 1998, pointing out the danger of this, as

18   well as some other people that came in from Washington and did

19   the same thing.  It was the back gate, and it was a logical

20   place that a terrorist would enter the building, because you

21   could place a bomb or truck under the building at that point.

22          And I knew this well because of the second Beirut bombing,

23   the building in Beirut and the building in Nairobi were

24   constructed similarly.  They were box-type buildings with

25   underground garages.  And the terrorists in Beirut tried to get

1    into the underground garage.  They tried the same thing, only he

2    was shot, and when he was shot he let go of the button he was

3    holding and the explosion blew.

4    Q.   How much time total did you spend before -- well, over your

5    whole lifetime, let me rephrase that.  How much time did you

6    spend in Africa in the Diplomatic Security Service or other

7    service for the United States?

8    A.   Eight years.

9    Q.   You'd be considered to have extensive experience in

10   knowing --

11   A.   I've been in every African country and worked in every

12   African country except Libya and Somalia, because we don't have

13   embassies in Libya and Somalia.  I flew over them a few times.

14   But I've worked in every capital city in Africa.

15   Q.   With regard to casualties on the scene, this is at Nairobi

16   on August 7 of 1998, I believe the video had an estimate of 240

17   dead and 5,000 injured.  First of all, with regard to American

18   casualties, how many Americans died --

19   A.   We lost 12 Americans in the attack.  And if I can expand on

20   that, 34 FSNs, foreign nationals that are local people we hire

21   to work in the embassy in the unclassified areas.

22   Q.   Now, I think that the video, my best recollection is that

23   it gave a figure of 240 dead and 5,000 injured, and as I

24   understood it from that, they were talking about total

25   casualties, not only people working in the embassy or associated

1    with the United States or working there, but people walking by,

2    whatever, casualties total.

3    A.   Yes.

4    Q.   Does that appear to you to be the total of people that were

5    killed or injured in this?

6    A.   Yes.  I was actually at an annex building 10 to 15 minutes

7    away when the bomb went off.  I had to park a city block away

8    because we couldn't drive down the street for the bodies and

9    body parts in the street, burning vehicles.  There were people

10   walking around wounded, laying in the street wounded, laying on

11   the side of the road wounded.

12        This part of Nairobi was always -- if you've been to New

13   York City on a rush hour day, it was like that all the time,

14   because it was a transportation hub.  So there were just body

15   and body parts everywhere, burning vehicles, the burning

16   buildings.  It was chaos.  And there were just bodies

17   everywhere.

18        Actually, because I've spent so much time in Africa, I

19   think the casualty figures may be a little low, because Africans

20   tend to take their wounded or dead away and not report it to a

21   government that sometimes they don't trust.  So it may be a

22   little low, but it's at least that amount.

23   Q.   Now, drawing on your background in physics, engineering and

24   so forth, can you tell us how the building was constructed?

25   We've got a lot of layperson estimates or talk on the thing,

1    that's probably about equivalent to what I would know about it.

2    But you're something different with the engineering.

3    A.   The building was not built the way it was for security

4    purposes.  It was built because of the Rift Valley and

5    earthquakes.  The same thing with the Cooperative Bank building.

6    It was built to 7.0 earthquake standards.  So it could take a

7    7.0 earthquake.

8         The security was added, and actually what you saw in the

9    film was the framework of the building.  The other parts were

10   filled in with what we call breeze block or hollow concrete

11   cinder blocks, sometimes they call it, and the windows and the

12   window frames and so forth.  There was a protective film on the

13   window frames, but it was ineffective because it was so close.

14        A bomb explodes, it explodes like an expanding ball.  It

15   gets bigger and bigger, and it works to a formula they call an

16   inverse square.  In other words, if you're at the center of the

17   explosion, it's the strongest, that's 1.  If you're a yard away,

18   it's then 2, and it would be 1/4, the inverse 1 over the

19   distance squared.  So that would be a fourth as strong.  And

20   then 3 yards away would be 1/9 and 16ths, so you see that the

21   energy dissipates rapidly as it goes out.

22   Q.   So if I'm 10 yards away from the door behind you, a bomb

23   against the door will do how much more damage approximately

24   than -- assuming my figure is right, about 10 yards, as --

25   A.   It would be 1/100, but what you have to remember is it's

1  the strength of the bomb to start with.

2          THE COURT:  You're talking about the strength of the

3  bomb, not necessarily the damage.

4          THE WITNESS:  No.  This is the strength of the bomb.

5  The damage is different.

6  BY MR. FAY:

7  Q.   So about a hundredth as much force as there would be right

8  at that door when it's set off?

9  A.   Yes.

10 Q.   Now, you mentioned the building blocks inside.  When you

11 went through the American embassy after the attack, what

12 happened with those interior walls made out of the building

13 blocks?

14 A.   What happens, you have to understand what happens in a

15 building car bomb explosion.  The explosion goes through the

16 weakest part of the building, the windows in this case, and so

17 forth, and then it's like a tidal wave going through the

18 building.  And the Israelis and DS and a number of people have

19 done tests on this.  It goes through the building, tearing down

20 walls, ceilings, floors, everything, and this debris then falls

21 down and hits the people going through it, high velocity.  High

22 velocity explosion.

23      This creates a vacuum that then comes back, like a tidal

24 wave coming back the other direction, so that when I got in the

25 building, the bombed areas were 3 to 6 feet deep of rubble.  I

1    actually -- my office, if you know what a standard four-door

2    U.S. government safe is, I had to dig 2 feet down to get to the

3    top of it.  So that's the amount of debris that was on the

4    floor.  About, I'd say, 3/4 of the embassy was like that.

5    Q.   Did the blast wave go all the way through to tear out the

6    walls all the way to the other side?

7    A.   Yes.  Actually, it follows the least path of resistance.

8    In this case it went all the way through, but the main blast

9    chose my office, which was on the other side, to go through.  So

10   it literally followed the least path of resistance through the

11   building, but it hit the entire building, but it was focused by

12   the hallways, what I call ballistic hallways.

13       It's like how a rifle works.  When you shoot a cartridge,

14   you have a large space in the cartridge and expanding gas goes

15   through the smaller rifling barrel at a faster speed.  Well,

16   that's what happened in this time.  It went around the concrete

17   core and went down these hallways where Lydia and a few other

18   people -- Sparks and a few other people were standing.  And then

19   followed the least path of resistance out of the building.

20       So to answer your question, all the cinder block interior

21   walls were torn down, damaged, highly unstable, and most of it

22   was laying on the floor.

23   Q.   I think someplace there was something having to do with a

24   safe that was within -- not a safe in the sense of a safe you

25   have on the floor, but like a safe area that was built

1    differently to withstand --

2    A.   Yes.  It's where my wife worked.  That's for security

3    reasons.  They're built to a bank -- like a layperson would

4    understand it's a bank vault standard, and that's the

5    communications center of the building.  And that wall withstood

6    the blast, but it moved that very thick, 2-1/2-foot thick

7    reinforced concrete rebar wall 2-1/2 feet in, and then it sprung

8    back 2-1/2 feet.  And that was on the top floor of the embassy.

9    So that shows you the strength of the explosion.

10   Q.   Let me take you through the rear of the building where the

11   vehicle stopped and then was detonated.  Could you tell us how

12   that gate was set up there and where the drive would lead to

13   from that gate.

14   A.   Okay.  When the terrorist entered, usually -- there was a

15   drop bar on the city bank building normally as you drove in, but

16   it was broken that day, so it was up in the air.  So he drove

17   right by it.  Then they would hit a drop bar, what we call a

18   sally port.  They would hit a drop bar.  Normally if they were

19   let in to the embassy, we would raise the drop bar, allow them

20   in to there, lower the drop bar so nobody could follow them in,

21   examine the vehicle, and then move the other gate and then let

22   them into the embassy.

23        Additional to those gates was a Delta barrier in back of

24   the gates in case there was somebody trying to force their way

25   in, and the guard -- it's hydraulic.  The guard just pushes a

1   button and it raises like a half circle up, and it can stop a

2   very large truck dead in its tracks at 15 miles an hour.  So it

3   was a sufficient barrier.

4   Q.   Is that like these things that are out on Constitution

5   Avenue going up the hill, where there's a metal piece that lays

6   flat when it's down, and when it's up it's at about a 45-degree

7   angle?

8   A.   Yes.  45 to 90.  It varies on the model, but yes, that's

9   them.

10  Q.   How big a truck will that, let us say refuse?  By refuse I

11  mean will it stop.

12  A.   It will refuse a truck, about a two to three-ton truck.  So

13  it's a very effective barrier.

14  Q.   Now, was there a gate too or a passageway through for

15  individuals?

16  A.   Yes.  There's a passenger door gate where the ambassador

17  went through in back, and other people went through in back

18  before this actually happened.

19  Q.   On the video it showed -- only showed two guards at the

20  gate.  What did your investigation --

21  A.   Actually, there were three.  The guards -- what the film

22  shows the two guards did is very accurate.  The third guard was

23  arguing with the other two guards to let the truck in because he

24  was afraid of -- what we assume is he was afraid of the

25  terrorist.  What happened when they started throwing -- shooting

1    and throwing the grenades, which started then about 17, 18

2    seconds later, the bomb went off, the guards ducked behind what

3    the Kenyans call a knee wall.  It's about the size of your knee.

4         And they survived because of a ballistic shadow that formed

5    over them.  They were right next to the wall.  So literally the

6    blast went around them, over top of them and around them.  They

7    were injured but they survived, which I think is a miracle.  But

8    they did.

9              THE COURT:  That's true of all three guards?

10             THE WITNESS:  No.  Two guards.  The third guard stood

11   up and looked the blast in the eye and we didn't find him.  He

12   was gone.

13   BY MR. FAY:

14   Q.   The two guards who survived were injured, however, in the

15   occurrence?

16   A.   Yes, they were, and I believe evacuated, because I didn't

17   see them for weeks later.

18   Q.   I take it from what you say that if the truck had been able

19   to enter that place and go past the Delta barrier, it could have

20   gone all the way to the basement; is that correct?

21   A.   Yes.  We had parking in the basement, so it could go

22   completely under the building.  It was a confined space.  If you

23   know explosives, if you confine an explosive, the effect of it

24   becomes even greater.  It would have lifted the floor of the

25   building and splitting walls and columns out, and acted

1    basically like a grenade, because of the strength of the

2    explosion.  The building would have exploded and then the

3    remaining top of the building would have come down.

4    Q.   You've had training in explosives and their effect?

5    A.   Yes.

6    Q.   The formula that you just gave, F equals 1 over distance

7    squared, is that a recognized formula not only for security

8    people but in using explosives generally?

9    A.   Yes, it is.  And it's what we use for our standard of a

10   hundred feet.  We did tests, and a hundred feet is what we

11   decided was a standard to protect embassies and consulates

12   worldwide.

13   Q.   In the basement where the parking was, what held up the

14   floor up above the basement?

15   A.   Concrete -- reinforced concrete and the rebar -- the

16   framework was the foundation of the building.  So it was

17   basically all rebar.  There were offices down on that floor as

18   well.  And what you don't see in the film, there was a second

19   basement down as well, but you had to access it through the

20   elevators or other basement.  And they were made of concrete

21   also, but with the breeze block walls.  Obviously no windows,

22   but breeze block walls.

23   Q.   Would you consider yourself to have sufficient knowledge,

24   education, training in explosives and the effect of explosives

25   on buildings to give an opinion within a reasonable degree of

1    certainty as to what would have happened if that vehicle with

2    the bomb on it had gotten down into the basement parking?

3    A.   Yes, because --

4         THE COURT:  Wait a minute.  The only question asked is

5    do you consider yourself to have that experience and training.

