UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


JAMES OWENS, et al.,                  .
                                      .
          Plaintiffs,                 .  CA Nos.  01-2244, 04-1536,
                                      .  08-1377, 08-1361, 08-1349
     v.                               .  08-1380
                                      .
REPUBLIC OF SUDAN, et al.,            .  Washington, D.C.
                                      .  Tuesday, October 26, 2010
          Defendants.                 .  9:35 a.m.
                                      .
 .  .  .  .  .  .  .  .  .  .  .  .  . .      Pages 103 through 211

                        DAY 2
                  EVIDENTIARY HEARING
          BEFORE THE HONORABLE JOHN D. BATES
              UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:
                              THOMAS FORTUNE FAY, ESQ.
01-2244                       RONALD KARP, ESQ.

04-1536                       JANE NORMAN, ESQ.

08-1361                       STEVEN PERLES, ESQ.
                              EDWARD MACALLISTER, ESQ.
                              ANDERS FERRINGTON, ESQ.
                              BILL WHEELER, ESQ.

08-1349, 08-1380              MICHAEL MILLER, ESQ.
                              GAVRIEL MAIRONE, ESQ.
                              DAVID DICKENS, ESQ.


Court Reporter:               BRYAN A. WAYNE, RPR, CRR
                              Official Court Reporter
                              U.S. Courthouse, Room 6714
                              333 Constitution Avenue, NW
                              Washington, D.C. 20001
                              202-354-3186


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

P R O C E E D I N G S

THE DEPUTY CLERK:  Your Honor, we have civil action 01-2244, 04-1536, 08-1377, 08-1361, 08-1349, and civil action 08-1380.  We have Mr. James Owens et al. versus the Republic of Sudan.  And Your Honor, all counsel is present, to include Mr. Tayjes Shah.

THE COURT:  All right.  Good morning, everyone.  We are ready to proceed, and will Dr. Clawson be the first witness?

MR. FAY:  No, he will not.

THE COURT:  That just means that the schedule you gave me has changed.

MR. FAY:  Well, just slightly, Your Honor.  He's on a plane which should land over at Reagan National Airport momentarily.  So instead we sort of reversed the order on the schedule, and first of all we'll have the deposition by video of Dr. Reuven Paz.

THE COURT:  All right.

MR. FAY:  Your Honor, while we're getting set up on that, Mr. MacAllister asked about admission of various exhibits. With Your Honor's permission, perhaps at the end of the morning session, we could just briefly go over that to make sure that all of our understandings of what's admitted and what isn't is in conformity.

THE COURT:  That'll be fine.  Get set up on that.

(Video deposition of Dr. Reuven Paz is played.)

```
 1            THE COURT:  All right.  Mr. Fay, do you know whether
 2    Dr. Clawson --
 3            MR. FAY:  He is here.
 4            THE COURT:  Why don't we take a short break and then
 5    we'll resume with his testimony.
 6            MR. FAY:  Yes, Your Honor.
 7            THE COURT:  So see you in 10 minutes.
 8          (Recess from 10:51 a.m. to 11:06 a.m.)
 9            THE COURT:  Mr. Fay.
10            MR. FAY:  Your Honor, at this time we'd call
11    Dr. Patrick Clawson to testify.  Your Honor, while he's coming
12    up, I sort of complete my request that Dr. Paz be qualified.
13            THE COURT:  We can complete that now, and he is
14    qualified as an expert on Islamist terrorism and such groups,
15    and his testimony and his opinions will be accepted based on
16    that designation as an expert.
17        **PATRICK L. CLAWSON, WITNESS FOR THE PLAINTIFFS, SWORN**
18                      DIRECT EXAMINATION
19    BY MR. FAY:
20    Q.   Could you state your full name and address.  In your case
21    so many people know your address, it probably doesn't make any
22    difference.
23            THE COURT:  Don't put a street address on the record.
24            THE WITNESS:  Patrick Lyle Clawson.  And I live at
25    1541 --
```

```
1              THE COURT:  Don't put the street address on the
2    record.
3              THE WITNESS:  I'm sorry.  And I live in Washington,
4    D.C.
5    BY MR. FAY:
6    Q.   You live right here in our nation's capital, I take it?
7    A.   Yes.
8    Q.   Could you describe your education for us post high school.
9    A.   I have a bachelor's degree from Oberlin College and a Ph.D.
10   from the New School for Social Research in New York City.
11   Q.   What has been your major field of concentration since
12   completing your education?
13   A.   Since receiving my Ph.D. in economics, I have studied the
14   Middle East, particularly Iran.
15   Q.   Which languages do you speak fluently, Doctor?  Other than
16   English, of course.
17   A.   Fluently French and Persian.  I know some German and
18   Spanish and Hebrew.  But French and Persian fluently.
19   Q.   To what extent in your line of work do you have occasion to
20   review writings -- by writings I include what's online -- of
21   Iran and of other terrorist nations?
22   A.   I spend a great deal of my time, at least an hour every
23   working day, doing that.
24   Q.   To what extent is there publication by Iran -- by Iran, I
25   mean the government in Iran of course, not an individual -- but
```

1    by Iran of various aspects of their political life and their

2    political objectives?

3    A.   One of the characteristics of the Islamic Republic of Iran

4    is vigorous debate and dissension within the ruling circles.

5    And as a result there's a great deal of information that's

6    available, and indeed a lot of my time and effort just sorting

7    out mud-slinging by various parties against each other to try to

8    discern which elements are true and which are not.

9    Q.   How far does that go in the Islamic Republic of Iran?  In

10   other words, how far do they have to go before they end up

11   peeking out through bars or in some other way silenced?

12   A.   That's changed at different times.  In the last year, since

13   the contested presidential elections in June 2009, the tolerance

14   for dissent has dramatically narrowed.  But in earlier periods

15   there was very vigorous dissent that was tolerated.

16        My favorite example of this is the Iran-Contra affair that

17   was so controversial in the 1980s, it was leaked by the Iranian

18   side, not by the American side.  So the Iranians were even more

19   prone to leaks of national security information than the

20   Americans.

21   Q.   With which United States government agencies do you

22   correspond?  That is, they talk to you, you talk to them, of

23   course.

24   A.   Well, I'm off to Tampa tomorrow to give a presentation to

25   the Special Forces Command down there.  I've done quite a bit of

 1    work with the Central Command in the last year in the U.S.

 2    military.  I speak quite often to people from the National

 3    Security Council and from the State Department.  There was a

 4    time in my life when I did a lot with the Central Intelligence

 5    Agency.  Less so recently.  I would say those are the main

 6    agencies, but that's not the only ones.

 7    Q.   Dr. Clawson, on the subject of terrorism and Iran and Near

 8    East terrorism generally, have you published extensively?

 9    A.   I've published -- I've written or edited 12 books and

10    monographs about Iran.

11    Q.   And over what period of time does that cover?

12    A.   That would be over the last 17 years.  I've also written

13    many other scholarly articles and popular articles, such as

14    op-ed pieces about Iran.

15    Q.   Let me go down a couple.  "Much Traction from Measured

16    Steps:  The Iranian Opposition, the Nuclear Issue, and the

17    West," published in 2010 at the Washington Institute for Near

18    East Policy.

19    A.   Correct, sir.

20    Q.   Now, the Washington Institute of Near East Policy, could

21    you describe that organization?

22    A.   It's a classic think tank, that is to say it's a 501(c)(3)

23    organization, which receives funding from a variety of

24    well-to-do individuals, only Americans, to conduct studies about

25    U.S. foreign policy interests and concerns in the Middle East.

1    Q.    What is your position within the Washington Institute?

2    A.    I'm the deputy director for research.   So I direct the

3    research program.

4    Q.    Can you give us the names of some of the other persons who

5    are there or who contribute to the various publications that you

6    have in the near -- by "you" I mean the Washington Institute.

7    A.    The office next to mine for the eight years when Mr. Bush

8    was president was occupied by Dennis Ross, who had been

9    President Clinton's chief Middle East peace process negotiator,

10   and is now the person at the National Security Council

11   responsible for what they now call the Central region, like the

12   Central Command covering the Middle East.

13        We have former assistant Secretary of the Treasury, Matthew

14   Levitt, is one of the people I direct.   Former deputy assistant

15   Secretary of State, Scott Carpenter, who works on Arab reform

16   programs.   I might have misspoken and described Mr. Levitt as

17   assistant Secretary of State.   He was deputy assistant Secretary

18   of Treasury, I'm sorry.

19   Q.    Are you regarded by your peers as an expert on Iran, the

20   Iranian political scene, the Near East and terrorism?   All of

21   those things?

22   A.    That would be a fair description, even among the people who

23   don't like my political views, would agree with that.

24   Q.    And you have presented us with a CV that I have marked as

25   an exhibit.   Let me see if I -- it's Exhibit J, which I would

1      state to you, although you weren't there when I put it in the

2      folder, is the same as what you gave me in your office.  Does

3      that CV, Exhibit J, accurately set forth at least some of your

4      publications and background in this area?

5      A.    The CV I gave you in my office does that, yes, sir.

6      Q.    I note too on that CV it indicates you've written for the

7      *New Republic*, *New York Times*, *Wall Street Journal* and the

8      *Washington Post*.  That's quite a wide spread politically in the

9      country.

10     A.    Yes, sir.

11     Q.    Have you at various times been called to testify as an

12     expert witness in courts of the United States on the subjects

13     that I just gave, Iran, the Iranian political scene, the Near

14     East and terrorism?

15     A.    Yes, sir.  On numerous occasions.

16     Q.    How many?  Can you give any estimate?

17     A.    I think I provided you my most comprehensive list in my

18     affidavit.  I think it's 24.  It's more than 20.

19     Q.    And which courts have you testified in, if you recall?

20     A.    In this building very frequently.  I've testified often

21     enough before Judge Lamberth that he knows my name when I go

22     before him.

23     Q.    You don't have to explain anything, okay.  On any occasion

24     have you ever been rejected as an expert?

25     A.    No, sir.

1          MR. FAY:  Your Honor, we would submit that Dr. Clawson

2   is qualified as an expert to testify upon Iran, Iranian

3   political scene, the Near East, and terrorism.

4          THE COURT:  I think that's true, but I want to ask you

5   one question.  Give me a little bit of context or substance to

6   the term "terrorism" as your field of expertise.  Does it have

7   any limits?

8          THE WITNESS:  I study Iran's connections with

9   terrorism.  I would be the first to tell you that I know very

10  little about the FARC in Colombia or the Tamil Tigers, and in

11  fact I'm not well versed in the activities of HAMAS as much as I

12  am in its connections with Iran.  So I study these terrorist

13  organizations primarily in their relationships with Iran.  I'm

14  not somebody who's well aware of how these terrorist

15  organizations recruit individuals, how do they motivate

16  individuals, how do they keep them active in a group.

17      Now, I supervise people who do carry out research on that

18  and have published on those issues, and so I have my opinions in

19  the matter.  But I would not wish to be qualified as an expert

20  on those subjects.

21          THE COURT:  With that understanding and the focus on

22  terrorism as it relates to Iran, Dr. Clawson is admitted as an

23  expert witness.

24          MR. FAY:  Thank you, Your Honor.

25  BY MR. FAY:

1   Q.   Dr. Clawson, I asked you a little bit about this before,

2   but can you expand a little bit on the extent to which Iranian

3   materials on terrorism are available online or in hard copy in

4   the world today?

5   A.   Well, Iran is proud of its support for resistance to global

6   arrogance, as they would put it, and talks frequently about its

7   support for those who resist global arrogance.  They are a

8   little cagey about the character of that support.  But some of

9   those to whom they provide support, and in particular the leader

10  of Hezbollah in Lebanon, Sheikh Nasrallah, has on several

11  occasions given very fiery speeches in which he has detailed the

12  extensive weaponry that he has received from his foreign

13  friends, without specifying that it was Iran.

14       So there is considerable information available also from

15  U.S. government sources and from a variety of western

16  intelligence agencies and Israeli agencies that publish reports

17  describing Iran's support to different terrorist organizations.

18  And as of last Friday, there's an enormous number of U.S.

19  government classified documents available on Wikileaks, which

20  are describing the U.S. military's concern about Iran's support

21  to al-Qaeda elements and others carrying out bombings and

22  attacks on Americans and Iraqis in Iraq.

23  Q.   Okay.  Over the course of your career, have you had access

24  to other materials, meaning classified materials as well in some

25  of these agencies that you consulted with?

A.    Yes, sir.

Q.    We're not asking you to repeat any information that's classified, but you can certainly take into account everything you know in answering questions asking for your opinion.  When did you first become aware of someone known as Imad Fayez Mughniyah?

A.    Many years ago.

Q.    Okay.  Can you recite for us the litany with Imad Fayez Mughniyah, what he's done and so forth.

A.    It was at some point shortly after the U.S. embassy bombing in Beirut, and there was the Marine barracks bombing in Beirut, and there was a lot of interest in the question of, okay, who's the master bomb builder here, and Mughniyah's name came forward. He was said to be associated with a lot of terrorist activities that Hezbollah was carrying out.  And he seemed to become very publicity shy about the same time.  And there were a lot of disputes in the scholarly community, and for that matter among intelligence circles, about how active a role that he was playing in terrorist activities.

      And I followed those debates with some interest because much of the debate was about how direct a relationship he had with Iran.  I have to say that it was with considerable satisfaction that I noted that after his untimely death in 2008, when Iranian leaders came forward with their effusive praise for him and description of what an important person he had been --

1    Q.    Why don't you detail that for us.

2    A.    Those statements by Iranian leaders were short on details

3    about the nature of the relationship, but very effusive in

4    praise about the man and describing him as having been

5    extraordinarily important for this resistance against global

6    arrogance.  And I thought that helped shed light on what had

7    been preceding debate about how active he remained in terrorism

8    after his widely acknowledged role in the mid-1980s.

9         Certainly for years there had been prominent knowledgeable

10   people who provided a considerable amount of evidence or a

11   considerable amount of information to suggest that he was a very

12   important -- remained a very important leader for Hezbollah and

13   very important in the Iran-Hezbollah relationship, as was widely

14   acknowledged he had been in the early and mid-1980s.

15   Q.    Dr. Clawson, could Hezbollah operate without the support it

16   gets from Iran, operate in terms of terrorism and do the things

17   that's been attributed to them from time to time?

18   A.    Well, one of the characteristics that Hezbollah has had is

19   some extraordinarily sophisticated techniques.  Some of the

20   bombs that were designed were quite remarkable, and the military

21   tactics that they developed for use against the Israelis in

22   south Lebanon were extraordinarily impressive.  My institute

23   under my direction has published several studies about this

24   matter.

25        And it would certainly appear, both from the accounts of

1    defectors in the organization, people who have been arrested

2    from the organization, and from the analysis of the material

3    they had, that much of this was provided by Iran, and so it was

4    hard to see how Hezbollah could have become such a world class

5    organization in these fields without the resources of Iran.

6    Q.   Dr. Clawson, could you in a little bit more detail describe

7    the relationship between Imad Fayez Mughniyah and the Islamic

8    Republic of Iran?

9    A.   Well, we know that -- there's no dispute that at one point

10   in the mid-1980s he was in charge of Hezbollah's terrorist

11   activities, and that he was working directly with and, by most

12   accounts, directly for the Islamic Republic of Iran in carrying

13   out those activities.  As I said, he became publicity shy by the

14   late 1980s, but there's certainly quite credible information

15   provided from a wide variety of sources, which -- defectors from

16   the organization, intelligence agency reports, published

17   intercepts, that would suggest that he remained in that role for

18   years.

19        Perhaps he became less active in the few years before his

20   death.  That remains a matter of dispute.  But he still remained

21   very close to both the Islamic Republic of Iran and an important

22   official in Hezbollah up to the time of his death.

23   Q.   Dr. Clawson, in the -- there will be hopefully in evidence

24   in just a moment the transcript from the plea hearing for

25   Sergeant Ali Mohammed.  It's in evidence -- it's listed as

```
1    Exhibit A.

2         And Your Honor, we would ask that it be received in

3    evidence at this point.

4              THE COURT:  It will be received.

5                             (Plaintiff Exhibit A

6                             received into evidence.)

7    BY MR. FAY:

8    Q.   Let me read you just part of that, from page 25 through

9    page 28.  It's not that long.

10             THE COURT:  You're going to read four pages?

11             MR. FAY:  I read quickly.

12             THE COURT:  That's going to be some question.

13   BY MR. FAY:

14   Q.   There was a question from the Court.  This is starting at

15   line 18:  "Now, Mr. Mohammed, would you tell us in your own

16   words what it is that you did and when and where you did it that

17   leads you to believe that you are guilty of these charges."

18        And the charges up above are conspiracy to commit murder of

19   American nationals in the East African embassy bombings.

20        Ali Mohammed answered, "Your Honor, in the early 1980s I

21   became involved with the Egyptian Islamic Jihad organization."

22   Then it goes, "In the early 1990s, I was introduced to

23   al-Qaeda -- al-Qaeda is the organization headed by Osama bin

24   Laden -- through my involvement with the Egyptian Islamic Jihad.

25   In 1992 I conducted military basic explosives training for
```

al-Qaeda in Afghanistan.  Among the people I trained were Harun

Fadhl and Abu Jihad.  I also conducted intelligence training for

al-Qaeda.  I taught my trainees how to create cell structures

that could be used for operations.

