UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


JAMES OWENS, et al.,                  .
                                      .
          Plaintiffs,                 .   CA Nos.  01-2244, 04-1536,
                                      .   08-1377, 08-1361, 08-1349
     v.                               .   08-1380
                                      .
REPUBLIC OF SUDAN, et al.,            .   Washington, D.C.
                                      .   Thursday, October 28, 2010
          Defendants.                 .   9:40 a.m.
                                      .
. . . . . . . . . . . . . . . .       Pages 212 through 376

DAY 3
EVIDENTIARY HEARING
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:
                                 THOMAS FORTUNE FAY, ESQ.
01-2244                          RONALD KARP, ESQ.

04-1536                          JANE NORMAN, ESQ.

08-1361                          STEVEN PERLES, ESQ.
                                 EDWARD MACALLISTER, ESQ.
                                 ANDERS FERRINGTON, ESQ.
                                 BILL WHEELER, ESQ.

08-1349, 08-1380                 MICHAEL MILLER, ESQ.
                                 GAVRIEL MAIRONE, ESQ.
                                 DAVID DICKENS, ESQ.


Court Reporter:                  BRYAN A. WAYNE, RPR, CRR
                                 Official Court Reporter
                                 U.S. Courthouse, Room 6714
                                 333 Constitution Avenue, NW
                                 Washington, D.C. 20001
                                 202-354-3186


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

```
 1                    P R O C E E D I N G S

 2           THE DEPUTY CLERK:  Your Honor, we have civil action

 3    01-2244, 04-1536, 08-1377, 08-1361, 08-1349, and civil action

 4    08-1380, James Owens et al. versus the Republic of Sudan.  All

 5    counsel are present, to include Mr. Pete Miller, who is now

 6    sitting at counsel table.

 7           THE COURT:  Good morning.  All right.  We have a

 8    couple of witnesses.  Where are we going to start?

 9           MR. FAY:  I defer to Mr. MacAllister.  It's his show

10    today.

11           THE COURT:  All right.  Mr. MacAllister.

12           MR. MACALLISTER:  Good morning, Your Honor.  We call

13    to the stand Evan Kohlman.

14        EVAN F. KOHLMANN, WITNESS FOR THE PLAINTIFFS, SWORN

15           THE COURT:  Good morning, Mr. Kohlmann.

16           THE WITNESS:  Good morning, Your Honor.

17           THE COURT:  Mr. MacAllister.

18                     DIRECT EXAMINATION

19    BY MR. MACALLISTER:

20    Q.   Good morning.  Please state your name for the Court.

21    A.   My name is Evan F. Kohlmann.  E-V-A-N, F., K-O-H-L-M-A-N-N.

22    Q.   Could you state the state that you live in but not your

23    full address?

24    A.   Yes.  I live in the State of New York.

25    Q.   What is your occupation?
```

1    A.    I work as an international terrorism consultant.  I provide

2    expert consulting services on terrorist financing, recruitment,

3    history, hierarchy, and other related subjects, to a variety of

4    different clients, including the United States government, the

5    British government, the Danish government, the government of

6    Bosnia-Herzegovina, the Australian government, and private

7    clients such as law firms, media companies and others.

8    Q.    What kinds of issues do you research when you're doing your

9    work?

10   A.    The primary issues that we research are the esoteric areas

11   of international terrorism that are not generally covered by

12   mainstream media and they're not generally covered by academics.

13   In other words, we're looking for ground-level information and

14   reliable knowledge, direct knowledge, first- and secondhand

15   sources providing insight into, again, very specific areas of

16   terror recruitment, financing, history, infrastructure, et

17   cetera.

18   Q.    Did we ask you to study the issue of the Sudanese

19   government's links to al-Qaeda in the context of the bombings?

20   A.    Of the 1998 embassy bombings?

21   Q.    Yes, sir.

22   A.    Yes, you did.

23   Q.    Did you review the relevant materials?

24   A.    I did, yes.

25   Q.    Are you prepared to discuss your findings today in court?

1    A.    I am, yes.

2    Q.    Could you please describe your post high school education

3    to the Court?

4    A.    Yes, of course.  I have a bachelor in the science of

5    foreign service from the Edmund A. Walsh School of Foreign

6    Service here in Washington, D.C. at Georgetown University.  I

7    have a degree from CMCU, the Center for Muslim-Christian

8    Understanding at Georgetown University, in Islam and

9    Muslim-Christian understanding.  I also have a graduate law

10   degree, or a JD from the University of Pennsylvania Law School.

11   Q.    Did any of your studies relate to terrorism?

12   A.    Yes.  My undergraduate and my certificate from the Center

13   for Muslim-Christian Understanding, both from Georgetown

14   University, were principally premised on my study of al-Qaeda

15   and other international terrorist organizations, as well during

16   my tenure at law school I also focused on national security law,

17   international security, and international terrorism.

18   Q.    Where have you worked since you graduated?

19   A.    Since I've graduated undergraduate or law school?

20   Q.    When did you graduate law school?

21   A.    I graduated law school in the spring of 2004.

22   Q.    Did you work in between undergraduate and law school?

23   A.    I did, yes.  I worked on behalf of the think tank based

24   here in Washington, D.C. known as The Investigative Project.

25   For that position I conducted again primary and secondary

1   research into international terrorist organizations, including

2   interviewing individuals accused or convicted of involvement in

3   international terrorism, traveling to locations and acquiring

4   original exhibits or original evidence regarding international

5   terrorism, reviewing other sources, academic reports and other

6   materials regarding international terrorism, and creating

7   confidential and -- both confidential and public memorandum,

8   reports, interviews, speeches regarding these subjects to both

9   governmental and nongovernmental clients.

10  Q.   What do you mean by original exhibits or original evidence?

11  A.    In the world of research, of scholarly research, there are

12  three different kinds of research you can collect.  There are

13  primary sources, there are secondary sources, and there are

14  tertiary sources.  Unfortunately, when it comes to terrorism,

15  frequently, because of the difficulty in collecting primary and

16  secondary sources, people rely exclusively on tertiary sources,

17  which would be newspaper articles and whatnot.

18       As part of our research we were trying to delve more deeply

19  than that and trying to get at actual, the building blocks

20  behind international terrorism, in other words direct interviews

21  with individuals involved in the groups or evidence that is

22  unfiltered by media or unfiltered by other analysts, in other

23  words, raw evidence, showing how terrorist financing works, how

24  terrorist recruitment works, and the history behind the

25  organizations involved in these activities.

1    Q.   Were you able to collect original evidence?

2    A.   Yes.

3    Q.   Was your research concerned with al-Qaeda at the

4    Investigative Center?

5    A.   At The Investigative Project, yes.  The primary focus of my

6    research was al-Qaeda and al-Qaeda allies.

7    Q.   What kind of original evidence did you procure?

8    A.   In 2002 I traveled to the United Kingdom, and while --

9    well, not posing, while actually as being a graduate student

10   studying Islam, I interviewed or encountered a number of

11   individuals who have either been designated by the United States

12   government as what are known as specially designated global

13   terrorists, or SDGTs, and I also interviewed or otherwise

14   encountered individuals who have been convicted both in the

15   United Kingdom and in the United States of violations of the

16   1996 Antiterrorism and Effective Death Penalty Act.

17        In addition to that, I also encountered and interviewed

18   individuals who are attempting to recruit themselves or are

19   being recruited into extremist movements allied with al-Qaeda or

20   al-Qaeda itself.

21   Q.   Did you work through law school?

22   A.   I did, that's correct.

23   Q.   How were you employed then?

24   A.   After law school?

25   Q.   During law school.

1    A.    During law school I was employed as a senior terrorism

2    analyst at The Investigative Project, up until December of 2003.

3    Q.    Where did you work then?

4    A.    Following my tenure at The Investigative Project I began my

5    own consulting business, providing the same services except

6    based on my own research, to similar clients, although the

7    focus -- The Investigative Project is primarily a nonprofit

8    public interest organization.  I began providing more services

9    directly to the United States government, to the United States

10   military, and to the United States Justice Department.

11   Q.    What U.S. agencies do you provide consulting work to?

12   A.    Currently I provide assistance on behalf of the Federal

13   Bureau of Investigation, the U.S. Justice Department, the

14   United States military, including the Office of Military

15   Commissions, the U.S. Treasury Department, and a variety of

16   other government agencies, the Department of Homeland Security,

17   et cetera.

18   Q.    Have you written articles regarding the operational

19   logistics and recruitment and propaganda of al-Qaeda and its

20   supporters?

21   A.    Yes, I have.

22   Q.    Where were those articles published?

23   A.    I publish in a variety of different places, including

24   everything from *Foreign Affairs*, *Foreign Policy*.  I have a piece

25   upcoming regarding Somalia and extremist groups in Somalia and

1    their relation to al-Qaeda which is going to be in the journal

2    *African Security*.  It ranges.  It's everything from trade

3    journals specifically focused -- scholarly journals specifically

4    focused on particular areas, like for instance *African Security*,

5    or more general foreign policy works, including also I just

6    recently published something in the *Washington Post*.

7    Q.   Have you written any books?

8    A.   Yes, I have.

9    Q.   What was the title of that book?

10   A.   The title of my book is "Al-Qaeda's Jihad in Europe:  The

11   Afghan-Bosnian Network."

12   Q.   Who published it?

13   A.   It was published by Berg Publishers here in the

14   United States, Palgrave Macmillan, in 2004.

15   Q.   Is that book used by teaching institutions?

16   A.   Yes.  It's been used in a variety of classes around the

17   world, everything from the Harvard Kennedy School of Government

18   to universities in the United Kingdom and Australia.  It was

19   first published in the United Kingdom.  So it's frequently used

20   abroad as well.

21   Q.   You mentioned *Foreign Affairs*.  Could you describe that

22   article?

23   A.   Yes.  For *Foreign Affairs* I wrote a piece back about, I

24   believe two years ago, regarding how al-Qaeda uses the Internet

25   in order to communicate, fund-raise, and otherwise propagandize

1    on behalf of its mission.

2    Q.   Have you written other articles about how al-Qaeda uses the

3    Internet?

4    A.   Yes.  I frequently publish such articles, the most recent

5    of which was published in the West Point Counter Terrorism

6    Center's *Sentinel* journal last January.

7    Q.   Were these articles peer reviewed?

8    A.   Some of them are, yes.  Regardless of whether there's a

9    formal peer review process, I engage in a minimum informal peer

10   review.  Anything I publish is first reviewed by a number of

11   different analysts who are familiar with these topics and who

12   have direct knowledge of the events going on, because of the

13   fact that, simply put, when you're publishing this kind of

14   material, it's very helpful to get the perspectives of others.

15        A number of the pieces I've published have also been

16   coauthored with other analysts.  For instance, my piece upcoming

17   in *African Security* was coauthored with a professor who's

18   currently teaching I believe at Harvard University and another

19   individual who's teaching at a university based in Europe.

20   Q.   Have you testified in federal trials?

21   A.   Yes, I have.

22   Q.   On these subjects?

23   A.   Yes, I have.

24   Q.   How many times have you testified in U.S. federal court?

25   A.   In U.S. federal court I've testified 15 times in

1    international terrorism criminal cases.

2    Q.   Were you cross-examined in those cases?

3    A.   In all but one, yes.

4    Q.   Were there Daubert hearings in those cases?

5    A.   In all but I think two or three, yes.

6    Q.   Were you accepted as an expert in each case?

7    A.   Yes, that's correct.

8    Q.   And what were some of the topics of your testimony?  What

9    were the ones most pertinent to this case?

10   A.   The topics most pertinent to this case would most likely be

11   the history and infrastructure of al-Qaeda, the leadership of

12   al-Qaeda, al-Qaeda financing, the history of al-Qaeda in Sudan,

13   the history of al-Qaeda in East Africa and Somalia, the

14   relationship between militant groups in countries like Somalia

15   and al-Qaeda, and the ways in which al-Qaeda has attempted to

16   carry out international terrorist attacks, most specifically the

17   August 1998 bombings of two U.S. embassies in East Africa.

18   Q.   Have you testified in foreign jurisdictions?

19   A.   Yes, I have.

20   Q.   How many times?

21   A.   I believe I've testified eight times in foreign

22   jurisdictions.

23   Q.   Were these criminal proceedings?

24   A.   These were criminal proceedings.  That's correct.  I've

25   also testified in one civil proceeding abroad as well.

1    Q.   Were you cross-examined in the foreign jurisdictions?

2    A.   Yes, I was.

3    Q.   Were you qualified as an expert?

4    A.   Yes, I was.

5    Q.   And accepted as an expert?

6    A.   Yes.

7    Q.   What is the basis for the conclusions you are going to give

8    today in court?

9    A.   The basis for the conclusions I shall give today in court

10   are based upon my original review of secondary source materials,

11   including books, communiques released by al-Qaeda, video

12   recordings released and produced by al-Qaeda, interviews that I

13   have conducted with individuals who have been involved with

14   al-Qaeda since 1988.

15        It also includes my review of original exhibits and court

16   testimony, sworn court testimony in cases here in the

17   United States against individuals who have been convicted of

18   their involvement in terrorist activities, including the 1998

19   bombings of two U.S. embassies in East Africa, and other

20   materials besides.

21             MR. MACALLISTER:  May I ask for permission to approach

22   the witness at different times during the testimony?

23             THE COURT:  You may.  You may not only ask, but you

24   may do so.

25             MR. MACALLISTER:  Thank you.

1    BY MR. MACALLISTER:

2    Q.   Mr. Kohlmann, please identify what I've just handed to you.

3    A.   This is a copy of my CV.

4    Q.   Is that a fair and accurate copy?

5    A.   It is the most updated copy, that's correct.

6           MR. MACALLISTER:  Your Honor, at this time plaintiffs

7    would move into evidence what has been marked as Plaintiffs'

8    Exhibit M, the Kohlmann CV.

9           THE COURT:  Plaintiffs' Exhibit M is admitted.

10                           (Plaintiff Exhibit M

11                            received into evidence.)

12   BY MR. MACALLISTER:

13   Q.   Is this the kind of information that experts, law

14   enforcement officials, and academics routinely rely upon in

15   their research of terrorist organizations?

16   A.   Yes.  I mean, yeah, it's what I'm paid to do.

17   Q.   Is this the kind of information you relied upon in your 15

18   federal trials?

19   A.   Yes.

20   Q.   What is al-Qaeda?

21   A.   Al-Qaeda is an --

22           THE COURT:  Have we asked to admit him as an expert

23   yet in a particular subject?

24           MR. MACALLISTER:  That's a very good question,

25   Your Honor.

1          THE COURT:  And the answer is?

2          MR. MACALLISTER:  The answer is no.  The plaintiffs

3    would proffer Mr. Kohlmann as an expert in the history of

4    al-Qaeda, including state sponsorship, al-Qaeda leadership, the

5    infrastructure of al-Qaeda, and al-Qaeda operations and modus

6    operandi.

7          THE COURT:  All right.  Mr. Kohlmann is admitted as an

8    expert to provide expert testimony on that or those subjects.

9    Please proceed.

10          MR. MACALLISTER:  Thank you, Your Honor.

11    BY MR. MACALLISTER:

12    Q.   What is al-Qaeda, Mr. Kohlmann?

13    A.   Al-Qaeda, which means the solid foundation or solid base,

14    was a terrorist organization founded in September of 1988.  It

15    was founded as the heir apparent to a previous group known as

16    Makhtab al-Khidamat.  Makhtab al-Khidamat, known as the Office

17    of Mujahideen Services, was founded in the late 1980s by Osama

18    bin Laden and his spiritual mentor, a guy named Abdullah Azzam.

19          The reason that this organization had initially been

20    founded was that there were groups of foreign fighters arriving

21    on the Afghan-Pakistani border who had sought to participate in

22    the Afghan jihad, fighting against the Soviets in the Afghan

23    Communist army.  However, when they arrived there, they were

24    poorly equipped, they were poorly organized, they didn't have

25    money, they didn't have a place to stay.

1        So Azzam and Bin Laden came up with the idea of having an

2   organization there to help bring these people in, send them out

3   on direct missions, make them useful, make their force

4   concentrated.

5        After the end of the Afghan war, or as the Afghan war began

6   dying, Bin Laden decided there needed to be a new organization,

7   from the ashes of Makhtab al-Khidamat, which would serve a

8   greater cause, which would serve a greater mission.  While

9   Makhtab and Abdullah Azzam were primarily focused on

10  Afghanistan, Bin Laden had a greater vision of how to use the

11  ashes of this organization and the various different resources

12  that had been accumulated by it in order to broaden the mission

13  and to create a worldwide network of individuals who would

14  defend the Muslim community by waging, I guess you could say a

15  low-intensity war against any of its enemies, including, as

16  al-Qaeda put it, both in the East and the West; i.e., not just

17  the Soviet Union, not just Communism, but also the United States

18  and other Western countries.

19  Q.   Who was the leader of al-Qaeda?

20  A.   The leader of al-Qaeda was the person who founded it, which

21  was Osama bin Mohammed bin Laden, otherwise known as Abu

22  Abdallah.

23  Q.   Was his leadership of al-Qaeda ever disputed?

24  A.   No.  He was the primary financier behind al-Qaeda.  He was

25  the primary creative genius behind al-Qaeda.  The idea for

1    al-Qaeda, the money for al-Qaeda, this principally came from

2    Bin Laden, so there was never really anyone in a position to

3    challenge his position of leadership.

4    Q.   Could you describe the structure of al-Qaeda at its

5    inception?

6    A.   Yes.  When al-Qaeda was first formed it was formed as a

7    relatively secretive organization.  It was designed to be fairly

8    small, compartmentalized, where you had a shura council sitting

9    at the top, a group of individuals who were its *de facto*

10   leaders.  Each of these shura council members were responsible

11   for subcommittees; a subcommittee for media, a subcommittee for

12   military affairs, a subcommittee for security, a subcommittee

13   for logistics.  In other words, the shura council members

14   essentially provide the subsidiary leadership to Bin Laden that

15   Bin Laden is unable to provide singularly of himself.

16        Beneath this shura council and Bin Laden, you have the

17   network of al-Qaeda members, which when it began in 1988 was

18   fairly small.  Even many of those who had been part of the

19   Mujahideen Services Office, people like Abdullah Azzam, were

20   reluctant to get involved with al-Qaeda.  Not everyone agreed

21   that this was the right way of moving forward.  In fact, in some

22   ways, it was quite controversial.

23   Q.   Where was al-Qaeda located at its inception?

24   A.   Al-Qaeda was first located primarily in the region of

25   Peshawar, Pakistan, in the North-West Frontier Province.

1    Q.   Did al-Qaeda have the capability to carry out large-scale

2    attacks at its inception?

3    A.   No.  For the first several years of al-Qaeda's existence,

4    its membership was no more than about 100 or 200 people maximum.

5    Many of these individuals frankly were not even sworn members of

6    al-Qaeda, they hadn't sworn an oath to Bin Laden, they were what

7    al-Qaeda referred to as friends of al-Qaeda, individuals who had

8    been involved with the Arab Afghans in the Office of Mujahideen

9    Services, but frankly who weren't willing to commit themselves

10   life eternal to Bin Laden.

11        In 1991, following the invasion of Kuwait by Saddam

12   Hussein, Bin Laden approached several Saudi officials, and

13   attempted to convince the kingdom of Saudi Arabia to allow

14   al-Qaeda to defend Saudi Arabia instead of the United States

15   military.  He was laughed out of the office, because at that

16   point the idea that al-Qaeda was capable of anything significant

17   was laughable.  Their single claim to fame was their role in the

18   Afghan war, and frankly they had only been involved for about

19   two years in the Afghan war and they hadn't really done too

20   much.

21   Q.   How many members of al-Qaeda were there in the late '80s,

22   early '90s?

23   A.   When it first started, al-Qaeda was first conceived with a

24   membership of no more than about 60 people.  By 1991 it might

25   have gone up to about 200, but keep in mind this is 200 people

1    that in some cases are spread around by thousands of miles of

2    distance.  They're scattered.  There's only one small base of

3    operation on the Afghan-Pakistani border, and it's not very well

4    organized.

5    Q.   Were there significant numbers of al-Qaeda operatives in

6    the Sudan in 1990?

7    A.   No.  No, there was a handful of individuals who were

8    al-Qaeda members who happened to be Sudanese, but there was no

9    mass movement of al-Qaeda members living in or operating from

10   the Sudan.

11   Q.   Were there any al-Qaeda members in Kenya at this time?

12   A.   No.

13   Q.   Were there any al-Qaeda members in Somalia at this time?

14   A.   No.

15   Q.   When did al-Qaeda -- we've heard testimony earlier in the

16   trial that al-Qaeda eventually moved to Sudan.  When did

17   al-Qaeda move to Sudan?

18   A.   It moved to Sudan as -- it was part of a running process

19   beginning in late 1991 and running all the way into 1993.

20   However, by early 1992, many senior al-Qaeda operatives and

21   leaders, including Bin Laden, were based in Khartoum, Sudan.

22   Q.   Why did al-Qaeda leave Afghanistan?

23   A.   Al-Qaeda left Afghanistan for several different reasons.

24   One of the most important reasons was that the Afghan war had

25   come to an end, or the major phase of the Afghan war had come to

1    an end, and what it had been replaced with was that the two

2    major Afghan mujahideen factions, led by Massoud and Hekmatyar,

3    instead of working together, were fighting and killing each

4    other.

5         This put al-Qaeda in a very difficult position because it

6    would have to choose sides.  It eventually did choose sides, but

7    in doing so, al-Qaeda would go from being the vanguard of the

8    Muslim faithful into being just another accessory to internecine

9    Muslim violence in Afghanistan, something al-Qaeda didn't want

10   to be involved with.

11        As a result, because of the increasingly dangerous

12   atmosphere in Afghanistan, the lack of a viable conflict, and

13   then eventually pressure from the Pakistani government on

14   foreign mujahideen fighters to leave Pakistan, it became

15   incumbent upon al-Qaeda to find a new base of operations, where

16   it could conduct training, where it could organize, where it

17   could send operatives out.

18        It also happened that because of the fact that al-Qaeda's

19   primary objectives are in the Middle East, countries like Egypt

20   and Saudi Arabia, being based in Afghanistan was, for practical

21   considerations, not a very good idea.  It was thousands of miles

22   away, there was no easy way back and forward, there was no

23   border links.  Iran, very large country, sits -- and Iraq sits

24   right between Afghanistan and where these individuals wanted to

25   get to.  So it really wasn't, practically it wasn't useful for

1    al-Qaeda, what al-Qaeda's goals were.

2    Q.    Did al-Qaeda leave Afghanistan entirely?

3    A.    It didn't leave it entirely.  However, the majority of

4    al-Qaeda assets left Afghanistan, left Pakistan, and the

5    majority of them headed for Khartoum, Sudan.  There was a few

6    individuals left behind.  There was occasionally a camp opened

7    once in a while, but frankly the vast majority of al-Qaeda

8    resources left or were shuttered.

9    Q.    You mentioned the shura council.  Did the shura council

10   travel to Sudan?

11   A.    Yes.  Virtually every single member of the shura council of

12   al-Qaeda left Afghanistan, left Pakistan, and traveled to Sudan,

13   basing themselves there.  Several of these individuals returned

14   to Afghanistan or Pakistan once in a while, but their primary

15   base of operations until about late 1996 was Khartoum, Sudan.

16   Q.    Why did the Sudan want al-Qaeda to come?

17   A.    Sudan had a number of reasons why it was encouraging

18   al-Qaeda to travel there, to base itself there, the first of

19   which is ideological.  At the time the Sudan was run by a

20   political party known as the National Islamic Front party, which

21   was headed by an individual known as Dr. Hassan al-Turabi.

22   Al-Turabi, although he had been educated in Paris at the

23   Sorbonne, considered himself to be an Islamic revolutionary, and

24   had a vision in which Sudan, though a poor country and bereft of

25   resources and not known as the center of political movement in

1    the Muslim world, would become the new haven for Islamic

2    revolutionary thought and would serve as a base not just for

3    al-Qaeda but for Islamic revolutionaries of every stripe and

4    size.

5        What did Sudan have to benefit from this aside from

6    ideologically?  First of all, Sudan had conflicts ongoing with a

7    number of its neighbors, most principally Egypt.  Egypt at the

8    time and still is headed by a government which is fairly

9    anathema to Islamic revolutionaries, particularly groups like

10   the Egyptian Islamic Jihad and al-Qaeda.  So al-Qaeda provided

11   useful leverage for the government of Sudan against its enemies.

12       Additionally, because of the fact that Sudan is a fairly

13   poor country and it's again bereft of natural resources for the

14   most part, it desperately needed money for development.  If the

15   United States was not going to be a source of that money, if the

16   West was not going to be a source of that money, Sudan's leaders

17   reasoned that they would attempt to go for alternative sources

18   of financing, of money.

19       One of those alternative sources that Turabi believed he

20   had identified were dissidents from the Muslim world led by

21   Osama bin Laden, who were rumored to have fantastic amounts of

22   cash and bank accounts and resources at their disposal, which

23   would play a role in developing the economy of the Sudan.

24   Q.   You mentioned that Turabi wanted to launch a global Islamic

25   revolution and invited groups.  Which groups did he invite into

1    the Sudan?

2    A.    Turabi was not a picky person.  He basically invited any

3    group that espoused the revolutionary Islamic ideology,

4    regardless of the fact that some of the groups he was inviting

5    seemed to have conflicts between them.  He invited groups,

6    everything from the Palestinian HAMAS movement, the Palestinian

7    Islamic Jihad, Hezbollah from south Lebanon, which is an Iranian

8    sponsored Shi'ite movement, al-Qaeda, the Egyptian Islamic

9    Jihad, the Libyan Islamic Fighting Group, dissident groups from

10   Algeria, Morocco, the Eritrean Islamic Jihad movement, literally

11   every single jihadist style group, regardless of what sectarian

12   perspective they had, was invited to take a base in Khartoum,

13   and for the most part, most of them did.

