# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JAMES OWENS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> REPUBLIC OF SUDAN, et al., <br><br> Defendants. | Civil Action No. 01-2244 (JDB) |

## MEMORANDUM OPINION[1]

Over fifteen years ago, on August 7, 1998, the United States embassies in Nairobi, Kenya and Dar es Salaam, Tanzania were devastated by simultaneous suicide bombings that killed hundreds of people and injured over a thousand. This Court has entered final judgment on liability under the Foreign Sovereign Immunities Act ("FSIA") in this civil action and several related cases—brought by victims of the bombings and their families—against the Republic of Sudan, the Ministry of the Interior of the Republic of Sudan, the Islamic Republic of Iran, and the Iranian Ministry of Information and Security (collectively "defendants") for their roles in supporting, funding, and otherwise carrying out these unconscionable acts.[2] The next step in the case is to assess and award damages to each individual plaintiff, and in this task the Court has been aided by a special master.

---

[1] The Court has redacted plaintiffs' names in both this Opinion and the Judgment filed this date—but the Court has only redacted in this case precisely as requested by plaintiffs' counsel—and unredacted versions will be filed under seal. See Mot. for Order to Redact [ECF No. 298].

[2] Plaintiffs in some of the related actions have also sued—and the Court has entered judgment against—the Iranian Revolutionary Guards Corps.

Plaintiffs are twelve U.S. citizens injured in either the Nairobi or Dar es Salaam bombings, as well as forty-nine[3] immediate family members of the victims, of whom forty-two are U.S. citizens. Service of process was completed upon each defendant, but defendants failed to respond, and a default was entered against each defendant. This Court then held that it has jurisdiction over the defendants and that the U.S. nationals have a federal cause of action under 28 U.S.C. § 1605A(c). See Owens v. Republic of Sudan, 826 F. Supp. 2d 128, 148-51 (D.D.C. 2011). The Court also held that although those plaintiffs who are foreign national family members of victims lack a federal cause of action, they may nonetheless pursue claims under the law of the District of Columbia.[4] Id. at 153-57. A final judgment on liability was then entered in favor of plaintiffs. Nov. 28, 2011 Order [ECF No. 214] 2. The deposition testimony and other evidence presented established that the defendants were responsible for supporting, funding, and otherwise carrying out the bombings in Nairobi and Dar es Salaam. See Owens, 826 F. Supp. 2d at 135-47.

The Court then referred plaintiffs' claims to a special master, Paul G. Griffin, to prepare proposed findings and recommendations for a determination of damages. Feb. 27, 2012 Order Appointing Special Masters [ECF No. 221] 2. The special master has now filed completed reports on each plaintiff, and plaintiffs have filed proposed findings of fact and conclusions of law based on those reports. See Reports of Special Master Paul Griffin [ECF Nos. 271-77, 279, 286, 288; Proposed Findings of Fact & Conclusions of Law [ECF No. 287]. In completing those reports and in finding the facts, the special master relied on sworn testimony, expert reports, medical records, and other evidence. The reports extensively describe the key facts relevant to

---

[3] This tally does not include one injured plaintiff's two grandchildren (Jane Grandchild1 Cdoe and Jane Grandchild2 Cdoe), named in the complaint: the Court will dismiss their claims because they do not have a viable cause of action. See infra Part III.a.3.

[4] The non-citizen plaintiffs are Jane Sibling3 Bdoe, Jane Sibling2 Bdoe, Jane Sibling3 Bdoe, Jane Parent1 Gdoe, John Parent2 Gdoe, Jane Sibling3 Gdoe, and Jane Sibling4 Gdoe.

each of the plaintiffs and carefully analyze their claims under the framework established in mass tort terrorism cases. The Court commends Paul Griffin for his excellent work and thoughtful analysis.

