UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JAMES OWENS, et al.,

    Plaintiffs,

        v.

REPUBLIC OF SUDAN, et al.,

    Defendants.

Civil Action No. 01-2244 (JDB)

## MEMORANDUM OPINION

Over sixteen years ago, simultaneous suicide bombings in Nairobi, Kenya, and Dar es Salaam, Tanzania, devastated two United States embassies, killed hundreds of people, and injured over a thousand more. This Court has entered final judgment on liability under the Foreign Sovereign Immunities Act ("FSIA") and District of Columbia law in this and other civil actions—brought by victims of the bombings and their families—against the Republic of Sudan, the Ministry of the Interior of the Republic of Sudan, the Islamic Republic of Iran, and the Iranian Ministry of Information and Security for their roles in these unconscionable acts. And with the help of special masters, the Court has assessed and awarded damages to most of the individual plaintiffs in these cases. See, e.g., Mar. 28, 2014 Mem. Op. [ECF No. 300] at 3. But a few plaintiffs remain. Currently before the Court are a special master's award recommendations for these remaining plaintiffs.

Plaintiffs—the so-called "Aliganga plaintiffs," who take their name from Jesse Nathanael Aliganga, a United States Marine Corps sergeant who died in the 1998 attack—are twelve United States citizens injured or killed in the Nairobi bombing and their immediate family members. See Am. Compl. in Intervention [ECF No. 262] ("Am. Compl.") at 9; Apr. 11, 2014

1

Mem. Op. at 1.  Although these plaintiffs did not participate in the opening stages of the original Owens lawsuit, this Court allowed them to intervene in this case.  July 23, 2012 Order [ECF No. 233] at 1.  By that time, other plaintiffs had already served process on each defendant, defendants had failed to respond, and the Court had entered a default against defendants.  Moreover, this Court had already held that it has jurisdiction over defendants and that the United States national plaintiffs have a federal cause of action under 28 U.S.C. § 1605A(c), while the foreign-national family members of the bombing victims may pursue their claims under the laws of the District of Columbia.[1]  See Owens v. Rep. of Sudan, 826 F. Supp. 2d 128, 148–51, 153–57 (D.D.C. 2011).  Finally (and perhaps most importantly), this Court had already found that defendants were responsible for supporting, funding, or otherwise carrying out the Nairobi bombing, and it therefore entered final judgment on liability against them pursuant to the FSIA.  See id. at 135–47, 157.

The Court then referred the Aliganga plaintiffs' claims to a special master, Paul G. Griffin, to prepare proposed findings of fact and damages recommendations for each plaintiff.  Sept. 18, 2012 Order [ECF No. 253] at 1.  The special master has now filed his reports, which rely on sworn testimony, expert reports, medical records, and other evidence.  See Reports of Special Master [ECF Nos. 332–39, 341–42]; see also Filing of Special Master [ECF No. 344] ("Wolf Expert Report").  The reports describe the facts relevant to each plaintiff and carefully analyze each plaintiff's claim for damages under the framework established in other mass-tort-terrorism cases from this District.  The Court thanks Special Master Griffin for his work.

The Court hereby adopts all facts found by the special master relating to plaintiffs in this case.  Where the special master has received evidence sufficient to find that a plaintiff is a United

---

[1] Amongst the Aliganga plaintiffs, only one—Egambi Fred Kibuhiru Dalizu—is not a United States national.  See Am. Compl. at 44; see also infra at 5.

States national and is thus entitled to maintain a federal cause of action, the Court adopts that finding. In addition, the Court adopts the special master's finding that each plaintiff has established the familial relationship necessary to support standing under the FSIA. See 28 U.S.C. § 1605A(a)(2)(A)(ii); see also Owens, 826 F. Supp. 2d at 149. The Court also adopts all damages recommendations in the reports—with the exception of the few adjustments described below. See Valore v. Islamic Rep. of Iran, 700 F. Supp. 2d 52, 82–83 (D.D.C. 2010) ("Where recommendations deviate from the Court's damages framework, those amounts shall be altered so as to conform with . . . the framework." (internal quotation marks omitted)). As a result, the Court will award the Aliganga plaintiffs a total judgment of over $622 million.

