**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JAMES OWENS, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 01-2244 (JDB) |
| REPUBLIC OF SUDAN, et al., | |
| Defendants. | |
| JUDITH ABASI MWILA, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 08-1377 (JDB) |
| THE ISLAMIC REPUBLIC OF IRAN, et al., | |
| Defendants. | |
| RIZWAN KHALIQ, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 10-356 (JDB) |
| REPUBLIC OF SUDAN, et al., | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION**
**FOR ORDER AUTHORIZING THE ISSUANCE OF WRIT OF ATTACHMENT**

## **INTRODUCTION**

Despite Iran's remarkable efforts to continue evading the $1 billion in judgments that this Court has granted to Plaintiffs, nearly $10 million in Iranian funds are currently blocked in one or more accounts at Wells Fargo Bank, N.A., and subject to attachment in partial satisfaction of Plaintiffs' judgments.  Plaintiffs therefore seek an order authorizing issuance of a writ of attachment to Wells Fargo.

The story of how the assets came to be blocked is itself remarkable: Iran's Islamic Revolutionary Guard Corps-Qods Force ("IRGC-QF")—the IRGC's foreign policy branch, which provides lethal support to terrorist organizations, such as al Qaeda and Hezbollah—set up a front company, Taif Mining Services, LLC ("Taif"), in order to purchase a shipping vessel to transport Iranian oil without triggering U.S. sanctions controls.  Taif contracted to purchase the shipping vessel, named the Nautic, from a Liberian maritime company called Crystal Holdings, Ltd.  Taif routed the payment for the Nautic through the United States, and the $2 million security deposit was successfully transmitted to Crystal Holdings without detection.  Soon after, Taif transmitted its remaining balance of nearly $10 million for the Nautic to Crystal Holdings, yet these funds were detected as violating the U.S. sanctions regime against Iran, and immediately blocked at Wells Fargo.  None the wiser, Crystal Holdings tendered the Nautic to Taif, which immediately ordered the vessel to travel to Iran to be loaded with oil from the National Iranian Oil Company.

The blocked Iranian funds are subject to execution under both the Foreign Sovereign Immunities Act ("FSIA") and the Terrorism Risk Insurance Act ("TRIA") in order to partially satisfy Plaintiffs' judgments.  The FSIA authorizes Plaintiffs to execute upon assets belonging to Iran in the United States that are used for commercial activity—all criteria that are easily satisfied by Iran's wiring of funds into the United States in order to purchase the Nautic.  And the TRIA

was specifically designed to compensate victims of terrorism—such as Plaintiffs—where, as here, their judgment debtor's assets are blocked in accounts in the United States.

Because Plaintiffs satisfy the requirements of those statutes, Plaintiffs move this Court to issue an Order (1) authorizing the Clerk of the Court to issue Plaintiffs' writ of attachment to Wells Fargo against the Iranian funds in aid of Plaintiffs' execution of their judgments against Iran; and (2) directing the U.S. Marshals Service to serve Plaintiffs' writ of attachment—as signed, sealed, and issued by the Clerk of the Court—on Wells Fargo.[1]

## BACKGROUND

### I.    Iran Owes Plaintiffs Nearly $1 Billion In Compensation

On August 7, 1998, al Qaeda carried out simultaneous suicide bombing attacks on the U.S. embassies in Nairobi, Kenya and Dar es Salaam, Tanzania, killing hundreds of people and injuring over a thousand others.  Plaintiffs, direct victims and surviving family members, brought suit against Iran pursuant to 28 U.S.C. § 1605A for its role in the attacks.[2]  After a three-day hearing on liability and damages, this Court found Iran "liable for damages suffered by the plaintiffs" because the country "provided material aid and support to al Qaeda."  *See Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 135 (D.D.C. 2011).

This Court then entered judgments against Iran, totaling nearly $1 billion.[3]  Iran has never appeared in this action, and has yet to pay one cent of the Judgments.

---

[1]  Plaintiffs have attached a proposed writ of attachment to this Motion.

[2]  These suits, brought as three separate actions in the D.C. District Court, were led by named-plaintiffs James Owens, Rizwan Khaliq, and Judith Mwila, respectively.  We therefore refer to the "*Owens* Plaintiffs," "*Khaliq* Plaintiffs," and "*Mwila* Plaintiffs" to refer to the respective plaintiff-groups represented by the undersigned counsel.