6         THE WITNESS:  Yes, because I'm the counterterrorism,

7    counterespionage expert for the State Department.

8         MR. FAY:  Your Honor, we would ask that Mr. Reed be

9    qualified as an expert and be allowed to answer that question

10   within a reasonable degree of certainty.

11        THE COURT:  I'm going to ask that you -- keeping in

12   mind any sensitive nature of the inquiries, I'm going to ask

13   that you ask him one or two questions to give me a sense of his

14   training and the basis of his experience.

15        THE WITNESS:  That's fine.  And it's not just

16   training, but it's also experience --

17        MR. FAY:  Yeah, why don't you -- I think it's easier

18   for you to just narrative and tell the judge.

19        THE WITNESS:  First, starting in 1984, I was -- and

20   before that with just viewing it with Secretary of State, but

21   starting in 1984 I was sent in as a recovery team, but also to

22   reconstruct the building in Beirut, the second Beirut annex

23   bombing.  I have been involved in a number of minor terrorism

24   attacks throughout Africa.  One was an attack on a restaurant

25   that we happened to be around in Monrovia that was targeted at

1    Americans.  Riots, bombings for other than terrorist reasons,

2    and then Nairobi especially.

3        But security engineers are tasked with the protection of

4    buildings, and that includes the protection against bombs.  And

5    we're taught very specifically how to do that, what the effects

6    are, that type of thing.  So it's a specific training, but we do

7    more than that.  We're not just that expert.  We do a lot of

8    different security activities, but that's one thing that we do

9    do.

10       And as an agent, as an engineer, we were taught explosives

11   and how to use explosives, to know the effect of the explosives

12   and so forth.  And I know explosives from studies of physics and

13   so forth as well.

14            MR. FAY:  Your Honor, we would ask that Mr. Reed be

15   qualified as a witness and allowed to render an opinion to a

16   reasonable degree of certainty on whether or not, if that

17   vehicle with its bomb on board had gotten down into the

18   underground garage, it would have, within a reasonable degree of

19   accuracy, it would have brought down the building.

20            THE COURT:  I think he's already given that opinion,

21   but I will allow him to give the opinion again.  Is it the same

22   as the opinion you've already given?

23            THE WITNESS:  Yes, sir, it is.  And it's based upon

24   not only real-life experience but tests that we've done,

25   Israelis have done, that Diplomatic Security strongly

1    discourages underground garages because of that.  So if you'll

2    find the embassies are built now without underground garages.

3    Because if you get a vehicle under there, it confines it, it

4    blows out the supporting members and so forth, and the building

5    either comes down or actually acts like a large grenade.

6            THE COURT:  And I'll allow that opinion as an expert

7    opinion based on his training and experience.  Go ahead.

8    BY MR. FAY:

9    Q.   Where did Ambassador Bushnell go from the Cooperative Bank,

10   when she emerged from the Cooperative Bank?

11   A.   She was high on the floors, 20-some floors up.  She was

12   injured by flying glass in the explosion and thrown to the

13   floor, as the film depicts.  She was evacuated out to the Hilton

14   because there was a doctor on staff there, and treated,

15   because -- treated at the hotel because the hospitals were

16   overwhelmed.

17        And this is secondhand, but there were people laying on the

18   floors, beds, floors, every place.  So there was no place for

19   her to go where she would get treated for her injuries.  Once

20   she was treated, less than an hour and a half later, she was

21   back at the embassy.

22   Q.   Is that the Hilton that is about a third of a mile away up

23   the street on a little bit of a hill there?

24   A.   Yes.

25   Q.   With regard to Ambassador Bushnell's injuries, she really

1   didn't say much about that.  What could you observe about her

2   injuries?

3   A.   She had serious injuries to her lip, to -- her face was cut

4   from flying glass, and she told me she had glass embedded in her

5   body from the flying window.  So she was seriously injured.

6   Q.   In the video it showed the recovery of the three

7   cartridges.  Can you confirm from reviewing all of the

8   investigative documents that that was -- they were recovered?

9   A.   Yes.  That was the key element that led us to the second

10  terrorist.

11  Q.   In the video as well, Mr. Al-Owhali was interrogated and

12  admitted to his part after some interrogation.  Is it unusual

13  for that to happen in your experience within the Diplomatic

14  Security Service, where people have been caught after an event?

15  A.   Yes.  They're taught to initially resist interrogation, but

16  they tend to lie about things that are insignificant and get

17  caught up in that.  He lied about his clothes.  He claimed he

18  was wearing the clothes he was wearing that day of the bombing.

19  He had injuries to his back, he went to a place that was -- you

20  know, blood was everywhere, and yet his shirt and everything

21  were spotless.  And he had -- in fact his belt was so new it

22  still had the tag on the inside.  So he had brand-new clothes,

23  but he claimed to have the clothes he was wearing.

24       The agent asked him specifically, said, let's be honest.

25  You've been trained in counterinterrogation techniques, and

1    instead of denying it, I was told he moved forward and asked,

2    where did I make my mistake?  So he admitted -- and then from

3    then on he talked about it openly.  So he felt he had made a

4    mistake, therefore he was honest.  And they're also, once they

5    get to that point, very proud of what they did, so they want to

6    talk about it.

7    Q.   In the video regarding the rescue effort, there are a

8    number of people who are wearing what look like sort of

9    yellowish helmets.  Do you know who they were?

10   A.   Yes.  Israel sent a rescue team to us that arrived the

11   following day.  They initially came to the embassy, and we had

12   accounted for the people that were alive in the embassy by that

13   time.  So we sent them to the Ufundi building pile to help the

14   Kenyans recover people from there.  So they were Israeli rescue

15   workers.

16   Q.   It would appear too from the video that there were a lot of

17   people who weren't part of any organized group as such.  They

18   didn't seem to be wearing any uniforms or anything.  Did that

19   give a problem in doing the rescue recovery operation?

20   A.   Yes.  Immediately after the bombing, the building was

21   flooded with looters, as a matter of fact, unfortunately.  But

22   they were looting, and that continued for a while after I

23   arrived.  And we had a lot of difficulty getting them out of the

24   building, one for looting, and two, we didn't know if the

25   building was going to stand or not.  We didn't want any more

1    casualties than necessary.

2         But I caught people pulling earrings out of dead Kenyan

3    employee ears, just pulling them out, two people dressed as

4    Kenyan policemen were doing that, and I threw a tire iron at

5    them and told them to get out of the building and rushed them

6    and they fled from me.  But they were armed so that wasn't the

7    brightest thing in the world to do.  But we finally got them out

8    of the building, and then we put a perimeter around the building

9    to keep people from coming back in.  That was our responsibility

10   to do that.

11   Q.   There was a little bit of testimony in the video before of

12   Ambassador Bushnell about the setback of the embassy.  Do you

13   know what the recommended setback line was?  Setback from public

14   street.

15   A.   It's 100 feet from all directions.  So that's the

16   recommended setback.  And you could actually walk up on the

17   street and touch the embassy wall.  So there was no setback at

18   all.  And it was about 25 to 30 feet, depending on where you

19   were, from the back of the building where the bomb went off.

20   Q.   I think she indicated in essence that other than moving the

21   embassy location to another place, there wasn't any way to do

22   that, given the city around the embassy there.  You agree with

23   that?

24   A.   Yes.  In fact, I made it an official statement in the

25   report I gave in February of 1998 to the counterintelligence

1    committee of the embassy that we move the embassy.  It was not

2    safe to be there.

3    Q.   Did you and your wife, Joyce, attend the trial of the

4    people who were arrested in this?

5    A.   Yes.  In May 2001 we were flown to New York from South

6    Africa, where we were stationed then, and attended the trial for

7    a week, and stayed at the World Trade Center hotel, by the way.

8    But yes, we did.

9    Q.   There was some testimony on that videotape, by I believe a

10   Kenyan who was injured in the occurrence, that he observed the

11   defendants in the case.  And did you have any opportunity to

12   actually observe them?  I say that because I recognize there's

13   so many people trying to get into that trial, most of the people

14   had to sit next door.

15   A.   Actually, we were inside, and they had a victims section

16   and the defendants showed behavior of being happy.  They showed

17   no remorse.  They were waving to their families that were in the

18   crowd.  They were proud of what they did.  This was not

19   something where they felt guilty about it at all, period.

20   Q.   Where did you stay when you were up in New York for that

21   trial?

22   A.   At the World Trade Center hotel, in the towers.

23   Q.   That was how long before 9/11?

24   A.   In May.  So it's May, June, July, August, September.  Four

25   months before the 9/11 attacks.

1      THE COURT:  With all due respect, Mr. Fay, we need to

2  keep on target here so we don't take too much time.

3      MR. FAY:  Okay.  Thank you, Your Honor.

4  BY MR. FAY:

5  Q.  Immediately prior to the attacks on August 7, 1998, are you

6  aware of the movements of any Iranian diplomatic personnel from

7  Kenya and Tanzania?

8  A.  Yes.  We found -- this was after the bombing, but we found,

9  the FBI and all of us found out that they literally packed up

10  the embassy and moved out of Nairobi.  I believe in Dar es

11  Salaam as well.  They just left the country.  The whole embassy

12  was gone.

13  Q.  Do you know Ellen Bomer?

14  A.  Yes, I do.  I met her in July -- just after July 6 of 1998

15  when she arrived.

16  Q.  And were you and your wife friendly with them and see them

17  on a social basis as well?

18  A.  Actually, my wife and her worked together on a Secretary of

19  Treasury visit at the Serena Hotel.  I had met her and saw her

20  in the hallway and so forth, but my wife was very friendly with

21  her and knew her well.

22  Q.  Prior to testifying today, did you have an opportunity to

23  observe a photograph of her that was taken when she was being

24  treated actually at Walter Reed sometime after the --

25  A.  Yes, I did.

1    Q.   If Your Honor would indulge me just for a moment.

2         I hand you what has been marked Plaintiffs' Exhibit Z.  You

3    can see it on the monitor there?

4    A.   Yes.  I have one right here.  I see it.

5    Q.   And is that an accurate picture of her when she was being

6    treated at Walter Reed?

7    A.   Yes.  When I saw her -- the blood has been removed from her

8    face.  Her face was covered in blood and she was being helped

9    out of the embassy by our search and rescue team.  As in the

10   case of a number of employees, I thought I recognized her as

11   Ellen Bomer, and then I found out directly that it was Ellen

12   Bomer.  I saw her on the steps that led up to the embassy.  We

13   had a triage center at the bottom of the steps on the sidewalk.

14   That's where she was taken initially.

15        MR. FAY:  Your Honor, I don't have any other questions

16   at this point.

17        THE COURT:  Any other counsel participating or are we

18   done with this witness, Mr. Fay?  Are we done with this witness?

19        MR. FAY:  Yes, Your Honor.

20        THE COURT:  Let's have the next bit of testimony.

21        MR. FAY:  Your Honor, next we have the deposition of

22   Mr. Al-Ridi.

23        THE COURT:  And that's 45 minutes long?

24        MR. FAY:  Yes, Your Honor.

25        THE COURT:  We'll have to break it in the middle

```
 1    probably, but let's start it.
 2            MR. FAY:  We would ask that Exhibit Z be admitted into
 3    evidence.
 4            THE COURT:  It's a little bit unusual to admit that
 5    through this witness, who really doesn't know anything about
 6    that picture other than someone showed him the picture.  But I
 7    don't want to create any discomfort because I don't know whether
 8    the plan is to admit it through Ms. Bomer.
 9            MR. FAY:  Can I approach for just a moment,
10    Your Honor?
11            THE COURT:  You can.
12            MR. FAY:  This doesn't have to be on the record.
13        (Off-the-record discussion.)
14            THE COURT:  I'm going to go ahead and conditionally
15    admit that photograph.  Is it marked as an exhibit, Mr. Fay?
16            MR. FAY:  Yes, Your Honor.  It's marked as Exhibit Z.
17            THE COURT:  All right.  And I will conditionally admit
18    it.
19                            (Plaintiff Exhibit Z
20                             received into evidence.)
21        (Video deposition played of Essam al-Ridi.)
22            THE COURT:  All right.  We'll break there for lunch,
23    because we have another 20 minutes or so to go on this tape.  So
24    let's stop right there.  Actually, if you'd set it so we can
25    repeat that question and answer to start off, since it's a new
```

 1    subject matter.