"In 1991 I helped transport Osama bin Laden from

Afghanistan to the Sudan.  When I engaged in these activities,

and the others I am about to describe, I understood that I was

working with al-Qaeda, bin Laden, Abu Hafs, Abu Ubaidah, and

that al-Qaeda had a shura council, which included Abu Hajer al

Iraqi.

"In the early 1990s, I assisted al-Qaeda in creating a

presence in Nairobi, Kenya, and worked with several others in

this project.  Abu Ubaidah was in charge of al-Qaeda in Nairobi

until he drowned.  Khalid al Fawwaz set up al-Qaeda's office in

Nairobi.  A car business was set up to create income.  Wadih el

Hage created a charity organization that would provide al-Qaeda

members with identity documents.  I personally helped el Hage by

making labels in his home in Nairobi.  I personally met with Abu

Ubaidah and Abu Hafs at Wadih's house in Nairobi.  We used

various code names to conceal our identities.  I used the name

"Jeff," el Hage used the name "Norman," Ihab used the name

"Nawawi."

"In late 1993, I was asked by bin Laden to conduct

surveillance of American, British, French, and Israeli targets

in Nairobi.  Among the targets I did surveillance for was the

American embassy in Nairobi, United States AID building in Nairobi, the United States Agricultural Office in Nairobi, the French Cultural Center and French embassy in Nairobi.  These targets were selected to retaliate against the United States for its involvement in Somalia.  I took pictures, drew diagrams, and wrote a report.  Khalid al Fawwaz paid for my expenses and the photo enlarging equipment.  He was in Nairobi at this time.

"I later went to Khartoum, where my surveillance files and photographs were reviewed by Osama bin Laden, Abu Hafs, Abu Ubaidah and others.  bin Laden looked at the picture of the American embassy and pointed to where a truck could go as a suicide bomber.

"In 1994, bin Laden sent me to Djibouti to do surveillance on several facilities, including French military bases and the American embassy.

"In 1994, after an attempt to assassinate bin Laden, I went to the Sudan in 1994 to train Bin Laden's bodyguards, security detail.  I trained those conducting the security of the interior of his compound, and coordinated with the Sudanese intelligence agents who were responsible for the exterior security.

"In 1994, while I was in Sudan, I did surveillance training for al-Qaeda.  Ihab Ali, also known as Nawawi, was one of the people I trained.  Nawawi was supposed to train others.

"In the early 1990s, Zawihiri made two visits to the United States, and he came to the United States to help raise

1    funds for the Egyptian Islamic Jihad.  I helped him to do this.

2         "I was aware of certain contacts between al-Qaeda and

3    al-Jihad organization, on one side, and Iran and Hezbollah on

4    the other side.  I arranged security for a meeting in the Sudan

5    between Mughniyah, Hezbollah's chief, and bin Laden.

6         "Hezbollah provided explosives training for al-Qaeda and

7    al-Jihad.  Iran supplied Egyptian Jihad with weapons.  Iran also

8    used Hezbollah to supply explosives that were disguised to look

9    like rocks."

10        And my question is this.  Turn back, make sure I get this.

11   Do you have an opinion within a reasonable degree of certainty

12   as to whether Mughniyah during this period, in 1994, exercised

13   sufficient authority within the Islamic Republic of Iran that he

14   could conclude the agreement set forth above to supply

15   explosives and weapons to al-Qaeda?

16        Let me put in just one other little fact.  The name Abu

17   Ubaidah was given earlier in the transcript.  It was clear that

18   was the man known as Banshiri who drowned in an accident,

19   drowned in Lake Victoria.

20        Do you have within a reasonable degree of certainty an

21   opinion as to whether Mughniyah exercised the necessary

22   authority to conclude this agreement binding Iran and Hezbollah

23   to help?

24             THE COURT:  This agreement to what?

25             MR. FAY:  To binding Hezbollah and Iran to provide the

1    explosives and assist in the attack.

2         THE WITNESS:  I have no idea if the gentleman in his

3    confession was telling the truth or not.

4    BY MR. FAY:

5    Q.   I'm not asking you that.

6    A.   But on the question of Mughniyah's authority, I would say

7    that Mughniyah's relationship with the Iranian government at the

8    time was very close, and that if he were to conclude an

9    agreement, that there would have to be extraordinary

10   circumstances for Iran not to carry through with an agreement.

11        And the agreement that you're asking me about, if such an

12   agreement was concluded, would certainly seem to be something

13   that Iran would be in fact quite pleased with.  And so I would

14   find -- it would strain credulity to say that if such an

15   agreement were concluded by Mughniyah, the Iranian authorities

16   would not carry through with it.

17        And especially the agreement that you described fits well

18   with a pattern of how Hezbollah has worked with other terrorist

19   organizations, including with some terrorist organizations with

20   which it has some profound differences, such as our rich

21   experience in Iraq, where Hezbollah, working on Iran's behalf

22   with a number of organizations with which it had profound

23   differences.

24        And by the way, explosives shaped like a rock was a famous

25   characteristic of something that Hezbollah developed and used

1   with great effect in southern Lebanon against the Israeli

2   forces.

3   Q.   I want to ask you a couple of questions with regard to

4   material support.  Let me read you the definition given in 18

5   United States Code Section 2339A, subsection (b), paragraph 1 of

6   material support.  I'm quoting now.

7       "The term 'material support or resources' means any

8   property, tangible or intangible, or service, including currency

9   or monetary instruments or financial securities, financial

10  services, lodging, training, expert advice or assistance,

11  safehouses, false documentation or identification,

12  communications equipment, facilities, weapons, lethal

13  substances, explosives, personnel," and in parentheses, "(one or

14  more individuals who may be or include oneself), and

15  transportation, except medicine or religious materials."

16      Based upon your studies, your experience with Iran, would

17  you have an opinion within a reasonable degree of certainty, as

18  an expert on Iran and on terrorism, as to whether Iran rendered

19  material support to the activities during this period, the

20  mid-'90s, to, first, Hezbollah?

21           THE COURT:  No, Mr. Fay.  You're asking him a

22  conclusion of law.  You just stated a legal definition, a

23  statutory definition, and you're asking him the conclusion of

24  law that I have to reach.  You can ask him questions to help me

25  reach that conclusion, but he's not the one who reaches the

1  conclusion of law as to whether it's material support.  Ask him

2  what they did.  And I'll decide whether it meets the legal

3  definition.

4          MR. FAY:  Well, the Federal Rules of Evidence do state

5  that an expert can give an opinion on the ultimate issue.

6          THE COURT:  He can give an opinion on the ultimate

7  issue, yes, but not the legal definition and whether that legal

8  definition is met.  So ask him the questions in terms of the

9  parts of the definition.  Did they do A?  Did they do B?  Did

10  they do C?

11          MR. FAY:  Very well, Your Honor.

12  BY MR. FAY:

13  Q.  Well, let's start out with regard to both -- let's apply

14  this so we're not spending the rest of the day, of course.  With

15  regard to both al-Qaeda and Hezbollah, at various times within

16  your studies, is there evidence, reasonable, so that you can

17  come to a reasonable conclusion, that Iran gave property,

18  tangible or intangible, to Hezbollah and to al-Qaeda?

19  A.  Well, Hezbollah, we have the statements by Hezbollah

20  leaders and the statements by Iran and the statements by every

21  scholar who studied the subject, that Iran provided substantial

22  financial support and lots of other services to Hezbollah.  That

23  there's broad agreement on, and there's also lots of statements

24  by the United States government attempting to quantify this and

25  provide rich detail about the character of the support.  U.S.

1   government sources and some other sources provide information

2   about weapons systems, I think very credible information about

3   weapons systems.  So with Hezbollah there's simply no question.

4           THE COURT:  Let's just round that out.  And focus then

5   for a second on the 1990s as opposed to the 1980s.

6           THE WITNESS:  Yes, sir.  The relationship starts in

7   the early 1980s.  Indeed, by most accounts it was Iran which at

8   least actively encouraged if not directed the formation of

9   Hezbollah in the early 1980s.  And the relationship was quite

10  close during the 1990s.

11      Now, after the election of a new president of Iran in '97,

12  Mr. Khatami, he goes to Lebanon, gives a famous speech in

13  Lebanon which suggests that Iran's support is not bottomless,

14  and that he encourages Hezbollah to develop its political side

15  as well as its resistance side.  But I don't know of anyone to

16  suggest that Iran ended its support.  And indeed certainly at

17  that time Hezbollah was very vigorously supporting attacks on

18  Israeli soldiers who were occupying southern Lebanon until their

19  withdrawal in 2000.  Indeed, that's why the Israelis withdrew in

20  2000, was because of the effectiveness of the Hezbollah attacks

21  in that period, in the years before their withdrawal.

22      At this time, there were also credible reports of Hezbollah

23  at least scoping out targets outside the Middle East for

24  potential attack.  So that continues -- those kinds of

25  activities continue throughout the 1990s.

1      Al-Qaeda, the relationship is -- I don't know much evidence

2      of the two sides cooperating during the Soviet occupation of

3      Afghanistan, for instance.

4              THE COURT:  Both sides being al-Qaeda and Iran?

5              THE WITNESS:  Al-Qaeda and Iran, correct, sir.  After

6      bin Laden ends up in Sudan, and the Iranian government is very

7      involved at that time in Sudan, the Iranian government is

8      providing a very active assistance to the Sudanese government

9      for its fighting in the south and the civil war in the south.  I

10     had made more than 20 trips to Sudan in my work for the IMF and

11     World Bank in the 1980s and early 1990s, and I was following

12     this with great interest.

13     So there was a lot of evidence of a very active Iranian

14     role in Sudan at the time.  And there were -- the Sudanese

15     government proudly displayed its support for a conference of

16     those resisting the Israeli-Arab peace process that had been

17     launched in Madrid in the fall of 1991.  And the Iranians played

18     a prominent role there, and bin Laden was there, where he was

19     living at the time.

20     And so there were certainly many credible reports at the

21     time that Iran and bin Laden were working together closely.

22     There were some lurid but still unconfirmed reports of

23     substantial financial assistance.  But what we find at that time

24     is certainly a lot of reports of close collaboration.

25     And I would find, I could say flatly, evidence that Iran

1      was helping train al-Qaeda operatives and al-Qaeda personnel at

2      that time.

3                  THE COURT:  In Sudan?

4                  THE WITNESS:  In Sudan.  Yes, sir.

5      BY MR. FAY:

6      Q.   Okay.

7      A.   And that cooperation of course then continues and

8      accelerates.  And we see in the 9/11 Commission the various

9      interesting indications of how close that relationship became

10     after bin Laden was expelled from Sudan under U.S. pressure.  He

11     was expelled to Afghanistan.  The relationship became much

12     closer.  The relationship between Iran and al-Qaeda became much

13     closer.

14     Q.   Money, meaning financial support, that is to say, not that

15     they handed a million dollars in bills to somebody, but

16     financial support --

17                 THE COURT:  That does happen in Iran, we understand.

18                 MR. FAY:  It does happen, yes.

19                 THE WITNESS:  The president of Afghanistan tells us it

20     does.

21                 THE COURT:  That's what I was referring to.

22     BY MR. FAY:

23     Q.   Yes.  Did they engage in essentially what would financially

24     help them?

25     A.   I don't know at the time in Sudan, because in Sudan bin

1   Laden was pretty flush.  And it's really only after -- I mean,

2   he loses a lot of money in Sudan.  Bad investments.  And it's

3   really only after he gets to Afghanistan that he seems to be

4   more -- it's not as clear where his finances are coming from.

5   Q.   With regard to both organizations, the next term here is

6   lodging.  I take it they don't mean the Ritz Carlton, simply

7   somebody being able to transport through.

8   A.   Don't know that.  Certainly Iran provided important

9   services to al-Qaeda as a transit location through Iran to the

10  outside world once bin Laden and his outfit moved to

11  Afghanistan.  And that happens of course before the embassy

12  bombings.

13  Q.   Expert advice or assistance.  I have in mind here

14  particularly with regard to explosives.  Did either one of these

15  organizations really have expert knowledge of explosives

16  without --

17  A.   Well, Hezbollah certainly has extraordinary knowledge of

18  explosives.  And on the Iranian side, the Islamic Republic Guard

19  Corps, the IRGC, is said to have extraordinary expertise in

20  explosives.

21        THE COURT:  Let's focus on the mid to late 1990s.

22        THE WITNESS:  Well, at that time, because the Israelis

23  are encountering Hezbollah's expertise in explosives in southern

24  Lebanon, and the Israeli defense forces are usually thought to

25  be quite a good military, and yet they were quite confounded by

1    the skill that Hezbollah was demonstrating with its explosives,

2    and hiding explosives and the force of these explosives and

3    their compact character and their ability to set them off and so

4    on.

5    BY MR. FAY:

6    Q.    Overall, when I went through all the rest of these, lethal

7    substances, weapons, personnel, to what extent did Iran give

8    material support -- give these things to Hezbollah and al-Qaeda?

9    A.    Al-Qaeda --

10   Q.    Or al-Qaeda I should say.

11   A.    Hezbollah certainly.  To al-Qaeda it's less clear while

12   al-Qaeda's in Sudan.  I think most, but not necessarily all of

13   those items, I could certainly testify to after al-Qaeda gets to

14   Afghanistan.

15   Q.    I'm sorry.  At the time?

16   A.    When al-Qaeda is expelled from -- bin Laden and his

17   followers are expelled.

18   Q.    When would they have been expelled from Sudan?  Is that

19   1996?

20   A.    I should have reviewed that.  I thought it was the summer

21   of 1996, but I'd hate to go on record saying that.

22          THE COURT:  I think you're right in the ball park.

23   And when would they have been settled, if you will, in

24   Afghanistan and receiving, as you just referred to, this kind of

25   assistance and support?

1          THE WITNESS:  After all, both al-Qaeda as an

2    organization and bin Laden as an individual had extensive ties

3    in Afghanistan from their time when they were living in Peshawar

4    and Pakistan and supporting the resistance movements and the

5    Islamist organizations in Afghanistan.  So by most accounts they

6    kind of hit the ground running when they got to Afghanistan.

7          THE COURT:  In 1997.

8          THE WITNESS:  Right.  And formed a very close

9    relationship with the Taliban movement and provided very

10   valuable services to the Taliban, which by most accounts was a

11   relatively ineffectual fighting organization at the time and

12   really depended on the skill and dedication brought to it by the

13   Arab fighters in general and al-Qaeda in particular.

14        I would think that by all of the accounts of the success

15   that bin Laden was having in raising money from Arab donors at

16   the time, and the accounts that we have of how useful it was for

17   Iranian -- for al-Qaeda people to pass through Iran in order to

18   get to the outside world, because if they showed up with

19   Pakistani visas on their passports, then the Saudis or United

20   Arab Emirate authorities were suspicious, but if they came

21   through Iran without any stamps on their passport, they had a

22   much easier time.

23        And the accounts we have from the 9/11 Commission would all

24   suggest that the transit through Iran begins not long after bin

25   Laden shows up in Afghanistan.

1   Q.   Did Iran in fact support other terrorist groups who were

2   Sunni other than al-Qaeda?

3   A.   Oh, certainly.   It's very active in supporting the HAMAS

4   movement, the Palestinian Islamic Jihad movement, and it was --

5   of course in a later period it worked with a number of

6   resistance groups in Iraq that were Sunni.   And the Taliban.

7   There was a love/hate relationship.   Some parts of the Iranian

8   government worked with the Taliban, some parts of the Iranian

9   government worked against the Taliban.

10  Q.   Is there any reason to think that Iran would be more

11  reluctant to support al-Qaeda than HAMAS, or would they be --

12  there not be any difference anyway?

13  A.   Well, the al-Qaeda leadership was, and bin Laden in

14  particular was very blunt about saying that we don't like Shia,

15  but we have a common enemy, the West, and we'll work together

16  against that.   And that would fit well with the expressed views

17  of the Iranians.