14   Q.    You mentioned Hezbollah.  We will get back to that.  But

15   you mentioned earlier Egyptian Islamic Jihad.  What was that

16   group?

17   A.    The Egyptian Islamic Jihad was started in the wake of the

18   assassination of Anwar Sadat, the former president of Egypt.

19   The purpose of the Egyptian Islamic Jihad was to foment a jihad,

20   an Islamic revolution in Egypt, and to overthrow the government

21   and to replace it with a hard-line Sunni fundamentalist regime.

22        It happened that after a short period of years the Egyptian

23   Islamic Jihad began fracturing into less hard-line and more

24   hard-line elements.  The most hard-line element of the Egyptian

25   Islamic Jihad was the element that was based outside of Egypt,

1    that had literally been forced into exile.  This faction is

2    known as Talah e Fatah, and it is led by an individual known as

3    Dr. Ayman al-Zawahiri, who is a former Egyptian pediatrician who

4    was imprisoned for his involvement in the assassination of Anwar

5    Sadat and eventually fled to Afghanistan.

6    Q.    Did Dr. al-Zawahiri come to the Sudan also?

7    A.    Yes, he did.  He was one of the first individuals from

8    al-Qaeda to travel to Khartoum, Sudan.

9    Q.    Was he a member of both organizations?

10   A.    Yes.  Al-Qaeda itself was formed primarily as an alliance

11   between individuals from the Arabian Peninsula, i.e. Saudis and

12   Yemenis, with Egyptians who were members of the Egyptian Islamic

13   Jihad.  So there were a number of individuals who you could say

14   were both members of the Egyptian Islamic Jihad and al-Qaeda, in

15   fact, their roles were synonymous.

16   Q.    What was his position in al-Qaeda?

17   A.    His role in al-Qaeda was, number one, as Bin Laden's

18   personal physician, but also as the deputy commander of

19   al-Qaeda, the second most important person within al-Qaeda.

20   Q.    You mentioned Hezbollah.  Was Hezbollah located in the

21   Sudan also?

22   A.    Hezbollah had also taken a base of operations in Khartoum,

23   Sudan.  Yes, that's correct.

24   Q.    You mentioned that the Sudan was supported by Iran.

25   A.    Again, Sudan was courting all the kinds of investment and

1   support it could.  It was a pariah state.  It was espousing

2   ideals and engaged in activity which made it a pariah state, not

3   just among the United States and its allies, but among most

4   countries.  Thus, in order to find allies, which were few and

5   far between, Sudan aggressively courted support and solidarity

6   from the government in Iran.

7   Q.   Was the government of Iran -- what if any links were there

8   between the government of Iran and the government of Sudan?

9   A.   Well, number one, there were delegation offices, that the

10  government of Iran actually put delegation offices in Khartoum,

11  Sudan.  There was an office in Khartoum run by a guy named

12  Sheikh Nomani, which was specifically set up to, number one, try

13  to convert Sunni Muslims in Sudan to the Shia sectarian view of

14  Iran, but also to facilitate relations between the two

15  governments, between the two regimes.

16      There was information sharing and resource sharing at the

17  level of the military, at the level of the intelligence service,

18  and at the level of the government in general.

19  Q.   Which government and military are you speaking of?

20  A.   I'm referring to both the militaries respectively of Iran,

21  both the intelligence services of Iran and Sudan.  In the case

22  of intelligence services I'm talking particularly about the

23  Iranian Revolutionary Guards and the Sudanese intelligence

24  service.

25  Q.   What was the role of the Iranian Revolutionary Guard in

 1    Iran's support for terrorism?

 2    A.    The Iranian Revolutionary Guard essentially serves as

 3    Iran's proxy force abroad, to make sure that Iranian allies,

 4    such as Hezbollah, which are non-state actors and which frankly

 5    are terrorist organizations, receive adequate support, financing

 6    and advice and intelligence, without it rising to the level of

 7    an official branch, I guess you could say, of the Iranian

 8    government per se, such as the Ministry of Foreign Affairs

 9    getting involved.  It is a means for the Iranian government to

10    provide this kind of assistance covertly.

11    Q.    And to clarify, was the IRGC in Khartoum?

12    A.    It was operating in Khartoum.  It's obviously based in

13    Tehran, but it was operating in Khartoum, yes.

14    Q.    Mr. Kohlmann, I've handed you two exhibits.  Could you

15    identify the exhibit that has "Iran Under Rafsanjani" on the

16    front page?

17              THE COURT:  Does it have a letter?

18              MR. MACALLISTER:  Your Honor, we're going to have to

19    assign it DD.  It's not on Mr. Fay's exhibit list.

20              THE COURT:  DD.

21              THE WITNESS:  Okay.  Yes.  This is what's known as an

22    NIE, a national intelligence estimate.  This is something which

23    is created by the U.S. Central Intelligence Agency.  It's not

24    meant to be a specific reporting of a specific event, it's

25    supposed to be an overview of intelligence gathered on

1    particular wide-ranging subjects.  Some of these NIEs are

2    eventually declassified and released to the public.  I believe

3    this one was.  And this is again titled "Iran" --

4              THE COURT:  Are you confident that it was?

5              THE WITNESS:  I'm not entirely confident, sir, but it

6    does say that -- the "Secret" that's on here and the "No

7    Release" advisories have been crossed out, which generally

8    speaking signifies that they have been declassified.

9              THE COURT:  Mr. MacAllister, you're representing that

10   this is a declassified document, correct?

11             MR. MACALLISTER:  Yes, Your Honor.  In fact,

12   Mr. Kohlmann, if you turn to the fourth page -- sorry, the fifth

13   page, do you see where there's been redactions?

14             THE WITNESS:  Yes.  And typically speaking, when

15   documents are redacted like this, it's for the purposes of

16   public disclosure.

17   BY MR. MACALLISTER:

18   Q.   Have you seen NIEs before?

19   A.   Yes.

20   Q.   Does this look like an NIE?

21   A.   Yes, it does.

22   Q.   What year is this NIE from?

23   A.   This appears to be from October of 1991.

24   Q.   Have you ever been to the CIA FOIA Web site before?

25   A.   Yes, I have.

1    Q.   Have you downloaded documents from that Web site?

2    A.   Yes, I have.

3    Q.   In your experience, were those documents accurate and true

4    documents that were produced by the CIA but declassified?

5    A.   That's correct.  Yes.

6              MR. MACALLISTER:  At this time, Your Honor, we would

7    move Exhibit DD into evidence.

8              THE COURT:  DD is admitted.

9                             (Plaintiff Exhibit DD

10                              received into evidence.)

11   BY MR. MACALLISTER:

12   Q.   Mr. Kohlmann, on page 20 of this exhibit, in the second

13   column there is a paragraph with a bullet and it says

14   "Terrorism."

15   A.   Yes.

16   Q.   What does that indicate regarding Iranian support for

17   terrorism?

18             THE COURT:  Could I ask a question?  Is there a copy

19   for me, or not yet?

20             MR. MACALLISTER:  There is.  Let me give that copy to

21   you, Your Honor.  You make an excellent point.

22        (Document tendered to the Court.)

23             THE COURT:  Thank you.  We're on page 20; is that

24   right?

25             MR. MACALLISTER:  Yes, Your Honor.

1          THE COURT:  Go ahead.

2          THE WITNESS:  Under "Terrorism" the NIE states,

3   "Iranian support for terrorism will remain a significant issue

4   dividing Tehran and Washington.  Tehran is unlikely to conduct

5   terrorism directly against U.S. or Western interests during the

6   next two years, but it is supporting radical groups that might

7   do so."

8   BY MR. MACALLISTER:

9   Q.   How would that support be coordinated?

10  A.   The support would be coordinated, number one, through the

11  IRGC, the Iranian Revolutionary Guard Corps, it would also be

12  arranged with other Iranian allies, particularly in this case

13  the government of Sudan.

14  Q.   I gave you another document.  The front of that document

15  has the words "Terrorism Review" on it.

16  A.   Yes.

17          MR. MACALLISTER:  Your Honor, I would like to mark

18  that as Exhibit EE.

19          THE COURT:  All right.

20  BY MR. MACALLISTER:

21  Q.   Mr. Kohlmann, could you describe this document?

22  A.   I believe this is another NIE.  This appears to have been

23  released in August of 1990.

24  Q.   And what agency was this produced by?

25  A.   This is again the U.S. Central Intelligence Agency.

1    Q.    How do you know that?

2    A.    The logo of the CIA is on the front cover.

3    Q.    What else does the front cover say?

4    A.    "Directorate of Intelligence."

5    Q.    And below that?

6    A.    "Terrorism Review."

7           MR. MACALLISTER:  At this time, Your Honor, we would

8    move Exhibit EE into evidence.

9           THE COURT:  EE is admitted.

10                              (Plaintiff Exhibit EE

11                               received into evidence.)

12   BY MR. MACALLISTER:

13   Q.    Mr. Kohlmann, on the -- unfortunately, there are not --

14   actually, there are page numbers.  It's page 7.  There are a lot

15   of large black redactions.  There is a sentence in the left-hand

16   column that begins, "Rafsanjani's record"?

17   A.    Yes.

18   Q.    What does this indicate regarding Iranian support of

19   terrorism?

20   A.    It states that Iran's purpose is to "target the enemies of

21   the regime.  The terrorist attacks carried out by Iran during

22   the past year were probably approved in advance by President

23   Rafsanjani and other senior leaders.  The planning and

24   implementation of these operations are, however, probably

25   managed by other senior officials, most of whom are Rafsanjani's

1    appointees and/or allies.  Nonetheless, we believe Rafsanjani

2    and Khomeini would closely monitor and approve the planning for

3    an attack against U.S. or Western interests."

4    Q.   Would the Iranian government know that Hezbollah is in

5    Khartoum?

6    A.   Yes.  They would know it, yes.

7    Q.   Why?

8    A.   Number one, because Hezbollah is a proxy force of Iran.

9    Its primary foreign sponsor is Iran, both financially and

10   otherwise.  Almost all of Hezbollah's activities are well known

11   to the Iranian government.  In some cases they're planned by the

12   Iranian government, not to mention the fact that Hezbollah's

13   presence in Khartoum was made possible by the relationship

14   between the government of Sudan and the government of Iran.

15   Q.   Were there meetings between Hezbollah and al-Qaeda in

16   Khartoum?

17   A.   Yes.  There were meetings that took place between

18   representatives of Hezbollah, representatives of al-Qaeda,

19   overseen by the Sudanese government and representatives of the

20   Iranian government.

21   Q.   What did these meetings lead to?

22   A.   These meetings were designed to attempt to put sectarian

23   differences in the past.  In the words of a ranking al-Qaeda

24   shura council member, Abu Hajer al-Iraqi, the idea was to focus

25   on a common enemy, that being the West, the United States.

1        As a result of these meetings, Hezbollah and Iran agreed to

2   provide advanced training to a number of al-Qaeda members and

3   shura council members at Hezbollah terrorist training camps in

4   south Lebanon.  This would have been the first major activity

5   that this would have taken place.  Beforehand these camps were

6   mostly off limits to al-Qaeda members.

7            THE COURT:  Give me a time frame.

8            THE WITNESS:  Sure.  This took place in 1992 and 1993.

9   BY MR. MACALLISTER:

10  Q.   Which al-Qaeda members were trained by the Hezbollah?

11  A.   There were a number of them, but they included senior

12  al-Qaeda shura council members such as Saif al-Adel, who is the

13  head of al-Qaeda security.  He's still around today.  Saif

14  al-Islam al-Masri, a senior Egyptian Islamic Jihad member, and

15  also a senior member of al-Qaeda.  You also had individuals such

16  as Ali Mohammed, otherwise known as Abu Mohammed the American.

17  A bodyguard for Osama bin Laden, the head of Bin Laden's

18  security detail, and the individual responsible for scouting out

19  potential terrorist targets for al-Qaeda in overseas locations.

20  There was also Salim al-Masri, Abu Jaffar al-Masri, and several

21  other individuals.

22  Q.   How do we know these gentlemen went to Lebanon?

23  A.   Because of the fact that when the individuals returned from

24  Lebanon, they actually spoke with other al-Qaeda members and

25  described, number one, the training they had acquired, number

two, they described how they had acquired it.  There were

individuals who were witnesses to the meetings that took place

between Iran, Hezbollah, and al-Qaeda in Khartoum.  And what's

more is that al-Qaeda members brought back with them materials

provided to them by Hezbollah in south Lebanon for further

training.

Q.   And what did those materials include?

A.   Video recordings showing how to blow up large buildings.

Q.   Mr. Kohlmann, you mentioned earlier a man named Hassan

al-Turabi.  Could you describe him more?

A.   Yes.  In Sudan at the time of 1991, Sudan was ruled

similarly to the way that I think you could compare the Soviet

Union during the Cold War in the sense that there is a *de facto*

government, there is a regular government.  However, the

political life of the Sudan was entirely dominated and

controlled by a single political party.  In this case not the

Communist party but the National Islamic Front party, which was

led by Dr. Al-Turabi.  Though the president of Sudan was an

individual by the name of Omar al-Bashir, the real power behind

the throne was Dr. Al-Turabi because of the fact that the

political party, the National Islamic Front party, essentially

controlled government, controlled the country.

Q.   Who invited al-Qaeda and Bin Laden into Khartoum?

A.   Initially it was Dr. Al-Turabi.  Dr. Al-Turabi extended an

invitation to al-Qaeda members, to al-Qaeda's leadership, to

1    come base themselves in Khartoum and to leave Afghanistan.

2    Shortly thereafter, this was followed by a letter directly

3    signed by the president of Sudan, Omar al-Bashir, restating as

4    much.

5    Q.   How do we know about the letter?

6    A.   The letter was made available to a number of al-Qaeda

7    members.  The reason being is that in order -- when these

8    individuals arrived in Sudan, in order so that they could avoid

9    having to go through normal immigration and customs controls, in

10   order so that if they encountered problems with the local police

11   or authorities, they were given copies of this letter to show.

12   Upon viewing this letter, whether it was customs or immigration

13   or Sudanese police officers, they backed off.  They understood

14   that these individuals were there in an official quote-unquote

15   diplomatic role.

16          THE COURT:  So we know -- I understand from that

17   answer how other members of al-Qaeda know.  How do we know?

18          THE WITNESS:  Because those individuals have

19   subsequently testified under oath regarding their being in

20   possession of the letter, how they used the letter, and the

21   reaction of Sudanese government officials upon viewing the

22   letter.

23   BY MR. MACALLISTER:

24   Q.   Could you give us the name of one of the al-Qaeda

25   operatives who has testified?

A.    Sure.  An individual who goes by the name Abu Bakr

al-Sudani.  His real name is Jamal al-Fadl.

Q.    Who is Jamal al-Fadl?

A.    Jamal al-Fadl is a former high-ranking al-Qaeda member from

Sudan who also was doing work on behalf of the Sudanese

intelligence service and the NIF.  In 1991 and 1992, when

al-Qaeda moved from Afghanistan to Sudan, Jamal al-Fadl was one

of the linchpins of that relationship.  His work with the

Sudanese intelligence service was known by Bin Laden, was

approved by Bin Laden and by al-Qaeda, with the hopes that they

could leverage that relationship to provide benefit for

al-Qaeda.

      Several years later, after engaging in various activities

on behalf of al-Qaeda, both in Sudan and elsewhere, Mr. al-Fadl

eventually defected and became an official source for the

Federal Bureau of Investigation and the U.S. Justice Department.

Q.    Would you describe him as a senior al-Qaeda operative?

A.    Yes.  He was a senior al-Qaeda operative who had been

around in al-Qaeda, I guess in the al-Qaeda organization prior

to it arriving in Sudan.  He was senior enough that he was given

the responsibility of personally interviewing and vetting other

individuals who were attempting to travel to the Sudan in order

to find housing with al-Qaeda, to make sure that those

individuals were of proper stock.

Q.    What was his nationality?

1    A.    He was Sudanese.

2    Q.    Did this play a role in his interactions between al-Qaeda

3    and the Sudanese government?

4    A.    Yes.  Both al-Qaeda and the government of Sudan viewed the

5    fact that he was both a Sudanese national and an al-Qaeda member

6    as a useful tool.  For al-Qaeda it was a way for them to have a

7    direct relationship with the Sudanese intelligence service.  For

8    the Sudanese intelligence service, it was a way to get directly

9    into the hierarchy of al-Qaeda.

10           Though initially the most important members of al-Qaeda

11   were Egyptians and Saudis, the very fact that you were a

12   Sudanese national during this period of time made you perhaps

13   more important than you otherwise would have been, because of

14   the fact that you could play this role, this dual role, both as

15   leveraging on behalf of al-Qaeda and on behalf of the Sudanese

16   intelligence service and the military.

17   Q.    We talked about why Turabi wanted -- the Sudanese

18   government wanted al-Qaeda to relocate.  You mentioned also that

19   al-Qaeda wanted to be closer to certain countries.  Why was

20   al-Qaeda so interested in moving to the Sudan?

21   A.    Al-Qaeda had been formed with the idea that it was no

22   longer enough simply to organize in Afghanistan and to fight

23   infidel forces in Afghanistan.  The idea being that it was now

24   time to take the fight directly to the enemies of al-Qaeda, the

25   real enemies of al-Qaeda.

1       The primary force behind the creation of al-Qaeda are again

2    Saudi, Yemeni, and Egyptians.  So the countries that these

3    people were most interested in in terms of their own local

4    interests would have been Egypt, Yemen, and Saudi Arabia.

5       It happens that the Sudan is ideally placed for individuals

6    to become involved in the conflicts in these three countries.

7    There's a direct land border between Sudan and Egypt, which was

8    used by al-Qaeda to smuggle weapons from Sudan up into Egypt for

9    the purposes of supporting the Egyptian Islamic Jihad movement.

10   There's the Red Sea, which is between Sudan and Yemen and Saudi

11   Arabia.  Al-Qaeda used the Red Sea in order to covertly send

12   weapons, personnel, and other equipment across to support jihadi

13   movements in the Arabian Peninsula.

14      In other words, it was ideally placed as a jumping point,

15   not just for Egypt and Saudi Arabia, but for al-Qaeda activities

16   in a variety of different states, particularly in East Africa

17   and Central Africa.

18   Q.   Has al-Qaeda revealed its goals and purposes?

19           THE COURT:  When are we talking about?

20   BY MR. MACALLISTER:

21   Q.   Has al-Qaeda published documentation regarding its history?

22   A.   Yes, it has.

23   Q.   In what format?

24   A.   In a number of formats.  There are books, there are video

25   recordings, there are audio recordings.  Most popularly,

1    al-Qaeda actually has its own media wing, which is known as

2    as-Sahab, the clouds.  As-Sahab is al-Qaeda's official party

3    line.  It is the same organization which publishes every single

4    video recording and audio recording of Bin Laden that you see,

5    of Zawahiri.  This all comes from as-Sahab.  This is their

6    official party line.

7         In addition to publishing statements by Bin Laden, video

8    recordings of Bin Laden, they also produce propaganda videos

9    which tell the history of al-Qaeda as told by al-Qaeda leaders

10   themselves.

11   Q.   Have you viewed these videos?

12   A.   Yes.  My company, Flashpoint Global Partners, maintains a

13   complete library of every single video and audio recording ever

14   publicly disseminated by as-Sahab.

15   Q.   How do you know they're authentic al-Qaeda videos?

16   A.   Well, first of all, some of them are self-authenticating

17   because they have original material in them, such as video of

18   Bin Laden, which is again somewhat self-authenticating.  But

19   also they've been directly endorsed by al-Qaeda.  Al-Qaeda has

20   come out and said the only official voice for us is as-Sahab,

21   and this is how you get information from as-Sahab.

22        Over the past six years the primary mechanism for which

23   as-Sahab videos or audio recordings are disseminated publicly is

24   that initially sometimes they are previewed on Arabic language

25   satellite channels like Al Jazeera.  And eventually they are

1 released in their entirety via al-Qaeda Internet Web sites.

2 Q.   When you say al-Qaeda says this is how you get al-Qaeda

3 videos, do you mean a particular person?

4 A.   Yes.  People like Dr. Ayman al-Zawahiri, the deputy

5 commander of al-Qaeda.  Several years ago Dr. Al-Zawahiri agreed

6 to sit for an open question and answer session on the Internet

7 and specifically said this is where you go to submit questions,

8 this is who the questions are going to go to.

9   MR. MACALLISTER:  At this time, Your Honor, we would

10 like to show a video.

11 BY MR. MACALLISTER:

12 Q.   Could you describe the video to the Court, please?

13 A.   Yes, of course.  In July of 2008, as-Sahab released a new

14 video which was more or less titled, roughly titled "The Life

15 of" or "The Will of Abul-Hassan al-Misri."  Abul-Hassan al-Misri

16 was an al-Qaeda shura council member, one of the founders of

17 al-Qaeda in 1988, an Egyptian, who traveled with al-Qaeda to

18 various different conflict zones, including Sudan and Somalia.

19 He was eventually killed in 2008, or martyred in 2008, back

20 fighting in Afghanistan.

21   MR. MACALLISTER:  Your Honor, we'd move this video

22 into evidence as Exhibit FF, the al-Misri DVD.

23   THE COURT:  All right.  It's admitted and you may show

24 it.

25

```
 1                    (Plaintiff Exhibit FF

 2                    received into evidence.)

 3          MR. MACALLISTER:  I will play portions of this video.

 4          THE COURT:  How long is it?

 5          MR. MACALLISTER:  It's quite long, Your Honor, but I'm

 6     only going to play five or six minutes.

 7          THE COURT:  Okay.

 8     BY MR. MACALLISTER:

 9     Q.   Mr. Kohlmann, could you tell the courtroom what we will see

10     when the lights come on.

11     A.   Yes, of course.  You will see a section of the video in

12     which Abul-Hassan al-Misri, again an al-Qaeda shura council

13     member, describes al-Qaeda's base in the Sudan, describes

14     al-Qaeda activities in Somalia and the relationship that Kenya,

15     the nation of Kenya plays in terms of the activity in Somalia,

16     and by virtue of that also Sudan.

17          THE COURT:  Can you date this video?  And I don't mean

18     when it was released, which was in July of 2008, but when it was

19     made?

20          THE WITNESS:  I believe it was recorded sometime

21     between 2006 and 2008.  Abul-Hassan al-Misri makes references to

22     a number of different events; however, it appears it was

23     recorded within the past five years.

24     BY MR. MACALLISTER:

25     Q.   If the disk had played, were there al-Qaeda logos in the
```

1    video?

2    A.   Yes.  The video itself is marked with the official

3    watermark of al-Qaeda's as-Sahab media.  It is the exclusive

4    logo of al-Qaeda, and whenever someone tries to use that without

5    al-Qaeda's permission, they hear about it pretty quickly.

6    Q.   What does al-Misri testify to in the video?

7    A.   Al-Misri testifies to a number of things.  First of all, he

8    explains at great length his own personal experience in Somalia

9    between the years of 1992 and 1993, specifically his role in

10   providing paramilitary assistance to Somali militants fighting

11   against U.N. forces and the United States.  He actually suggests

12   that he himself was personally involved in the October 1993

13   Black Hawk Down incident in Mogadishu.  Describes taking night

14   vision goggles off the bodies of dead U.S. soldiers.

15        He describes the nation of Kenya as "the principal way

16   station" for individuals, al-Qaeda members traveling into

17   Somalia and out of Somalia, also as the principal place from

18   which al-Qaeda resources are being put into Somalia or coming in

19   and out of Somalia.  He also describes the fact that -- I think

20   that's more or less it.

21   Q.   Does he describe the Sudan?

22   A.   Yes.  He also describes the -- he talks about why al-Qaeda

23   moved to Sudan and he explains the fact that they saw Sudan as a

24   base from which al-Qaeda could expand its operations, military

25   operations, across North Africa and East Africa.  In other

1    words, it would be a base for launching missions.

2              MR. MACALLISTER:  Your Honor, we'll get you a working

3    video in short order.

4              THE COURT:  Promises, promises.

5    BY MR. MACALLISTER:

6    Q.   Which members of al-Qaeda were important in the move to the

7    Sudan?

8    A.   Well, a number of individuals played key roles.  However,

9    some of the most key roles were played by individuals who were

10   both members of al-Qaeda and also individuals who were Sudanese

11   nationals.  In other words, people who were working on behalf of

12   the Sudanese intelligence service.

13        One individual who was not Sudanese who played a key role

14   in this was known as Abu Hajer al-Iraqi, otherwise known as

15   Mamdouh Mahmoud Salim.  Salim was an Iraqi national, a very,

16   very high-ranking al-Qaeda member who was playing a key role in

17   terms of facilitating al-Qaeda's move to Sudan.

18        Another individual who played a key role was Ali Mohammed,

19   otherwise known as Abu Mohammed the American, who again was a

20   high-ranking al-Qaeda member, assigned to a number of roles,

21   including scouting out potential terrorist targets on behalf of

22   al-Qaeda.  He also played a key role in assuring that Bin Laden

23   had safety and security while transiting between Afghanistan and

24   Khartoum.

25   Q.   Where did al-Qaeda settle in Sudan?

1    A.    It settled in a number of locations.  The principal

2    location for al-Qaeda activity in Sudan was Khartoum, both in

3    the form of offices -- it actually had an official kind of

4    business office with secretaries and whatnot on McNimr Street in

5    north Khartoum.  It also had an expansive two-story guest house

6    which was designed to house al-Qaeda operatives in transit.  Bin

7    Laden spent a great deal of time at the guest house.

8         Aside from various other different houses and locations

9    inside of Khartoum, al-Qaeda also purchased a number of farms.