The Court hereby adopts all facts found by the special master relating to all plaintiffs in this case. Where the special master has received evidence sufficient to find that a plaintiff is a U.S. national and is thus entitled to maintain a federal cause of action, the Court adopts that finding. In addition, the Court adopts the special master's findings that each plaintiff[5] has established the familial relationship necessary to support standing under section 1605A(a)(2)(A)(ii). See Owens, 826 F. Supp. 2d at 149. The Court also adopts all damages recommendations in the reports, with the few adjustments described below. "Where recommendations deviate from the Court's damages framework, 'those amounts shall be altered so as to conform with the respective award amounts set forth' in the framework, unless otherwise noted." Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 82-83 (D.D.C. 2010) (quoting Peterson v. Islamic Republic of Iran, 515 F. Supp. 2d 25, 53 (D.D.C. 2007) ("Peterson II"), abrogation on other grounds recognized in Mohammadi v. Islamic Republic of Iran, 947 F. Supp. 2d 48, 65 (D.D.C. 2013)). As a result, the Court will award plaintiffs a total judgment of over $487 million.

---

[5] With the exception of the two grandchildren, who are not immediate family members. See supra note 1.

**CONCLUSIONS OF LAW**

I.     **Plaintiffs Are Entitled To Damages On Their Federal Law Claims Under 28 U.S.C.
       § 1605A**

"To obtain damages in a Foreign Sovereign Immunities Act (FSIA) action, the plaintiff
must prove that the consequences of the defendants' conduct were reasonably certain (i.e., more
likely than not) to occur, and must prove the amount of the damages by a reasonable estimate
consistent with application of the American rule on damages." Valore, 700 F. Supp. 2d at 83.
Plaintiffs here have proven that the consequences of the defendants' conduct were reasonably
certain to—and indeed intended to—cause injury to plaintiffs. See Owens, 826 F. Supp. 2d at
135-46. As discussed in this Court's previous opinion, because the FSIA-created cause of action
"does not spell out the elements of these claims that the Court should apply," the Court "is forced
. . . to apply general principles of tort law" to determine plaintiffs' entitlement to damages on
their federal claims. Id. at 157 n.3.

Survivors here are entitled to recover for the pain and suffering caused by the bombings:
acts of terrorism "by their very definition" amount to extreme and outrageous conduct and are
thus compensable by analogy under the tort of "intentional infliction of emotional distress."
Valore, 700 F. Supp. 2d at 77 (citing Restatement (Second) of Torts § 46(1) (1965)); see Baker
v. Socialist People's Libyan Arab Jamahriya, 775 F. Supp. 2d 48, 74 (D.D.C. 2011) (permitting
plaintiffs injured in state-sponsored terrorist bombings to recover for personal injuries, including
pain and suffering, under tort of "intentional infliction of emotional distress"); Estate of Bland v.
Islamic Republic of Iran, 831 F. Supp. 2d 150, 153 (D.D.C. 2011) (same). Hence, "those who
survived the attack may recover damages for their pain and suffering, . . . [for] economic losses
caused by their injuries; . . . [and] family members can recover solatium for their emotional
injury . . . ." Oveissi v. Islamic Republic of Iran, 879 F. Supp. 2d 44, 55 (D.D.C. 2012) ("Oveissi

II") (citing <u>Valore</u>, 700 F. Supp. 2d at 82-83); 28 U.S.C. § 1605A(c). Accordingly, all plaintiffs who were injured in the 1998 bombings can recover for their pain and suffering as well as their economic damages, and their immediate family members—if U.S. nationals—can recover for solatium. <u>Bland</u>, 831 F. Supp. 2d at 153.

## II.   <u>Plaintiffs Who Lack A Federal Cause Of Action Are Entitled To Damages Under D.C. Law</u>

This Court previously held that it will apply District of Columbia law to the claims of any plaintiffs for whom jurisdiction is proper, but who lack a federal cause of action under the FSIA. <u>Owens</u>, 826 F. Supp. 2d at 153-57. This category includes only the foreign national family members of the injured victims from the 1998 bombings. Individuals in this category seek to recover solatium damages under D.C. law based on claims of intentional infliction of emotional distress. To establish a prima facie case of intentional infliction of emotional distress under D.C. law, a plaintiff must show: (1) extreme and outrageous conduct on the part of the defendant which, (2) either intentionally or recklessly, (3) causes the plaintiff severe emotional distress. <u>Larijani v. Georgetown Univ.</u>, 791 A.2d 41, 44 (D.C. 2002). Acts of terrorism "by their very definition" amount to extreme and outrageous conduct, <u>Valore</u>, 700 F. Supp. 2d at 77; the defendants in this case acted intentionally and recklessly; and their actions caused each plaintiff severe emotional distress. <u>See</u> <u>Owens</u>, 826 F. Supp. 2d at 136-45; <u>Murphy v. Islamic Republic of Iran</u>, 740 F. Supp. 2d 51, 74-75 (D.D.C. 2010). Likewise, D.C. law allows spouses and next of kin to recover solatium damages. D.C. Code § 16-2701. Based on the evidence submitted to the special master, the Court concludes that the foreign national family members of the victims of the 1998 bombings have each made out their claims for intentional infliction of emotional distress and are entitled to solatium damages.