This opinion and judgment brings to a close this Court's role in assessing the responsibility for, and the damages recoverable as a result of, the 1998 embassy bombings. But the story is hardly over for the victims of these attacks, who not only must continue the effort to actually recover their awarded damages, but, more importantly, must also continue to live with the devastating consequences of these callous acts. That, after all, is the design of such terrorist activity—to inflict present and future fear and pain on individuals and governments. The Court commends the dedicated, creative, and courageous resolve of all plaintiffs—and their conscientious attorneys—in the cases brought against the terrorists responsible for the embassy bombings and their supporters. They have helped to ensure that terrorism, and its support by defendants, will not ultimately succeed in achieving its long-term goals.

## CONCLUSIONS OF LAW

Defendants' liability in this case under both the FSIA and District of Columbia law was decided long ago.[2] See Owens, 826 F. Supp. 2d at 157. But two questions remain. First, what

---

[2] It bears repeating from previous opinions in this case that "for plaintiffs' federal claims under § 1605A(c), the Court [was] presented with the difficulty of evaluating the[] claims under the FSIA . . . which does not spell out

kinds of damages may plaintiffs recover from the (now liable) defendants? And second, what damages awards are appropriate for each plaintiff?

I.     **PLAINTIFFS MAY RECOVER DAMAGES UNDER EITHER 28 U.S.C. § 1605A OR DISTRICT OF COLUMBIA LAW**

Both the FSIA and District of Columbia law provide a basis for damages awards here. Start with the FSIA. That statute allows United States national plaintiffs to recover various types of damages, including "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). But "[t]o obtain damages in an FSIA action, the plaintiff must prove that the consequences of the defendants' conduct were reasonably certain (i.e., more likely than not) to occur, and must prove the amount of the damages by a reasonable estimate consistent with this Circuit's application of the American rule on damages." Valore, 700 F. Supp. 2d at 83 (internal quotation marks and alterations omitted).

The Aliganga plaintiffs satisfy these requirements. As discussed in this Court's previous opinions, plaintiffs have proven that the consequences of defendants' conduct were reasonably certain to—and indeed intended to—cause plaintiffs' injuries. See Owens, 826 F. Supp. 2d at 135–47. According to the FSIA's remedial scheme, then: "[T]hose who survived the attack may recover damages for their pain and suffering, as well as any other economic losses caused by their injuries; estates of those who did not survive can recover economic losses stemming from wrongful death of the decedent; [and] family members [so long as they are United States

---

the [applicable] elements of these claims . . . . Hence, the Court [was] forced to apply general principles of tort law." Owens, 826 F. Supp. 2d at 157 n.3 (internal quotation marks, citations, and alterations omitted); see also Mar. 28, 2014 Mem. Op. at 4–5 (concluding that plaintiffs are entitled to damages under the FSIA). Plaintiffs, here, proffered various theories of recovery under the FSIA that typically sound in tort, including wrongful death and intentional infliction of emotional distress. See, e.g., Am. Compl. at 29–31. In this Court's judgment, plaintiffs met their burden regarding these claims. As other terrorism cases explain, "there is no but-for causation requirement under the FSIA; proximate cause is sufficient." Valore, 700 F. Supp. 2d at 75. And there is no doubt—based on this Court's earlier factual findings—that defendants proximately caused the wrongful, "premature death" of several plaintiffs. Id. at 78 (internal quotation marks omitted); see also Owens, 826 F. Supp. 2d at 135–47. The family members of the injured or killed plaintiffs also satisfied the traditional intentional-infliction-of-emotional-distress test, because acts of terrorism "by their very definition" amount to extreme and outrageous conduct. Valore, 700 F. Supp. 2d at 77 (internal quotation marks omitted).

nationals] can recover solatium for their emotional injury." Oveissi v. Islamic Rep. of Iran, 879 F. Supp. 2d 44, 55 (D.D.C. 2012); see also Amduso v. Rep. of Sudan, --- F. Supp. 2d ---, 2014 WL 3687126, at *2 (D.D.C. July 25, 2014) (limiting solatium-damages awards under the FSIA to United States national family members). The Court will therefore award plaintiffs "reasonable" economic, pain-and-suffering, and solatium damages, as appropriate.