[3]  Specifically, the Court awarded $487,687,665.78 to the *Owens* Plaintiffs; $419,752,640.49 to the *Mwila* Plaintiffs; and $49,761,544.86 to the *Khaliq* Plaintiffs.  *See* Judgment, *Owens v. Republic of Sudan*, No. 01-2244 (D.D.C. Mar. 28, 2014) ("*Owens* Dkt."), Dkt. No. 301;

Plaintiffs, recognizing that Iran would not satisfy the Judgments voluntarily, undertook two requisite steps to allow them to enforce their Judgments under the FSIA. First, Plaintiffs served the Judgments on Iran through diplomatic channels pursuant to 28 U.S.C. § 1608(a)(4). Specifically, the *Khaliq* and *Mwila* Plaintiffs served Iran on August 19, 2014, and the *Owens* Plaintiffs served Iran on June 9, 2015. *See Owens* Dkt. No. 354, at 1, 14; *Owens* Dkt. No. 380, at 1; *see also Owens* Dkt. No. 388, at 10 ("plaintiffs have provided notice of their default judgments to the foreign states"); *Mwila* Dkt. No. 142, at 2-3 (finding service on Iran to be adequate); *Owens* Dkt. No. 380, at 1. Second, Plaintiffs moved this Court for orders under 28 U.S.C. § 1610(c), having demonstrated that Iran had been properly served and a reasonable period of time had elapsed so that judgment enforcement proceedings could commence. This Court granted the *Owens* Plaintiffs' and *Khaliq* Plaintiffs' motions on October 28, 2015, and the *Mwila* Plaintiffs' motion on April 5, 2016, ordering that Plaintiffs "are entitled to enforce their judgment against defendants in any manner consistent with 28 U.S.C. § 1610 and any other applicable provisions of law." *Owens* Dkt. No. 388, at 1; *Mwila* Dkt. No. 142, at 4; *Khaliq* Dkt. No. 87, at 1.

## II.    Iranian Funds In The District Of Columbia

In a stunning disclosure, the *Wall Street Journal* reported on May 2, 2020 that Wells Fargo possesses approximately $10 million in blocked assets that belong to the government of Iran (the "Iranian Funds"). *See* Mengqi Sun & Dylan Tokar, *U.S. Charges Two Iranians Over Oil Tanker Purchase, Seeking $12 Million Forfeiture*, Wall St. J (May 2, 2020), https://www.wsj.com/articles/u-s-charges-two-iranians-over-oil-tanker-purchase-seeking-12-

---

Judgment, *Mwila v. The Islamic Republic of Iran*, No. 08-1377 (D.D.C. Mar. 28, 2014) ("*Mwila* Dkt."), Dkt. No. 88; Judgment, *Khaliq v. Republic of Sudan*, No. 10-356 (D.D.C. Mar. 28, 2014) ("*Khaliq* Dkt."), Dkt. No. 40, (collectively, the "Judgments").

million-forfeiture-11588380410 ("WSJ Article"), Decl. Ex. 1.[4]   Other public documents—including official court filings—have corroborated this information.  *See* United States' Verified Complaint for Forfeiture *In Rem*, *United States v. $2,340,000*, No. 20-1139 (D.D.C. May 1, 2020) ("Nautic Compl."), Dkt. No. 1, Decl. Ex. 2, ¶ 18; Affidavit in Support of Application for Arrest Warrant, *United States v. Dianat*, No. 20-72 (D.D.C.) ("Gov't Aff."), Decl. Ex. 3, ¶ 53.   As described below, the Iranian Funds belong to the IRGC-QF, which is the foreign policy branch of the IRGC (the military arm of the Iranian government), and an extension of the Iranian state.

## A.     The IRGC-QF Is The Government Of Iran

The IRGC-QF is one of five branches of the IRGC, which is the "military vanguard of Iran."[5]  Created in 1979 by national decree, the IRGC defends Iran against attacks and activities of foreign forces inside the country, assists Iran's other security forces, and performs other "duties" as "determined by law" under the Iranian constitution.[6]  The IRGC-QF in particular is the "Iranian regime's primary instrument for providing lethal support" to multiple terrorist organizations.[7] Given their importance to the nation's functioning, the IRGC and IRGC-QF report directly to the Supreme Leader, who sets all foreign and domestic policies according to Iran's constitution.[8]  As

---

[4]  References to an exhibit are references to exhibits of the Declaration of Chantale Fiebig, dated May 22, 2020 ("Fiebig Declaration"), which was filed in support of this motion.

[5]  *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism*, U.S. Dep't of Treasury (Oct. 25, 2007), https://www.treasury.gov/press-center/press-releases/pages/hp644.aspx.

[6]  Frederic Wehrey et al., *The Rise of the Pasdaran*, RAND Nat'l Def. Research Inst. 21-22 (2009) (quotation marks omitted), https://www.rand.org/content/dam/rand/pubs/monographs/2008/RAND_MG821.pdf.

[7]  *Fact Sheet*, *supra*, at n.5; *Profile: Iran's Revolutionary Guards*, BBC News (Jan. 3, 2020) https://www.bbc.com/news/world-middle-east-47852262.

[8]  *Iran's Ministry of Intelligence and Security: A Profile*, Library of Congress 13 (Dec. 2012), https://fas.org/irp/world/iran/mois-loc.pdf.

a result, the IRGC, including its Qods Force, functions "more like an 'armed force' under the ultimate command of the leadership of the Iranian government . . . than like a commercial agency or instrumentality of the state."  *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 117 (D.D.C. 2005); *see also Rimkus v. Islamic Republic of Iran*, 575 F. Supp. 2d 181, 194 (D.D.C. 2008) ("IRGC [is] considered to be a division of [the] state of Iran.").