 2          And we will resume at 1:45.  All right?  See you then.

 3          (Recess from 12:43 p.m. to 1:50 p.m.)

 4          THE COURT:  All right.  We're ready to resume with the

 5    video deposition of Mr. al-Ridi.

 6          (Video deposition continues of Essam al-Ridi.)

 7          THE COURT:  All right.  Let's proceed.

 8          MR. FAY:  Your Honor, at this time we call Mr. Kenneth

 9    Piernick.

10       **KENNETH PIERNICK, WITNESS FOR THE PLAINTIFFS, SWORN**

11          THE COURT:  Good afternoon.  Mr. Fay.

12                        DIRECT EXAMINATION

13    BY MR. FAY:

14    Q.    Could you please state your full name and address?

15    A.    Kenneth Raymond Piernick.  Springfield, Virginia.

16    Q.    What is your date of birth?

17    A.    December 21, 1949.

18    Q.    Your place of birth?

19    A.    Battle Creek, Michigan.

20    Q.    Could you detail your education for us post high school?

21    A.    Surely.  In 1967 I matriculated, or entered the Ratline at

22    VMI, graduated in May of '71, entered the military service as a

23    regular Army officer.  During my time during the military

24    service I took a master's course from Webster University in

25    management and public administration.

1    After I left active duty, I went to Wake Forest Law School

2    and graduated early, in, I think it was January of '80, took the

3    bar in early '81 in both states of North Carolina and Florida.

4    Q.   And you passed the bar in both states?

5    A.   I did indeed.  First time.

6    Q.   Congratulations.  And what was your major field of study at

7    VMI?

8    A.   I started off in chemistry, but the mathematics tormented

9    me dearly and I switched to history and graduated with a history

10   degree.

11   Q.   And then you were commissioned to second lieutenant in

12   1971?

13   A.   That's correct, armor officer.

14   Q.   What was your period of active service in the

15   United States --

16   A.   From May of 1971 to September of 1978.

17   Q.   During those seven years approximately can you tell the

18   Court what you did in the Army?

19   A.   Sure.  When I entered the military directly, I was assigned

20   to Fort Knox, Kentucky, where I took my basic officer training

21   and studied the skills for armored cavalry, because I was

22   assigned to an armored cavalry unit with the 3rd infantry

23   division mech in Europe.  That course of instruction of course

24   included work with delaying and retrograde tactics, which meant

25   the use and employment of explosives to delay the enemy.

1        I spent a year and a half, almost two years in Germany on

2   that tour, and then I went to flight school at Fort Wolters,

3   Texas, and then from Fort Wolters, Texas to Fort Rucker, Alabama

4   to finish up flight training, and then I immediately was

5   assigned to the 82nd airborne division.

6   Q.   You indicated after leaving the Army, you went to Wake

7   Forest, did you practice law at all before you entered the --

8   A.   I did.  For approximately six months or so I practiced in

9   Raleigh, North Carolina.  Insurance defense.

10  Q.   Did you have an opportunity before testifying here today to

11  review Plaintiffs' Exhibit K, which is a copy of your curriculum

12  vitae?

13  A.   Yes, I have.

14  Q.   And so far as you recall, know, is that all accurate?

15  A.   Yes, that's correct.

16        MR. FAY:  Your Honor, we would ask that Plaintiffs'

17  Exhibit K be admitted in evidence.

18        THE COURT:  Exhibit K is admitted.

19                              (Plaintiff Exhibit K

20                              received into evidence.)

21  BY MR. FAY:

22  Q.   There are two acronyms in your CV which are undefined and I

23  know are not familiar to me and perhaps not to the other people

24  here.  C-O-N-U-S and O-C-O-N-U-S.

25  A.   Yes.  That's CONUS and OCONUS.  That's old military

1   vernacular for continental United States and overseas from the

2   continental United States.

3   Q.   Starting with your first job in the FBI, why don't you tell

4   us what you did in the FBI.

5   A.   Well, I entered the FBI through the Charlotte division.  Of

6   course went to training at Quantico.  I left Quantico after the

7   completion of training and returned to Charlotte, where I did

8   basically I guess what you would call the break-in period for a

9   new agent, did multiple violations, bank robberies, motorcycle

10  gang, narcotics operations, and then from there I was

11  transferred to San Diego.  In San Diego I engaged in

12  international terrorism investigations and counterintelligence

13  investigations.

14  Q.   When was that that you went to San Diego?

15  A.   That would have been I think mid-'83.  You have to forgive

16  me on the exact months.

17  Q.   Okay.  Go ahead.

18  A.   All right.  So I spent a little over a year and a half in

19  San Diego doing international terrorism, counterintelligence

20  investigations and then was transferred to the Washington field

21  office in Washington, D.C., where initially all new arriving

22  folks had to do what I distastefully describe as applicant work,

23  where you did background investigations and that sort of stuff.

24  I did that for a period of several months, and then I was

25  assigned to counterintelligence and counterespionage duties.

1    Q.   Did this hook in to some extent with what you had done in

2    the Army, or was this all new?

3    A.   Well, because I had lived overseas a good part of my life

4    as a youth and that sort of stuff, I had an affinity for working

5    with Europeans and Eastern Europeans.  I have an Eastern

6    European background.  I understood some of what they said and

7    how they thought, so I was used in that regard.

8    Q.   You said you lived overseas a good deal of your youth.

9    Could you explain that a little bit?

10   A.   Sure.  My father was in the military, in the Special

11   Forces, in the 82nd airborne as well, and we lived six years

12   overseas in Europe and of course traveled around.

13   Q.   And you said European, Eastern European background?

14   A.   Yes.  We lived in Berlin.  He was responsible for what is

15   called Detachment A, which is no longer in existence, but it was

16   a very specialized Special Forces unit to resist the advances of

17   the Soviets should they decide to do so.

18   Q.   Now, in the course of your work as a special agent and

19   later on as you moved up the line, could you estimate for us how

20   many interrogations of suspects, defendants or persons of

21   interest in terrorism investigations were conducted by you or

22   were done pursuant to your direction and subject to your review?

23   A.   It's difficult to estimate the exact number, but it would

24   be in excess of a hundred certainly, somewhere in probably a

25   couple of hundred.

1   Q.   Could you give us an overview of this aspect of terrorism

2   based upon your work as a special agent and then assistant

3   section chief of the domestic terrorism --

4   A.   In the domestic terrorism arena, I of course first started

5   out as the unit chief of the domestic terrorism operations,

6   which meant all the domestic terrorism investigations were under

7   my purview and supervision.  I had a number of supervisors who

8   worked for me, and from them field supervisors and field agents.

9   We conducted investigations of militias.  That was a time of

10  great militia activity.  Ku Klux Klan, white supremacists, Aryan

11  nations, ALF, ELF, eco-terrorists, other single-issue terrorists

12  such as the Phineas -- well, the Phineas Priests were actually

13  white supremacists, and the Aryan Resistance Army.

14       So there were a number of different kinds of organizations

15  that we investigated to first prevent them from engaging in acts

16  of terrorism, and ultimately if they succeeded, which they

17  occasionally did, the consequences of those acts.

18  Q.   When did you did get into the field of foreign state

19  sponsored terrorism?

20  A.   Well, in the course of those investigations, both on the

21  domestic terrorism side and throughout your career, or my career

22  as an FBI agent, we were often called in to provide augmentation

23  to international terrorism investigations.  So I have to say it

24  started well before I ever got to do domestic terrorism.  But

25  salted throughout that were events where we conducted

1    investigations on international terrorists, because they were

2    such a commanding event that resources would be surged into

3    them.  So I often participated in those.

4         And then of course when I became the chief of the

5    Iran/Hezbollah unit, I was neck deep in acts of terrorism and

6    counterintelligence operations involving state sponsors of

7    terrorism and freelance or independent terrorist organizations.

8    Q.   Has most of your work or the overwhelming majority of your

9    work in foreign state sponsored terrorism been with regard to

10   Islamist state sponsored terrorism?

11   A.   Well, I would call it Islamist as opposed to Islamic,

12   because of course there's many, many Islamic adherents across

13   the world, and fortunately most of them don't engage in

14   terrorism.  But Islamists do, certain sects of Islam, and in

15   particular certain subsets of Islam do engage in terrorism

16   against the United States and infidels wherever they're found.

17   Q.   Did there come a time when you became the assistant special

18   agent in charge of the August 7, 1998, bombing of the embassy of

19   the United States at Dar es Salaam?

20   A.   Yes, there was.

21   Q.   Let me take you back to that.  I'll go back to that in a

22   minute, but let me go over the rest of your credentials.  Why

23   don't you tell us after that, and again I say we'll go back to

24   that in a moment, what positions you've had in the FBI with

25   regard to the terrorism, foreign state sponsored terrorism.

1   A.   Of course, throughout the -- as I mentioned before,

2   throughout my career I participated in various aspects of it.

3   When I got to the Iran/Hezbollah activities, and of course also

4   as ASAC, assistant special agent in charge, that was the

5   counterterrorism portfolio.  So all counterterrorism

6   investigations of the FBI in the Washington field office, and

7   overseas as assigned, were my responsibility.

8       In the course of conduct of that, I went to bomb commander

9   school to learn additional information about bombs, participated

10   in the exemplar bombings to blow up vehicles, to disarm

11   vehicles, and I also acquired sufficient money to send out what

12   they call PAN disrupters to bomb squads throughout the United

13   States, of local police forces.  So I was intricately involved

14   in all of those aspects of terrorism.

15   Q.   You said you were the chief of the Iran/Hezbollah unit at

16   the FBI.  Is that at just the Washington field office or --

17   A.   That was at the headquarters.  So I was responsible for all

18   of it nationwide.

19   Q.   Why don't you tell us what that job entailed.

20   A.   Well, that entailed of course monitoring and directing,

21   establishing policy for, and shall we say giving impetus to

22   operations against the Iranians and Hezbollah in the

23   United States, and wherever their actions affected U.S. citizens

24   overseas.  We worked in coordination with the intelligence

25   community, worked overseas with them and domestically.

1      When events such as a serious case developed, we would

2    throw resources, pull resources from other areas of the FBI to

3    support them, and of course part of the responsibilities for

4    myself was not only to know about the cases but then to brief

5    superiors in the FBI, including the director.

6    Q.   What was the group known as the national threat center

7    section?

8    A.   Well, this was a section that was developed after 9/11

9    because of the volume of threats and potential threats that were

10    coming in.  The FBI found itself receiving literally thousands

11    of threats in a week, and they had to be handled.  Prior to the

12    creation of this section, they were handled by whoever received

13    them.  They were not collated into a single place and parceled

14    out for appropriate investigation.

15      In some cases some threats were not handled as being just

16    unfortunate misstatements on somebody's part.  Sometimes real

17    threats were received and the like.  But it had to be collated

18    in one particular place so it could be systematically addressed

19    and then moved out to the field.  And then those threats had to

20    be briefed through the intelligence community and throughout the

21    executive, all the way to the president.