18  Q.   Dr. Paz made a statement where he said, I believe, that

19  without Iran there would be no Hezbollah.   Is that --

20  A.   Oh, that's clearly true, because the active organization in

21  the Lebanese Shia community had been the Amal organization,

22  which had quite a charismatic leader, and Iran encouraged

23  radicals within that Amal organization to develop a faction and

24  later to split with it, and then later to carry on a civil war

25  against it.

1      But to this day it is the case that Amal receives more

2   votes in the Lebanese Shia community in every election than does

3   Hezbollah.

4   Q.   Have all of the opinions that you've given here so far been

5   within a reasonable degree of certainty as an expert qualified

6   by the Court?

7   A.   Yes, sir.  If you haven't noticed, I'm rather cautious and

8   hedge my statements.

9   Q.   I noticed that.

10      MR. FAY:  Your Honor, I think there's some other

11   questions by counsel.

12      MR. MILLER:  I have a few questions.  Thank you, Your

13   Honor.  Michael Miller on behalf of the plaintiffs.

14                     DIRECT EXAMINATION

15   BY MR. MILLER:

16   Q.   Good morning, Dr. Clawson.

17   A.   Good morning.

18   Q.   We're not going to repeat the testimony, but two defendants

19   we haven't talked about that I just want to tie in, I think, the

20   Revolutionary Guard, the Iranian Revolutionary Guard, could you

21   explain to the Court who they are and in what context they're

22   related to the Iranian state?

23   A.   The Revolutionary Guard Corps was founded shortly after the

24   1979 revolution.  Its role is built into Iran's constitution as

25   defenders of the revolution, not just defenders of Iran as a

1   country, but defenders of the revolution.  Its first involvement

2   in terrorism in fact was showing up in Lebanon in the early

3   1980s uninvited, and has been a major player in Lebanon ever

4   since.

5   Q.   So when you've testified earlier about your positions about

6   particulars concerning material support of Iran, were you

7   referring also to the Iranian Revolutionary Guard?

8   A.   Yes, sir.  It's one of the two major organizations through

9   which Iran carries out its terrorism support historically.

10   Q.   Then the other question I have is MOIS.  Who are they?

11   A.   That's the Ministry of Information and Security in Iran.

12   That's the other organization through which Iran has

13   historically carried out its support for terrorism.  It is the

14   successor agency to the respected spy agency called SAVAK, run

15   by the Shah.  And after the revolution that organization was not

16   disbanded, but maintained in a secret manner, and then formed as

17   a ministry openly several years after the revolution.

18       It appears to have peaked at about 30,000 employees and was

19   regarded widely as probably the second most effective

20   intelligence agency in the Middle East outside of the Israeli

21   agencies.

22   Q.   And were they a known agency working in material support

23   with terrorism as you've described earlier?

24   A.   Yes.  They worked very closely, for instance, with

25   Hezbollah in the seizure and holding of western hostages in

1    Lebanon in the 1980s.

2    Q.   And the line of questions you answered earlier about the

3    Sudanese and the relationship to Hezbollah and Iran, did that

4    also apply to MOIS?

5    A.   Yes.  It would appear by most accounts, although I wouldn't

6    swear to this, that the Revolutionary Guard Corps was playing

7    the more active role in Sudan, in part because Iran's role there

8    was in support of a civil war, with active fighting going on in

9    the south.  So it would appear that the IRGC was the main

10   agency, but I can't be 100 percent certain of that.

11   Q.   And I respect that, sir.  While the Revolutionary Guard may

12   have been more culpable, what the Court I think will need to

13   understand and we will, was MOIS culpable?  Did they provide

14   material support?

15   A.   There were a number of episodes in which people working out

16   of the Iranian embassy were widely described by various

17   governments as MOIS officials.

18   Q.   All right.  I have no further questions.  Thank you for

19   your time.

20            THE COURT:  Any other counsel have questions?

21            MR. MACALLISTER:  No, Your Honor.

22            THE COURT:  Dr. Clawson, you've been very helpful in

23   both the broad and the specific sense with respect to the

24   involvement of Hezbollah and Iran together, and to some extent

25   as well with respect to al-Qaeda and Iran.  Ultimately in this

1    case the focus is on specific acts, and the specific acts are

2    the bombings of the American embassies in East Africa.  So let

3    me ask you the same kinds of questions with respect to those

4    specific acts, if you can answer, and I don't know whether you

5    can answer, but I'm going to ask you anyway.

6         Can you tell us whether, based on your knowledge and

7    experience, whether you have information that would establish in

8    your mind, to the best of your cautious approach, and at the

9    level of an expert opinion, that would establish that Iran

10   supplied support and resources that contributed to the actual

11   acts at issue here, which is the bombings of the embassies in

12   East Africa?

13        THE WITNESS:  As I said to Mr. Fay from the beginning

14   when he approached me about this matter, I said, look, I'm not

15   an expert on the East African bombings, and I would feel

16   reluctant to testify about what happened and who was involved in

17   that.  I have an opinion on the subject, but I can't say -- it's

18   not an expert opinion on the subject.

19        THE COURT:  I don't want to take you out of your

20   comfort zone.

21        THE WITNESS:  If the guilty plea is correct from that

22   gentleman, and I notice it's been cited by a number of prominent

23   individuals in the field of terrorism studies, if that is

24   correct, that would certainly fit with the pattern of what Iran

25   has done in other situations.  That's about as far as I think I

1    can go.

2              THE COURT:  All right.  Thank you, Dr. Clawson.

3              THE WITNESS:  Thank you.

4              THE COURT:  Anything else?

5              MR. FAY:  Just one.

6                    FURTHER DIRECT EXAMINATION

7    BY MR. FAY:

8    Q.   I take it that last opinion was within a reasonable degree

9    of certainty?

10   A.   Yes, sir.  In other words, if that gentleman's statement is

11   correct in his guilty plea, that would fit very well with the

12   pattern of what Iran has done in other similar circumstances.

13             THE COURT:  I think that's an opinion he's already

14   given earlier as well as right now.

15             MR. FAY:  Thank you, Your Honor.

16             THE COURT:  Thank you, Dr. Clawson.  Good to see you

17   again.

18        (The witness steps down.)

19             THE COURT:  All right.  It's 12 o'clock.  What would

20   we like to do now?  Is only food on your mind or do you want to

21   get something accomplished here for another 20 minutes to a half

22   an hour?

23             MR. FAY:  Hopefully it won't take that long.  With

24   regard to exhibits, Your Honor.  Your Honor, Exhibit A, I

25   believe that that is already --

1        THE COURT:  If you want to just know what exhibits are

2    in evidence in terms of what's happened here today, and

3    Mr. Bradley will double-check me, they are Exhibits Z, K, P, X-1

4    and 2, Y-1 and 2, and A.

5        MR. FAY:  Your Honor, we would move the admission of

6    B, the deposition of Mohammed Sadeek Odeh.

7        THE COURT:  For the record, identify who Mohammed

8    Sadeek Odeh is.

9        MR. FAY:  He was one of the terrorists who

10   participated in the Nairobi bombing who was captured.  He was

11   one of the people that cleared out at the same time the Iranian

12   diplomats cleared out.  The difference was he was a little bit

13   negligent and didn't --

14       THE COURT:  You're giving me more than I need for this

15   purpose.  He is one of the individuals who's been convicted with

16   respect to the Nairobi bombing, is held in U.S. custody and you

17   deposed him in June.

18       MR. FAY:  That is correct, Your Honor.

19       THE COURT:  And that deposition will be admitted.

20   That's Exhibit B.

21                        (Plaintiff Exhibit B

22                         received into evidence.)

23       MR. FAY:  Next we have the trial transcript, Exhibit

24   C, of John Anticev.

25       THE COURT:  And that's the trial transcript in

1    New York in the criminal case involving the bombings.

2             MR. FAY:  Yes.  Mr. Anticev essentially stayed with

3    Odeh and another terrorist over an extended period of time and

4    then testified as to what they told him after they were feeling

5    good about themselves.

6             THE COURT:  This is the entirety of his testimony,

7    which went on for more than a day.

8             MR. FAY:  Yes.

9             THE COURT:  Some of it may not be relevant to this

10   proceeding, but just for ease of our operations here, I will

11   admit Exhibit C.

12            MR. FAY:  Your Honor, in all of these I hesitated to

13   introduce a part transcript.

14            THE COURT:  That's fine.

15            MR. FAY:  Of course we ended up with seven volumes

16   because of that.

17            THE COURT:  I recognize that.  Hopefully you will give

18   me some assistance, you and your colleagues will give me some

19   assistance when we come to the findings and conclusions stage of

20   this, to focus me on particular pages of these exhibits.

21            MR. FAY:  Yes, we will, Your Honor.

22            THE COURT:  All right.  Exhibit C is in.

23                         (Plaintiff Exhibit C

24                         received into evidence.)

25            MR. FAY:  D is the trial transcript of Jamal Ahmed

```
1     al-Fadl.

2              THE COURT:  In the same criminal proceedings.

3              MR. FAY:  Yes, Your Honor.

4              THE COURT:  And it is admitted.

5                           (Plaintiff Exhibit D

6                           received into evidence.)

7              MR. FAY:  E and F are two depositions of Dr. Paz.  The

8     reason why I introduced the first deposition was that there

9     was -- we weren't sure whether we were going to be able to

10    depose Dr. Paz, so that we used that and quoted from it --

11             THE COURT:  Just hold on for a second.  We have a

12    video deposition that I've heard and seen.  Is that the October

13    8, 2010, deposition?

14             MR. FAY:  That is correct, Your Honor.

15             THE COURT:  Because I had asked you whether you had a

16    transcript and you said no.

17             MR. FAY:  I do not have a transcript, that's right.

18             THE COURT:  So F is what?

19             MR. FAY:  F is the October 8 transcript.

20             THE COURT:  You just told me you didn't have a

21    transcript.

22             MR. FAY:  No, no.  I mean the October 8 deposition.

23             THE COURT:  The video that I've seen?

24             MR. FAY:  Yes.  We wanted to introduce it into

25    evidence.
```

1          THE COURT:  I already received it into evidence in

2     terms of the testimony.  It's just like live testimony, so I

3     don't think we need an exhibit that is that CD.

4          MR. FAY:  I've had judges here and elsewhere rule --

5          THE COURT:  If you want to do it that way, for control

6     purposes, we can, but I need to know what it is.  So F is not a

7     transcript; it is simply the CD that I have already seen.

8          MR. FAY:  That's right.

9          THE COURT:  All right.

10          MR. FAY:  I believe E we have both a transcript and

11     the deposition.

12          THE COURT:  And why is E relevant?  What was done in

13     it that is relevant to this proceeding that wasn't done in F?

14          MR. FAY:  There was some questions with regard to

15     Hezbollah and so forth in it, and we cited from that in the

16     trial brief that we presented to Your Honor.

17          THE COURT:  I'll go ahead and admit both E and F, E

18     being both a CD and transcript, and F being just a CD.

19                              (Plaintiff Exhibits E and F

20                               received into evidence.)

21          MR. FAY:  And G, Dr. Paz's deposition is already in

22     evidence.

23          THE COURT:  That's a CD, not a deposition.  G is

24     admitted.  It's not in evidence yet, but it is admitted, so it

25     is now.

```
 1                              (Plaintiff Exhibit G

 2                              received into evidence.)

 3            MR. FAY:  H, the deposition of Essam al-Ridi.  And

 4     there is a transcript of that, I believe, as well as the -- it

 5     should be in the exhibits, as well as the disk.  Of course,

 6     that's --

 7            THE COURT:  So what is H?  Is H the transcript or is

 8     it the disk or both?

 9            MR. FAY:  Well, it's both, Your Honor.

10            THE COURT:  All right.  And H is admitted.

11                              (Plaintiff Exhibit H

12                              received into evidence.)

13            MR. FAY:  I is the testimony from the trial up in

14     New York of Mr. Kherchtou.  I believe we cited from that in the

15     pretrial brief as well.

16            THE COURT:  I is admitted.  I'm admitting the trial

17     testimony from that proceeding.

18                              (Plaintiff Exhibit I

19                              received into evidence.)

20            MR. FAY:  Dr. Clawson's CV.

21            THE COURT:  J, and that's admitted.

22                              (Plaintiff Exhibit J

23                              received into evidence.)

24            MR. FAY:  K has already been admitted.  Skipping down,

25     the video, "Seconds From Disaster."  Again, I think it's best
```

```
 1    that it go in, even though --

 2              THE COURT:  If you want to do that for control

 3    purposes, there's no harm, so we'll admit N.

 4                             (Plaintiff Exhibit N

 5                              received into evidence.)

 6              MR. FAY:  O is a chronology timeline we haven't had

 7    testimony about yet.

 8              THE COURT:  You're not offering O yet, are you?

 9              MR. FAY:  Not yet, no.  And then the photographs that

10    were utilized.

11              THE COURT:  P's in already.

12              MR. FAY:  Your Honor, with regard to the CV of Danny

13    Defenbaugh, we never have received the test report on the

14    explosive substances from the FBI, which is really necessary to

15    Mr. Defenbaugh's -- any testimony from him.  If this was in bulk

16    he'd be able to give testimony with regard to the probable place

17    of manufacture in that part of the world, and he could tell from

18    the test report whether it was in bulk.

19              THE COURT:  If this was in bulk?  What does that mean?

20              MR. FAY:  Well, PETN --

21              THE COURT:  No, no.  What do the pronouns mean?  If

22    "this" was in bulk?  You mean the explosives?

23              MR. FAY:  If the explosive was in bulk.  PETN is also

24    used --

25              THE COURT:  You don't have to give me any more
```

1    explanation.  What are you doing with respect to Mr. Defenbaugh,

2    is he going to take the stand?

3              MR. FAY:  No.

4              THE COURT:  Until you decide that he's going to take

5    the stand, we'll hold off on Q.

6              MR. FAY:  The next two are the copies of the

7    determinations by the appropriate authorities in the United

8    States government.

9              THE COURT:  Those are fine.  Those are just legal

10   items, R, and S, and they'll be admitted.

11                        (Plaintiff Exhibits R and S

12                         received into evidence.)

13             MR. FAY:  T we've marked as the map of East Africa.

14   It's going to be utilized by Mr. MacAllister in asking questions

15   of his witnesses.

16             THE COURT:  When you utilize it, move it in.

17             MR. FAY:  U I think is the actual transcript of the

18   testimony of Essam al-Ridi.

19             THE COURT:  So go back up to H, which you said --

20             MR. FAY:  H must be the disk, and this is the --

21             THE COURT:  Well, wait a minute.  One's listed as the

22   deposition on November 10, 2003, and the other is testimony on

23   February 14, 2001.  So are they two different things?

24             MR. FAY:  Yes.  I'm sorry.  This is the testimony --

25             THE COURT:  This is the testimony at trial.

1       MR. FAY:  The other one is the deposition.

2       THE COURT:  And the testimony at trial will be

3   admitted.

4                       (Plaintiff Exhibit U

5                         received into evidence.)

6       THE COURT:  That's U.

7       MR. FAY:  Your Honor, the only other one I have

8   anything to do with is Z, which is already in evidence.

9       THE COURT:  Z is in.

10      MR. FAY:  Anything else you wanted to add?

11      MR. MACALLISTER:  Your Honor, I have a sworn affidavit

12  of Dr. Lorenzo Vidino which I would like to move into evidence.

13      THE COURT:  Is it on this list or is it to be newly

14  marked?

15      MR. FAY:  It's marked on this list as Exhibit V.

16      THE COURT:  V says the CV and report.  The report is

17  the affidavit?

18      MR. MACALLISTER:  Yes, sir.

19      THE COURT:  Go ahead tell me who he is.

20      MR. MACALLISTER:  He's a terrorism expert and

21  researcher.  He's researched these issues for over a decade.  He

22  offered us an opinion on the relationship between the Sudan and

23  al-Qaeda in relation to the bombings.

24      THE COURT:  All right.  I will admit it, but that

25  doesn't mean I'm qualifying him as an expert.  I have to read it

1      before I --
2              MR. MACALLISTER:  I was actually going to ask, should
3      I proffer on the record that he is -- we move that he be
4      accepted as an expert?
5              THE COURT:  You can proffer and move and I will
6      reserve ruling until I read it.
7              MR. MACALLISTER:  Understood.
8              THE COURT:  But the exhibit, V, is admitted.
9                              (Plaintiff Exhibit V
10                              received into evidence.)
11             MR. MACALLISTER:  Thank you, Your Honor.  And just to
12     let the Court know, he was accepted as an expert in the Rux
13     trial.
14             THE COURT:  All right.  And that's marked as V?
15             MR. MACALLISTER:  I have a three-hole punch copy if --
16     I'm lying.  I do not.  Never mind.
17             THE COURT:  You're not lying, you're just mistaken.
18             MR. MACALLISTER:  Mistaken.  Your Honor, also we have
19     another expert, Steven Simon.
20             THE COURT:  That's Exhibit W.
21             MR. FAY:  Exhibit W.  He was a member of the security
22     council from 1994 to 1999.  He's a very busy man.  We hope to
23     put him on the stand.  We're still not sure yet.  If we can't
24     put him on the stand, then he's going to be submitting a report.
25     So that's to come.