10   The farms were everywhere from just outside of Khartoum in

11   places like Damazin, all the way to Soba and Port Sudan.  Port

12   Sudan is a Sudanese town or city, whatever you want to describe

13   it, right on the Red Sea.

14   Q.    What was the purpose of the farms?

15   A.    The purpose of the farms was twofold.  Number one, al-Qaeda

16   thought that it could make money, or Bin Laden thought it could

17   at least keep money or could maintain its resources by engaging

18   in agricultural development in the Sudan.  However, by the

19   account of al-Qaeda operatives who were at these farms, only

20   about two-thirds of the farms were being used actually for

21   agricultural purposes.  At least a third of these farms or a

22   third of the portion of these farms was being used for a

23   different purpose, which was known as quote-unquote refresher

24   training.

25        Refresher training consisted of basically a terrorist

1    training camp, the idea being to take al-Qaeda members who have

2    engaged in previous paramilitary conduct, and to make sure that

3    they haven't forgotten anything since they left Afghanistan.

4    While the Sudanese government initially had had more of the idea

5    of them engaged in intelligence activities, al-Qaeda took the

6    opportunity and used the farms and the training camps for

7    everything from making mockups for assassinations to blowing up

8    actually test explosive devices.

9    Q.   You said quote-unquote.  Who were you quoting?

10   A.   Refresher training?

11   Q.   Yes.

12   A.   That was actually described by a former al-Qaeda member,

13   Jamal al-Fadl.

14   Q.   You mentioned that al-Qaeda opened an office.  Were there

15   businesses in the Sudan?

16   A.   Yes.  In order to facilitate its development of the

17   Sudanese economy, in order to facilitate its ability to obtain

18   resources in the Sudan, al-Qaeda created a number of businesses.

19   The first business that it created was known as Wadi al-Aqiq.

20   Wadi al-Aqiq was the initial company that was created, which was

21   kind of Bin Laden's mother company in Sudan, which oversaw the

22   resources and activities of all the other subcompanies

23   established.

24        Underneath Wadi al-Aqiq you had a number of different

25   subcompanies that were established.  You had everything from

1    Themar al Mubaraka, which was an agricultural company.  You had

2    Ladin International Company, al-Hijrah Construction.  One of the

3    big projects that Bin Laden wanted to engage in in Sudan was

4    developing roads and infrastructure.  So Hijrah Construction was

5    responsible for building roads and infrastructure.

6         You also had companies that were set up exclusively for the

7    purpose of trading in terms of exchanging money between the

8    Sudanese pound and Western currency, pound sterling.  You had

9    al-Qudurat Transportation, which is much like it says, was

10   designed to help facilitate the transportation of individuals,

11   including al-Qaeda members.

12        And separately, aside from the actual for-profit companies,

13   al-Qaeda also engaged in activities within nonprofit

14   corporations, relief organizations, humanitarian relief

15   organizations, such as the Benevolence International Foundation,

16   otherwise known as al-Birr.  Al-Haramain, Mercy International,

17   the International Islamic Relief Organization, the Qatar

18   Charitable Foundation.

19   Q.   What was the purpose for al-Qaeda to open businesses and

20   charities in Khartoum and the Sudan?

21   A.   Well, number one, al-Qaeda needed a way to employ its

22   members.  Several of these members had families.  They had

23   wives, they had kids.  They needed income.  And al-Qaeda needed

24   to provide an income to them.  It wasn't enough simply to just

25   pay out of Osama Bin Laden's bank accounts, because at that

1    point Bin Laden's bank accounts were already being frozen and

2    they were starting to dwindle, frankly.

3         So al-Qaeda was looking for a way of self-sustaining,

4    providing a means of income for its membership, its leadership,

5    and also to provide an excuse for why al-Qaeda operatives would

6    be traveling to various different countries.  It makes a good

7    excuse if you show up at a foreign country at an immigration

8    desk and someone asks you, why are you here, I'm here to help

9    sell peanuts.  I'm here to provide humanitarian relief.  It

10   sounded a lot better than saying I'm here to foment Islamic

11   revolution.

12   Q.   Khartoum is the capital of the Sudan, and you've testified

13   that the government of Sudan invited Bin Laden and al-Qaeda to

14   the country.  Did they keep it a secret?

15   A.   No, they didn't.

16   Q.   How do we know that?

17   A.   Well, al-Turabi in particular, Hassan al-Turabi was very

18   proud of the fact that they had secured this alternative line of

19   financing and support.  He was so proud of this that when

20   Bin Laden began engaging in projects with the Sudanese

21   government, they would have actually press conferences to

22   celebrate the completion or the inauguration of these projects.

23   And in video recordings which were broadcast on Sudanese public

24   television, you actually see Turabi and Omar al-Bashir standing

25   side by side with Bin Laden celebrating the inauguration of

1    these projects.  They considered it something to be proud of.

2    Q.    Who was Bashir?

3    A.    Omar al-Bashir was the president of Sudan at this time.

4    Q.    Mr. Kohlmann, are you familiar with a report called "Global

5    Patterns of Terrorism"?

6    A.    "Patterns of Global Terrorism," yes.

7    Q.    Could you tell the Court what that is?

8    A.    "Patterns of Global Terrorism" is a publication produced by

9    the U.S. State Department each year.  The purpose of this is to

10   provide a yearly summary of activities involving international

11   terrorist organizations, identifying terrorist organizations --

12   international terrorist organizations, and attempting to explain

13   trends that are taking place within international terrorism.

14   Again, it's published each year in approximately the spring,

15   April or May, and it covers the entire year previous.

16   Q.    Could you explain to the Court what I've just handed you a

17   copy of?

18   A.    Yes.

19              THE COURT:  Which is marked as?

20              MR. MACALLISTER:  Which is marked as GG.

21              THE COURT:  Thank you.

22              THE WITNESS:  This is actually a copy of "Patterns of

23   Global Terrorism," again a State Department publication for

24   1993, which was released in April of 1994.

25   BY MR. MACALLISTER:

1    Q.    And you've worked with these reports before?

2    A.    Yes.  I've engaged in a number of scholarly studies

3    actually of statistics that are reported in "Patterns of Global

4    Terrorism."  In 1999 I published a study of how statistics from

5    "Patterns of Global Terrorism" showed that there was a trend

6    toward greater U.S. casualties in international terrorist

7    attacks.

8    Q.    Is this a fair and accurate copy of the report?

9    A.    Yes.  It appears to be.

10   Q.    And unfortunately, this does not have page numbers, but on

11   the third to last page -- hold on, let me give a copy to the

12   Court.

13        (Document tendered to the Court.)

14            THE COURT:  Thank you, Mr. MacAllister.

15   BY MR. MACALLISTER:

16   Q.    On the third to last page you'll see a section entitled

17   "Sudan."

18   A.    That's correct.

19   Q.    What does that indicate about the Sudan?

20   A.    It indicates, "Despite several warnings to cease supporting

21   radical extremists, the Sudanese government continue to harbor

22   international terrorist groups in Sudan."  This is referring to

23   the period of 1993. "Through the National Islamic Front party

24   which dominates the Sudanese government, Sudan maintained a

25   disturbing relationship with a wide range of Islamic extremists.

1    The list includes the ANO, which is the Abu Nidal organization,

2    the Palestinian HAMAS, the Palestinian Islamic Jihad, otherwise

3    known as PIJ, Lebanese Hezbollah, and Egypt's al-Gama'a

4    al-Islamiya."

5    Q.   You missed the first sentence, Mr. Kohlmann.

6    A.   Sure, no problem.  Excuse me.  "In August the Secretary of

7    State placed Sudan on the list of state sponsors of terrorism."

8    Q.   And skipping down two paragraphs --

9             THE COURT:  Mr. MacAllister, I believe that we didn't

10   admit this into evidence before we're reading it into evidence.

11   Maybe we did, but if we didn't, we'll admit it now.

12            MR. MACALLISTER:  Your Honor, if we didn't -- okay.

13   It's been admitted?

14            THE COURT:  It's been admitted.

15            MR. MACALLISTER:  Thank you.

16                            (Plaintiff Exhibit GG

17                             received into evidence.)

18   BY MR. MACALLISTER:

19   Q.   Again, on the third to last page, skipping down two

20   paragraphs, in the "Sudan" section, what does that indicate

21   about Sudan's ties to Iran?

22   A.   This "Patterns of Global Terrorism" states that "Sudan's

23   ties to Iran, the leading state sponsor of terrorism, continued

24   to cause concern during the past year.  Sudan served as a

25   convenient transit point, meeting site and safe haven for

1    Iranian-backed extremist groups.  The Iranian ambassador in

2    Khartoum, Majid Kamal, was involved in the 1979 takeover of the

3    U.S. embassy in Tehran and guided Iranian efforts in developing

4    the Lebanese Hezbollah group, while he served as Iran's top

5    diplomat in Lebanon during the early 1980s.  His presence

6    illustrated the importance Iran places on Sudan."

7    Q.   Thank you, Mr. Kohlmann.

8         Mr. Kohlmann, it is now 1992, al-Qaeda has relocated to the

9    Sudan.  At this time were there al-Qaeda operatives in Kenya?

10   A.   The very first al-Qaeda operatives begin arriving in Kenya

11   in approximately late 1991, early 1992.

12   Q.   Were there al-Qaeda terror cells in Somalia?

13   A.   They had just begun their initial forays.  You could call

14   them investigative missions, but there was no affirmed presence

15   of them yet.

16        MR. MACALLISTER:  Your Honor, this is actually on

17   Mr. Fay's exhibit list.  I got it to him in time.  This is

18   Exhibit T.

19   BY MR. MACALLISTER:

20   Q.   Mr. Kohlmann, could you describe what I just handed to you?

21   A.   Yes.  This is a map of East Africa comprising the nations

22   of what appears to be Kenya, Tanzania, Somalia, Ethiopia, Sudan,

23   and there are also parts of Saudi Arabia and Yemen.

24   Q.   Does this map appear to you to be a fair representation of

25   the geography of the area?

1    A.    Yes, it does.

2    Q.    Have you viewed other maps before of this area?

3    A.    Yes.

4          MR. MACALLISTER:  Your Honor, I'd move this exhibit

5    into evidence.

6          THE COURT:  T.  Exhibit T is admitted.

7                              (Plaintiff Exhibit T

8                               received into evidence.)

9          MR. MACALLISTER:  Your Honor, I'd like to use a blowup

10   of the map.

11         THE COURT:  Okay.

12         MR. MACALLISTER:  I'm going to move the stand over to

13   here.  Is that okay?

14         THE COURT:  That's fine with me.

15   BY MR. MACALLISTER:

16   Q.    Mr. Kohlmann, why is al-Qaeda moving into Kenya and

17   Somalia?

18   A.    Well, the primary purpose for moving into Somalia is

19   because of the fact that in late 1991 the U.S. government

20   announces that it will begin providing significant humanitarian

21   and -- with military-backed support, relief in Somalia.  At the

22   time there was a civil war taking place in Somalia which

23   essentially had divided Somalia up into clan-based violence.

24   Various different warlords were fighting each other for control

25   of the country, particularly in the capital of Mogadishu, which

you can see with an arrow pointing to it in the southeast.

Because of the humanitarian crisis that was created by the infighting and by the civil war, the U.S. government made the decision to, number one, intervene to provide humanitarian relief, and again to make sure that that humanitarian relief was not stolen or diverted by clan-based militants such as Mohammed Farrah Aidid.

At the time when the United States made this announcement, al-Qaeda viewed this as an extension of the U.S. involvement in the Arabian Peninsula.  It viewed this as an attempt by the United States to colonize East Africa and, as al-Qaeda members reasoned, if we let them establish a presence in Somalia, the next thing you know, they'll be taking over Sudan.

As a result, al-Qaeda made a decision that it must commit resources and personnel and money not merely to establishing jihadi movements or Islamic revolutionary movements in countries like Eritrea or elsewhere, but that it also must launch operations in Somalia.  As it happens, as you can see on the map, there's no easy way to get from Khartoum directly to Somalia.  In between Khartoum and Somalia is Ethiopia, and Ethiopia is the ever-present boogieman in Somali politics. Somalia and Ethiopia fight each other consistently.  There's no reason that Ethiopia would have to support Somalia in any way.

In other words, the only way for people here in Sudan to get across would be to take the very dangerous step of trying to

1    fly in Cessnas or other aircraft.  Al-Qaeda members did this but

2    it wasn't very effective.  They needed some other place that had

3    a land border with Somalia that they could cross back and forth

4    and they could provide resources from.

5         As it happened, Kenya, which you can see right here in the

6    middle, which shares a very, very long border with Somalia, was

7    essential for this.  Number one, Kenya obviously has a land

8    border.  Number two, the land border is exactly where al-Qaeda

9    was looking to get involved.  It happens that southern Somalia

10   is the area where Islamic militancy has found its greatest home.

11   The tribes in southern Somalia are the most sympathetic to the

12   aims of Islamic revolutionary movements.  So it was ideally

13   placed.

14        It also happened that in this whole region, the major bases

15   for U.S. and British and other nations that were getting

16   involved in Somalia, the main bases for their operations were

17   primarily in Djibouti, which you can see is a very, very tiny

18   country which is located up in the corner by Ethiopia, and

19   Kenya.  Kenya was the natural doorway, not just for al-Qaeda,

20   but it was also the natural doorway for the United States and

21   Great Britain.  It's a fact that al-Qaeda took note of very

22   quickly.

23   Q.   Did al-Qaeda carry out attacks in Somalia?

24   A.   Yes, it did.

25   Q.   Which ones?

1    A.   It carried out a number of attacks.  Beginning in 1992 it

2    began carrying out attacks targeting United Nations personnel in

3    southern Somalia.  It killed a number of U.N. personnel,

4    non-U.S. nationals.  Eventually al-Qaeda also began training

5    individuals at camps in southern Somalia on how to use

6    rocket-propelled grenade launchers, how to use mortars, how to

7    build explosives, how to carry out guerilla operations.

8         According to Abul Hassan al-Misri, among others, a number

9    of al-Qaeda operatives claimed this, including Osama bin Laden

10   himself, that there was actually involvement by al-Qaeda

11   operatives in the October 1993 downing of several U.S. Black

12   Hawk helicopters over the capital of Mogadishu.

13   Q.   Had al-Qaeda attacked U.S. soldiers, government, citizens

14   before?

15   A.   There had been an attempt, an attempt in December of 1992

16   by al-Qaeda operatives in Yemen to set off bomb attacks

17   targeting U.S. troops headed through Yemen into Somalia.

18   However, those bombings were more or less an abject failure.

19   The bombs did go off.  However, one of them killed an Austrian

20   tourist, and the other one blew the arm off of one of the people

21   who was trying to plant it.

22        So it wasn't a terribly successful attack.  It wasn't

23   directly claimed credit by al-Qaeda.  So this was some of

24   al-Qaeda's very first actual clashes, direct clashes with the

25   U.S. military.

1    Q.   Had al-Qaeda attacked U.S. interests before that attack in

2    '92?

3    A.   No.  No.  It didn't have the resources to do that.  It

4    didn't have the opportunity or the resources to do that.

5    Q.   Why did al-Qaeda go from no attacks against the U.S. to

6    attacking U.S. soldiers?

7    A.   Well, again, one of the main reasons was, number one,

8    following the U.S. presence in the Arabian Peninsula, then the

9    idea that the U.S. was going to quote-unquote colonize East

10    Africa.  Why was al-Qaeda concerned about this?  Because of

11    their base in Khartoum.  They were afraid that the United States

12    was going to come in and rob them of their base in Khartoum.

13        They also had now the resources to launch these operations.

14    With a base in Khartoum and with operatives moving in and out of

15    Kenya, there was now a way for al-Qaeda to position the

16    resources and to obtain the opportunities to fight against U.S.

17    soldiers.  This was an opportunity to meet face-to-face.  It was

18    one of the first opportunities that al-Qaeda had had.

19    Q.   Was al-Qaeda's hostility to the United States a secret?

20    A.   No.  It was not a secret.

21    Q.   How was this shared?  How was this information shared?

22    A.   It was widely advertised by al-Qaeda in its publications,

23    in its books.  In addition to that, Bin Laden had been issuing

24    fatwas in his guest houses against the United States starting in

25    1991.  The first issue of grievance was the presence of American

1     soldiers in the Arabian Peninsula, a fact that was no secret

2     because of the fact that Bin Laden communicated this directly to

3     the Saudi government, saying you can't let infidel soldiers in

4     the land of Mohammed, the peninsula of Mohammed.  This is a job

5     for Muslims, not a job for Americans.

6          In addition, following the U.S. decision to then move into

7     Somalia, Bin Laden issued fatwas in his guest houses in Khartoum

8     and disseminated them amongst both Sudanese and non-Sudanese

9     members of al-Qaeda, explaining that America is the head of the

10    snake and that if we're really serious about what we're doing

11    here, we need to cut the head off the snake; i.e., we need to

12    attack the United States directly.

13    Q.   Would the Sudanese government have known of this hostility

14    and intent to attack?

15    A.   Yes.  The Sudanese government was aware of this.  One of

16    the grievances that the United States had against Sudan was the

17    fact that Sudan was harboring international terrorist

18    organizations in Khartoum who had the avowed interest of

19    striking at the United States.  This is one of the reasons why

20    Sudan takes such a prominent place in "Patterns of Global

21    Terrorism" and the national intelligence estimates that are

22    being issued by the CIA.

23    Q.   Would the Sudan have reasons to fear the United States or

24    act against the United States?

25    A.   Well, Sudan had an interest in acting against the

1    United States inasmuch as the United States was and still is one

2    of the most significant foreign sponsors of the government of

3    Egypt, which again at the time was Sudan's avowed enemy.  Not to

4    mention the fact that the United States was also promoting

5    various other different policies in the Middle East which ran

6    directly counter to the interests of Sudan, including Middle

7    East peace between Israelis and Palestinians, the presence of

8    U.S. soldiers in Saudi Arabia, fighting against the government

9    of Saddam Hussein.

10        All these things were things that the Sudanese government

11   not only had no interest in, but their interests ran the other

12   way.  They ran contrary to these.  So for many reasons the

13   Sudanese government was not thrilled with the United States.

14   Q.   How did the Sudanese government view the United States

15   landing in Somalia?

16   A.   They viewed this as a direct threat to their national

17   security.  Much like al-Qaeda, they perceived that if the

18   United States was able to establish a firm base of operations in

19   Mogadishu, it was only a short hop, skip and a jump to Khartoum,

20   and this would have been a clear and present danger to the

21   continued existence of their regime.

22   Q.   Did al-Qaeda publicize its involvement in the Black Hawk

23   Down incident?

24   A.   Yes, it did.

25   Q.   How did it do that?

1    A.    Initially it published it within the organization itself.

2    Several individuals who were -- first of all, Abu Hafs al-Masri,

3    who eventually became the senior military commander of al-Qaeda,

4    a very senior al-Qaeda member throughout this, who had been one

5    of the first individuals to travel to Somalia and establish

6    relationships with Somali militants, came back from Somalia,

7    convened a meeting at an al-Qaeda guest house in Khartoum, and

8    announced to the individuals there, everything you see happening

9    in Somalia right now, we did this.  This is our work.  We did

10   this.

11        In addition, the individuals from al-Qaeda who were

12   involved in these activities, who had traveled to Somalia and

13   become engaged in fighting with U.S. and U.N. forces, actually

14   were given rewards.  One of these individuals, known as Abu

15   Talha al-Sudani, another high-ranking al-Qaeda member, when he

16   returned from Somalia, when he returned back to Sudan, purchased

17   a large residence and told other al-Qaeda members, including

18   Jamal al-Fadl, that the money he had gotten to purchase this

19   house was given to him as a reward from al-Qaeda for the

20   successful operations they had conducted in Somalia.

21   Q.    Were the al-Qaeda claims publicized in other ways?

22   A.    Yes.  Yes, they were.  Osama bin Laden and other al-Qaeda

23   members even boasted about this in the media.  They boasted in

24   Arab press articles.  They boasted in publications that they

25   were releasing.  Eventually Osama bin Laden himself took to

1    American airwaves and said on CNN, we did what happened in

2    Somalia.

3         But they were very proud of it.  For al-Qaeda, this was one

4    of the very first objective incidents that they could point to

5    and say we did this, it was a victory for us, we achieved what

6    we wanted to do, we forced the Americans out of Somalia and

7    we're not just a phantom threat.

8    Q.   You mentioned that Osama bin Laden and other al-Qaeda

9    members were talking about this in the guest houses.  Would the

10   Sudanese government have known what's going on in the guest

11   houses?

12   A.   Yes.  Because not only were there Sudanese intelligence

13   officers in these guest houses, but what's more is again,

14   individuals like Abu Hafs al-Masri, the Egyptian military

15   commander, had to fly from Sudan to Somalia in a Cessna.  All

16   these activities would have been well within the gambit of

17   knowledge of the Sudanese government.

18   Q.   Let's examine -- after the credit was taken for the attacks

19   in Somalia against U.S. soldiers, did the Sudan shut down its

20   support of al-Qaeda?

21   A.   No.  Not at all.

22   Q.   Let's examine in depth that support.  Could you please

23   describe the relationship between al-Qaeda and the Sudanese

24   intelligence service, which you've mentioned before in passing?

25   A.   Sure.  The Sudanese intelligence service viewed al-Qaeda as

1    a proxy, much the way that Iran views Hezbollah as a proxy.  The

2    idea being is that by sharing resources, information, by

3    assisting al-Qaeda, the Sudanese could use al-Qaeda to attack

4    their mutual enemies.

5         In order to provide this assistance, there were a number of

6    means of assistance provided.  One of the first means was that

7    in order for al-Qaeda to move its resources from Afghanistan to

8    Khartoum, and then from Khartoum into other countries, al-Qaeda

9    didn't have its own airline.  It didn't own airplanes.  It

10   needed a means to move this equipment without using a major

11   cargo service or a major airline that would have started asking

12   questions that al-Qaeda didn't want to answer.

13        In this role stepped in Sudan Airways.  The Sudanese

14   intelligence service facilitated the use of Sudan Airways jets

15   in order to move equipment, weapons, operatives back and forth

16   between Afghanistan, Sudan, and other countries, in direct

17   support for acts of international terrorism.

18        Number two, a number of the individuals fighting with

19   al-Qaeda are more or less, or they're *de facto* stateless

20   individuals.  They may be from countries like Egypt or Algeria

21   or Syria, but because of their activities with al-Qaeda and

22   other radical Islamic groups, they can no longer use their

23   passports of origin.  In doing so, they would have made

24   themselves subject to potential arrest and extradition to their

25   countries of origin, which obviously they didn't want.

1        These individuals needed a means to travel.  They needed a

2   means of identification.  Sudan stepped into the chasm and the

3   Sudanese intelligence service provided al-Qaeda with passports,

4   both in their names and also with fake names, official Sudanese

5   passports.  The purpose of which again, facilitate the travel,

6   communication, and operations of al-Qaeda, both in the Sudan and

7   abroad.

8        The Sudanese intelligence service also provided al-Qaeda

9   with contacts.  Prior to 1992, al-Qaeda did not have very good

10  contacts with groups like Hezbollah.  It didn't even necessarily

11  have a great relationship with groups like Hezbollah or Iran.

12  Sudanese intelligence provided the key connections there and

13  helped smooth things over, which allowed al-Qaeda to operate

14  with these groups that it didn't necessarily fully trust.

15       The Sudanese intelligence service also provided al-Qaeda

16  with weapons.  It provided al-Qaeda with explosives.  It

17  provided al-Qaeda with assistance when they would run into

18  problems with local Sudanese law enforcement.

19       At one point in Port Sudan Saif al-Adel and a number of

20  other senior al-Qaeda operatives were engaged in testing

21  explosives.  The blasts attracted the attention of local police,

22  and these individuals were arrested.  They were eventually

23  rescued from the custody of Sudanese police by Sudanese

24  intelligence officials, who told them, don't do this anymore,

25  you're attracting too much attention.

1   Q.   Was Osama bin Laden aware of the links between Sudanese

2   intelligence and his operatives?

3   A.   Yes.  He was aware of these links, and he directly -- he

4   told directly individuals who were members of al-Qaeda that were

5   doing work on behalf of the Sudanese intelligence service that

6   that was fine so long as they assist with al-Qaeda's delegation

7   office in Sudan.  The delegation office was responsible for

8   providing services to al-Qaeda members on behalf of the Sudanese

9   intelligence service.

10        For instance, when al-Qaeda members would arrive in

11   Khartoum airport, someone from the delegation office would come

12   out, greet them at the airport, escort them around immigration

13   and customs, so they didn't have to have their passport stamped,

14   they didn't have to have their bags searched, they didn't have

15   to be interrogated.  There was no record of them coming or

16   leaving the country.

17   Q.   Why is it important if the passport is stamped or not?

18   A.   Because of the fact that at the time anyone with a stamp on

19   their passport showing an entry or exit from Khartoum, Sudan,

20   would immediately come under suspicion as a potential Sudanese

21   intelligence operative or someone involved with international

22   terrorist organizations.  At the time Khartoum had the

23   reputation of being like Casablanca.  It was a center for

24   intrigue, espionage and terrorist activity.

25   Q.   Were there foreign governments who were looking for the

1   al-Qaeda operatives?

2   A.    Yes.

3   Q.    Which ones?

4   A.    A number of different governments, but most principally the

5   country that these operatives feared most was Egypt.

6   Q.    Why?

7   A.    Because of the fact that many al-Qaeda operatives,

8   including most of the senior leadership, were all Egyptians,

9   they were all well known to the Egyptian government, they were

10  engaged while in Sudan in activities directly targeting the

11  Egyptian government, including the attempted assassination of

12  President Hosni Mubarak, and other senior Egyptian political

13  leaders, and as a result they had much to fear from the Egyptian

14  intelligence service.