5

### III.   <u>Damages</u>

Having established that plaintiffs are entitled to damages, the Court now turns to the question of the amount of damages, which involves resolving common questions related to plaintiffs with similar injuries. The damages awarded to each plaintiff are laid out in the tables in the separate Order and Judgment issued on this date.

### a.   **Compensatory Damages**

#### 1.   <u>Economic damages</u>

Under the FSIA, plaintiffs may recover economic damages, which typically include lost wages, benefits and retirement pay, and other out-of-pocket expenses. 28 U.S.C. § 1605A(c). To determine each surviving plaintiff's economic losses resulting from the bombings, the special master relied on economic reports submitted by Dr. Jerome Paige and Associates, which estimated lost earnings, fringe benefits, retirement income, and the value of household services lost as a result of the injuries sustained from the bombing. Those reports were attached to each special master report where a plaintiff suffered economic damages. In turn, Dr. Paige and Associates relied on information from the survivors as well as other documentation, including social security benefit reports and employment records. <u>See</u> Proposed Findings of Fact & Conclusions of Law Ex. 2 [ECF No. 287-3] (further explaining methodology employed in creating the economic loss reports). The Court adopts the findings and recommendations of the special master as to economic losses.

The special master also recommends awarding economic damages to account for certain out-of-pocket expenses incurred as a direct result of the bombings, consisting of both past and future medical expenses. The Court adopts the special master's recommendations as to out-of-pocket medical expenses already incurred. In determining future medical costs of certain

plaintiffs, the special master relied on reports created by Mona Yudkoff, R.N, a life care planner, who determined that several plaintiffs will require constant medical care and treatment for the rest of their lives because of the injuries they sustained in the bombing. <u>See</u> Proposed Findings of Fact & Conclusions of Law Ex. 3 [ECF No. 287-4] (further explaining methodology employed in creating future medical expense reports). The Court adopts the special master's recommendations as to these future medical costs as well.

2.   <u>Awards for pain and suffering due to injury</u>

Courts determine pain-and-suffering awards for survivors based on factors including "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." <u>See</u> <u>O'Brien v. Islamic Republic of Iran</u>, 853 F. Supp. 2d 44, 46 (D.D.C. 2012) (internal quotation marks omitted). When calculating damages amounts, "the Court must take pains to ensure that individuals with similar injuries receive similar awards." <u>Peterson II</u>, 515 F. Supp. 2d at 54. Recognizing this need for uniformity, courts in this district have developed a general framework for assessing pain-and-suffering damages for victims of terrorist attacks, awarding a baseline of $5 million to individuals who suffer severe physical injuries, such as compound fractures, serious flesh wounds, and scars from shrapnel, as well as lasting and severe psychological pain. <u>See</u> <u>Valore</u>, 700 F. Supp. 2d at 84. Where physical and psychological pain is more severe—such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead—courts have departed upward from this baseline to $7 million and above. <u>See</u> <u>O'Brien</u>, 853 F. Supp. 2d at 47. Similarly, downward departures to a range of $1.5 to $3 million are warranted where the victim

suffers severe emotional injury accompanied by relatively minor physical injuries. See Valore, 700 F. Supp. 2d at 84-85.

The special master recommends an award of $5 million in pain and suffering for three plaintiffs, downward departures from the baseline for five plaintiffs, and upward departures from the baseline for four plaintiffs. The Court will adopt these recommendations with four adjustments to ensure consistency with prior cases and between plaintiffs in this case.