This conclusion covers all but one of the Aliganga plaintiffs. And District of Columbia law suffices to cover the damages claim of the sole remaining plaintiff: Egambi Fred Kibuhiru Dalizu, who is a national of the Republic of Kenya, and who was the husband of Jean Rose Dalizu, a United States citizen and embassy employee killed in the Nairobi attack. Am. Compl. at 44. Dalizu hopes to recover solatium damages under District of Columbia law, because, he alleges, defendants' actions amounted to intentional infliction of emotional distress. As this Court has previously held, District of Columbia law applies to Dalizu's claim. Owens, 826 F. Supp. 2d at 153–57. A prima facie claim for intentional infliction of emotional distress under that jurisdiction's law requires Dalizu to show: (1) extreme and outrageous conduct on the part of defendants which, (2) either intentionally or recklessly, (3) causes him severe emotional distress. Larijani v. Georgetown Univ., 791 A.2d 41, 44 (D.C. 2002).

Dalizu meets every element of this tort. Here, just as in the FSIA context, acts of terrorism "by their very definition" amount to extreme and outrageous conduct, Valore, 700 F. Supp. 2d at 77 (internal quotation marks omitted), and the facts in this case prove that defendants acted intentionally and recklessly, causing Dalizu severe and lasting emotional trauma, see Report of Special Master [ECF No. 339] ("Dalizu Report") at 3–6, 25; see also Owens, 826 F. Supp. 2d at 135–46; Murphy v. Islamic Rep. of Iran, 740 F. Supp. 2d 51, 74–75 (D.D.C. 2010) (describing an immediate family member's intentional-infliction-of-emotional-distress claim in

5

the state-sponsored-terrorism context). Because Dalizu presented evidence sufficient to prove his intentional-infliction-of-emotional-distress claim under District of Columbia law, and because that law allows spouses to recover solatium damages, see D.C. Code § 16-2701, the Court concludes that he is entitled to recover such damages here.

**II.    DAMAGES**

Having established that plaintiffs are entitled to damages, the Court will now assess the type and amount of damages to award each plaintiff. This issue requires the Court to consider the recommendations of the special master and to weigh the severity and extent of plaintiffs' injuries against those alleged by other plaintiffs in other terrorism cases. See, e.g., Mwila v. Islamic Rep. of Iran, --- F. Supp. 2d ---, 2014 WL 1284978, at *3–7 (D.D.C. Mar. 28, 2014). The Court will accept most (but will reject or adjust some) of the special master's recommended awards. A complete list of the damages awarded each plaintiff can be found in the table attached to the Order separately issued on this date.

    **a.    Compensatory Damages**

        1.    Economic damages

Under the FSIA, injured victims and the estates of deceased victims may recover economic damages, which typically include lost wages, benefits and retirement pay, and other out-of-pocket expenses. See 28 U.S.C. § 1605A(c). The special master recommended that the Court award economic damages to the estates of eleven deceased plaintiffs.[3] See Wolf Expert Report at 6. To determine the economic losses resulting from each plaintiff's death, the special master relied on a report submitted by Steven A. Wolf, an accounting and financial forensics expert. See, e.g., Dalizu Report at 3, 22; Wolf Expert Report at 18. Wolf's report, in turn, relied

---

[3] They are: Jesse Nathanael Aliganga, Julian Leotis Bartley, Sr., Julian Leotis Bartley, Jr., Jean Rose Dalizu, Molly Huckaby Hardy, Kenneth Ray Hobson II, Prabhi Guptara Kavaler, Arlene Bradley Kirk, Mary Louise Martin, Ann Michelle O'Connor, and Sherry Lynn Olds. See Am. Compl. at 9.

6

on such factors as each plaintiff's annual income, expected future income, and work-life expectancy. Wolf Expert Report at 6–11 (explaining methodology used to calculate the economic losses for each plaintiff). The Court will adopt the findings and recommendations of the special master and award economic damages to the estates of these eleven victims in the amounts calculated and recommended.