The U.S. government views the IRGC and IRGC-QF as one and the same as the government of Iran.  In fact, the U.S. Department of Treasury Office of Foreign Assets Control ("OFAC") has described IRGC-QF as "the Government of Iran's primary foreign action arm for executing its policy of supporting terrorist organizations and extremists groups around the world."[9]

Although its primary function is as a military force supporting Iran's terrorist factions, OFAC has also recognized that the IRGC plays a significant role in Iran's oil-related economic affairs.  In particular, OFAC has explained that "IRGC and its major holdings" maintain a "dominant presence in Iran's commercial and financial sectors, controlling multi-billion dollar businesses and maintaining extensive economic interests in the oil industry."  Decl. Ex. 2, Nautic Compl. ¶ 13.  Indeed, these funds fuel the IRGC's terrorist and militaristic activities.  *Id.* ("[T]he profits from these activities support the IRGC's full range of nefarious activities, including the proliferation of weapons of mass destruction . . . and their means of delivery, support for terrorism, and a variety of human rights abuses, at home and abroad.").

 OFAC, moreover, has added both the IRGC and IRGC-QF to its "Specially Designated Nationals And Blocked Persons List" ("SDN list"), as entities having committed, or posing a

---

[9] *Treasury Sanctions Five Individuals Tied to Iranian Plot to Assassinate the Saudi Arabian Ambassador to the United States*, U.S. Dep't of Treasury (Oct. 11, 2011), treasury.gov/press-center/press-releases/pages/tg1320.aspx.

significant risk of committing, acts of terrorism. *See* Exec. Order No. 13,224, *as amended by* Exec. Order No. 13,886, 84 Fed. Reg. 48,041 (Sept. 9, 2019).[10]  Most recently, the IRGC, including its Qods Force, has been designated a Foreign Terrorist Organization—a designation that "recognizes the reality that Iran is not only a State Sponsor of Terrorism, but that the IRGC actively participates in, finances, and promotes terrorism as a tool of statecraft" and that the "IRGC is the Iranian government's primary means of directing and implementing its global terrorist campaign."[11]

As is particularly relevant here, OFAC recently warned the "maritime community" of IRGC-QF's use of "front companies to broker associated contracts" to "obfuscate its involvement in selling Iranian oil."[12]  In that advisory, OFAC stated that "Iran's exportation of oil directly funds

---

[10] To be added to OFAC's "SDN list" means to be "designated."  OFAC designated IRGC in 2007 pursuant to Executive Order 13224 for supporting Iran's ballistic missile and nuclear program; in 2011 pursuant to Executive Order 13553 for its role in human rights violations; in 2012 pursuant to Executive Order 13606 for similar reasons; and in 2017 pursuant to Executive Order 13224 for international terrorism. *See* Elena Chachko, *The U.S. Names the Iranian Revolutionary Guard a Terrorist Organization and Sanctions the International Criminal Court*, Lawfare (Apr. 10, 2019), https://www.lawfareblog.com/us-names-iranian-revolutionary-guard-terrorist-organization-and-sanctions-international-criminal.  OFAC also designated the IRGC-QF in 2007 pursuant to Executive Order 13224 for providing lethal support to multiple terrorist organizations, and again in 2011 after IRGC-QF's failed assassination attempt on the Saudi Arabian Ambassador to the United States. *See Fact Sheet*, *supra*, at n.5; *Treasury Sanctions Five Individuals*, *supra*, at n.9.

[11] *Statement from the President on the Designation of the Islamic Revolutionary Guard Corps as a Foreign Terrorist Organization*, The White House (Apr. 8, 2019) https://www.whitehouse.gov/briefings-statements/statement-president-designation-islamic-revolutionary-guard-corps-foreign-terrorist-organization/.  This Court may take judicial notice of the facts that the IRGC, including its Qods Force, is part of the government of Iran and is a terrorist organization. *See Pharm. Research & Mfrs. of Am. v. United States Dep't of Health & Human Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014) (courts "frequently take[] judicial notice of information posted on official public websites of government agencies").