22    Q.   I take it from what you've said that with the FBI in

23    foreign state sponsored terrorism, as in other things, there's a

24    certain number and percentage of reports that might be

25    classified as nut-burger?

1    A.   Yes.  To put it in the vernacular, yes.  In fact, I would

2    say a vast majority of them are unfounded or found to be without

3    merit.  For example, and I just use this as a brief example, on

4    one occasion we received a complaint of three Arabic looking men

5    in a field next to a nuclear reactor.  Of course, that would

6    make our antenna rise very high and jumped on that immediately.

7    Come to find out it was three migrant workers picking

8    strawberries.  So.  But it had to be checked out.  For us not to

9    check it out, and it turns out that particular facility would

10   get stroked by an international terrorist organization would be

11   most unfortunate.

12   Q.   What was the period that you were chief of that office, the

13   national threat center section?

14   A.   That was from the time when I returned from the White

15   House.  I had a little medical issue at the White House, and I

16   spent, I guess it was about a total of eight, nine months there.

17   I had a heart attack and of course I had to rehab.  Then I came

18   back and that was my assignment.  It was viewed as less

19   stressful.

20   Q.   In charge of the national threat in the United States.

21   That's good, yes.  At any rate, what other duties did you have

22   in that office as head of the national threat center section?

23   A.   That was the primary duty.  I think what you may be

24   referring to is the crisis management aspect.

25   Q.   Yes.

1    A.    On 9/11 I was in my unit preparing to brief and receive

2    briefings from my subordinates, and the TV monitors were on in

3    the background.  We always watched either CNN or whatever news

4    happened to be on.  I won't say Fox, but probably Fox at the

5    time.  And while my back was to the monitor, they showed a

6    picture of an airplane slamming into one of the towers.  And of

7    course it got our attention, and I looked at it and I thought

8    perhaps it was some kind of cheesy, Orson Welles-like grade B

9    effort to entertain.

10       But as we were briefing each other, the second plane hit,

11   and that came in live as I recall.  And then I said, ladies and

12   gentlemen, we're at war.  Let's go.  And of course, we literally

13   ran to the operations center and stood it up.  Because I was

14   first on the scene and the one who volunteered, I was the one

15   who was responsible for standing it up for the entire FBI and

16   maintained that duty for about five, six months, trying to

17   convert it into a genuine world class operations center.

18   Q.    Did there come a time then when you became the acting chief

19   of the international terrorism operations section, section 2 of

20   the FBI?

21   A.    Yes.  I tossed to our international terrorism operations

22   section 2.  Leadership was transferred, and at the time I was

23   running the threat section, and so I was asked to take over that

24   section since I had the most encompassing knowledge of the folks

25   on the scene at that point.  So then I ran that.  That section

is responsible for all international terrorism apart from

al-Qaeda and Sunni fundamentalist terrorism.

Q.   During the course of your time with the FBI, did you

receive any awards or commendations from the FBI?

A.   I did.  I received at least a dozen commendations and also

incentive awards.

Q.   How many of the investigations that you did had to do with

terrorist actions in which there was some form of explosives

utilized?

A.   I would say somewhere in the vicinity of at least a dozen.

Q.   And since 2003, what has been your occupation?

A.   Since I retired from the FBI, I became a consultant.  I

performed contract services for the intelligence community.

I've done threat and vulnerability assessments for a civilian

firm doing infrastructure, mostly in the western United States.

And I have done some pro bono lawyering for what I consider to

be deserving clients.

Q.   Would it be fair to say that in the law enforcement

community you are regarded as an expert on terrorism and

specifically terrorism with respect to bombing cases?

A.   Yes.  I think so, yes.

Q.   Are the techniques utilized by you and your associates at

the FBI in investigating the August 7, 1998 bombing of the

United States embassy at Dar es Salaam recognized as appropriate

and effective within the law enforcement and intelligence

1    community?

2    A.    Without a doubt.

3            MR. FAY:  Your Honor, we would move the admission of

4    Exhibit K, if I haven't already.  I think we already did.

5            THE COURT:  I think you did already.

6            MR. FAY:  And we submit, subject to Your Honor's

7    inquiries or any other counsel here, we would request that

8    Mr. Piernick be qualified as an expert and be permitted to

9    express opinions on terrorism and on bombing, particularly

10   bombing cases involving terrorism.

11           THE COURT:  He will be admitted to provide expert

12   testimony on that subject.

13           MR. FAY:  Okay.

14   BY MR. FAY:

15   Q.    Following the attack at Dar es Salaam on August 7, 1998,

16   you were assigned to head up the investigation?

17   A.    That is correct.

18   Q.    When did you arrive at Dar?

19   A.    Because we were working 24 hours a day, it's a little bit

20   difficult for me to recall the precise time, but it was

21   approximately two days after the bombing event.

22   Q.    Could you set out the parameters of your function in the

23   investigation?

24   A.    Well, of course these are huge bombing crime scenes.  We're

25   talking very, very, very large in comparison to most ordinary

1    circumstances for bombings.  So the first thing you do, of

2    course, is do a survey and cordon off the area to make sure that

3    the evidence is not contaminated or otherwise altered or

4    molested.

5        And then of course you begin interviews of anybody and

6    everybody who could have been a witness to the bombing.  And you

7    actually grid off the environment and begin a very systematic

8    search of the evidence, literally sweeping the streets for small

9    particulate matter.  You take a lot of photographs of the

10   existing circumstances, inspecting every piece as you go along.

11   And you do calculations of the size of the bomb, you do chemical

12   assays, field assays of the composition of the bomb, and you

13   determine the range of the debris of the bomb in that

14   circumstance.

15   Q.   Did you have to amend any of these standard procedures of

16   the FBI because of the situation, any situation at Dar es

17   Salaam?

18   A.   Well, of course every bombing situation has its own unique

19   circumstances.  One in this particular one is that, No. 1, it

20   was in a foreign country, surrounded by people who did not speak

21   very good English.  They spoke Kiswahili, and we did not,

22   frankly, although we did have some translators.  The site is

23   occupied by a Marine FAST team, so you have 50, 60 combat

24   soldiers who were providing security.  So that's unusual in

25   comparison to an average bombing in the United States, for

1    example.

2         And then of course you are remote from your headquarters,

3    so you have to establish secure communications.  You have to

4    establish layers out of security to see that you're not attacked

5    by a follow-up bomb by any of the potential perpetrators that

6    might have been left behind.  So there's a number of different

7    things that have to go on.

8         In addition to that, I had about 120 special agents, some

9    support people, and we had to provide provisioning, quarters,

10   medical care, and all the other ancillary facets of life for

11   them, since nothing really of the local area was available to

12   us.

13   Q.   Did the Marine unit arrive before your outfit got there?

14   A.   They did.  They were cruising offshore in the Indian Ocean

15   and they helicoptered in within hours is my understanding.  They

16   had already established a concertina wire perimeter, with lift

17   gates and machine gun positions to assure the security of the

18   environment.

19   Q.   In your opinion, of course with your background as a

20   military officer, as well as an investigator in state sponsored

21   terrorism, do you believe that they did an adequate job in

22   preserving the crime scene for your investigation?

23   A.   I know they did.  God love them, they didn't touch anything

24   that we could discern, and the crime scene was, except for the

25   fact that the smoke was gone and the fires extinguished, was as

1  it was the moment it blew up.

2  Q.   They were all Marines?

3  A.   Yes, they were Marines.

4  Q.   And they didn't touch anything, didn't even touch the cold

5  beer?

6  A.   Well, they didn't bring cold beer with them.  We did bring

7  with us chewing tobacco and snuff, which they truly appreciated.

8  Q.   Could you highlight for us the significant observations and

9  evidence uncovered by your group?

10  A.   Sure.  Well, as we did our initial survey, I caused an

11  aerial surveillance by a local helicopter to take some

12  photographs, and of course we began immediately photographing

13  everything that we could see.  We also had scout teams going

14  around the perimeter on the outside, to see how far we could

15  find debris.  Debris actually landed in the bay of Dar es

16  Salaam.  I forget the exact name of the bay, but it was out

17  there in the muck as well.

18      On top of surrounding embassies, roofs, the trees had body

19  parts, there was skin and flesh seared from bodies hanging on

20  trees, dropping kind of like snowflakes down onto us.  Vehicles

21  up and down the street were destroyed.  Some virtually burned to

22  the ground.  Others just mangled.  Residences were knocked down

23  or substantially destroyed.  Of course, the embassy itself was

24  substantially wrecked on the front side of it, and the annex,

25  which is part of it, and then the ancillary service buildings

1   that were around the perimeter.

2         The fence or the gate of entry and egress of the embassy

3   was shattered into pieces.  The guard shack, a reinforced

4   concrete bunker style guard shack, was shattered, roof still on

5   it, but the internal guts were blown apart and it was

6   pulverized.  A large Mercedes 10-ton capacity tanker truck had

7   been thrown up against the annex building, full of shrapnel

8   holes, engine completely blown out of it, and the occupants

9   vaporized.

10        Also, in front of the Delta, just outside the gate, was a

11   crater, I would say somewhere around eight feet in circumference

12   or in diameter, and about four feet deep in soil that was as

13   hard as concrete.  At the bottom of that pit were various

14   vehicular components.

15   Q.   You were present in the courtroom earlier I believe when

16   Worley Lee Reed testified with regard to a formula for figuring

17   force from an explosion and distance.  So let me ask you this.

18   Would you agree that the force of an explosion becomes weaker in

19   the inverse square of the distance from the bomb, usually

20   expressed as force equals 1 over distance squared?  Do you agree

21   with that formula?

22   A.   Yes, I do.  In instructions and learning how to use

23   explosives, that is a formula that is presented.

24   Q.   Is that generally recognized by investigators, not only

25   people with the FBI or even with American --

1    A.    I believe so.  There are other aspects of explosives.  For

2    example, the kind of explosive used.  Some are what they call

3    slow explosives, which are used as moving charges.  For example,

4    somebody had mentioned ammonium nitrate.  That's a relatively

5    slow charge designed to move earth and heavy objects out of the

6    way, blow holes in roads, which is what we used in the armored

7    cavalry to deny anti-armor access to roads, to much faster

8    explosives, TNT being the standard by which all explosives are

9    measured.  Like it's the number 1 and then other explosives are

10   much, much faster and much more unstable, depending on what it

11   is.

12        The faster the explosives, generally they are used as

13   shattering charges.  So what they will do, rather than simply

14   move, they will literally smash things to bits.

15   Q.    I think in the example that I had asked, the bomb force of

16   a million pounds per square inch at one foot distant, after you

17   got eight feet it would diminish to about 15,000 pounds.  In

18   other words, a little bit more than 1 percent of what it would

19   be if it was within one foot.

20   A.    Right.

21   Q.    Now, did you take a series of photographs that I've marked

22   as Exhibit P, which you have reviewed before your testimony

23   today?

24   A.    Yes, I did, or I had them taken by my subordinates.

25   Q.    Let me have you move over here, with the Court's

1   permission, to put these on the viewer.  Over there, is it

2   possible to --

3          THE COURT:  He can't mark over there.

4          MR. FAY:  He just has to mark over here.  Okay.  In

5   that case I'm going to surrender this position and you can move

6   over to the viewer.

7          THE COURT:  Mr. Fay, if you're going to ask questions

8   from there, Mr. Bradley is going to give you a hand microphone.

9      (The witness moves to the lectern.)

10  BY MR. FAY:

11  Q.   Directing your attention to Exhibit P-1, let me put that on

12  the viewer.  You can make marks with your finger or a pen.