1          THE COURT:  And you have the report or don't?

2          MR. MACALLISTER:  If we can put him on the stand,

3     there will probably not be a report.  We're still trying to

4     figure that out, depending on his travel schedule.

5          THE COURT:  Then I'm not going to do anything with W

6     yet, because you might not be offering it, right?

7          MR. MACALLISTER:  That's correct.  I just wanted to

8     give Your Honor an idea where we're going.  And I think that's

9     all I can address right now.

10          THE COURT:  Okay.

11          MR. MACALLISTER:  Thank you.

12          MR. PERLES:  Your Honor, may I be heard?

13          THE COURT:  Yes.

14          MR. PERLES:  One housekeeping matter to make sure we

15     do not run afoul of an agreement that we entered with the

16     Justice Department.  Let me start by apologizing for the

17     conflict that I developed this morning.

18          THE COURT:  No problem.

19          MR. PERLES:  If you covered this already, I extend my

20     apologies again.

21          THE COURT:  I don't think we have.

22          MR. PERLES:  Mr. Fay moved into evidence the

23     deposition of a terrorist that Mr. MacAllister, Mr. Fay, and I

24     took last June.  I believe our agreement with the Justice

25     Department requires that that deposition be held under seal

1    unless it is subsequently declassified.

2             THE COURT:  Which it hasn't been yet?

3             MR. PERLES:  To the best of my knowledge it has not

4    been.  I don't know if it will ever be.  I simply wanted to note

5    to the Court that I think that transcript has to be held under

6    seal here.

7             THE COURT:  Which exhibit are we talking about,

8    Mr. Fay, that you've moved in?

9             MR. FAY:  B.  I think we got that in a bag all sealed,

10   I think we got to Your Honor's chambers.  If we didn't, I

11   apologize.  I'll get it there.

12            THE COURT:  For present purposes the only important

13   thing is that Exhibit B is admitted, but it is under seal.

14            MR. FAY:  Yes, Your Honor.

15            THE COURT:  So it will not be part of the public

16   record of this case.

17            MR. FAY:  I submitted that some time ago to -- I was

18   told -- well, reading through the protective order, there's a

19   person named by the FBI to receive it.  I sent it to him.  I

20   cannot remember the name off the top of my head.  I haven't

21   gotten anything back, and the FBI chose to have nobody in

22   attendance at the deposition.

23            THE COURT:  But the agreement is that it's under seal,

24   and so you're not trying to breach that agreement, and we'll

25   keep it under seal.

```
 1            MR. FAY:  As far as I can tell, I've done everything I

 2    could.

 3            THE COURT:  I have enough experience with the

 4    government and classified information to know that sometimes it

 5    takes a long time.

 6            MR. PERLES:  Thank you, Your Honor.

 7            MR. FAY:  Thank you.

 8            MR. PERLES:  That's all I have.  Thank you.

 9            THE COURT: All right.  Thank you all.  With that,

10    it's 12:10.  Now what do you suggest?

11            MR. FAY:  Your Honor, I would suggest we break for

12    lunch and come back at about 1:30.  I have Mr. Owens to go as a

13    witness, but I believe Dr. Levitt is going to be here right

14    after -- is 1:30 okay?  Yeah, he'll be here at 1:30.

15            THE COURT:  Are we estimating an hour and a half or

16    two and a half hours, or how long are you estimating for

17    Dr. Levitt?

18            MR. MACALLISTER:  An hour and a half on the outside.

19            THE COURT:  Because it's listed on this sheet that I

20    have as two and a half hours.

21            MR. MACALLISTER:  I think we can cover it in an hour,

22    hour and a half.

23            MR. FAY:  My guesstimate is --

24            THE COURT:  Guesstimates are fine.  I'm not

25    criticizing.  I'm just trying to schedule.  That's all.  Then
```

1    you'll put Mr. Owens on as well today?

2              MR. FAY:  Yes, Your Honor.

3              THE COURT:  Okay.  That'll be good.

4              MR. FAY:  I think that's going to fill the afternoon.

5              THE COURT:  Those two will probably come close to it.

6    So we'll get back together at 1:35.  See you then.

7         (Recess from 12:11 p.m. to 1:40 p.m.)

8              THE COURT:  All right.  We're ready with Dr. Levitt?

9              MR. MACALLISTER:  Your Honor, may we call Dr. Levitt

10   to the stand?

11             THE COURT:  Please.

12        **MATTHEW LEVITT, WITNESS FOR THE PLAINTIFFS, SWORN**

13             THE COURT:  Good afternoon, Dr. Levitt.

14             THE WITNESS:  Good afternoon, sir.

15                      DIRECT EXAMINATION

16   BY MR. MACALLISTER:

17   Q.   Please state your name for the Court.

18   A.   Dr. Matthew Levitt.

19   Q.   Which state do you reside in?

20   A.   Maryland.

21   Q.   What is your occupation?

22   A.   I am a senior fellow and director of the Stein Program on

23   Counterterrorism and Intelligence at the Washington Institute

24   for Near East Policy, a local think tank, and I'm an adjunct

25   professor at John Hopkins University's School of Advanced

1    International Studies.

2    Q.   Dr. Levitt, did we ask you to study the responsibility of

3    the Iranian government for the 1998 embassy bombings?

4    A.   You did.

5    Q.   Did you complete your study?

6    A.   I did.

7    Q.   Are you prepared to discuss those findings today?

8    A.   Yes.

9    Q.   Before we get to your findings, let's discuss your

10   qualifications for the Court.  Please describe your post high

11   school education.

12   A.   I have a bachelor of arts in political science from Yeshiva

13   University in New York, a master's of law and diplomacy from the

14   Fletcher School of Law and Diplomacy, Tufts University,

15   Massachusetts, and a Ph.D. from the same in international

16   relations with honors.

17   Q.   What was the subject of your dissertation for your Ph.D.?

18   A.   It was on the impact of terrorist attacks on ongoing

19   negotiations, case studies of the 1993 to 1996

20   Israeli-Palestinian peace process.

21   Q.   And what types of terrorist groups did you study?

22   A.   Jewish terrorist groups, radical Islamist terrorist groups,

23   so Kach and Kahane Chai on the Jewish extremist side, K-A-C-H,

24   K-A-H-A-N-E, new word C-H-A-I.  And HAMAS and Palestinian

25   Islamic Jihad in particular on the radical Islamic side.

1    Q.    And where have you worked since you received your doctorate

2    from Tufts?

3    A.    I was on fellowship at Harvard to complete the doctorate,

4    and then I came down here to Washington in 1998 to work as a

5    counterterrorism intelligence analyst at the FBI.  While those

6    clearances were going through, I took an introductory position

7    at the same think tank I'm at now, the Washington Institute for

8    Near East Policy, it's called the Soref fellowship.  I was

9    supposed to be there for a year.  The clearances went through

10   rather quickly.  I was there for about 10 weeks, and went to the

11   FBI.

12   Q.    Do you still teach at Johns Hopkins?

13   A.    I do.  I've been in and out of government, and in each of

14   my stints out of government now, and still today, I've taught at

15   Johns Hopkins.

16   Q.    Have you worked at any other government agencies since the

17   FBI?

18   A.    I have.

19   Q.    Which ones?

20   A.    I've done part-time things for the 9/11 Commission where I

21   consulted.  A year and a half ago I served as a counterterrorism

22   advisor to General James Jones, who at the time was the special

23   envoy for Middle East regional security at the State Department

24   before he became the national security advisor in the next

25   administration.

1        But my full-time employment was at the Treasury Department,

2    where I was the deputy assistant secretary for intelligence and

3    analysis, which is part of the management chain of the

4    department, and through myself and my boss, the assistant

5    secretary for intelligence and analysis, it is also part of the

6    intelligence community.

7    Q.   What position did you hold for the FBI?

8    A.   The FBI I was an intelligence research specialist, which in

9    regular language is an analyst.

10   Q.   And what does an analyst do?

11   A.   My responsibility was to analyze classified and

12   unclassified information relating to Middle Eastern terrorist

13   groups and state sponsors and their activities here in the

14   United States.

15   Q.   Did your work at the FBI include the analysis of

16   information to determine state sponsorship of different

17   terrorist groups?

18   A.   It did.

19   Q.   Did you participate as a team member in any crisis

20   situations?

21   A.   Yes.

22   Q.   Which ones?

23   A.   The millennial plot at the turn of the millennium, where

24   Ahmed Ressam came across the border, or attempted to come across

25   the border from Canada to bomb Los Angeles International

1    Airport, which had international parallel plots abroad,

2    especially in Jordan, and then the 9/11 attacks, where I led the

3    analytical team for Flight 175.

4    Q.   While at the FBI were Iran and al-Qaeda the subject of any

5    of your work?

6    A.   Yes.

7    Q.   What is the Washington Institute?

8    A.   Washington Institute is a think tank, a nonpartisan think

9    tank which takes no government money or foreign money.  It's

10   based on donations from Americans who are interested in U.S.

11   policy towards the Middle East, which is all we do.  U.S. policy

12   and the broader Middle East.  So North Africa through and

13   including Iran, although Iran isn't technically part of the

14   Middle East, and up to and including Turkey, though it too is

15   technically beyond the Middle East.

16   Q.   And what positions have you held at the Washington

17   Institute?

18   A.   As I mentioned, when I first came to Washington in 1998, I

19   was briefly a Soref fellow, which is basically the introductory

20   position on senior staff.  When I left the FBI after 9/11 I was

21   asked to come back as a senior fellow and to found and direct a

22   new program on counterterrorism.  When I was recruited to go to

23   the Department of Treasury four years later, I left that

24   position.  The person who I'd lined up to fill that position

25   fell through, which worked out okay for me, because then when it

1    was time for me to leave Treasury, I ended up coming back to the

2    Washington Institute.

3    Q.   What has been the primary focus of your research and

4    analysis at the Washington Institute?

5    A.   My program is on counterterrorism and intelligence, and

6    it's a program in a think tank that focuses on U.S. policy in

7    the Middle East.  So my focus is on terrorist groups and

8    counterterrorism tactics and strategies, specifically focused on

9    terrorist groups operating in or from the greater Middle East.

10   Q.   Does your work include the analysis of information to

11   determine state sponsorship of terrorist groups, including

12   Iranian sponsorship?

13   A.   Yes.  I've done a significant amount of work on state

14   sponsorship, and on Iranian state sponsorship in particular,

15   which shouldn't surprise, since Iran is described by the State

16   Department as the premier state sponsor of terrorism year in and

17   year out, and in fact has been on the State Department's list of

18   state sponsors since the inception of that list.

19   Q.   Did your analysis of information include Hezbollah?

20   A.   Yes.  I have written extensively on Hezbollah.  I'm

21   currently writing a book to be published by Georgetown

22   University Press specifically on Hezbollah.

23   Q.   Has your work included research and analysis on al-Qaeda?

24   A.   It has.

25   Q.   What position did you hold at the Department of Treasury?

A.   I was the deputy assistant secretary for intelligence and
analysis.

Q.   And what does the deputy chief do?

A.   Well, it is both -- it's a deputy assistant secretary
position, so it is within the senior management of Treasury's
terrorism and financial intelligence branch, which was created
after the large government reorganization after 9/11.  And it is
also deputy chief of the Treasury's office of intelligence and
analysis, which is the second smallest but one of the 16 U.S.
intelligence agencies.  So I held both those positions,
dual-hatted.

Q.   Did your work there include a focus on al-Qaeda?

A.   Yes.

Q.   Did your work include a focus on Iran sponsorship of
terrorist groups?

A.   Yes.

Q.   How was this job different from your post as a
counterterrorism analyst at the FBI?

A.   I'm an academic now.  My research is completely in the
unclassified public domain.  I don't use classified information
for a report like the one I issued for you, or the public
articles or books I write, the lectures I give.  My research is
based on published material and my primary research.

Q.   And while you were at Treasury, was your job different than
your job at FBI?

```
1    A.    Yes.

2    Q.    How was it different?

3    A.    At the FBI I was a middle to senior level analyst, and at

4    the Treasury Department, I was the senior manager.  So at the

5    FBI I was the one doing the analysis as tasked down to me from

6    my supervisors, and at the Treasury Department I was the one who

7    was overseeing the analysis, deciding what analysis should get

8    done, how it should be used, as opposed to the one doing the

9    analysis myself.

10   Q.    Now that you're in the private sector, can you comment upon

11   the qualitative, if any, difference between the information you

12   assess in the private sector versus the information you would

13   assess in the public sector?

14   A.    Unclassified information is not necessarily poorer than

15   classified information.  It's just different information.  In

16   fact, one of the things I told my intelligence analysts when I

17   came to Treasury is that they best not only focus on the

18   classified or even just the highly classified information; it's

19   more information from different types of sources, not

20   necessarily better or more authoritative information.

21         But all information, whether it comes from classified

22   sources or your own personal research, or government documents

23   or peer reviewed journals, has to be reviewed and vetted and

24   bounced off other people to get a level of comfort with the

25   quality of the analysis and the information.
```

1   Q.   The events at issue occurred in August of 1998.   What

2   effect, if any, has that had on the availability of information

3   for you to review?

4   A.   The farther in the past an event happens, the greater the

5   amount of information is going to be available about that

6   incident.   With the passage of time, more research is done.

7   With the passage of time, more government documents become

8   available.   Consider the 9/11 Commission Report, which goes into

9   detail about this attack, events preceding and following as

10   well.   Consider the CIA and other agencies and departments in

11   government and the Freedom of Information Act and the FOIA

12   requests that are issued and made public.   And there are CIA

13   FOIA documents that relate to some of the questions that you've

14   asked me to opine on.

15       Other scholars have written about these issues.   Other

16   journalists, scholars have done field research about these

17   issues.   So more information is available, which means it makes

18   my job that much easier.

19             THE COURT:   And that's not even considering Wikileaks.

20             THE WITNESS:   I cannot confirm nor deny.

21       (Laughter)

22   BY MR. MACALLISTER:

23   Q.   Did you come across any information during your review of

24   the CIA FOIA site during this case?

25   A.   I did.

1    Q.   While we're obtaining the exhibits, how do you assess what

2    is good information versus what is bad information, whether

3    you're in the public sector or the private sector?

4    A.   With great effort.  There are better sources, and there are

5    less reliable sources.  It all comes down to doing rigorous

6    vetting of material.  In the intelligence community, people

7    often think about is it a single source that's reporting

8    something, is it a source with a good reputation or no

9    reputation?  In the public sector we think, is this just some

10   report in a newspaper?  If it's a report in a newspaper, is it

11   something you can run down yourself?  If it's something that's

12   published by a highly respected professor who has written in a

13   peer reviewed journal perhaps, and has done field research, can

14   you reach out to that individual?  Is it information you can

15   corroborate from your own field research?

16        So, for example, I spend a significant amount of time

17   traveling abroad, in the Middle East in particular, but

18   elsewhere as well, conducting primary field research,

19   interviewing people.  And all of this put together and bouncing

20   the findings that you have against other scholars gives you a

21   level of confidence in the material that you have, to the extent

22   you can corroborate either details or at least general patterns.

23             MR. MACALLISTER:  May I approach the witness?

24             THE COURT:  You may.

25             MR. MACALLISTER:  Can I provide a courtesy copy to the

1    Court now?

2            THE COURT:  Yes.  If I don't have it already, give it

3    to Mr. Bradley.

4    BY MR. MACALLISTER:

5    Q.   Dr. Levitt, could you identify what I just handed you?

6    A.   Yes.  You handed me two different declassified intelligence

7    reports that are available on the CIA FOIA Web site.

8    Q.   Are these -- how do you know that these are CIA documents?

9    A.   First of all, they are from the official CIA FOIA Web site.

10   Second of all, having been in the intelligence community, I know

11   what these documents look like and these are what, in this case

12   highly redacted, but intelligence documents look like.  They

13   have clearly gone through declassification review and they're

14   marked "Approved for release" on specific dates.

15   Q.   Did you download these documents yourself?

16   A.   Yes.

17   Q.   Have you been to that Web site before to download

18   documents?