15      At one point an al-Qaeda operative crashed an aircraft at

16  Khartoum International Airport, and even though this was

17  Khartoum, even though this was Sudan, the individuals ran from

18  the airport because they were afraid that Egyptian intelligence

19  officers would witness this and would make a record of it.

20  Q.    And when you say fear the Egyptian intelligence, could you

21  describe some of the methods of the Egyptian intelligence?

22  A.    The Egyptian intelligence operatives are known for using

23  every method imaginable in order to obtain information.  At one

24  point they attempted to assassinate Ayman al-Zawahiri, the

25  deputy commander of al-Qaeda, in Khartoum, with a bag full of

1    explosives left there by an individual who was serving as an

2    informant within al-Qaeda.  If it wasn't for the quick thinking

3    of the Sudanese intelligence service, the Egyptians probably

4    would have killed Ayman al-Zawahiri.

5                THE COURT:  Mr. MacAllister, we're going to need to

6    take a morning break.  So give me an idea of approximately how

7    much longer with Mr. Kohlmann.

8                MR. MACALLISTER:  Your Honor, if we could ask four or

9    five more questions, we'd reach a stopping point for

10   Mr. Kohlmann, and then we'll continue to lunchtime.

11               THE COURT:  You think he will continue all the way

12   until lunchtime?

13               MR. MACALLISTER:  I think so, yes.  Maybe 15 minutes

14   short.

15               THE COURT:  All right.  Go ahead with your four or

16   five questions.

17   BY MR. MACALLISTER:

18   Q.   Mr. Kohlmann, did the Sudanese intelligence save the lives

19   of any other al-Qaeda operatives?

20   A.   They stepped in and they -- there were two individuals who

21   attempted to carry out the assassination of Egyptian President

22   Hosni Mubarak in Addis Ababa in Ethiopia.  It was the Egyptian

23   intelligence service that provided these individuals

24   documentation and papers which allowed them to escape Ethiopia

25   before they were captured.

1    Q.   That would be Sudanese intelligence?

2    A.   Yes.

3    Q.   I think you said Egyptian intelligence.

4    A.   Excuse me.  Sudanese intelligence.  Sudanese intelligence

5    officers also provided support to al-Qaeda in a number of

6    different countries, providing papers, documentation, you name

7    it.  They were integral in providing protection for Bin Laden

8    and others.

9         In fact, when there was an assassination attempt on

10   Bin Laden in 1994 in Khartoum, part of the reason Bin Laden

11   survived was probably luck, but part of it had to do with the

12   quick thinking of Sudanese intelligence officers.

13   Q.   How did they assist in his protection?

14   A.   At any time they perceived there was a threat to his life,

15   at any time they perceived there were potential spies on the

16   loose that were working for nations or governments or regimes

17   that were considered hostile to al-Qaeda, they immediately

18   reported this to al-Qaeda and took measures to clamp down on

19   whatever hostile elements they had discovered.

20   Q.   And the last question.  You mentioned that the Sudan

21   Airways transported equipment from Afghanistan to the Sudan.

22   What kind of equipment?

23   A.   What ended up happening was that al-Qaeda had a number of

24   weapons in Afghanistan that it didn't want to let go of.  They

25   were too valuable to let go of.  So a Sudanese Airways flight

```
1    was dispatched from Khartoum to Afghanistan, bringing with it

2    agricultural cargo.  On the way back it was loaded with Milan

3    anti-tank missiles, and Stinger shoulder-fired surface-to-air

4    missile launchers, and those weapons were brought back from

5    Afghanistan back to Khartoum on behalf of al-Qaeda.

6    Q.   Would those weapons have been important to al-Qaeda?

7    A.   Yes, they would have been.  Surface-to-air missile

8    launchers are fairly rare, they're expensive, and they've been

9    used in al-Qaeda operations in East Africa.  In 2002 al-Qaeda

10   attempted to shoot down an Israeli airliner off the coast of

11   Kenya using a shoulder-fired surface-to-air missile launcher.

12             MR. MACALLISTER:  Shall we take a break, Your Honor?

13             THE COURT:  We should.  We're going to take a

14   15-minute break.  Mr. Kohlmann, you may step down.  And you

15   actually think we'll go with Mr. Kohlmann all the way up until

16   12:30?

17             MR. MACALLISTER:  At least another half an hour to 40

18   minutes I would say.

19             THE COURT:  And if we finish him before 12:30, do you

20   expect to put Mr. Piernick on this morning?

21             MR. MACALLISTER:  I would have to consult with

22   co-counsel.

23             THE COURT:  Do so.  Or let me know when we come back.

24   And then you have a witness this afternoon?

25             MR. MACALLISTER:  Mr. Simon at 1:30.
```

```
 1              THE COURT:  Mr. Simon at 1:30.  How long do you expect
 2      his testimony to take?
 3              MR. MACALLISTER:  That's going to be half an hour to
 4      40 minutes.
 5              THE COURT:  All right.  See you in 15 minutes.
 6          (Recess from 11:07 a.m. to 11:32 a.m.)
 7          (The witness resumes the stand.)
 8              THE COURT:  Mr. Kohlmann, I remind you you're still
 9      under oath.  Mr. MacAllister.
10      BY MR. MACALLISTER:
11      Q.   Mr. Kohlmann, could you try to speak a little bit slower
12      for the court reporter's benefit?
13      A.   Of course.  Sorry about that.
14      Q.   You mentioned that al-Qaeda opened several businesses in
15      Khartoum and Sudan.
16      A.   That's correct.  Yes.
17      Q.   You also testified that the purpose of this was to provide
18      cover for the employees and employment for al-Qaeda operatives.
19      Let's take a closer look at the companies so that we can see who
20      was working for them.
21              MR. MACALLISTER:  Your Honor, I would mark this as
22      Exhibit HH.
23      BY MR. MACALLISTER:
24      Q.   Could you tell the Court what that is?
25      A.   Yes.  These are charts that were created by my office which
```

1   lay out the structure of al-Qaeda's businesses and charities in

2   Sudan.

3   Q.   Do you have knowledge of all the information that's on this

4   chart?

5   A.   Yes.  This is based upon documents that are in our

6   archives.

7            MR. MACALLISTER:  Your Honor, I move HH into evidence.

8            THE COURT:  Let me get straight what's been handed me.

9   I've been handed a two-page and a one-page.

10           MR. MACALLISTER:  Your left hand has HH.

11           THE COURT:  But it's not marked.  But it is HH.  It's

12  two pages with the heading at the top, "Osama bin Laden and

13  al-Qaeda in the Sudan."

14           MR. MACALLISTER:  Yes, Your Honor.  I have a nice

15  color copy I was going to provide to the Court as evidence, but

16  I'm also going to use it on ELMO.

17           THE COURT:  Use it on the ELMO.  And did you -- you

18  did move HH into evidence, and it will be admitted.

19           MR. MACALLISTER:  Yes, Your Honor.  Thank you.

20                       (Plaintiff Exhibit HH

21                        received into evidence.)

22  BY MR. MACALLISTER:

23  Q.   Mr. Kohlmann, please explain what this displays.

24  A.   This, I believe you're referring to "Osama bin Laden and

25  al-Qaeda in the Sudan."  "Companies in the Sudan affiliated with

1    Osama bin Laden."  This is a chart laying out the various

2    different companies which al-Qaeda and Osama bin Laden founded

3    in the Sudan, along with various different al-Qaeda members who

4    were associated with particular charities or companies.

5    Q.    Describe the company Ladin International, import/export.

6    A.    Ladin International was for import/export.  As Jamal

7    al-Fadl described, the purpose of this was if you wanted to

8    export or import particular items into Sudan, i.e., if you

9    wanted to export agricultural products, if you wanted to import

10   cars, Ladin International was the company for you.  It would

11   arrange import/export deals.

12        You'll notice it's right next to Wadi al-Aqiq.  Wadi

13   al-Aqiq is again the mother company of all of Osama bin Laden's

14   companies based in Sudan.

15   Q.    What year were these opened?

16   A.    These were opened in approximately 1991.

17   Q.    Were Sudanese officials or nationals involved in these

18   companies?

19   A.    Yes.  Well over half the staff at Wadi al-Aqiq were

20   Sudanese nationals.

21   Q.    What is al-Themar al Mubaraka?

22   A.    Al-Themar al Mubaraka is, again, it's a farming company.

23   Agricultural goods.  They were growing peanuts.  They were

24   producing palm oil, various different agricultural products with

25   a base in Sudan.

1    Q.    Who are the gentlemen listed in that box?

2    A.    You see the names Abu Hassan al-Masri, who was an al-Qaeda

3    member, and Dr. Mubarak al Doori.

4    Q.    What are they known for?

5    A.    They're known for being al-Qaeda members, also responsible

6    for running Al-Themar al Mubaraka.

7    Q.    Who are the next four names?

8    A.    Well, it happens that, as I explained, the farms were used

9    for a number of different tasks.  One of the principal purposes

10   of the farms was to serve as a cover for training camps or

11   refresher camps for al-Qaeda members, for paramilitary

12   exercises.  The four names you see listed there are four

13   individuals who provided or participated in explosives training

14   that took place on farms run by Al-Themar al Mubaraka in Sudan.

15         You'll see the name Salem al-Masri, Saif al-Islam al-Masri,

16   Saif al-Adel, and Abu Talha al-Sudani.  I've discussed several

17   of these individuals already.  Abu Talha was one of the

18   individuals from al-Qaeda who led the initial delegation to

19   Somalia, and was paid a reward after the Black Hawk Down

20   incident in '93.  Saif al-Adel is a senior member of al-Qaeda,

21   the head of its security committee, an individual who was in

22   both Somalia and Kenya.  Saif al-Islam al-Masri was one of the

23   individuals from al-Qaeda who traveled from Khartoum and

24   eventually reached Lebanon and received training with Hezbollah

25   in south Lebanon.  So did Saif al-Adel.

1    Q.   Were any of these individuals involved in the Kenya terror
2    cell?
3    A.   Yes.  Like I said, Saif al-Adel was directly involved.  He
4    was in Kenya.
5    Q.   What about al-Hijrah Construction?
6    A.   Al-Hijrah Construction, as I explained before, was the
7    company responsible for building infrastructure in Sudan,
8    particularly big road projects such as the road to Damazin.
9    These were projects which were engaged in directly by both
10   al-Qaeda, in partnership with the Sudanese government.  You'll
11   see the names listed again next to there.  These are again names
12   of al-Qaeda members who were directly involved in the
13   administration and operations of al-Hijrah Construction.
14        You see names such as Abu Hassan al-Sudani.  Abu Hassan
15   al-Sudani was initially responsible in Afghanistan for logistics
16   for al-Qaeda's main terrorist training camp, known as Al-Farouq.
17   Later on he was an essential conduit between the Sudanese
18   government and al-Qaeda.
19        You also see Abu Hammam al-Saudi, a Saudi al-Qaeda
20   operative.  Abu Rida Suri, a Syrian al-Qaeda operative, a shura
21   council member, and an individual who was very important in
22   terms of the nexus between the Sudanese government and al-Qaeda.
23   In fact, Abu Rida Suri was responsible for al-Qaeda's abortive
24   bid to obtain nuclear weapons in conjunction with the Sudanese
25   government.

1      And Abu Hajer al-Iraqi, otherwise known as Mamdouh Mahmoud

2   Salim, he's the individual who helped move al-Qaeda from

3   Afghanistan to Sudan, he was an al-Qaeda shura council member,

4   he was responsible for engaging in overseas missions on behalf

5   of al-Qaeda, and he was a very important al-Qaeda member.

6   Q.   These gentlemen were employed by al-Hijrah?

7   A.   Yes.  They were involved either in the administration or

8   operations of al-Hijrah Construction.

9   Q.   You mentioned that a road was built to Damazin?

10  A.   Yes.

11  Q.   Would you describe that project?

12  A.   Yes.  Again, at the time both the Sudanese government and

13  al-Qaeda had the interest of developing the infrastructure in

14  Sudan.  There was an opportunity to build a hundred-mile-long

15  road to Damazin, connecting I believe to Khartoum.  It was a

16  big, big project.  It was very famous.  It got a lot of

17  attention, a lot of publicity.  This is one of the instances

18  when Bin Laden was actually videoed and shown on video standing

19  next to Hassan al-Turabi and Omar Bashir to celebrate the

20  eventual successful completion of this road project.

21  Q.   To the best of your knowledge, are explosives used in road

22  construction?

23  A.   Not only are explosives used in road construction, but

24  al-Hijrah Construction, the company, one of the things that it

25  did was to obtain explosives for the purpose of blowing up

1    obstacles in the creation of roads.

2    Q.    Page 2 of Exhibit HH has four other boxes.  Could you go

3    through the boxes one by one and explain what they are to the

4    Court?

5    A.    Yes.  Taba Investments was the company in Sudan run by

6    al-Qaeda, created by al-Qaeda, with the idea of taking profits

7    accrued by other al-Qaeda companies and converting them from the

8    Sudanese pound into dollars or pounds sterling.  In other words,

9    taking the profits earned in Sudan and making them into a

10   currency that could be exported.  I believe Taba Investments not

11   only did this on behalf of al-Qaeda, but eventually others as

12   well.

13        Al-Qudurat Transportation, another company that I mentioned

14   earlier, responsible for transportation, vehicles, for both

15   al-Qaeda members and other al-Qaeda interests in Sudan.  Of

16   course, you see a dry cleaner and a bakery, a variety of other

17   interests that were controlled at the time.

18        And at the very bottom you see al-Qaeda office on McNimr

19   Street.  This is actually the office of al-Qaeda that was shared

20   with the National Islamic Front party.  This is a very

21   standard-looking office.  It had a secretary in front, it had a

22   row of secretaries.  It was operated like a business.

23        Half of the offices were occupied by Sudanese National

24   Islamic Front party members.  So it was kind of a joint

25   operation of al-Qaeda and the NIF.  At one time Osama bin Laden

1    and a number of other senior al-Qaeda leaders had their own

2    personal offices in this building on McNimr Street.  It happened

3    that after a while there was a dispute with some of the Sudanese

4    NIF members over money.  The Sudanese NIF members felt they

5    needed to be paid more money, they weren't being paid enough, so

6    eventually al-Qaeda moved out of the McNimr Street offices and

7    moved into a guest house in Khartoum.

8    Q.   There are a number of names listed on page 2.  Could you

9    explain who they are?

10   A.   Yes.  These are individuals, again they're senior al-Qaeda

11   leaders who had offices or who had an office at the McNimr

12   Street address.  You see obviously Osama bin Laden.  I just

13   mentioned him.  Abu Hassan al-Masri.  You see Dr. Mubarak

14   al-Doori.

15        Sheikh Sayyid al-Masri, you see that name there.  Sheikh

16   Sayyid, he's otherwise known as Mustafa Abu al-Yazid.  He was

17   al-Qaeda's treasurer.  He was responsible for cutting the checks

18   on behalf of al-Qaeda members, deciding how and where al-Qaeda

19   money went.  He was also one of the original founders of

20   al-Qaeda, and he was an al-Qaeda shura council member.

21        You see Abdul Rahman Somali.  Motassem Sadeek Abu Sashl,

22   who was technically the chief of the companies.  You see Abu

23   Fadhl al Makkee, a Saudi al-Qaeda member who was very close to

24   Osama bin Laden.  In other words, basically most of al-Qaeda's

25   senior leadership, including some of the most dominant figures

1    in the organization, had space at the McNimr Street office.

2    Q.    These individuals were living and working in Khartoum?

3    A.    That's correct, yes.

4         THE COURT:  Before we leave that document,

5    Mr. Kohlmann, just describe for me very generally what the

6    sources for this information are.

7         THE WITNESS:  Yes, of course.  There are a number of

8    sources for this information.  The most authoritative sources

9    are two former al-Qaeda members who were working with al-Qaeda

10   in Khartoum in Sudan at that time, who had direct knowledge of

11   these facilities and who eventually defected from al-Qaeda and

12   became sources for the U.S. government.

13        Those two individuals are named Jamal al-Fadl, and the

14   second individual whose name is L'Houssaine Kherchtou.  Both of

15   these individuals have testified under sworn oath.

16   BY MR. MACALLISTER:

17   Q.    You mentioned an al-Qaeda attempt to acquire nuclear

18   weapons.  Could you describe that with more detail?

19   A.    Yes.  Al-Qaeda had an interest in acquiring nonconventional

20   weapons for the use against its adversaries.  Among these were

21   both chemical and nuclear weapons.  There was actually a joint

22   venture between the Sudanese government and al-Qaeda with this

23   respect.

24        With regards to chemical weapons, there was a project in a

25   place called Hilat Koko, which is part of the Sudanese capital,

1    where the Sudanese military was directly engaged in trying to

2    develop regular conventional weapons into nonconventional,

3    chemical weapons with al-Qaeda's assistance.  This project was

4    being overseen by, among others, a Sudanese military officer by

5    the name Muqadem Abdul Basit Hamza.

6        With regard to the efforts to obtain nukes, leveraging

7    their connections within the Sudanese government, al-Qaeda

8    operatives, led by Abu Rida al-Suri, the Syrian operative I

9    showed earlier on the chart, met with individuals who claimed to

10   have fissile material that they had obtained from South Africa.

11   However, after al-Qaeda purchased this fissile material, it was

12   later determined to be empty.

13   Q.   I handed you another single piece of paper, what's been

14   marked as Exhibit II.

15            MR. MACALLISTER:  Your Honor has a copy.

16   BY MR. MACALLISTER:

17   Q.   Could you explain to the Court what this is?

18   A.   Yes.  As I stated earlier, in addition to for-profit

19   ventures begun by al-Qaeda in Sudan, al-Qaeda was also keenly

20   aware of the use which nonprofit organizations could have,

21   particularly religious charities.  These charities were

22   providing the lion's share of al-Qaeda's income, its operating

23   expenses, and they were an excellent way of laundering money

24   because of the fact that regional governments, not just the

25   Sudan, but many regional governments, even those hostile to

1    al-Qaeda, were reluctant to get involved in attempting to

2    regulate or stop humanitarian relief agencies.  So this was a

3    good way of laundering money.

4         It happened that a number of these charities not just

5    laundered money on behalf of al-Qaeda, but they actually served

6    as fronts for al-Qaeda activity, to provide a means and a reason

7    for al-Qaeda operatives to be in a particular area, to provide a

8    place to hide al-Qaeda records and communications, to provide a

9    place for al-Qaeda operatives to gather, to meet, to plan

10   operations.

11        These charities were based in a variety of different

12   countries, but they, most of them had offices in Khartoum, they

13   were active in Sudan, and they were also active elsewhere in

14   East and Central Africa, including both Somalia and Kenya.

15   Q.   Just to back up for a second, how do we know about Hilat

16   Koko and the attempt to acquire fissile material?

17   A.   We know about Hilat Koko and the attempt to acquire fissile

18   material because those efforts involved the two individuals who

19   I just named previously who were senior al-Qaeda members, and

20   who eventually became sources for the FBI, namely Jamal al-Fadl

21   and L'Houssaine Kherchtou.

22             MR. MACALLISTER:  I would move Exhibit II into

23   evidence, Your Honor.

24             THE COURT:  It's admitted.

25

1                            (Plaintiff Exhibit II

2                            received into evidence.)

3    BY MR. MACALLISTER:

4    Q.    There are four boxes on this exhibit.  Could you please

5    describe each for the Court?

6    A.    Yes.  Again, these are some of the Islamic charitable

7    organizations which were misused by al-Qaeda.  The first of

8    which, Mercy International, was actually a real humanitarian

9    group.  It wasn't just a front.  It was an organization, again

10   the purpose of which was to provide humanitarian relief,

11   initially to Muslims in Pakistan and Afghanistan, and eventually

12   elsewhere.

13        As you can see here according to the chart, Wadih el Hage

14   agreed to open a local branch in Nairobi, with the purpose of

15   providing a base for operations.  Mercy International's offices

16   in Nairobi were used to hide al-Qaeda documents, they were used

17   again for planning operations by al-Qaeda members, they were

18   used to house al-Qaeda members.  In this case Mercy gave

19   identification cards to al-Qaeda members, saying we're

20   humanitarian relief workers.

21        The second charity listed on this sheet, Help Africa

22   People, was actually not a real charity.  It was a complete

23   fraud.  It was created by Wadih el Hage, otherwise known as Abu

24   Abdullah the Lebanese, or al-Lubnani, a Lebanese al-Qaeda member

25   with U.S. citizenship who worked as Osama bin Laden's personal

1    secretary.

2         Wadih el Hage was largely responsible for the terror cell

3    that eventually sprung up in Nairobi.  He played a very, very

4    omnipresent role in that.  He also played a very large role in

5    al-Qaeda's financing and al-Qaeda's business activity in Sudan.

6    The purpose of establishing Help Africa People in Nairobi was to

7    give an excuse for why he was there.  In other words, if local

8    authorities came and asked, what are you doing here, I'm

9    providing humanitarian relief.  I'm here helping innocent

10   suffering people.

11        And once again, much like Mercy International, Help Africa

12   People was used to issue local identity cards to al-Qaeda

13   operatives, aside from Wadih el Hage, to show why they were

14   there, or why they technically were there.  In other words, it

15   was a cover for al-Qaeda's activities.

16   Q.   Who are some of the names listed that were involved with

17   Help Africa People?

18   A.   Sure.  You see here al-Qaeda members affiliated include

19   Osama Bin Laden, Wadih el Hage, Haroun Fazul.  Haroun Fazul is

20   an al-Qaeda operative from the Comoros Islands who played a

21   very, very significant if not dominant role in the 1998 bombings

22   of two U.S. embassies in East Africa.

23        Abu Mohammed al-Amriki, otherwise known as Ali Mohammed,

24   who was Osama bin Laden's bodyguard, and also an individual

25   responsible for scouting out terrorist targets on behalf of

1    al-Qaeda.

2         And Abu Ubaidah al-Banshiri.  Abu Ubaidah al-Banshiri at

3    the time was the top individual responsible for al-Qaeda's

4    military wing.  He was an Egyptian national.  He was also the

5    person in charge of al-Qaeda's Nairobi cell.

6    Q.   Were these individuals given identity cards through their

7    interaction with this fake charity?

8    A.   That's correct.  In fact I believe Wadih el Hage's identity

9    card was later exhibited as evidence during the trial of

10   conspirators relating to the 1998 embassy bombings.

11   Q.   What are the next two boxes?  What information do they

12   contain?

13   A.   Sure.  In the next box you see Al-Birr International

14   Organization, otherwise known as Benevolence International

15   Foundation and the International Islamic Relief Organization.

16   These are two charities, both of which have been used to launder

17   millions of dollars on behalf of al-Qaeda and provide

18   documentation to al-Qaeda members around the world, who both had

19   offices in the same neighborhood as -- not just in the same

20   neighborhood as Wadi al-Aqiq in Khartoum, but they were actually

21   facing Bin Laden's offices.  They were on the same street.  They

22   were on adjacent sides of the street.

23        One of the reasons for this is that they were very, very

24   heavily involved in financing and providing operational

25   capabilities to al-Qaeda.

1    Benevolence International has actually been shut down and

2    has been black listed by the U.S. government as being an

3    al-Qaeda charity.

4    Q.    And what is Qatar Charitable Foundation?

5    A.    Qatar Charitable Foundation was yet another charity which

6    was misused by al-Qaeda.  In this case very specifically it was

7    run by an individual named Dr. Abdullah Mohammed Yousef.

8    Al-Qaeda, in approximately 1992, provided, through Yousef, a

9    hundred thousand dollars to the Eritrean Islamic Jihad Movement.

10   Again, Eritrea is that country which is just to the

11   northeast of Ethiopia, sandwiched between Sudan and Somalia on

12   the coast.  Individuals from the Eritrean Islamic Jihad Movement

13   had approached al-Qaeda, had sought financing, and in order to

14   provide this financing the money was laundered through the Qatar

15   Charitable Foundation, run by Abdullah Mohammed Yousef.

16   Q.    And who was Dr. Yousef?

17   A.    Dr. Yousef was a Sudanese al-Qaeda member and also an

18   individual involved with the National Islamic Front party.

19   Q.    How do we know this?

20   A.    Again from the testimony of Jamal al-Fadl and L'Houssaine

21   Kherchtou, among other things.  The Qatar Charitable Foundation

22   played a fairly notorious role.  It was also involved in jihadi

23   financing on the Afghan-Pakistani border, and evidence from that

24   came from separate sources in Pakistan.

25   Q.    While al-Qaeda was located in the Sudan, were there other

1    conflicts that it was involved in aside from Somalia, which

2    you've already mentioned, and Eritrea?

3    A.   Yes.   Again, al-Qaeda viewed the Sudan as a base from which

4    to spring out and launch operatives across the region.   It was

5    an expansive aim, but it also meant that Somalia and Kenya were

6    not nearly the only targets they had in mind.   Al-Qaeda

7    operatives based in Sudan launched aggressive missions into a

8    number of countries, including Morocco, Algeria, Tunisia, Libya,

9    even Uganda, Ethiopia, Yemen, basically all across the region,

10   even as far as Bosnia-Herzegovina, which is all the way across

11   the Mediterranean.

12   Q.   Was the Sudanese government involved in any of these

13   conflicts?

14   A.   Yes.   The Sudanese government was heavily involved in these

15   conflicts.   For instance, even in Bosnia-Herzegovina, which is

16   again across the Mediterranean, NIF charities provided hundreds

17   of millions of dollars worth of illegal weapons and financing to

18   foreign fighters and to Muslim militants fighting in

19   Bosnia-Herzegovina.

20       I've also discussed about the Eritrean Islamic Jihad

21   Movement.   It was a Sudanese NIF member who played a key role in

22   laundering the money headed to the EIJM in Eritrea.   It was a

23   consistent pattern where al-Qaeda would use its resources in

24   Khartoum, shepherded by resources controlled or owned by either

25   the Sudanese government or the NIF in order to get stuff there.