The special master's report on John Victim1 Bdoe suggests an award of $12 million in pain and suffering, based on his extensive injuries. Report of Special Master Paul Griffin Concerning John Victim1 Bdoe [ECF No. 271] 83. Although an upward departure from the baseline is appropriate, the Court finds that a departure of $3 million is more appropriate, bringing the total pain-and-suffering award to $8 million. John Victim1 Bdoe was a supervisor in information technology in the diplomatic services corps at the U.S. Embassy in Nairobi at the time of the bombing. Id. at 2. A steel beam fell on him during the explosion, crushing his left arm and shoulder. Id. at 12. The hospital in Nairobi recommended amputation because the bones were shattered and soft tissues were torn away from the shoulder socket, destroying his rotator cuff, but his doctors did not ultimately amputate. Id. at 10. Efforts to repair John Victim1 Bdoe's shoulder—including eight lengthy reconstructive operations—have failed because of alignment problems, post-operative infections, and other complications. Id. at 12. He has permanently lost the use of his left shoulder, and has only limited use of his left arm below the elbow. Id. at 15. He also suffers from repeated infections due to his injuries, requiring him to take antibiotics for the rest of his life. Id. at 13. John Victim1 Bdoe also suffered massive injuries to his head. Id. at 17. During the bombing, a significant portion of his lower jaw was blown off. Id. He also suffered injuries to many of his teeth and to his mouth and face. Id. Because of the distortion to

his face, oral surgeons have trouble locating nerves to numb when performing dental surgeries, and so he has felt the full pain of such surgeries for hours at a time. Id. at 18. John Victim1 Bdoe also suffers from numerous shrapnel wounds: fragments of glass, drywall, metal, and other debris are embedded in his body; that shrapnel periodically migrates through his body and erupts through his skin. Id. at 22. These physical injuries have destroyed John Victim1 Bdoe's ability to engage in sports with his children. Id. at 29. He also suffers from very serious emotional injuries, including post-traumatic stress disorder ("PTSD"), nightmares, flashbacks, a sense of loss of control over his life, isolation, loneliness, frustration of not being a good husband and father due to his injuries, and financial concerns of how he can support his wife and family after the injuries he sustained. Id. at 31-32. These injuries have substantially interfered with his ability to enjoy a normal family relationship with his wife and children. Id. at 32-33.

In Peterson II, the court departed upwards from the baseline to award $12 million to a bombing survivor who suffered severe injuries that included a broken neck, which resulted in permanent quadriplegia. 515 F. Supp. 2d at 55. Although John Victim1 Bdoe's injuries are horrific, the Court finds that they are more in line with those suffered by plaintiffs awarded $8 million by the Peterson II court. See, e.g., id. at 54 (awarding $8 million to plaintiff Burnette, who was buried alive for four days, and suffered injuries including closed head injury, basilar skull fracture, facial nerve palsy, rib injuries, tympanic membrane ruptures, foot injuries, and severe psychological problems); id. at 55 (awarding $8 million to plaintiff Hunt, who suffered injuries including skull fractures, brain bruising, various broken bones in his leg, an exposed Achilles tendon, and severe psychological problems). Because these injuries and their lasting effects are significantly more serious than those of most plaintiffs receiving the baseline award of $5 million, the Court will award $8 million to John Victim1 Bdoe.

The special master's report on Jane Victim Cdoe suggests an award of $20 million in pain and suffering, based on her extensive injuries. Report of Special Master Paul Griffin Concerning Jane Victim Cdoe [ECF No. 275] 43. Although an upward departure from the baseline is certainly appropriate, the Court finds that a departure of $7 million is more appropriate, bringing the total pain-and-suffering award to $12 million. Jane Victim Cdoe worked for the U.S. Department of State at the U.S. Embassy in Nairobi at the time of the bombing, and she was at work when the bomb went off. Id. at 2. She was knocked unconscious by the blast, and when she regained consciousness she was pinned to the floor by various objects. Id. at 7. She was taken to the hospital, and when she awoke she was on a plane to Germany. Id. at 8. She was later taken to Walter Reed Medical Center, where she spent over a month. Id. As a direct result of the bombing, Jane Victim Cdoe suffered the following injuries: deep lacerations on both feet, severe burns on her left arm, shrapnel and glass embedded in her left arm and chest, first- and second-degree burns to her head and face, two perforated eardrums (one requiring surgery), extremely serious eye injuries resulting in bilateral blindness, a hole in the top of her skull, facial lacerations and embedded glass, serious blast tattooing on her face and permanent scarring, a dislocated elbow, a large piece of shrapnel embedded in her upper thigh, a lost tooth, nerve damage, and PTSD. Id. at 8-9. She was also infected with HIV due to blood contamination at the Nairobi hospital, resulting in AIDS. Id. at 9. Her skin still erupts shrapnel from her face and head twice a month on average, and her hearing is still poor. Id. at 23. Jane Victim Cdoe has had over forty surgeries to repair her eyes, and many other surgeries to repair her other injuries. Id. at 10-11. She is, however, still almost completely blind. Id. at 15. HIV destroyed the physical relationship between Jane Victim Cdoe and her former husband John Spouse Cdoe, and she recently filed for a divorce. Id. at 18.