### 2. Pain and suffering awards

Courts determine pain-and-suffering awards for injured and killed victims based on factors including "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." O'Brien v. Islamic Rep. of Iran, 853 F. Supp. 2d 44, 46 (D.D.C. 2012) (internal quotation marks omitted); see also Haim v. Islamic Rep. of Iran, 425 F. Supp. 2d 56, 71 (D.D.C. 2006). But when calculating damages awards, "the Court must take pains to ensure that individuals with similar injuries receive similar awards." Peterson v. Islamic Rep. of Iran, 515 F. Supp. 2d 25, 54 (D.D.C. 2007), abrogation on other grounds recognized in Mohammadi v. Islamic Rep. of Iran, 947 F. Supp. 2d 48, 65 (D.D.C. 2013). Courts in this District have therefore developed a general framework for assessing pain-and-suffering awards for victims of terrorist attacks. Plaintiffs who suffer serious physical injuries tend to receive a $5 million award; plaintiffs who suffer relatively more serious or numerous injuries may receive $7 million (or more); and plaintiffs whose injuries are relatively less serious or who only suffer emotional injuries may receive something closer to $1.5 million. See Valore, 700 F. Supp. 2d at 84–85; O'Brien, 853 F. Supp. 2d at 47.

The special master has recommended that the Court award pain-and-suffering damages to three Aliganga plaintiffs. One recommended award—advising the Court to award $1.5 million to Howard Charles Kavaler, who worked in the Nairobi embassy at the time of the attack, and

who continues to suffer severe post-traumatic stress syndrome as a result of the bombing, see Report of Special Master [ECF No. 338] ("Kavaler Report") at 3–4, 11—complies with this District's general damages framework. The Court will therefore adopt the special master's recommendation regarding Kavaler.

Two recommended awards, however, depart from this District's framework and require significant adjustment. The first relates to Jesse Nathanael Aliganga, the Marine killed in the Nairobi attack. The special master recommended that the Court award Aliganga $12 million in pain-and-suffering damages, because he "suffered severe physical injuries prior to his death." Report of Special Master [ECF No. 333] ("Aliganga Report") at 10. But while there is no doubt that Aliganga's injuries were severe, this recommendation ignores that the touchstone of any pain-and-suffering award is whether the victim suffered "conscious pain" for some period of time. Peterson, 515 F. Supp. 2d at 53; see also Oldham v. Korean Air Lines Co., 127 F.3d 43, 56 (D.C. Cir. 1997) ("[T]he key factual dispute [in pre-death pain-and-suffering cases] turns on whether the [victim was] immediately rendered unconscious." (internal quotation marks omitted)). In other words, if the victim was conscious after suffering injury, then a pain-and-suffering award might be appropriate; if not, then not. Here, all the available evidence suggests that Aliganga's injuries put him on the inappropriate side of the divide. As the special master recognized, Aliganga's "head was crushed in the bombing and his brain avulsed [i.e., separated] from his skull." Aliganga Report at 3. And though the Marines initially told Aliganga's family that he was "alive but injured," no one testified that Aliganga was conscious at any point before dying from his wounds. See id. at 4–5. The Court therefore cannot award Aliganga's estate any pain-and-suffering damages.

8

The second problematic award presents a similar issue.  The special master recommended that the Court award $12 million to the estate of Julian Leotis Bartley, Jr., because he "endured bodily pain and suffering after the attack and prior to his death."  Report of Special Master [ECF No. 342] at 11–12.  There is some basis for awarding pain-and-suffering damages in Bartley's case.  After all, he "suffered horrific injuries and terrible pain when both his legs were . . . amputated in the explosive blast."  Id. at 12.  But the special master admitted that "it is unclear how long [Bartley] suffered before succumbing to his injuries," and he could only conclude that Bartley did not die "immediately," but instead died some time later "due to a severe loss of blood."  Id.  Though Bartley's injuries were undeniably terrible, in cases like this—"[w]hen the victim endured extreme pain and suffering for a period of several hours or less"—the courts will "rather uniformly award[] $1 million" in damages.  Haim, 425 F. Supp. 2d at 71 (emphasis added).  Indeed, courts will sometimes settle on smaller awards, if the evidence suggests that the victim suffered for only a very brief period.  See, e.g., Peterson, 515 F. Supp. 2d at 53.  Here, Bartley almost certainly survived for less than several hours.  The Court will therefore adopt the usual award for such cases:  $1 million.