[12] *Treasury Designates Vast Iranian Petroleum Shipping Network That Supports IRGC-QF and Terror Proxies*, U.S. Dep't of Treasury (Sept. 4, 2019), https://home.treasury.gov/news/press-releases/sm767.

acts of terrorism by Iranian proxies" and "[t]his 'vast oil-for-terror shipping network demonstrates how economically reliant Tehran is on the IRGC-QF . . . as [a] financial lifeline[].'"[13]

### B.      The IRGC-QF Uses Taif To Purchase Nautic To Transport Iranian Oil

In 2019, the IRGC-QF, and thus the government of Iran, deployed two seasoned operatives to execute the Nautic Scheme: Amir Dianat and Kamran Lajmiri, who have a history of coordinating petroleum shipments with NIOC.  *See* Decl. Ex. 2, Nautic Compl. ¶¶ 14-15, 21.[14] Lajmiri worked "for approximately seven years [in the technical department of the National Iranian Tanker Company at] Kharg Island, Iran," and "previously used NIOC as a bunker supplier at Kharg Island."  Decl. Ex. 3, Gov't Aff. ¶ 37(b).  Dianat, too, previously coordinated with NIOC to load Iranian crude oil at Kharg Island.  *Id.* ¶ 37(a).  According to OFAC, Dianat also "has supported IRGC-QF smuggling operations for several years, including efforts aimed at the shipment of weapons including missiles," and, in turn, the IRGC-QF "has relied on Dianat to secure entry for vessels carrying IRGC-QF shipments and has used his business connections to facilitate logistics requirements."[15]

Through Dianat and Lajmiri, the IRGC created Taif as a front company to procure the Nautic from a Liberian Company, Crystal Holdings, Ltd. ("Crystal Holdings").  Decl. Ex. 3, Gov't Aff. at 2; Decl. Ex. 1, WSJ Article at 2.  Lajmiri initially planned to use another Iranian company to buy the Nautic.  *See* Decl. Ex. 3, Gov't Aff. ¶ 41.  But Lajmiri's agent informed him that the

---

[13] *Id.* (quotation marks omitted).

[14] NIOC is wholly owned by the government of Iran.  *See, e.g.*, *National Iranian Oil Company*, The Islamic Republic of Iran Ministry of Petroleum, https://en.mop.ir/portal/home/?generaltext/4012/4187/165282/National-Iranian-Oil-Company-(NIOC) (last visited May 20, 2020).

[15] *Treasury Designates IRGC-Qods Force Front Company and Owner*, U.S. Dep't of Treasury (May 1, 2020), https://home.treasury.gov/news/press-releases/sm995.

bank processing the sale of the Nautic would need "detailed background documentation" on the purchasing company and affiliated entities "as part of 'OFAC' and due diligence checks." *Id.* To avoid those requirements, Lajmiri and Dianat formed Taif instead, registering it to do business and creating a company website mere weeks before it purchased the vessel. Decl. Ex. 2, Nautic Compl. ¶ 26; *see also* Decl. Ex. 3, Gov't Aff. ¶ 28. Although Taif "was nominally registered in the name of two Omani nationals," the IRGC-QF maintained the true majority ownership of Taif through its operative, Dianat. Decl. Ex. 2, Nautic Compl. ¶¶ 27-28.

In May 2019, the United Kingdom broker to the transaction required Taif to produce a performance guarantee from a more established company that would "unconditionally and irrevocably guarante[e]" Taif's purchase of the Nautic. Decl. Ex. 2, Nautic Compl. ¶ 29 (quotation marks omitted). Weeks later, a Taif nominee owner signed a "memorandum of agreement" for the purchase, warranting that "the Buyers, shareholders and/or affiliated companies, were not under any 'sanctions, prohibition or blacklist whatsoever imposed by USA, UK, EU, UN.'" *Id.* ¶ 30 (quotation marks omitted). With these representations, the sale was cleared by the parties to proceed.

## C.    The Iranian Funds Are Frozen By Wells Fargo

Taif wired its first payment—a $2,340,000 deposit—in September 2019. The funds were wired through the UK brokerage firm, and successfully traveled through the U.S. financial system undetected before reaching Crystal Holdings, Ltd. Decl. Ex. 2, Nautic Compl. ¶ 34. In October, Taif caused the UK brokerage firm to transmit an additional $9,983.931.91, which was the remainder of the purchase price for the Nautic, as well as $15,010 in late fees. *Id.* ¶¶ 36-37. Those wired funds, however, were frozen while transiting through Wells Fargo due to U.S. sanctions regulations. Decl. Ex. 3, Gov't Aff. ¶ 53. Presumably unaware the funds were blocked, Crystal Holdings transferred possession of the Nautic to Taif. Decl. Ex. 2, Nautic Compl. ¶ 39.

Immediately upon receiving possession of the Nautic, Taif ordered the captain "to take the vessel to Iran." Decl. Ex. 2, Nautic Compl. ¶ 42. Once the Nautic's captain notified Taif that "a notice of readiness had been tendered to NIOC at Kharg Island, Iran for loading," the vessel was loaded with Iranian crude oil and set sail to illegally transport the oil for NIOC. *Id.* ¶¶ 44-45. Soon after, however, the Nautic was seized pursuant to a U.A.E. court order obtained by Crystal Holdings on the grounds that it had never received final payment for the vessel. *Id.* ¶ 46.