13  A.   I'll just point here.

14  Q.   Yeah, just point.  Could you indicate what's shown in that

15  photograph?

16         THE COURT:  Let me interrupt by saying we don't have a

17  jury here, Mr. Fay, so it's not as important, but normally when

18  substantive testimony comes in on an exhibit, it only does so

19  after the exhibit has been admitted into evidence.  So if you

20  want to admit Exhibit P, which is a series of photographs --

21         MR. FAY:  Yeah.  15.  16.

22         THE COURT:  Let's do that first.

23         MR. FAY:  I would so move for the admission,

24  Your Honor.

25         THE COURT:  And they're all photographs that the

1    witness has just testified to knowledge of?

2            MR. FAY:  Yes.

3    BY MR. FAY:

4    Q.   And you took all these photographs or they were taken at

5    your direction?

6    A.   Yes.

7    Q.   And I take it you also witnessed what's depicted in the

8    photographs?

9    A.   I did indeed.

10           THE COURT:  So that's Exhibit P and that will be

11   admitted.

12                           (Plaintiff Exhibit P

13                            received into evidence.)

14   BY MR. FAY:

15   Q.   Directing your attention to P-1, could you tell us what's

16   shown in this photograph and its importance?

17   A.   This is the bomb crater just outside the gate on the street

18   and apron to the gate.  You don't have a good perspective here,

19   but this picture is taken from top down to the bottom.  In there

20   you will see, these are leaf springs from the rear suspension of

21   the truck.  These are gears from the transmission of the truck,

22   all of which blew down.

23       There are other little bits and debris of the truck in

24   there.  There is also debris tossed in by rescuers at the time.

25   Water bottles and the like, and other miscellaneous debris,

1    rock, and of course charred earth and the like.  The balance of

2    the truck was pretty much blown apart everywhere.

3    Q.   Now, before I hand you the next one, could you outline for

4    us the area -- in other words, if we have the embassy here, was

5    there a guard house then with the embassy?

6    A.   Yes, there is.

7    Q.   And then the street is here --

8    A.   Yes.  And we have the aerial photograph.

9         THE COURT:  Yeah, you and he are having a nice

10   conversation, but it's not of any use to me.

11   BY MR. FAY:

12   Q.   Okay.

13   A.   All right.  I apologize for the lack of clarity of the

14   picture.  This was taken high overhead, not my helicopter on

15   scene.  I think it's been adjusted for public consumption.

16        In any event, this is the embassy building right here.

17   This is the road that the bomb vehicle took towards the embassy.

18   Here are some embassy vehicles.  And right here is where my --

19   the tip of my pen -- this is where the guard house was and this

20   is where the gate and Delta barrier was, and right about here is

21   where the bomb detonated.

22   Q.   When you made your investigation, could you tell the way

23   that the guard house was built, in other words what was it made

24   of and so forth?

25   A.   Sure.  Of course, I'm not an engineer, so I don't know

1     precise composition of the concrete and the like, but it was

2     clearly built to withstand heavy force.  It was reinforced,

3     rebar concrete with extraordinarily thick glass.

4     Q.   Okay.  And directing your attention then back to the

5     exhibit, the truck carrying the bomb pulled up to the guard

6     house; is that correct?

7     A.   It pulled up to the gate, which is immediately adjacent to

8     the guard house.

9     Q.   Okay.

10              THE COURT:  It will help just for the record if you

11    identify the particular exhibit by number.  It's P what?

12              THE WITNESS:  This is P-15, Your Honor.

13              THE COURT:  Thank you.

14    BY MR. FAY:

15    Q.   And at the time it reached that point, was there a barrier

16    to prevent it from going further forward?

17    A.   Well, you had the gate, like a wrought iron gate, actually

18    very heavy metal gate, which opened, and then just behind that

19    you also had a steel Delta barrier.

20    Q.   And the steel Delta barrier was up at the time --

21    A.   Yes.  It is our belief it was up.

22    Q.   As far as you could tell, did the guards at the embassy,

23    Ultimate Security guards there, ever drop that steel barrier?

24    A.   To our knowledge, they did not.  They stood their ground.

25    There was a whole story that we discerned about how things

1   transpired.

2   Q.   Okay.  Go ahead.

3   A.   If you will see in this picture right here, this is Exhibit

4   P-2, this vehicle here is a water truck that I had articulated

5   earlier.  This is the frame of the water truck, and this is the

6   charred remnants of the cab and the engine.  This vehicle was

7   assigned, perhaps every other day, every third day, the duty of

8   bringing fresh water to all of the embassy residents.  The water

9   in Dar es Salaam for Westerners is untrustworthy, and so the

10  embassy supplied water to all of its employees.

11          THE COURT:  I'm sorry to do this to the audience, but

12  you need to talk into the microphone.

13          THE WITNESS:  I'm sorry.  So they provided the service

14  of providing water to all of the embassy employees who lived off

15  site.  The water truck would fill up in the back over here.

16  There was like a well here, a deep well, and then a bathroom

17  facility for the drivers and attendants that worked on the

18  grounds.  That truck would come around, every time it did, to

19  come out right through this gate out on the street and then

20  begin its delivery.

21      On the morning of the bombing, we know that that truck had

22  filled up its tank with water and was attempting to depart.  As

23  it departed, it is apparent to us, or it was apparent to me and

24  to my staff, that the surveillance by the terrorists was that

25  was when the gate would open up and the Delta would come down.

1    And that was when they decided they would penetrate the

2    perimeter, because otherwise they wouldn't get in.

3         So at that particular moment then, the bomb truck, which

4    had been up in this area here, came down this road and tried to

5    advance into the gate.  The truck had not gotten out yet.  He

6    was still behind the Delta barrier.  There was some sort of

7    altercation that was engaged in, and they couldn't get in and

8    they detonated the truck.

9         That detonation of course was partially absorbed into the

10   guard house, which was shattered.  It was absorbed by the water

11   truck, which is extremely heavy water.  It's like 5,000 gallons

12   of water.  It's a huge, huge weight.  It flipped it up and

13   slammed it up against the embassy, and of course it began to

14   blow down buildings on this side, and then of course the blast

15   damage to the embassy itself.

16   BY MR. FAY:

17   Q.   Water is approximately eight pounds per gallon?

18   A.   It's approximately that.  I don't recall the exact weight

19   of water per gallon.

20   Q.   So 40,000 pounds of water, that would be 20 tons were in

21   that tank, and it was torn off the truck and tossed back against

22   the embassy?

23   A.   Correct.  It took a huge, huge blast to do that.

24   Q.   Did any of the Ultimate Security guards in that guard house

25   survive the attack?

1  A.   No.

2  Q.   Is there anything else in the Exhibit P-15 that you wanted

3  to comment on?

4  A.   No.  Well, I can see over here, this area right here, this

5  is part of the bay area --

6          THE COURT:  I think you're going to have to scope it

7  out.  Otherwise, it doesn't mean anything.  Use it to back up.

8  There you go.

9          THE WITNESS:  Okay.  Here's the embassy again, and

10 this is part of the bay, and debris from here flew all the way

11 out over into this area here, and it pelted the roofs and in

12 fact tore off parts of the roofs of buildings around the embassy

13 as well.  Not to mention the residences that were right here.

14 Our headquarters was in a building right here, which is tough to

15 tell the difference between the trees and the roof of the

16 building.  Its roof was completely torn off.  It was a clay tile

17 roof.  It became uninhabitable except for our purposes, which

18 was a hasty headquarters and command post.

19 BY MR. FAY:

20 Q.   One last question on Exhibit P-2.  Can you estimate the

21 distance from where that water truck was stopped with the 20

22 tons of water on it, to the place where the tank stopped after

23 the explosion?

24 A.   I would say -- well, of course it was on the photograph

25 right here, and it was blown this way, and my recollection is

1    that distance is about 20 yards.

2    Q.   Okay.  Let me hand you now Exhibit P-3.  And could you

3    indicate what is depicted in P-3?

4    A.   This is one of the vehicles that was parked as you face the

5    embassy and the gate, it was parked to the left of the gate,

6    outside the perimeter of the fence and very near the guard

7    house.  Of course, it was an SUV of some sort.  I don't recall

8    that we bothered to identify every single one of them.  We found

9    them to be simply incidental damage and we had them removed

10   quickly.

11   Q.   How far was that approximately away from the explosion?

12   A.   That would have been, based on the shape of the fence line

13   here, we're looking at about 10 yards.

14   Q.   And now I'll hand you what has been marked and admitted in

15   evidence as Exhibit P-4.  What does that depict?

16   A.   This is another view of the water tank.  You can see of

17   course the damage and the fact that it's been ripped from the

18   frame completely.  These are the tires of the frame as well, and

19   this is of course part of the frame of the truck that's laying

20   this way up against the building.

21   Q.   And let me hand you what has been marked and admitted as

22   Exhibit P-5.  Could you describe what that photograph depicts?

23   A.   This is another SUV that was damaged.  This, on the other

24   hand, is on the right side of the gate when the bomb detonated.

25   You notice the damage of that.

1      Now, one of the unique things we found -- it wasn't unique

2  to bombing, but it was unique to this crime scene, is that

3  explosions bounce.  So some vehicles were in this kind of

4  condition and the condition of the one before, but other

5  vehicles, sometimes just right next to them, were simply mashed

6  but not almost burned to the ground like this.

7  Q.   Let me hand you what has been admitted as Exhibit P-6.  Can

8  you identify what's depicted there?

9  A.   This is a picture facing outward.  This post here is where

10 part of the gate was.  This is a residence of an embassy

11 employee.  And this is a curb here, stone curb.  This residence

12 here had with it several children who ordinarily were playing in

13 the front yard at the time of the bombing, but they were on a

14 vacation picnic and not present at the house.

15     This is another residence that was a little bit less

16 damaged.  This is one of the cars that was literally blasted

17 across the street.  And of course this rubble right here is the

18 guard house.

19 Q.   That was the guard house?

20 A.   That's the guard house.

21 Q.   Let me hand you another photograph of the guard house,

22 Plaintiffs' Exhibit P-7.

23 A.   Well, here you see, this is taken as you look at the gate,

24 you have to turn this way and move next to the guard house.  So

25 basically you're looking through the side of the guard house.

1    This is the back of the guard house, this is the water trailer

2    that slammed up against part of the embassy building, and over

3    here on this side is where the gate was in the explosion.  So it

4    literally cavitated out that entire part of the bunker.

5    Q.    What is what looks like spaghetti hanging down?

6    A.    That is steel reinforcement for concrete to make it very,

7    very sturdy.

8    Q.    So they would have been buried in the middle of the

9    concrete.

10   A.    That's correct.  Generally in the middle of the concrete.

11   Q.    What happened to the concrete?

12   A.    Well, you see bits and pieces of it laying all about.  Much

13   of it was just pulverized and blown away as dust, varying to

14   chunks the size of a human head, to some somewhat larger.  It

15   was basically shattered.

16   Q.    How thick was that wall before the explosion as best you

17   can determine?

18   A.    My recollection is between 8 and 12 inches.

19   Q.    And let me hand you what has been marked and admitted as

20   Exhibit P-8.

21   A.    All right.  This is another angle.  This is up the street.

22   Let me get back to the -- this was taken from down this

23   direction, down that street.  This is on the public way going by

24   the embassy.  These were all cars of employees that were parked

25   there along the fence line of the embassy.  The bomb detonated

1     off in this area here.

2          You can see, not very well, regrettably, in this picture,

3     this vehicle over here is damaged.  Then basically these are,

4     except for windows blown out, pretty much left intact, and then

5     the explosion, again the force bounced and hit the tops of these

6     vehicles and crushed them.