19   A.   Yes.

20   Q.   Has it always been an accurate source of information?

21   A.   Yes.

22           MR. MACALLISTER:  Your Honor, we're going to come back

23   to these documents, but could I move them into evidence at this

24   point?

25           THE COURT:  You need to mark them in order to move

1   them into evidence.  Otherwise, we don't have anything to refer

2   to them by.  So give them a letter or a number.

3        MR. MACALLISTER:  Your Honor, they're not on Mr. Fay's

4   list, which is my fault.

5        THE COURT:  That's what I gathered.

6        MR. MACALLISTER:  Can we call them AA and BB?

7        THE COURT:  We can, but you need to tell me which is

8   which.

9        MR. MACALLISTER:  AA will be the report that is dated

10  December 4, 1998.

11        THE COURT:  Which happens to be signed by the acting

12  director of Central Intelligence.

13        MR. MACALLISTER:  That's right, Your Honor.  And the

14  second report, which is dated May 12, 1997, is BB.

15        THE COURT:  All right.  Plaintiff's Exhibits AA and BB

16  are admitted.

17                              (Plaintiff Exhibits AA and BB

18                               received into evidence.)

19        MR. MACALLISTER:  We'll come back to these,

20  Dr. Levitt.

21  BY MR. MACALLISTER:

22  Q.   What courses are you teaching at Johns Hopkins University?

23  A.   I teach one course.  It's called "Combating the financing

24  of transnational threats."  So it's focused on combating terror

25  finance, proliferation finance, organized crime money

laundering, and it draws on my interest and professional

experience at the Treasury Department.

Prior to going back into government, to the Treasury

Department, I also taught at Johns Hopkins, and that was a post

9/11 course on contemporary terrorism and the American response,

and that involved specific lectures on specific groups,

including of course al-Qaeda, as well as specific lectures on

state sponsorship and including one week on Iran in particular.

Q.   Have you been honored with any awards in connection with

your work?

A.   Yes.

Q.   Which awards were those?

A.   I received many awards from the FBI, for my work there.  I

don't remember the whole list.  I apologize.  I received an

award for exceptional service at the Treasury Department.  I

received several awards for my graduate work.  I've been awarded

a grant to be a speaker for the State Department abroad.  State

Department will often take people outside of government and send

them as speakers abroad, and I've gone to Europe for the State

Department on multiple occasions.  The full list is available on

my CV.

Q.   Do you belong to any professional associations?

A.   I do.

Q.   Which ones?

A.   Aside from the Washington Institute and Johns Hopkins, I am

1    also senior fellow at George Washington University's Homeland

2    Security Policy Institute here in Washington.  I'm a fellow at

3    the Combating Terrorism Center at West Point at the U.S.

4    Military Academy.  And I was a term member of the Council on

5    Foreign Relations in New York.  That's a five-year membership

6    for people who are under 35.  I was at the time.  I'm not

7    anymore.  And am currently being considered for permanent

8    membership now that I have aged.

9    Q.    Do you do any work for think tanks aside from your current

10   employment?

11   A.    I do.

12   Q.    Which think tanks?  Not all of them, just I suppose the

13   more prominent ones related to the issues in the case.

14   A.    Sure.  It's not uncommon for think tanks, including my own,

15   to put on task forces to look at issues, and you'll bring in

16   people from outside your own think tank, often of different

17   perspectives, different political affiliations.  And so I've

18   been asked different times to participate in such working groups

19   or task forces by places like the Council on Foreign Relations

20   and the Brookings Institution.

21   Q.    Have you written articles regarding al-Qaeda and its

22   relationship to Iran or Sudan?

23   A.    I have.

24   Q.    Which articles were those?

25   A.    I've written many articles, but I've written one in

1    particular.  It was a policy brief published by the Washington

2    Institute specifically on the issue of the relationship between

3    Iran and its primary proxy, Hezbollah, and al-Qaeda.

4    Q.   Have you published books on terrorism and the state

5    sponsorship of terrorism?

6    A.   I have.

7    Q.   And what are those books?

8    A.   I published a book through the Washington Institute called

9    "Targeting Terror" which included a chapter specifically on

10   Iranian state sponsorship, focused on the Arab-Israeli arena.  I

11   wrote a book on HAMAS, the Palestinian terrorist group, which

12   was published by Yale University Press.  Again I had a specific

13   focus on Iranian state sponsorship.

14        My dissertation was also edited and published as a book

15   called "Negotiating Under Fire."  As was mentioned, that

16   included analysis of several groups that received significant

17   state sponsorship from Iran, the Palestinian Islamic Jihad and

18   HAMAS in particular.  And as I think I mentioned, I'm now under

19   contract and currently writing a book on Hezbollah, which is

20   Iran's primary proxy and therefore has many detailed references

21   to Iran.  That will be published next year, I hope, by

22   Georgetown University Press.

23   Q.   Dr. Levitt, have you testified in other federal trials?

24   A.   Yes.

25   Q.   How many?

1     A.    At least a dozen.

2     Q.    Were these federal criminal trials or civil trials?

3     A.    Primarily criminal trials, but several civil cases as well.

4     Q.    Were you cross-examined in those trials?

5     A.    Almost every one.  Not every one.

6     Q.    Were you cross-examined on your qualifications?

7     A.    Just about, if not every time.

8     Q.    Were you accepted as an expert in those cases?

9     A.    Yes.

10    Q.    Every time?

11    A.    Yes.

12    Q.    Were some of those cases related to the issues in this

13    case?

14    A.    They overlapped, yes.  Cases involving Hezbollah, Iran,

15    al-Qaeda, Palestinian Islamic Jihad.  Many of those include

16    specific components on Iranian state sponsorship.

17    Q.    Has your work ever been cited by a federal appellate court?

18    A.    It has.

19    Q.    Which court was that?

20    A.    I think it was the 9th Circuit or 6th Circuit.  I can't

21    remember.

22    Q.    What did they say?

23    A.    Well, it was an appeal of a case in Cleveland, so we can

24    figure out which appellate court it was.

25              THE COURT:  6th.

```
 1              THE WITNESS:  Thank you, sir.  6th Circuit.  Described
 2   my methodology and means of research as, quote, the gold
 3   standard.  More recently, the Supreme Court of the United States
 4   cited my book on HAMAS twice in the case upholding the material
 5   support statute.
 6   BY MR. MACALLISTER:
 7   Q.   Have you testified to Congress regarding terrorism and
 8   Iranian state sponsorship?
 9   A.   Yes.
10   Q.   How many times have you testified to Congress?
11   A.   Also about a dozen.
12   Q.   Were each of those times about Iranian state sponsorship?
13   A.   No.  They were on a wide variety of issues.  One at least
14   was specifically and in its entirety on Iranian state
15   sponsorship, and many others involved the issue as well.
16              MR. MACALLISTER:  Permission to approach the witness?
17              THE COURT:  You may.
18   BY MR. MACALLISTER:
19   Q.   Dr. Levitt, could you identify what I've placed before you?
20   A.   This is my CV.
21              MR. MACALLISTER:  Your Honor, we move into evidence
22   Dr. Levitt's CV marked as L-1.
23              THE COURT:  It will be admitted.
24                            (Plaintiff Exhibit L-1
25                              received into evidence.)
```

1          MR. MACALLISTER:  At this time we would proffer

2     Dr. Levitt as an expert witness on the state sponsorship of

3     terrorism generally, with Iran specifically, and also on

4     Hezbollah and its terrorist operations, and al-Qaeda.

5          THE COURT:  And he will be admitted to provide expert

6     testimony on those subjects.

7     BY MR. MACALLISTER:

8     Q.   Dr. Levitt, what is the basis of the conclusions that

9     you're going to give today in court?

10    A.   Government reports, in particular the 9/11 Commission

11    Report; court documents, in particular from the case U.S. v. Bin

12    Laden, the indictment of Bin Laden in the East Africa embassy

13    bombing trial in New York; other open source material, reports,

14    articles, and my own primary field research in the region.

15    Q.   Are these the kind of sources that experts in your field

16    rely upon when coming to conclusions?

17    A.   Yes.

18    Q.   Are those the kind of sources that you relied upon in the

19    trials where you were accepted as an expert witness by the

20    Court?

21    A.   Yes.

22    Q.   Is this the kind of information that you relied upon when

23    you gave congressional testimony?

24    A.   Yes.

25    Q.   Dr. Levitt, do you know who attacked the two embassies on

August 7, 1998, located in Nairobi, Kenya, and Dar es Salaam,

Tanzania?

A.    Without a question, it was al-Qaeda.

Q.    How do you know this?

A.    Again, we know this from the findings of the 9/11

Commission Report.  We know this in great detail from the East

Africa embassy bombings trial, including the testimony of former

al-Qaeda operatives themselves who testified in that trial.  A

significant amount of material is available on this terrible

attack.

Q.    Which issues specifically did we ask you to review for this

trial?

A.    The relationship and support, if any, al-Qaeda received for

and in the period leading up to this attack from Iran and its

primary proxy, Hezbollah, Lebanese Hezbollah.

Q.    We heard in court that al-Qaeda was located in the Sudan

for a number of years.  How did al-Qaeda come into contact with

the Iranian government?

A.    Al-Qaeda, Bin Laden, and many of his cohorts moved to Sudan

in 1991.  Hassan al-Turabi, the head of the National Islamic

Front, which ruled Sudan at the time, was keen not only on

instituting Islamic sharia law in Sudan at home, but in making

the Sudan a place from which worldwide Islamic revolution could

flow.

        And to that effect Hassan al-Turabi hosted numerous

1    meetings, some large summits with radical extremist groups,

2    including one, for example, in April 1991.  Groups like HAMAS

3    and Palestinian Islamic Jihad, Egyptian Islamic Jihad, al-Qaeda,

4    Sudanese radicals, Iranians, Lebanese Hezbollah were all invited

5    and attended.  So it was at these meetings where Iranian

6    officials, Hezbollah officials, al-Qaeda officials and others

7    first began to have some serious meetings.

8    Q.   Were such meetings involving groups from such a wide

9    spectrum unusual?

10   A.   They had been unusual until then.  Since, Iran has held

11   similar meetings in Iran.  But at the time it was unusual for

12   that many groups to get together in that type of a setting.

13   It's the type of thing, the type of benefit that comes really

14   only with state sponsorship and the kind of safe haven that

15   Sudan as a radical Islamist government at the time was able to

16   provide.

17   Q.   We've also heard in court that Hezbollah frequently trained

18   and interacted with Palestinian Sunni groups in the Bekaa Valley

19   in Lebanon.  Why would it be unusual for Hezbollah to deal with

20   al-Qaeda?

21   A.    It should not surprise that Lebanese Hezbollah, which sees

22   Israel as its primary enemy, would support other groups fighting

23   Israel, this shared enemy.  But more than that, it shouldn't

24   surprise that Sunnis and Shia, who share a radical ideology,

25   will cooperate with one another to confront a common enemy.

1   What is more surprising is not when Shia and Sunni cooperate

2   together, but when Shia, especially hard-line Shia, and Salafi,

3   Salafi jihadi, or sometimes in the context of Saudi Arabia

4   they're referred to as Wahabi Sunnis, cooperate together.

5         For that extreme element of the Sunni spectrum, Shia are

6   the worst heretics.  They're worse than Christians and Jews.

7   Christians and Jews are at least not Muslim.  Here are the Shia,

8   they claim to be Muslim, and they are heretics.  That's kind of

9   an in-house heresy that is even worse.  So it was very rare at

10  the time for the Salafi jihadi, al-Qaeda type of group to

11  cooperate with Iran.

12  Q.   So was there resistance to the idea of cooperation between

13  al-Qaeda and the Iranian government within al-Qaeda itself?

14  A.   We know that in different points in time al-Qaeda was --

15  Bin Laden was uncomfortable even with this type of relationship

16  with Iran, even as they absolutely did engage in this type of a

17  cooperative relationship.  For example, we know that after the

18  East Africa embassy bombings and after the Cole bombing in 2000,

19  according to the 9/11 Commission Report, Iran reached out to

20  al-Qaeda about potentially further firming up this relationship,

21  and Bin Laden was reportedly uncomfortable about the prospect of

22  losing the support base he has in Saudi Arabia, where Salafi

23  jihadis or Wahabis would be really uncomfortable getting too

24  close to Shia Iran.

25  Q.   Was the resistance, the internal resistance overcome to

1   working with the Iranian government?

2   A.   Yes.

3   Q.   Why do you think that was?

4   A.   Because of a shared interest in targeting the West in

5   general and the United States in particular.  We know that that

6   was the purpose of some of these meetings in Sudan between

7   Sudanese and Iranian clerics in particular, and al-Qaeda

8   operatives.  This came out in testimony in spades in the East

9   Africa embassy bombing trials in New York, including from people

10  like Jamal al-Fadl, a former al-Qaeda operative.  And as I think

11  since-retired former special agent from the FBI Daniel Kohlman

12  wrote in an affidavit in that case, these meetings were for the

13  purpose of and succeeded in overcoming their mistrust of one

14  another for the express purpose of their joint interest in

15  targeting the United States.

16  Q.   When you say their joint interest, which parties are you

17  referring to?

18  A.   Iran and al-Qaeda.

19  Q.   What was the result of the meetings in the Sudan?  What

20  happened after the meetings in the Sudan?

21  A.   The result of these meetings, which continued, we know at

22  least 1992 through 1996, which is the period throughout which

23  this bombing was being planned, that there were several

24  instances of training of al-Qaeda operatives.  We know of one in

25  Iran where senior al-Qaeda operatives went to Iran for training.

1    We know that after that senior al-Qaeda operatives went to

2    Lebanon for training in Hezbollah camps, camps at which it is

3    regularly the case that Iran's Islamic Revolutionary Guard Corps

4    also serve as trainers.

5         We know there was at least another training in Lebanese

6    Hezbollah camps by individuals who were later tied to this

7    particular bombing in East Africa, including a financier and a

8    bomb-maker who came back with videotapes and manuals

9    specifically about how to blow up large buildings.

10        We know, by the way, that this is one of the things that

11   al-Qaeda was most interested in.  Bin Laden had praised the

12   Hezbollah bombings in Beirut in the 1980s, and we know from, for

13   example, the testimony of Ali Mohammed, also former al-Qaeda,

14   that this particular issue, learning how to blow up big

15   buildings, was something that they were interested in.  That was

16   something included in these videotapes and manuals.

17   Q.   Who taught Hezbollah how to blow up big buildings?

18   A.   Hezbollah is as capable as it is, and is often described as

19   the A-team of terrorists, even compared to al-Qaeda, because of

20   its training from Iran, in counterintelligence and in explosive

21   capability in particular.  All of Hezbollah's training it

22   received and still receives from Iran.  Hezbollah operatives

23   regularly go to Iran for that training.  And as I mentioned,

24   Iran's Islamic Revolutionary Guard Corps has long had and

25   continues to have, throughout the period leading up to this

1    attack certainly had a presence in Lebanon and at Lebanese

2    training camps, Hezbollah training camps in Lebanon.

3    Q.    You mentioned Ali Mohammed.  What role did he play in the

4    relationship that we're discussing?

5    A.    Ali Mohammed, who at one point gave training to U.S.

6    military officers, who was himself in the U.S. military, born in

7    Egypt, later provided security for one such meeting between Bin

8    Laden and Hezbollah's chief external operations officer at the

9    time, Imad Mughniyah.

10   Q.    Were there other al-Qaeda operatives, known al-Qaeda

11   operatives that were involved in the relationship?

12   A.    Certainly.

13   Q.    Who?

14   A.    Well, one that comes to mind in particular is Mustafa

15   Hamid, H-A-M-I-D.  Mustafa Hamid, throughout the period we're

16   talking about here, throughout the 1990s, was one of al-Qaeda's

17   primary points of contact specifically to Iran's Islamic

18   Revolutionary Guard Corps.  Later, in 2009, the Treasury

19   Department would designate him as a specially designated global

20   terrorist, noting specifically that he was one of al-Qaeda's

21   senior leadership living in Iran and working closely with the

22   IRGC, the Islamic Revolutionary Guard Corps.

23          MR. MACALLISTER:  Permission to approach the witness?

24          THE COURT:  You may.

25   BY MR. MACALLISTER:

```
 1    Q.   Dr. Levitt, can you identify what I just put in your hand?

 2              THE COURT:  Which is marked as?

 3              MR. MACALLISTER:  We'll have to mark this as CC,

 4    Your Honor.

 5              THE COURT:  You may identify it.

 6              THE WITNESS:  This is the first page of the press

 7    release dated January 16, 2009, entitled "Treasury targets

 8    al-Qaeda operatives in Iran."  The first individual identified,

 9    the one identified on this page and others that follow is

10    Mustafa Hamid.

11    BY MR. MACALLISTER:

12    Q.   Is this a fair and accurate copy of the report?

13    A.   Yes.

14    Q.   Where did you find this report?

15    A.   This report is available on the Treasury Department's Web

16    site.

17              THE COURT:  But it's only the first page of the

18    report.

19              THE WITNESS:  Correct.  According to this printout,

20    it's one of three.

21              MR. MACALLISTER:  We'll provide you with the other two

22    pages, Your Honor.  I don't have them with me.

23    BY MR. MACALLISTER:

24    Q.   Do you know what's on the other two pages?

25    A.   There was, I think it was four individuals who were
```

1    designated in this action, and so Mustafa Hamid is identified

2    here with his alternative identities, also known as, his place

3    of birth, date of birth, nationality, and some details about why

4    he was designated.  And what would follow would be the same

5    about the other operatives.