1    Q.    Where does your knowledge come from about the conflict in

2    Bosnia-Herzegovina?

3    A.    It comes from direct study of documents produced by the

4    Bosnian Muslim -- excuse me -- the Muslim arm of

5    Bosnia-Herzegovina's security service, it comes from documents

6    produced by the Austrian police in regards to their

7    investigation of the NIF and NIF charities which were laundering

8    money and transporting weapons through Austria.  It comes from

9    documents uncovered by the international war crimes tribunal at

10   the Hague.

11        It comes from testimonial evidence from individuals who

12   witnessed this.  It comes from seized documents produced by

13   al-Qaeda members.  It comes from everything from, in 1995 an

14   individual carrying an identification card naming him as a

15   member of an NIF charity carried out a suicide bombing in

16   Rijeka, Croatia in retribution for the U.S. capture of a ranking

17   Egyptian jihadi.

18   Q.    When did you review these materials?

19   A.    I've reviewed them consistently over the past 10 years.

20   Q.    For what purpose?

21   A.    For the purpose of providing testimony before the

22   international war crimes tribunals, for writing my book, for

23   producing other scholarly documents, scholarly papers and

24   whatnot, and just in the normal context of research.

25   Q.    Did you testify on the conflict in Bosnia as an expert?

1    A.    Yes, I have.

2    Q.    You mentioned that the charities were used to store

3    al-Qaeda records and communications.  How do we know that?

4    A.    Because of the fact that after the 1998 bombings of two

5    U.S. embassies in Africa, these charities had their offices

6    raided because of their connection to Wadih el Hage and other

7    conspirators.  It was in those offices that direct evidence of

8    their involvement in the conspiracy was uncovered.

9    Q.    And where were those offices located?

10   A.    They were located in Nairobi, Kenya.  I should say as well

11   the Kenyan government actually shut down the operations of

12   several charities, such as the al-Haramain Islamic Foundation,

13   because of their involvement in the 1998 embassy bombings.

14   Q.    Why would -- we've heard testimony that Osama bin Laden and

15   al-Qaeda were operating in the open in Sudan.  Why would

16   identity cards be needed in Kenya?

17   A.    Because of the fact that the government of Kenya was not

18   sympathetic to al-Qaeda.  It was not sympathetic at all to

19   al-Qaeda.  In fact, the Kenyan government as early as 1995 and

20   1996 began to come under a tremendous amount of pressure from

21   the U.S. government, which believed there were terrorist cells

22   in Nairobi, Kenya which were targeting American interests.  As a

23   result, the Kenyan police were instructed to attempt to find

24   these cells, to arrest the individuals responsible, and to

25   thwart any potential terrorist plots.

1    Q.    If al-Qaeda members were traveling into Kenya and to the

2    cell in Nairobi, were there -- would they require the help of

3    the Sudanese intelligence?

4    A.    It would have been pretty much essential, yes.  Because

5    otherwise it would have been fairly easy to trace the path of

6    these individuals back to al-Qaeda.  They essentially needed the

7    Sudanese intelligence service to help provide them documents and

8    help try to obscure their transportation routes, their travel

9    routes.

10   Q.    What did al-Qaeda operatives bring to Nairobi from the

11   Sudan?

12   A.    From the Sudan they brought a lot of stuff.  They brought

13   operatives, they brought equipment, they brought documentation,

14   they brought money.  One al-Qaeda operative in particular who

15   I've discussed already, L'Houssaine Kherchtou, who was the

16   formal al-Qaeda operative eventually turned FBI source, has

17   testified in federal court that he brought as much as $10,000 on

18   a single occasion from Sudan to Kenya, in violation of,

19   obviously of Kenyan customs regulations.  The purpose of which

20   was to transport money to the Nairobi al-Qaeda cell without

21   alerting the Kenyan government or any other government as to

22   what al-Qaeda was doing.

23         In order to smuggle this money out of Sudan without coming

24   to the attention of anyone before he left Sudan, L'Houssaine

25   Kherchtou had to be shepherded through customs and immigration

1    by the al-Qaeda delegation office, the joint NIF-al-Qaeda

2    delegation office.

3    Q.    Which agency of the Sudanese government was the delegation

4    office staffed by?

5    A.    The Sudanese intelligence service.

6    Q.    Were there other Sudanese government agencies that assisted

7    al-Qaeda, that we know of?

8    A.    Yes.  As I explained before, the Sudanese military also

9    provided partnership with al-Qaeda.  One of the reasons for

10   which is because of the fact that al-Qaeda was doing its best to

11   support something known as the PDF, the Popular Defense Force,

12   which is a pro-military militia fighting against separatists in

13   the Sudan, in southern Sudan.

14        One individual in particular who I did already mention,

15   Muqadem Abdul Basit Hamza, who was a high-ranking Sudanese

16   military officer, played a key role, not just in al-Qaeda's

17   efforts to obtain chemical weapons, but also in terms of

18   negotiating the relationship itself between the Sudanese

19   military and al-Qaeda.

20   Q.    What other forms of support did the Sudanese government

21   give to al-Qaeda aside from the intelligence service, the

22   military, the businesses, the passports?  Were there other forms

23   of support?

24   A.    I did mention it before, but it's important to emphasize,

25   they also provided air travel.  In addition to the example which

1     I provided earlier, which is when al-Qaeda used Sudanese Airways

2     flights to transport weapons from Afghanistan, in addition,

3     Sudanese Airways flights were also used to shepherd weapons to

4     conflicts in which al-Qaeda was engaged.

5          In other words, when al-Qaeda wanted to transport weapons

6     from the Sudan to Bosnia, they used Sudan Airways flights.  When

7     al-Qaeda and the Egyptian Islamic Jihad wanted to transfer

8     resources and explosives to Ethiopia, more specifically Addis

9     Ababa, in order to try to assassinate the president of Egypt,

10    they used Sudan Airways, with the assistance of the Sudanese

11    intelligence service.

12         They were essentially operating as a key logistical partner

13    to al-Qaeda.  They were providing logistical services that

14    al-Qaeda would otherwise not have had access to.

15    Q.   When did the conflict in Somalia end?

16    A.   Well, the conflict in Somalia never really did end.  It's

17    still ongoing right now.  However, the U.S. began withdrawing

18    from Somalia beginning in late 1993.

19    Q.   In late 1993, then, where are the principal al-Qaeda cells

20    located?

21    A.   The principal al-Qaeda cells at this point now, al-Qaeda

22    now using Khartoum as the base of operations, they've expanded

23    out now.  They now have cells active in Somalia -- I'm saying

24    "now" in reference to again about 1994.  They have cells in

25    Somalia, Kenya, Tanzania, Libya, Azerbaijan, Bosnia-Herzegovina,

1    Afghanistan, Pakistan, and they were at that point attempting to

2    rapidly expand elsewhere as well.  Chechnya, various other

3    locations.

4    Q.   You have testified earlier to an assassination attempt of

5    President Mubarak in Ethiopia.  What was the date of that

6    attempt?

7    A.   I believe that was June 1995.

8    Q.   Who was involved in that attack?

9    A.   The attack was carried out by individuals associated with

10   the Egyptian Islamic Jihad movement and al-Gama'a al-Islamiya,

11   the Egyptian Islamic group.  However, it was key logistical

12   support provided by Sudanese intelligence service operatives.

13   Q.   How do we know that?

14   A.   Because of the fact that the Ethiopians and the Egyptians

15   came up with evidence of that in their investigation of what

16   happened.  There were very serious repercussions for the

17   government of Sudan as a result.

18   Q.   What were those repercussions?

19   A.   Both Ethiopia and Egypt identified Sudan as the culprit

20   behind the attempted assassination, publicly.

21   Q.   What was the result of the public unveiling of the

22   evidence?

23   A.   Well, I believe Sudan had already been designated at that

24   point as a state sponsor of terrorism by the U.S. government,

25   but it certainly made the list by then.

1  Q.   Why is an action by the Egyptian Islamic Jihad -- how is

2  that related to al-Qaeda?

3  A.   Al-Qaeda was formed as an alliance principally between

4  Saudi and Yemeni jihadists, with the Egyptian Islamic Jihad

5  movement.  The reason being is that in 1988 when al-Qaeda was

6  first formed, there weren't a lot of people with a lot of

7  experience in running international terrorist groups.  The one

8  group that was really experienced in this was the Egyptian

9  Islamic Jihad.  And there were a lot of them.  And these guys

10  couldn't go home because if they went home they would have been

11  arrested or killed.  So they had nowhere to go.

12      So as far as al-Qaeda was concerned, this was a key

13  constituency.  It was part of their key audience.  So from the

14  very beginning, Egyptian Islamic Jihad members staffed most of

15  the senior positions within al-Qaeda, and al-Qaeda was very

16  interested in operations and activities involving Egypt.

17  Q.   If Egyptian Islamic Jihad is carrying out an assassination

18  attempt of President Mubarak, does Osama bin Laden and al-Qaeda

19  know this?

20  A.   Yes.  By 1994 the wing of the Egyptian Islamic Jihad run by

21  Zawahiri, Talah e Fatah, and al-Qaeda were more or less

22  synonymous.  They were more or less one and the same

23  organization.  They were engaged in the same projects, they were

24  engaged in the same financing.  They were engaged in the same

25  recruitment.  They were more or less one organization.

1    Eventually this alliance was actually formulated into an

2   official alliance in 1998, when al-Qaeda was renamed al-Qaedat

3   al-Jihad, which is essentially a fusion, a direct fusion of

4   Egyptian Islamic Jihad and al-Qaeda, the names.  But yes, that's

5   what it was already by '94.

6   Q.    And at this time, you testified earlier that the cell in

7   Nairobi or the group in Nairobi was sort of a gateway to

8   Somalia.  After the U.S. withdrawals, what is the cell in

9   Nairobi doing?

10  A.    Well, that's the problem, is that without any other purpose

11  the cell in Nairobi doesn't have much else to do now, except to

12  look for local targets.  The purpose of al-Qaeda getting

13  involved in Somalia was to try to spill American blood, to try

14  to kill Americans.  Now there are no more Americans there and

15  there is an al-Qaeda cell just sitting around.

16      At this point in time the al-Qaeda cell in Nairobi becomes

17  more and more focused on the idea of looking for soft targets

18  nearby that it can attack Americans.  In other words, embassies,

19  cultural centers, other Western targets, either U.S., British,

20  French targets, things that will achieve a high body count and

21  that will push al-Qaeda's name back into the newspapers, even

22  though there are no more Americans left in Somalia.

23  Q.    Did the Kenya terror cell come up with this on its own, or

24  were they ordered --

25  A.    No, no.  These orders came directly from the top level of

1    al-Qaeda.  As early as 1992, a senior al-Qaeda member, on the

2    orders of Osama bin Laden, Ali Mohammed, otherwise known as Abu

3    Mohammed the American, was dispatched to Kenya to conduct

4    research on potential targets, including the U.S. embassy in

5    Nairobi.

6         Shortly thereafter, about two years later, L'Houssaine

7    Kherchtou, one of the FBI cooperators who I cited before, was

8    present in Nairobi, only a few hundred yards away from the U.S.

9    embassy, and encountered other al-Qaeda members carrying

10   cameras, who apparently were there for the purpose of again

11   documenting photographic evidence of the embassy, of the best

12   routes for attacking the embassy, of how such an attack could be

13   carried out.

14        In 1996 the cell became increasingly militarized.  The cell

15   began planning out an act of terrorism.  The actual bombing that

16   was being planned was temporarily delayed in 1997.  It initially

17   was scheduled to take place sometime in 1997.  However, Wadih el

18   Hage was arrested by the FBI, was questioned, was put in front

19   of a grand jury, which delayed the execution of the plot.

20   Q.   Let's move back a second.  You said there were al-Qaeda

21   members taking pictures.  Who are they?

22   A.   They included everyone from Hamza al-Liby, Anas al-Liby,

23   and there were several other individuals there as well.

24   Q.   Was Ali Mohammed involved?

25   A.   Yes.  Ali Mohammed was actually involved in the previous

1    efforts.  He was there as early as 1992 conducting surveillance.

2    Q.    Who ordered him to do that?

3    A.    On the orders of Osama bin Laden.

4    Q.    Where was Osama bin Laden located then?

5    A.    Khartoum, Sudan.

6    Q.    What did Ali Mohammed do after he took the surveillance of

7    the embassy?

8    A.    He provided this information to al-Qaeda operatives such as

9    Saif al-Adel and Abu Ubaidah al-Banshiri, whose role was to try

10   to plan out terrorist attacks targeting enemy targets, including

11   U.S. embassies.  Saif al-Adel was an explosives expert.

12   Q.    Did Ali Mohammed report back to Osama bin Laden?

13   A.    Yes, he did.

14   Q.    Where did that happen?

15   A.    That took place in Khartoum, Sudan.

16   Q.    Do we know about the meeting that occurred after the

17   surveillance?

18   A.    We know about several meetings that took place after the

19   surveillance.  We know that immediately following that

20   surveillance, al-Qaeda began sending more and more operatives to

21   Nairobi, in order to deliver resources, to deliver orders, and

22   to further plan operations.

23   Q.    Was there a meeting between Osama bin Laden and Ali

24   Mohammed after the surveillance?

25   A.    Yes.

1    Q.    What happened there?

2    A.    The information was transmitted to Osama bin Laden.  Bin

3    Laden was very pleased upon receiving it.

4    Q.    Did Ali Mohammed show the pictures to Bin Laden?

5    A.    Yes, he did, yes.

6    Q.    Do we know how Bin Laden reacted?

7    A.    He was very positive, but that's the extent of what we

8    know.

9    Q.    How do we know this?

10    A.    From the testimony of Ali Mohammed.  Ali Mohammed has pled

11    guilty and has been convicted with regard to these offenses.

12    Shortly after the 1998 embassy bombings, he was arrested while

13    in the United States and he was subject to an eventual

14    indictment.  Like I said, he pled guilty.

15    Q.    Mr. Kohlmann, could you describe to the Court what I've

16    just handed you?

17    A.    Yes.  This is a report that was written by members of the

18    East Africa Nairobi cell, the al-Qaeda cell in Nairobi, in

19    approximately August of 1997.  The reason that they issued this

20    report was because of the fact that they felt that the position

21    of the Nairobi cell was in great danger.  The reason being is

22    that this followed directly in the wake of Wadih el Hage's

23    residence in Nairobi being searched by Kenyan police and the FBI

24    taking an interest.

25        As a result, this communication was sent back to Osama bin

1    Laden directly to advise him that the, quote-unquote, the crew

2    members in East Africa are in great danger.

3    Q.   How do you know that this is an al-Qaeda report?

4    A.   This was actually intercepted by, I believe, the National

5    Security Agency, the NSA, in approximately 1997, while --

6    actually, excuse me.  This report was actually seized from the

7    offices of Mercy International, excuse me, when it was raided

8    after the embassy bombings.

9    Q.   How do you know that?

10   A.   Because of the fact it was eventually presented as an

11   exhibit in the case against the conspirators responsible for the

12   1998 East Africa embassy bombings.

13   Q.   What was that case called?

14   A.   United States v. Osama bin Laden et al.

15   Q.   And where did you get this exhibit from?

16   A.   This exhibit was published by the Court.  I ordered it

17   directly from the U.S. Attorney's Office in the Southern

18   District of New York.

19   Q.   Was the exhibit entered into evidence in that trial?

20   A.   Yes, it was.

21   Q.   How was that done?

22   A.   It was done via stipulation.  This is stipulated to be the

23   FBI translation, accurate translation of an Arabic document

24   which again was originally seized in Nairobi, Kenya.

25   Q.   Stipulation with the defense?

```
 1     A.    That's correct, yes.

 2              MR. MACALLISTER:  Your Honor, at this time we would

 3     move Exhibit JJ into evidence.

 4              THE COURT:  It's admitted.

 5                                (Plaintiff Exhibit JJ

 6                                 received into evidence.)

 7     BY MR. MACALLISTER:

 8     Q.   Mr. Kohlmann, on the fourth page and the last paragraph,

 9     what does that paragraph indicate about the relationship between

10     Khartoum -- the relationship between the terrorist cell in

11     Nairobi and the rest of al-Qaeda?

12     A.    Well, first of all, it states very clearly, "The work we

13     are doing, the return of the Islamic state is a team effort and

14     not an individual one.  We are all participating in it.  We the

15     East Africa crew do not want to know how work plans are operated

16     because we are not fit for planning; we are just implementers."

17              Again, the idea being that the cell in Nairobi is not a

18     free-thinking cell that's responsible for itself.  It's not a

19     homegrown cell; it has been put there for very specific purposes

20     by al-Qaeda, and it is operating exclusively and only under the

21     orders, personal orders of Osama bin Laden.  Everything that

22     they're doing, they're doing under the direct orders of Bin

23     Laden, Wadih el Hage and other authorized Bin Laden

24     representatives and spokesmen.

25     Q.    Did the al-Qaeda leadership order the bombing from
```

1   Khartoum?

2   A.   Actually no, it did not.

3   Q.   Why is that?

4   A.   Because at the time when the bombing was eventually

5   ordered, Bin Laden had already been forced to flee Khartoum.  By

6   1997, when the order was issued, Bin Laden had fled Khartoum

7   back to Afghanistan.  At that point in time Bin Laden frankly

8   didn't see any use left for the cell in East Africa other than

9   carrying out a terrorist attack.

10   Q.   When Bin Laden was expelled from the Sudan, was al-Qaeda

11   expelled from the Sudan?

12   A.   Not entirely, no.  For instance, the former senior al-Qaeda

13   member, Abu Rida al-Suri, the Syrian, who I've mentioned

14   previously, is still living in Khartoum right now.  Al-Qaeda

15   resources remained at some level in Sudan post-1996.  However,

16   the vast majority of al-Qaeda resources and al-Qaeda operatives

17   did leave Sudan because they no longer viewed the government

18   there as being sufficiently trustworthy.

19   Q.   Was it noted by the U.S. government that some al-Qaeda

20   elements remained in the Sudan?

21   A.   Yes, it was.

22   Q.   Could you tell the Court what I just put into your hands?

23   A.   You just gave me a collection of what appears to be

24   "Patterns of Global Terrorism," the document produced by the

25   U.S. State Department.

1   Q.   Take a moment to have a look at these, and please tell the

2   Court what year they are and whether it's a fair and accurate

3   copy of the reports that you've testified that you're familiar

4   with.

5           THE COURT:  Is this one exhibit or a series of

6   exhibits?

7           MR. MACALLISTER:  Your Honor, I'm going to mark it as

8   K-1 through whatever the number is.

9           THE COURT:  What he has is not marked?  So when he

10  tells us what something is he can't refer to K-1 or K-3?

11          MR. MACALLISTER:  It's not marked, Your Honor.  The

12  first report is a '91 report.  I would mark that as KK-1.  The

13  second report is a '97 report.  I'd mark that as KK-2.  The

14  third report is a '99 report.  I would mark that as KK-3.  The

15  fourth report is a 2000 report.  I would mark that as KK-4.  And

16  then there's a 2001 report -- sorry -- 2000 report, which is

17  KK-5.

18          THE COURT:  I thought we already said 2000.

19          THE WITNESS:  Your Honor, it's actually "Patterns of

20  Global Terrorism 1991," which was released in April of 1992;

21  "Patterns of Global Terrorism 1997," which was released in April

22  of 1998; "Patterns of Global Terrorism 1998," which was released

23  in April of 1999; "Patterns of Global Terrorism 1999," which was

24  released in April of 2000; and "Patterns of Global Terrorism

25  2000," which was released in April of 2001.

```
 1              THE COURT:  So is that six total or five total?

 2              MR. MACALLISTER:  1 through 7.

 3              THE DEPUTY CLERK:  I have five.

 4              MR. MACALLISTER:  1 through 5, Your Honor.  I would

 5     move those into evidence, Your Honor.

 6              THE COURT:  They are admitted.

 7                              (Plaintiff Exhibits KK-1

 8                               through KK-5 received into

 9                               evidence.)

10     BY MR. MACALLISTER:

11     Q.   Mr. Kohlmann, are they a fair and accurate copy of the

12     reports?

13     A.   Yeah, they do appear to be.

14     Q.   Let's look at the '91 report.  Unfortunately, these don't

15     have page numbers.  There's a section on the Sudan roughly in

16     the middle of the report.  It's after "Patterns of Global

17     Terrorism '91, Middle East overview," and then the next page

18     lists Sudan.

19     A.   Yes.

20     Q.   What does that indicate about Sudan's relationship with

21     international terrorist groups?

22     A.   "In the past year Sudan has enhanced its relations with

23     international terrorist groups, including the Abu Nidal

24     Organization, ANO.  Sudan has maintained ties with state

25     sponsors of terrorism such as Libya and Iraq, has improved its
```

1    relations with Iran.  The National Islamic Front, NIF, under the

2    leadership of Hassan al-Turabi, has intensified its domination

3    of the government of Sudanese president, General Bashir, and has

4    been the main advocate of closer relations with radical groups

5    and their sponsors.  The NIF has organized its own militia, the

6    People's Defense Force" -- this is the PDF which I mentioned

7    before -- "modeled after the Iranian Revolutionary Guard Corps."

8    Q.   And in what's been marked as KK-2, the Patterns report

9    1997, released in '98, on the second to last page, there's a

10   section regarding the Sudan.

11   A.   Yes.

12   Q.   What does that indicate about the Sudan in 1997?

13   A.   "Sudan in 1997 continued to serve as a haven, meeting place

14   and training hub for a number of international terrorist

15   organizations, primarily of Middle East origin.  The Sudanese

16   government also condoned many of the objectionable activities of

17   Iran, such as funneling assistance to terrorists and radical

18   Islamic groups operating in and transiting through Sudan."

19   Q.   And then the paragraph below, what does that say about the

20   Sudan and U.N. Security Council resolutions?

21   A.   "Sudan has not complied with U.N. Security Council

22   resolutions 1044, 1054, and 1070, passed in 1996, despite

23   efforts that year by the regime to distance itself somewhat from

24   terrorism, including ordering the departure of terrorist

25   financier Osama bin Laden."

1    Q.    Are you familiar with these Security Council resolutions?

2    A.    Yes, I am.

3    Q.    What were they about?

4    A.    I believe they were in relation to Sudan distancing itself

5    and disavowing itself with any connections to rogue regimes and

6    also international terrorist organizations, as well as ceasing

7    its conflict with southern Sudan.

8    Q.    Mr. Kohlmann, the '98 report, which was released in '99,

9    that's been marked as KK-3.

10   A.    Yes.

11   Q.    Does this -- on the second to last page is a section about

12   the Sudan?

13   A.    That's correct.  Yes.

14   Q.    What does that indicate about the al-Qaeda organization?

15   A.    "Sudan continued to serve as a meeting place, safe haven,

16   and training hub for a number of international terrorist groups,

17   particularly Osama bin Laden's al-Qaeda organization.  The

18   Sudanese government also condoned many of Iran's objectionable

19   activities, such as funding terrorists and radical Islamic

20   groups operating in and transiting through Sudan."

21   Q.    This was released in '99?

22   A.    This was actually released in April of '99.  That's

23   correct, yes.

24   Q.    And the report that's been marked as KK-4, "Patterns of

25   Global Terrorism 1999," released in April 2000.  On the second

1  to last page there's a section regarding the Sudan.  What does

2  that indicate about al-Qaeda?

3  A.    "Sudan in 1999 continued to serve as a central hub for

4  several international terrorist groups, including Osama bin

5  Laden's al-Qaeda organization."

6  Q.    And does it say something about Iran there also?

7  A.    Yes.   "The Sudanese government also condoned Iran's

8  assistance to terrorists and radical Islamist groups operating

9  in and transiting through Sudan."

10  Q.    And then finally the last exhibit, which is the 2000

11  Patterns, released presumably in April of 2001, on the third to

12  last page there's a section regarding the Sudan.

13  A.    Yes.

14  Q.    What does the second paragraph indicate about al-Qaeda?

15  A.    "Sudan, however, continued to be used as a safe haven by

16  members of various groups, including associates of Osama bin

17  Laden's al-Qaeda organization, the Egyptian al-Gama'a

18  al-Islamiya, the Egyptian Islamic Jihad, the Palestine Islamic

19  Jihad, and HAMAS."

20  Q.    Thank you, Mr. Kohlmann.  Did Osama bin Laden's move to

21  Afghanistan disrupt the bomb plot?

22  A.    Not at all.  In fact, it actually accelerated the bomb

23  plot.

24  Q.    How so?

25  A.    It accelerated the bomb plot in the sense that al-Qaeda now

```
 1    no longer was vulnerable in Sudan.  It no longer had a position

 2    where the United States could readily strike back at it.  So in

 3    other words, this now gave Osama bin Laden the freedom to use

 4    the terrorist cell in any way he saw fit, including by

 5    militarizing it.  In 1997 Osama bin Laden used his satellite

 6    telephone to communicate orders to the cell in Nairobi,

 7    explaining that they were now in a military role, that they were

 8    no longer simply conducting surveillance, they were no longer

 9    researching targets, that they had been militarized.

10         MR. MACALLISTER:  Your Honor, at this time we're going

11    to mark another DVD, which we've tested and works.

12    BY MR. MACALLISTER:

13    Q.   Mr. Kohlmann, could you describe to the Court the

14    "Knowledge is" DVD, what that is?

15    A.   Yes, of course.  In September of 2006, al-Qaeda's official

16    as-Sahab media wing, their official media wing, released a

17    two-part documentary movie about the 9/11 terrorist attacks in

18    the United States.  The documentary not only covered 9/11, but

19    it covered the events preceding it, namely the 1998 embassy

20    bombings and the bombing of the USS Cole off the coast of Yemen.

21         And it attempted to explain the history of how these events

22    had come together, how al-Qaeda had planned and conceived these

23    events and executed them, why, and how the events all came

24    together as part of a common conspiracy.

25         The video was released on the fifth anniversary of 9/11,
```

1  and it was meant to serve as a testimonial and an honor to 9/11

2  hijackers and others involved in al-Qaeda operations, including

3  the two individuals responsible for the embassy bombings.