The Court finds that Jane Victim Cdoe's injuries are most comparable to those of the plaintiff rendered quadriplegic in Peterson II, who was awarded $12 million. 515 F. Supp. 2d at 55. In addition to her horrific physical injuries and many surgeries, as a direct result of the bombing she is irreparably blind and partly deaf, and she contracted HIV. In light of her suffering, the Court finds that a significant upward departure is merited, and it will award $12 million to Jane Victim Cdoe.

The special master's report on John Victim Ddoe suggests an award of $10 million in pain and suffering, based on his extensive injuries. Report of Special Master Paul Griffin Concerning John Victim Ddoe [ECF No. 276] 26. Although an upward departure from the baseline is appropriate, the Court finds that a departure of $2 million is more appropriate, bringing the total pain-and-suffering award to $7 million. John Victim Ddoe was employed by the U.S. Department of State and was stationed at the embassy in Nairobi. Id. at 2. He has since passed away from an unrelated cause. Id. at 3. John Victim Ddoe was knocked unconscious by the explosion and was buried underneath rubble. Id. at 4. After rescuers dug him out of the rubble, he was taken immediately to the hospital in Nairobi. Id. at 5. He was covered in bruises and lacerations from the bombing. Id. at 8. He experienced severe issues as a result of the extreme head trauma he suffered, including issues thinking and talking clearly, being reduced to wearing a diaper, having to relearn remedial tasks such as walking, talking, and using the bathroom, and having trouble remembering things. Id. at 5. As a direct result of the bombing, John Victim Ddoe suffered the following injuries: a fractured scapula, a fractured rib, severed nerves in his leg, burns on his back, missing teeth, brain damage—including impairment of memory function, problems with overall executive function and apathy, disinhibition, problems processing information, and a hematoma—and PTSD. Id. at 7-9.

As with John Victim1 Bdoe and Jane Victim Cdoe, John Victim Ddoe's injuries were significantly more serious than those of most plaintiffs receiving the baseline award. His injuries are comparable to those suffered by one of the plaintiffs in Estate of Doe v. Islamic Republic of Iran, 943 F. Supp. 2d 180, 187 (D.D.C. 2013). There, the court awarded $7 million to a plaintiff who was mistaken for dead; rescue workers threw her body from the building to an ambulance waiting below.

> She remained in the hospital for eight months and underwent several surgeries for severe head injuries. The crown of her head had been split open, the roof of her mouth was cracked, her vision and hearing were damaged, all of her teeth were broken, and her hair was burnt off . . . Due to glass pieces stuck in her lips and cheeks, [she] required surgery to reconstruct her face. She continues to be profoundly affected by her injuries: she is unable to eat certain foods because the roof of her mouth didn't heal correctly, has eye pain, and relies on other people to take care of her in certain ways. She experiences constant dizziness and cannot tolerate loud noises.

Id.; see also Peterson II, 515 F. Supp. 2d at 55 (awarding $7 million to plaintiff Matthews, who suffered injuries including shrapnel wound to forehead destroying nose, lacerations, a perforated eardrum, and severe psychological problems); id. at 56 (awarding $7 million to plaintiff Rivers, who suffered injuries including two broken eardrums, lacerations, burns, knee damage, and severe psychological problems). John Victim Ddoe's injuries are similarly severe. He suffered severe head trauma, burns and lacerations, broken bones, and he suffered from PTSD. Because his injuries are comparable to those of other plaintiffs receiving a $7 million award, the Court will award $7 million to John Victim Ddoe's estate.