   3. Solatium

"In determining the appropriate amount of compensatory damages, the Court may look to prior decisions awarding damages for . . . solatium."  Acosta v. Islamic Rep. of Iran, 574 F. Supp. 2d 15, 29 (D.D.C. 2008).  Only immediate family members—parents, siblings, spouses, and children—are entitled to solatium awards.  See Valore 700 F. Supp. 2d at 79; see also D.C. Code § 16-2701 (allowing recovery by "the spouse or domestic partner and the next of kin of the deceased person").  The commonly accepted framework for solatium damages in this District's FSIA terrorism cases is that used in Peterson, where spouses of deceased victims receive $8 million, parents of deceased victims receive $5 million, and siblings of deceased victims receive

$2.5 million. 515 F. Supp. 2d at 52. And where the victim does not die, but instead only suffers injury, the solatium awards are halved: Spouses receive $4 million, parents receive $2.5 million, and siblings receive $1.25 million. Id. Moreover, this Court has previously held that children of deceased and injured victims should receive awards akin to those given to parents (i.e., $5 million where the victim died, and $2.5 million where the victim suffered injury). See, e.g., Mwila, 2014 WL 1284978, at *5 ("[C]hildren who lose parents are likely to suffer as much as parents who lose children."). Although these amounts are guidelines, not rules, see Valore, 700 F. Supp. 2d at 85–86, the Court finds the distinctions made in Peterson and other cases to be reasonable, and thus will adopt this framework for determining solatium damages here.

For most plaintiffs, the special master properly applied the preceding framework in making his damages calculations, and the Court will therefore accept the bulk of his recommendations. But there are a few exceptions. One is straightforward. The special master recommended a $5 million solatium award to the estate of Frederick Arthur Bradley, the father of a deceased victim of the Nairobi attack. See Report of Special Master [ECF No. 334] at 20. But there is a significant problem with this award: Frederick Arthur Bradley is no longer a plaintiff in this case, as he voluntarily dismissed his claim in 2012. See Notice of Vol. Dismissal [ECF No. 258] at 1. The Court therefore declines to award Bradley any damages.

Four other solatium awards also require adjustment. Other courts in this District have held that it is inappropriate for the solatium award of a family member to exceed the pain-and-suffering award of the surviving victim. See, e.g., Davis v Islamic Rep. of Iran, 882 F. Supp. 2d 7, 15–16 (D.D.C. 2012). This Court has followed that approach in previous embassy-bombing cases, see, e.g., Mwila, 2014 WL 1284978, at *6, and it will do the same here. Therefore, the solatium awards for several family members of Howard Charles Kavaler—who suffered severe

emotional injury after the bombing, and who the Court has awarded $1.5 million in pain-and-suffering damages—must be modified. The special master recommended awarding $2.5 million each to Tara and Mary Kavaler (Howard's daughters) and to the estates of Pearl and Richard Kavaler (Howard's parents). See Kavaler Report at 13–14. But $2.5 million is obviously greater than $1.5 million, and so the Court will reduce these family members' awards to match Howard's pain-and-suffering compensation.[4]

### b. Pre-Judgment Interest

Plaintiffs are not only entitled to damages in this case. They are also owed pre-judgment interest at the prime rate on most of those damages. See Oldham, 127 F.3d at 54; Forman v. Korean Air Lines Co., 84 F.3d 446, 450–51 (D.C. Cir. 1996). The special master already adjusted the recommended economic loss figures for each plaintiff to reflect the present discounted value of those awards, see, e.g., Aliganga Report at 9; see also District of Columbia v. Barriteau, 399 A.2d 563 (D.C. 1979), but he did not adjust the recommended awards for pain and suffering and solatium. These awards therefore do not account for the time that has elapsed since the 1998 attacks, meaning plaintiffs have lost the use of this money which should have been theirs immediately after the bombings. Moreover, denying pre-judgment interest on these damages would allow defendants to profit from their use of these funds over the intervening sixteen years. The Court will therefore award pre-judgment interest on plaintiffs' pain-and-suffering and solatium awards—which should suffice to place plaintiffs in the same position they would have been in had they received (and invested) their damages awards in 1998. See, e.g.,

---

[4] The special master actually recommended that each of Howard's daughters receive $7.5 million in solatium damages, because their mother (Prabhi Guptara Kavaler) died in the bombing, which entitles them to an additional $5 million under this District's solatium-damages framework. This $5 million award is entirely appropriate, and the Court's reduction of their award only applies to the solatium damages stemming from their father's injury. The Court therefore awards each daughter $6.5 million in solatium damages: $5 million based on their mother's death and $1.5 million based on their father's injury. See, e.g., Valore, 700 F. Supp. 2d at 86 (awarding solatium damages for each lost relationship).