### D.    The U.S. Government Brings Charges And Imposes Sanctions

On May 1, 2020, the U.S. Attorney's Office for the District of Columbia ("USAO") brought charges against Dianat and Lajmiri for money laundering and violation of U.S. sanctions. *See generally* Decl. Ex. 3, Gov't Aff. On the same day, the USAO filed a related civil forfeiture complaint, "represent[ing] the largest ever seizure of IRGC-QF related funds."[16] OFAC also designated Dianat and Taif pursuant to Executive Order 13224 for "having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, the IRGC-QF," which had the effect of requiring all of Taif's property in the United States to be blocked.[17] As a result, the $9,983.931.91 remains blocked at Wells Fargo.

### ARGUMENT

Plaintiffs are entitled to attach Iran's blocked assets in partial satisfaction of their $1 billion Judgments. To do so, Plaintiffs must obtain a writ of execution from this Court in accordance with District of Columbia law, and must satisfy any applicable federal statutes as well. Fed. R. Civ. P. 69(a)(1) (the "procedure on execution [of a money judgment] . . . must accord with the procedure

---

[16] *Criminal Charges Filed Against Two Iranian Nationals for Violating Money Laundering & Sanctions Laws by Procuring Petroleum Tanker*, U.S. Dep't of Justice (May 1, 2020), https://www.justice.gov/opa/pr/criminal-charges-filed-against-two-iranian-nationals-violating-money-laundering-sanctions.

[17] *Treasury Designates IRGC-Qods Force Front Company and Owner*, *supra*, at n.15.

of the state where the court is located, but a federal statute governs to the extent it applies"). The requirements of D.C. law may be easily dispensed of: D.C. law enables a judgment creditor to reach the "personal property of a debtor held by a third party" by requesting "the court to issue a writ of attachment," as "[s]ervice of the writ on the garnishee creates a valid lien in favor of the judgment creditor." *Consumers United Ins. Co. v. Smith*, 644 A.2d 1328, 1351-52 (D.C. Cir. 1994) (citing D.C. Code §§ 16–542, 16–546). Therefore, in order to attach the assets under D.C. law, this Court must simply order the Marshal to serve a writ of attachment on Wells Fargo.

The assets are also attachable under the only two applicable federal statutes: the Foreign Sovereign Immunities Act and the Terrorism Risk Insurance Act. As further explained below, the FSIA is satisfied because the Iranian Funds are property of the Iranian state, used for commercial activity in the United States. Similarly, the assets are attachable under TRIA because they are blocked assets belonging to a foreign state sponsor of terrorism. Because the Iranian Funds are subject to execution under both the FSIA and TRIA, Plaintiffs are entitled to an order issuing a writ of attachment on the assets.

**I.    Under The FSIA, The Iranian Funds Are Subject To Attachment And Execution In Satisfaction Of The Judgments**

Since Plaintiffs' Judgments were issued under the terrorism exception of the FSIA, *see* 28 U.S.C. § 1605A, the FSIA authorizes them to attach "property in the United States" belonging to Iran that is "used for a commercial activity in the United States," *id.* § 1610(a). Plaintiffs may attach such property "regardless of whether the property is or was involved with the act upon which the claim is based," *see id.* § 1610(a)(7), so long as the requirements of 28 U.S.C. § 1610(c) are satisfied. All of these criteria are readily satisfied here.

A.    **The Iranian Funds Belong To The Government Of Iran**

*Taif Is Iran.*  The Iranian Funds belong to Iran because Taif is part of the government of Iran under the plain terms of the FSIA.  The FSIA provides that a "foreign state" includes a "political subdivision of a foreign state."  28 U.S.C. § 1603(a).  Because Taif is a front company for the IRGC-QF, and the IRGC is indisputably a political subdivision of Iran, it inexorably follows that Taif's property is the government of Iran's property.  *See, e.g.*, *Rimkus v. Islamic Republic of Iran*, 575 F. Supp. 2d 181, 194 (D.D.C. 2008) ("IRGC [is] considered to be a division of [the] state of Iran."); *see also Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 117 (D.D.C. 2005) (same); *see also supra* pp. 5-8.

*Alternatively, Taif Is An Alter Ego Of Iran.*  Even if Taif were not considered part of the Iranian state, the FSIA would nevertheless authorize execution on its assets because Taif is, at a minimum, an alter ego of the IRGC-QF.  Under the Supreme Court's seminal decision in *First National City Bank v. Banco Para El Comercio Exterior de Cuba* ("*Bancec*"), Taif could be afforded a presumption of separateness from the IRGC-QF if it were established as a "distinct and independent" governmental entity.  *See* 462 U.S. 611, 626-27 (1983) (holding governmental instrumentalities may be "established as juridical entities distinct and independent from their sovereign"); *see Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 849 (D.C. Cir. 2000) (holding independent instrumentalities are generally afforded a "presumption of separateness").  This presumption of separateness can be overcome, however, if (1) Taif is "so extensively controlled" by the government that a "relationship of principal and agent is created," or (2) where viewing Taif as a separate entity "would work fraud or injustice."  *Bancec*, 462 U.S. at 626-29 (quotation marks omitted); *Estate of Heiser v. Islamic Republic of Iran*, 885 F. Supp. 2d 429, 435 (D.D.C. 2012); *see also Transamerica Leasing, Inc.*, 200 F.3d at 848.  Both factors are satisfied here.