7          And then of course you see the burn damage of the foliage.

8     You see the blast damage and probably oil from the truck

9     splattered up against the side of the building, along with body

10    fluids, shall we say.

11    Q.   Leaving that up for just a moment and directing your

12    attention to the building, the guard house would have been over

13    here?

14    A.   Yes.  On the other side of those -- right here.  This is

15    where the guard house would be.

16    Q.   And I take it that would have been between the truck

17    carrying the bomb and the embassy itself?

18    A.   Well, it certainly would have been between the main part of

19    the embassy and the truck bomb, but it was beside the water

20    truck.

21    Q.   Okay.  And then this part here of the embassy, the wall was

22    actually torn down?

23    A.   Yes.  They were literally blown in.

24    Q.   And that distance again from the water truck, or from the

25    bomb-carrying truck to the embassy would have been --

1   A.   About 20 yards.  I want to point out, if I may, these

2   louvers you see here, they are not wood.  They were also

3   reinforced concrete.

4   Q.   Let me hand you what is admitted as Plaintiffs' Exhibit

5   P-9.  Could you describe what that photograph depicts?

6   A.   This is a direct on photograph from approximately where the

7   bomb went off of the guard house.

8   Q.   Okay.  And --

9   A.   With the embassy behind it and the annex slightly over

10  here.

11  Q.   Is it possible to point to the area where you found the

12  depression in the ground from the explosion?

13  A.   That would have been right about here.

14  Q.   Is the photographer standing in the depression?

15  A.   Well, he's standing right across, but the lens shoots over

16  top of it.

17  Q.   Let me hand you now what has been admitted as Plaintiffs'

18  Exhibit P-10.

19  A.   All right.  This is the Delta barrier which was just inside

20  the gate and beside the guard shack.

21  Q.   And in that picture it has been knocked down.  It's in a

22  down position?

23  A.   Well, what we surmised, or what I certainly surmised is

24  that it was up, and the blast hit it with such force that

25  regardless of the stays on it, it would cause it to bounce back

1    and forth and slam shut.

2    Q.   That would be with the force of the explosion coming back

3    as Mr. Reed testified to?

4    A.   Well, see, this is all concrete back here.  It's pivoted on

5    the ends, and then of course it generally raises up like this,

6    and there are stays so it only raises up so far.  Those are

7    usually big steel stays on the pivot side of the ramp.  Well, it

8    bounced and came back down.  The blast was so great it would

9    have torn the hydraulics out.

10   Q.   Are these pretty much, all these Delta barriers pretty much

11   standard with about an inch of armor plate?

12   A.   I don't know the quality of steel, there's various grades,

13   but it's very heavy grade steel, and it's perhaps an inch thick.

14   Q.   Let me hand you now what has been marked as Plaintiffs'

15   Exhibit P-11.  Could you indicate what's depicted in that

16   photograph?

17   A.   Yes.  One of the difficulties we had is, because the force

18   of the explosion had so shattered the vehicle, we, like in

19   Nairobi, had great difficulty finding and identifying a serial

20   number to identify the kind of vehicle.  There was nothing much

21   left.

22        The engine was bounced around.  We didn't find it at the

23   time, and I think even when we did, there was no serial number

24   left on it.

25   Q.   Tell us how you found that piece.

1    A.    This particular piece, I have to admit that at some point

2    in time during the investigation we were getting a lot of

3    pressure to produce results, and we simply were not finding the

4    forensic evidence that we needed to identify the vehicle or any

5    body.  One evening, after I had dismissed my investigators and

6    search teams, I was mulling and contemplating the circumstances

7    and walking back and forth on that main street there, which we

8    were gradually working.  And there were still some vehicles

9    there.  We had begun to pull some of the burnt-out vehicles out.

10        At one particular point I looked down and saw this black

11   piece of metal which didn't look like it was related to the

12   vehicle that was there that was burnt to the ground, so I kicked

13   it, and as I kicked it, it flipped over and I noticed some

14   numbers on the edge.  So then I immediately went back to my

15   technicians and said I think I just found something.

16        And they walked over, they picked it up, recovered it, and

17   then used solvents, and the area which appeared to be numbers

18   were in fact numbers.  Well, these numbers were sufficient

19   enough for us to go back to Nissan Corporation and identify the

20   vehicle.

21   Q.    Let me hand you what's been marked and admitted as

22   Plaintiffs' Exhibit P-12.  And what does that depict?

23   A.    That is the Nissan Atlas, or a facsimile of the Nissan

24   Atlas that was used as the bombing vehicle.

25   Q.    Now, tell us what you did with the numbers, the engine

1    identification or vehicle identification?

2    A.   Well, we of course had our liaison, or legats in Tokyo

3    consult with Nissan and all the other manufacturers, but Nissan

4    realized that was their piece.  So they identified the vehicle

5    for us.  And then we started to learn about the process.  And

6    like in the Nairobi situation, we learned that there are very

7    high tariffs for new vehicles coming in to Tanzania, where the

8    tax law is written.  So what the Tanzanians like to do is buy

9    used vehicles from Japan which do not have the same heavy

10   tariffs.

11        So the Japanese take their used vehicles, bundle them up by

12   the hundred and put them in freighters and then ship them to

13   places like Mombasa, and then these things are sold as used

14   vehicles throughout the countryside.

15   Q.   Using that, were you able to identify who purchased the

16   vehicle in Tanzania?

17   A.   Ultimately we did identify who purchased it, and that was

18   one of the key clues for us to follow the track of the vehicle.

19   Again, it was a hand search, just like you saw on the tape in

20   Nairobi.

21   Q.   And were you able to identify the organization the

22   purchasers of the vehicle were from?

23   A.   Yes.  I recall we did identify them.

24   Q.   Where were they from?

25   A.   They were initially locals, local Tanzanians, and then of

1    course it moved several times to its ultimate owners.

2    Q.   And what organization were they part of?

3    A.   Well, they were clearly al-Qaeda.

4    Q.   Let me hand you what has been admitted as Plaintiffs'

5    Exhibit P-13.  Could you indicate what's depicted in that

6    photograph?

7    A.   Yes.  This is another one of the smashed vehicles that's on

8    the left side of the gate, guard house, along the embassy's

9    fence line.  I would like to point out also in this fence line

10   here, shrapnel from the vehicle and the bomb became embedded,

11   which, as we systematically moved down the road, we found it.

12   We found the base of like an acetylene or oxygen bottle that was

13   embedded in the fence.  They all have unique serial numbers, and

14   that allowed us to track that bottle to a specific welding shop

15   in the Dar es Salaam area, and ultimately to where the bomb was

16   constructed.

17        The bomb vehicle, constructed differently than the one in

18   Nairobi, although I'm not intimately familiar with how that one

19   was constructed.  The internal box of this had a series of racks

20   welded into it, and somewhere between 20 and 32 bottles of gas,

21   acetylene and oxygen, and then of course the couple tons of TNT

22   in there.

23        The purpose, we were led to believe, was to make it, number

24   one, directional, so it would blast and give some direction, and

25   then, it's a belief primarily amongst Hezbollah, who pioneered

the technique of using oxygen and acetylene bottles to what they

believe enhance the explosion.

Q.   Does that have the effect of enhancing the injuries to

people who are nearby?

A.   Well, I suppose it would, yes.  In my discussion with my

bomb technicians, there was some debate among them whether this

did anything other than just to increase the flash and heat, or

whether it actually increased the blasting capacity of it.

Q.   Let me hand you now what is admitted in evidence as

Plaintiffs' Exhibit No. 14.  And what does this depict?

A.   This is the blast hole again, and here again you can see

the measurements, the blast areas and eight-foot diameter and

the four foot deep.  It seems odd because it's taken at an

angle, but you see here the vehicle leaf springs that were

pointed out in the earlier photograph.  And of course, all sorts

of bomb debris.  A lot of this greenish stuff is singed leaf

matter that had fallen from the tree down onto the site.

Q.   Thank you.  Could you resume the stand, and I have a couple

of other questions.

     (The witness resumes the stand.)

     How many individuals, as far as you could tell, were in the

truck that was carrying the bomb?

A.   We only knew, or thought we knew of one.  We could not find

any evidence of a second in the bomb truck.  The water truck,

which many people initially thought was the bomb truck, had two

1    people.  It had the driver and the so-called water boy, both of

2    whom we found no trace of.

3    Q.    Was your team able to estimate the amount of explosive used

4    in this attack from all of the evidence that you gathered?

5    A.    Yes.

6    Q.    And was -- well, why don't you give --

7    A.    The preliminary indication was at least 1,000 pounds of

8    TNT.  That was later recalculated up to almost 2,000 pounds of

9    TNT.

10   Q.    Would you have an opinion within a reasonable degree of

11   accuracy as an expert in terrorism and explosives as to whether

12   that is in fact a reasonably accurate estimate of the amount --

13   A.    Yes, I do.  I believe it is.

14   Q.    What was the condition of the embassy building after the

15   attack?

16   A.    Well, the embassy was severely compromised.  When we got

17   there we thought it was okay, it gave us enough time to go

18   through and survey every room.  We found no room that was

19   undamaged.  We found blood trails down the stairs, we found them

20   in the various rooms.  We noticed that the clocks had all

21   stopped.  Pretty much all the glass had been broken, and ceiling

22   tiles and everything else had fallen down.

23        So it was fairly well damaged.  But the significance to us

24   was debris started falling from the outside.  And the engineers,

25   both the State Department engineers and the CBs who came with

1  us, declared the building unstable and it could collapse at any

2  time.  So they brought in contractors from one of the --

3  Skanska, I believe it was, some company that does international

4  construction contracting, to brace it up during the course of

5  our investigation, which they did.  But ultimately the building

6  has been torn down as totally unstable.

7  Q.   Was the embassy building itself constructed in a similar

8  fashion to the guard house outside it?

9  A.   Well, of course it's a much larger building, and it was

10  built by the Israelis, presumably with the intent to stop

11  explosives, since they were the subject of so many terrorist

12  attacks, particularly car bombs.  It was a very hard building,

13  certainly built out of concrete.  The main building especially.

14  The annex, which I believe was built somewhat later in time, was

15  a little less sturdy.

16  Q.   From your service in the armed forces of the United States,

17  your training in the FBI, your experience in crime scene

18  investigation, knowledge of explosives, do you have an opinion

19  within a reasonable degree of certainty as to whether the

20  embassy building would have collapsed had the bomb-carrying

21  truck been able to pass the Delta barrier and pull up to the

22  side of the embassy building?

23  A.   My belief is that that building would have probably

24  collapsed to the ground.

25  Q.   You've seen explosives in your military training used to

1   attempt to blow up as a test buildings and so forth?

2   A.   Not buildings necessarily, but vehicles of all kinds.

3   Q.   Putting this in the vernacular, was this attack an amateur

4   job or the work of professionals?

5   A.   This required a great deal of professionalism, not only to

6   construct the device, which by the way it was built in Dar es

7   Salaam area, and for anybody that's ever been to Dar es Salaam,

8   with some very narrow exceptions, the roads are virtually

9   cratered, and for this bomb to hold together from its

10  construction site on the trip to the embassy was almost

11  fantastic in and of itself.  It was very, very well built.

12       Secondly, the surveillance, the timing of the attack, their

13  technique of getting it in, the fact that they all disappeared,

14  with the exception of the driver, who vaporized, is indicative

15  of a serious professional terrorist operation.

16  Q.   Prior to being here today and listening to the testimony in

17  the courtroom with regard to Sudan -- Your Honor, indulge me for

18  just a moment.