6         But this includes some of the details about his activities

7    in the mid-1990s and late 1990s facilitating communications and

8    negotiating a secret relationship between Osama bin Laden and

9    Iran.

10         MR. MACALLISTER:  Your Honor, at this time we would

11   move Exhibit CC into evidence.

12         THE COURT:  Exhibit CC is admitted.

13                        (Plaintiff Exhibit CC

14                         received into evidence.)

15   BY MR. MACALLISTER:

16   Q.   Turning back to the documents that I handed you before,

17   which are Exhibit AA, the 12/14/98 declassified CIA report, and

18   BB, the May 12, 1997 declassified CIA report.  Let's look at AA

19   first.  What is on this document --

20   A.   I'm sorry.  AA is the 1998?

21   Q.   I'm sorry.  December 4, 1998.

22   A.   Thank you.

23   Q.   What does this document say about al-Qaeda that is relevant

24   to the proceedings today?

25   A.   If you look down the page to the paragraph marked paragraph

3 --

THE COURT:  Just for clarification, what you refer to as a report is actually a two-page document, the first page of which is part of the president's daily brief, I think, and the second page of which is simply the notation of declassification of that.

THE WITNESS:  Correct.  It actually doesn't say if this is part of the PDB, the president's daily brief.

THE COURT:  But I assume the second page has so indicated, because it refers to it as the president's daily brief.

THE WITNESS:  Indeed it does.

THE COURT:  Go ahead.

BY MR. MACALLISTER:

Q.   Dr. Levitt, you were describing the third paragraph, what's marked as paragraph 3.

A.   Paragraph 3.  So this is in December 1998.  Obviously following the East Africa embassy bombings.  Halfway through that paragraph it says, and I quote, "A Bin Laden associate in Sudan" -- indicating parenthetically that Bin Laden associates are still in Sudan -- "a Bin Laden associate in Sudan late last month told a colleague in Kandahar, Afghanistan that he had shipped a group of containers to Afghanistan.  Bin Laden associates also talked about the movement of containers to Afghanistan before the East Africa embassy bombings."

1        So the concern of course is that activity that happened

2   just prior to a major al-Qaeda attack, in this case the East

3   Africa embassy bombings, is now happening again, and there's

4   concern that this is either -- it's not clear from here if this

5   is code word activity, they're talking about containers, or if

6   literally containers, perhaps of munitions, where they're

7   concerned similar types of behaviors are happening again and the

8   possibility that that might indicate that other attacks are

9   forthcoming.

10        THE COURT:  Of course the reference to East Africa

11  bombings would indicate that material went from Sudan to

12  Afghanistan.

13        THE WITNESS:  Correct.  Correct.

14  BY MR. MACALLISTER:

15  Q.   You mentioned that this might be a code word versus to be

16  taken literally.

17  A.   Yes.

18  Q.   Do you have any way of knowing which that is?

19  A.   Based on this alone, I don't.

20  Q.   Dr. Levitt, there's been testimony prior that Osama bin

21  Laden left the Sudan in 1996.  What conclusion to a reasonable

22  certainty do you have regarding whether al-Qaeda remained in the

23  Sudan after 1996, whether all of al-Qaeda left with Bin Laden?

24  A.   Well, we know there's at least one Bin Laden associate in

25  Sudan as of November 1998, because it talks about late last

1   month, when this is dated December.  Presumably this was not the

2   only one.  In fact, it's a well-known fact that al-Qaeda

3   operatives remained in Sudan, just not as overtly and not in as

4   many numbers as they had previously.

5   Q.   And referring to Exhibit BB, which is the May 12, 1997

6   report.

7   A.   Yes.

8   Q.   On page 2, what information is identified there about the

9   Sudan?

10   A.   So this is entitled "Sudan:  A Primer on Bilateral Issues

11   With the United States."  On the second page, which is actually

12   numbered page 4, presumably because the rest is redacted, it

13   says, and I quote, "Despite some positive steps over the past

14   year, Khartoum has sent mixed signals about cutting its

15   terrorist ties and has taken only tactical steps.  In mid-1996

16   international pressure and the imposition of U.N. sanctions

17   forced it to press high-profile Egyptian extremist groups and

18   the Saudi terrorist financier Osama bin Laden to depart."

19        Clearly, Sudan did not make a break with terrorism of its

20   sudden change of heart.  There were specific things that led --

21   types of pressure, Sudan to believe that it had to force

22   high-profile extremists to depart the country, and therefore it

23   shouldn't surprise that even after this departure there are

24   still extremists in the Sudan.

25   Q.   And Dr. Levitt, on what's listed as page 4, it says that

1    the Sudan has only taken tactical steps; is that correct?

2    A.   Correct.

3         MR. MACALLISTER:  At this time, Your Honor, we would

4    move in Exhibits AA and BB into evidence.

5         THE COURT:  I think they've already been admitted.

6    Actually, BB, it's sort of interesting as an aside to show how

7    things change over time.  This is a 1997 document which refers

8    to Osama bin Laden as a terrorist financier.  I doubt that is a

9    reference you will find in a CIA document today.

10        THE WITNESS:  That, sir, is a comment that I tell my

11   class in my class on combating terror finance.  It is a lesson

12   indeed.

13   BY MR. MACALLISTER:

14   Q.   Dr. Levitt, returning back to the relationship between Iran

15   and al-Qaeda, you mentioned trips to Lebanon for training with

16   Hezbollah.  Why do you think training from Hezbollah was

17   something that al-Qaeda was interested in?

18   A.   Again, al-Qaeda had already expressed interest -- had

19   already praised the Marine barracks and embassy bombings in

20   Beirut in the 1980s, and had expressed interest specifically in

21   learning how to blow up buildings, as Hezbollah had already

22   done.

23        We know that at least in one of those training instances

24   the trainers came back with manuals and videos, which one does

25   if one wants to train others.  That training, I believe, is very

1    significant.

2    Q.   Had al-Qaeda blown up any buildings or engaged in any

3    large-scale attacks prior to the 1998 embassy bombings?

4    A.   No.  Al-Qaeda had carried out small-scale attacks.  In

5    fact, one of the things that was so surprising was that al-Qaeda

6    went from a small failed bombing targeting U.S. military in

7    Yemen on their way to Somalia, to blowing up entire buildings in

8    East Africa in a fairly small, short period of time.

9    Q.   Was the intelligence community surprised by the '98 embassy

10    bombings?

11    A.   I don't want to comment on what the intelligence community

12    was or was not, but I can tell you I find it surprising.

13    Q.   Would Iranian government authorization be required for

14    Hezbollah support of al-Qaeda?

15    A.   I believe so, yes.

16    Q.   Why do you think that?

17    A.   Hezbollah is its own entity.  In fact, it's multiple

18    different things at home in Lebanon.  It is today a political

19    party more so than it was then.  It is a social welfare group.

20    It is a militia.  And it can act more independently at home in

21    Lebanon.  In fact, maybe its sponsorship from Syria is more

22    important there.  When and where Hezbollah engages in

23    international terrorism abroad, it has always done so in very

24    close tactical and strategic cooperation with Iran.

25        As Iran's primary proxy, it's important for Iran to have

1    reasonable or plausible deniability for these international

2    terrorist attacks, which is why it finds Hezbollah so useful.

3    But it also needs Hezbollah to be just that good, so that lines

4    won't be drawn back to Iran.

5         If we look at Hezbollah's attacks in Argentina, targeting

6    the Israeli embassy in Buenos Aires in 1992, or the Jewish

7    Cultural Center in Buenos Aires, the AMIA building, in 1994; if

8    we look at the failed Hezbollah attempt to blow up the Israeli

9    embassy in Bangkok, Thailand that same year, 1994; if we look at

10   Saudi Hezbollah, which is Saudi Shia in Saudi Arabia with very

11   close ties to Lebanese Hezbollah, and their bombing of the

12   Khobar Towers barracks of the U.S. and other Coalition forces in

13   Dhahran, eastern province of Saudi Arabia in 1996; if you look

14   at those attacks, in each and every one Iran has played a very

15   important, I would argue intimate role, tactically, in the

16   ability to train and execute those attacks, and strategically,

17   in approving them.

18        In the case of the attacks in Argentina, the indictment for

19   the AMIA bombing expressly lays out in detail the meeting in

20   Iran, date, time, participants, place, where senior Iranian

21   leaders gave the approval for the attack.

22   Q.   When you say Iranian leaders, who are we talking about in

23   the case of interactions with Hezbollah?

24   A.   Well, arguably there are two parallel leadership structures

25   in Iran.  One is the supposedly elected leadership, which has

1    been widely contested in the past year, year or two.  But the

2    other is the revolutionary leadership led by the Supreme Leader,

3    Ayatollah Khomeini, and that is the one that counts.  It is the

4    Supreme Leader who controls oversight of the media, the

5    military, the Ministry of Intelligence and Security, the Islamic

6    Revolutionary Guard Corps, the Basij militia, the IRGC's Qods

7    Force, et cetera.  All those entities that oversee the training

8    and support and cooperation and approval for terrorist attacks

9    with other groups answer to the Supreme Leader.

10   Q.    Dr. Levitt, to a reasonable degree of certainty, would

11   Hezbollah's assistance to al-Qaeda have been possible without

12   the authorization of the Iranian government?

13   A.    No.

14   Q.    Can you explain why?

15   A.    I think there are several reasons.  The first is again the

16   getting in bed with al-Qaeda.  After al-Qaeda had issued not one

17   but two fatwas, religious edicts, in '92 and '96, announcing its

18   intent to target the West, it was a dangerous proposition.  As I

19   mentioned earlier, Iranian leaders have their own version of

20   rationality, but they are rational actors.  And that is

21   something that I believe had to be approved, again, so there

22   would be reasonable or plausible deniability.

23        Overcoming this deep mistrust between the most radical

24   Salafi jihadi Sunnis, who, as we saw in the context of the

25   aftermath of the war in Iraq, are sometimes all too eager to

1    kill Shia in particular, and for the Shia on the other side to

2    overcome their historical animosity towards these radical

3    Sunnis, is no small feat.  And I think it is only because of

4    their shared interest at that point, in the 1990s and the

5    immediate -- to target U.S. interests, that they were able to

6    decide to overcome this animosity and mistrust.

7         And I think it's quite clear, because it was for the

8    express purpose of targeting the United States, it shouldn't

9    surprise then that the type of training they received was

10   specifically of the type used in the East Africa embassy

11   bombings.  They expressed interest in, we know they received at

12   least videos and manuals about, blowing up large buildings.

13   Q.   Dr. Levitt, did you compile a report based upon your

14   conclusions?

15   A.   I did.

16            MR. MACALLISTER:  Permission to approach the witness.

17            THE COURT:  You may.

18   BY MR. MACALLISTER:

19   Q.   Dr. Levitt, what is this that I've just handed to you?

20   A.   This is my signed report.

21   Q.   Is that a fair and accurate copy?

22   A.   Yes.

23            MR. MACALLISTER:  Your Honor, at this time we would

24   move Exhibit L-2 into evidence, which is Dr. Levitt's report.

25            THE COURT:  L-2 is admitted.

1                              (Plaintiff Exhibit L-2

2                              received into evidence.)

3      BY MR. MACALLISTER:

4      Q.   Dr. Levitt, what conclusions did you reach to a reasonable

5      degree of certainty regarding the links between the Iranian

6      government and the two U.S. embassy bombings that occurred on

7      August 7, 1998?

8      A.   I concluded that al-Qaeda carried out these attacks,

9      without question; that al-Qaeda in the period leading up to the

10     bombings received training, at least in one instance in Iran, at

11     least in two instances in Lebanon, from Iran's proxy, Hezbollah;

12     and that it would not have been possible for al-Qaeda to a

13     reasonable degree of certainty to have executed this type of a

14     bombing attack, which it had never previously executed, without

15     this type of training it received from Iran and Hezbollah.

16     Q.   To a reasonable degree of certainty, then, how important

17     was the Iranian and Hezbollah aid to al-Qaeda's mission when it

18     attacked the U.S. embassies?

19     A.   Given that the small-scale bombing attack targeting U.S.

20     forces in Yemen was a failure -- not only did it not

21     successfully target U.S. forces, but the bomb didn't work

22     particularly well -- and that they went in a relatively short

23     period of time from that to this, an extremely powerful

24     explosive device, I think that it could not have happened

25     without this type of training.

1    Q.    Thank you, Dr. Levitt.

2              MR. MACALLISTER:  I have no further questions,

3    Your Honor, but I don't know if anyone else does.

4              THE COURT:  Any counsel have questions?

5              MR. FAY:  Yes, Your Honor.

6                        DIRECT EXAMINATION

7    BY MR. FAY:

8    Q.    Dr. Levitt, who was Abu Ubaidah al-Banshiri?

9    A.    Abu Ubaidah al-Banshiri was a senior al-Qaeda operative in

10   East Africa, arguably the most senior al-Qaeda operative in East

11   Africa, who died in an accident, I think it was on Lake

12   Victoria, when a ferry that he was on sank.

13   Q.    How important was he --

14             THE COURT:  Let's get a time frame.

15             MR. FAY:  Yes.

16             THE WITNESS:  I believe that was 1996.

17   BY MR. FAY:

18   Q.    In 1996?  Okay.  How important was he to the operations of

19   al-Qaeda in East Africa?

20   A.    He was the most senior al-Qaeda operative there.  His death

21   would have had a very serious effect on al-Qaeda's operations

22   across the board.  Terrorist operations, logistical, fundraising

23   operations.  You lose your senior commander, who has the faith

24   and trust of the leadership now in Afghanistan, after they moved

25   out of Sudan, and you need to reestablish that cellular

     1    structure.

     2    Q.   Was he such a senior person in this hierarchy that it is

     3    reasonable to assume that that accounts for a delay from 1996 to

     4    1998 for the actual carrying out of the attacks?

     5    A.   I think that that is one very important factor.  I think

     6    another is the fact that Bin Laden himself was kicked out and

     7    left with other senior operatives, and there's then the need to

     8    communicate back and forth, and that also has a delay.

     9    Q.   You mentioned the language of the Supreme Court using the

    10    term "gold standard" to your work?

    11    A.   The 6th Circuit.

    12    Q.   The 6th Circuit?  Okay.

    13    A.   The Supreme Court cited my book but did not use that

    14    language.

    15    Q.   And that's in -- is that the case that went to the Supreme

    16    Court?

    17    A.   No.  Those are two different cases.

    18    Q.   Which case went to the Supreme Court?

    19    A.   This is Humanitarian Law Project v. Holder, and it was a

    20    challenge to the material support statute.  The Supreme Court

    21    upheld the material support statute, and in so doing cited my

    22    book on HAMAS twice.

    23    Q.   Doctor, from the Supreme Court decision, there is an

    24    indication of three different things that were done by, in that

    25    case, the plaintiffs.  That was, as you know, a suit to --

1    designed to prevent some enforcement, some action being taken

2    place.  It said -- let me read this.  "First, plaintiffs

3    proposed to train members of the PKK on how to use humanitarian

4    and international law to peacefully resolve disputes," citing

5    552 Federal Third at 921, note 1.  "Congress can, consistent

6    with the First Amendment, prohibit this direct training.  It's

7    wholly foreseeable that the PKK could use these specific skills

8    that plaintiffs propose to impart, Section 2339A(b)(2), as part

9    of a broader strategy to promote terrorism."

10             THE COURT:  Where are we going, Mr. Fay?

11             MR. FAY:  Your Honor, give me an opportunity here.

12             THE COURT:  To read the whole Supreme Court decision?

13             MR. FAY:  No, I'm not, Your Honor.  That goes on for,

14   let's see, I don't know, about 150 pages.  No, I'm not going to

15   do that.  I realize some in the room have had troubles with

16   insomnia.  That would cure it, though, I'm sure of that.