4  Q.   And how do you know this is an authentic video?

5  A.   Well, number one, it was released directly by as-Sahab.  It

6  features exclusive video recordings of a number of al-Qaeda

7  spokesmen and leaders, including American al-Qaeda operative

8  Adam Gadahn.  And it was released through the official

9  logistical, online logistical network run by al-Qaeda to

10  disseminate its propaganda.

11  Q.   Did al-Qaeda take credit for the bombings?

12  A.   Yes, it did.

13       MR. MACALLISTER:  We're going to play just a short

14  portion of this.  We'd move Exhibit LL into evidence.

15       THE COURT:  LL is this document, I mean this tape?

16       MR. MACALLISTER:  LL is part 1 of this tape.  There

17  are two parts.  We have two separate DVDs, as well as English

18  transcripts.

19       THE COURT:  Okay.  How long?

20       MR. MACALLISTER:  In fact, we'd move LL, MM, which is

21  part 2, NN, which is the English transcript of part 1, and OO,

22  which is the English transcript of part 2.

23       THE COURT:  They're all admitted.

24                           (Plaintiff Exhibits LL, MM,

25                            NN and OO received into

```
1                              evidence.)

2              THE COURT:  How long is this tape that you're going to

3    show?

4              MR. MACALLISTER:  We're showing a minute.

5         (Video is played.)

6    BY MR. MACALLISTER:

7    Q.   What did we just see, Mr. Kohlmann?

8    A.   We just saw both Ayman al-Zawahiri and Osama bin Laden

9    discussing al-Qaeda's involvement and the logic behind the

10   bombing of two U.S. embassies in East Africa in August of 1998.

11   Q.   Why did they bomb the embassies?

12   A.   According to this, because of the fact that, particularly

13   the embassy in Nairobi was, as Zawahiri described it, was the

14   nest of American intelligence in East Africa.  In other words,

15   this was the United States's base of operations in East Africa.

16   It was a way of -- Bin Laden describing it, of dealing a blow to

17   the prestige of the superpower.

18        So as Bin Laden explained, it wasn't so much a matter of

19   how many people were killed.  The purpose of this was to

20   reawaken people to the idea that the United States was

21   vulnerable, that it could be struck at, and that al-Qaeda had a

22   reason and a logic behind launching these attacks against the

23   United States, and the capability to do so.

24   Q.   You testified they were trying to send a message to the

25   U.S. government.  Was there an attack that the '98 embassy
```

1   bombings were patterned after?

2   A.   Yes, there was, actually.

3   Q.   Which attack was that?

4   A.   Al-Qaeda has patterned many of its attacks looking back in

5   history at the 1983 bombing of a U.S. Marine barracks in

6   Lebanon, in Beirut, Lebanon, by Hezbollah.  The reason why

7   al-Qaeda patterns its activities on this is because of the fact

8   that this is viewed as a seminal event by al-Qaeda in the sense

9   that the bombing of the Marine barracks in Lebanon killed a

10  large number of U.S. military personnel, and it also forced the

11  U.S. to withdraw from Lebanon.  In other words, the U.S. fled

12  from Lebanon shortly thereafter.

13       The idea being that al-Qaeda perceives that by carrying out

14  large vehicle-borne suicide bombings targeting U.S. embassies,

15  U.S. military barracks and other targets associated with the

16  U.S. government or U.S. civilians, that it can force the U.S. to

17  withdraw from these areas because it is too vulnerable to defend

18  itself.

19  Q.   Who blew up the embassy in 1983?

20  A.   Elements of Hezbollah, the Shi'ite group sponsored by Iran

21  in south Lebanon.

22  Q.   Who builds bombs that blow up embassies?  Which terrorist

23  groups build these kinds of bombs?

24  A.   There are a few of them.  Of course, they're ones in the

25  Middle East.  There are only a few organizations that have the

1   capabilities of building bombs like this one, or bombs that are

2   capable of that kind of destruction.  There is of course

3   Hezbollah.  There is al-Qaeda.  There is the Egyptian Islamic

4   Jihad movement as part of al-Qaeda.  There are not very many

5   other organizations capable of doing that, not without

6   assistance from one of these groups.

7   Q.   You mentioned that al-Qaeda went to training camps in

8   Lebanon and dealt with the Iranian government.  What was -- had

9   al-Qaeda engaged in any bombing attacks prior to its training in

10  Lebanon?

11  A.   The only attempted bombing would have been the attempted

12  bombing in December of 1992 in Yemen.  However, that was not a

13  successful bombing.  So they had engaged in basically no

14  successful bombings prior to receiving that training.

15           MR. MACALLISTER:  Your Honor, I'd move into

16  evidence -- have we moved into evidence the English

17  translations?

18           THE COURT:  Yes.  We've done LL, MM, NN, and OO.

19           MR. MACALLISTER:  And that's also for part 2.  Right

20  now I'd like to play --

21  BY MR. MACALLISTER:

22  Q.   Mr. Kohlmann, what is part 2?

23  A.   Part 2 of "Knowledge is For Acting Upon"?

24  Q.   Yes.

25  A.   Well, it's part 2 of "Knowledge is For Acting Upon."  It's

1    a two-part video.  It's so long they had to divide it into a

2    second part.  It continues the story again of 9/11.

3         (Video is played.)

4    BY MR. MACALLISTER:

5    Q.   Mr. Kohlmann, what is Bin Laden discussing there?

6    A.   Bin Laden is discussing the timeline of the al-Qaeda cell

7    in Nairobi and the amount of time it took for them to produce

8    explosives.  In other words, he's using the example of

9    al-Qaeda's cell in East Africa in order to provide guidance and

10   inspiration to individuals for subsequent al-Qaeda operations.

11   Q.   What did he say about TNT?

12   A.   He explained that for nine months they carefully pounded

13   down TNT into explosive devices, or an explosive device, in

14   order to make this operation happen.

15   Q.   What did he say about where the TNT came from?

16   A.   He said it came from outside of Kenya.

17   Q.   What was the word he used?

18   A.   "Delivered."

19   Q.   "Smuggled"?

20   A.   "Smuggled."  Excuse me.  Sorry.

21   Q.   Mr. Kohlmann, did you reach conclusions to a reasonable

22   degree of certainty regarding the links between al-Qaeda and the

23   Sudanese government in the context of these two bombings?

24   A.   Yes.

25   Q.   What were those conclusions to a reasonable degree of

1    certainty?

2    A.    Well, first of all, al-Qaeda would not have been able to

3    carry out the 1998 East Africa bombings had it not had a

4    presence in Khartoum, Sudan.  The presence, the safe haven that

5    al-Qaeda had in the Sudan was absolutely integral for its

6    capability of launching operations not just in Kenya, but in

7    Somalia, in Eritrea, in Libya.  Without this base of operations,

8    none of this would have happened.

9         Al-Qaeda did not have the capability of bringing in

10   resources to that extent into this area.  It did not have a

11   place to base its leadership or its operatives.  It did not have

12   a ready supply of passports, of infrastructure.  Sudan was the

13   base for which almost everything that al-Qaeda did in the space

14   between 1992 and 1998 leads back to.  Without the support given

15   by the Sudanese government, the attempted assassination attempt

16   on Hosni Mubarak, the involvement in Somalia, the embassy

17   bombings, none of this would have happened.

18   Q.    Mr. Kohlmann, what conclusions did you reach to a

19   reasonable degree of certainty regarding the importance of the

20   support to al-Qaeda's ability to launch the two embassy attacks?

21   A.    It was integral.  Again, without the base that Sudan

22   provided, without the capabilities provided by the Sudanese

23   intelligence service, without the resources provided, none of

24   this would have happened.  If you look, it's quite clear because

25   of the fact that the vast majority of planning and preparation

1    that went into the al-Qaeda cell in Nairobi took place between

2    the years of 1991 and 1997.  The vast majority of that was done

3    by al-Qaeda operatives transiting back and forth between Nairobi

4    from Khartoum.

5         And you can take the words of al-Qaeda operatives

6    themselves.  They label the cell in Nairobi as the key way

7    station that allowed them back and forth into Somalia.  Without

8    Sudan, there never would have been Nairobi, there would have

9    never been a Somalia, there would have never been any of this.

10   It was absolutely essential, integral.

11        MR. MACALLISTER:  Thank you.  Nothing further,

12   Your Honor.

13        THE COURT:  Any other counsel have anything?

14        MR. FAY:  No, Your Honor.

15        THE COURT:  I have one -- it may turn into more than

16   one question.

17        THE WITNESS:  Of course, Your Honor.

18        THE COURT:  Basically, it's an observation coupled

19   with a question.  And that is that much of what you've testified

20   to relates to al-Qaeda and Sudan and the bombing in Nairobi.

21   How much can you say with respect to those same connections

22   relevant to the bombing in Dar es Salaam?

23        THE WITNESS:  Actually, the cell, Your Honor, in Dar

24   es Salaam was more or less -- it's like the little brother of

25   the cell in Nairobi.  It's kind of like a chain almost.  Without

1    al-Qaeda's presence in Khartoum, there would have never been a

2    cell in Nairobi.  Without the cell in Nairobi, there would have

3    never been a cell in Dar es Salaam.  It really was the little

4    brother.

5         It was not as the -- the cell in Nairobi was the one that

6    al-Qaeda really sank the most resources in, with the perception

7    that once you got that, it would be relatively easy to move over

8    and do it in Tanzania as well.

9         The other thing is that in Tanzania there was a perception

10   that you could easily get explosives.  There were easy ways of

11   getting explosives.  So this was also attractive to al-Qaeda.

12        But it should not be mistaken.  Al-Qaeda's primary interest

13   was Nairobi.  Dar es Salaam was the second cousin, the lesser

14   liked but still attractive second cousin.

15             THE COURT:  All right.  Thank you very much,

16   Mr. Kohlmann.

17             THE WITNESS:  My pleasure, Your Honor.  Thank you very

18   much.

19        (The witness steps down.)

20             THE COURT:  Give me a -- we're going to break now, but

21   give me a rundown of what we expect for the rest of the day.

22             MR. MACALLISTER:  Mr. Simon has agreed to meet me at

23   1:30.  He was going to try and meet me earlier for lunch.  I

24   need to check my cell phone to see where he is.  But he will be

25   ready to go at 1:30.  If we want to break longer for lunch,

1    that's fine.

2                THE COURT:  We'll be ready to go at 1:45.

3                MR. MACALLISTER:  And Mr. Piernick will also be called

4    to testify to the contents of the sealed document in the

5    possession of the Court.  And I think then that we'll have

6    housekeeping matters.

7                THE COURT:  So you figure an hour and a half this

8    afternoon, or how much time do you think you need to wrap things

9    up?

10                MR. MACALLISTER:  I think Mr. Simon will take about a

11   half an hour, maybe a little bit less.  Mr. Piernick probably

12   will take 15 minutes, 20 minutes.

13                THE COURT:  And then whatever housekeeping.

14                MR. MACALLISTER:  Yeah.  I'm not sure about all of

15   that.

16                THE COURT:  So let's make it 1:50, to give you a

17   comfortable time to have lunch and any discussions that you need

18   to have with Mr. Simon.  And we'll see everyone then.

19          Mr. Perles?

20                MR. PERLES:  Just a housekeeping matter.  Because

21   Mr. Piernick will be testifying about a document that is under

22   seal, the courtroom will have to be sealed.  If we took him

23   first we could let everybody stay later for lunch, because

24   they're going to come back and then just be pushed out.

25                THE COURT:  Mr. Bradley will arrange that with you.

1    And that's probably the easier way to do it.  But Mr. Bradley

2    will take care of that.

3         All right.  We're breaking for lunch.  Thank you.

4         (Recess from 12:40 p.m. to 1:56 p.m.)

5              THE COURT:  What is it that we're intending to do now,

6    Mr. MacAllister?  Mr. Perles, what is it we're intending to do?

7              MR. PERLES:  Mr. MacAllister is now going to recall

8    Mr. Piernick.  Mr. Piernick was present at the deposition which

9    took place in the maxi prison in Colorado Springs.  We'd like

10   him to testify about -- he was there to observe the veracity of

11   the deponent.

12             THE COURT:  So I'm going to get his views on the

13   veracity of the deponent?

14             MR. PERLES:  I think that's important, because there

15   is a document which Mr. MacAllister and I believe has to be

16   added into the record.  The deponent wrote a post-deposition --

17   I'll use the term loosely -- repudiation or partial repudiation.

18   I think, given his political persuasion, shall we say, as a

19   member of al-Qaeda, I think he regretted talking to us after the

20   fact and wrote a post-deposition repudiation, which I think

21   needs to go on the record.

22             THE COURT:  I agree with that observation.

23             MR. PERLES:  I think that, given that that needs to go

24   into the record, and I think our not putting it in the other day

25   was really an administrative oversight, but it does need to go

1       into the record.  Because he's written this post-deposition

2       repudiation and because Mr. Piernick was there to observe what

3       Your Honor can't see, because we weren't allowed to do a video

4       deposition, which is body language, the general quality,

5       demeanor of the witness, we think it will add to Your Honor's

6       ability to understand what happened.

7              THE COURT:  I understand that, and I'm willing to do

8       that, except my understanding is that the United States has

9       requested that this document be quote-unquote under seal, the

10      document being the deposition transcript.

11             MR. PERLES:  My understanding --

12             THE COURT:  Let me continue with my question.  Is that

13      because the United States believes that some of it is

14      classified, and is it the case that the United States has

15      classified it?

16             MR. PERLES:  The -- my understanding of our agreement

17      with the United States is that the United States has classified

18      the deposition until the United States can do a declassification

19      review of --

20             THE COURT:  There will be no testimony in court, even

21      in a sealed courtroom, about a classified document.  We don't do

22      that.  First of all, I don't know who among these lawyers has a

23      security clearance.  Secondly, I don't have testimony on

24      classified materials in any case without our security personnel

25      supervising the entire proceeding.  So we're not doing it.

1        MR. PERLES:  Then I need to then notice the Court that

2   we have entered an exhibit into the record, which is Exhibit B,

3   which is the document.

4        THE COURT:  Let me continue with what I'll allow you

5   to do.

6        MR. FAY:  Your Honor, I just wanted to make one

7   statement of clarification.  This protective order, I believe,

8   it has the same language thing as they have down at Guantánamo,

9   which is essentially that as the deposition is going on,

10  everything the lawyers ask, everything that the deponent replies

11  is classified as the words escape our lips.

12       MR. PERLES:  Right.

13       MR. FAY:  And therefore, I think everything that

14  happened from the oath to us going out to get a sandwich is

15  probably classified.

16       THE COURT:  Therefore, we're not going to have

17  testimony on it in court.  But the deposition transcript is

18  going to be an exhibit in this case.  You've submitted it under

19  seal; is that right?

20       MR. PERLES:  That is correct.

21       THE COURT:  And you would submit this further document

22  from the deponent also under seal, because you think it needs to

23  be added to the record.

24       MR. PERLES:  I suppose that is correct.

25       THE COURT:  And then what you want is for Mr. Piernick

1    to testify as to his assessment of the credibility of the

2    deponent.

3              MR. PERLES:  Correct.

4              THE COURT:  Now, my strong belief is that careful

5    testimony about the credibility of the deponent would not be

6    classified.  But if the United States has asserted an interest

7    that everything is classified until they say it's not, then

8    we're not going to take that chance.  So I'm not going to

9    receive the testimony until the United States clears it; in

10   other words, says that that testimony can be received.  And then

11   I will receive it.

12        Which leaves you with this option.  Let's make things easy

13   on ourselves and on all the lawyers that are gathered here.

14   Once I'm informed that the United States has no objection and

15   does not consider what Mr. Piernick is going to say to be

16   classified, because you have shown it to him, because you'll do

17   it in the form of an affidavit, I will then receive that

18   affidavit in the record.  Because I don't need to assess his

19   credibility on the stand about the credibility of the deponent.

20   All I need to do is to receive his assessment in the form of an

21   affidavit.

22             MR. PERLES:  What we will do, if it pleases the Court,

23   is I will contact Rhonda Fields, who represents the government

24   with respect to its interest here, and we will get this worked

25   out with her.

```
 1              THE COURT:  All right.  So that's where we stand on

 2      that issue, and that means it's put off, if you will, until we

 3      run through those hoops.

 4              MR. PERLES:  Thank you, Your Honor.

 5              MR. MACALLISTER:  Your Honor, should we submit the

 6      letter from the deponent?

 7              THE COURT:  Now, there's a little bit of awkwardness

 8      in the way this is going on, because under the understanding

 9      that you all have, you're holding in your hands a classified

10      document.

11              MR. MACALLISTER:  Right.  So perhaps we should go back

12      and put this in an envelope and submit it to the Court under

13      seal --

14              THE COURT:  I think that's right.  Because you don't

15      know whether everyone in the clerk's staff capacity that that

16      would be going through would have clearance.

17              MR. MACALLISTER:  Right.

18              THE COURT:  And I don't want to hand walk it through

19      everything.

20              MR. FAY:  In light of Your Honor's ruling, Your Honor,

21      if Mr. Piernick wishes to leave, go home, fight the traffic on

22      the way home, does he have Your Honor's permission to?

23              THE COURT:  He's welcome to.

24          All right.  We have one last witness.

25              MR. MACALLISTER:  And one final thing.  Mr. Fay sent a
```

```
 1    copy of the transcript to the FBI agent that we were --

 2              MR. FAY:  I haven't gotten any -- well, he's not

 3    actually an agent.  He's the counsel over at FBI.

 4              THE COURT:  All right.  You don't have to defend the

 5    timing of this.

 6              MR. FAY:  I've got nothing back from him.  I called

 7    five or six times.

 8              THE COURT:  You're going to have to tweak the system

 9    and get it done.

10              MR. MACALLISTER:  At this time we would call Steven

11    Simon to the stand.

12         STEVEN SIMON, WITNESS FOR THE PLAINTIFFS, SWORN

13              THE COURT:  Good afternoon.

14              THE WITNESS:  Hi.

15              THE COURT:  Mr. MacAllister.

16                        DIRECT EXAMINATION

17    BY MR. MACALLISTER:

18    Q.   Please state your name for the Court.

19    A.   Steven Simon.

20    Q.   Could you state your address without stating your complete

21    home address.  What state do you live in?

22    A.   Woodville, Virginia.

23    Q.   What is your occupation, Mr. Simon?

24    A.   I'm a consultant.

25    Q.   And what do you offer consulting services on?
```

1    A.    Security primarily, for international clients.

2    Q.    Let's take a step back.  Could you describe to the Court

3    your post high school education?

4    A.    I went to college at Columbia University, got a double

5    degree in classics and Middle Eastern languages.  Then I went to

6    Harvard for a number of years where I studied religion, and then

7    I was out of school for a bit.  Then I went back to school, to

8    Princeton University, where I got a policy degree.  And then

9    several years after that I was a fellow at an Oxford college

10   studying things relating to the Middle East and Islam.

11   Q.    When did you start working for the government?

12   A.    Well, actually I started working for the government in

13   1984, but I entered the State Department in 1985.

14   Q.    Where did you begin with the State Department?

15   A.    In the Bureau of Political-Military Affairs.

16   Q.    And what were the things that you worked on there?

17   A.    Over the course of years, I worked on Arab-Israeli security

18   issues, South Asian security issues, particularly in Pakistan.

19   For a while inter-Korean security issues.  And during the first

20   Gulf War I was one of the people running the task force in the

21   State Department, then spent time in the Middle East assisting

22   in the negotiation of basing and access agreements for the U.S.

23   military in the Persian Gulf.

24         Then I went to the White House, where for a number of years

25   I was first director and then senior director for combating

1    terrorism.  That lasted until the fall of 1999, when I was

2    assigned by the State Department to London, and took up

3    residence at the International Institute For Strategic Studies,

4    where I spent the next few years, until the spring of 2003, when

5    I retired from government.

6    Q.   Let's describe with a little bit more detail some of these

7    jobs that you've had.  What different postings did you have in

8    the State Department after the Gulf War?

9    A.   After the Gulf War I headed the office of strategic

10   analysis in the political-military bureau, and after that I was

11   the day-to-day manager of the bureau.  I was the principal

12   deputy assistant Secretary of State.

13   Q.   Did the issues of terrorism and Islamic radicalism come up

14   in the course of those jobs?

15   A.   Not that much in the State Department, frankly.  It was

16   mostly when I got to the White House in the spring of 1994 that

17   those issues really came to the fore for me professionally.

18   Q.   And what was your first posting with the White House?

19   A.   I was director for global issues and multilateral affairs.

20   And then rather quickly after that I was made senior director

21   for combating terrorism, which I think at first was called

22   transnational threats, and then, perhaps because it sounded

23   ludicrous, they changed it to combating terrorism.

24   Q.   When you were the director for global issues and

25   multilateral affairs, did the issues of Islamic radicalism and

1   counterterrorism and U.S. policy, was that part of your job?

2   A.   Yes, it was.

3   Q.   How did it come up?  How?

4   A.   Well, it came up in two ways.  We were primarily concerned

5   at that time with Shi'ite radicalism because our relationship

6   with Iran was very strained at that time.  But we were also

7   concerned about the stability of Saudi Arabia and Sunni

8   radicalism.

9   Q.   When you became the senior director for combating

10  terrorism -- what was the date of that again?

11  A.   It was in 1995.

12  Q.   I would suppose that the issues of Islamic radicalism and

13  counterterrorism were a large part of your job.

14  A.   A significant part.  Most of it, actually.

15  Q.   Did we ask you to study the links between the Sudanese

16  government and al-Qaeda for the purposes of giving testimony in

17  this case?

18  A.   Yes.

19  Q.   And did you review the relevant materials for that?

20  A.   Yes.

21  Q.   Have you written books on this issue?

22  A.   Yes.

23  Q.   What book was that?

24  A.   I wrote a book called -- I coauthored a book called "The

25  Age of Sacred Terror:  Radical Islam's War Against America."  It

1    was published in 2002 by Random House.

2    Q.   Have you written articles on this issue?

3    A.   Yes.  Many.

4    Q.   Have they been published in peer reviewed journals?

5    A.   Some in peer reviewed journals and some in other

6    periodicals that are regarded as authoritative but are not

7    strictly speaking peer reviewed.

8    Q.   After you left the White House National Security Council,

9    where did you work?

10   A.   I went to the RAND Corporation, where I was their senior

11   Middle East analyst and, among other things, I had the contract

12   to do the NIE, the national intelligence estimate draft on

13   terrorism for the National Intelligence Council.

14   Q.   How did it come about that you worked on the NIE when you

15   were working for RAND?

16   A.   Well, RAND is a federally funded research and development

17   corporation, and many of us have significant clearances to see

18   whatever would be required to research that sort of thing.  The

19   National Intelligence Council often makes use of outside

20   analysts to provide up-to-date research.

21   Q.   What kinds of assignments did you work on at RAND aside

22   from the national intelligence estimate?

23   A.   Well, for the most part I worked on things having to do

24   with Iraq, because RAND had a number of contracts with U.S.

25   Central Command, which was at that time heavily engaged in

1    combat operations in Iraq.  And I also worked on issues having

2    to do with Israel and Palestine.

3    Q.   Have you taught since leaving the government?

4    A.   Yes, for five years I think, maybe six.  I'd have to count.

5    But mostly for Georgetown.  I was visiting professor at

6    Princeton in 2008-2009.

7    Q.   What were the classes that you taught over those five

8    years?

9    A.   Middle East security issues for the most part, but I also

10   taught classes in intelligence and policy and on political

11   violence.

12   Q.   And what was your book, "The Age of Sacred Terror,"

13   primarily about?

14   A.   It was really two books in one.  It was about the origins

15   of al-Qaeda, its ideological origins, but also its

16   organizational and operational formation on the one hand, and on

17   the other it was an account of the U.S. government response to

18   the rise of al-Qaeda, culminating in the 9/11 attacks.

19   Q.   And was al-Qaeda something that -- was the rise of al-Qaeda

20   and the history of al-Qaeda an issue that you worked on while at

21   the National Security Council?

22   A.   Yes.

23   Q.   Mr. Simon, please identify what I've just handed to you.

24   A.   It's my vita.

25   Q.   Is it a fair and accurate copy?

1    A.   It is, yes.

2           MR. MACALLISTER:  Your Honor, at this time the

3    plaintiffs would move into evidence W-1, Mr. Simon's CV.

4           THE COURT:  It is admitted.

5                         (Plaintiff Exhibit W-1

6                          received into evidence.)

7           MR. MACALLISTER:  At this time, Your Honor, plaintiffs

8    would proffer Mr. Simon as an expert on al-Qaeda's history and

9    operations.

10          THE COURT:  He will be accepted as an expert witness

11   on that subject, and may provide his expert opinions on it.

12   BY MR. MACALLISTER:

13   Q.   Mr. Simon, what is al-Qaeda?

14   A.   Al-Qaeda is a loose network of Islamic resistance groups

15   under the overall direction of the war council commanded by

16   Osama bin Laden.

17   Q.   Where was Osama bin Laden and this war council in 1990?

18   A.   In Afghanistan.

19   Q.   We've heard testimony today that al-Qaeda moved to Sudan.

20   Why did Osama bin Laden and his war council leave Afghanistan?

21   A.   He had serious incentives to leave.  Afghanistan at that

22   time was an extremely chaotic place.  It was in the midst of an

23   extremely violent civil war.  It was a multidimensional civil

24   war involving numerous factions with shifting front lines.  It

25   was therefore a difficult place to maintain a safe and secure

1    base.