The special master's report on John Victim1 Edoe suggests an award of $7.5 million in pain and suffering, based on his extensive injuries. Report of Special Master Paul Griffin Concerning John Victim1 Edoe [ECF No. 277] 40.   The Court believes that a downward adjustment from both the special master's recommendation and the baseline amount is

appropriate for John Victim1 Edoe. Where physical injuries are comparatively minor and the primary injury is emotional, courts adjust the award downward. See, e.g., Valore, 700 F. Supp. 2d at 84-85. At the time of the bombing, John Victim1 Edoe was a special agent in the diplomatic services corps assigned to the embassy in Nairobi. Id. at 4. He was at an offsite embassy warehouse a few miles away from the embassy at the time of the bombing. Id. at 5. Knowing that his wife was in the embassy, he immediately drove back there while extremely upset. Id. He found his wife at the embassy, covered in dust, abrasions, and cuts, and he was overjoyed to find her alive. Id. at 6. Despite the grave emotional impact of the bombing on him—he personally knew many of the victims—he organized a search team and began to move through the building, searching for survivors in the rubble. Id. at 6. While searching the building, he witnessed many dead bodies, some with limbs and heads severed from torsos. Id. at 7-8. Even as someone with combat experience, he was overwhelmed by the number of people with severe wounds. Id. at 8. While participating in the cleanup, John Victim1 Edoe's mouth began to bleed from the amount of smoke and particles in the air. Id. at 24. Lifting survivors from the rubble caused him to suffer injuries to his back and shoulders. Id. at 10. As a direct result of his search and rescue efforts after the bombing, John Victim1 Edoe suffered the following injuries: damage to his rotator cuffs, severe bilateral muscle and tendon tears in his shoulders, back injury, lost lung function, Reactive Airways Dysfunction Syndrome, PTSD, anger, nightmares, insomnia, difficulty concentrating, distraction, major depression, and suicidal tendencies. Id. at 10-11, 16-17.

The record reflects lasting and severe psychological pain for John Victim1 Edoe. But in light of his relatively less severe physical injuries when compared to plaintiffs who were injured by the bomb blast itself, a downward departure from the baseline is appropriate. For instance, in

Valore, another judge in this district awarded $1.5 million where a plaintiff was knocked to the ground by a bomb blast, and suffered severe emotional turmoil from helping survivors. See Valore, 700 F. Supp. 2d at 84-85; see also Peterson II, 515 F. Supp. 2d at 55 (departing downward to $2 million where plaintiff experienced "nerve pain and foot numbness" as well as "lasting and severe psychological problems" from the attack). John Victim1 Edoe suffered physical injuries during his admirable search and rescue efforts, which are more severe than those of the plaintiff in Valore. Accordingly, the Court will award $3.5 million to John Victim1 Edoe for pain and suffering.

3.    Solatium

"In determining the appropriate amount of compensatory damages, the Court may look to prior decisions awarding damages for pain and suffering, and to those awarding damages for solatium." Acosta v. Islamic Republic of Iran, 574 F. Supp. 2d 15, 29 (D.D.C. 2008). Only immediate family members—parents, siblings, spouses, and children—are entitled to solatium awards. See Valore, 700 F. Supp. 2d at 79. The commonly accepted framework for solatium damages in this district is that used in Peterson II, 515 F. Supp. 2d at 52. See Valore, 700 F. Supp. 2d at 85; Belkin, 667 F. Supp. 2d at 23. According to Peterson II, the appropriate amount of damages for family members of injured victims is as follows: $4 million to spouses of injured victims, $2.5 million to parents of injured victims, and $1.25 million to siblings of injured victims. Peterson II, 515 F. Supp. 2d at 52. Courts in this district have differed somewhat on the proper amount awarded to children of injured victims. Compare Peterson II, 515 F. Supp. 2d at 51 ($2.5 million), with Davis v. Islamic Republic of Iran, 882 F. Supp. 2d 7, 14 (D.D.C. 2012) ($1.5 million). The Court finds the Peterson II approach to be more appropriate: to the extent

such suffering can be quantified, children who lose parents are likely to suffer as much as parents who lose children.