Doe v. Islamic Rep. of Iran, 943 F. Supp. 2d 180, 184–85 (D.D.C. 2013); Reed v. Islamic Rep. of Iran, 845 F. Supp. 2d 204, 214–15 (D.D.C. 2012).  But see Oveissi, 768 F. Supp. 2d at 30 n.12 (declining to award pre-judgment interest on solatium damages).[5]

The Court will calculate the applicable interest using the prime rate for each year.  The D.C. Circuit has explained that the prime rate—the rate banks charge for short-term, unsecured loans to creditworthy customers—is the most appropriate measure of pre-judgment interest.  See Forman, 84 F.3d at 450–51.  Although the prime rate, applied over a period of several years, can be measured in different ways, this Circuit has approved an award of pre-judgment interest "at the prime rate for each year between the accident and the entry of judgment."  Id. at 450.  Using the prime rate for each year is more precise than, for example, using the average rate over the entire period.  See Doe, 943 F. Supp. 2d at 185 (noting that this method is a "substantially more accurate market-based estimate" of the time value of money (internal quotation marks omitted)).  Moreover, calculating interest based on the prime rate for each year is a simple matter.[6]  Using the prime rate for each year results in a multiplier of 2.26185 for damages incurred in 1998,[7] and the Court will use this multiplier to calculate the total award for each plaintiff in this case.[8]

---

[5] In Oveissi, the court awarded damages in amounts above and beyond the usual solatium framework (i.e., the framework called for a $5 million award for plaintiff, but the court awarded $7.5 million).  768 F. Supp. 2d at 30.  And the court in that case denied plaintiff's request for pre-judgment interest, because its "upward adjustments" from the usual framework sufficed "to fully compensate [plaintiff] for the enormous loss he sustained."  Id. at n.12 (internal quotation marks omitted).  Unlike Oveissi, this Court has not made any "upward adjustments" from the usual framework, and the Court therefore finds that pre-judgment interest on plaintiffs' solatium awards is required if plaintiffs are to be "fully compensate[d]."

[6] To calculate the multiplier, the Court multiplied $1.00 by the prime rate in 1999 (8%) and added that amount to $1.00, yielding $1.08.  Then, the Court took that amount and multiplied it by the prime rate in 2000 (9.23%) and added that amount to $1.08, yielding $1.17968.  Continuing this iterative process through 2014 yields a multiplier of 2.26185.

[7] The Court calculated the multiplier using the Federal Reserve's data for the average annual prime rate in each year between 1998 and 2014.  See Bd. of Governors of the Fed. Reserve Sys. Historical Data, available at http://www.federalreserve.gov/releases/h15/data.htm (last visited October 14, 2014).  As of the date of this opinion, the Federal Reserve has not posted the annual prime rate for 2014, so the Court will conservatively estimate that rate to be 3.25%, the rate for the previous five years.

[8] The product of the multiplier and the base damages amount includes both the pre-judgment interest and the base damages amount.  In other words, applying the multiplier calculates not the pre-judgment interest but the base damages amount plus the pre-judgment interest—or the total damages award.

## **CONCLUSION**

The August 7, 1998, embassy bombings shattered the lives of thousands—including the seventy-one plaintiffs in this case. Reading plaintiffs' personal stories reveals that, even after some sixteen years, they each still feel the horrific effects of that awful day. Damages awards cannot fully compensate these innocent people, who have suffered so much. But they can offer a helping hand. That is the very least that plaintiffs are owed—and that is what this Court seeks to accomplish.

A separate Order consistent with this Memorandum Opinion has issued on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: October 15, 2014