IRGC-QF Exercised Complete Control Over Taif.  To determine control, courts generally consider a list of nonexclusive "*Bancec* factors," including: (1) the level of economic control by the government; (2) whether the entity's profits go to the government; (3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs; (4) whether the government is the real beneficiary of the entity's conduct; and (5) whether adherence to separate entities would entitle the foreign state to benefits in United States courts while avoiding its obligations.  *See Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 823 (2018).  These factors are not intended to be a "formulaic test."  *Entes Indus. Plants, Constr. & Erection Contracting Co. v. Kyrgyz Republic*, No. 1:18-cv-2228, 2020 WL 1935554, at *3 (D.D.C. Apr. 22, 2020).  Applied here, the balance of these factors weighs in favor of finding that the IRGC-QF exercised extensive control over Taif, and therefore the two should be treated as one and the same.

By design, the relationship between Iran, the IRGC-QF, and Taif is shrouded in impenetrable opacity.  Nevertheless, based on currently available information, the second *Bancec* factor is easily met because Taif's sole economic purpose was to procure the Nautic for the government of Iran.  Taif is not an established maritime company with any history of revenue. Rather, the IRGC-QF designated its longtime associate, Dianat, who then retained Lajmiri, a well-known associate of NIOC, to quickly stand Taif up as a front company that would ostensibly comply with OFAC in order to avoid sanctions.  *See supra* pp. 8-9; *see also* Decl. Ex. 3; Gov't Aff. ¶ 47 (Lajmiri admitting that "he had to circumvent sanctions in order to purchase the Nautic"). And Taif's profits from the illicit transport of Iranian crude oil with the Nautic went straight to the government of Iran.

The third *Bancec* factor—the degree to which government officials have a hand in an entity's daily affairs—is similarly easily satisfied.  The most significant display of the IRGC-QF's

control over Taif came days after the Nautic was purchased when Taif ordered the Nautic to sail to Iran, where it was immediately loaded with Iranian crude oil.  Taif purchased the Nautic for IRGC-QF to use as its own, so that IRGC-QF could earn profits that would fund its "full range of nefarious activities," including terrorism.  *See* Decl. Ex. 2, Nautic Compl. ¶ 13.  Further, it is no coincidence that Dianat is involved—he "has supported IRGC-QF smuggling operations for several years," and the IRGC-QF "has relied on Dianat to secure entry for vessels carrying IRGC-QF shipments and has used his business connections to facilitate logistics requirements."[18]  IRGC-QF simply directed Dianat to leverage Taif on its behalf.  In light of this degree of control and the specific directives, the fourth *Bancec* factor—whether the government is the real beneficiary of Taif's conduct—also cannot be disputed.

Finally, the fifth factor plainly favors Plaintiffs.  Adhering to purportedly separate identities would enable Iran to transmit its assets through the U.S. financial system, all while evading its judgment debt to Plaintiffs and other victims of its terrorism and circumventing all other obligations under U.S. law.

Treating Taif As A Separate Entity Would Work Fraud Or Injustice.  Taif should also be considered part of Iran under *Bancec's* "fraud or injustice" exception to the presumption of separateness, which is designed to prevent foreign states from using front companies in schemes that circumvent the law.  As this Court has explained, "foreign sovereigns cannot 'avoid the requirements of international law simply by creating juridical entities whenever the need arises.'" *de Csepel v. Republic of Hungary*, No. 1:10-cv-1261, 2020 WL 2343405, at *10 (D.D.C. May 11, 2020) (quoting *Bancec*, 462 U.S. at 633).  Yet, that is precisely what IRGC-QF did here.  Indeed, reliance on "front companies," like Taif, to "broker associated contracts" to "obfuscate its

---

[18] *Treasury Designates IRGC-Qods Force Front Company and Owner*, *supra*, at n.15.

involvement in selling Iranian oil" is the IRGC-QF's *modus operandi* to circumvent U.S. sanctions and avoid its obligations under U.S. law.[19] This Court should reject the presumption of separateness in this instance, particularly because Iran's actions exploit that presumption to deny compensation to victims of its own heinous terrorist activities. Because a finding that Taif and IRGC-QF are separate entities would cause such injustice, Taif should be deemed an alter ego of Iran.

## B.    The Iranian Funds Are Used For Commercial Activity

Plaintiffs may execute upon Iran's property that is "used for a commercial activity in the United States," "regardless of whether the property is or was involved with the act upon which the claim is based." 28 U.S.C. § 1610(a)(7). The FSIA defines "commercial activity" to mean "either a regular course of commercial conduct or a particular commercial transaction or act." *Id.* § 1603(d). And the Supreme Court has held that "a foreign state engages in commercial activity" whenever "it acts 'in the manner of a private player within' the market." *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993) (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992)). Relevant here, the Supreme Court has explained that "a contract to buy army boots or even bullets is a 'commercial' activity, because private companies can similarly use sales contracts to acquire goods." *See Weltover*, 504 U.S. at 614-15.