19            THE COURT:  Certainly.

20       (Plaintiff counsel conferring.)

21  BY MR. FAY:

22  Q.   Let me just give the definition of material support as used

23  in, I think it's 2239A of Title 18, Section 2339A.  "Material

24  support or resources means any property, tangible or

25  intangible" -- "means any property, tangible or intangible, or

1    service, including currency or monetary instruments or financial

2    securities, financial services, lodging, training, expert advice

3    or assistance, safehouses, false documentation or

4    identification, communications equipment, facilities, weapons,

5    lethal substances, explosives, personnel, and transportation,

6    except medicine or religious materials."

7        Using that as a definition and with what you know from

8    reviewing all those documents and actually testimony before, do

9    you have an opinion as to whether what Sudan did amounted to

10   material support to this terrorist attack?

11            THE COURT:  Wait.  Are you going to explore the basis

12   of this opinion?

13            MR. FAY:  Sure.

14            THE COURT:  Okay.

15            MR. FAY:  Go ahead.

16            THE WITNESS:  Yes.  I have no doubt that Sudan

17   provided material support to al-Qaeda in the conduct of this

18   operation.  Prior to this operation, al-Qaeda was given

19   sanctuary in Sudan.  They had huge property on which to conduct

20   training.  They were protected by the authorities of Sudan.

21   They were given free travel to and from.  And we know of course

22   that Wadih el Hage had traveled into Nairobi or into Kenya from

23   Sudan unmolested, and probably wasn't taking the waters while he

24   was there.

25        Of course, most of what they do is covert and beyond the

1   ken of normal people, but the fact of the matter is they were

2   able to conduct operations with impunity, or relative impunity

3   within Sudan, and ultimately that extended into Kenya and

4   Tanzania.

5   Q.   Prior to this meeting in the Sudan that there's been --

6   that there will be testimony about and the plea of Ali Mohammed,

7   there was a warrant issued, I believe, by the FBI for Imad Fayez

8   Mughniyah.  Was at that time, in 1995, were both Osama bin Laden

9   and Imad Fayez Mughniyah known across the world as terrorists?

10  A.   I would say yes.  Certainly Mughniyah, he became of great

11  attention to us after the Marine Corps barracks bombing in

12  Lebanon, and we followed his career throughout.  He was involved

13  in almost every major terrorist operation in the Middle East.

14  Certainly his organization, Hezbollah, particularly in the Bekaa

15  Valley and the southern parts of Beirut, trained all comers.

16      Hezbollah is a Shia religious sect, but they trained not

17  only Shia, but also Sunni.  They trained Palestinians, who are

18  generally Sunni.  And of course they worked very closely, hand

19  in glove with Syrians, who are Alawites, and Iranians were Shia,

20  but in the Bekaa Valley those who came for training were

21  trained, notwithstanding their sect of religion.

22          MR. FAY:  Your Honor, I'm going to ask that this

23  opinion -- I'm not asking the Court to accept it totally across

24  the board, but it is admissible, we would argue, under this --

25          THE COURT:  He's already given his opinion.  It's in

1    the record.  If you're asking me to make a decision in the case

2    now --

3            MR. FAY:  No, no.  I don't have any other questions of

4    the witness, Your Honor.

5            THE COURT:  Is the testimony you just gave about your

6    knowledge concerning the support Sudan gave, and then also to

7    some degree the support Hezbollah gave, based on information

8    that you became aware of during the course of your

9    responsibility at the FBI prior to this bombing?

10           THE WITNESS:  Some of it, yes.  Without a doubt.

11           THE COURT:  And after the bombing as well, from

12   reading reports and the like?

13           THE WITNESS:  Yes, sir.

14           THE COURT:  Anything else, Mr. Fay?

15           MR. FAY:  No, Your Honor.  Thank you.

16           THE WITNESS:  If I may, Your Honor.  In the conduct of

17   my office, in the FBI, we received huge quantities, literally

18   reams of intelligence reporting every single day, and I made it

19   a point to read every important one there was, and ensure that

20   my subordinates read it.  So we knew the nature of our foe, of

21   our opponent.  And without a doubt, al-Qaeda was operating in

22   the area.  One of their folks whose name escapes me drowned in

23   Lake Victoria.  We knew all of that in advance.

24       And of course we knew that, contrary to public awareness

25   that Sunnis and Shias hated each other, they actually worked

```
 1    very closely together with Hezbollah and all other comers.

 2              THE COURT:  All right.  Thank you.

 3              THE WITNESS:  Yes, sir.

 4              THE COURT:  Maybe we'll take our afternoon break.

 5    Will we be able to complete the next witness this afternoon?

 6              MR. FAY:  Yes.

 7              THE COURT:  Because I'd like to do that so she doesn't

 8    have to get split between two days.

 9              MR. PERLES:  May I have one minute with

10    Mr. MacAllister?

11              THE COURT:  You may.

12         (Plaintiff counsel conferring.)

13              MR. FAY:  Your Honor, we may wish to recall

14    Mr. Piernick, and I would ask the Court's permission on that.

15    This will not be for long testimony.

16              THE COURT:  Put him back on?  Oh, you mean later on?

17              MR. PERLES:  Later on.

18              MR. FAY:  Yes.

19              THE COURT:  That's all right.  There's no prejudice to

20    doing that.  All right.  We'll be back in 10 minutes and proceed

21    with the next witness.

22         (Recess from 3:16 p.m. to 3:32 p.m.)

23              THE COURT:  Mr. Karp.

24              MR. KARP:  If it please the Court, we would like to

25    call Ellen Bomer to the stand.
```

```
 1              THE COURT:  Please proceed, Mr. Karp.
 2                         DIRECT EXAMINATION
 3   BY MR. KARP:
 4   Q.   Good afternoon, Ms. Bomer.  Give us your full name, don't
 5   give us your address at this point, just tell us what state
 6   you're residing in.
 7   A.   My name is Ellen Bomer and I reside in Texas.
 8   Q.   And to whom are you married?
 9   A.   Don Bomer.
10   Q.   And any children?
11   A.   Yes.  I have a son, 41, and two grandchildren.
12   Q.   Just give us a little brief background.  Where were you
13   born, ma'am?
14   A.   I was born in Coatesville, Pennsylvania.
15   Q.   All right.  And what's the extent of your education?
16   A.   I have a BSBA.  That's a bachelor of science, business
17   administration.  Concentration in economics.  And I also was
18   pursuing a master's in contract management and acquisition.
19              MR. KARP:  Your Honor, I don't know if we went through
20   the formality of swearing her in.
21              THE COURT:  Mr. Bradley is going to do that right now.
22   I was just letting you proceed with some preliminaries and now
23   Mr. Bradley's going to swear her in.
24          ELLEN BOMER, WITNESS FOR THE PLAINTIFFS, SWORN
25                    DIRECT EXAMINATION CONTINUED
```

```
 1    BY MR. KARP:

 2    Q.    I think you were telling the Court about your educational

 3    background.

 4    A.    Mm-hmm.  I have a BSBA from University of Alabama, and I

 5    have a partial master's from FIT in contract management and

 6    acquisition.

 7    Q.    Did there come a time when you came to work for the

 8    United States government?

 9    A.    I began working for the U.S. government in 1977, in

10    Germany.

11    Q.    From that time to August 7, 1998, were you continuously

12    employed by the U.S. government?

13    A.    With maybe the exception of three months, yes.

14    Q.    All right.  Let me direct your attention to August 7, 1998.

15    What were you doing for the U.S. government on that date?

16    A.    I was on a temporary assignment from Jeddah, Saudi Arabia.

17    I worked for Commerce Department.  I was there to relocate the

18    foreign service commercial office from the American embassy to a

19    commercial site.

20    Q.    And just explain to the Judge what is the foreign

21    commercial service office?

22    A.    In all outside of the U.S. and all embassies and

23    consulates, Commerce Department has a foreign commercial service

24    office attached to it.  It's under the protection of the embassy

25    or the consulate.  It's there to promote trade with local
```

1    businessmen, and we actually make money for the U.S. government.

2    Q.   All right.  As of August 7, 1998, how long had you been in

3    that office?

4    A.   One month.

5    Q.   All right.  And where was your office located in the

6    embassy in Nairobi?

7    A.   The back of the building.  The part that there's nothing

8    left.

9    Q.   All right.  And on the morning of August 7, 1998, you were

10   in your office at the U.S. embassy in Nairobi?

11   A.   Yes, sir.

12   Q.   Tell the Court briefly what you remember happening that

13   morning.

14   A.   I was in my office with Moses, my driver, a local Kenyan,

15   and Gus, the commercial attache, as well as Riz Khaliq had just

16   left to go with the ambassador to the building, I think the

17   finance building a couple of buildings down behind us.  So I was

18   there in my office with Moses.  And we heard these two loud

19   (indicating) like that.  And I said, what is it?  And then Moses

20   jumped up to look out these transom windows, and that's all I

21   remembered.  I never heard anything after that.

22       Sometime later, I don't know when, I woke up and I was flat

23   on my back underneath, and I could not move.  I couldn't get up.

24   I tried to get up.  I couldn't.  I remember I took something out

25   of my mouth and threw it.  I couldn't see anything.  I laid

1    there thinking it was a bomb.  It had to have been a bomb.  And

2    I started taking inventory, whether or not I was hurt, if I

3    could feel anything.

4    Q.   Could you feel anything?

5    A.   No, sir.  I felt nothing.

6    Q.   Could you hear anything?

7    A.   No.  I couldn't hear anything, and I couldn't see anything.

8    And I wasn't worried about the seeing, because I figured, well,

9    I may be just in shock and this is going to pass, and they'll

10   find me and they'll get me out and then I'll be okay.  And then

11   I started getting really afraid.  And then I started saying,

12   God, please give me strength.  Please give me strength.  Please

13   give me strength.

14        And then I could tell that the anxiety was coming in -- I

15   could feel anxious and just really afraid.  And then I started

16   bargaining with God and I started saying please, you can have

17   one eye, just leave me one.  You take one, but leave me one.  I

18   can get along just fine with one.

19        And then I started feeling things moving around in me.  And

20   I started -- I couldn't do much with this arm, so I lifted this

21   arm, and I was saying, "I'm over here.  Please, I'm over here."

22   And I wasn't yelling.  I was speaking kind of soft.  I don't

23   think I was yelling.  And next thing I know, somebody grabbed my

24   left arm and I screamed, and then they started digging me out.

25   And then they put me on a stretcher.

```
 1           And they, eventually I remember them putting me in the back
 2      of a vehicle.  And Nairobi has a lot of ruts in the streets.  I
 3      remember we must have hit every single rut in every street that
 4      we went down, because it was -- I felt those ruts.  I felt it
 5      then.  And then they took me into this medical clinic and they
 6      put me down on the floor, and they saw the badge pressed between
 7      my breasts, and they said oh, she's an American citizen.  Don't
 8      leave her here.  Take her to Nairobi hospital.  And so then they
 9      picked me up, put me back in that vehicle, back on the ruts, and
10      we went to the hospital.
11           And then in the hospital it was mass pandemonium.  I mean,
12      it was chaotic, people everywhere crying, upset.  It was
13      horrible in the hospital.
14      Q.   How long did you stay in that hospital?
15      A.   I would guess maybe three, four hours.
16      Q.   And then where were you taken next from there?
17      A.   I was medevaced to Landstuhl Army medical hospital in
18      Landstuhl, Germany.
19      Q.   And what do you remember happening, just very briefly, in
20      Landstuhl?
21      A.   Well, I remember getting off the plane and driving up the
22      hill to Landstuhl, because we were stationed just maybe 30 miles
23      from there.  And I remember thinking oh, God, I'm going to be
24      safe, I'm going to be safe.  And we got to Landstuhl, and I
25      remember my husband coming, and I remember him taking my hand,
```

1    and then I thought, well, okay.  I'm okay now.  Everything's

2    going to be fine.  And that's all I remember about Landstuhl.