17             THE COURT:  All right.  I'll give you a little leeway.

18             MR. FAY:  "Plaintiffs propose to teach PKK members how

19   to petition various representative bodies such as the United

20   Nations for relief."  And finally it says, "Plaintiffs propose

21   to engage in political advocacy on behalf of Kurds who live in

22   Turkey and engage in political advocacy on behalf of Tamils who

23   live in Sri Lanka."

24       Those are the things that were mentioned by the Supreme

25   Court.  Was your testimony testimony that was obviously

1    ultimately accepted by the Supreme Court, as well as lower

2    courts to some extent --

3              THE COURT:  It wasn't his testimony.  It was a

4    reference to a book.  He wasn't a witness in the case.

5    BY MR. FAY:

6    Q.   Let me see if I have this straight, then.  In what way did

7    you participate in this, in Holder?

8    A.   In none, other than to be proud to have had my book cited

9    twice.

10   Q.   Oh, okay.  Did your book uphold that this would fit within

11   material support?

12   A.   Yes.  My book was on HAMAS, not on those groups, but my

13   book was cited in explaining how money is fungible, how support

14   to one part of a group frees up funds for activities by other

15   parts of the group.  How groups like these spend funds to build

16   grassroots support that then can be used for all kinds of other

17   activities, and that this applies whether you're talking about a

18   group like HAMAS, or a group like Hezbollah, or the PKK.

19   Q.   Would you agree that what was cited in the plea by Ali

20   Mohammed as to what was discussed in terms of assistance to be

21   given by Hezbollah, by Iran, Hezbollah, in form of weapons,

22   explosives and so forth, is closer to the actual accomplishment

23   of a terrorist act than what was noted here?  I'm not saying the

24   Supreme Court was wrong in this by any means.  I endorse it.

25   But isn't that closer to the actual terrorist act than what we

1    had in Holder?

2    A.   If you would like me to testify specifically to Ali

3    Mohammed's plea, I'm going to need you to put that in front of

4    me.  But if I can answer it in general terms, is the provision

5    of explosives and weapons and training closer to the actual

6    execution of an attack than providing social welfare or

7    political training?  Yes.

8            MR. FAY:  Thank you, Doctor.  Thank you, Your Honor.

9            THE COURT:  Thank you, Mr. Fay.  Other counsel?

10           MR. MILLER:  No, Your Honor.

11           THE COURT:  Dr. Levitt, let me just ask you one or two

12   questions.  You referred to the criminal trial in New York both

13   now and earlier in your testimony, and you were asked a few

14   moments ago about Iranian authorization.  From your familiarity

15   with the New York trial, did any of the individuals who

16   testified, which included some of the defendants in that case,

17   or who gave testimony in their pleas, did any of it speak of

18   authorization being obtained from Iran for the East African

19   bombings to your recollection?

20           THE WITNESS:  To my recollection, they all speak about

21   different types of Iranian support, tangible support over the

22   period during which al-Qaeda was training for, preparing, and

23   then executing this attack.  And they do not get into the

24   specifics of whether and at what level an Iranian official, you

25   know, checked the box.

1        THE COURT:  But that might not have been done with

2   them anyway, I take it; it might have been done with a higher

3   level Hezbollah official?

4        THE WITNESS:  Presumably it would be done only with a

5   Hezbollah official, and they wouldn't have been in a position to

6   know about it.  But it's also the case that the nature of the

7   Iran-Hezbollah relationship is intimate enough that you don't

8   necessarily need this face-to-face meeting with the Supreme

9   Leader.  There's a member of the Islamic Revolutionary Guard

10  Corps Qods Force on the Shura council, on this senior

11  consultative council of Hezbollah.  It is believed that until he

12  was assassinated, Imad Mughniyah, the head of Hezbollah's

13  external services organization, was dual-hatted and had a title

14  within the Revolutionary Guard Corps.

15       So when you are that intimately interconnected, there are

16  ways to get approvals that will again provide this reasonable

17  deniability, a "we never had this meeting" moment.

18       THE COURT:  And you spoke a few moments ago about

19  training received by al-Qaeda from Iran or Hezbollah -- I'm not

20  sure which you actually were referring to -- both in Iran and in

21  Sudan.

22       THE WITNESS:  Correct.

23       THE COURT:  Was the training by Hezbollah or by the

24  Revolutionary Guard, or do you know?

25       THE WITNESS:  In at least one instance al-Qaeda

1   operatives went to Iran for training.  That training would have

2   been at the hands of Iranians.  In at least two instances groups

3   of al-Qaeda operatives -- at least one of those two instances

4   included people involved in the East Africa embassy bombings

5   themselves -- received training in Lebanese Hezbollah camps in

6   Lebanon.  Those are the types of camps that we know then, and

7   parenthetically still today, Iranian trainers train in.

8   Lebanese Hezbollah trainers train people in them as well.

9           THE COURT:  Can we be confident that these types of

10  training received by al-Qaeda operatives, including those who

11  are responsible for the East Africa bombings, included

12  explosives training and even particularly training in explosive

13  attacks on large buildings?

14          THE WITNESS:  I believe we can, in part because of

15  al-Qaeda's expressed interest in receiving just that type of

16  knowledge, its lack of that knowledge prior to this attack, and

17  suddenly it has this knowledge, and the fact that we know that

18  some of the material brought back from training in Lebanon,

19  including manuals and videos, included information on how to

20  blow up large buildings.

21          THE COURT:  All right.  Thank you, Doctor.

22          THE WITNESS:  Thank you, sir.

23          THE COURT:  You may step down.  I appreciate you

24  coming.

25      (The witness steps down.)

```
 1              THE COURT:  Let's keep going.  I don't think we need
 2       to take a break quite yet, so let's get another witness on.
 3              MR. FAY:  One more witness for today, Your Honor.
 4       That would be Mr. James Owens.
 5          JAMES OWENS, WITNESS FOR THE PLAINTIFFS, SWORN
 6              THE COURT:  Good afternoon, Mr. Owens, and welcome
 7       again.
 8              THE WITNESS:  Good afternoon, Your Honor.
 9              THE COURT:  Mr. Fay.
10                        DIRECT EXAMINATION
11       BY MR. FAY:
12       Q.   Could you please give your full name.
13       A.   My name is James Benjamin Owens.
14       Q.   What is the state of your residence?  By that I mean
15       geographically the state, not whether you're happy or sad.
16       A.   I live in Wilmington, North Carolina.
17       Q.   Could you describe your education for us?
18       A.   I have a bachelor of science degree in industrial arts from
19       Appalachian State University in Boone, North Carolina.
20       Q.   Are your parents still alive at this time?
21       A.   My mother is.
22       Q.   Do you have any siblings?
23       A.   I do.  I have an older sister and a younger brother.
24       Q.   And are you presently married?
25       A.   I am.
```

1  Q.    To whom are you married?

2  A.    I just married my Tanzanian sweetheart this past April 8.

3  Q.    Do you have any children or stepchildren?

4  A.    I do have one stepchild who is six years old.

5  Q.    Where was that stepchild born?

6  A.    She was born in Tanzania and lives with her mother.

7  Q.    Where were you born?

8  A.    I was born in Alexandria, Virginia.

9  Q.    Did you grow up there?

10 A.    I grew up in Falls Church, Virginia.

11 Q.    At all times from your birth to the present, have you been

12 a citizen of the United States?

13 A.    I have.

14 Q.    Tell me where you went to school, what it was like growing

15 up in this area.

16 A.    Well, I went to Falls Church High School, and at the time

17 it was I guess considered the lily white suburbs of Northern

18 Virginia, and I graduated from Falls Church in 1966.

19 Q.    And where did you go from there?

20 A.    I went to school at Appalachian State University.

21 Q.    What did you want to do with your life at that point?

22 A.    I wanted to be an industrial arts teacher, so I have a

23 degree in industrial arts.

24 Q.    After you got out of school, where did you go from there?

25 A.    I joined the Peace Corps and was sent to Kenya.

```
1   Q.   Was that the first time you had ever been to Africa?

2   A.   Yes.

3   Q.   Tell me how that affected you, going to Africa in the Peace

4   Corps?

5   A.   Well, I think the very first minute I stepped off the plane

6   in Kenya I kind of felt like I'd come home.  And as you well

7   know, I've spent most of the past 20 years now in Tanzania.

8   Q.   When did you move -- well, start spending most of your time

9   over in Africa?  About what year was that?

10  A.   Well, I was doing research for my very first expedition

11  starting in 1986, right after I'd returned from Borneo.  And

12  from 1990 until the present I've been in Tanzania at least once

13  a year.

14  Q.   You mentioned the word "expedition."  What do you mean by

15  that?

16  A.   I lead expeditions in Africa that retrace the footsteps of

17  famous 19th century explorers who were searching for the source

18  of the Nile and for each other.  An example would be Henry

19  Morton Stanley's search for Dr. David Livingstone, and so forth.

20  Q.   Can you tell us where you start from, go to, and come back

21  to, and what happens along the way?

22  A.   Well, almost all of the 19th century expeditions started on

23  the island of Zanzibar, where everybody built their caravans and

24  transported their teams to Bagamoyo, which is on the East

25  African coast just north of Dar es Salaam.  And then they walk
```

1    what is now known as the Central Slave and Ivory Trade Routes

2    into the interior, ending up in Ujiji on the shores of Lake

3    Tanganyika.

4         I've led seven expeditions so far, and I have an eighth

5    expedition planned for next summer.  It's a very rigorous

6    exercise where we're walking between 8- and 900 miles at a time.

7    We walk 15 miles a day.  We camp in the bush.  Along the way

8    we've renovated three schools, we've planted over a hundred

9    thousand trees, we've distributed tens of thousands of dollars

10   and tons of humanitarian aid, we've saved a couple of lives

11   along the way.  And I think it's a real worthwhile occupation.

12        We're very popular with the Tanzanian government.  I think

13   some of my Peace Corps education helped a lot, and the fact that

14   we treat Tanzanians appropriately.  This is their country.  If

15   you see them walking down the street, you step aside and not

16   them and so forth.

17        As a matter of fact, in 2008 I had a 70-year-old judge from

18   Springfield, Massachusetts whose now-grown children were the

19   plaintiffs in the lawsuit that desegregated schools in

20   Springfield, Massachusetts.  So I've had people as young as 19

21   and the oldest person I've had on my expedition was 70 years

22   old.

23   Q.   Mr. Owens, as a lawyer who's practiced on both sides in

24   personal injury cases, I was fascinated by all the dangers you

25   listed that people had to sign off assuming the risk on.  Could

1   you tell His Honor about that?

2   A.   I have about a four-page contract that everybody has to

3   sign, and a lot of people -- it has to be notarized, and a lot

4   of people will go to a friend who's a notary and ask them to

5   notarize it, and they read the document and they usually look at

6   the person and say, are you going to sign this?

7        It says that even if you are killed or you're badly

8   injured, even if I'm negligent, you can't sue me or anybody that

9   I know.  It mentions specifically tsetse flies, malaria,

10  insurrection, bad weather, and every kind of terrain, every kind

11  of sickness you can encounter in Africa.  So it's quite

12  comprehensive, and one of the conditions of joining my

13  expedition is that you must sign this document.

14           THE COURT:  And hopefully you haven't had to litigate

15  the enforceability of that document.

16           THE WITNESS:  So far I have not.  And so far I've been

17  really lucky.  There have only been two circumstances where

18  people had to leave the expedition because of injuries.  But

19  other than that, we've never lost anybody.  Of the people that

20  have been badly injured -- I've been injured probably more than

21  anybody -- but I had a 19-year-old Dutch girl that drank one too

22  many Kilimanjaros and fell in the fire and burnt her hand

23  terribly.  I've had citizens from the Netherlands, from Great

24  Britain, from Canada, from Vietnam.  But most of the people that

25  join my expeditions are Americans.  And of course I have a

1    Tanzanian staff, three of which are Muslim and two are

2    Christian.

3    Q.   Kilimanjaro I know from my nephew is a type of beer, right?

4    A.   It is the African beer.  I guess it's the Budweiser of

5    Tanzania, yes, sir.

6    Q.   Do those dangers include lions, Cape buffalo, innumerable

7    snakes and other creatures of that sort?

8    A.   It does.  And we see all of these animals, and I guess

9    black mambas are one of my greatest fears, but it's not unusual

10   when we're deep in the bush to have our camps entirely

11   surrounded by hyenas.  We can see their orange eyes.  And of

12   course whenever they're in the neighborhood we stoke up the fire

13   as much as we can.  But we can come out in the morning and you

14   can actually watch and see a pee trail, they've peed all the way

15   around, marking their area surrounding our encampment.  Because

16   of that, everybody on the team has to sit up for two hours every

17   other night to keep the campfire going and to make sure that

18   animals or uninvited guests don't come into camp.

19       So, yes, we see elephants, we've seen lions.  Haven't ever

20   seen any rhinos.  One of the biggest curses are the cute little

21   verbit monkeys who come into camp and steal our food, steal our

22   cameras, steal our blue jeans and go up a tree and sit there and

23   laugh at us.

24   Q.   How many people over the years have gone on these

25   expeditions with you?

1    A.    More than 80.

2    Q.    And they all survived, I take it?

3    A.    So far, yes, everybody has survived.

4    Q.    Prior to August 7 of 1998, with the exception of one event

5    in the Army, what was the state of your health?

6    A.    I generally enjoyed good health.  I did have a heart attack

7    when I was 34 years old.  My father died of a massive heart

8    attack here in Falls Church at the age of 39.  He's buried here

9    at Arlington.  So I had that heart problem.  I turned my life

10   around, started jogging, started walking.  Now I'm just

11   generally injured all over.  I have a bone spur and injured

12   Achilles, I've had malaria five times, and because of the

13   bombing I'm suffering from seizures on a regular basis, so.

14   Q.    Other than those things, any other health pre-existing

15   August 7, 1998?

16   A.    No.  I was actually -- I've actually enjoyed good health

17   most of my life.

18   Q.    Any unusual psychological strain in your life before August

19   7, 1998?

20   A.    I think probably the only one was my father dying in my

21   arms at the age of 39, three days before Christmas in 1962.  All

22   the counseling I received because of the bombing seems to always

23   want to visit that subject.

24   Q.    Incidentally, how many miles do people -- does the

25   expedition go walking?

1    A.   Well, my most popular expedition is retracing Stanley's

2    search for Dr. Livingstone, and that's 856 miles from Bagamoyo

3    to Ujiji.

4    Q.   One way or round trip?

5    A.   That's one way.

6    Q.   Let me take you to August 7 of 1998.  Had you just

7    completed an expedition on that date?

8    A.   I had.  For 130 years scholars and historians had been

9    bickering about the route that these African men took when they

10   carried Dr. Livingstone's body out of the interior.  And in 1998

11   I solved that riddle by walking 1,300 miles from central Zambia

12   and all the way across Tanzania to Bagamoyo.

13   Q.   And did there come a time that day when you went over to

14   the American embassy?

15   A.   Yes, there was.

16   Q.   And why did you go over to the American embassy?

17   A.   John Lange, the chargé, and Calvin Conner, the consul

18   general, had become acquaintances of mine.  I'd been to the

19   American embassy many times.  And they decided that they wanted

20   to meet the expedition for the final day, meet us at the Ruvu

21   River, camp on the banks of the river, and then walk into

22   Bagamoyo with us the next day.  I had a film crew from South

23   Africa and they wanted to be in the video.  Plus they were going

24   to enjoy the adventure.

25        Besides that, as the leader of an expedition, before each

1   expedition I take a copy of everybody's passport and all of

2   their emergency numbers.  If anybody is ever seriously injured

3   or killed on my expedition, it's the American embassy that has

4   to step up.  So it's my duty as the leader of the expedition to

5   go to the embassy and inform them that all Americans were safe

6   and on their way home.

7       I had a double purpose this time.  We arrived in Bagamoyo

8   on Thursday, the 6th.  I went to my hotel to take the first bath

9   I'd had in several weeks, and got cleaned up, and Friday morning

10  I got in a taxi on the 7th and went to the embassy to inform

11  John Lange and Calvin Conner that they were not going to be able

12  to walk with the expedition because I had brought the team in

13  like eight days early.

14          THE COURT:  Just for clarification, because I don't

15  think it's been specifically said, we're talking about the

16  embassy in Dar es Salaam.

17          THE WITNESS:  Yes.  The embassy in Dar es Salaam.

18  Yes, sir.

19  BY MR. FAY:

20  Q.  Now, you mentioned John Lange, the chargé d'affaires.  Was

21  there an ambassador at the American embassy in Dar es Salaam on

22  this date?