2    Q.    Why did al-Qaeda choose the Sudan to go to?

3    A.    Al-Qaeda had significant incentives to choose Sudan.   On

4    the one hand, there were ideological affinities with the new

5    leadership in Sudan, whose program very much resembled Bin

6    Laden's own.   Bin Laden needed a base where he could operate

7    more or less with impunity, or at least with a minimum risk of

8    foreign interference, which was something that the Sudanese

9    authorities could guarantee to him.   And he was in a position to

10   meet the Sudanese requirements in exchange for that arrangement.

11   Q.    And what did the Sudanese want from al-Qaeda?

12   A.    The Sudanese wanted support from al-Qaeda for the war

13   against Christians and animists in the south of Sudan.   They

14   needed extensive subventions for Sudanese government

15   obligations, including the creation of infrastructure.   And this

16   was something that Bin Laden was able to provide.   And they

17   needed investment in industry, and Bin Laden was able to provide

18   that, too.

19   Q.    You mentioned the leadership of Sudan.   Who was the

20   leadership of Sudan at this time?

21   A.    The leadership of Sudan was composed of a number of

22   individuals who had -- well, revolutionary backgrounds, if I can

23   put it that way.   But the two chieftains were Hassan al-Turabi,

24   who was a lawyer, a French and British trained lawyer turned

25   Islamic revivalist, and an army brigadier named Omar Bashir.

1   Q.   And what position did Turabi occupy in the government?

2   A.   Turabi was really a power behind the scenes.  The

3   government was actually run by Omar Hassan Bashir.

4   Q.   How did the Sudanese government communicate its interest to

5   al-Qaeda that it wanted it to relocate to the Sudan?

6   A.   There was an informal invitation, followed up by a letter

7   from the government of Sudan to Bin Laden, inviting him to

8   relocate to Sudan, where Bin Laden had already been investing in

9   property.

10  Q.   Who was the letter from from the Sudanese government?

11  A.   It was from Bashir.

12  Q.   Did the Sudanese government embrace -- I'm sorry, strike

13  that.

14       We've heard testimony about the National Islamic Front.

15  What was the National Islamic Front?

16  A.   The National Islamic Front was -- it was kind of a

17  concatenation of different groups and individuals that came

18  under the leadership of al-Turabi.  It had a very distinct,

19  readily identifiable agenda.  And at the forefront of its agenda

20  was the implementation of Sharia in the Sudan; that is, the use

21  of Islamic law for the purposes of adjudicating disputes and

22  regulating social and business ventures.

23  Q.   What were the other philosophies of the NIF and Hassan

24  al-Turabi?

25  A.   Well, they actually sought to universalize or

1   internationalize the application of Sharia in Muslim majority

2   countries.  So there was an international dimension to its

3   agenda.  They also felt that the Muslim world was endangered,

4   and it was endangered primarily by Western encroachment, which

5   had to be resisted.  The best way to resist this encroachment in

6   Turabi's way of thinking was for Muslims to be aligned once

7   again with the most authentic form of their faith.

8        Now, this would have been a stage in Islamic development

9   before the split between Sunnis and Shi'ites.  So from his

10  perspective, not only was global resistance possible through a

11  reconnection, so to speak, between Muslims and the origins of

12  their faith, but it was also a view that called into question

13  this gulf between Sunnis and Shi'ites, and urged their unity in

14  the face of Western encroachment.

15  Q.   When you said "his," did you mean Mr. Turabi?

16  A.   Yes.

17  Q.   What position did Mr. Turabi occupy in the NIF?

18  A.   I don't recall his exact title, but he was, you know, a

19  guide.

20  Q.   And what were some of the manifestations of the

21  implementation of NIF philosophy in the Sudan?

22  A.   Well, in the Sudan the first manifestation was the

23  implementation of a corpus of legislation known as the September

24  Laws.  Even before Bashir and Turabi seized power in a bloodless

25  coup, they were, even before this coup, a force to be reckoned

1   with, and had pushed through the implementation of Sharia for

2   certain aspects of life in Sudan, particularly those relating to

3   family status issues.

4       After they seized power, Sharia was applied to a much wider

5   range of issues.  Moreover, the NIF program led to the opening

6   of Sudan's borders to a wide variety of Muslim resistance

7   movements, terrorist groups, and so forth, which Turabi felt was

8   the right thing for Sudan to do in consequence of its commitment

9   to the agenda that I've just described.

10  Q.   And which terrorist groups arrived in the Sudan?

11  A.   There were at least 20 and possibly more, ranging from

12  Tajiks to Azerbaijanis, Lebanese, Palestinian.  It was quite a

13  wide variety of the, you know, the zoology of terrorism at that

14  time.

15  Q.   And we've discussed al-Qaeda's move to the Sudan.  Who from

16  al-Qaeda traveled to the Sudan?

17  A.   Well, principally Bin Laden and his more or less immediate

18  entourage, which consisted of something like 4- to 500 advisors,

19  associates, hangers-on, foot soldiers, family members, you name

20  it, from his cantonment in Afghanistan.

21  Q.   Aside from inviting al-Qaeda to the Sudan, what forms of

22  support, if any, did the Sudanese government offer to the

23  organization?

24  A.   The Sudanese government offered significant forms of

25  assistance to al-Qaeda.  That is to say, forms of assistance

1   that could facilitate al-Qaeda operations.  And these included

2   passports to permit legitimate travel for people who were

3   otherwise wanted in their home countries or were traveling in

4   pursuit of criminal enterprises.  He offered the banking system

5   of Sudan to Bin Laden, which was very useful for laundering

6   money and facilitating other financial transactions that

7   stabilized and ultimately enlarged Bin Laden's presence in the

8   Sudan.  And he offered land on which training camps could be

9   built.

10          In addition, the government of Sudan offered what amounted

11   to security services for al-Qaeda, by helping al-Qaeda judge

12   whether, among the rather significant flow of militants to the

13   Sudan, there were no plants, that is to say, moles from Western

14   or other security services seeking to penetrate al-Qaeda's

15   organization.

16   Q.   Were Western and other security services seeking to

17   penetrate al-Qaeda at that time?

18   A.   Yes, particularly Egypt.

19   Q.   Why was Egypt interested in penetrating al-Qaeda?

20   A.   Half of al-Qaeda was made up of an Egyptian insurgent

21   movement that was very deadly, that had been responsible for the

22   assassination in 1981 of Anwar Sadat, who had been the president

23   of Egypt at that time.

24   Q.   Prior to al-Qaeda's arrival in the Sudan, was there an

25   active al-Qaeda network in Kenya?

1    A.   The earliest network in Kenya of which I am aware

2    originated -- well, I don't know when it originated, but I know

3    that it became known to the U.S. government in 1992.

4    Q.   What was the purpose of the al-Qaeda network in Kenya in

5    1992?

6    A.   It was primarily a logistical support cell for al-Qaeda

7    foreign operations.

8    Q.   And where were al-Qaeda's primary foreign operations in

9    1992?

10   A.   Well, the ones in Africa were Somalia, principally.  They

11   had many other foreign operations globally that were supported

12   by other logistical support cells which resembled the one in

13   Nairobi.

14   Q.   What was happening in Somalia?

15   A.   In Somalia there was a U.N. operation, the U.S. military

16   name for which was I believe Restore Hope.  There was a

17   coalition force deployed to Somalia that included, among many

18   other countries, American troops.

19   Q.   When al-Qaeda was created, which you've testified to

20   earlier, was it explicitly formed to attack the U.S.?  Was it

21   intending to attack U.S. interests and citizens?

22   A.   Not when it was formed in the late '80s.  It had other

23   preoccupations, primarily against the Soviet Union.  Al-Qaeda,

24   and Bin Laden personally, I guess you could say, or would be

25   justified in saying, turned against the United States in 1990

1    with the Iraqi invasion of Kuwait, whereupon Bin Laden had

2    offered to the ruling family of Saudi Arabia his services in

3    marshaling an army of mujahideen to expel the Iraqis from

4    Kuwait.

5         This offer was spurned by the Al Saud, the ruling family of

6    Saudi Arabia.  And this outcome was disappointing, even shocking

7    to Osama bin Laden, especially when he saw the Al Saud throw

8    their lot in with the U.S. organized coalition against Iraq.  It

9    was at that point that the United States became in Bin Laden's

10   eyes no better and in fact just as evil as the Soviet Union.

11   Q.   Did al-Qaeda attack U.S. soldiers or citizens in Somalia?

12   A.   They certainly said they did.

13   Q.   How did they publicize these statements?

14   A.   A number of years later Bin Laden bragged in a media

15   interview that al-Qaeda had been responsible for Black Hawk

16   Down.  In any case, the United States in the meantime, through

17   law enforcement and intelligence sources, had concluded that Bin

18   Laden's al-Qaeda had been involved in anti-U.S. operations in

19   Somalia and was responsible for the deaths of American soldiers

20   there.

21   Q.   What happened to the U.S. presence in Somalia?

22   A.   The United States drew down rapidly after its military

23   setbacks there.

24   Q.   Did this have an effect on the composition of the al-Qaeda

25   cell in Kenya?

```
1   A.    I don't know the answer to that question.
2   Q.    Well, what was -- if the purpose of the Kenya cell was as a
3   transit point to Somalia, what was the Kenya cell's purpose
4   after the withdrawal from Somalia?
5   A.    Well, the Kenya cell as a logistical support cell had a
6   number of functions, and Somalia was not the only object of its
7   attentions.  At that time the cell was already surveilling U.S.
8   targets in Nairobi.
9   Q.    How do we know that?
10  A.    Well, I know that it's in the 9/11 Commission Report.  I
11  can't discuss other ways that it was known to the U.S.
12  government.
13  Q.    Understood.  Who in al-Qaeda was doing the surveillance?
14  A.    You mean the names of the operatives?
15  Q.    Do you know?
16  A.    Under the pressure of the moment, they slip my mind.
17  Sorry.
18  Q.    That's okay.  Do you know what role Khartoum played in the
19  surveillance of the targets?
20  A.    Well, the surveillance of the targets was directed from
21  Khartoum.  The al-Qaeda leadership in Khartoum was deeply
22  interested in the casing of the targets in East Africa.  Attacks
23  against those targets was a high priority for Bin Laden, and he
24  was personally in contact with the al-Qaeda operatives who
25  carried out the surveillance and were doing the preoperational
```

1   planning for the attacks, which of course wouldn't mature until

2   many years later.

3   Q.   Do we know any other details about Bin Laden's involvement

4   in the choosing of targets or the casing of the targets?

5   A.   Yes.  There is a well-known incident attested from multiple

6   sources that Bin Laden personally and explicitly approved the

7   choice of targets and did so while poring over the map

8   indicating the targets with the attack planners.

9   Q.   You've testified earlier about the support that the

10  Sudanese government offered to al-Qaeda.  Do we know whether the

11  Sudanese government was explicitly involved in the operational

12  aspects of terrorist attacks?

13  A.   The best attested incidence of Sudanese involvement is with

14  the World Trade Center attacks in 1993, and I think it was

15  called TERRSTOP subsequent to that.  It was the landmarks case.

16  And in these incidents it was apparent to the U.S. government

17  that Sudanese diplomatic personnel had been involved in the

18  plots or certainly were aware of them.

19  Q.   What was the result of those plots and the United States

20  government awareness of the involvement of Sudanese?

21  A.   Well, the proximate result was the departure and expulsion

22  of the diplomats, but on a wider stage, Sudan was designated by

23  the U.S. State Department as a state sponsor of terrorism, which

24  carries of course a number of sanctions.

25  Q.   And the diplomats were Sudanese diplomats?

1   A.   Yes.

2   Q.   Were there other international findings or resolutions

3   against the Sudan as a result of its sponsorship of terrorist

4   acts?

5   A.   Yes.  The Sudanese appeared to be complicit in an attempt

6   by an Egyptian terrorist group to kill President Hosni Mubarak

7   in 1995 in Addis Ababa in Ethiopia.  This outraged the

8   international community and led to at least one U.N. Security

9   Council resolution sanctioning Sudan.

10   Q.   What was the U.S. government response to the open

11   consorting with terrorist groups and the invitation of terrorist

12   groups to the Sudan in 1993, 1994, 1995?

13   A.   As the situation between the U.S. and Sudan became more

14   fraught during this period, in part because U.S. citizens were

15   targeted by assailants in Khartoum, in fact the embassy was

16   fired upon at one point, the United States sought a number of

17   meetings with authoritative representatives of the Sudanese

18   government.  These meetings took place between Ambassador Tim

19   Carney, who was in country at the time, and at least on two

20   occasions the vice president of Sudan and an old guard NIF

21   member, Uthman Taha.

22   Q.   What was the outcome of these meetings?

23   A.   Well, the objective of the meetings was to secure Sudanese

24   cooperation, both in terms of ensuring the safety and security

25   of U.S. citizens in Sudan, but more broadly seeking the Sudanese

1    government's cooperation against the growing empire that Bin

2    Laden had established in Sudan.  And among other things the U.S.

3    wanted was of course intelligence information on what al-Qaeda

4    was doing in Sudan, and especially concerning al-Qaeda's

5    financing.

6         Bin Laden and al-Qaeda at that time were mostly thought of

7    by the U.S. government as a kind of Ford Foundation for

8    terrorism.  They were giving away a lot of grant money to

9    promising projects.  And this was very troubling, and we sought

10   Sudanese help on this, especially since the banks were Sudanese

11   banks.

12        At the end of the day, although there were superficial

13   offers of cooperation by the Sudanese government, these were not

14   made in earnest and produced no actionable intelligence.

15   Q.   Mr. Simon, could you identify what I've just handed to you?

16   A.   Plaintiffs' Exhibit W-2?

17   Q.   Yes.  What is that?

18   A.   It's an affidavit regarding the matters under discussion

19   right now.

20   Q.   Who created that affidavit?

21   A.   I did.

22   Q.   And the affidavit concerns what matters?

23   A.   It concerns links -- primarily links between al-Qaeda and

24   the Sudan.

25             MR. MACALLISTER:  At this time, Your Honor, we'd move

 1    W-2 into evidence.

 2              THE COURT:  W-2 is admitted.

 3                        (Plaintiff Exhibit W-2

 4                        received into evidence.)

 5              MR. MACALLISTER:  And this is our only copy.

 6    BY MR. MACALLISTER:

 7    Q.   Mr. Simon, what conclusions did you reach to a reasonable

 8    degree of certainty regarding the support given by the Sudanese

 9    government to al-Qaeda and the links to the two embassy

10    bombings?

11    A.   I think it's fair to say that in the absence of the safe

12    haven provided by Sudan to al-Qaeda, that the planning for and

13    the execution of the attacks against those embassies would have

14    been vastly more complicated.  I can't say that they would have

15    been impossible, but it's difficult to see how, in the absence

16    of the active support and freedom of action that Bin Laden

17    enjoyed in the Sudan, and the fact that much of the

18    preoperational activities were directed from Khartoum, that the

19    attacks could have been carried out with equal success.

20              MR. MACALLISTER:  Thank you.  Nothing further from me,

21    Your Honor.

22              THE COURT:  Anything from other counsel?

23              MR. FAY:  No questions, Your Honor.  Thank you.  Thank

24    you, Mr. Simon.

25              THE COURT:  Mr. Simon, thank you very much for coming.

1          THE WITNESS:  Thanks.

2       (The witness steps down.)

3          THE COURT:  All right.  With the exception of what

4    we've reserved, other evidence?

5          MR. FAY:  Your Honor, with regard to other evidence,

6    there remains open the matter of the possible deposition of

7    Hassan Salameh, whose testimony would be describing the

8    assistance being given to his handlers and so forth by Iran,

9    Hezbollah, while he was in --

10          THE COURT:  Well, if you complete it in time, before I

11    issue a ruling, then it'll be considered.

12          MR. FAY:  Okay.  Thank you very much.

13          THE COURT:  What else can I say?

14          MR. FAY:  With regard to the exhibit list I have, I

15    believe a number of exhibits were admitted before.  I think

16    today you admitted the CV of Mr. Kohlmann.  We prepared a

17    chronology, a timeline, and we didn't present any evidence of

18    that.  That's simply trying to go through all of the events and

19    hook them in to the text that Your Honor has in the volumes of

20    testimony taken primarily from the criminal trial and --

21          THE COURT:  So the chronology -- what are you

22    intending to do with that?  Are you asking that it be admitted?

23          MR. FAY:  Yes, Your Honor.

24          THE COURT:  Where is it?

25          MR. FAY:  It is in the exhibits as Exhibit O.

1          THE COURT:  Lay a foundation for it.  Who prepared it?

2          MR. FAY:  It was prepared primarily by Cole Dowden, my

3     clerk.  And I went through and reviewed it.  It appears to be

4     accurate, and it simply is of some use to the Court in trying to

5     locate stuff.  There's so much volume here in this testimony

6     that is from the criminal case, it occurred to us that there

7     should be something of this sort.

8          THE COURT:  I haven't looked at it yet.  How long is

9     it?  Is it a one-page document?

10          MR. FAY:  I forget the number of pages, Your Honor.

11     It's Exhibit O.

12          THE COURT:  Do you know what volume it's in?  Oh, it's

13     in volume 7?

14          MR. FAY:  Yes, Your Honor.

15          THE COURT:  Well, I'll admit it.  I'll look at it and

16     consider it as appropriate.  We don't have a jury here, so the

17     evidentiary issues aren't quite as tight.  I'll admit it subject

18     to my review and consideration.

19          MR. FAY:  Thank you, Your Honor.

20                    (Plaintiff Exhibit O

21                     received into evidence.)

22          THE COURT:  And I'll take it into account as

23     appropriate.

24          MR. FAY:  Thank you very much, Your Honor.  The only

25     other things that are open on my exhibit list are the deposition

```
1    of George Mimba, the deposition of Jomo Boke, and I'm not sure

2    whether Mr. MacAllister --

3               THE COURT:  Wait a minute.  I have X-1 and 2 being

4    admitted, and Y-1 and 2 being admitted.

5               MR. FAY:  Okay.  That completes that, Your Honor.

6               THE COURT:  So the only document on your exhibit list

7    that hasn't been admitted is Q?

8               MR. FAY:  Q, because Mr. Defenbaugh could not testify.

9    We didn't give him enough information for him to be able to

10   testify.

11              MR. MACALLISTER:  Your Honor, Evan Kohlmann told me he

12   was going to do a translation and get a transcript for you for

13   the al-Misri video, which is the video that didn't work.  So

14   we'll get you a correct working video, and there will be --

15              THE COURT:  "Al-Misri" is appropriately titled.

16              MR. MACALLISTER:  It is.  It's not happy stuff.  And

17   we also have an affidavit from a client, George Mimba, who

18   couldn't appear.  This affidavit is important because it

19   discusses the employment structure for the plaintiffs, whether

20   they were working for the U.S. government or whether they were

21   working on contract.  And we would submit that affidavit into

22   evidence.

23              THE COURT:  Where is that?

24              MR. MACALLISTER:  That would be PP.

25              THE COURT:  And you have it in your hands?
```

1          MR. MACALLISTER:  Yes, Your Honor.

2          THE COURT:  All right.  Give it to Mr. Bradley so I

3     can look at it for a moment before I rule on it.

4          Give me a little bit of explanation, if you would, for the

5     basis upon which Mr. Mimba is declaring and swearing that the

6     long list of people included in this affidavit, all of whom I

7     take it are plaintiffs, were in fact quote-unquote such employee

8     or contractors at the time of the bombing in 1998.

9          MR. MACALLISTER:  He was and --

10          THE COURT:  Is he simply saying this based on

11     information you provided to him?

12          MR. MACALLISTER:  No.  He was and I believe still is

13     the head of the federal -- not the federal but the -- I need a

14     copy of the affidavit.

15          THE COURT:  President of the Foreign Service National

16     Employees Association?

17          MR. MACALLISTER:  That's it.  It's sort of the union

18     of all foreign service nationals, including all Kenyans.  I

19     doubt that he actually remembered that each and every one of

20     those people were, but he had access to records and he could

21     talk to people and find out, to determine their employment

22     status.  And as Mr. Otieno testified earlier, people who were

23     working at the embassy for the most part were either working for

24     an agency or were there on contract.  And that's something that

25     people knew.  So that's information that was accessible by

1    Mr. Mimba, if not already known.

2            THE COURT:  Now, is it your intention, as this case

3    proceeds to a damages phase, that the Court will receive

4    evidence from each of these people?  Or relating to each of

5    these people at least?

6            MR. MACALLISTER:  Yes, Your Honor.

7            THE COURT:  And -- go ahead.

8            MR. FERRINGTON:  Additionally, for Mr. Mimba's

9    knowledge, he was tasked at the end of the bombing to visit the

10   injured, the sick, and to go to the funerals by the embassy.

11   That was part of his employment duties.  So he would have also

12   direct knowledge, that the embassy sent him to visit or to these

13   funerals.

14           THE COURT:  All right.  I think I'll continue on with

15   my idea nonetheless.  And that is that if we reach the damages

16   phase, which you all expect to, and I think with good reason, it

17   probably will make sense if you include an actual statement from

18   the individual or knowledgeable family member, if the plaintiff

19   is actually a knowledgeable family member, attesting to their

20   employment status.

21           MR. MACALLISTER:  I agree with you, Your Honor.

22           THE COURT:  But I will accept this affidavit.

23           MR. MACALLISTER:  Thank you.  And I believe that came

24   up in every deposition.  But that'll be up to the special master

25   or magistrate.

1          THE COURT:  Right.  Plaintiffs' Exhibit PP therefore

2     is admitted.

3                              (Plaintiff Exhibit PP

4                              received into evidence.)

5          MR. PERLES:  Excuse me.  I would just note, as someone

6     who is married into the State Department through my wife, who is

7     now retired, she was a career diplomat for the United States,

8     the acronym "foreign service national" in State Department

9     parlance refers to the non-U.S. national employees of the

10    Department of State, local hires, as opposed to -- those are

11    what are called FSNs, as opposed to FSOs, which are foreign

12    service officers, they are the U.S. nationals who are in

13    diplomatic service outside the country.

14         THE COURT:  But it may matter whether someone was

15    employed at the time as opposed to just being part of the

16    organization because they were previously a foreign service

17    national.

18         MR. PERLES:  Absolutely.

19         THE COURT:  That's why I think testimony will be

20    helpful.

21         MR. PERLES:  Thank you, Your Honor.

22         MR. MACALLISTER:  I'm told, Your Honor, that we have

23    copies of all the original death certificates, and as soon as

24    they're organized, we will present them.

25         THE COURT:  You may submit them as a separately

1    numbered exhibit and I will accept them.  So just --

2           MR. PERLES:  We can give them to Mr. Bradley in about

3    five minutes after we finish.

4           THE COURT:  Whatever works for you.  He's a very

5    flexible and accessible guy.

6           MR. MACALLISTER:  We'll mark them as QQ-1 through

7    whatever number.

8           THE COURT:  That's fine.

9           MR. MACALLISTER:  Thank you, Your Honor.  And that I

10   believe is all I have.

11          MR. FAY:  Your Honor, we interpreted the bifurcation

12   between liability and damages as indicating that as long as

13   injury was proven on each place, that completed the tort, and

14   then the question of whether each person was an American

15   national or an American employee, an employee of the

16   United States government at the time of the occurrence that they

17   were injured rise now the occurrence to be part of the damages.

18   And we have completed, actually, depositions of all of the

19   plaintiffs in the Mwila case.  And we would ask to be allowed to

20   submit that with the damages.  We can -- I can submit all of

21   those depositions --

22          THE COURT:  There's no problem with that.

23          MR. FAY:  Fine.  Thank you, Your Honor.  Your Honor,

24   the only other thing left is of course under the federal rules

25   we are required to present to you, and intend to, a findings of

```
 1    fact, at least a form findings of fact, conclusions of law, and

 2    judgment, which doesn't mean necessarily Your Honor will endorse

 3    everything we do, but submit that to you.

 4         In the past with these cases we've always submitted those

 5    not on the record, that is to say not putting in an electronic

 6    filing, but submitted a hard copy and an electronic copy on a

 7    disk in Word format or some other format.

 8              THE COURT:  That's fine.

 9              MR. FAY:  Fine.  Thank you, Your Honor.  In terms of

10    time --

11              THE COURT:  Time starts with Mr. Wayne.  And you're

12    ordering the transcript because you'll need to use the

13    transcript.

14              MR. FAY:  We certainly will, Your Honor.

15              THE COURT:  You'll get that in about two weeks, and

16    then when would you propose to submit your proposed findings and

17    conclusions?

18              MR. FAY:  I'm willing to --

19              THE COURT:  And are you going to collectively try to

20    do one set?

21              MR. FAY:  Well, everything is, from the brief that we

22    submitted on liability and the memorandum I submitted on damages

23    is on the computers of my office.  I thought that I would go

24    through and submit -- do up a findings and conclusions, judgment

25    form, so forth, circulate it among all of the --
```

1          THE COURT:  That's fine.  However you want to do it.

2     My question is whether I'm likely to get a single document or

3     whether I'm likely to get multiple documents.

4          MR. FAY:  I think likely one.

5          MR. PERLES:  I think likely one.  Mr. Karp made a very

6     good suggestion today.  It was his view, and I would concur,

7     that for a variety of reasons that my office is probably -- in

8     fact, Mr. MacAllister, given the nature of the testimony that

9     came in, is probably going to bear the brunt of most of the

10    original drafting in that document, and we're pleased to serve

11    as the collection point for people's comments, to organize --

12         THE COURT:  That's up to you all to coordinate.

13         MR. PERLES:  Our anticipation is that we will get this

14    in as a single document without any dissenting comments.

15         THE COURT:  So how much time do you think you want,

16    assuming you're going to get the transcript in about two weeks?

17    And I'm not going to put undue pressure on you.  So you pick it.

18         MR. PERLES:  30 days would be fine.

19         THE COURT:  30 days from that two-week point.

20         MR. PERLES:  30 days from whenever we are in receipt

21    of the transcript.