Although these amounts are guidelines, not rules, see Valore, 700 F. Supp. 2d at 86, the Court finds the distinctions made by the Valore court to be responsible and reasonable, and hence it will adopt the same guidelines for determining solatium damages here. In the interests of fairness and to account for the difficulty in assessing the relative severity of each family member's suffering, in this case and in related cases, the Court will not depart from those guidelines for any individual plaintiff.[6]

Some plaintiffs in this case, sadly, had not one but two parents injured in the bombings. Solatium awards are meant to compensate for "the mental anguish . . . that those with a close personal relationship to [an injured victim] experience as the result of the [survivor's injuries], as well as the harm caused by the loss of the [survivor's] society and comfort." Id. at 85 (internal quotation marks omitted). Accordingly, those plaintiffs who suffered the misfortune of experiencing the disruption of not one but two close personal relationships because of the bombings are entitled to doubled solatium awards, and the special master so recommended. See id. at 86 (awarding solatium damages for each lost relationship).

The Court finds that the special master has appropriately applied the solatium damages framework to most of the plaintiffs in this case, and will adopt his recommendations with a few exceptions. Other courts in this district have held that it is inappropriate for the solatium awards of family members to exceed the pain-and-suffering awards of surviving victims. See Davis, 882

_____

[6] Two plaintiffs are actually former—or soon to be former—spouses of injured victims. Case law is unclear on how much to award former spouses. See Baker, 775 F. Supp. 2d at 84 (noting lack of clarity and lowering solatium award because of divorce soon after injury). Here, the special master has not recommended a downward departure for the plaintiffs involved (John Victim2 Fdoe, divorced from Jane Victim1 Fdoe, and John Spouse Cdoe, divorced or soon-to-be divorced from Jane Victim Cdoe). Because of the lengthy post-injury period of marriage in both cases, and because the special master found that both marriages suffered greatly as a result of the bombings, the Court will award the full amount of solatium damages to both plaintiffs.

F. Supp. 2d at 15; O'Brien, 853 F. Supp. 2d at 47; Bland, 831 F. Supp. 2d at 157. The Court will follow that approach here. The special master recommended solatium awards exceeding the pain-and-suffering awards to the related victim in several cases. Hence, the Court will reduce those solatium awards to match corresponding pain-and-suffering awards where appropriate.[7] The Court will also increase the solatium awards for two plaintiffs—John Child1 Fdoe and Jane Child2 Fdoe—for whom the special master apparently calculated solatium awards without accounting for their suffering associated with their brother John Victim3 Fdoe's injuries.[8]

### b.    Punitive Damages

Plaintiffs in this case have waived their claims for punitive damages. See Waivers of Punitive Damages [ECF No. 298-2]. Hence, the Court will dismiss Count XXV of the Fifth Amended Complaint.

### c.    Prejudgment Interest

An award of prejudgment interest at the prime rate is appropriate in this case. See Oldham v. Korean Air Lines Co., Ltd., 127 F.3d 43, 54 (D.C. Cir. 1997); Forman v. Korean Air Lines Co., Ltd., 84 F.3d 446, 450-51 (D.C. Cir. 1996). Prejudgment interest is appropriate on the whole award, including pain and suffering and solatium, with one exception. See Reed v. Islamic Republic of Iran, 845 F. Supp. 2d 204, 214-15 (D.D.C. 2012) (awarding prejudgment interest on the full award). But see Oveissi v. Islamic Republic of Iran, 768 F. Supp. 2d 16, 30 n.12 (D.D.C.

---

[7] Accordingly, the Court reduces the following awards: John Victim1 Bdoe's solatium award, reduced from $4 million to $3 million; John Victim1 Edoe's solatium award, reduced from $4 million to $2.5 million; Jane Victim2 Edoe's solatium award, reduced from $4 million to $3.5 million; Jane Victim1 Fdoe's solatium award, reduced from a combined $6.5 million to a combined $4.5 million ($3 million for solatium associated with John Victim2 Fdoe's injuries and $1.5 million for solatium associated with John Victim3 Fdoe's injuries); John Victim2 Fdoe's solatium award, reduced from a combined $6.5 million to a combined $5.5 million ($4 million for solatium associated with Jane Victim1 Fdoe's injuries and $1.5 million for solatium associated with John Victim3 Fdoe's injuries); John Victim1 Gdoe's solatium award, reduced from $4 million to $1.5 million; and Jane Child1 Gdoe's solatium award, reduced from a combined $5 million to a combined $4 million ($2.5 million for solatium associated with John Victim1 Gdoe's injuries and $1.5 million for solatium associated with Jane Victim2 Gdoe's injuries).