The IRGC-QF, and thus the government of Iran, acted in the manner of a "private player within the market" when it used Taif to contract to buy the Nautic and when Taif was required to transmit payment through the United States. *See Weltover*, 504 U.S. at 614-15. Furthermore, through Taif, the IRGC-QF acted like a "private player" when it produced a performance guarantee and a memorandum of agreement warranting that the buyers were not under U.S. sanctions. *See*

---

[19] *Treasury Designates Vast Iranian Petroleum Shipping Network*, *supra*, at n.12.

*supra* p. 9.  But for the IRGC-QF's ability to stand up Taif so that it could purportedly comply with OFAC regulations, and thus transmit funds through the United States, IRGC-QF would not have been able to contract for the purchase of the Nautic.  *Cf. I.T. Consultants, Inc. v. Republic of Pakistan*, 351 F.3d 1184, 1186 (D.C. Cir. 2003) (holding "sovereign's failure to make a contractually required deposit in a bank in the United States" satisfies commercial activity exception).  This conduct demonstrates that the Iranian Funds now frozen at Wells Fargo were used for commercial activity in the United States.

### C.     Plaintiffs Have Satisfied The Requirements Of Section 1610(c)

This Court has already determined that Plaintiffs have met the notice and service requirements of Section 1610(c) of the FSIA, which restricts judgment enforcement actions against foreign states until the "court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required."  28 U.S.C. § 1610(c); *see also Owens* Dkt. No. 388, at 1; *Mwila* Dkt. No. 142, at 4; *Khaliq* Dkt. No. 87, at 1.  This determination should be accorded preclusive effect.  *See Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 798 F. Supp. 2d 260, 271 (D.D.C. 2011) (explaining the role of a prior determination under Section 1610(c) "so that the plaintiff may pursue specific attachments without worry over any lingering [Section] 1610(c) requirements").[20]  Since Plaintiffs have met the requirements of Section 1610(c), this Court may issue writs of execution as permitted under Section 1610(a) of the FSIA.

---

[20]  In any event, the evidence of Plaintiffs' service of the Judgments in 2014 and 2015 is incontrovertible, and it cannot be disputed that a "reasonable period of time has elapsed" since then.  *See, e.g.*, *Ned Chartering & Trading, Inc. v. Republic of Pakistan*, 130 F. Supp. 2d 64, 67 (D.D.C. 2001) (quotation marks omitted) (determining that six weeks of notice was reasonable under Section 1610).  Iran has now been on notice of all of the Judgments for more than six years, which is ample notice under any measure.

16

II.    **Under The TRIA, The Iranian Funds Are Subject To Attachment And Execution In Satisfaction Of The Judgments**

Plaintiffs are also entitled to a writ of attachment under the TRIA.  The TRIA provides that "[n]otwithstanding any other provision of law, . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based on an act of terrorism . . . the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment."  TRIA, Pub. L. No. 107-297, § 201(a) (2002) (codified at 28 U.S.C. § 1610).  In other words, Congress enacted the TRIA specifically for the purpose of allowing Plaintiffs and other victims of state-sponsored terrorism to execute upon blocked assets—just like the Iranian Funds— in order to satisfy precisely the types of judgments that Plaintiffs hold against Iran.

To attach property under the TRIA, a plaintiff must show "(1) that the [d]efendants are a 'terrorist party' or an 'agency or instrumentality of that terrorist party,'" and "(2) that the [d]efendants' properties are 'blocked assets.'"  *Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 131 (2d Cir. 2016), *abrogated on other grounds by Rubin*, 138 S. Ct. 816; *see also Peterson v. Islamic Republic of Iran*, 938 F. Supp. 2d 93, 96-97 (D.D.C. 2013).  Both of these elements are met.

***First***, Iran has been designated a state sponsor of terrorism by the Executive Branch and is therefore a "terrorist party" for purposes of the TRIA.  *See* TRIA § 201(d)(4); U.S. Dep't of State, Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran, 49 Fed. Reg. 2836 (Jan. 23, 1984).  Because the IRGC-QF is indisputably part of the government of Iran, and Taif is a front company for the IRGC-QF, Taif itself qualifies as a "terrorist party."  *See supra* pp. 5-8, 12-15.

Even if Taif does not qualify as the government of Iran, Taif qualifies as an agency or instrumentality of Iran for purposes of the TRIA. Because the terms "agency or instrumentality" are undefined under the TRIA, courts "construe these words according to their ordinary meanings." *Kirschenbaum*, 830 F.3d at 135; *see Stansell v. Revolutionary Armed Forces of Colombia*, 771 F.3d 713, 732 (11th Cir. 2014) (quotation marks omitted) (using "plain and ordinary meaning" of "agency" and "instrumentality" in the TRIA § 201). In *Kirschenbaum*, the Second Circuit reasoned that an entity may qualify as an agency or instrumentality of a terrorist party when that entity "(1) was a means through which a material function of the terrorist party is accomplished, (2) provided material services to, on behalf of, or in support of the terrorist party, *or* (3) was owned, controlled, or directed by the terrorist party." 830 F.3d at 135.