3    Q.   How long do you think you stayed at the Landstuhl hospital?

4    A.   The next time I had reality, it was in the back of an

5    ambulance on the way to Walter Reed Medical Center, and I

6    believe that was Sunday morning.

7    Q.   All right.  So there came a time when you were medevaced

8    from Landstuhl to Walter Reed.  Correct?

9    A.   Yes, sir.

10   Q.   Can you just estimate the amount of time you were probably

11   at Landstuhl all combined?

12   A.   I would guess anywhere from 12 to 18 hours.

13   Q.   And then you came to Walter Reed?

14   A.   Yes.

15   Q.   All right.  Just very briefly, because the details are for

16   another day, but just briefly tell His Honor what injuries you

17   sustained as a result of this bombing.

18   A.   I had massive injuries to my eyes, both.  Retinas were both

19   detached, perforated.  This eye had a hole in it, the white

20   part, and they had to patch it with an aorta.  I have no lens,

21   no pupils.  It was a miracle that I still have eyeballs.  My

22   eyes are full of glass behind the balls.  There's glass in the

23   bones still.

24        I have a hole in my head up here.  It was like something

25   had scraped me and gone off.  My right eardrum was damaged, was

1    gone.  My left eardrum had a hole in it.  I had stomach and --

2    what do you call it, cuts?  I was covered from about here to my

3    knees.  So most of the vital parts of my body were protected,

4    but both of my feet had slices and my left elbow was dislocated.

5    Q.   How many surgical procedures have you had in an effort to

6    care for these injuries?

7    A.   34.

8    Q.   And even after 34 procedures, has your sight ever been

9    restored?

10   A.   There was a time when I had a little bit of vision back in

11   2000, but then it went, and I've never had any since.

12   Q.   And just tell the Court how you manage today, how do you

13   manage each day now?

14   A.   Well, I manage okay.  I have -- I'm HIV positive, which I

15   contracted in Nairobi.

16   Q.   Tell the Judge just briefly about that.

17   A.   When they first took me to that medical clinic and put me

18   down on the floor, my face -- what I was told by Dr. Gretchen

19   McCoy, the medical doctor at the embassy, my face was like

20   ground meat, and I had a lot of blood and a lot of cuts and

21   scrapes and everything.  They laid me down on the floor in the

22   room, and blood was everywhere, and they would come in with

23   buckets of water to slosh the blood away, and that's where I

24   contracted HIV.

25        When I said I had a little vision in 2000, that was before

1    the HIV started to assert itself.  And I didn't even know I had

2    it until 2001.  I almost died of it then, because I had

3    full-blown AIDS.  But it went and -- thank the Lord.  I'm not

4    supposed to have it, so.  I'm well medicated and I don't have

5    anything from that except I'm extremely careful.  I don't want

6    anybody to touch me if I'm cut or -- I'm just very careful that

7    way.

8         And you asked how I'm doing?  I'm doing as well as any

9    blind person could be in a sighted world.

10   Q.   And prior to the bombing did you ever have the HIV virus in

11   any way at all?

12   A.   No, sir.  No.

13            MR. KARP:  Your Honor, I have nothing further at this

14   time.

15            THE COURT:  All right.  No other counsel have any

16   questions for Ms. Bomer?  Ms. Bomer, thank you very much for

17   coming today, and thank you for testifying, and thank you as

18   well for your service and sacrifice.

19            THE WITNESS:  Thank you, sir.

20       (The witness steps down.)

21            MR. KARP:  Your Honor, I'd just like to briefly put on

22   her husband to authenticate this photograph that you

23   conditionally --

24            THE COURT:  You may.

25       **DONALD G. BOMER, WITNESS FOR THE PLAINTIFFS, SWORN**

```
 1              THE COURT:  Good afternoon, Mr. Bomer.

 2              THE WITNESS:  Good afternoon, Your Honor.

 3                     DIRECT EXAMINATION

 4   BY MR. KARP:

 5   Q.   Please give us your full name, but not your address, sir.

 6   A.   Donald Gene Bomer.

 7   Q.   How are you related to Ellen Bomer?

 8   A.   I'm her husband.

 9   Q.   When were you married?

10   A.   We were married in 1973.

11   Q.   And you reside with her in Texas today; is that right?

12   A.   Yes.

13   Q.   I'd like to show you that which has been marked as

14   Plaintiffs' Exhibit No. C.  Let me just hand you that, sir, if I

15   can.  Do you see that Exhibit C in front of you, sir?

16   A.   Yes.

17   Q.   Do you recognize the person in that photograph?

18   A.   I do.

19   Q.   And who is it?

20   A.   That's my wife, Ellen.

21   Q.   How do you know it's your wife, Ellen?

22   A.   I was standing behind the photographer.

23   Q.   When the photo was taken?

24   A.   Yes.

25   Q.   Where was that photo taken?
```

1    A.    At Walter Reed hospital.

2    Q.    Does that photograph accurately depict the way your wife

3    looked at the time the photograph was taken at Walter Reed?

4    A.    And you should have seen her before, when I saw her the

5    first time.   This looks a lot better.

6    Q.    The photograph looks better than when you first saw her?

7    A.    Absolutely.   I almost passed out when I first saw her.

8    Q.    How much time lapsed between the bombing that we've talked

9    about all day today and the taking of that photograph?

10   A.    Less than 48 hours.

11   Q.    Okay.

12            MR. KARP:   Your Honor, I have nothing further.

13            THE COURT:   You called this Exhibit C.   It's actually

14   Exhibit Z.

15            MR. KARP:   Exhibit Z.   And we would like to move its

16   admission.   I know it was conditionally --

17            THE COURT:   It's been admitted conditionally.   I will

18   remove the condition.   It is admitted.

19                            (Plaintiff Exhibit Z

20                             received into evidence.)

21            MR. KARP:   Thank you, Mr. Bomer.

22        (The witness steps down.)

23            THE COURT:   Ms. Bomer and Mr. Bomer, thank you very

24   much.

25            MR. MACALLISTER:   Your Honor, we have a short video

1    deposition.  What time do you think we'll go to today?

2           THE COURT:  How much do you want to accomplish today?

3           MR. MACALLISTER:  As much as possible.

4           THE COURT:  Put on the video deposition.  We'll see

5    where we are.  I will not -- in all likelihood I will not go

6    longer than 5:00, unless it's to facilitate the schedule of a

7    witness, but I generally am going to be available up to 5:00.

8           MR. MACALLISTER:  Thank you, Your Honor.  We have the

9    deposition of George Mimba, which is marked as -- which will be

10   marked as Exhibit X.  George Mimba was in the National

11   Geographic video earlier.

12          THE COURT:  Spell his name for the record.

13          MR. MACALLISTER:  M-I-M-B-A.

14       (Video deposition of George Mimba is played.)

15          MR. MACALLISTER:  Your Honor, I would move Exhibit X

16   into evidence.  It's a full DVD of the entire deposition, which

17   includes a lot of information about his injuries.  I think it's

18   cumulative at this point.

19          THE COURT:  All right.  Well, the entire deposition

20   will be admitted.

21          MR. MACALLISTER:  I also have a deposition transcript,

22   which I will move in as a separate exhibit.

23          THE COURT:  Are they separately marked or are they

24   both X?

25          MR. MACALLISTER:  X-1, X-2?

1            THE COURT:  That's fine.

2            MR. MACALLISTER:  X-2 would be the deposition

3    transcript.

4            THE COURT:  All right.

5                         (Plaintiff Exhibits X-1 and

6                         X-2 received into evidence.)

7            MR. MACALLISTER:  Your Honor, you have the binders.  I

8    have a three-hole punch of the transcript.  Do you want that?

9            THE COURT:  Oh, it's not in already?

10           MR. MACALLISTER:  No, sir.

11        (Transcript tendered to the Court.)

12           THE COURT:  We'll put it in there.

13           MR. MACALLISTER:  Your Honor, this is the deposition

14   of Jomo Boke, B-O-K-E.  He was one of the security guards.

15           THE COURT:  How long is it?

16           MR. MACALLISTER:  This I believe is six or seven

17   minutes.

18           THE COURT:  Did you say the first name is Jomo?

19           MR. MACALLISTER:  J-O-M-O.  It's Exhibit Y.

20        (Video deposition of Jomo Boke is played.)

21           MR. MACALLISTER:  Your Honor, I would move Exhibit Y-1

22   into evidence, which would be the DVD of this deposition.

23           THE COURT:  And you have a transcript as well?

24           MR. MACALLISTER:  Yes, Your Honor, which would be Y-2.

25           THE COURT:  All right, that's fine.  Y-1 and Y-2 are

1     admitted.

2                          (Plaintiff Exhibits Y-1 and

3                          Y-2 received into evidence.)

4          THE COURT:  We're loading another one?

5          MR. FAY:  Your Honor, I have the deposition of

6     Dr. Paz.  That's about an hour and 10 minutes.  I'd rather have

7     that in one gulp than start it today and --

8          THE COURT:  I don't want to start a deposition that's

9     an hour and 10 minutes.

10         MR. FAY:  Other than that, I have the people that are

11    assigned for tomorrow, Dr. Patrick Clawson, I believe Dr. Levitt

12    will be here.  He's an expert of Mr. MacAllister's.  And Jim

13    Owens.  Mr. Owens, I think he's going to take more than -- I

14    would prefer to start that tomorrow morning, I think.

15         THE COURT:  I'll let you.  You've filled up to almost

16    4:30.  We can adjourn for the day, and then tomorrow you have

17    listed Dr. Clawson, Dr. Paz, and Dr. Levitt.  And those are the

18    three pieces of evidence you would intend.  Will there be other

19    depositions as well, or just those three for tomorrow?

20         MR. FAY:  Dr. Clawson will be live.  Dr. Paz will be

21    the deposition.  Dr. Levitt will be live.  I think it's possible

22    that we will get to Mr. Owens tomorrow, too.

23         THE COURT:  All right.

24         MR. FAY:  You can't ever tell in these things.

25         THE COURT:  You're right, you can't ever tell.  But

1    it's easier to tell when there's no cross-examination.

2              MR. FAY:  Yes, much.

3              THE COURT:  It's easier to estimate the time.  You

4    should have pretty good estimates, so I'd imagine we're not far

5    off those estimates.  So we will see you tomorrow.  We'll be

6    ready to go at 9:30, all right?

7              MR. FAY:  Yes, Your Honor.

8              THE COURT:  Good.  We'll see you then.

9              MR. FAY:  Thank you very much, Your Honor.

10             THE COURT:  Thank you.

11         (Proceedings adjourned at 4:27 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **INDEX**

2    **WITNESS:**                                    **PAGE:**

3
     Worley Lee Reed    Direct Examination ................  19
4    Kenneth Piernick   Direct Examination ................  45
     Ellen Bomer        Direct Examination ................  87
5    Donald G. Bomer    Direct Examination ................  95

6
                          * * * * *
7
                     **EXHIBITS RECEIVED**
8
     Plaintiff Exhibit Z ...................................  44
9    Plaintiff Exhibit K ...................................  47
     Plaintiff Exhibit P ...................................  64
10   Plaintiff Exhibit Z ...................................  96
     Plaintiff Exhibits X-1, X-2 ...........................  98
11   Plaintiff Exhibits Y-1, Y-2 ...........................  99

12                          * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

_____
BRYAN A. WAYNE