23  A.  Not at that time.  Ambassador Stith had been nominated, but

24  the Senator from North Carolina, Jesse Helms, was holding up his

25  nomination.

```
 1    Q.   So Mr. Lange would have been the chief at the embassy, the

 2    acting ambassador if you will?

 3    A.   That is correct.

 4    Q.   Tell us what happened when you went to the embassy.

 5    A.   First of all, I think it's interesting to note that my '98

 6    expedition was called the Livingstone Death March, since we

 7    figuratively carried Dr. Livingstone's body all that way, I

 8    thought it was ironic, given the circumstances later that day.

 9         I arrived at the American embassy just about the time the

10    bomb was going off in Nairobi.  I remember my taxi driver asking

11    me, which is traditional in Tanzania, would you like me to wait,

12    and I told him no, I was going to have a long meeting.  I'd just

13    see him back at my hotel.

14    Q.   That saved his life.

15    A.   Well, it did, and he never let me forget that.  When I did

16    arrive back to the hotel after I left the hospital, he actually

17    bent down and kissed my feet and said that I had saved his life.

18         I know that I was joking around with the four kids.  I call

19    them kids.  They were in their 20s, maybe their young 30s.  One

20    of the plaintiffs in this, in the Mwila case, his wife was

21    there, and there were three males, and they knew me because of

22    my many visits to the embassy.  And they were joking around, and

23    they wanted to take the little cigarette lighter I had in my

24    pocket, and even though I didn't set off the alarms, they wanted

25    to wand me and just kind of joke around, how you doing, Bwana
```

1    Jim, and so on and so forth.

2         So I was in the guard booth for several minutes talking to

3    all these young people.  And then I entered the embassy.

4    Q.   Okay.  What happened then?

5    A.   One of the things I had never noticed before because of all

6    my many visits to the embassy, that the door on the embassy is

7    like thick steel, and it was the first time I had ever noticed

8    that, and for some reason I had to open it that day.  All of the

9    offices were on the second floor of the embassy, so I had to go

10   up two flights of stairs to get to the second floor.

11        When I got there, the vice consul, and I apologize for not

12   remembering her name, came running up to me.  "Jim, what are you

13   doing here?  You're early.  We don't expect you.  John and

14   Calvin were excited about meeting you," and so on and so forth.

15   She took me by the hand, and when you get to the top of the

16   stairs where the visa section is, sitting at a kind of a

17   45-degree angle, it was a bulletproof booth with a young Marine

18   behind it, and in every circumstance he will take your passport

19   and give you a badge on a chain which you put around your neck.

20        Well, the vice consul was holding my hand and she called

21   the young Marine by his first name and says, "Well, this is Jim,

22   and John's waiting to meet him.  Do we need to do this?"  And

23   the young Marine thought about it and just kind of waved me

24   through, which actually kind of saved my life, I guess.

25        I went around behind the booth where the young Marine was

1   and into an office directly behind the visa section.  The person

2   I was there to see first was Calvin Conner.  You don't go see an

3   American ambassador without going to see somebody first.  I went

4   into Calvin's office, but Calvin was off at the time and I was

5   talking to another gentleman, and I'd only been there, it wasn't

6   even two minutes.  We were just introducing ourselves, and I

7   hadn't begun my debriefing, when the bomb went off.

8   Q.   Tell us what you remember about the bomb going off.

9   A.   The gentleman I was speaking to had his back to the window.

10  I was facing the window and facing him, and to our right was the

11  visa section.  I saw the glass coming at me.  It was almost as

12  if it was in slow motion, but I saw the glass coming at me

13  before I heard the noise of the bomb.  I don't remember exactly

14  how, but I ended up about five feet behind myself, where I was

15  originally sitting when the bomb went off.  And the glass came

16  so fast that I didn't have time to even raise my arms.  I could

17  actually almost see the shards coming to me, and there was

18  nothing that I could do.

19       Something, either the gentleman I was talking to or

20  something from his desk hit me in the chest, and I had a huge

21  black and blue and yellow bruise that covered almost all of my

22  chest.  Immediately my glasses were covered in blood and I

23  couldn't see, and I thought oh, gosh, I can't see.  Took me a

24  few minutes to figure out to take my glasses off.  But a legal

25  sized file cabinet had fallen across our doorway and we were

trapped in the office.  And so myself and this other gentleman,

we grabbed the file cabinet and stood it up in its proper

position, and that was the last time I ever saw him.

And all I knew was I had to get out of there.  All we could

do was smell petrol and there were little fires all there in the

visa section and so forth.  We couldn't see.  The bomb shook the

building and between the debris and the smoke, I literally had

to get down to almost knee level to be able to look at the exit

where I had to get.  I felt my way along the wall.  I'd gotten

about 10 yards when I started hearing a woman crying for help,

and I kept trying to turn towards her.  She would have been to

my left, and every time I tried to turn to my left, I was

obstructed by furniture that was turned over, and ceiling tiles

had collapsed, and it was so smoky I couldn't see anything, and

I just kept smelling the petrol, and I said we gotta get out of

here.

So I continued my journey feeling my way along the wall.  I

finally got to the top of the stairs, and some young Marines --

I was very proud to be an American that day -- some of the young

Marines had bolted into the embassy, and as Special Agent

Piernick testified yesterday, the bomb blew the walls inward

into the embassy, and as I was standing at the top of the

stairs, a couple of the young Marines yelled, "Hey, mister, can

you help us?  Can you give us a hand?"  I said yes, I could.  So

I went over and a bunch of us lifted the wall just enough for a

1    young Marine to dive under the wall and pull out -- there was an

2    American woman who had been working there, and was able to drag

3    her out.  I only got to glance at her for a second, but I

4    noticed that her feet were pointing in the wrong direction.

5        After that was done, I went back to the top of the stairs

6    and the original vice consul who had helped me bypass the Marine

7    table there, she was asking me, "Jim, are you okay?"  And I

8    said, "Well, I'm okay, nothing's broken, but we need to get out

9    of here."  And she was just covered in blood, and she said, "Can

10   you help" -- and I think she said the lady's name was Evelyn --

11   "Can you help Evelyn?"  And it was an American, and the front

12   part of her nose was missing.  She was catatonic.  She had in

13   her arm a big group of files which she would not set down.  The

14   vice consul asked her to set it down, I asked her to set it

15   down.  And we had to negotiate the stairs.

16       Well, the bomb was just right next to the stairs, so it was

17   all twisted steel and broken glass and blood and body parts and

18   so forth.  And I had to forcibly help her down the stairs to

19   keep moving forward.  We had to go down one flight and take a

20   90-degree turn and another flight till we got to the outside.

21       As she did not want to go out the final door, so I

22   literally had to grab her and I dragged her out.  And as soon as

23   we got out, the Marines started screaming at us to get down.

24   And we were hearing pops and explosions.  We learned later that

25   the house across the street was on fire, and it was car tires

1    and gasoline tanks and aerosol cans that were -- I didn't know,

2    I had been in the bush for four months.  I thought we were under

3    attack.

4         So we had to crawl on our hands and knees entirely around

5    the embassy to the rear courtyard where everybody had gathered.

6    And they had erected a ladder on both sides of the fence, about

7    a 10-foot tall fence, so we could climb up and go over.  I was

8    one of the last to go up the ladder.  I was just trying to be

9    helpful, to help people up.  And I overheard all of the people

10   at the embassy saying we'll meet at Calvin Conner's in an hour,

11   and that didn't include me since I was the only civilian in the

12   embassy at that time.

13        And I know that when I got to the top of the fence to look

14   out, all I could see was young American Marines, Tanzanian

15   police, Tanzanian military, and big crowds of people.  I climbed

16   down the other side of the ladder.  I noticed the two young

17   Tanzanian police on the ground were covered in American blood,

18   and they were whispering to me, "Pole sana, pole sana," which is

19   I'm sorry in Swahili.

20        By the time I got down, all the ambulances had gone, so

21   they were trying to shove me into a Tanzanian police car, and I

22   looked back and there was John Lange, and he was also bleeding,

23   so it meant that the blast had penetrated the innermost part of

24   the embassy.  He had blood running down his face.  And he saw me

25   and he said "Jim, what are you doing here?"  And I said, "Well,

1    John, I came to see you, but the next time I come to see you

2    I'll just put it in writing."

3        So they rushed us all to four different hospitals.

4    Q.   Tell us where you were injured.

5    A.   Well, I've had plastic surgery on my neck.  My face had

6    glass all in it.  As a matter of fact, when the FBI finally

7    caught up with me I was over here on H Street in Washington at

8    my dermatologist, and she had a magnifying glass, picking glass

9    out of my face and my skull.  Evidently one piece of glass hit

10   me in the forehead, and it followed the contour of my skull and

11   it blew out the back of my head.  I'm deaf in my right ear.

12       I have PTSD.  I don't know if Your Honor noticed yesterday,

13   but when Ellen was testifying and she slammed the desk here, all

14   of us survivors startled, so we have exaggerated startle

15   response.  And I suffer from seizures.  An MRI revealed an

16   abnormality on the right side of my brain, which is consistent

17   with the bomb coming from the right.  And I'm deaf in my right

18   ear.  And I spent three months in the hospital just this past

19   August trying to I guess narrow down where these seizures are

20   coming from.  So I have four or five major seizures every night.

21   Q.   Is there anything more you would like to add to your

22   testimony here today?

23   A.   Not really.

24   Q.   Okay.

25            MR. FAY:  Thank you, Your Honor.

1          THE COURT:  All right.  Thank you, Mr. Owens.

2       (The witness steps down.)

3          THE COURT:  So it's 3:08.

4          MR. FAY:  Yes, Your Honor.

5          MR. MACALLISTER:  Your Honor, the issue -- the narrow

6    issue of how the Kenyan employees of the U.S. embassy, how their

7    contracts were structured, whether they were working for the

8    U.S. government of course is an issue in this case.  We have a

9    survivor from the bombing who worked in the embassy who can

10   testify to that issue.  I'd like to call him, and it probably

11   won't take 15 minutes, 10 minutes.

12          THE COURT:  Let's do that.

13          MR. MACALLISTER:  Your Honor, we'd like to call Tobias

14   Otieno to the stand.

15          **TOBIAS OTIENO, WITNESS FOR THE PLAINTIFFS, SWORN**

16          THE COURT:  Good afternoon, Mr. Otieno.

17          THE WITNESS:  Good afternoon, sir.

18                    DIRECT EXAMINATION

19   BY MR. MACALLISTER:

20   Q.   Good afternoon.  Please state your name for the Court.

21   A.   My name is Tobias Oyanda Otieno.

22   Q.   Where were you born?

23   A.   I was born in Kenya in August -- 30th August 1950.

24   Q.   Were you born near Nairobi?

25   A.   No.  I was born about 500 kilometers from Nairobi.

1    Q.    How did you end up in Nairobi?

2    A.    Well, after my university education, then I moved to

3    Nairobi and I was employed by the Kenya government and various

4    other organizations.  So that's how I --

5    Q.    I'm sorry, did you say the Canadian government?

6    A.    Yes.  Originally, yes.  After my university education, the

7    first job I had was with the Kenya government for two or three

8    years, and then I also worked for other organizations, and from

9    then on I moved on and I worked for the U.S. government.

10   Q.    Where was your university education?

11   A.    I received my postsecondary education in the U.S. at

12   California State University at Hayward.  In 1980 I got my

13   bachelor's of science degree in business administration.  And

14   then at the same -- I also enrolled at the same university and

15   received my master's degree in business administration in 1983.

16   And I went back to Nairobi in 1984.

17   Q.    When did you start working for the United States

18   government?

19   A.    I started working for the U.S. government Department of

20   Commerce in July 1998.

21   Q.    You were hired by the Department of Commerce?

22   A.    Yes.  I was recruited and hired by the Department of

23   Commerce.

24   Q.    Which building did you work in?

25   A.    I worked at the U.S. embassy in Nairobi.

1   Q.   Were you in the building on August 7, 1998?

2   A.   Yes, I was.

3   Q.   Do you know a number of the Kenyan nationals who were

4   killed or injured in that bombing?

5   A.   Yes.  I know a number of them.  Several of them were my

6   colleagues, so I know them, yes.

7   Q.   Are you familiar with how they were employed at the

8   embassy?

9   A.   Yes, I do.  There are two types of contracts of the U.S.

10   employees.  There are those who are employed by the various U.S.

11   government agencies.  Like myself, I was employed by the

12   Department of Commerce.  That is on a permanent basis contract.

13   And then there are those who are employed by some private

14   organizations which are contracted by the U.S. government.  For

15   example, those who are employed by the security firm at the

16   embassy even up to this day.  There are those who are employed

17   by the private firms but contracted by the U.S. government.

18           MR. MACALLISTER:  Thank you.  I have nothing further.

19           THE COURT:  Anything else?

20           MR. MACALLISTER:  I have nothing further, Your Honor.

21           THE COURT:  All right.  Thank you, Mr. MacAllister.

22           MR. MACALLISTER:  Thank you, sir.

23           THE COURT:  Thank you, Mr. Otieno.

24           THE WITNESS:  Thank you very much.

25       (The witness steps down.)

1        MR. FAY:  Your Honor, I don't personally have anything

2   left to put on.  The only witness left is Mr. Kohlman.

3        THE COURT:  Oh, we're not going to hear -- we've

4   already heard from Mr. Mimba through deposition.

5        MR. FAY:  Yes.

6        MR. MACALLISTER:  Mr. Mimba cannot make it.  He

7   testified for a week in New York at the Ghailani trial.  He

8   could not make it here for this one.

9        THE COURT:  And we don't think Mr. Defenbaugh is going

10   to be put on the stand?

11        MR. FAY:  That's correct, Your Honor.

12        THE COURT:  And that would leave only Mr. Kohlman.

13   And when would you like to put him on the stand?

14        MR. MACALLISTER:  Mr. Kohlman is arriving late

15   tomorrow, so I think that means we can have him on Thursday

16   morning.

17        THE COURT:  And that will be the only other witness we

18   need to hear from?

19        MR. FAY:  Yes, Your Honor.  I believe so.

20        MR. MACALLISTER:  Oh, and Your Honor, I think we might

21   call Kenneth Piernick for a very short brush-up on the

22   deposition.

23        THE COURT:  Do you want to do that on Thursday?  Is

24   that what you'd like to do?  Would you like to adjourn for

25   today, not sit tomorrow, and then finish up Thursday morning

 1   with Mr. Kohlman and the brief recall of Mr. Piernick?

 2                MR. FAY:  I think that would be best, Your Honor.

 3                THE COURT:  All right.  Why don't we do that, then.

 4   So I will see you at 9:30 on Thursday to complete the testimony

 5   that I'll be receiving.  I will also go over any exhibits that

 6   you need to go over to make sure we have the record complete

 7   with respect to exhibits at that time.  We'll expect to hear

 8   from Mr. Kohlman and briefly from Mr. Piernick again.

 9        And anything else we need to cover today?

10                MR. FAY:  I don't think so, Your Honor.  Thank you

11   very much.

12                THE COURT:  Thank you all.  We'll see you Thursday

13   morning at 9:30.

14        (Proceedings adjourned at 3:14 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1

## INDEX

2  **WITNESS:**                                                          **PAGE:**

3

Patrick Clawson        Direct Examination ................  105
4                              Direct Examination ................  130
                             Further Direct Examination ........  134
5  Matthew Levitt         Direct Examination ................  147
                             Direct Examination ................  182
6  James Owens            Direct Examination ................  189
   Tobias Otieno          Direct Examination ................  205

7                              * * * * *

8
## EXHIBITS RECEIVED

9
Plaintiff Exhibit A ...................................  116
10  Plaintiff Exhibit B ...................................  135
    Plaintiff Exhibit C ...................................  136
11  Plaintiff Exhibit D ...................................  137
    Plaintiff Exhibits E, F ...............................  138
12  Plaintiff Exhibit G ...................................  139
    Plaintiff Exhibit H ...................................  139
13  Plaintiff Exhibit I ...................................  139
    Plaintiff Exhibit J ...................................  139
14  Plaintiff Exhibit N ...................................  140
    Plaintiff Exhibits R, S ...............................  141
15  Plaintiff Exhibit U ...................................  142
    Plaintiff Exhibit V ...................................  143
16  Plaintiff Exhibits AA, BB .............................  158
    Plaintiff Exhibit L-1 .................................  163
17  Plaintiff Exhibit CC ..................................  172
    Plaintiff Exhibit L-2 .................................  181

18                              * * * * *

19

20

21

22

23

24

25

\*   \*   \*   \*   \*   \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that

the foregoing pages are a correct transcript from the record of

proceedings in the above-entitled matter.

_____
BRYAN A. WAYNE