22         THE COURT:  All right.  That's going to put you right

23    before the end-of-the-year holidays.

24         MR. FAY:  Your Honor, I'd like to make it quicker than

25    that.  I understand the 30 days.  I interpret within 30 days not

1    to mean to be necessarily come in on the 30th day.  The 15th

2    would be better and the 10th is better than that.

3         THE COURT:  Well, it may be better for all of you.  It

4    doesn't really mean that I'm going to be able to do it right

5    away.  But the sooner I get it, probably the sooner I'll get it

6    done.  So I figure that I'll be seeing it within 30 days of your

7    receipt of the transcript.

8         MR. MACALLISTER:  Very well.  Thank you, Your Honor.

9         THE COURT:  Now, let's talk a little bit about a legal

10   issue.  And you -- we're just going to take five or 10 minutes

11   on this.  And you can educate me in terms of what you have.  And

12   I'm not going to speak precisely; I'm going to speak loosely in

13   terms of the cause of action here.  And that the plaintiffs

14   under the cause of action can be, I believe, and I'm doing this

15   from memory, a U.S. national, a member of the U.S. military, an

16   employee of the United States, which would include the foreign

17   service nationals, and, in terms of possible plaintiffs, the

18   legal representative of that employee.  Those are the possible

19   plaintiffs.

20        MR. MAIRONE:  I think there's one more.

21        THE COURT:  What's the other one?

22        MR. MAIRONE:  That a contractee of the United States

23   government was injured or killed --

24        THE COURT:  Yes.  When I say employee, I'm including

25   contractor.  And it would be the legal representative of that

1    contractor as well.

2        We have plaintiffs in the various cases that include

3    employees or contractors, and then family members of those

4    employees or contractors, which would include I think spouses,

5    parents, children, and siblings, right?

6            MR. FAY:  Correct, Your Honor.

7            THE COURT:  As you know, I'm concerned about some

8    issues, and you've briefed them a little bit, and I remain

9    concerned about the issues.  Even if by operation of law, and

10   even if you figure that the law that applies is the law of Kenya

11   or the law of Tanzania, even if by operation of law there is a

12   legal representative, does that mean that there's only one legal

13   representative?  In other words, that there's no right for suit

14   to be pursued by a parent, a spouse, and a sibling all at the

15   same time?

16           MR. FAY:  No.  Well --

17           THE COURT:  How can there be more than one legal

18   representative under the law?

19           MR. FAY:  Starting off with 1605A, 1605A in the cause

20   of action refers back to the prior jurisdictional statement and

21   refers to everybody covered under there.  Everybody covered

22   under there includes, it says, legal representative.  Now, I

23   think this issue --

24           THE COURT:  But there can't be more than one legal

25   representative.

1          MR. FAY:  Yes, but I think this issue was covered

2    really in the Vasek case by Judge Lamberth's decision.  That

3    case went up to the Court of Appeals and was reversed, not on

4    those grounds but on other grounds.

5          THE COURT:  Is that a post -- is that a 2008 act case?

6    I don't believe it is.

7          MR. FAY:  I started out with that case and I'm just

8    not sure whether we filed an amended complaint.

9          THE COURT:  When did you get a judgment from Judge

10   Lamberth?

11         MR. FAY:  I think it was late 2008.  But at any rate,

12   what they said -- what Judge Lamberth said in that case, and it

13   was not disturbed up on appeal, was that the solatium is a

14   totally derivative cause of action, and therefore it has to be

15   brought together with the other -- the claim of the injured

16   person or the estate of the dead person.  That being the case,

17   we don't think that you have to -- we think in other words that

18   1605A regarding solatium is extended to the same people as

19   covered under the Bettis case, namely, within the first degree

20   of kindred:  parent, sibling or child.

21         THE COURT:  That would mean that the focus should be

22   on 1605A not (a)(7), right?

23         MR. FAY:  I don't think that it's really different

24   when you get to that, Your Honor.  In the enactment of 1605A

25   they neither contracted nor expanded the area of the people who

1    could make a solatium claim, the people for whom a solatium

2    claim could be made.  Under the regular rules of interpretation

3    of legislation, I would submit that that means that Congress,

4    knowing well what had been done before by the courts, by Judge

5    Lamberth and the Court of Appeals in Bettis, intended that to

6    remain.

7              THE COURT:  I know you want to rely on that, and maybe

8    that's a good reliance, and maybe when I look at it I'll agree

9    with you.  But the statutory language with respect to the cause

10   of action, the private right of action in subsection (c) lists

11   those four possibilities with respect to a foreign state's

12   liability.  A foreign state is only liable to a national of the

13   United States, a member of the armed forces, an employee of the

14   government of the U.S. or an individual performing a contract,

15   or the legal representative of a person described in one of

16   those three paragraphs.

17             MR. FAY:  Yes, but up above that --

18             THE COURT:  I don't see how -- I know you say up

19   above, but focusing on that statutory language, I don't see how

20   you can have multiple legal representatives or anything other

21   than a legal representative to whom the foreign state is liable.

22   Congress may have blown it in the language that they drafted,

23   but that's what it says.

24             MR. FAY:  Yeah, but up above that it establishes the

25   cause of action.

```
 1              THE COURT:  For solatium.

 2              MR. FAY:  No, wait a minute.  Up above that it

 3    establishes the cause of action and it refers to a cause of

 4    action for those persons for whom the court has jurisdiction.

 5    Then it goes down below.  They didn't repeat "legal

 6    representative" because the cause of action --

 7              THE COURT:  They did.  It's in there.

 8              MR. FAY:  Yes, I know, but they didn't say sibling, et

 9    cetera, et cetera.  But --

10              THE COURT:  They didn't say it, but you think it's in

11    there anyway.  That's the problem I have.  It isn't there.  None

12    of us drafted this.  Congress did.  I'm just trying to figure

13    out how I get around it.  That's what you want me to do is get

14    around it.

15          What I'm suggesting to you is that your briefing hasn't

16    convinced me, so you better look at it a little bit more and

17    explore it a little bit more, because that language says what it

18    says.  And in subsection (c), when it lists the fourth category,

19    which is the legal representative, which is really what we're

20    focusing on right now, it talks about the causes of action and

21    it includes solatium.  So it's not saying that a solatium cause

22    of action exists for someone beyond the legal representative.

23    It's only for the legal representative.

24              MR. FAY:  Yeah, but the legal representative could not

25    possibly have a cause of action for solatium, because the legal
```

1    representative is the injured party.  It's the fictional person

2    we've erected and personal representative.  So you can't say the

3    legal representative has a cause of action for --

4         THE COURT:  All right.  So you're telling me that the

5    statutory language makes no sense.

6         MR. FAY:  Well, if you read it literally that way --

7         THE COURT:  That's what judges do, you know.  They

8    read statutory language.  They don't read what people want it to

9    say.

10        MR. FAY:  It would mean that for any one of the

11   foreign nationals who was working for the United States at the

12   time, that their parent, sibling, or child would have a cause of

13   action, but if the kid died or the parent died or the sibling

14   died, they would.  That doesn't make any sense, Your Honor.  It

15   couldn't possibly have meant that.  They couldn't possibly have

16   meant it.

17        THE COURT:  All right.  I'm not saying that you have a

18   foolish or an unattractive argument.  What I'm saying is that

19   you haven't thus far dealt with the problem of what appears to

20   be clear statutory language that works against you, other than

21   to say, oh, wait a minute, that can't be what Congress meant to

22   do.  But if it's what Congress did do, then the problem -- and

23   this happens in cases, Mr. Fay.  You know it happens in cases.

24   The problem is not mine to correct, perhaps, but Congress's to

25   correct.

1          MR. FAY:  Well, the congressional intent --

2          THE COURT:  And I've so ruled in other cases.  I'm not

3     speaking specifically about FSIA cases, but in other cases, and

4     the Court of Appeals has affirmed me.

5          MR. FAY:  But the congressional intent as expressed in

6     the conference committee report published in the House was that

7     this would cover all of these people.  That obviously is what

8     they --

9          THE COURT:  Is that in your briefs, that there's

10    congressional intent that it would cover quote-unquote all of

11    these people?

12         MR. FAY:  I attached a copy of it.  No, I don't have

13    the actual document, but I attached a copy of it to our

14    memorandum, Your Honor.  That was what they believed that they

15    were doing.  They didn't need to say that it covered the

16    siblings; it's a derivative action.  It's derivative of the

17    wrongful death --

18         THE COURT:  I don't understand what the concept

19    derivative action has to do with it.  If the statute -- just

20    bear with me for a second again.  If the statute specifies that

21    a foreign state is only liable to these four individuals or

22    entities, then why does it matter whether solatium is a

23    derivative action?

24         MR. FAY:  Because it's part of the action for the

25    injury or for the death.

1          THE COURT:  You mean it's part of the action by the

2    employee?

3          MR. FAY:  Yes.  This came up too in the Peterson case,

4    in the decision on damages by Judge Lamberth, where there was --

5    actually, it was a Navy medic, the decision accidentally had

6    "Army" -- the Marine Corps doesn't have any Army medics attached

7    to it, it was a Navy medic, who was killed in the attack.

8          The question was was he considered an American national.

9    He'd taken the oath of allegiance when he was sworn into the

10   Navy.  He was a Philippine citizen.  He never got naturalized by

11   the time he was killed.  And Judge Lamberth held, okay, that

12   oath became permanent, obviously at death, he can't revoke it

13   now, there's no process for doing that.  Then he went down and

14   noted that the relatives were not American citizens, but they

15   would still be covered under the law.

16         THE COURT:  That's under the pre-2008 language.

17         MR. FAY:  That's right.  The same word was used in the

18   statute before, Your Honor, in the Flatow Amendment.  "Solatium"

19   was used in the Flatow Amendment as well.

20         THE COURT:  Fine.  What I'm saying to you is include

21   in your findings and conclusions some --

22         MR. FAY:  Okay.

23         THE COURT:  -- some further elaboration of why it is

24   you think I should find the way you want me to find.  Don't just

25   assume that I'm going to, because upon reading your briefs to

1   date, they haven't convinced me.  Now, maybe when I complete my

2   research, even without any help from all of you, I will be

3   convinced, building off of your briefs.  But thus far, just

4   having read your briefs and not having gone through the exercise

5   of independent research, I'm not necessarily convinced.

6        MR. PERLES:  Ever the practical one, you want this

7   addressed within the findings of fact and conclusions of law

8   here?

9        THE COURT:  Right.  I don't think it makes any sense

10  for me to issue a decision without identifying not just the

11  general liability question but the categories of people who have

12  causes of action.  Otherwise, you'll be going off and doing all

13  these damages proceedings, potentially with respect to people

14  that I've concluded don't have any cause of action.  You don't

15  want to do that.  You want this all clarified.

16      Now, I know what you want, and what you may get is that

17  every plaintiff has the claim.  But what I'm saying is, this

18  language is hanging me up a little bit, and you need to help.

19       MR. PERLES:  And I think all of this is particularly

20  important here --

21       THE COURT:  And you are not the only ones that know

22  that this is a difficult issue.  There are other cases in front

23  of me where counsel know this is a difficult issue.  And they're

24  filing briefs on it, and they volunteered to file the briefs,

25  because they said we know this is a difficult issue.  And

1    they're just as experienced as you are, and you know who they

2    are.

3              MR. FAY:  We're not saying anything that --

4              THE COURT:  But you seem to think, Mr. Fay, that it's

5    so obvious and so easy.  I'm telling you it isn't.  So you

6    better do some work on it.

7              MR. PERLES:  We hear Your Honor.  We will address that

8    in the findings of fact and conclusions of law.  I spent an

9    inordinate amount of time meeting with members of Congress when

10   the 2008 amendment was being passed.  I don't think there's

11   any --

12             THE COURT:  Oh, you're not going to be able to provide

13   me your own legislative history, Mr. Perles.  I'm not going to

14   rely on that.

15             MR. PERLES:  Absolutely not.  No.  I would only

16   suggest that one of the major underlying purposes of that

17   legislation was to create parity in the damages that were

18   afforded U.S. government employees who happened to be U.S.

19   nationals killed in the performance of their duty, and U.S.

20   government employees who were not U.S. nationals, and that maybe

21   Congress botched it.  I don't get to write these things.  I only

22   get to go up and talk to people.

23             THE COURT:  But if Congress botched it, then Congress

24   botched it, and I can't fix it.  I can only fix it if there's

25   enough ambiguity for me to fix it.

1          MR. PERLES:  We're going to try and help you fix it.

2          THE COURT:  That's what I want.

3          MR. PERLES:  Thank you, Your Honor.

4          THE COURT:  So we've got a timetable.  You've got

5     identification of an issue or two.  You ought to look at both

6     those issues I asked for briefing on, but this one in particular

7     gives me some pause.  And I look forward to receiving your

8     findings and conclusions after you receive the transcript.  And

9     be as specific and complete as you can.  I'm looking for a work

10    of art from you so that your hopes of receiving a work of art

11    from me are fulfilled.

12         MR. PERLES:  Is this the appropriate time to talk

13    about whether you have made a decision about whether you're

14    going to refer this matter to special masters for --

15         THE COURT:  I'm definitely going to refer it to a

16    special master.  What do you think I am, crazy?

17       (Laughter)

18         MR. FAY:  Your word, not ours.

19       (Laughter)

20         MR. PERLES:  Thank you, Your Honor.

21         THE COURT:  That's assuming I find liability.

22         MR. PERLES:  Assuming you find liability.  And

23    assuming you find liability, there is one other issue I would

24    like to raise.  If Your Honor looks at the captions of the two

25    complaints involving large numbers of these foreign service

1    nationals, you'll see that these case captions overlap, that

2    there is a commonality of clients that are claimed to be

3    represented by one law firm or the other.  That's a very

4    difficult question for two law firms to resolve without some

5    outside assistance.

6         I haven't talked to Mr. Mairone about this, but I would

7    suggest that perhaps it might be helpful if you might loan us

8    perhaps Magistrate Judge Facciola or Magistrate Judge Kay to

9    help us sort this out.

10                  THE COURT:  Sure.  If you need help --

11                  MR. PERLES:  We need help.

12                  THE COURT:  If you need help, let me know.

13                  MR. MAIRONE:  I agree with Mr. Perles for sure.  We'd

14   like to just get this resolved for the benefit of the clients.

15   And if I could add one more point about --

16                  THE COURT:  You don't think the clients can resolve

17   it?

18                  MR. PERLES:  I think the clients are all very

19   confused.

20                  MR. MAIRONE:  I think the clients are very confused.

21                  MR. PERLES:  I'm sure the clients are very confused.

22                  MR. MAIRONE:  Just a point about a special master, is

23   that we're coming up on 12 years since the attack, and many if

24   not the vast majority of the clients are really destitute.  So

25   if we can expedite the process by appointing as many special

1    masters as possible, because there's so many complaints that --

2         THE COURT:  The problem with that is inconsistency.

3    What's going to happen if I appoint multiple special masters and

4    in virtually identical situations one says $5 million for --

5    just to give you the benefit of the doubt -- for solatium for a

6    spouse, and the other says a million and a half?  Are you all

7    going to be happy with that, or are you going to come running to

8    me and say, no, no, no, accept this, don't accept that?  That's

9    just going to cause me more --

10        MR. MAIRONE:  There might be a procedure for -- wait,

11   let me just --

12        MR. PERLES:  Mr. Fay -- we already worked through that

13   problem in the Beirut barracks case, and we got actually

14   surprisingly consistent results.

15        MR. MAIRONE:  Right.  There might be a procedure for

16   having the masters anyway, you know, as a committee kind of like

17   reach parameters.  And the expediency I think for the clients

18   would far outweigh what I believe in the final result would be

19   small if no differences in terms of the judgments.

20        THE COURT:  I will listen to all of you on that

21   subject.  And that raises the question of whether there's

22   anything that you think that I should do with respect to special

23   masters and the damages phase before I decide, based on your

24   findings and conclusions, this liability phase.  Or does that

25   damages phase and the structures and decisions have to await

1    that, and therefore I'll just have you in two weeks after I

2    issue my decision so we can start that process.

3         MR. PERLES:  Were it not for this, what I'll call

4    unfortunate ambiguity in the way Congress has structured this

5    provision, we could probably start damages now.  But because of

6    that ambiguity, I think we ought to wait.  I really don't think

7    we have an option.  We're going to have to brief this and you're

8    going to have to make a very hard decision about what you want

9    to do there, because we really can't proceed into the damages

10   phase until that's resolved, although I think a lot of the

11   attorneys here have already been out expediting the damages --

12        THE COURT:  I know you have.  And I think that's good.

13   I guess what I would suggest is, if there's anything you think

14   that I should be doing, submit something to me.  If you think I

15   should be appointing special master or masters, or taking any

16   steps, submit it to me just in a short filing, what you think I

17   should do, and I will be able to consider it on that basis.

18        MR. FAY:  I think as a practical matter of the numbers

19   of persons that are concerned here, it's going to be virtually

20   impossible to find one special master who can take on all these

21   things.  It'll take up his time or her time for a year, year and

22   a half or something, and I don't think that can happen.

23        With regard to the not having let's say irreconcilable --

24   differences from master to master, the way that that was handled

25   in Peterson was that the administrative plan under which --

1   which every master signed, agreeing to abide by this, named the

2   cases that we then had, awarding damages, and instructed the

3   masters to go by the guidelines set out in those cases in

4   awarding damages, and then Judge Lamberth --

5               THE COURT:  What do you mean by go by the guidelines?

6   In awarding what damages?

7               MR. FAY:  In awarding damages --

8               THE COURT:  You're talking about solatium?

9               MR. FAY:  Solatium as well as damages for injury, or

10  the damages with regard to the monetary loss in the wrongful

11  death cases.

12              THE COURT:  I don't see how the specific monetary

13  losses could be generalized.  They're based on the particular

14  injuries that someone suffered.

15              MR. FAY:  Well, they are --

16              THE COURT:  Go ahead.

17              MR. FAY:  Since it's not a scheduled amount, as we

18  have in workers' comp, for instance, it could differ

19  tremendously from master to master, as it differs from judge to

20  judge.

21              THE COURT:  See, I can see how we can simplify this

22  with certain kinds of damages, because there are figures that

23  have developed over time.  Now, they're usually ranges, quite

24  frankly, not specific figures, and you've referred to them, for

25  certain things.  But not for everything.  And the particular

1    medical condition that someone has as a result of injuries, that

2    can't be --

3         MR. FAY:  I'm not saying it has to fit in the slot.

4    He just instructed them to use these just as a guide.  He didn't

5    say you have to award X dollars to each surviving spouse or Y

6    dollars to each surviving child.  He just said use these past

7    decisions as a guide in damages.

8         THE COURT:  Among all the plaintiffs -- how many

9    plaintiffs are there total in all these cases combined?

10        MR. MAIRONE:  About 400, I think.

11        THE COURT:  About?

12        MR. MAIRONE:  I don't have the exact count.

13        MR. MACALLISTER:  Over 400.

14        THE COURT:  It makes me feel good that I can ask that

15   question and none of you can give me a specific number either.

16        MR. PERLES:  It's because of the vagaries of

17   transliterations of names from Swahili and English.

18        THE COURT:  Okay.  400 or more.  Of those, how many

19   are surviving employees or contractors of the United States?

20        MR. FAY:  In the Mwila case, which is the one I have,

21   there's one family that dropped out.  I think there are 11.  Six

22   are death cases and five are survivors who were injured in the

23   occurrence.  All of them being employees either directly of the

24   United States government or Ultimate Security, which was the

25   guards at the --

1           THE COURT:  So yours is about half and half.  Is that

2      a fair description?

3           MR. MAIRONE:  No.  Without really studying it, my gut

4      is about 30 percent, because there's large families, and so I'm

5      just --

6           THE COURT:  30 percent are the actual --

7           MR. MAIRONE:  The actual employees.  And the rest

8      are --

9           THE COURT:  Even when you say five and six --

10          MR. FAY:  I don't pretend that's a scientific

11     sampling.

12          THE COURT:  You're talking about families, though, not

13     plaintiffs?

14          MR. FAY:  Yes, exactly.  Yes.  It averages about the

15     same, I think, about four to five, maybe five and a half people

16     per family of the 11 families.  So we probably have 55, and then

17     it's maybe -- it's about the same, I guess, in the Owens case.

18          THE COURT:  We could talk forever, I guess.

19     Mr. MacAllister.

20          MR. MACALLISTER:  Your Honor, what about issuing an

21     order on who is eligible under the statute, as well as an

22     advisory for special masters, as well as deciding how many

23     special masters there will be, and issuing that order prior to

24     issuing the final order on liability.  So then the plaintiff

25     groups can at least get their programs up and running.  And then

1    when your final liability order comes out, then we can either

2    move forward or not.  But up to that time, we could still --

3    does that make sense?  Rather than waiting to the end to do

4    everything.

5            THE COURT:  It may make sense, but submit it to me in

6    terms of what you want me to do, if that's what you want to do.

7    Understand that judges are normally a little reluctant to say A,

8    B, and C, all of which are based on a finding of liability,

9    before the judge has found liability.

10           MR. FAY:  I think it's best to wait till there's a

11   finding on liability.  I think we're sort of trapped by our own

12   procedure here.

13           THE COURT:  But if you want me to do something,

14   collectively if you think it's a good idea, I'm open to

15   considering it, and just throw it in front of me.

16           MR. MAIRONE:  Thank you, Your Honor.

17           THE COURT:  All right.  Anything else?

18           MR. FAY:  Oh, Your Honor, one other thing.  Of course

19   everyone is joined for purposes of liability.  And I take it

20   with regard to damages we will no longer be joined.  I say that

21   because we have completed all of the damages depositions in the

22   Mwila case, and we've even done a damages deposition for

23   Mr. Owens.  And the rest of the people in the Owens case I think

24   are at various stages, but they'll shortly be done.  Whereas in

25   the other cases, I think it's probably going to be more drawn

1  out.

2          THE COURT:  This is a plea to go to the front of the

3  line.

4          MR. FAY:  Well, it is -- well, all I'm saying is if

5  they're separate, then when one gets done, they won't be waiting

6  for two years.  And we already have people that are --

7          THE COURT:  Won't that be up to the special masters?

8  In all likelihood, what I'll do is, if I appoint more than one

9  special master, is for different cases, the damages phase of the

10  different cases.

11         MR. FAY:  Yes.

12         THE COURT:  And then it's a question of how quickly

13  that special master gets through the work.  If you're in a

14  better position and can push it forward quicker, then you'll

15  have that advantage, and then it'll come to me sooner.

16         MR. FAY:  In other words, when we're through in one

17  case with all the special master reports, that goes to Your

18  Honor, then there would be a judgment issued just under that

19  case number?

20         THE COURT:  I certainly will consider doing that.  I

21  see no obvious reason not to do it.

22         MR. FAY:  Okay.  Well, thank you very much,

23  Your Honor.

24         MR. PERLES:  Nothing further.

25         THE COURT:  Mr. Perles, would you submit, please, a

1    draft order for what it is you want me to refer to a magistrate

2    judge.

3              MR. PERLES:  I will.

4              THE COURT:  You'll have to coordinate with others, but

5    please submit that.

6              MR. PERLES:  Yes.

7              THE COURT:  All right.  Thank you all.  I appreciate

8    the presentations and the discussion as well.  If there's

9    anything else that you need me to have, give it to Mr. Bradley,

10   and he will sort through all these exhibits, with my help, and

11   we'll have a record and we'll --

12             MR. MACALLISTER:  Your Honor, I just want to make sure

13   that you understand that the material that's sealed is sitting

14   in those binders.

15             THE COURT:  I think I do understand that, yes.  I was

16   worried about that.  And I hope you all didn't take me as being

17   too pedantic in my discussion earlier.  But when classified

18   information -- and the posture is I guess we have to assume that

19   it is or, until it's determined not to be, is the equivalent of

20   being classified information.  When classified information is

21   discussed in this courtroom, every one of you has all electronic

22   equipment removed.  You don't have cell phones, you don't have

23   BlackBerrys.  There are all sorts of precautions that we go

24   through.  So we can't just, even by taking some people out of

25   the courtroom, we can't just launch into discussing classified

1    documents.

2         MR. PERLES:  And we recognize the legitimate concern

3    of the government of the United States, that even though the

4    deponent has been incarcerated for 10 years, you just never know

5    when some kernel of something important that ought to be

6    classified might pop out in the deposition.

7         THE COURT:  I've heard that before in many contexts.

8    Thank you all.

9         (Proceedings adjourned at 3:24 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **INDEX**

2    **WITNESS:**                                          **PAGE:**

3

     Evan Kohlmann      Direct Examination ...............    213
4    Steven Simon       Direct Examination ...............    326

5                              * * * * *

6                       **EXHIBITS RECEIVED**

7    Plaintiff Exhibit M ................................    223
     Plaintiff Exhibit DD ..............................    237
8    Plaintiff Exhibit EE ..............................    239
     Plaintiff Exhibit FF ..............................    249
9    Plaintiff Exhibit GG ..............................    258
     Plaintiff Exhibit T ...............................    260
10   Plaintiff Exhibit HH ..............................    277
     Plaintiff Exhibit II ..............................    287
11   Plaintiff Exhibit JJ ..............................    304
     Plaintiff Exhibits KK-1 through KK-5 ..............    307
12   Plaintiff Exhibits LL, MM, NN, OO .................    312
     Plaintiff Exhibit W-1 .............................    332
13   Plaintiff Exhibit W-2 .............................    344
     Plaintiff Exhibit O ...............................    346
14   Plaintiff Exhibit PP ..............................    350

15                             * * * * *

16

17

18

19

20

21

22

23

24

25

\*   \*   \*   \*   \*   \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that
the foregoing pages are a correct transcript from the record of
proceedings in the above-entitled matter.

_____
BRYAN A. WAYNE