[8] Those awards will each amount to $6.25 million: $2.5 million for solatium associated with each of their parents' injuries and $1.25 million for solatium associated with their brother's injuries.

2011) (declining to award prejudgment interest on solatium damages). Because the economic loss figures recommended by the special master have already been adjusted to reflect present discounted value, see District of Columbia v. Barritaeu, 399 A.2d 563, 568-69 (D.C. 1979), the Court will not apply the prejudgment interest multiplier to the economic loss amounts. See Doe, 943 F. Supp. 2d at 186 (citing Oldham, 127 F.3d at 54). Awards for pain and suffering and solatium are calculated without reference to the time elapsed since the attacks. Because plaintiffs were unable to bring their claims immediately after the attacks, they have lost use of the money to which they were entitled upon incurring their injuries. Denying prejudgment interest on these damages would allow defendants to profit from the use of the money over the last fifteen years. Awarding prejudgment interest, on the other hand, reimburses plaintiffs for the time value of money, treating the awards as if they were awarded promptly and invested by plaintiffs.

The Court will calculate the applicable interest using the prime rate for each year. The D.C. Circuit has explained that the prime rate—the rate banks charge for short-term unsecured loans to creditworthy customers—is the most appropriate measure of prejudgment interest, one "more appropriate" than more conservative measures such as the Treasury Bill rate, which represents the return on a risk-free loan. See Forman, 84 F.3d at 450. Although the prime rate, applied over a period of several years, can be measured in different ways, the D.C. Circuit has approved an award of prejudgment interest "at the prime rate for each year between the accident and the entry of judgment." See id. at 450. Using the prime rate for each year is more precise than, for example, using the average rate over the entire period. See Doe, 943 F. Supp. 2d at 185 (noting that this method is a "substantially more accurate 'market-based estimate'" of the time value of money (citing Forman, 84 F. 3d at 451)). Moreover, calculating interest based on the

prime rate for each year is a simple matter.[9] Using the prime rate for each year results in a multiplier of 2.26185 for damages incurred in 1998.[10] Accordingly, the Court will use this multiplier to calculate the total award.[11]

## CONCLUSION

The 1998 embassy bombings shattered the lives of all plaintiffs in this case. Reviewing their personal stories reveals that, even more than fifteen years later, they each still feel the horrific effects of that awful day. Damages awards cannot fully compensate people whose lives have been torn apart; instead, they offer only a helping hand. But that is the very least that these plaintiffs are owed. Hence, it is what Court will facilitate.

A separate Order consistent with these findings has issued on this date.

/s/
JOHN D. BATES
United States District Judge

Dated:  March 28, 2014

---

[9] To calculate the multiplier, the Court multiplied $1.00 by the prime rate in 1999 (8%) and added that amount to $1.00, yielding $1.08. Then, the Court took that amount and multiplied it by the prime rate in 2000 (9.23%) and added that amount to $1.08, yielding $1.17968. Continuing this iterative process through 2014 yields a multiplier of 2.26185.

[10] The Court calculated the multiplier using the Federal Reserve's data for the average annual prime rate in each year between 1998 and 2014. See Bd. of Governors of the Fed. Reserve Sys. Historical Data, available at http://www.federalreserve.gov/releases/h15/data.htm (last visited March 28, 2014). As of the date of this opinion, the Federal Reserve has not posted the annual prime rate for 2014, so the Court will conservatively estimate that rate to be 3.25%, the rate for the previous six years.

[11] The product of the multiplier and the base damages amount includes both the prejudgment interest and the base damages amount; in other words, applying the multiplier calculates not the prejudgment interest but the base damages amount plus the prejudgment interest, or the total damages award.