Under *Kirschenbaum's* sound reasoning, Taif is an agency and instrumentality of Iran. IRGC-QF used Taif as a means to accomplish "a material function of Iran": the transportation of oil for its state-owned oil company. But for using Taif as a front company to "broker associated contracts" and "obfuscate [IRGC-QF's] involvement in selling Iranian oil,"[21] IRGC-QF would not have been able to purchase the Nautic from Crystal Holdings, which explicitly required compliance with OFAC and U.S. sanctions. *See* Decl. Ex. 2, Nautic Compl. ¶¶ 25-26, 29-30. Furthermore, it cannot be disputed that Taif provided "material services to, on behalf of, or in support of" Iran—within days of receiving the vessel and notice of readiness, Taif directed the captain to Iran to transport oil for NIOC. *See id.* ¶¶ 42-45. And finally, nearly every known relevant fact allows only the conclusion that the IRGC-QF controlled Taif entirely. *See supra* pp. 13-14.

---

[21] *Treasury Designates Vast Iranian Petroleum Shipping Network*, *supra*, at n.12.

**Second**, the Iranian Funds are "blocked assets," and thus subject to attachment under TRIA. TRIA defines "blocked assets" as "any asset seized or frozen by the United States," TRIA § 201(d)(2)(A), with "reference to OFAC regulations." *Estate of Heiser v. Islamic Republic of Iran*, 807 F. Supp. 2d 9, 18 n.6 (D.D.C. 2011). While transmitting through Wells Fargo, the Iranian Funds were frozen in accordance with those regulations. Decl. Ex. 2, Nautic Compl. ¶ 38. When any Iranian asset enters the United States, it is required to be blocked. 31 C.F.R. § 560.211(a) ("All property and interests in property of the Government of Iran . . . that hereafter come within the United States . . . are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in."). Moreover, any property of Taif or Dianat in the United States or in the possession or control of U.S. persons is also blocked pursuant to Executive Order 13224.[22] Accordingly, the Iranian Funds—whether they are deemed to be owned by the government of Iran or Taif as an agency or instrumentality of Iran—are blocked assets subject to attachment for the TRIA.[23]

## CONCLUSION

The location of the Iranian Funds at Wells Fargo presents a potentially singular opportunity for Plaintiffs to secure a portion of their judgment from Iran, and issuance of a writ will forestall Iran's ability to again evade its obligations to those who have suffered from its unrelenting terrorist

---

[22] *Treasury Designates IRGC-Qods Force Front Company and Owner*, *supra*, at n.15.

[23] In its civil forfeiture complaint, the government also seeks $2,340,000 held by Crystal Holdings. To the extent those funds are in the United States, Plaintiffs are entitled to attach and execute upon them for the reasons described in this motion.

acts.  For these and the reasons set forth above, Plaintiffs respectfully request that this Court enter an Order:

(1) granting Plaintiffs' Motion;

(2) authorizing the Clerk of the Court to issue Plaintiffs' writ of attachment to Wells Fargo against the Iranian Funds in aid of Plaintiffs' execution of their Judgments against Iran; and

(3) directing the U.S. Marshals Service to serve Plaintiffs' writ of attachment—as signed, sealed, and issued by the Clerk of the Court—on Wells Fargo.

Dated: May 22, 2020                                    Respectfully submitted,


/s/ *Matthew D. McGill*
Matthew D. McGill (No. 481430)
Chantale Fiebig (No. 487671)
Suria M. Bahadue (*to be admitted pro hac*)
Crystal L. Weeks (No. 1617317)
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
Telephone:  202.955.8500
Facsimile:  202.530.9522
mmcgill@gibsondunn.com

Thomas Fortune Fay
Caragh Fay
Fay Law Group, P.A.
777 6th Street, N.W., Suite 410
Washington, D.C. 20001
(202) 589-1300

*Attorneys for Plaintiffs*

Jane Carol Norman
Bond & Norman Law, P.C.
777 6th Street, N.W., Suite 410
Washington, D.C. 20001
(202) 682-4100

*Co-Counsel for Plaintiffs Khaliq, et al.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 22nd day of May, 2020, I electronically filed and therefore caused the foregoing document to be served via the CM/ECF system in the United States District Court for the District of Columbia on all parties registered for CM/ECF in the above-captioned matter.  No service is required on Defendant Iran, which is in default for failing to appear.  *See* Fed. R. Civ. P. 5(a)(2).

Dated:  May 22, 2020                                          <u>/s/ *Matthew D. McGill*</u>
                                                                        Matthew D. McGill